# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| TRENT L. CHAPIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:06-CV-34-TS |
| | ) | |
| FORT-ROHR MOTORS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On April 20, 2007, a jury awarded Plaintiff Trent L. Chapin $100,000 in compensatory damages and $1,000,000 in punitive damages on his Title VII retaliation claim against Defendant Fort-Rohr Motors d/b/a Fort Wayne Toyota-Lexus (Fort Wayne Toyota). The Court reduced the total damages to $100,000 to comply with the statutory cap, 42 U.S.C. § 1981a, but denied the Defendant's motion for remittitur. Because 42 U.S.C. § 1981(b)(2) excludes back pay and other relief (including front pay) from compensatory damages under the statute, those issues remained outstanding even after the jury's award and the Court's reduction. On November 16, 2007, the Court conducted a damages hearing and set a briefing schedule.

The Plaintiff contends that the Court should award back pay, front pay, and prejudgment interest. The Defendant argues that back pay should be denied, or in the alternative significantly reduced, because the Plaintiff failed to exercise reasonable diligence to find other employment. The Defendant claims that the request for front pay is speculative and is not based upon any reasonable method of calculation. The Defendant also asks that the Court deny the Plaintiff's request for prejudgment interest.

**DISCUSSION**

Where a party has been harmed by an unlawful employment practice, Title VII allows a court to grant equitable relief, "which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay, . . . or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g). Such relief should make the injured party whole, *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418–19 (1975), by restoring them, so far as possible, to a position they would have enjoyed were it not for the employer's unlawful discrimination, *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1982).

Once a plaintiff establishes that his employment termination was the result of unlawful discrimination by the employer, "a presumption in favor of full relief arises." *Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989). The plaintiff has the initial burden to establish the amount of damages that he claims resulted from the employer's conduct. *Id.* The burden then shifts to the defendant to prove, as an affirmative defense, that the plaintiff failed to mitigate damages or that they were in fact less than the plaintiff asserts. *Id.*; *see also Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990); *Hanna v. Am. Motors Corp.*, 724 F.2d 1300, 1306–07 (7th Cir. 1984).

**A.   Back Pay**

The back pay period for victims of job discrimination typically begins on the date the economic loss starts and ends on the date of entry of judgment. The time period for back pay awards cannot begin more than two years before the Plaintiff filed his complaint with the EEOC. *See* 42 U.S.C. § 2000e-5(g) (back pay awards "shall not accrue from a date more than two years

prior to the filing of a charge with the Commission"). Back pay can be reduced by the victim's failure to mitigate damages. The victim must use reasonable diligence to seek substantially equivalent employment. The Defendant bears the burden of proving the Plaintiff's failure to mitigate by showing the plaintiff "failed to exercise reasonable diligence to mitigate his damages" and that "there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994).

Here, the Plaintiff stopped earning wages from the Defendant on February 28, 2005, which was the day that General Manager Larry Kruse told the Plaintiff to "reverse" his EEOC claim against Bob Rohrman if he wanted to work at the dealership. The Plaintiff did not work for the Defendant again after this date. The Defendant argues that because Kruse and others informed the Plaintiff after February 28 that he still had his job, but the Plaintiff chose not to return to work, that he has no back pay damages. But as the jury already found when it awarded the Plaintiff damages on his retaliation claim, the Plaintiff did not have a legitimate position with the Defendant after February 28, despite Kruse's assurances. As further evidence that the Plaintiff should not receive back pay, the Defendant points out that the Plaintiff did nothing to find a job for six to eight weeks after February 28. However, this was a relatively short period of time, and the mere fact that he found work later, in September 2005, is not proof that he would have obtained work earlier with additional efforts. The Defendant argues that Toyota's controller, Dan Schroeder, with over thirty years of experience in the automobile industry, "is certainly a credible witness who would know the 'pulse' of the local job market," (Def. Rebuttal 3, DE 85), and that his testimony that jobs were available in automotive sales meets the

3

Defendant's burden. But Schroeder testified regarding the availability of generic sales positions in the auto industry, as opposed to comparable management positions, and his testimony was directed only to summer 2005. He testified that there were "absolutely" sales positions opening and closing because of high turnover in the market, but he did not reveal how many of these positions were with companies that were not related to Bob Rohrman. (Hr'g Tr. 101–02.) His own interest in hiring individuals for sales was limited to Fort Wayne Toyota. The Defendants have not met their burden of establishing that there was a reasonable likelihood that the Plaintiff, with additional efforts, would have found comparable work earlier than September.

However, remaining mindful that "[t]he remedial purpose of Title VII is to place the victims 'where they would have been were it not for the unlawful discrimination,'" *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1045 (7th Cir. 1994) (quoting 118 Cong. Rec. 7168 (1972)); *see also McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992) (holding that the proper cutoff time for a damage assessment was the day when the sting of discriminatory conduct ended or should have ended), the Court finds that within two years after his termination the Plaintiff should have recovered from the wounds of the retaliatory discharge. The Court bases this on the Plaintiff's past job history, his performance at the Defendant's lot before his termination, and the performance of the lot after his termination.

It is unlikely that the Plaintiff would have remained as the manager of the budget lot for two years, even absent any discrimination. Even though the Plaintiff worked for the Defendant through the 1990's, he did so in several short stints, and moved around often, including moving outside of the county. Before being assigned as the manager of the budget lot, the Plaintiff was terminated from another of Bob Rohrman's dealerships, and the jury found that this was not an

4

unlawful termination. The Defendant contends that he was terminated for lack of leadership and performance. Although the Plaintiff was a successful salesperson when he was focused, he did not have long term stability and would decide to move after selling for a while in a location. This was consistent with the high turnover among sales personnel in the car business, in general, and it was also in keeping with the instability that existed in the Plaintiff's personal life. Further, the Plaintiff was earning less than $4000 per month (which would have amounted to just over $40,000 per year) at the budget lot, and he expected, based on his own testimony, to earn $80,000 to $140,000 per year. Thus, there is no reason to believe that the Plaintiff would have been satisfied at the budget lot long term. Moreover, the budget lot itself most likely would not have continued operating for more than two years. The budget lot did not have a manager for the two months immediately following the Defendant's departure. Even though this did not negatively impact the sales' numbers at the lot, it eventually closed in June 2005. The Plaintiff himself may have moved to a different position with the Defendant upon the lot's closing, but for the reasons stated above, his time with the Defendant in any capacity most likely would not have extended beyond two years.

Because the purpose of back pay is to make the Plaintiff whole, and not to provide a windfall, the Court finds that March 2007, shortly before trial, should mark the cutoff for back pay damages. It is not reasonable that the Plaintiff would have worked for the Defendant beyond this period of time, even absent the Defendant's discriminatory conduct.

The calculation of damages for the relevant period is the difference between the Plaintiff's actual earnings for the period and those which he would have earned absent the Defendant's retaliation. *Waters v. Wisc. Steel Workers of Int'l Harvester Co.*, 502 F.2d 1309,

1321 (7th Cir. 1974); 42 U.S.C. § 2000e-5(g) (providing that back pay is reduced by "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against"). There are various uncertainties in the calculation of the Plaintiff's back pay award. Generally, ambiguities about what an employee would have earned but for discriminatory conduct should be resolved against the employer. However, as it relates to lost sales earnings, which are inherently speculative, the Seventh Circuit has approved using the plaintiff's previous sales record and subsequent sales efforts to reach an estimated average earning amount. *See Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 918–19 (7th Cir. 1981) (finding no abuse of discretion in district court's use of an estimate of the plaintiff's sales earnings as opposed to the use of her successor's sales record).

The Plaintiff argues that he would have earned $80,000 to $140,000 per year as the manager at the Toyota budget used car lot. He contends that General Manager Larry Kruse told the Plaintiff that this would be his salary because he would be able to make the same amount that other Fort Wayne Toyota/Lexus used car managers earned. He also notes that Kruse guaranteed that he would earn $5000 minimum per month for the first three months of his employment as the budget used car lot manager.

A Pay Plan signed by the Plaintiff and Kruse sets forth a monthly base salary of $1500 with the potential for bonuses as follows: a 7% bonus on gross profit sales up to $50,000; a 7.5 % bonus on gross profit sales from $50,001 to $75,000, and; an 8% bonus on gross profit sales over $75,000. The gross profit sales at the budget lot for July, August, and September 2004 did not warrant a bonus under the Pay Plan that would bring the $1500 salary up to $5000. However, to fulfill Kruse's guarantee to the Plaintiff that he would receive at least $5000 per month for the

6

first three months as the manager of the budget lot, the Defendant in fact paid the Plaintiff $5000 for each of these three months by subsidizing his commission earnings to reach the guaranteed minimum $5000 per-month salary. After the first three months the Plaintiff still received the $1500 base salary plus a bonus as set forth in the Pay Plan, but the Defendant did not continue to subsidize the Plaintiff's salary to reach $5000. With his commissions being paid one month in arrears, the Plaintiff earned the following from October 2004 to February 2005: October–$4265.80; November–$4198.83; December–$3912.72; January–$2186.82; February–$4052.90. The Plaintiff's February commissions, $2667.11, were paid in March. The Plaintiff's average monthly salary for the nine months that he served as the manager of the used car budget lot (including June) was $3457.22. The Plaintiff also received medical and dental benefits and the use of a car for a charge of $125 per month.

The Plaintiff makes two different back pay calculations in his briefing: one based upon earnings of $5000 from July 2004 to January 2005; and a second, larger, calculation based upon Kruse's representation that he would earn at least $80,000 per year.

Neither of the Plaintiff's predicted earnings are supported by the record. The $80,000 per year estimate is far too speculative to support an award of back pay. There is no contract or other documents referencing an understanding that the Plaintiff would earn this level of pay. The only document pertaining to any agreement regarding pay was the Pay Plan that set forth the $1500 per month salary plus a bonus that was tied to gross profit sales. Kruse testified that he never anticipated that the manager of the used car budget lot would earn income comparable to the other used car managers, who sold higher-end cars at larger lots. In fact, the commission incentives in the Pay Plan were set more aggressively than for any other sales manager within

7

the organization because the budget lost was a smaller, independent location, and it was expected that it would take more work and a larger incentive to make it profitable. The actual sales at the budget lot, as compared to other lots, support the conclusion that a manager's income that was to be based largely on the profit of a lot's sales would be less at the budget satellite store than at the Defendant's other lots. Even if it were appropriate to rely on more than these historical numbers, the Plaintiff has not attempted to demonstrate what a realistic salary would be through other managers' subsequent earnings, gross profit sales for used budget cars, or any other means.

The Court will use the actual sales data from the Plaintiff's nine months of managing the budget lot to determine the lost wages impact that the Defendant's retaliation had on the Plaintiff. Although the Plaintiff testified that it generally takes two years to develop a good clientele (and thus his salary would have arguably increased the longer he held the position), the actual performance of the store itself does not warrant a finding that the Plaintiff's average earnings would have increased from the $3457 he averaged during the nine months he served as the lot's manager. As to the $5000 guarantee, it expired after the first three months. The Plaintiff's average earnings of $3457 multiplied by 24 months totals $82,968.

The Plaintiff argues that medical and dental insurance should be included in his back pay because he has not enjoyed these fringe benefits with any other employer. But to recover for lost insurance coverage, a plaintiff must show that he either incurred expenses in securing alternative insurance coverage or incurred medical expenses that would have been covered under the employer's insurance program. *Kossman v. Calumet County*, 800 F.2d 697, 703–04 (7th Cir. 1986), *overruled on other grounds, Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir. 1988).The Plaintiff has not made either showing. The Plaintiff also notes that he was allowed to

8

drive one of the Defendant's vehicles as a fringe benefit. But much like the medical benefits, he has not submitted any evidence of the additional expense that he incurred for a car that would have been paid by the Defendant. Accordingly, the Court will not include the undefined fringe benefit amounts in the calculation of the Plaintiff's back pay award.

During the twenty-four month period from March 2005 to March 2007, the Plaintiff actually earned $28,658.76 ($9,141.01 from Auto Liquidators; $7,165 from Yukon Truck & Trailer; $12,352.75 from Aable Auto), as determined by the credible evidence presented at the evidentiary hearing.[1] Subtracting this amount from what the Defendant would have earned yields $54,309.24 in back pay.

**B.      Front Pay**

"[F]ront pay is designed to compensate discrimination victims for the reasonable time it would take to find comparable employment elsewhere." *Shick v. Ill. Dept. of Human Servs.*, 307 F.3d 605, 614 (7th Cir. 2002) (citing *Williams v. Pharmacia*, 137 F.3d 944, 951 (7th Cir. 1998)). It is an equitable substitute for reinstatement. *Ward v. Tipton County Sheriff Dept.*, 937 F. Supp. 791, 796 (S.D. Ind. 1996).[2] An award must be grounded in available facts, acceptable to a reasonable person, and not highly speculative. *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994). It cannot be based simply on a plaintiff's own stated intentions with regard

---

[1] The Court declines to subtract unemployment benefits as part of the Plaintiff's interim earnings. *See EEOC v. O' Grady*, 857 F.2d 383, 390 (7th Cir. 1988); *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1429 (7th Cir. 1986); *EEOC v. Corinth, Inc.*, 824 F. Supp. 1302, 1311 (N.D. Ind. 1993) (declining to deduct unemployment benefits from award of backpay while noting the plaintiff's obligation to return to the State any money she received in benefits from the State).

[2] The parties in this case do not propose reinstatement as an appropriate remedy.

to how long he would have worked. *Pierce v. Atchinson*, *Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 274 (7th Cir. 1995). To prove the proper amount of front pay, a plaintiff is expected to provide the court with data as to the length of time he would have worked for the defendant and the amount of money he would have made in that period. *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992).

Here, the same factors that support a March 2007 cutoff date for back pay make any award of front pay inapplicable.

**C.     Prejudgment Interest**

Even though Title VII does not specifically mention the award of prejudgment interest, the Supreme Court has said that prejudgment interest is a normal incident of back pay awards in Title VII cases. *Loeffler v. Frank*, 486 U.S. 549, 558 (1988); *see also Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1046 (7th Cir. 1994) ("Prejudgment interest is an element of complete compensation and a normal incident of relief under Title VII"). Prejudgment interest on back pay award compensates a plaintiff for the loss of the use of the money. *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1144 (7th Cir. 1994). The Seventh Circuit has, by its own admission, "issued conflicting pronouncements on whether prejudgment interest is required or discretionary." *Hutchison*, 42 F.3d at 1046 (citing *City of Chi. v. United States Dept. of Labor*, 753 F.2d 606, 608 (7th Cir. 1985) and *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 411 (7th Cir. 1989)). However, in *Gorenstein Enters. v. Quality Care-USA*, the court stated that it was time "to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violation." 874 F.2d 431, 436 (7th Cir. 1989)

(cited in *Hutchison*, 42 F.3d at 1046).[3]

The presumption in favor of prejudgment interest has not been refuted. The Court has ascertained the Plaintiff's damages at $54,309.24. However, because he was not deprived of the use of the monies he received as unemployment benefits, he is only entitled to prejudgment interest on $36,901.99 ($54,309.24 - $17,407.25 in unemployment benefits). The Plaintiff requests that Court use the relevant average Treasury bill rate to calculate interest. Because the Defendant argues that no prejudgment interest should be awarded, it does not suggest a rate. The Seventh Circuit has suggested that district courts use the prime rate for calculating prejudgment interest where there is no statutory interest rate. *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 820 (7th Cir. 2002) (citing *Gorenstein*, 874 F.2d at 437). That federal prime rate is 3.25% (as of 1-9-09)

Therefore, the Plaintiff is entitled to $1199.31in prejudgment interest to make him whole. Adding the interest to the back pay award totals $55,508.55.

## CONCLUSION

For the foregoing reasons, the Clerk is directed to enter judgment in favor of the Plaintiff and against the Defendant in the amount of $155,508.55. This amount represents $100,000 awarded by the jury and reduced to the statutory cap by the Court, and back pay and prejudgment interest as calculated in this Opinion and Order.

---

[3] In their briefs, the parties rely on a pre-*Gorenstein* district court case to argue whether the Court should exercise its discretion to award prejudgment interest.

SO ORDERED on January 13, 2009.

                                       s/ Theresa L. Springmann
                                      THERESA L. SPRINGMANN
                                      UNITED STATES DISTRICT COURT