IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

TRENT L. CHAPIN,                          )
                                          )
            Plaintiff,                    )
                                          )  CIVIL
vs.                                       )  CAUSE NO:
                                          )  1:06-CV-34
MID-STATES MOTORS, INC.,                  )
            Defendant.                    )  VOLUME I of I
-------------------------------------

TRANSCRIPT OF TRIAL PROCEEDINGS HELD
APRIL 17, 2007, BEFORE THE
HONORABLE THERESA L. SPRINGMANN, UNITED STATES
DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:        ROBERT VEGELER,ESQ.
                          110 West Berry Street
                          Fort Wayne, In  46802

FOR THE DEFENDANT         JAMES BUCHHOLZ, ESQ.
                          1400 One Summit Square
                          Fort Wayne, IN  46802


OFFICIAL COURT REPORTER:  TINA M. GALLUCCI,
                          RMR, CRR, FCRR
                          U.S. DISTRICT REPORTER
                          1300 S. HARRISON STREET
                          SUITE 2105
                          FORT WAYNE, IN  46802
                          (260) 423-3060


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1

2                               <u>INDEX</u>

3

4        VOIR DIRE ..............................  Page   22

5        VOIR DIRE by the Plaintiff..............  Page   53

6        VOIR DIRE by the Defense................  Page   64

7        PRELIMINARY JURY INSTRUCTIONS...........  Page  121

8        OPENING STATEMENT by the Government......  Page  127

9        OPENING STATEMENT by the Defense.........  Page  136

10

11

12                             <u>WITNESSES</u>

13

14       TRENT L. CHAPIN -
                 Direct Examination.............  Page   170
15

16

17                           *    *    *

18

19

20

21

22

23

24

25

1    (Whereupon, the following proceedings were held on April

2    17, 2007; the parties appearing in person and with their

3    counsel:)

4         **THE CLERK:**  All rise.

5         **THE COURT:**  Go ahead and be seated, please, and good

6    morning.

7    We're on the record this morning in the case of Trent

8    Chapin against Mid-States Motors Incorporated and Fort-Rohr

9    Motors, Incorporated, under cause 1:06-cv-34.  This matter is

10   scheduled today to begin a 3 to 4-day jury trial.

11   For the record, the plaintiff, Mr. Chapin, is present in

12   the courtroom in person, and also by his attorney, Attorney

13   Robert Vegeler.

14   The defendants are being represented by Attorney James

15   Buchholz.  And Mr. Buchholz, could you advise on the

16   representatives who are seated with you.

17        **MR. JAMES BUCHHOLZ:**  This is Larry Kruse.  He's the

18   representative from Fort-Rohr, also known as Fort Wayne

19   Toyota.  And this is Bill Gardner (phonetic) from Mid-States.

20   To make it easier for the jury during this case, I'm going

21   to be utilizing the product names Fort Wayne Acura, Fort Wayne

22   Toyota as the opposed to the legal names, because I think it

23   will be confusing.  Is that all right with, Your Honor?

24        **THE COURT:**  That's fine.  Counsel, I've been advised

25   the jurors have gone through their orientation this morning

1    and are ready to be called into the court.  But before we

2    begin the voir dire process, I just want to go through a few

3    items with you regarding a few of the procedures we have in

4    place, most of which I think I previously discussed with you.

5    One, maybe not, and I want to take that up this morning.

6        First, as you know, during the voir dire, the Court will

7    conduct an initial general voir dire just to advise the jury

8    on the length of the trial, and to determine generally, their

9    availability for participating as jurors, and also to

10   generally find out if there's any conflicts any of them have

11   to be able to sit as a juror in this case.  And then I turn

12   the selection process over to you.

13       As part of the voir dire process, you have the right to

14   present the jurors with a preliminary statement of your case.

15   That is, you can generally advise the jury what the issues are

16   as regards your client, what issues may come up, what evidence

17   may come up, everything that might be relevant to you to then

18   being able to ask relevant voir dire questions to make sure

19   none of them are unavailable for the parties, and so on.  And

20   I leave the bulk of the voir dire to you to do exactly that.

21       And again, it's not your opening statement necessarily,

22   but, in fact, it's a more condensed version of that to let

23   them know what the background of the case is.  Because when I

24   describe the case to them, I'm just going to generally say

25   this is an employment discrimination case brought up under

1    Title 7 where the plaintiff claims that he was discriminated

2    and retaliated against based on his race and national origin,

3    and it occurred sometime between March of '04 and February of

4    '05.  So that's all they hear from me.  And you'll be given an

5    opportunity to fill in the blanks on it.

6        Now, we had previously talked about choosing eight jurors

7    and that's what we're going to do.  And we stipulated, the

8    Court received a stipulation to a minimum of six persons for

9    unanimous verdict, all right?  But all eight make it through

10   the entire trial process and then you've got the jury of

11   eight.

12       I trust you've already gotten the jury questionnaires and

13   the readout of the order in which the jurors are going to be

14   called into the jury box.  Did you receive that for your

15   client, Mr. Vegeler?

16           **MR. ROBERT VEGELER:**  Yes, Your Honor.

17           **THE COURT:**  Okay.  Mr. Buchholz.

18           **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

19           **THE COURT:**  All right.  So you know, juror number one

20   is going to be put in the front row closest to the Court.

21   Then it's 1 through 6 and then 7 through 14.  And then what we

22   do, we load the box.  You'll conduct most of your voir dire to

23   the 14.  I preliminarily tell the folks that are in the back

24   of the courtroom waiting to be called in to listen carefully

25   to the questions, and in the event they are called to fill in,

1    then to advise the Court whether they would have answered any

2    of the questions in the affirmative and then we pick up the

3    voir dire from that.

4        Again, it's -- you'll be going back and forth on the voir

5    dire, and then I'll ask you to approach the bench.  And we

6    have a side bar mic here.  During the side bars, my deputy

7    will put -- what's called by the IT folks -- as white noise

8    into the jury box, which is just static which prevents the

9    folks in the jury box from hearing the side bar up here at the

10   bench.  And at the side bar, you'll present me with your

11   challenges for cause.  I'll ask each side, always starting

12   with plaintiff, going to defendant, for any challenges for

13   cause, and then your peremptory challenges first.  The

14   plaintiff's first, then the defendant's first and back and

15   forth until you exhaust your three peremptories each.

16       Now, let's see.  As I had previously told you, I instruct

17   the jury once they're selected that they do have a right to

18   take notes during the trial.  I think that is helpful to them.

19       Secondly, at the conclusion of the trial, after the

20   verdict has been returned, where I sense it's appropriate in

21   these civil cases, I've invited the jury to stay afterwards.

22   And with the agreement of counsel, we go off the record and

23   have a stipulation that none of the juror's comments with

24   regard to the case would be the basis for any appeal.  But we

25   allow the jury to comment with regard to how they reach the

1    verdict that they did in the case and then I give counsel an

2    opportunity to give them questions.  And then the Court kind

3    of breaks the ice at that point by asking them questions.

4         I find the jurors appreciate being given the opportunity

5    finally to voice their views of the presentation of the

6    evidence.  My experience has been very positive in letting the

7    jurors do this.  And I know it's something we used to do in

8    state court.  The jurors are usually very, very observant,

9    very concise about their comments.  I've never seen any of

10   them say anything that's personal or derogatory or anything

11   like that.  They really appreciate the positiveness in being

12   able to as citizens to partake in the jury trial process and

13   be able to articulate their reasonings afterwards in a very

14   non-threatening environment.

15        I'm not sure I talked to you about this before, but I'm

16   going to implement it in this case because I think it may be

17   appropriate.  And that is, giving the jurors the opportunity

18   to ask questions of the witnesses.  Now the way the ABA has

19   recommended this be done and the way the Seventh Circuit

20   American Jury Project has recommended it be done -- and I'll

21   give them a preliminary instruction on this and so you know

22   what I do -- is I advise them that after each witness has

23   testified, they'll be given the opportunity to ask a witness a

24   question.  The way they have to do is to write down a question

25   and submit it to the Court.  The Court will review it, ask

1    counsel to come up here to a side bar.  We look at it, make

2    sure it's appropriate under the rules of evidence, that it's

3    appropriately worded.  The Court may modify the form of the

4    wording, if it's otherwise appropriate to ask and I can ask

5    that witness the question.  It's not usually identified which

6    juror is asking it specifically.

7        They're given an instruction that they are to consider the

8    answer to the question in the same way as they would take any

9    other evidence or to consider any other evidence presented in

10   the case.  So that's the process.  Very often, there's no

11   questions for witnesses, sometimes there's one or two.  But at

12   the end of the day, what I've again found is that the jurors

13   appreciate being given the opportunity to ask those questions.

14   Again it empowers them to be a part of this process.  So I

15   bring that to your attention.  But again, you're full

16   participants in the process.

17       Any questions on how that will work?

18           **MR. ROBERT VEGELER:**  None, Your Honor.

19           **THE COURT:**  Mr. Vegeler, Mr. Buchholz?

20           **MR. JAMES BUCHHOLZ:**  No, Your Honor.

21           **THE COURT:**  All right.  The Court had previously

22   ruled on all the Motions in Limine. The only issue that was

23   left open -- let me ask -- I had given counsel an opportunity

24   to work out, perhaps in a stipulation or an agreement, as to

25   what, if any, evidence may come in with regard to the

 1    plaintiff's background.  Has that been worked out, Mr.

 2    Vegeler?  Go ahead, Mr. Buchholz.  I think it was the subject

 3    of one of the plaintiff's Motions in Limine.

 4         **MR. JAMES BUCHHOLZ:**  Right, Your Honor.  The issue is

 5    whether there was any felony convictions --

 6         **THE COURT:**  Correct.

 7         **MR. JAMES BUCHHOLZ:**  -- within the last ten years and

 8    I've indicated to Mr. Vegeler that I don't have any felony

 9    convictions within the last ten years that I can present.  So

10    based upon what I said to the Court earlier about that issue,

11    we don't have an objection to that motion as written.

12         I did want to address and confirm with Mr. Vegeler, and I

13    talked about relating to Mr. Holm, and also with respect to

14    the motion relating to Glenn Richards to Your Honor, so that

15    you are aware of what it is our discussions had been.

16         **THE COURT:**  All right.  Go ahead.

17         **MR. JAMES BUCHHOLZ:**  Mr. Holm, you might recall,

18    created transcriptions of two different conversations off of

19    an audio tape.  And you might remember, Your Honor, that I had

20    some concerns associated with the transcriptions.

21         **THE COURT:**  Right.

22         **MR. JAMES BUCHHOLZ:**  We've come to an agreement

23    associated with allowing one of Mr. Holm's transcripts to be

24    used, the first one and then a supplement that I provided Mr.

25    Vegeler today to be used as an aid to the jury.  It's my

1  understanding and my position that those transcriptions should

2  not go to the jury as exhibits, but only as an aid to the

3  listening to the tape.

4      And as a result of that, it's my understanding that we're

5  not going to be calling Mr. Holm, is that right?

6      **MR. ROBERT VEGELER:**  Yes, Your Honor.  That's subject

7  to us reaching -- no matter which way it goes, we're amenable

8  to using the -- Mr. Buchholz' transcription.  It's just a

9  matter of whether it's one entry that makes it in or stays

10  out.  So that would eliminate in having Mr. Holm and delaying

11  any proceedings there.  And I would agree with Mr. Buchholz,

12  it's been my experience that the recording -- the statements,

13  the written statements only meant to help the jurors and

14  somehow instructions, whatever, given to clarify that.

15      **THE COURT:**  Yeah, I've got a stock instruction that

16  just advises them that the transcript is just as an aid, it's

17  not the evidence.

18      Go ahead.

19      **MR. JAMES BUCHHOLZ:**  The only issue he talked about

20  within the transcription is part of the second communication,

21  the second transcription.  There's a discussion associated

22  with Mr. Richards' situation at Fort Wayne Acura, and his

23  separation from Fort Wayne Acura.  That separation occurred

24  nearly nine months after Mr. Chapin left.  And it was my

25  position, I think Mr. Vegeler agreed, that information about

1   that claim and that suit is not relevant to this one.  And so

2   part of the tape that has that information on it, at least in

3   terms of the transcription, we've left a blank line.  We'll

4   have to deal with it as it comes up on the tape, but that's my

5   understanding how that's going to work.

6          **THE COURT:**  Excuse me.  Go ahead.  Anything else?

7   And you can advise the jury as you present this, if it's

8   appropriate, that there's a blank line -- irrelevant material

9   was.

10         **MR. JAMES BUCHHOLZ:**  Yeah, I think he's going to need

11  to advance the tape at that point.

12         **MR. ROBERT VEGELER:**  If the Court rules that way,

13  we'll certainly put an immediate pause in advance. The issue,

14  though, is it doesn't mention anything in this about a Glenn

15  Richards lawsuit or Glenn Richards discrimination claim.

16      One of Mr. Chapin's points is that the Pakistani Muslim

17  people that were brought in that were unqualified and the

18  point of this transcription portion of this tape, and

19  discussion between Mr. Chapin and Mr. Kruse is you took this

20  gentleman, and you replaced a twenty-year veteran with

21  somebody who had had no experience.

22      Now, that, I think, doesn't mention a lawsuit or anything,

23  just relevant to what was going on in the mix.

24         **MR. JAMES BUCHHOLZ:**  Well, Judge, Mr. Chapin's

25  separation was in April of 2004.  Mr. Richards' separation was

1    in January of 2005.  It stretches, Judge, that there would be

2    any kind of connection between Mr. Chapin's claims of

3    separation and a separation that occurs eight or nine months

4    later.  And I mean, if we want to get into the discussion

5    associated -- Mr. Richards has filed his claim.  He will have

6    the opportunity to bring those issues up.  I don't want to be

7    trying three cases in this case.  It seems to me that Mr.

8    Chapin's claim rises and fall with the employment situation as

9    he encountered it at the dealership during the time he was

10   there.  And that something that happens eight or nine or ten

11   months later really is of no moment (phonetic) to his

12   allegations of discrimination eight or nine or ten months

13   earlier.  And that's my -- that's my position as associated

14   with that.  It's just not relevant as it relates to his

15   claims.

16            **THE COURT:**  Remind me, is Richards testifying in

17   person?

18            **MR. JAMES BUCHHOLZ:**  Yes.

19            **MR. ROBERT VEGELER:**  Yes.

20            **THE COURT:**  Is he coming in today?

21            **MR. ROBERT VEGELER:**  Yes.

22            **THE COURT:**  This morning.

23            **MR. ROBERT VEGELER:**  I don't think we'll get through

24   with Mr. Chapin so I've ordered him to show up at one or 1:30.

25            **THE COURT:**  I may get to that issue this afternoon,

1    then, so insofar as what will be coming in on him.  I'm

2    concerned whether or not -- I understand your argument, Mr.

3    Buchholz.  I just need to determine whether or not, plaintiff

4    being able to talk about Richards' situation might be evidence

5    of some kind of pattern.  And whether or not it happened

6    before Chapin leaving the employment or Richards or

7    afterwards, I'm not sure that's necessarily relevant.  So let

8    me think that through and we'll decide before Richards takes

9    the stand and we'll just caution that during the voir dire and

10   opening statements, don't get into that necessarily.

11        **MR. JAMES BUCHHOLZ:**  That's fine, Your Honor.  I

12   guess my point is or my thought is if we're going to be

13   dealing with management changes and the separation of

14   employees and the hiring of employees on a wide variety of

15   levels, you know, where do we stop?  Do we stop in 2007?  Do

16   we stop in 2006?  Where do we stop in terms of the relevant

17   inquiry is as it relates to separations and putting people in

18   place?

19        **THE COURT:**  I understand what you're saying so far as

20   I'm hearing.

21        **MR. JAMES BUCHHOLZ:**  I --

22        **THE COURT:**  The only evidence that would be offered

23   in is with regard to Richards within eight or nine months of

24   Chapin being out of the scene, right?  I mean there's no other

25   comparative other than Mr. Richards, is that true, Mr.

1    Vegeler?

2         **MR. ROBERT VEGELER:**  There were three people who were

3    replaced by Pakistani Muslims.

4         **THE COURT:**  Chapin, Richards and who was the third?

5         **MR. ROBERT VEGELER:**  Kurt Richards?

6         **PLAINTIFF TRENT CHAPIN:**  (Nodding.)

7         **MR. ROBERT VEGELER:**  Kurt Richards.  And it wouldn't

8    be in the tape, Your Honor, March 4th of 2005, unless it

9    already happened.  So it's between the start of the events

10   that are relevant here and the second tape.

11        **THE COURT:**  All right.  So give it to me again.

12   Chapin, Kurt Richards and Glenn Richards.  There's two

13   Richards?

14        **MR. JAMES BUCHHOLZ:**  They're not related in any form,

15   Judge.  But Glenn Richards was a participant in the separation

16   of Mr. Chapin.  He certainly has things he can talk about with

17   respect to that.  But again, if we're going to get into

18   Richards, what happens if the next guy that comes in isn't a

19   Pakistani Muslim.  What about the next guy after that?  I

20   mean, where do we stop and that's my concern.  How far do we

21   need to go?  And if I need to bring additional people in to

22   talk about those things, I need to know that.

23        **MR. ROBERT VEGELER:**  Well, I'll represent to the

24   Court the even people we're going to be talking about are the

25   three Pakistani Muslims, Glenn Richards, Kurt Richards and

1    Trent Chapin.  I don't know any other testimony is going to be

2    developed.

3           **THE COURT:**  And this issue comes up quite often in

4    these kinds of cases.  The Court has to hear the evidence that

5    precedes it, anticipate the evidence that's coming in and see

6    how it fits in the context of the evidence overall.  I don't

7    want to have three different cases tried in one, because

8    that's certainly not fair to the defendants.  And it's

9    probably -- it's going to end up being confusing to the jury.

10        On the other hand, to the extent some of that evidence of

11   other individuals, treatment or handling by the employer might

12   be relevant to the plaintiff's claim to establish some kind of

13   pattern, then the Court has to be open to possibly allowing

14   some of that in.  So let me hear what -- how this is going to

15   set up, and we'll get to the issue.  We're not going to hear

16   from either of the Richards until this afternoon, and I would

17   just caution if Mr. Chapin is going to be called to the stand

18   beforehand.

19          **MR. ROBERT VEGELER:**  Yes.  Yes.

20          **THE COURT:**  Let's see where we're at at that point.

21   Again, let's get a ruling before you bring in that testimony,

22   ask for a side bar or hearing outside of the jury, we'll see

23   where we're at at that point.  You know, the plaintiff can

24   always be recalled to present that testimony if it's going to

25   be offered in.  So that's how we'll go at that.

1          All right?  Let me just mention a couple other things

2     before we bring the jury in.  I don't mean to preempt you.

3     Let me just mention before I forget not to, or before I forget

4     to.

5          Please use the well of the court for your purposes.

6     You're free to move the podium.  You're free to arrange things

7     however you want, easels.  I see you've got some sound

8     equipment, all of that.  The well of the court is yours.  All

9     right?  You don't need to ask the Court for permission to

10    approach the witness stand, all right, just do it.  The only

11    separation I would ask for is to stay -- don't put things up

12    on the bar in front of that jury box and don't crowd into the

13    jurors' space, because that makes them nervous.

14         So anything that's supposed to be handed into the jury, if

15    you've got copies of the documents if you want to pass through

16    an exhibit, my deputy will take it from you, and pass it

17    through the jury so you don't have to worry about doing that.

18    And you can continue the examination while it's being done.

19         **MR. JAMES BUCHHOLZ:**  So you allow exhibits to go to

20    the jury as opposed to using the video screen?

21         **THE COURT:**  Yeah, the video screen is an option.  If

22    you want to use a black board, that's fine.  It's

23    presentation.  However you want to.  I just wanted to mention

24    that.

25         All right.  Was there anything else to follow up on the

1    Richards issue or anything else?

2         **MR. JAMES BUCHHOLZ:**  There is another issue, Judge.

3    You might remember there was a witness we served.

4         **THE COURT:**  Right.

5         **MR. JAMES BUCHHOLZ:**  And we were in communication

6    with that witness last Wednesday.  That witness indicated that

7    she had willingness to come in, that she would communicate

8    with her employer.  I called her on Thursday and the number

9    that I called her previously on was disconnected.  The

10   employer has indicated that they don't have any responsibility

11   to contact her in any fashion.  She has been served with a

12   Federal Court subpoena, and we'd ask a bench warrant be issued

13   for her, because she is somebody we want to call and testify

14   in the case.  To the extent we can determine where she is,

15   we'd like the power of the Court to try to bring her here.

16        **THE COURT:**  When was she subpoenaed; what date and

17   time?

18        **MR. JAMES BUCHHOLZ:**  She was subpoenaed to be here

19   this morning, Judge.  With the indication that we'll have some

20   communication with you to make it easiest on your calendar and

21   your schedule so you won't have to be sitting through the

22   whole thing.

23        And then when we attempted to communicate with her

24   thereafter, I indicated or we had a initial communication

25   where we said those same things, we gave the subpoena that

1    said the same things.  If you would like the affidavit from

2    the person who served her, I would be happy to provide it to

3    you.

4         **THE COURT:**  Let's make the record on her.  Did you

5    subpoena her to be here at 9:00 o'clock?

6         **MR. JAMES BUCHHOLZ:**  I did.

7         **THE COURT:**  Perhaps what we should do.  Again, I

8    don't like to keep the jury waiting for any reason if we can

9    avoid it, is let's go ahead and pick our jury, I'll let you

10   make your record that you did serve or serve -- this witness

11   is this Helgoe?

12        **MR. JAMES BUCHHOLZ:**  Yes.

13        **THE COURT:**  Helgoe, that she was served, the proper

14   fee for her appearance and/or mileage was provided at the time

15   of service, and that she failed to appear as subpoenaed.  Was

16   that for 9:00 o'clock?

17        **MR. JAMES BUCHHOLZ:**  9:00 o'clock this morning, Your

18   Honor.

19        **THE COURT:**  All right.  It's five to 9:00 right now.

20   Let's wait a little bit before it's effectuated, so we'll take

21   that up at the break after we select the jury.  Why don't we

22   do that and that's appropriate.

23        So you know, too, after we've selected the jury and

24   everybody's excused, we'll take about a 10 or 15-minute break

25   before we resume with opening statements.  All right.  So

1   maybe we'll handle it during that time.  Mr. Vegeler.

2          **MR. ROBERT VEGELER:**  There are some issues that were

3   developed, Your Honor, documents have been exchanged and --

4   and if we can avoid that during voir dire, then we can discuss

5   it after the break.  And it has to do with kind of a

6   404(b)-type analysis, having to do with lawsuits, civil

7   lawsuits as old as 1992 involving Mr. Chapin, which I'd rather

8   not bring it up in voir dire until we can discuss it.

9          **MR. JAMES BUCHHOLZ:**  Your Honor, I was not intending

10  to speak about any of those issues in voir dire.

11         **THE COURT:**  Okay.  Sounds like an agreement.

12  Anything else?

13         **MR. ROBERT VEGELER:**  No, Your Honor.

14         **THE COURT:**  Anything else, Mr. Buchholz?

15         **MR. JAMES BUCHHOLZ:**  Not at this point, Judge.

16         **THE COURT:**  Just again, with regard to the Helgoe

17  issue, just be prepared at the next break after the jury's

18  been selected to present to me the evidence that you have as

19  to the subpoena, the service for last known address and so on

20  so the bench warrant issue.  It's subject to the availability

21  of me having Marshals in the house today to be able to send

22  them out.  We're short-handed by two men, two Marshals.

23         **MR. JAMES BUCHHOLZ:**  I'm not sure that she's in the

24  State of Indiana at this point, Judge, honestly.  But

25  certainly we'll be happy to work with your people in any

1   fashion we can.

2         **MR. ROBERT VEGELER:**  Your Honor, she's -- she's an

3   over-the-road truck driver and she could be in California or

4   Texas or Alaska.  I don't know, maybe Mr. Buchholz has better

5   information than I've got.

6         **THE COURT:**  Maybe she is.  But if she was properly

7   served with a subpoena, then it was incumbent upon her to

8   notify the Court in various methods available under the rules

9   to indicate that she would not be able to appear to seek some

10  kind of extension or continuance by the Court.  I mean, just

11  the mere fact she's an over-the-road driver doesn't excuse --

12        **MR. ROBERT VEGELER:**  Well, I thought that might help,

13  not sending somebody out in Fort Wayne in a car.

14        **THE COURT:**  Yeah.  You know, I'll pass that onto the

15  Marshals.  I understand what you're saying.  I'm

16  anticipating that -- I'm trying to foresee where the defense

17  might be going with this.  Are you anticipating being able to

18  present to the jury sometime she was a witness who had been

19  subpoenaed who failed to appear and then somehow her failure

20  to appear --

21        **MR. JAMES BUCHHOLZ:**  Yes.

22        **THE COURT:**  -- should be considered against the

23  plaintiff's interests?

24        **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

25        **THE COURT:**  All right.  Just so I see where

1   everything is going.  All right.

2       Now, one other thing, my deputy or my court reporter is

3   signaling here.  If you gentlemen want to use the microphone,

4   you guys have the lapel mics, pocket mics at the desk.  You

5   see those?  I think my deputy probably showed you how you use

6   those.  If you don't need them, you don't have to use them.

7   But if you're not going to use them, make sure you keep your

8   voices up, so my court reporter can hear you, my deputy can

9   hear you and the jurors can hear you.  They really are

10  effective to use.  It takes a little getting used.  If you

11  start to fade, I may ask you to approach the side bar and ask

12  you to use it.

13      **MR. ROBERT VEGELER:**  I assume they still keep the

14  desk mics on.

15      **THE COURT:**  Oh, yeah.  In fact, if you want to talk

16  to your client's representatives, just hit that little button,

17  to shut down the mic.  The green light's on, that means it's

18  amplifying.  If you hit that button, it stops.  All right.

19      Also, to the extent we have that wireless mic, which we'll

20  use during the voir dire, it has some negligible amplification

21  qualities so just be aware of that.  That's why I say, you can

22  move around wherever you want in the courtroom, just keep your

23  voice up.  All right.  We can call the jurors in.

24      (Whereupon, the Jury Panel is present.)

25

## VOIR DIRE

1

2          **THE COURT:**  Go ahead and bet seated, ladies and

3     gentlemen.  Make yourselves comfortable.  Counsel, you may be

4     seated.

5          Good morning, ladies and gentlemen, and welcome to the

6     United States District Court for the Northern District of

7     Indiana in its Fort Wayne Division.  My name is Theresa

8     Springmann and I will be the judge that will be presiding over

9     the case to which you've been called in today as prospective

10    jurors.

11         This morning we're going to be picking a jury for a trial

12    in the case of Trent L. Chapin against Mid-States Motors,

13    Incorporated and Fort-Rohr Motors, Incorporated.  This is a

14    civil trial that's expected to last over the next 3 to 4 days.

15    But in any event, will be concluded this week.

16         Without getting into too many details about what the case

17    is about at this point in the jury selection process, I can

18    tell you that this case involves the plaintiff, Mr. Chapin's,

19    claim that the defendants, by whom he used to be employed,

20    discriminated against him on the basis of his race and

21    national origin.  Mr. Chapin claims that the discrimination

22    occurred between March of 2004 and February of 2005.

23         Now, ladies and gentlemen, the plaintiff and the

24    defendants have a right to have this case tried by qualified,

25    fair and impartial jurors.  A qualified and impartial jury is

1   one that is responsible and capable and that will, without

2   fear, bias, prejudice, sympathy or passion, objectively hear

3   and decide the issues to be tried and render a verdict solely

4   on the evidence presented at the trial and the law applicable

5   to the case as will be given to you by the Court.

6        Now a juror's qualifications and impartiality cannot be

7   assumed.  An inquiry has to be made.  This inquiry is called

8   voir dire.  This is a time-honored process by which the

9   qualifications and impartiality of jurors can be determined.

10  The purpose of it is to develop the truth about a juror's

11  competency, his or her frame of mind and ability to do his or

12  her sworn duty in accordance with the juror's oath.  Your

13  answers to the questions that will be asked will enable the

14  parties and the Court to determine whether a prospective juror

15  should be excused for cause or upon the motion of a party.

16  They'll also allow the attorneys to make intelligent use of

17  their peremptory challenges.

18       Peremptory challenges are challenges that are allowed

19  under the law to each side or to the parties to dismiss a

20  prospective juror without assigning a specific reason.

21       Now, each of you is under a compulsion to disclose upon a

22  general question all matters that might tend to disqualify you

23  for any reason from sitting on this jury.  Now, while the

24  sweep of the questions might be broad, it is your affirmative

25  duty to honestly and conscientiously answer the real

1   implications of the questions asked, and to make your answers

2   as full and complete as possible.  False or misleading answers

3   might result in the seating of a juror who might otherwise

4   have been discharged by the Court for cause, or stricken

5   through the exercise of a peremptory challenge.  This can

6   result in the miscarriage of justice in the case.

7       Please consider each question carefully and don't wait

8   until after you've been selected and sworn as a juror to

9   disclose something that ought to have been made known at the

10  time a question was asked, or when one question suggests to

11  you some other reason for disqualification.

12      While the questions that will be asked of you will be

13  asked collectively, they must be considered by you

14  individually.

15      Now, you've already provided the Court with answers to

16  written questions with regard to yourself, your family, your

17  educational background, your work background and you should

18  know the Court has provided copies of those questionnaires to

19  the parties' attorneys this morning for use in the jury

20  selection process.  The Court will be collecting those

21  questionnaires back from the attorneys as soon as we have

22  selected a jury in the case and those questionnaires will be

23  destroyed.

24      Now, many of you will be excused from service on this

25  jury.  Let me tell you at the get go that that should not be

1    considered by you in any way as any kind of embarrassment or

2    any mark against your good name or reputation.  It carries

3    with it no disqualification for service on a future jury.  It

4    just simply means it's been determined you are not a match to

5    serve on the jury in this particular case.

6        Now to begin this process, we need to place everybody

7    under oath.  And the oath that my deputy is going to

8    administer is one for the members of this venire panel.

9        At this time, if you would all stand and raise your right

10   hand now to be sworn by my deputy, Ms. Johnson.  You folks in

11   the back as well, please stand and raise your right hand to be

12   sworn.

13       (Whereupon, the jury panel was sworn.)

14       **THE COURT:**  Go ahead and be seated.

15       Now the way this is going to work is that my questions are

16   going to be primarily to the 14 people who are in the jury box

17   right now.

18       For you folks who are seated in the public section of the

19   courtroom, I would ask that you please listen carefully to the

20   questions that I will be asking these prospective jurors and

21   the questions that will be asked of them by parties' counsel.

22   In the event any of these prospective jurors in the jury box

23   are excused from service, and you are called into the box, I

24   will be asking you whether or not you would have answered yes

25   to any of the Court's questions or would have had any issues

1    or information to give us in response to the questions asked

2    of you by the attorneys.  So that's why it's very important

3    that you listen and follow this voir dire process in the event

4    you are called in to substitute for any of these individuals

5    in the jury box.

6         At this time, I'm going to ask parties' counsel in turn to

7    introduce themselves to you, as well as their clients, and I'm

8    going to start with the plaintiff.  Counsel, if you would

9    please introduce yourself and your client.

10        **MR. ROBERT VEGELER:**  Thank you.  I'm Robert Owen

11   Vegeler of the Vegeler Law Office in Fort Wayne.  And this is

12   Mr. Trent Chapin, the plaintiff in this case.

13        **THE COURT:**  All right.  For the defendants.

14        **MR. JAMES BUCHHOLZ:**  My name is Jim Buchholz.  I'm

15   with Carson Boxberger here in Fort Wayne.  I represent

16   Fort-Rohr, also known as Fort Wayne Toyota.  This is Larry

17   Kruse from that organization, and this is Bill German from

18   Fort Wayne Acura.  And my paralegal is Courtney Brubaker also

19   from my office.

20        **THE COURT:**  Thank you.  Now, let me start by asking

21   are any of you personally or professionally acquainted with

22   any of the persons introduced?  That is, the attorneys, the

23   law firms they're from or their clients or their

24   representatives, any of you familiar with any of these

25   individuals?

 1          **JUROR:**  Yes.

 2          **THE COURT:**  Is it Lazzer.  Mr. Lazzer, who do you

 3   know?

 4          **JUROR:**  I know the defendant, Mr. Kruse.

 5          **THE COURT:**  All right.  How do you know Mr. Kruse?

 6          **JUROR:**  I shoot commercials -- I've done his

 7   commercials I think for the past six or seven, eight years.

 8          **THE COURT:**  All right.  You say you have done that

 9   for the last six, seven, eight years?

10          **JUROR:**  Mmm-mm.  (Nodding.)

11          **THE COURT:**  You know, I always forget to do this

12   until we're in the middle of the voir dire.  I've got a

13   wireless mic up there.  If you could pass it down to whoever

14   it is I'm talking to.  Just take it out of the stand and then

15   that will be easier to pass that through.  Thank you very

16   much.  This is such a big room, the acoustics could be better

17   and so that will help us.

18      I heard you.  Now, you say you videotape his commercials.

19   And you work for WANE T.V. is that --

20          **JUROR:**  Correct.

21          **THE COURT:**  All right.  Now, have you worked directly

22   with Mr. Kruse, Larry Kruse?

23          **JUROR:**  Yes, ma'am.

24          **THE COURT:**  Now, understanding that he is the

25   representative of one of the defendants involved in this case,

1   do you believe that that ongoing relationship, business

2   relationship that you have might affect your ability to be a

3   fair and impartial juror in this case?

4         **JUROR:**  Yes, ma'am.

5         **THE COURT:**  Counsel, at this time, let me ask you,

6   it's sometimes unusual we draw a potential conflict this early

7   in the process, but I think it might be helpful if there would

8   be no objection to excusing Mr. Lazzer from further

9   participation in this selection process and we can substitute.

10        **MR. ROBERT VEGELER:**  Your Honor, upon behalf of the

11   plaintiff, we would understand and we would not object to his

12   being dismissed.

13        **THE COURT:**  Mr. Buchholz.

14        **MR. JAMES BUCHHOLZ:**  Your Honor, we understand as

15   well.  We don't have any objection.

16        **THE COURT:**  All right.  Sir, you're excused from

17   further service in this case.  I appreciate your candor at the

18   get go.  And if you need anything from our Clerk's office

19   before you leave the building in terms of the work slip or

20   anything else, please check in before you leave.

21        **JUROR:**  Okay.

22        **THE COURT:**  You want to hand the mic back down and

23   Mr. Meyer will put it back in the stand.  If you left anything

24   in the jury assembly room, the Court Security Officers will

25   help you retrieve it.  Thank you.

1        Could you please call the name of the next prospective

2    juror.

3              **THE CLERK:**  Number 17, Tad Smith.

4              **THE COURT:**  Good morning, Mr. Smith.

5              **JUROR:**  Good morning.

6              **THE COURT:**  Now, let me back up a little bit and ask

7    you, are you familiar, either personally or professionally,

8    with either the attorneys, the parties or their

9    representatives?

10             **THE DEFENDANT:**  No.

11             **THE COURT:**  Thank you.  And was anybody else on the

12   panel familiar with them?  Again, just raise your hand and

13   I'll call on you and we'll get to you.

14      No one else?  Now, I'm going to read to you a list of

15   witnesses who may be called to testify in this case.  And I'll

16   ask you whether or not any of the names sound familiar to you

17   and if they do, I'll ask counsel to clarify who these

18   individuals are, perhaps what town or city they reside in or

19   their employment.

20      Again, I want to make sure that anybody that sits on this

21   jury ultimately is not personally familiar with or, you know,

22   closely involved with any of the potential witnesses.

23      Now the witnesses may include, of course, the plaintiff,

24   Trent Chapin.  Also, there's Trent Chapin the second?  All

25   right.  And Sterling J.R. Chapin.  I'm going to mispronounce

1    that name, I'm afraid, for a while.  Robert Chapin.  There may

2    be a Nadim Baig, B-A-I-G; Glenn Richards; Tim Maddox; Kurt

3    Richards; Dan Twomey; a Tracy Glendo -- Glendonen,

4    G-L-E-N-D-O-N-E-N; Todd Hein, H-E-I-N; Kathy Waters; Jeff

5    Lidel, L-I-D-E-L, perhaps it's Lidel (phonetic); Mark Taylor,

6    Kyle Schultz; Lou Ann Montz, M-O-N-T-Z; a Steve Antel,

7    A-N-T-E-L; Kevin Patterson; Larry Kruse; Luke Luther; Shane

8    Householder; a Mark Batista, I'm sorry.  Let's go.  It's Ms.

9    Tuttle?

10        **JUROR:**  Shane Householder we bought a vehicle.  I

11   don't know if that qualifies for --

12        **THE COURT:**  And where was he working when you did

13   business with him?

14        **JUROR:**  At Rohrman's.

15        **THE COURT:**  Oh, okay.

16        **JUROR:**  I should back up a little bit.  He wasn't the

17   actual salesperson, but he was involved in sales.

18        **THE COURT:**  All right.

19        **JUROR:**  Other than that, I don't know him personally

20   beyond the (Inaudible).

21        **THE COURT:**  All right.  And how long ago was that?

22        **JUROR:**  Just last year.

23        **THE COURT:**  And we'll come back to that issue about

24   who may have done business with either of these dealerships.

25   But let me go through the list of individual witnesses and

1    we'll come back to it.  Thank you.  All right.

2        Other than -- we're on Mark Batista; Charles D. Holm,

3    H-O-L-M.  There may also be a Lucinda Baell, B-A-E-L-L; Kelly

4    Helgoe, H-E-L-G-O-E; a Bill Thayer, T-H-A-Y-E-R; Amber Okpara,

5    O-K-P-A-R-A; an Officer Scott Adam -- officer -- I'm sorry,

6    Jason Crowder; a Heath Grepke, G-R-E-P-K-E; a Milo Zojergi,

7    Z-O-J-E-R-G-I; Robert Rohrman and that would be it.

8        Anyone familiar with any of those individuals other than

9    Miss Tuttle with Shane Householder?

10           **JURORS:**  (No Audible Response.)

11           **THE COURT:**  All right.  New, let me back up and ask

12   you, have any of you done business with either of the

13   defendants' dealerships.  And again this is Mid-States Motors

14   Incorporated or Fort-Rohr Motors.  And I've got a note here

15   this might help to clarify it.  Let's see.  Oh, let me ask

16   counsel, Mid-state is doing business as what dealership at

17   what location, Mr. Buchholz?

18           **MR. JAMES BUCHHOLZ:**  Mid-States is doing business as

19   Fort Wayne Acura on Illinois Road.  Fort-Rohr is doing

20   business as Fort Wayne Toyota also on Illinois Road.

21           **THE COURT:**  Now so with that information, have any of

22   you done business with either of those locations other than

23   Ms. Tuttle?

24           **JURORS:**  (No audible response.)

25           **THE COURT:**  All right.  Let me come back to Ms.

1    Tuttle.  Ms. Tuttle, the fact that Mr. Householder may be

2    called to testify in this case, and maybe not, would the fact

3    that you either know him from this sale or did business at

4    that dealership, do you think that would affect your ability

5    to be a fair and impartial juror on this case?

6         **JUROR:**  No, it would not, Your Honor.

7         **THE COURT:**  So you think you could be fair to both

8    sides in this case?

9         **JUROR:**  Yes, I do.

10        **THE COURT:**  And so I can explain, the duty, the role

11   of the juror in a case, and each juror individually is to

12   listen carefully to the evidence that's presented in the case.

13   And from the evidence, you determine what the facts are in the

14   case.  Then you take the law that's given to you by the Court

15   in the Court's instructions and you apply the law to the facts

16   as you find them to be and that's how you determine the

17   outcome of the case with your verdict.

18      So that's -- you're judges of the fact, if you're selected

19   as a juror.  And that's why we want to make sure you're

20   completely fair and impartial and can be so to both sides of

21   the dispute.  And there's no question in your mind

22   notwithstanding this last purchase, the purchase in the last

23   year that you could be fair to Mr. Chapin as well as to the

24   two dealerships?

25        **JUROR:**  I can be fair.

1          **THE COURT:**  Anybody with a question on how that -- on

2    any of the Court's comments just now?

3          **JURORS:**  (No audible response.)

4          **THE COURT:**  Now, is there anything just about the

5    nature of the case itself that might prevent you from being a

6    completely fair and impartial juror?  That is, knowing this

7    case is about a claim of employment discrimination and it's

8    brought under Title 7 of the Civil Rights Act of 1964 and that

9    the claim that's being made, I think I can fairly describe it,

10   is reverse discrimination where Mr. Chapin claims that he was

11   discriminating against because he is white, non-Muslim.  And

12   that he met discrimination in the workplace and there's also a

13   claim for retaliation.

14        Is there anything about the nature of the case itself that

15   gives any of you pause as to whether or not you can be a fair

16   and impartial juror?

17         **JURORS:**  (No audible response.)

18         **THE COURT:**  Let me ask you, have any of you have ever

19   been involved in a situation similar to the matter at trial in

20   this case?  That is, have any of you ever been involved in a

21   charge at work involving discrimination, either yourself being

22   discriminated against or somebody that you work with or who

23   works for you being charged or charging or being charged with

24   discrimination?  Is it Mr. Stell?

25         **JUROR:**  Yes, ma'am.

1      **THE COURT:**  Sir, tell me what that was.

2      **JUROR:**  Oh, I work for the City of Huntington and I

3  was appointed Street Commissioner when Ron Schenkel became

4  Mayor.  And I fired the secretary before me, and she claimed

5  discrimination, and that's pretty much the bulk of it.

6      **THE COURT:**  I remember reading that in your

7  questionnaire.  Let me ask you, though, how far did that claim

8  go; did it go that a lawsuit?

9      **JUROR:**  It did, but they settled out of court.  I

10  guess the protem told the -- told the City Attorney we had a

11  good case of winning that, but if you got a (Inaudible) of the

12  jury, it could go the other way.  So they settled out of

13  court.

14      **THE COURT:**  Now, could I ask, what was, if you

15  recall, what was the basis for the secretary claiming she was

16  discriminated.  Was it her gender, race, nationality or what?

17      **JUROR:**  No, she just more or less said I didn't give

18  her a good reason why I was firing her.

19      **THE COURT:**  So she wasn't claiming that you singled

20  her out because she was female or something like that?

21      **JUROR:**  No.  And you know, with me working on the

22  work force, I seen actions that she done that I didn't feel

23  that I wanted her as my secretary at that particular time.

24      **THE COURT:**  Now, from going through that process, let

25  me ask you, do you have any strong opinions one way or the

1   other about that situation that you think may affect your

2   ability to serve on this case?

3          **JUROR:**  I don't think so.

4          **THE COURT:**  You think you can keep an open mind with

5   regard to the evidence that will be presented in this case and

6   be fair to both the plaintiff as well as the defendants?

7          **JUROR:**  Yeah, probably.

8          **THE COURT:**  All right.  Thank you.  Anyone else with

9   that kind of experience, work or life experience?

10         **JURORS:**  (No audible response.)

11         **THE COURT:**  Now this case is expected to last three

12  or four days.  And let me explain what our usual schedule is.

13  We start, as you can tell, we start at 9:00 o'clock every day

14  with proceedings.  Now today I know you came in early about

15  7:30 or so and some of you came in a considerable distance.

16  So in light of that, we try and finish the proceedings on the

17  first day of trial between 4:00 and 4:30 so you can get back,

18  you know, get back on the road a little bit earlier.

19     Subsequent days we'll usually run from 9:00 to 5:00.  And

20  I say "usually" because it depends on the witnesses to be

21  called.

22     Again, we try to work with everybody's schedule to try to

23  get witnesses subpoenaed in or called in, get their testimony

24  into the record and then release them, you know, so that they

25  can go back to work or whatever.  So again, that's the process

1    we go through.  We're estimating this case will take three or

2    four days and that's the schedule we keep.  Now, I say that

3    preliminarily because the Court understands, the attorneys

4    understand, the parties know that anyone who is called to jury

5    service is going to have some amount of disruption in their

6    schedules whether it's their -- your schedule getting things

7    done at home, your work schedule, it's going to affect maybe

8    child care, elder care.  There's all sorts of things you have

9    to reschedule in order to serve on a jury.

10       But understanding it is one of the most important rights,

11   duties and obligations you have as a citizen to this country,

12   what I would ask you to keep in mind is that putting aside

13   those ordinary scheduling conflicts, what I need to know is

14   whether or not any of you have a conflict in your life that

15   would be seriously affected by you serving on this jury over

16   the next three or four days.

17       And let me give you an example of situations that have

18   come up and where I have excused them from duty.  Sometimes I

19   get people who are scheduled for surgery and it's surgery they

20   have to have.  I get folks who have somebody in the family

21   who's ailing or very sick or needs to be with them.  I get

22   somebody in the family whose passed away, and they need to --

23   something that cannot be -- something of that magnitude,

24   certainly the Court and everyone present in the courtroom

25   understands excusing you from service in those circumstances.

1    But barring those circumstances, is there anyone in the

2    box right now that has a conflict that you would not be able

3    to schedule around in order to serve as a juror in this case?

4    Raise your hand and we'll talk about it.

5      Mr. Meyer.

6         **JUROR:**  Yes, ma'am.

7         **THE COURT:**  And what is that, Mr. Meyer?

8         **JUROR:**  I guess there's a possibility it could be

9    rescheduled.  But Thursday morning at 9:00 o'clock, myself and

10   two of my sisters have an appointment at Youth for Christ with

11   a family counselor.  My younger sister recently lost her

12   husband.  She's declaring personal bankruptcy, moved in with

13   my parents, and so there's lots of issues, possible financial

14   guardianship.  So lots of issues which we're talking with a

15   counselor about, and it's been rescheduled once already, that

16   particular appointment.  So that's just an issue for me this

17   week that's come up.

18        **THE COURT:**  All right.  And that's very

19   understandable.  Especially since you've indicated it's been

20   rescheduled once.  Is it easy to get that kind of appointment

21   that kind of counseling session through YFC?  I would ask you

22   to see if you could get it rescheduled.  Is it something you

23   could get rescheduled within a week or two weeks, do you

24   think?

25        **JUROR:**  I'm not sure.  It was -- it was pushed back

1  two weeks this first rescheduling situation.  They seem to be

2  pretty busy as far as I can tell.

3      **THE COURT:**  All right.

4     Let me ask you, if you were otherwise chosen as a juror in

5  this case, would the fact that you were -- would be unable to

6  attend that counselling session, which is being conducted for

7  the benefit of your sister who is going through these

8  circumstances, would that affect your ability to be able to

9  focus in and pay strict attention to the presentation of the

10  evidence that would be coming into the case?  That is, would

11  you be distracted from focusing on this case because of your

12  concerns involving your sister and missing that counselling

13  session?

14      **JUROR:**  No, I think it would be a serious

15  distraction.

16      **THE COURT:**  So you think if the Court were to ask you

17  to try to reschedule that session, you would not hold it

18  against the parties or this case or the Court and you would be

19  able to give over full cooperation and attention to the case?

20      **JUROR:**  Yeah, I would be able to give full attention,

21  yes.

22      **THE COURT:**  Well, let me ask you, just very candidly,

23  then, would you be willing and able to do that?  If there were

24  no other reason for you to be excused from the case, would you

25  be willing to reschedule that session for Thursday?

 1          **JUROR:**  Yes, I would.

 2          **THE COURT:**  Thank you.  Anyone else with a scheduling

 3  conflict that you think would be -- that you think would be

 4  such that you should be excused?

 5          **JURORS:**  (No audible response.)

 6          **THE COURT:**  Thank you, Mr. Meyer.  Now, have any of

 7  you read or heard anything about this case before coming here

 8  today?

 9          **JURORS:**  (No audible response.)

10          **THE COURT:**  Now, some of you have had prior jury

11  experience that you've noted, but sometimes it's faster if you

12  raise your hand and I come to you, than me going through your

13  questionnaires.

14      Let me ask at this time, how many of you have had prior

15  jury service if you would raise your hand.

16          **JURORS:**  (Some raising hands.)

17          **THE COURT:**  Okay.  Let me take you in turn, then and

18  I'll go to your questionnaire and I'll start with Ms. Hudson.

19  Ms. Hudson, you had prior jury service.  Was it within the

20  last ten years?

21          **JUROR:**  (Nodding.)

22          **THE COURT:**  Approximately?  All right.  And you're

23  from Allen County.  Was that at Allen County courthouse?

24          **JUROR:**  City-county building.

25          **THE COURT:**  Okay.  Could you pass --

1          **JUROR:**  Oh, I'm sorry.

2          **THE COURT:**  -- could you pass the mic down to her.

3     I'm sorry, just a little soft spoken.  And that was a criminal

4     trial and the jury found the defendant guilty?

5          **JUROR:**  Correct.

6          **THE COURT:**  Could you tell me what the charge was in

7     that case?

8          **JUROR:**  Reverse sexual assault.

9          **THE COURT:**  A woman assaulting a man?

10         **JUROR:**  Yeah.

11         **THE COURT:**  And let me ask you now, that -- this

12    applies to everybody that's had prior jury service perhaps in

13    a criminal case.  As all of you are probably aware in a

14    criminal case, the standard of proof is different from that

15    in a civil case.  In a criminal case, the proof that has to be

16    presented has to be proof beyond a reasonable doubt.  And you

17    remember being instructed along those lines, correct?

18         **JUROR:**  Yeah.

19         **THE COURT:**  Now in a civil case, it's a different

20    standard.  And it's not as some people describe or might

21    describe as heavy or onerous as a criminal standard, because

22    in a criminal case, you have life and liberty at stake.  In a

23    civil case, it's not the same stakes.

24         In a civil case, the standard is by a preponderance of the

25    evidence, that is the party bearing the burden of having to

1    prove something, prove an element of their case has to do so

2    by a preponderance of the evidence.  And the preponderance of

3    the evidence, you'll later be instructed, means has to prove

4    something is more likely true than not true.  So there's a

5    difference.

6        Given your experience on a criminal case, would you be

7    able to keep that distinction in mind between the proof in a

8    criminal case and the proof in a civil case?

9            **JUROR:**  Yes.  (Nodding.)

10           **THE COURT:**  Any of you want further clarification

11   with regard to that distinction between the civil case, the

12   proof in a civil case and proof in a criminal case?

13           **JURORS:**  (No audible response.)

14           **THE COURT:**  Was there anything that happened in that

15   criminal case, Ms. Hudson, that left you with either a strong

16   negative opinion or a strong positive opinion about how the

17   system works and the system, I mean the court system?

18           **JUROR:**  No.

19           **THE COURT:**  Were you satisfied that justice was done

20   in that case?

21           **JUROR:**  Oh, yeah.

22           **THE COURT:**  All right.  All right.  Thank you.

23       Now, who else had their hand up, Mr. Meyer.  Okay.  Pass

24   it down to Mr. Meyer.

25       Mr. Meyer, what -- trying to get your questionnaire.  You

1    served Allen County.  Was it over in Allen County Superior

2    Court?

3           **JUROR:**  No, ma'am.  It was the state District Court

4    in Wyoming.

5           **THE COURT:**  Oh, Federal District Court?

6           **JUROR:**  No state.

7           **THE COURT:**  State District Court.  Okay.  And that he

8    was a while back and that was almost ten years ago.  And that

9    was a vehicle accident?

10          **JUROR:**  Yes, ma'am.

11          **THE COURT:**  And you're familiar with the standard of

12   proof, and you've dealt with the standard of proof of evidence

13   in that case, is that correct?

14          **JUROR:**  Yes, ma'am.

15          **THE COURT:**  And you understand every case has to be

16   decided on its own merits, correct?

17          **JUROR:**  Correct, right.

18          **THE COURT:**  Was there anything that happened in that

19   case that has left you with a strong negative opinion or a

20   strong positive opinion of how the system works?

21          **JUROR:**  No.

22          **THE COURT:**  Were you satisfied that justice was done

23   in the case that you served on?

24          **JUROR:**  Yes.

25          **THE COURT:**  Could I ask you, you said damages -- what

1    was the nature of the injuries to that plaintiff, if you

2    remember?

3         **JUROR:**  I think it was primarily an ex (Inaudible)

4    related.

5         **THE COURT:**  And do you remember approximately, I know

6    it was a long time ago, do you remember what the damages were?

7         **JUROR:**  Uh, I don't recall.

8         **THE COURT:**  Less than $10,000 more than $10,000?

9         **JUROR:**  I think it was less than that.  I think it

10   was basically medical expenses that had been incurred up to

11   that point or related specifically to that event.

12        **THE COURT:**  All right.  Thank you.  Who else had

13   their hand up for prior jury experience?  Let's go to Mr.

14   Hearn, if you pass the mic down to Mr. Hearn.

15      Let me get to your questionnaire, Mr. Hearn.  I saw it you

16   reside here in Allen County; was over in Allen County --

17        **JUROR:**  Yes.

18        **THE COURT:**  -- Superior Court?  And that was a

19   criminal case?

20        **JUROR:**  Yes.

21        **THE COURT:**  And that was a long time ago?

22        **JUROR:**  About 25 years ago.

23        **THE COURT:**  Do you remember what the nature of that

24   case was?

25        **JUROR:**  I think it was a car theft.

1          **THE COURT:**  And the jury found --

2          **JUROR:**  The jury didn't find -- I think the Judge had

3    to take over the case.

4          **THE COURT:**  Uh-oh.  So you served on the jury, but at

5    some point in time the jury was dismissed?

6          **JUROR:**  Yes.

7          **THE COURT:**  Before you came to a verdict?

8          **JUROR:**  Correct.

9          **THE COURT:**  Did you ever find out what happened in

10   the case?

11         **JUROR:**  Um, no, not really.

12         **THE COURT:**  Well that can be sometimes a frustrating

13   process for the jury to be called in the case and not to get

14   to come to a verdict.  Was there anything about that

15   experience that left you with either a strong positive or

16   strong negative opinion of how the system works?

17         **JUROR:**  No.

18         **THE COURT:**  Because sometimes procedurally that can

19   occur.  It's very rare the Judge would take the case away from

20   the jury.  Who knows what the circumstances were.  But

21   sometimes it happens.  You understand every case has to be

22   decided own its own merits?

23         **JUROR:**  Correct.

24         **THE COURT:**  And you would be willing if you were

25   selected as a juror to keep an open mind with regard to all

1     the evidence in this case?

2          **JUROR:**  Yes, I would.

3          **THE COURT:**  All right.  Thank you.  I thought there

4     was one other hand.  All right.  Let's go down to -- is it

5     Headings or Headings (phonetic)?

6          **JUROR:**  Headings.  Mr. headings, what was your jury

7     experience?

8          **JUROR:**  I wasn't actually selected on a jury, but

9     I've gone down several times to the Allen County courthouse

10    and not been selected.

11         **THE COURT:**  Okay.  So you've gone through this voir

12    dire process before?

13         **JUROR:**  Yes, ma'am.

14         **THE COURT:**  Have you made it into the box before?

15         **JUROR:**  No, ma'am.

16         **THE COURT:**  Okay.  Now, was the selection process --

17    so you were like the folks in the back of the courtroom

18    waiting to be called in?

19         **JUROR:**  Yes.

20         **THE COURT:**  And you went through this voir dire.  Was

21    it for criminal cases or were any of those for civil cases?

22         **JUROR:**  I believe they were all criminal.

23         **THE COURT:**  All right.  Now, although you never made

24    it into the box, was there anything about that experience,

25    just in going through the voir dire, that left you with a

1  strong opinion, negative or positive, with regard to how this

2  system works?

3          **JUROR:**  No, ma'am.

4          **THE COURT:**  All right.  Thank you.

5      Anyone else that I may have missed regarding prior jury

6  experience or near experience?

7          **JURORS:**  (No audible response.)

8          **THE COURT:**  All right.  Have any of you ever

9  testified as a witness in a case before.  I thought I saw that

10 on somebody's questionnaire but they may not be in the box

11 right now.  Mr. Stell, that was the case you were talking

12 about?

13         **JUROR:**  Another case, just here recently, Mayor of

14 Huntington got sued.  I also discharged a fella from

15 employment, and he sued the Mayor for the City of Huntington.

16 They dropped the City of Huntington and just sued the Mayor

17 personally and I testified in that case there.

18         **THE COURT:**  How long ago was that?

19         **JUROR:**  Oh, geez, that was probably just last month

20 or two.

21         **THE COURT:**  And what court did you testify in?

22         **JUROR:**  This court right here, ma'am.

23         **THE COURT:**  What was the name of the case?

24         **JUROR:**  Mayor Abbott versus --

25         **THE COURT:**  Oh, okay.  All right.  Now I remember.

1   All right.

2      Now, and forgive me for not recognizing your face as a

3   witness.  That's pretty poor on my part, but knowing the

4   number of cases that we have come in and the number of

5   witnesses that sit here and my age, that can happen.

6         **JUROR:**  I'm not answering.

7         **THE COURT:**  All right.  Was there anything about that

8   case that when you were sitting right here?

9         **JUROR:**  Yes, ma'am.

10        **THE COURT:**  Was there anything about that case that

11  either reinforced your position about the system or how the

12  system works?

13        **JUROR:**  No.

14        **THE COURT:**  You were satisfied with how that case was

15  done?

16        **JUROR:**  Yes, ma'am.

17        **THE COURT:**  All right.  Well, that was a civil rights

18  case, but a different civil rights that didn't involve

19  employment discrimination.

20        **JUROR:**  No.

21        **THE COURT:**  That was involving police officers and a

22  wrongful search and that was completely different and you

23  understand that?

24        **JUROR:**  Yes.

25        **THE COURT:**  All right.  And you would be able, if you

1   were otherwise selected as a juror on this case, you would be

2   able to keep your experience as a witness in that prior case

3   separate?

4       **JUROR:**  (No audible response.)

5       **THE COURT:**  Okay.  I should ask the question next

6   time I have a jury come in, does anybody recognize the judge

7   for the case.

8       All right.  Anyone else testify as a witness in another

9   case, Mr. Meyer?

10      **JUROR:**  And Your Honor, I guess, you're including

11  there deposed where you may have not actually been in the

12  courtroom.

13      **THE COURT:**  Right.  Have you ever been deposed in a

14  case?

15      **JUROR:**  Twice.

16      **THE COURT:**  Tell me what was the general nature of

17  those cases; I think I saw it on your questionnaire.

18      **JUROR:**  They were both civil cases.  One was a real

19  tragic accident where a college student in Iowa got in a motor

20  boat, fell out and was killed.  And anyway, there was a

21  lawsuit was part of that situation, and I was there at the

22  time at the lake, and was deposed.

23      I was in Wyoming and the attorney was in Iowa, and I was

24  just deposed over the phone and the other -- the other case

25  again was a civil case.  I can't even recall much of the

1    details, between two companies.  One of the companies was like

2    pond management consulting company, and the other party was I

3    think chemical supplier that this other business bought

4    chemicals from.

5          **THE COURT:**  Something went bad with the deal or the

6    purchase; you had to testify and were deposed?

7          **JUROR:**  Yes.  I had been involved with one of the

8    parties because they stocked fish and my position was a state

9    fishery (phonetic) biologist, so I knew one of the parties and

10   they wanted to depose me as a witness.

11         **THE COURT:**  Okay.  Was there anything about your

12   experience in providing deposition testimony in those cases

13   that you think would affect your ability to serve on this

14   case?

15         **JUROR:**  No, I don't think so.

16         **THE COURT:**  Let me back up a second, go back to Mr.

17   Stell.  Were you involved -- was Mr. Vegeler involved in that

18   case?

19         **MR. ROBERT VEGELER:**  That was the City of Bluffton.

20   This is Huntington.

21         **THE COURT:**  So none of these lawyers were involved

22   that you testified --

23         **JUROR:**  I don't believe so.  There was one other I

24   testified in Bluffton or Columbia City a case there, uh, woman

25   went to a rummage sale, stepped in a hole, and the people that

```
 1    lived there said the City of Huntington created the hole,

 2    which I worked in the traffic control division at that time,

 3    and I had to go testify there, you know, I created a hole or I

 4    didn't, whatever.

 5            THE COURT:  Okay.  All right.  Boy, you've had the

 6    most experience in judicial proceedings than almost anyone in

 7    here.  All right.

 8      Now, have any of you had any special legal training,

 9    either from educational courses or an occupation?  And by

10    this, I mean, are any of you trained as a paralegal, as an

11    investigator, any other legal, education, if you would raise

12    your hand, and we'll talk about that, anyone?

13            JURORS:  (No audible response.)

14            THE COURT:  Any close family members or close friends

15    or acquaintances with that kind of background, meaning that

16    are lawyers, paralegals, investigators, all right.  Miss

17    Tuttle.

18            JUROR:  I didn't put it on my form.  I didn't know.

19    My brother is a lawyer.  But I didn't know if you consider any

20    family member husband and children or if you consider --

21            THE COURT:  I think brother would come into that,

22    yeah.  So where does he -- where does he practice?

23            JUROR:  In Chicago; he's in Federal Court.

24            THE COURT:  What kind of work does he do?

25            JUROR:  He was a prosecutor.  Now he's -- he oversees
```

```
 1    cases.
 2           THE COURT:  Is he -- oh, is he with the U.S.
 3    Attorney's Office in Chicago?  He's a federal prosecutor?
 4           JUROR:  He was a prosecutor.
 5           THE COURT:  So now he's in private practice?
 6           JUROR:  No, he still works for that, but he's not
 7    actually in the courtroom anymore.
 8           THE COURT:  Oh, okay.  But he's still with the U.S.
 9    Attorney's Office?
10           JUROR:  Yeah.
11           THE COURT:  Okay.  Is there anything about that
12    relationship and having a brother that's doing that kind of
13    work that you think would affect your ability to serve on this
14    case?
15           JUROR:  No.
16           THE COURT:  All right.  Thank you.
17       Anyone else, family, friends.  Miss Hoeppner, we haven't
18    heard from you yet.  Who is in the family?
19           JUROR:  Just a friend and I didn't -- I just worked
20    for a part-time fill-in at a law office, just as a
21    receptionist with friends who I also attend church with who
22    are lawyers there.
23           THE COURT:  All right.  And where is this in town?
24           JUROR:  Auburn, Kruse and Kruse.
25           THE COURT:  I'm sorry.
```

```
1          JUROR:  Kruse and Kruse Law Office in Auburn.

2          THE COURT:  Now, let me ask, because I think we have

3     a similar spelling on the name.  Larry Kruse, counsel, is Mr.

4     Kruse related to the Kruse family up in Auburn?

5          MR. JAMES BUCHHOLZ:  Not that I'm aware of, Your

6     Honor.

7          THE COURT:  Okay.  So because I am aware of the

8     attorney, the family of attorneys up in Auburn, and there's

9     some business enterprises up there too that have that family

10    name to them.  So they're not related to or involved in this

11    case at all so you understand that.

12         JUROR:  (Nodding.)

13         THE COURT:  All right.  Now, is there anything, just

14    given the fact that you work as a receptionist in a law firm

15    that you think would affect your ability to serve on this

16    case?

17         JUROR:  No.

18         THE COURT:  All right.  Anyone else, friends, family,

19    involved in the practice of law juror jurors (No audible

20    response.)

21         THE COURT:  Has any other reason come to your mind as

22    we've gone through this voir dire this morning that you think

23    might prevent you from giving both sides in this case a

24    completely fair and impartial trial?

25         JURORS:  (No audible response.)
```

1        **THE COURT:**  Is there any of you that know of any

2   reason why you could not sit as a juror in this case?

3        **JURORS:**  (No audible response.)

4        **THE COURT:**  At this time, I'm going to turn over the

5   voir dire to the attorneys.  And in this process, they're

6   going to give you a preliminary statement, just a little bit

7   of background about what the case is about, kind of fleshing

8   it out what I've described the case to be and just maybe

9   telling you some of the issues, some of the evidence they

10  think is developing in the case.  It's not opening statements

11  yet, but it's to give you more information about the case that

12  will help you determine whether or not there's any potential

13  conflict for you in sitting as a juror in the case.

14       And the way this works is first I'll give plaintiff's

15  counsel an opportunity, Mr. Vegeler, to talk to you, ask you

16  questions and then I'll give you the opportunity to the

17  defendant's attorney, Mr. Buchholz.  All right.

18       With that, Mr. Vegeler, you may proceed.

19                    **VOIR DIRE BY THE PLAINTIFF**

20       **MR. ROBERT VEGELER:**  Thank you.  Again, I'm Robert

21  Owen Vegeler of the Vegeler Law Office representing Mr. Chapin

22  and voir dire is always kind of a squirmy process, because it

23  allows me to ask some individual questions to see if you

24  would, number one, like to be a juror.  Number two, if you can

25  serve and be fair and not prejudice to both of us.  So

1    sometimes, there's some questions asked and we obviously, have

2    your jury questionnaires to see if maybe there's just

3    something, just maybe shifts you just a little bit either way

4    before you even hear the evidence, and the instructions by the

5    Court.

6        Mr. Chapin was a used car manager and a salesperson and a

7    finance manager; he's been in the car business for a number of

8    years in Indiana and Minnesota.

9        And he had been with what is known as the Bob Rohrman Auto

10   Group.  And if anybody watches any television or anything,

11   they see Mr. Rohrman on the television.  And there are an

12   extensive number of dealerships within the Bob Rohrman Auto

13   Group.  And you've heard counsel indicate that this case is

14   against Mid-States, which is on Illinois Road with the

15   familiar name of Fort Wayne Acura Subaru.  And then at the

16   relevant time, the other defendant is Fort-Rohr, Inc. which

17   used the dealership name of Fort Wayne Toyota Lexis on

18   Illinois Road.  So that kind of orients you to where we're at.

19       Mr. Chapin was involved and employed in various capacities

20   over the years.  And he had come back to Fort Wayne for family

21   matters, and had two sons that moved in with him.  And he was

22   working at the Acura -- it started out the Toyota in March of

23   '04.  So you get the time frame, March of '04.  And the last

24   date that he had an employee relationship with the Toyota

25   Lexus would be March of '05, for Mr. Chapin.

1    During that period of time, the Acura Subaru people hired

2    a new manager by the name of Nadim Baig.  And Mr. Baig was

3    involved as -- I'll let the evidence come in as it is, but

4    there was eventually an Anwar Al-Haq, and Irvan Hussein hired

5    involved in the facts of the case.

6        Now, as the Judge indicated, Mr. Chapin is a -- he's

7    non-Muslim, he's white, he's born in the United States and Mr.

8    Baig is a Pakistani Muslim.

9        Now, given that general background, I'd like to ask you a

10   general question and that is given the events that affect all

11   of us as citizens of the United States, is anybody

12   uncomfortable or is it impossible for them to listen to the

13   evidence and listen to the Court's instructions as to the law

14   and just knowing those bare facts, is anybody here unable to

15   be unbiased, unprejudiced, not prejudging this case, because

16   right now you know very little of the facts?

17        **JURORS:**  (No audible response.)

18        **MR. ROBERT VEGELER:**  Since we, Mr. Chapin and I,

19   don't know you very well, I'm going to ask hopefully a few of

20   you, maybe not all of you, a individual question and I'll

21   start it with Miss Brueck.

22        **JUROR IN SEAT ONE:**  Yes.

23        **MR. ROBERT VEGELER:**  I notice pursuant to your

24   questionnaire that you are retired.  Is that a fair statement?

25        **JUROR:**  I never really worked.  I was a homemaker.

1          **MR. ROBERT VEGELER:**  Well, that's fine.  But the --

2    you didn't -- the judge asked you this question, but I really

3    am concerned, as extensive as the Bob Rohrman Auto Group is

4    with Suzuki, Kia, very extensive line of dealerships, would

5    that -- did you purchase a vehicle from them or --

6          **JUROR:**  No.

7          **MR. ROBERT VEGELER:**  Would that somehow prejudice you

8    that they're so expansive and Mr. Chapin is just an

9    individual?

10         **JUROR:**  No.

11         **MR. ROBERT VEGELER:**  Ms. Hudson, you deal with

12   customers on a regular basis, do you not?

13         **JUROR:**  Yes.

14         **MR. ROBERT VEGELER:**  Are you in a sales position or

15   are you more of a service position?

16         **JUROR:**  Service.

17         **MR. ROBERT VEGELER:**  So that life experience isn't

18   going to affect you either way in listening to the evidence I

19   assume?

20         **JUROR:**  No.

21         **MR. ROBERT VEGELER:**  Since this involves salespeople?

22         **JUROR:**  No.

23         **MR. ROBERT VEGELER:**  Okay.  It's Ms. Grogg, correct?

24         **JUROR:**  Yes.

25         **MR. ROBERT VEGELER:**  I take it, since we indicated

1   we're with the Bob Rohrman Auto Group, but you're up in

2   DeKalb, is that correct?

3       **JUROR:**  Yes, correct.

4       **MR. ROBERT VEGELER:**  Have you had any involvement in

5   purchasing any vehicles from the Bob Rohrman Auto Group?

6       **JUROR:**  No, we haven't.  We've always gotten our

7   vehicles locally.

8       **MR. ROBERT VEGELER:**  Mr. Meyer, you've answered a

9   number of questions, and I notice that you have an extensive

10  background as a biologist, is that correct?

11      **JUROR:**  That's right.

12      **MR. ROBERT VEGELER:**  And now you're in telecom?

13      **JUROR:**  Right, fiber optics.

14      **MR. ROBERT VEGELER:**  Fiber optics.  And have you had

15  to or have you had the opportunity to purchase any vehicles

16  from the Bob Rohrman Auto Group?

17      **JUROR:**  No, sir.

18      **MR. ROBERT VEGELER:**  Well, Miss Seymour, not Miss

19  Seymour, I have --

20      **THE COURT:**  Mr. Smith.

21      **MR. ROBERT VEGELER:**  -- Mr. Smith.  You've been

22  quiet.  I haven't seen you answer any questions.  I notice

23  that you are involved in IPFW work?

24      **JUROR:**  Mmm-mm.

25      **MR. ROBERT VEGELER:**  Is that still true?

```
 1         JUROR:  Yes.

 2         MR. ROBERT VEGELER:  Have you had the opportunity to

 3    purchase any vehicles from the Bob Rohrman Auto Group?

 4         JUROR:  No.

 5         MR. ROBERT VEGELER:  Is there anything about this

 6    trial -- the Judge read to you a really long list of

 7    witnesses.  I can tell you that it isn't going to be that

 8    long, at least from our perspective.  So is my best guess,

 9    three days is that going to cause some problems with your

10    duties at IPFW?

11         JUROR:  No.

12         MR. ROBERT VEGELER:  Miss Seymour, you've been quiet

13    also.  And I notice you are from the DeKalb area.

14         JUROR:  Yes.

15         MR. ROBERT VEGELER:  Have you had -- purchased any

16    vehicles from the Bob Rohrman Auto Group?

17         JUROR:  No.

18         MR. ROBERT VEGELER:  I hope I pronounce this right,

19    Miss Flener?

20         JUROR:  (Nodding.)

21         MR. ROBERT VEGELER:  I think you're in Allen County?

22         JUROR:  Yes.

23         MR. ROBERT VEGELER:  And so you might be driving down

24    Illinois Road on a regular basis and see all these all kinds

25    of automobile dealerships.  Have you had opportunity to buy
```

1    any vehicles or trade in vehicles with Bob Rohrman Auto Group?

2         **JUROR:**  No.

3         **MR. ROBERT VEGELER:**  Mr. Hearn, you answered, I think

4    volunteered an answer on at least one question.  And I think

5    you're, what, at IT?

6         **JUROR:**  Yes.

7         **MR. ROBERT VEGELER:**  Okay.  And Allen County, so you

8    probably driving down Illinois Road at times also and see all

9    the dealerships.  Have you had any opportunity to buy one of

10   the many vehicles that Bob Rohrman Auto Group offers?

11        **JUROR:**  No.

12        **MR. ROBERT VEGELER:**  Then it's Ms. Dick, who is, I

13   think in Adams County, according to your questionnaire.

14     Are you with the North Adams school system now?

15        **JUROR:**  Yes.

16        **MR. ROBERT VEGELER:**  And you were with the Dictator

17   Democrat also?

18        **JUROR:**  Yes.

19        **MR. ROBERT VEGELER:**  So you do two --

20        **JUROR:**  Mmm-mm.  (Nodding.)

21        **MR. ROBERT VEGELER:**  Did the Decatur Democrat have

22   advertising done by the Bob Rohrman Auto Group, do you get

23   involved in that?

24        **JUROR:**  No.

25        **MR. ROBERT VEGELER:**  So that won't be a problem.

```
1    Somehow you selling advertising or you're not involved in

2    that?

3              JUROR:  No, I don't work in the office directly.

4              MR. ROBERT VEGELER:  Okay.  Then I believe it's Ms.

5    Richardson who has been extremely quiet.  You're an x-ray tech

6    at, is it Parkview?

7              JUROR:  Yes.

8              MR. ROBERT VEGELER:  Okay.  And I don't know, but

9    I'll ask you the same question.  As many automobile lines as

10   the Bob Rohrman Auto Group sells, have you had on your budget

11   bought any of the vehicles that they sell?

12             JUROR:  No, but I would like to say that my fiancé

13   does sell cars in Fort Wayne.

14             MR. ROBERT VEGELER:  And I don't need to know who

15   your fiance is, but can you tell us who he sells for?

16             JUROR:  Thompson Dodge.

17             MR. ROBERT VEGELER:  Is that something that could

18   prejudice you for or against either one of the parties?

19             JUROR:  No.

20             MR. ROBERT VEGELER:  Now, as an x-ray tech, I know

21   you have certain schedule hours and shifts and so forth and

22   they count on you to cover, sometimes, second or third shift,

23   however you get that worked out.  Is that going to be a

24   problem for the next, say, three days?

25             JUROR:  (Shaking head.)
```

1    **MR. ROBERT VEGELER:**  Mr. Stell, I only have one

2    question for you, having heard a number of answers.  I could

3    not tell whether or not you had some hesitation about being

4    able to at least not have a little bias or prejudice against

5    people who file employment claims or discrimination claims,

6    because you've been hit up the side of the head a few times in

7    these kind of deals.

8        Did I hear that nuance correctly or are you --

9        **JUROR:**  Somewhat, yes.

10   **MR. ROBERT VEGELER:**  Without going any further, I

11   would assume that could mean you're starting out a little

12   jaundiced against Mr. Chapin for having filed a discrimination

13   claim?

14       **JUROR:**  No, not necessarily with Chapin.  Just

15   whatever the evidence is there, you know.

16   **MR. ROBERT VEGELER:**  Yeah.

17       **JUROR:**  Sometimes going to come this.  I've always

18   told my employees if you got something coming, I'm going to

19   give it to you.

20       **MR. ROBERT VEGELER:**  Okay.  So if I dug a hole in the

21   rummage sale case, if I was the City of Huntington and I had

22   my workers out there and they pulled up a sign and left a hole

23   about that big (Indicating) right in the -- near the curb or

24   whatever and somebody stepped into that and broke their ankle

25   somehow, you wouldn't sit there and say hey, that's -- that's

 1    not fair, I mean that claim could have some merit, right?

 2         **JUROR:**  Yes.

 3         **MR. ROBERT VEGELER:**  Okay.  We have Miss Hoeppner

 4    from DeKalb.  And I think you're a homemaker, correct?

 5         **JUROR:**  (No audible response.)

 6         **MR. ROBERT VEGELER:**  With three children?

 7         **JUROR:**  Mmm-mm.  (Nodding.)

 8         **MR. ROBERT VEGELER:**  And being in DeKalb, I don't

 9    know, have you had any dealer -- dealings with the Bob Rohrman

10    Auto Group, having to buy Acuras and Lexuses?

11         **JUROR:**  No.

12         **MR. ROBERT VEGELER:**  Miss Tuttle, you've answered

13    several questions, and you went over the purchase of the

14    vehicle deal.  But I also get the feeling that you're pretty

15    level-headed and can be fair, as I understand it, that's what

16    you're telling the Judge?

17         **JUROR:**  That's right.

18         **MR. ROBERT VEGELER:**  Now, I think I noted on your

19    questionnaire that there's -- I think you're married, you have

20    some children, but your spouse may have been involved in auto

21    equipment service?

22         **JUROR:**  He repairs automotive repair equipment, the

23    air conditioning equipment, the basic car, he repairs that

24    equipment, tire, muffler, benders (phonetic), tire balancing

25    machines that sort of equipment.

1    **MR. ROBERT VEGELER:**  So if the Bob Rohrman Auto Group

2    sent twelve pieces of equipment, automotive repair equipment

3    to be repaired by your husband's business, I don't know

4    whether he owns it?

5         **JUROR:**  No, he does not own it.

6         **MR. ROBERT VEGELER:**  Would that somehow --

7         **JUROR:**  It would not --

8         **MR. ROBERT VEGELER:**  -- do you have any knowledge

9    that would somehow bias or prejudice you?

10        **JUROR:**  No, it would not.

11        **MR. ROBERT VEGELER:**  Finally, Mr. Headings, notice

12   that you're fairly diverse in your interest between being a

13   programmer, a large hardware as well as being a cello player,

14   is that correct?

15        **JUROR:**  Violin.  My wife is cello.

16        **MR. ROBERT VEGELER:**  Mistook your questionnaire.  But

17   you live in Allen County as I read?

18        **JUROR:**  Yes.

19        **MR. ROBERT VEGELER:**  So as you travel down Illinois

20   Road and you think back as to hearing in evidence in this

21   case, is there going to be something, did you have any

22   interactions with Bob Rohrman Auto Group?

23        **JUROR:**  No, I haven't.

24        **MR. ROBERT VEGELER:**  Let me ask you if the evidence,

25   the facts as you determine them, and the law as given to you

1    by the Judge tell you that illegal discrimination did take

2    place or illegal retaliation for Mr. Chapin asserting his

3    federal statutory rights occurred, does anybody here have any

4    moral or other objection to awarding Mr. Chapin monetary

5    damages?

6            **JURORS:**  (No audible response.)

7            **MR. ROBERT VEGELER:**  Thank you, Your Honor.

8            **THE COURT:**  Mr. Buchholz.

9                      **VOIR DIRE FOR THE DEFENSE**

10           **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.  Get

11   situated here.

12       Mr. Vegeler told you briefly what he expected the case to

13   be about as relates to his client.  I'd like to tell you a

14   little bit about what we think the case is going to be about

15   associated with my clients, and to frame some of the questions

16   that I'm going to be asking you today.

17       The evidence is going to show that in the early part of

18   2004, Fort Wayne Acura didn't have an acting general manager.

19   Mr. Kruse from Fort Wayne Toyota was kind of keeping an eye on

20   things until a general manager could be placed into position

21   at Fort Wayne.  And during that time frame, Mr. Chapin in

22   April of 2004 was placed into a used car manager's position.

23   He worked in tandem with a man named Kurt Richards, who was in

24   the new car manager's position.

25       And that was after some history with Mr. Chapin.  Mr.

1    Chapin worked on and off in the Toyota dealership over the

2    years.  And, in fact, when he returned from Minnesota, as Mr.

3    Vegeler indicated, he worked in the Fort Wayne Toyota

4    dealership as a salesperson for about three weeks, left that

5    position and about a week later, went into the used car

6    manager's position at Fort Wayne Acura.

7        About four days after he was there, the evidence is going

8    to show that, in fact, Nadim Baig was brought into the

9    dealership and announced as the new general manager to be

10   taking over operations at that store.  And there will be

11   testimony in this case about his actions while he was there

12   and the communications he had with employees and some of the

13   decisions he made associated with the management team that he

14   was inheriting from the previous regime and it were.

15       Mr. Chapin was replaced.  Mr. Richards was replaced.  A

16   month after Mr. Chapin was replaced, he was placed as a used

17   car manager at Fort Wayne Toyota, different dealership,

18   different management, different employees, different bank

19   accounts, different locations; separate companies.

20       Mr. Baig brought in two managers, Irfan Hussein to replace

21   Mr. Chapin and Anwar Al-haq to replace Kurt Richards.  And

22   there will be testimony about that and we'll talk about that a

23   little bit.

24       It's in my voir dire, but subsequently about a year later,

25   Mr. Chapin alleges that he was terminated from Fort Wayne

1    Toyota for pursuing a discrimination claim against Fort Wayne

2    Acura.  And we'll talk about that.  And then he claims he's

3    been damaged.

4        So in a nutshell, those are the issues that you're going

5    to be hearing about in this case, our perspective about the

6    separation from Fort Wayne Acura is different from Mr. Chapin.

7    Our perception and position associated with retaliation at

8    Fort Wayne Toyota is different than Mr. Chapin's and that's

9    what the evidence in this case is going to be.

10       And hearing that rendition of things, does that cause any

11   of you to be one way -- one way or the other positive or

12   negative for either of the parties at this point, Mrs. Brueck?

13            **JUROR:**  (Shaking head.)

14        **MR. JAMES BUCHHOLZ:**  What about you, Ms. Hudson?

15            **JUROR:**  (Shaking head.)

16        **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

17            **JUROR:**  No.

18        **MR. JAMES BUCHHOLZ:**  Mr. Stell, does that influence

19   you one way or the other?

20            **JUROR:**  No.

21        **MR. JAMES BUCHHOLZ:**  All right.  So you could be --

22   so from what it is you've heard, until you hear evidence from

23   the witness stand, I suppose leave there, you aren't favoring

24   one side over the other as it relates to this case, nothing

25   you've heard does that, is that right?

1           JUROR:  Sure.

2           MR. JAMES BUCHHOLZ:  What about you, Miss Dick?

3           JUROR:  No.

4           MR. JAMES BUCHHOLZ:  Miss Hoeppner?

5           JUROR:  (Shaking head.)

6           MR. JAMES BUCHHOLZ:  No?  Okay.  What about you, Mr.

7    Headings?

8           JUROR:  No.

9           MR. JAMES BUCHHOLZ:  No.  Okay, Miss Seymour?

10          JUROR:  No.

11          MR. JAMES BUCHHOLZ:  Mr. Smith?

12          JUROR:  (Shaking head.)

13          MR. JAMES BUCHHOLZ:  You heard earlier that we're the

14   defendants.  Does the fact that I represent defendants in this

15   case cause you to believe, just because of the name, they've

16   done something wrong before we hear any of the evidence from

17   the witness stand, Ms. Hoeppner?

18          JUROR:  (Shaking head.)

19          MR. JAMES BUCHHOLZ:  No.  No.  What about you, Miss

20   Tuttle?

21          JUROR:  No.

22          MR. JAMES BUCHHOLZ:  No.  Okay.  Mr. Stell?

23          JUROR:  No.

24          MR. JAMES BUCHHOLZ:  Miss Hudson?

25          JUROR:  No.

1        **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

2        **JUROR:**  No.

3        **MR. JAMES BUCHHOLZ:**  All right.  Now, just because

4   Mr. Chapin has made allegations against my clients, before we

5   start out in hearing the evidence, does that predispose you to

6   believe that something, in fact, untoward happened to him?

7   Mr. Meyer?

8        **JUROR:**  Can you ask me the question again?

9        **MR. JAMES BUCHHOLZ:**  Sure.  Sure.  Does his status as

10  a plaintiff make you believe because he's made an allegation,

11  that's necessarily true without hearing any of the evidence?

12       **JUROR:**  Oh, no.

13       **MR. JAMES BUCHHOLZ:**  You're going to listen to the

14  evidence as it comes from the witness stand before you make

15  any decisions?

16       **JUROR:**  Yes.

17       **MR. JAMES BUCHHOLZ:**  Okay.  And you'll be able to do

18  that and weigh the evidence as it comes from the witness

19  stand?

20       **JUROR:**  Yes.

21       **MR. JAMES BUCHHOLZ:**  How about you Mr. Hearn?

22       **JUROR:**  Yeah.

23       **MR. JAMES BUCHHOLZ:**  Okay.  Ms. Flener?

24       **JUROR:**  Yes.

25       **MR. JAMES BUCHHOLZ:**  Yes?

```
 1              JUROR:  Yes.

 2              MR. JAMES BUCHHOLZ:  Okay.  Miss Richardson, your

 3      fiance sells cars.  Does anything about his status as a car

 4      salesman, having to report to managers going to affect you one

 5      way or the other?

 6              JUROR:  No.

 7              MR. JAMES BUCHHOLZ:  Okay.  Car salesmen change

 8      positions from dealership to dealership more often than,

 9      perhaps, other positions.

10          Is that your experience?

11              JUROR:  He's worked for this dealership for probably

12      three years.

13              MR. JAMES BUCHHOLZ:  Okay.  So he's been pretty

14      stable in that position, then.

15          Okay.  Is there anything about his experience as relate to

16      you by his managers going to cause you to be before or against

17      my clients before we start?

18              JUROR:  (Shaking head.)

19              MR. JAMES BUCHHOLZ:  You're going to be able to

20      listen to the evidence from the witness stand and the law as

21      given to you by the Judge before you can make any decisions in

22      this case?

23              JUROR:  (No audible response.)

24              MR. JAMES BUCHHOLZ:  Okay.

25          Now, as I've done this morning so far, I've got to go
```

1    second.  And there's always two sides of a story.  Is there

2    anything about me going second that's going to have you

3    prejudge a case before all the evidence is in, Mrs. Brueck?

4         **JUROR:**  (Shaking head.)

5         **MR. JAMES BUCHHOLZ:**  Miss Hudson?

6         **JUROR:**  No.

7         **MR. JAMES BUCHHOLZ:**  How about you, Miss Grogg?

8         **JUROR:**  No.

9         **MR. JAMES BUCHHOLZ:**  You agree there's two sides to

10   every story?

11        **JUROR:**  Definitely.

12        **MR. JAMES BUCHHOLZ:**  Until you hear all the evidence

13   and all the facts, you can't make a decision?

14        **JUROR:**  That's right.

15        **MR. JAMES BUCHHOLZ:**  Nothing about that causes you

16   any concern about this case, does it?

17        **JUROR:**  No.

18        **MR. JAMES BUCHHOLZ:**  Okay.  What about you, Mr.

19   Smith?

20        **JUROR:**  No.

21        **MR. JAMES BUCHHOLZ:**  Miss Seymour?

22        **JUROR:**  No.

23        **MR. JAMES BUCHHOLZ:**  All right.  In this case, there

24   are separate claims against separate companies.

25        Is there anything about the fact that there are two

 1   defendants and one plaintiff cause you to be bias for either

 2   side before we start?

 3        **JURORS:**  (No audible response.)

 4        **MR. JAMES BUCHHOLZ:**  No?  Okay.  How about you, Miss

 5   Hudson?

 6        **JUROR:**  (Shaking head.)

 7        **MR. JAMES BUCHHOLZ:**  No?  Okay.  Now, some of the

 8   allegations against one of my clients doesn't apply to the

 9   other and vice versa.  You going to be able to separate that

10   out while listening to the evidence in this case and to the

11   instructions from Your Honor associated with the law, Miss

12   Brueck?

13        **JUROR:**  I didn't quite understand the question.

14        **MR. JAMES BUCHHOLZ:**  Sure.  Sure.  Mr. Chapin has

15   made allegations associated with reverse race, religious and

16   national origin claims against my client, Fort Wayne Acura

17   Subaru, okay?

18        **JUROR:**  Okay.

19        **MR. JAMES BUCHHOLZ:**  Is anything associated with

20   those claims going to slop over in terms of your

21   determinations about the Fort Wayne Toyota claims wherein he

22   claims he was retaliated against?

23        **JUROR:**  No.

24        **MR. JAMES BUCHHOLZ:**  You're going to be able to

25   separate that out because there's two companies and two

```
 1    claims?

 2              JUROR:  Yes.

 3              MR. JAMES BUCHHOLZ:  Okay.  And you, Miss Hudson, you

 4    going to be able to do that?

 5              JUROR:  Absolutely.

 6              MR. JAMES BUCHHOLZ:  What about you, Mr. Hearn?

 7              JUROR:  To the best of my ability.

 8              MR. JAMES BUCHHOLZ:  All right.  Is there anything

 9    about that process that causes you concern before we start out

10    in hearing the evidence?

11              JUROR:  No.

12              MR. JAMES BUCHHOLZ:  Okay.  What about you, Miss

13    Seymour?

14              JUROR:  No.

15              MR. JAMES BUCHHOLZ:  Mr. Stell, anything about you on

16    that?

17              JUROR:  I guess I lost something there.  He was fired

18    from both places or terminated from both places?

19              MR. JAMES BUCHHOLZ:  He claims he was terminated from

20    both places.  We don't have the same position as that.

21              JUROR:  I understand that.

22              MR. JAMES BUCHHOLZ:  What about that?

23              JUROR:  He had worked both places?

24              MR. JAMES BUCHHOLZ:  There's no question about that,

25    sir, yes.
```

 1        **JUROR:**  And one place terminated for one reason and

 2   the other place terminated for another reason for --

 3        **MR. JAMES BUCHHOLZ:**  That's his position.  That's

 4   true.  That's his position.  We don't necessarily agree with

 5   that, you understand?

 6        **JUROR:**  Yes, I understand.

 7        **MR. JAMES BUCHHOLZ:**  And there's more than one side

 8   to every story?

 9        **JUROR:**  Yes.

10        **MR. JAMES BUCHHOLZ:**  But anything about the existence

11   of claims against two different companies cause you any

12   concern before we start off?

13        **JUROR:**  (Shaking head.)

14        **MR. JAMES BUCHHOLZ:**  You'd be able to sift that out?

15        **JUROR:**  (Nodding.)

16        **MR. JAMES BUCHHOLZ:**  What about you, Miss Richardson?

17   Would you be able to do that as well?

18        **JUROR:**  Yes.

19        **MR. JAMES BUCHHOLZ:**  Okay.  Miss Dick?

20        **JUROR:**  Yes.

21        **MR. JAMES BUCHHOLZ:**  Okay.  Now in a civil case, the

22   plaintiff has the burden of proof.  You have any problem with

23   that proposition, any of the people in the panel?

24        **JURORS:**  (No audible response.)

25        **THE COURT:**  All right.  And as it relates to proof,

```
 1    there are two elements, responsibility and reliability, and

 2    damages.  Any problem with that proposition in what a

 3    plaintiff would have to prove before we hear the evidence

 4    predisposes you to agree or disagrees with either side's

 5    position in this case?

 6         JURORS:  (No audible response.)

 7         MR. JAMES BUCHHOLZ:  Mrs. Grogg, anything about that

 8    that causes you concerns?

 9         JUROR:  No.

10         MR. JAMES BUCHHOLZ:  What about you, Mr. Smith?

11         JUROR:  No.

12         MR. JAMES BUCHHOLZ:  And Miss Tuttle, anything about

13    that?

14         JUROR:  No problem.

15         MR. JAMES BUCHHOLZ:  Okay.  What about you, Miss

16    Hoeppner?

17         JUROR:  (No audible response.)

18         MR. JAMES BUCHHOLZ:  Mr. Headings?

19         JUROR:  No problem.

20         MR. JAMES BUCHHOLZ:  Okay.  Since I go second in this

21    case, I may not call as many witnesses as Mr. Vegeler.  Is the

22    number of witnesses going to predispose you as to one side or

23    the other having more merit than the other, Mrs. Flener?

24         JUROR:  No.

25         MR. JAMES BUCHHOLZ:  Miss Seymour?
```

 1              **JUROR:**  No.

 2              **MR. JAMES BUCHHOLZ:**  Does anybody have any idea

 3      there's too many lawsuits filed these days, Miss Brueck?

 4              **JUROR:**  No, not really.

 5              **MR. JAMES BUCHHOLZ:**  Okay.  The fact that Mr. Chapin

 6      has filed a claim doesn't predispose you for or against him

 7      based on the number of suits you hear about in the papers,

 8      right?

 9              **JUROR:**  No.  No.

10              **MR. JAMES BUCHHOLZ:**  What about you, Miss Flener?

11              **JUROR:**  No.

12              **MR. JAMES BUCHHOLZ:**  Miss Seymour?

13              **JUROR:**  No.

14              **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

15              **JUROR:**  Certainly topic of conversation at least.

16              **MR. JAMES BUCHHOLZ:**  Okay.  Well, as relates to that

17      conversation, is there anything that predisposes you one way

18      or the other to one side or the other?

19              **JUROR:**  No, I don't believe so.

20              **MR. JAMES BUCHHOLZ:**  Now, Mr. Vegeler was talking

21      about a large number of dealerships other than ones that we're

22      involved with in this case.

23          Does anything about buying a car have anything that puts

24      you on edge about the type of business my clients are in, Miss

25      Brueck?

 1           **JUROR:**  No.

 2           **MR. JAMES BUCHHOLZ:**  What about you, Miss Hudson?

 3           **JUROR:**  No.

 4           **MR. JAMES BUCHHOLZ:**  Miss Grogg?

 5           **JUROR:**  No.

 6           **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

 7           **JUROR:**  Well, I think I should be honest with you on

 8    that.

 9           **MR. JAMES BUCHHOLZ:**  Sure.

10           **JUROR:**  My younger -- my younger sister did have a,

11    what appears to be an unfortunate situation with buying a car

12    at a large dealership.  And from her end of the deal, things

13    were, you know, she was stuck with two vehicles, making

14    payments on them and it was a mess.

15           **MR. JAMES BUCHHOLZ:**  Sounds like it was a transaction

16    gone bad?

17           **JUROR:**  Yes, you can put it that way.

18           **MR. JAMES BUCHHOLZ:**  So sounds like I know a little

19    bit about the car business, as you can imagine, sounds like

20    there's a car that was purchased and perhaps the trade didn't

21    work or something of that nature?

22           **JUROR:**  Yes.

23           **MR. JAMES BUCHHOLZ:**  And so she's stuck with two

24    cars.  Anything about that process that's going to predispose

25    you against my clients?

1    **JUROR:**  I would say no, but I mean, um, car, you

2    know, buying cars, you got to be careful I guess.

3    **MR. JAMES BUCHHOLZ:**  That's right.  It's a tough

4    business, isn't it?

5    **JUROR:**  Yeah.

6    **MR. JAMES BUCHHOLZ:**  It's -- I've been told

7    oftentimes, Mr. Grogg (sic), Mr. Meyer, that the worst two

8    kinds of professions are car dealers and lawyers.  Sounds to

9    me like you've got a little bit of that in you, you agree with

10   that?

11   **JUROR:**  Oh, sure.

12   **MR. JAMES BUCHHOLZ:**  Okay.  Well, is there anything

13   about that process, then, going to cause my clients to start

14   off on a lower end having to gain more of your attention in

15   order to believe what they have to say?

16   **JUROR:**  No, sir, I don't believe so.

17   **MR. JAMES BUCHHOLZ:**  Okay.  Well, that car

18   transaction, is that something -- that didn't happen in any of

19   my clients, did it?

20   **JUROR:**  No, sir.

21   **MR. JAMES BUCHHOLZ:**  Okay.  It didn't happen at

22   Toyota or Acura?

23   **JUROR:**  No.

24   **MR. JAMES BUCHHOLZ:**  Correct?  Okay.  But it was

25   another dealership here in town?

 1              **JUROR:**  Yes, sir.

 2          **MR. JAMES BUCHHOLZ:**  And how long ago did that occur?

 3          **JUROR:**  Oh, I'm going to say maybe within the last

 4    two years.

 5          **MR. JAMES BUCHHOLZ:**  Okay.  Is this the same sister

 6    you're going to do some counselling with?

 7          **JUROR:**  Yes, sir.

 8          **MR. JAMES BUCHHOLZ:**  So this is a sister that has a

 9    special place with what's going on, right?

10          **JUROR:**  Yes.

11          **MR. JAMES BUCHHOLZ:**  What about you, Mr. Smith, have

12    you had any bad experience buying cars?

13          **JUROR:**  No, sir, not yet.

14          **MR. JAMES BUCHHOLZ:**  Not yet.  It sounds like you

15    don't think the car business is a good business?

16          **JUROR:**  No, sir.

17          **MR. JAMES BUCHHOLZ:**  Okay.  Anything about the car

18    business generally that causes you to be for or against my

19    client?

20          **JUROR:**  No.

21          **MR. JAMES BUCHHOLZ:**  Mr. Chapin's been in the car

22    business a long time; anything having to do with causes you

23    concern one way or the other?

24          **JUROR:**  No, sir.

25          **MR. JAMES BUCHHOLZ:**  Okay.  Miss Seymour?

1        **JUROR:**  Nope.

2        **MR. JAMES BUCHHOLZ:**  All right.  What about you, Miss

3   Flener?

4        **JUROR:**  No.

5        **MR. JAMES BUCHHOLZ:**  Mr. Hearn?

6        **JUROR:**  No.

7        **MR. JAMES BUCHHOLZ:**  Now, one of the processes

8   associated with buying a car is financing associated with it.

9   Is there anything about the financing process, any car

10  dealership, anywhere, whether it's my client or not, affected

11  any of you negatively, other than your sister, Mr. Meyer?

12       **JURORS:**  (No audible response.)

13       **MR. JAMES BUCHHOLZ:**  Miss Richardson, anything about

14  that process cause you concern one way or the other?

15       **JUROR:**  (No audible response.)

16       **MR. JAMES BUCHHOLZ:**  You've got a softer spot for

17  financial salesman of cars, I understand?

18       **JUROR:**  Yes.

19       **MR. JAMES BUCHHOLZ:**  Miss Hoeppner, my law office and

20  the Kruse office tend to go head to head on quite a number of

21  matters; do you understand?

22       **JUROR:**  Yeah.

23       **MR. JAMES BUCHHOLZ:**  Is there anything about the

24  place you work and the place I may work and being adverse to

25  each other going to cause you to be for or against my client?

1      **JUROR:**  No.

2      **MR. JAMES BUCHHOLZ:**  You understand why I have that

3  concern?

4      **JUROR:**  Mmm-mm.  (Nodding.)

5      **MR. JAMES BUCHHOLZ:**  But you think that despite the

6  fact that I'm in an office that goes against the office that

7  you work for part-time is not going to cause you concern one

8  way or the other?

9      **JUROR:**  (Shaking head.)

10     **MR. JAMES BUCHHOLZ:**  Okay.  Mr. Vegeler asked you a

11  question about if the evidence shows that Mr. Chapin is

12  entitled to some money, would you have a problem, if the proof

13  were there as posed and the law as given by the Judge, could

14  you give him an award of damages; you remember that set of

15  questions, everybody?

16     **JURORS:**  (No audible response.)

17     **MR. JAMES BUCHHOLZ:**  If the proof isn't there, and

18  there are no damages, are you able to send him out of here

19  without giving him a penny?  If the law from the Court is

20  appropriate, and the evidence from the witness stand supports

21  it, you would be able to do that, Miss Seymour?

22     **JUROR:**  Yes.

23     **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

24     **JUROR:**  Yes, sir.

25     **MR. JAMES BUCHHOLZ:**  Miss Grogg?

1           **JUROR:**  Yes.

2           **MR. JAMES BUCHHOLZ:**  Miss Hudson?

3           **JUROR:**  Yes.

4           **MR. JAMES BUCHHOLZ:**  Miss Brueck?

5           **JUROR:**  (Nodding.)

6           **MR. JAMES BUCHHOLZ:**  Miss Flener?

7           **JUROR:**  Yes.

8           **MR. JAMES BUCHHOLZ:**  Mr. Hearn?

9           **JUROR:**  Yes.

10          **MR. JAMES BUCHHOLZ:**  Miss Dick?

11          **JUROR:**  Yes.

12          **MR. JAMES BUCHHOLZ:**  Okay.  Now, we heard about the

13  Bob Rohrman Auto Group.  Mr. Rohrman's on television a lot.

14  Anything about his commercials that cause you to say one way

15  or another that he's a guy you'd want to listen to or not,

16  Miss Brueck?

17          **JUROR:**  (No audible response.)

18          **MR. JAMES BUCHHOLZ:**  Miss Hudson?

19          **JUROR:**  (Shaking head.)

20          **MR. JAMES BUCHHOLZ:**  Miss Grogg?

21          **JUROR:**  No.

22          **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

23          **JUROR:**  No, sir.

24          **MR. JAMES BUCHHOLZ:**  Miss Seymour?

25          **JUROR:**  No.

 1        **MR. JAMES BUCHHOLZ:**  Mr. Smith?

 2        **JUROR:**  No.

 3        **MR. JAMES BUCHHOLZ:**  Okay.  Now, sounds like none of

 4    you have you been at dealerships looking for cars.  Maybe the

 5    advertising needs to be better.  Within that, the advertising,

 6    does that cause you to be biased against him, anybody?  Raise

 7    your hands if you do.

 8        **JURORS:**  (No audible response.)

 9        **MR. JAMES BUCHHOLZ:**  Thanks.  Mr. Kruse has been on

10    television on behalf of Fort Wayne Toyota Lexus.  Anything

11    about his commercials that cause you to believe positively or

12    negative in his favor or for or against him and his dealership

13    before we start, Ms. Brueck?

14        **JUROR:**  (No audible response.)

15        **MR. JAMES BUCHHOLZ:**  Miss Hudson?

16        **JUROR:**  No.

17        **MR. JAMES BUCHHOLZ:**  Miss Dick?

18        **JUROR:**  No.

19        **MR. JAMES BUCHHOLZ:**  Miss Seymour?

20        **JUROR:**  No.

21        **MR. JAMES BUCHHOLZ:**  What about you, Mr. Stell?

22        **JUROR:**  No.

23        **MR. JAMES BUCHHOLZ:**  Miss Tuttle?

24        **JUROR:**  I know I wouldn't be buying a Lexis, but that

25    wouldn't proclaim or keep me from going to his dealership to

1  purchase some other vehicle.

2      **MR. JAMES BUCHHOLZ:** Okay. You wouldn't buy a Lexus

3  not because of him; you don't like the product line?

4      **JUROR:** I don't like the price.

5      **MR. JAMES BUCHHOLZ:** Okay. That's fair enough. But

6  you don't have any preconceptions about Mr. Rohrman or Mr.

7  Kruse because you've seen them on television?

8      **JUROR:** No, and I admitted we have purchased a

9  vehicle from --

10     **MR. JAMES BUCHHOLZ:** Mr. Householder?

11     **JUROR:** Well, he wasn't the actual salesperson. I

12 don't remember his name, but Mr. Householder, we did talk with

13 him.

14     **MR. JAMES BUCHHOLZ:** Now, Mr. Householder is an

15 employee of Fort Wayne Toyota you know?

16     **JUROR:** Correct.

17     **MR. JAMES BUCHHOLZ:** Does anything about your prior

18 experience with him cause you positive or negative feelings

19 about him?

20     **JUROR:** No.

21     **MR. JAMES BUCHHOLZ:** Okay. Are you able to listen to

22 any testimony he may give in this case and fairly balance it?

23     **JUROR:** Yes.

24     **MR. JAMES BUCHHOLZ:** Okay. So if he says something,

25 that's not -- not under a lens for bad or not under a lens for

 1    good for you?

 2              **JUROR:**  I can listen to it fairly.

 3              **MR. JAMES BUCHHOLZ:**  We talked about Mr. Baig.  And

 4    Mr. Vegeler said Mr. Baig is from the Middle East.  He's a

 5    Pakistan national who's moved to the United States, and become

 6    part of our society.

 7         Anything about his background cause you to agree or

 8    distrust him in any fashion or any testimony he may give

 9    before we start out in this case, Ms. Brueck?

10              **JUROR:**  No.

11              **MR. JAMES BUCHHOLZ:**  Ms. Grogg?

12              **JUROR:**  No.

13              **MR. JAMES BUCHHOLZ:**  Ms. Seymour?

14              **JUROR:**  No.

15              **MR. JAMES BUCHHOLZ:**  Mr. Smith?

16              **JUROR:**  No.

17              **MR. JAMES BUCHHOLZ:**  And now we are at war now in the

18    Middle East.  Is there anything about that process and what

19    our country's going through to cause you to have a dimmer view

20    of somebody from the Middle East, Ms. Dick?

21              **JUROR:**  No.

22              **MR. JAMES BUCHHOLZ:**  Mr. Hearn?

23              **JUROR:**  No.

24              **MR. JAMES BUCHHOLZ:**  Miss Flener?

25              **JUROR:**  No.

1          **MR. JAMES BUCHHOLZ:**  What about you, Mr. Headings?

2          **JUROR:**  No.

3          **MR. JAMES BUCHHOLZ:**  Miss Hoeppner?

4          **JUROR:**  No.

5          **MR. JAMES BUCHHOLZ:**  Any of you have family in the

6   military who is currently overseas; raise your hand if you do?

7       Mr. Hearn, can you tell me how long has your family member

8   been away?

9          **JUROR:**  He's been away for three months.

10          **MR. JAMES BUCHHOLZ:**  Okay.  Is there anything

11  about -- is he in Iraq or Afghanistan or some other location?

12          **JUROR:**  Iraq.

13          **MR. JAMES BUCHHOLZ:**  Is there anything about him

14  being there that cause you positive feelings or negative

15  feelings about Mr. Baig if he comes in and testifies based

16  upon the area of the world he comes from?

17          **JUROR:**  No.

18          **THE COURT:**  Who is it in your family that's serving?

19          **JUROR:**  It my nephew.

20          **THE COURT:**  Thank you.

21          **JUROR:**  Do you need the name?

22          **THE COURT:**  No, it's not necessary.

23          **MR. JAMES BUCHHOLZ:**  Okay.  Mr. Baig, the testimony

24  has been, and I've told you is the general manager of Fort

25  Wayne Acura.

```
 1          Anything about his position at that dealership and his

 2   nationality cause you to believe positively or negatively

 3   about the defendants or the plaintiff in this case, Miss

 4   Brueck?

 5          JUROR:  No.

 6          MR. JAMES BUCHHOLZ:  Miss Hudson?

 7          JUROR:  No.

 8          MR. JAMES BUCHHOLZ:  Miss Seymour?

 9          JUROR:  No.

10          MR. JAMES BUCHHOLZ:  Mr. Smith?

11          JUROR:  No.

12          MR. JAMES BUCHHOLZ:  What about you, Mr. Meyer?

13          JUROR:  No.

14          MR. JAMES BUCHHOLZ:  Anybody on the panel ever been

15   involved in management changes at a place of work?  Okay.  Ms.

16   Tuttle, what was the experience wishing you involving a

17   management change?

18          JUROR:  Personally as a manager or the person that

19   was --

20          MR. JAMES BUCHHOLZ:  Either way.

21          JUROR:  I worked at a restaurant and we were a

22   training restaurant, so shift leaders and management trainees

23   would come through all the time.

24          MR. JAMES BUCHHOLZ:  Is there anything about that

25   process or your experiences there that would put you more
```

1   favorably for Mr. Chapin or against Mr. Chapin starting off

2   here?

3         **JUROR:**  No.

4         **MR. JAMES BUCHHOLZ:**  How about in favor of the

5   defendants one way or the other?

6         **JUROR:**  No.

7         **MR. JAMES BUCHHOLZ:**  Who else had their hand up?  You

8   did, Mr. Stell.  That would be the changing of the mayor-type

9   situation?

10        **JUROR:**  Yes, political.

11        **MR. JAMES BUCHHOLZ:**  Anything about that process that

12  cause you inability to be fair to either Mr. Chapin or my

13  clients?

14        **JUROR:**  No.

15        **MR. JAMES BUCHHOLZ:**  In this case, Mr. Chapin was a

16  manager at Fort Wayne Acura and he was also a manager when he

17  was at Fort Wayne Toyota.  Have any of you been in management

18  when there's been a separation occurred, anybody, hand up?

19        **JURORS:**  (No audible response.)

20        **MR. JAMES BUCHHOLZ:**  Okay.  Have any of been -- have

21  family members that have been caught in a management change at

22  a place of employment and lost a job as a result?

23        **JURORS:**  (No audible response.)

24        **MR. JAMES BUCHHOLZ:**  Okay.  Mr. Hearn, are you the

25  member of a union or one of your family members?

1      **JUROR:**  I am.

2      **MR. JAMES BUCHHOLZ:**  Okay.  Is anything about the

3   fact that you're involved in a union cause you concern about

4   what management does?

5      **JUROR:**  No.

6      **MR. JAMES BUCHHOLZ:**  Okay.  You understand how it is

7   representing an employer that could be concerned about your

8   relationship with a union, and the animosity that it may well

9   have with some management?

10      **JUROR:**  I understand.

11      **MR. JAMES BUCHHOLZ:**  Okay.  Is there anything about

12   your union position that puts you in conflict with management?

13      **JUROR:**  No.

14      **MR. JAMES BUCHHOLZ:**  Okay.  Are you any type of

15   leader within the union?

16      **JUROR:**  No.

17      **MR. JAMES BUCHHOLZ:**  Okay.  So is there anything

18   about your union status at all that puts the plaintiff on an

19   unequal balance with the defendants in this case?

20      **JUROR:**  No.

21      **MR. JAMES BUCHHOLZ:**  Mr. Stell, you were part of the

22   Teamsters for a period of time?

23      **JUROR:**  Yes, sir.

24      **MR. JAMES BUCHHOLZ:**  Okay.  Does anything about that

25   process give you an evil eye towards management as it were?

1        **JUROR:** No.

2        **MR. JAMES BUCHHOLZ:** So anything about that process

3  cause you more to be in favor of Mr. Chapin or my clients

4  before we start out?

5        **JUROR:** No.

6        **MR. JAMES BUCHHOLZ:** Are you able to listen to the

7  evidence as it comes from the witness stand and the law as the

8  Judge reads it?

9        **JUROR:** Yes.

10       **MR. JAMES BUCHHOLZ:** Miss Hoeppner, what about you?

11       **JUROR:** Repeat the question, please.

12       **MR. JAMES BUCHHOLZ:** Sure.  Sure.

13     As I understand it, you or your husband is involved with a

14  union?

15       **JUROR:** My husband, yes.

16       **MR. JAMES BUCHHOLZ:** Okay.  Is there anything about

17  that process that causes him to be in conflict with management

18  at all?

19       **JUROR:** No.

20       **MR. JAMES BUCHHOLZ:** Anything about his position in

21  the union that causes you to favor employees over management

22  one way or the other?

23       **JUROR:** No.

24       **MR. JAMES BUCHHOLZ:** Are you able to give Mr. Chapin

25  and my clients a fair shake one way or the other, listening to

1    the evidence from the witness stand?

2            **JUROR:**  Yeah.

3            **MR. JAMES BUCHHOLZ:**  As well as the law written by

4    the Judge?

5            **JUROR:**  Yeah.

6            **MR. JAMES BUCHHOLZ:**  Mr. Headings, how about you?

7            **JUROR:**  No problem.

8            **MR. JAMES BUCHHOLZ:**  Okay.  Your wife is a member of

9    a union?

10           **JUROR:**  Yes.

11           **MR. JAMES BUCHHOLZ:**  Okay.  And are you as well?

12           **JUROR:**  No, I'm not.

13           **MR. JAMES BUCHHOLZ:**  Okay.  Anything about her

14   participation in that regard that puts you favorably to one

15   side or the other before we start?

16           **JUROR:**  No.

17           **MR. JAMES BUCHHOLZ:**  Are you able to listen to the

18   witnesses and the law as given by the Judge to make a

19   determination?

20           **JUROR:**  Yes.

21           **MR. JAMES BUCHHOLZ:**  Okay.  We're going hear in this

22   case Mr. Chapin -- one of the things he claims is that his

23   separation from Fort Wayne Acura was because of his skin

24   color, because of his religion and because he's a United

25   States citizen.

```
 1        Okay.  Any of those things in terms of his religious
 2   background cause you to be more favorable towards him or
 3   against him as relates to listening to the evidence or the law
 4   by the Judge?
 5             JURORS:  (No audible response.)
 6             MR. JAMES BUCHHOLZ:  Mr. Meyer?
 7             JUROR:  No.
 8             MR. JAMES BUCHHOLZ:  How about you, Mr. Hearn?
 9             JUROR:  No.
10             MR. JAMES BUCHHOLZ:  Miss Flener?
11             JUROR:  No.
12             MR. JAMES BUCHHOLZ:  Miss Brueck?
13             JUROR:  No.
14             MR. JAMES BUCHHOLZ:  Miss Richardson?
15             JUROR:  No.
16             MR. JAMES BUCHHOLZ:  Miss Grogg?
17             JUROR:  No.
18             MR. JAMES BUCHHOLZ:  Miss Seymour?
19             JUROR:  No.
20             MR. JAMES BUCHHOLZ:  Miss Tuttle?
21             JUROR:  (Shaking head.)
22             MR. JAMES BUCHHOLZ:  In this case, there's going to
23   be evidence coming from an audio tape.  Is there anything that
24   any of you have in terms of hearing that would cause you
25   concern about being able to fairly listen to that tape?
```

 1          **JURORS:**  (No audible response.)

 2          **MR. JAMES BUCHHOLZ:**  In you have any hearing issues,

 3    hearing problems?

 4          **JURORS:**  (No audible response.)

 5          **MR. JAMES BUCHHOLZ:**  Now this audio tape is not the

 6    best quality.  It's not like you're getting a CD and listening

 7    to it from the store.

 8       Is there anything about the quality of the tape that's

 9    going to cause you to favorably be for one of the parties or

10    against one of the parties in this case; be able to listen to

11    the tape fairly, without any problems with hearing or

12    otherwise, Miss Flener?

13          **JUROR:**  Yes.

14          **MR. JAMES BUCHHOLZ:**  Yes, Mr. Stell?

15          **JUROR:**  Are you saying as far as hearing what they

16    have to say or hearing in general?

17          **MR. JAMES BUCHHOLZ:**  Hearing in general, because I'm

18    telling you this tape is a very crackly quality.

19          **JUROR:**  I do have a little bit of a hearing problem.

20          **MR. JAMES BUCHHOLZ:**  Okay.  Is there anything

21    associated with a poor quality of audio tape that would cause

22    you concern about being able to be fair to one side or the

23    other as relates to this case?

24          **JUROR:**  Not as far as the quality, just being able to

25    hear it.

1        **MR. JAMES BUCHHOLZ:**  Well, you'd agree with me if

2   there's information on that tape that is supporting to Mr.

3   Chapin or supporting to my clients, it would be important for

4   you to understand that information?

5        **JUROR:**  Yes, I agree with you.

6        **MR. JAMES BUCHHOLZ:**  Okay.  Is there anything about

7   your hearing condition that causes you concern before we

8   start, before you hear it about whether you should be able to

9   evaluate that tape?

10       **JUROR:**  Yeah, like I say, I belong to the Teamster.

11  I had to take an annual physical and there was twice the

12  doctor had to do it twice for me to hear.

13       **MR. JAMES BUCHHOLZ:**  Okay.

14       **JUROR:**  And he said I was subject to hearing aids,

15  so.

16       **MR. JAMES BUCHHOLZ:**  Okay.  Do you wear hearing aids?

17       **JUROR:**  No, I no longer belong to -- I'm retired.  I

18  don't need them as far as --

19       **MR. JAMES BUCHHOLZ:**  Do you have hearing aids if

20  you're choses as a juror that you would be willing to wear to

21  hear this tape?

22       **JUROR:**  No, I don't have any.

23       **THE COURT:**  You have had any problem hearing what's

24  been going on in court for the last hour?

25       **JUROR:**  No, there's some things.  There's certain

1    pitches I don't hear, but no, not in general.

2         THE COURT:  And if you were otherwise chosen as a

3    juror in this case, you wouldn't be shy if something is being

4    presented to you in the form of these tapes, if you can't hear

5    it, you would raise your hand to say, turn it up or --

6         JUROR:  No, I would not be shy about that.

7         THE COURT:  I didn't think you would.  Okay.

8       Go ahead, Mr. Buchholz.

9         MR. JAMES BUCHHOLZ:  Okay.  There's going to be some

10   former employees testifying in this case and some current

11   employees testifying in this case.

12      Does the status of a former employee or current employee

13   have any effect on your ability to fairly listen to what it is

14   they have to say from the witness stand?

15        JURORS:  (No audible response.)

16        MR. JAMES BUCHHOLZ:  Mr. Meyer?

17        JUROR:  No.

18        MR. JAMES BUCHHOLZ:  Miss Richardson?

19        JUROR:  (Shaking head.)

20        MR. JAMES BUCHHOLZ:  Mr. Hearn?

21        JUROR:  No.

22        MR. JAMES BUCHHOLZ:  Miss Brueck?

23        JUROR:  No.

24        MR. JAMES BUCHHOLZ:  At the conclusion of this case,

25   if Mr. Chapin has not met his burden of proof, do you have any

1  problem telling him he has not met his burden of proof and

2  saying that one of my clients is not responsible to him in any

3  fashion, Miss Brueck?

4  **JUROR:**  No problem.

5  **MR. JAMES BUCHHOLZ:**  Miss Hudson?

6  **JUROR:**  No.

7  **MR. JAMES BUCHHOLZ:**  Miss Grogg?

8  **JUROR:**  No.

9  **MR. JAMES BUCHHOLZ:**  Mr. Meyer?

10  **JUROR:**  No.

11  **MR. JAMES BUCHHOLZ:**  Mr. Smith?

12  **JUROR:**  No.

13  **MR. JAMES BUCHHOLZ:**  Miss Seymour?

14  **JUROR:**  No.

15  **MR. JAMES BUCHHOLZ:**  Mr. Headings?

16  **JUROR:**  (Shaking head.)

17  **MR. JAMES BUCHHOLZ:**  Miss Hoeppner?

18  **JUROR:**  No.

19  **MR. JAMES BUCHHOLZ:**  Miss Tuttle?

20  **JUROR:**  No.

21  **MR. JAMES BUCHHOLZ:**  Mr. Stell?

22  **JUROR:**  No problem.

23  **MR. JAMES BUCHHOLZ:**  Miss Richardson?

24  **JUROR:**  (Shaking head.)

25  **MR. JAMES BUCHHOLZ:**  Miss Dick?

1          **JUROR:**  No.

2          **MR. JAMES BUCHHOLZ:**  Mr. Hearn?

3          **JUROR:**  No.

4          **MR. JAMES BUCHHOLZ:**  Miss Flener?

5          **JUROR:**  No.

6          **MR. JAMES BUCHHOLZ:**  I have a relative who works at

7    Parkview Hospital.  Is there any connection you have or any

8    connection in this case or anything associated with lawyers,

9    Miss Richardson?

10          **JUROR:**  No.

11          **THE COURT:**  Same last name?

12          **MR. JAMES BUCHHOLZ:**  No, but very talkie.

13          **THE COURT:**  Would she recognize the relative's name?

14          **MR. JAMES BUCHHOLZ:**  She might.  If you want it.

15    Matthew or Katrina Klein (phonetic).

16          **JUROR:**  I do know them, but -- Katrina works at

17    Parkview North, so I don't see her -- I haven't seen her

18    lately.  I just know Matthew, I just see him passing.

19          **MR. JAMES BUCHHOLZ:**  Is there any concern you have

20    associated with knowing them that would be fair or unfair as

21    relates to this case?

22          **JURORS:**  (No audible response.)

23          **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

24          **THE COURT:**  Anything from -- any further voir dire on

25    your part, Mr. Vegeler?

1        **MR. ROBERT VEGELER:**  No, Your Honor.

2        **THE COURT:**  Ladies and gentlemen, we've been at this

3   part of the voir dire for a while this morning.  So let's take

4   about a fifteen-minute break.  During this time you can use

5   the facilities, grab another coffee out of the jury assembly

6   room if you want, just stretch and we'll be back on the

7   record.

8        During this time period, counsel will be able to confer

9   with their clients and when we're back in the courtroom at the

10  end of the recess, then we'll go through the strike process

11  and we should be able to have a jury selected when we're back

12  in here.  It's twenty 'til 11:00 by this o'clock and let's

13  take a recess until 5 'til.

14       Now, during this recess, let me just mention two things.

15  First, you should not discuss the issues that have come up

16  during the voir dire process, you know, amongst yourselves.

17  And secondly, when you come back into the courtroom, resume

18  the position, the seats you're in right now, okay?  So during

19  the break do not talk about the case, you can talk about the

20  weather or anything else, but not about the case, the lawyers,

21  the parties or anything like that, all right?

22       We'll see you back in here at 5 'til.

23       (Prospective Jurors absent.)

24       **THE COURT:**  Okay, counsel, we'll be in recess for

25  about 15 minutes.  I would ask you to take this opportunity to

1    confer.  Once we're back on the record, I'll ask you to

2    approach.  The last juror is out.  Mr. Vegeler.

3         **MR. ROBERT VEGELER:**  Refresh my memory, if you do not

4    strike one of the 14, then they are --

5         **THE COURT:**  No back strikes.

6         **MR. ROBERT VEGELER:**  Okay.

7         **THE COURT:**  No back striking.  They're accepted

8    unless in subsequent voir dire cause develops like they

9    suddenly remember they're related to one of the witnesses or

10   party, some basis of cause.  So there's no back strike.

11        So when you're picking -- when you're making your

12   selections, when you're doing your preempts, the first eight

13   that both sides approve, that's your jury and usually we're

14   able to garner the jury from the 14 in the box, unless we have

15   several challenges for cause.

16        Any question on that, Mr. Vegeler?

17        **MR. ROBERT VEGELER:**  No, Your Honor.

18        **THE COURT:**  Mr. Buchholz?

19        **MR. JAMES BUCHHOLZ:**  I have got one of the

20   individuals here is my sister's brother-in-law.  So when Mr.

21   Tiernon sitting in the back, he will be eventually called as

22   we get far enough.  I wanted Your Honor to know, I wasn't sure

23   whether it would be him.  I recognized him.

24        **THE COURT:**  All right.  I haven't asked --

25        **MR. JAMES BUCHHOLZ:**  Whether that's an issue or not,

1    I don't know.

2         **THE COURT:**  And I haven't heard and I haven't invited

3    a motion for separation yet.  We'll get to that once we get

4    the jury selected.

5         All right.  Until 5 'til.

6         (Whereupon, a break was taken; thereafter, the

7    following proceedings were held:)

8         (Whereupon, all Prospective Jurors are present in the

9    courtroom.)

10        **THE COURT:**  Go ahead and be seated.  I just thought

11   you'd still be out in the hallway, waiting to be called in.

12   I'm surprised.  All right.  Go ahead and be seated.

13        All right.  Counsel, let me ask, have you had an

14   opportunity to confer and are you ready to approach the bench?

15        **MR. ROBERT VEGELER:**  Upon behalf of the plaintiff,

16   Your Honor, yes.

17        **THE COURT:**  Mr. Buchholz?

18        **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

19        **THE COURT:**  All right.  Please approach.

20        **MR. JAMES BUCHHOLZ:**  Turn my microphone off?

21        **THE COURT:**  Yes, I think that would be best, and I

22   can't -- Tina, can you hear us?

23        **COURT REPORTER:**  (Nodding.)

24        **THE COURT:**  All right.  She's good.  Let me ask,

25   first, are there any questions you want the Court to ask the

1   panel, Mr. Vegeler?

2              **MR. ROBERT VEGELER:**  No, Your Honor.

3              **THE COURT:**  Mr. Buchholz, for your clients?

4              **MR. JAMES BUCHHOLZ:**  No, Your Honor.

5              **THE COURT:**  Any challenges for cause, Mr. Vegeler,

6   for your client, the first one?

7              **MR. ROBERT VEGELER:**  No.

8              **THE COURT:**  Any challenge for cause for your clients?

9              **MR. JAMES BUCHHOLZ:**  Yes, I have a challenge for Mr.

10  Meyer based upon his indication about the concern about his

11  sister's transaction as well as the Youth for Christ issue.

12  It just seems to me, Judge, based upon what he's said, he's

13  not going to be fair and unbiased as to each party and we

14  would move for his striking by cause.

15             **THE COURT:**  Why do you think -- I asked him and

16  followed up, I thought pretty thoroughly, with regard to his

17  sister's counselling session.  What else did he say that

18  concerned you or indicates that he might be biased?

19             **MR. JAMES BUCHHOLZ:**  He claims or he said in his

20  response to his questions that the counselling session, a

21  financial deal, deal with his sister that dealt with bad car

22  transaction and he has issue with car dealers as it were.  I

23  followed up with him some.  I'm not convinced he can be fair

24  and unbiased in those situations and would move him for cause.

25             **THE COURT:**  What do you think, Mr. Vegeler?

1          **MR. ROBERT VEGELER:**  I disagree, Your Honor.  It

2      seems to me those appear to be non-material concerns.  It's

3      certainly not the anti-religious, anti-bias or the

4      pro-Christian and any bias on sister's bankruptcy.  I don't

5      think was caused by -- there's no evidence there's a bad car

6      deal.

7          **THE COURT:**  Let me just say this.  I'm not going to

8      grant -- I'm not going to strike him for cause, because I'm

9      convinced because of my questioning of him and questions

10     counsel posed to him, that Mr. Meyer is making a real effort,

11     has made an effort to determine that he can have an open mind

12     with regard to this case and be fair to both sides.  I think

13     there's been plenty of issues that came out that had he had

14     any hesitation in being able to sit on this jury with these

15     issues that he would have been forthright with the Court.  So

16     I would not be surprised if you exercise a peremptory at him

17     or with regard to him, but as to a challenge for cause, I

18     don't -- I disagree.  So I'll disallow.

19        Did you have any other challenges for cause?

20          **MR. JAMES BUCHHOLZ:**  No, I did not.

21          **THE COURT:**  All right.  All right.  Does the

22     plaintiff have a first peremptory?

23          **MR. ROBERT VEGELER:**  Yes, Your Honor, it is now

24     seated as juror number 5, Mr. Smith.

25          **THE COURT:**  Okay.  Does the -- do the defendants have

1    a first peremptory.

2          **MR. JAMES BUCHHOLZ:**  Yes, Your Honor, it would be

3    number 4, Mr. Meyer.

4          **THE COURT:**  Does the plaintiff have a second

5    peremptory?

6          **MR. ROBERT VEGELER:**  Yes, Your Honor, juror seated as

7    number 10, Ms. Richardson.

8          **THE COURT:**  Do the defendants have a second

9    peremptory?

10          **MR. JAMES BUCHHOLZ:**  Miss Hoeppner, seated as number

11    12.

12          **THE COURT:**  Does the plaintiff have a third

13    peremptory?

14          **MR. ROBERT VEGELER:**  Yes, Your Honor, seated as juror

15    13, Tuttle.

16          **THE COURT:**  And the Defendant's third?

17          **MR. JAMES BUCHHOLZ:**  Miss Dick, number 9.

18          **THE COURT:**  All right.

19      Now, it would appear to the Court, then, that we have 8

20    remaining individuals of the original 14 called in, and that

21    we would have a jury that would include Brueck, Hudson, Grogg,

22    Seymour, Flener, Hearn, Stell and Headings.

23      Would that be correct for your client, Mr. Vegeler?

24          **MR. ROBERT VEGELER:**  Yes, Your Honor.

25          **THE COURT:**  Would that be correct for your clients,

 1    Mr. Buchholz?

 2              **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

 3              **THE COURT:**  Now what I will do when we go back, I'll

 4    excuse those jurors on the peremptories and I'll ask you

 5    whether or not you accept the remaining eight as the jury for

 6    your client and for yours, okay?

 7              **MR. JAMES BUCHHOLZ:**  Okay.

 8              **THE COURT:**  And we'll swear them in and I'll give

 9    them some preliminaries and I'll swear them in and go upstairs

10    and get settled and give you about five minutes to prepare for

11    opening.  You want to do that?  We'll get opening in before

12    noon.  I'll bring them back down, do preliminary instructions

13    for them, do the openings and then I think we'll recess.

14              **MR. JAMES BUCHHOLZ:**  You think we'll get in both the

15    openings before lunch you think?

16              **THE COURT:**  How long are they going to be?  I'm not

17    putting a time on it.

18              **MR. ROBERT VEGELER:**  Mine will be 15 minutes.

19              **THE COURT:**  You think you can get it in?

20              **MR. JAMES BUCHHOLZ:**  I think so.

21              **THE COURT:**  So in any event, no evidence before.

22              **MR. JAMES BUCHHOLZ:**  When did you want me to lay that

23    foundation on that subpoena?

24              **THE COURT:**  Over the lunch hour.  Over the lunch

25    break we'll do it.

1        (Whereupon, the bench conference was concluded;

2    thereafter,the following proceedings were held in open

3    court:)

4        **THE COURT:**  At this time, the Court is going to

5    excuse the following individuals from further participation in

6    the selection process.  At this time, the Court is going to

7    excuse Mr. Meyer, Mr. Smith.  Just wait one moment.  Ms. Dick,

8    Ms. Richardson, Ms. Hoeppner, and Ms. Tuttle.

9        And at this time, let me just remind you that before

10   leaving the building, if there is anything that you need with

11   regard to an employment slip or anything else, please check in

12   with the Clerk's Office before you leave the building.  And

13   again, thank you for coming in here today, and your patience

14   in the jury selection process.  It's greatly appreciated by

15   the Court.  At this time, you are excused from further

16   service.

17       (Whereupon, those jurors that were excused are absent.)

18       **THE COURT:**  You may go ahead and be seated.

19       With regard to the eight individuals remaining in the jury

20   box at this time, Mr. Vegeler, let me ask you, does your

21   client accept these eight individuals as his jury in this

22   case?

23       **MR. ROBERT VEGELER:**  Yes, Your Honor.

24       **THE COURT:**  And Mr. Buchholz, with regard to the

25   remaining eight individuals in the jury box, do your clients

1    accept these eight individuals as their jury in this case?

2              **MR. JAMES BUCHHOLZ:**  About yes, Your Honor.

3              **THE COURT:**  All right.  At this time, then, both

4    sides having accepted the eight individuals to constitute the

5    jury in this case, let me ask that you folks please stand now,

6    and raise your right hand now to be sworn in as the jurors in

7    this case.

8         (Whereupon, the Jury was sworn.)

9              **THE COURT:**  Go ahead and be seated.

10        Now, I would just ask you folks in the public section to

11   remain in the courtroom for about 5 more minutes and I'll talk

12   to you momentarily.

13        But to you ladies and gentlemen now who have just been

14   selected as jurors in this case, let me tell you that in a few

15   minutes, we'll be taking a very short break, not like -- as

16   long as the first one -- and I'll allow you to go upstairs and

17   to be settled into the jury room.

18        Now, it's important from this time forward through this

19   case that you keep in mind and obey the following instructions

20   of the Court with regard to all of the recesses that we take

21   during the day and over the evening, whether I specifically

22   remind you of this instruction or not.  You are to keep an

23   open mind throughout the trial, reaching your decision only

24   during your deliberations, after all of the evidence is in,

25   and after you've heard the closing arguments of counsel, and

1   you've been given the Court's instructions of law.  You are

2   not to discuss this case either amongst yourselves or with

3   anyone else during the course of the trial.

4        You are not to permit any third person to discuss the case

5   in your presence, and if anyone does so, despite you telling

6   him or her not to, you are to report that fact immediately to

7   the Court.

8        In addition, you are not to talk to, whether inside or

9   outside of the courtroom, with any of the parties or the

10  attorneys or their witnesses.  Now, by this I mean not only

11  not talk about the case, but you can't talk to them at all and

12  that's so, not even to pass the time of day, because there's

13  no other way that we can ensure the integrity of the process

14  and assure the parties to this case of the absolute

15  impartiality that they are entitled to from this jury.

16       Each of the lawyers is also going to be admonished that

17  there is to be no communication between them and the members

18  of this jury.

19       Please understand, ladies and gentlemen, that the lawyers

20  are not being unfriendly when they don't speak to you by

21  chance they see you in the hallway or outside the courthouse.

22  They are simply following the orders of this Court.

23       Additionally, you are not to read about this case in the

24  newspapers or do any independent investigation with regard to

25  the case on the Internet, listen to any radio or T.V.

 1    coverage, if any, with regard to this matter.  You must base

 2    your verdict solely and exclusively on the evidence received

 3    in court during the trial.

 4        Now, to the attorneys, you are admonished that you, your

 5    parties, your representatives, their witnesses must under no

 6    circumstances talk with or fraternize with the members of this

 7    jury during the trial of this case.

 8        Now, at this time, it's about ten after 11:00.  I'm going

 9    to direct that the Court Security Officers take the members of

10    this jury upstairs to settle that the jury room and I'll call

11    you back down here in about 5 minutes.

12        At that time, the Court will give you some preliminary

13    instructions of law that will assist you in going through this

14    trial process.  We'll also be hearing the opening statements

15    of counsel.  And then I anticipate we'll be going into our

16    lunch break and we'll actually start receiving the evidence in

17    the case after the lunch break, all right?

18        You'll also have an opportunity over the lunch break to

19    make whatever phone calls that you might need to make either

20    to home or to work or wherever, to let folks know that you

21    have been selected to be a juror on this case.  And the Court

22    Security Officers and my Deputy will assist you in that

23    process.  So we'll call you back in the courtroom in about 5

24    minutes.

25        (Jury absent.)

1          **THE COURT:**  All right.  Go ahead and be seated,

2     ladies and gentlemen, counsel.

3          To those of you seat in the jury selection, as you can see

4     from this jury selection process, we're never quite sure how

5     many people we need to call in for any given case because

6     there's so many factors that affect our ability to select a

7     jury within a certain time period.

8          I want to thank you for coming in here this morning and

9     going through the orientation process and in going through

10    this voir dire process.

11         As you can see, we're never sure what -- when or if

12    certain prospective jurors are going to be excused from

13    service in the case, and when we would need to call any

14    individuals from the public section of the courtroom into the

15    jury box to be ready to substitute in for them.

16         That's just the process.

17         But I appreciate you reporting in today for this duty.

18    You have the thanks of the Court in doing this, and please

19    know that you remain on call for future jury service here in

20    Federal Court.

21         Likewise for you folks, if you need anything from our

22    Clerk's Office by way of an employment slip or anything at

23    all, please make sure you stop in there before you leave the

24    building this morning.  At this time, you're excused from

25    further duty on this case.

```
 1        (Whereupon, the remaining prospective jurors are exiting

 2   the courtroom.)

 3        THE COURT:  Counsel, let me ask you, at this time, is

 4   there going to be a motion for separation of witness in this

 5   case?

 6        MR. ROBERT VEGELER:  Yes, Your Honor.

 7        THE COURT:  All right.  We'll show a grant of that

 8   motion by the plaintiff.  Let me ask, are there any potential

 9   witnesses in the public section of the courtroom right now?

10        MR. JAMES BUCHHOLZ:  No, Your Honor.

11        MR. ROBERT VEGELER:  No, Your Honor.

12        THE COURT:  All right.  Go ahead and be seated.  Then

13   I would just ask counsel, if you would, to the extent you

14   advise your witnesses the Court has granted a separation order

15   and if anybody, any of your witnesses come into the courtroom

16   during the proceedings inadvertently, that you alert them and

17   alert the Court again so they're not put in a precarious

18   position of being in here during testimony.

19        All right.  I said we would take up the issue with regard

20   to the issue of the bench warrant on the one witness over the

21   lunch hour.  Let's stick with that.  Otherwise, gentlemen, you

22   have about five minutes.  We'll be back on the record in five

23   minutes and we'll proceed in opening statements unless there's

24   anything else.

25        MR. JAMES BUCHHOLZ:  I had one issue, Judge.  Has
```

 1   there been any determination associated at this point with

 2   Glenn Richards matter?  I might need to amend my PowerPoint or

 3   might have, if I need to amend, I'll just do that.  If there's

 4   not going to be an issue about it --

 5          **THE COURT:**  Well, there was mention made during the

 6   voir dire of Richards, I believe.

 7          **MR. JAMES BUCHHOLZ:**  Kurt Richards.

 8          **MR. ROBERT VEGELER:**  Kurt Richards.

 9          **THE COURT:**  Right.  I just called the Richards.  Any

10   response on that?

11          **MR. ROBERT VEGELER:**  Yes, Your Honor.  I think that

12   issue has to be addressed in more than in passing detail.  So

13   I would suggest we defer it until lunch.  I don't think Mr.

14   Buchholz' opening statement will be lessened of quality or

15   impact because of an inability to refer to that at this time

16   because if it comes out, if the evidence comes out, it does.

17   If it doesn't, it doesn't.

18          **MR. JAMES BUCHHOLZ:**  Well, I guess, Judge, I'm not

19   going to refer to that specifically, but I didn't want to be

20   in a position where I open the door with any comments I make

21   within my opening, associated with your ruling.  I suppose if

22   I could have maybe a couple of extra minutes to amend that

23   slide, that might be the better way to go.

24          **THE COURT:**  Sure.  Let's do that.  And you have the

25   time period to do that, because what I would like to do once

 1   we go from opening statements just roll from plaintiffs into

 2   yours, so if you need a few extra minutes, that's fine.  Just

 3   let my Deputy know.

 4        **MR. JAMES BUCHHOLZ:**  It shouldn't take longer but --

 5        **THE COURT:**  I'd rather, you know, just do it

 6   carefully.  When you're ready, just let us know.

 7        **MR. JAMES BUCHHOLZ:**  Thank you.

 8        **THE CLERK:**  All rise.

 9     (Whereupon, a break was taken; thereafter, the

10   following proceedings were held:)

11        **THE COURT:**  Go ahead and be seated, please.  Not yet.

12     All right.  Let me just follow up on this Richards issue.

13   You've already been able to --

14        **MR. JAMES BUCHHOLZ:**  I've taken it out, Judge.

15        **THE COURT:**  Just to give me something to think about

16   during your opening statements, what is the proffer on which

17   Richards -- is it Richards or Richardson?

18        **MR. JAMES BUCHHOLZ:**  There are two, Judge.  Kurt

19   Richards was a new car manager and they can talk about him all

20   they like.  Glenn Richards --

21        **THE COURT:**  Because he does not have --

22        **MR. JAMES BUCHHOLZ:**  He does not have a claim.

23        **THE COURT:**  All right.

24        **MR. JAMES BUCHHOLZ:**  Glenn Richards is the one that

25   has a claim that you had ordered a Motion in Limine on.

1      **THE COURT:**  Right.

2      **MR. JAMES BUCHHOLZ:**  As I said, his separation was in

3   January of 2005, and that separation was a voluntary quit, so

4   that's a --

5      **THE COURT:**  Was he deposed?

6      **MR. JAMES BUCHHOLZ:**  He was.

7      **THE COURT:**  And what does the plaintiff anticipate in

8   proffering him; can you give me a proffer on that?

9      **MR. ROBERT VEGELER:**  Yes, first of all, he's present

10  during the -- when Mr. Baig is brought on as the basically,

11  the general manager of the Acura Subaru back in April of '04.

12  Then Mr. Baig then replaces Kurt Richards with who was general

13  sales manager with Anwar Al-haq.  And then he replaces,

14  approximately 21 days later, he replaces Mr. Chapin with Irfan

15  Hussein.

16     Now, Mr. Glenn Richards was present during a meeting that

17  occurred at least towards the end of April wherein there were

18  representations made by Mr. Baig that he's tired of hearing

19  rumors that Mr. Chapin is on his way out as used car manager,

20  etc., at Acura Subaru, and anybody that says that again is

21  going to be terminated.  And then two days later, he relieves

22  Mr. Chapin of his duties.

23     Now, at some point in time when Mr. Chapin is in over at

24  Toyota Lexus, then Mr. Glenn Richards is demoted from a

25  business manager position to a sales position, customer rep.

1    So that kind of -- he's a fact witness to some things and he's

2    also -- they are -- during the period that is relevant of

3    basically 3-11-04 to 3-4 of '05 back wise.

4         **MR. JAMES BUCHHOLZ:**  If I may, Your Honor, I don't

5    agree with all of the things he said associated with the time

6    lines, but Mr. Richards in his deposition indicated that he

7    was moved from the finance position to the customer relations

8    position where he could go sell cars in November of 2004.  And

9    then in January of 2005 he had determined that he was quitting

10   his position at the dealership in total.

11        And so again, it would be my position associated with Mr.

12   Glenn Richards' testimony that he can talk all he likes about

13   the time that Mr. Chapin was present, what Mr. Chapin did or

14   didn't do, and his interpretation of Mr. Chapin's separation,

15   he was at that meeting he can clearly testify about that, and

16   I'm not trying to limit testimony about that, but when we

17   start getting into his situation eight months and nine months

18   later, I think we're going down a slippery slope in terms of

19   management changes one way or the other.  And that's what my

20   comments this morning earlier were meant to try and prevent.

21        Mr. Richards will be able to come in and testify in his

22   own case about any perceptions he had about his own matter,

23   Mr. Chapin's matter, what happened associated with all of

24   that, but I don't think eight or nine months after Mr.

25   Chapin's situation, they're able to link up Mr. Richards.

1          **THE COURT:**  Just to go back again so I can follow the

2    chronology and see where this issue still lays.  In the

3    defendant's Motion in Limine, you sought to exclude any

4    evidence coming in with regard to Glenn Richards separate

5    lawsuit in this Court and there was no objection to that, and

6    it was granted.

7          **MR. ROBERT VEGELER:**  Right.

8          **THE COURT:**  All right.  What's going to peek in here

9    with regard to Glenn Richards?  We're not going to talk about

10   the lawsuit, we're not going to talk about his place.  He's

11   simply going to be testifying, then, as to what he knows about

12   Mr. Chapin's claim, is that right, or is there going to be

13   something else?

14         **MR. ROBERT VEGELER:**  Right, but in the audio tape,

15   which is where the focus is, comments are attributed to Mr.

16   Chapin is you know what the thing is, the guy had no

17   qualifications and Mr. Chapin's referring to Anwar Al-haq or

18   Irfan.

19         **MR. JAMES BUCHHOLZ:**  No, actually what he's doing in

20   that situation, Judge, he's referring to the replacement for

21   Glenn Richards.  And I have provided to Mr. Vegeler a copy of

22   the transcription, where the reference to Glenn Richards'

23   situation is excised.  And I think if we are following the

24   transcript on the tape, we should be able to move around that.

25   And that was the basis for our discussion this morning and how

1    this all arose.

2         **MR. ROBERT VEGELER:**  Anyway, the rest of that is he

3    just fired Glenn Richards.  Now, since this tape was done on

4    March 4th, 2005, then that is, I take it that's Mr. Chapin's

5    reference to the demotion of 11-4 and a further demotion of

6    January, 5th, '05, which is two months prior to the incident

7    that basically is the Toyota Lexus retaliation issue showing a

8    pattern that Mr. Baig continues to treat Mr. Richards the way

9    he has Mr. Chapin, Mr. Kurt Richards.  And so that's why it

10   doesn't mention anything about a Glenn Richards lawsuit.  It

11   doesn't make any mention of a charge of discrimination.  He's

12   just saying he just fired Glenn Richards.  Now, that's what's

13   on the tape, it's not that he filed a suit or anything.

14        **THE COURT:**  So your proffer would be Glenn Richards

15   would take the stand, he identifies his comments on that tape,

16   correct --

17        **MR. ROBERT VEGELER:**  Yes.

18        **THE COURT:**  -- he's speaking on the tape.

19        **MR. ROBERT VEGELER:**  Well, Mr. Richards is not on the

20   tape, Mr. Chapin is on the tape.

21        **THE COURT:**  Chapin is on the tape.

22        **MR. ROBERT VEGELER:**  Yes.

23        **THE COURT:**  And Mr. Richards is going to say, yes,

24   that happened to me, too, but he's not going to talk about his

25   suit?

1        **MR. ROBERT VEGELER:**  No, he's not going to talk about

2   a charge of discrimination.  He's going to talk about the

3   April meetings.

4        **THE COURT:**  But he was going to say I was replaced by

5   --

6        **MR. ROBERT VEGELER:**  I was replaced by -- Mr. Baig

7   replaced me with somebody that had absolutely no experience or

8   skill in the area.

9        **THE COURT:**  By a Pakistani or by a non-white, was

10  replaced by what, somebody in the same circumstances as Mr.

11  Chapin?

12       **MR. ROBERT VEGELER:**  I got to tell you, Your Honor, I

13  remember Irfan replaced Mr. Chapin.  Anwar Al-haq replaced Mr.

14  Richards.  Mr. Baig went into kind of an open position.  I

15  can't remember who replaced Glenn Richards in his position.

16       **MR. JAMES BUCHHOLZ:**  What we have on the tape is Mr.

17  Chapin's impression associated, what's happening at a

18  different dealership, different employer, eight or nine months

19  later and then he wants to boot strap it in to say hey, look

20  this is my case.  And then he wants to bring Mr. Richards in

21  to try and deal with his circumstances.  If I'm going to be

22  trying three cases, then we're going to be talking about a lot

23  of different things, Judge.

24       **THE COURT:**  And I'm not going to put you to proving

25  three cases or three cases.  But if I'm understanding the

1    facts, Baig is still at the center of both situations?

2            **MR. ROBERT VEGELER:**  Yes.

3            **THE COURT:**  Whether or not there's a difference in

4    the employer entity involved, Baig is still the common

5    denominator between Chapin and Richards, Glenn Richards,

6    correct?

7            **MR. ROBERT VEGELER:**  Yes.

8            **THE COURT:**  And what you're saying, Richards was in

9    similar circumstances as to position, as to race and as to

10   nationality as was Chapin?

11           **MR. ROBERT VEGELER:**  Yes.

12           **THE COURT:**  But you're not going to mention the

13   pending case and we're not going to go into any further

14   details other than superficial comparative, which that was

15   subject to cross examination.

16           **MR. JAMES BUCHHOLZ:**  Well, sure, but then we're going

17   to have to have explanations if Mr. Baig testifies why it is

18   he did what he did with Glenn Richards.

19           **THE COURT:**  Well, Baig is going to testify anyways

20   what he did with regard to Chapin.

21           **MR. JAMES BUCHHOLZ:**  I understand.  But now I'm going

22   to deal with a different claim and different circumstances

23   that are really are, like I say, nine months later.

24           **THE COURT:**  I understand.  And the Court has to try

25   to make a determination and balance the facts as to, number

1    one, are they relevant, is there a close comparison between

2    Glenn Richards and the plaintiff?  Is there proximity in time

3    as to the events?  And that's what I was trying to get some

4    insight in.  I can tell you right now as I'm looking at it --

5    as I'm thinking about it, there's probably enough similarities

6    to allow that limited testimony in.  But I'll let you more

7    fully argue it and I don't want you, either side to touch on

8    that during opening statement.

9         **MR. JAMES BUCHHOLZ:**  That's fine, Judge.  So I

10   understand what you're talking about further, but I'm -- I

11   jumped ahead, I'm sorry.

12        **THE COURT:**  Sure.

13        **MR. JAMES BUCHHOLZ:**  What it sounds like to me like I

14   will need to do then is have explanations for Mr. Richards'

15   situation and Mr. Chapin's in order to not have to leave this

16   jury hanging.

17        **THE COURT:**  Correct.  To some limited extent, there's

18   going to be explanation for the change, because he's the one

19   and only similarly situated comparison to establish a pattern

20   that aids itself in establishing the case against Chapin.

21   That's what I'm being told.

22        **MR. JAMES BUCHHOLZ:**  No.  No, he's not the only one,

23   Judge.  Because you're confusing again the two Richards, but

24   that's fine.  We can deal with --

25        **THE COURT:**  But only one has the lawsuit that's the

 1   subject of the Motion in Limine.

 2            **MR. JAMES BUCHHOLZ:**  That's correct.

 3            **THE COURT:**  So Kurt Richards -- Richardson and we'll

 4   hear from Glenn Richards.  So the two of them established a

 5   so-called pattern, correct?

 6            **MR. JAMES BUCHHOLZ:**  If they're both called, but, you

 7   know, I'm not sure that's going to happen.

 8            **THE COURT:**  All right.  All right.  And again, we'll

 9   go through this again before they're presented for testimony.

10   But right now I just want to give you a fair opportunity to

11   make a proffer on it and tell you I'm probably leaning towards

12   that limited, allowing it in, unless I hear -- unless I hear

13   something more that would show it to be prejudicial or being

14   presented without fair notice to the defendant.  And to any

15   extent, it's going to be very limited.  We're not going to try

16   three cases in this one.

17       All right.  Anything else before I call the jury in?  We

18   will hear opening statements from both sides.  We'll run over

19   until twelve noon.  But that's the way it goes and then we'll

20   take our lunch recess.  It will be about an hour -- have the

21   arrangements been made over at Don Hall's for lunch?

22            **THE CLERK:**  Yes.

23            **THE COURT:**  All right.  I'm going to give them the

24   offer of Don Hall's, since they closed the Palace.  It might

25   take a little bit longer.  It might take an hour and a half,

1    just so you can plan to call the witnesses and over the lunch

2    hour, after I excuse them for lunch, I'll take up the issue

3    for the subpoena on the witness, okay?  Bring the jury down.

4         (Jury present.)

5              **THE COURT:**  Go ahead and be seated, ladies and

6    gentlemen.  Counsel, you may be seated.

7         Sometimes the Court gives an estimate on how long a recess

8    is going to be and sometimes I really miss the mark.

9    Understand, though, that during these recesses, more often

10   than not, when you're upstairs getting ready to come into the

11   court, I'm working with counsel to make sure when you are

12   called in that the presentation of arguments and evidence is

13   presented very efficiently to you, so as not to waste time or

14   be too inpatient with the process.

15        So that's what we were doing during the last conference is

16   making sure the technology was ready for the presentation for

17   opening statements and to work out some of the evidentiary

18   issues.

19        So understanding that, if I missed the mark again with

20   regard to how long a recess is going to take, understand that

21   we're working very diligently in here to try to work out those

22   matters, and that we're always conscious of you waiting

23   upstairs.  And in no way are we trying to, would we abuse or

24   take advantage of them.  You're not to hold that delay against

25   the parties or the lawyers, okay?  So understanding that, let

1   me now, since you've been selected as jurors, I need to give

2   you some preliminary instructions that will help guide you in

3   your participation now in this trial.

4                    **PRELIMINARY JURY INSTRUCTIONS**

5            **THE COURT:**  The law applicable to this case will be

6   contained in the instructions that I give you during the

7   course of the trial and it is your duty to follow all such

8   instructions.  It is your duty to determine the facts and to

9   determine them from the evidence, and the reasonable

10   inferences arising from such evidence.  And in so doing, you

11   must not indulge in guesswork or speculation.

12       The evidence which you are to consider consists of the

13   testimony of witnesses, documents and other things received

14   into the record as exhibits, and any facts that the lawyers

15   agree or stipulate to or that the Court may instruct you to

16   find.

17       The term "witness" means anyone who testifies in person or

18   by deposition.  The admission of evidence in court is governed

19   by the rule of rules of law.  From time to time, it may be the

20   duty of the attorneys to make objections to the evidence.

21   It's my job as the Judge to rule on those objections and to

22   decide whether or not you can consider certain evidence.  You

23   should not concern yourself with the objections or the Court's

24   reasons for its rulings.  You must not consider testimony or

25   exhibits to which an objection has been sustained, or which

1    has been ordered stricken from the record by the Court.

2         Opening statements and closing arguments by the attorneys

3    are intended to help you in understanding the evidence and

4    applying the law.  But the arguments are not evidence.

5         You must not be influenced in any degree by any personal

6    feeling or sympathy for or prejudice against the plaintiff or

7    the defendants in this case, for each side is entitled to the

8    same fair and impartial consideration.

9         No statement, ruling or remark that I may make during the

10   course of the trial is intended to indicate any opinion on my

11   part about what the facts are.  You are to determine the

12   facts.   In this determination, you alone must decide upon the

13   believability of the evidence, and its weight and value.   In

14   considering the weight and value of the testimony of any

15   witness, you may take into consideration the appearance,

16   attitude, and behavior of the witness, the interest of the

17   witness in the outcome of the case, the relation of the

18   witness to the plaintiff or a defendant, the inclination for a

19   witness to speak truthfully or not, the probability or

20   improbability of the witness's statement, and all other facts

21   and circumstances in evidence.  Thus, you may give the

22   testimony of any witness just such weight and value as you may

23   believe the testimony of such witness is entitled to receive.

24        Now, until in case is submitted to you for deliberation,

25   you must not discuss this case with anyone or remain within

1    hearing of anyone discussing it, nor should you listen to any

2    newspaper article, listen to any radio broadcast, view any

3    television programs which discusses the case and you're not to

4    do any independence investigation on the Internet or otherwise

5    with regard to the issues in the case.

6         Until the case has been submitted to you for your

7    deliberations, you must only discuss the case in the jury room

8    when all members of the jury are present.  I'm sorry let me

9    rephrase that.  After this case has been submitted to you for

10   your deliberation, at that time, you may only discuss the case

11   in the jury room when all members of the jury are present.

12        You are to keep an open mind and you must not decide any

13   issue in the case until the case is submitted to you for your

14   deliberation under the instructions of the Court.

15        In a civil case such as this, the burden is on each party

16   asserting an affirmative issue to prove such issue by a

17   preponderance of the evidence.  To establish by a

18   preponderance of the evidence means simply to prove that

19   something is more likely so than not so.  A party has carried

20   this burden of proof on an issue of fact, if after

21   consideration of all the evidence in the case, the jurors

22   believe that what is sought to be proved on that issue of fact

23   is more likely true than not true.

24        Now, if you would like to take notes during the trial, you

25   may do so.  On the other hand, you are not required to take

1    notes if you don't want to.  That will be left up to you

2    individually.  If you decide to take notes, be careful not to

3    get so involved in notetaking that you become distracted from

4    the ongoing procedures.  You should only use your notes as

5    aids to your memory.  And if your memory should later differ

6    from your notes, you should rely upon your memory and not your

7    notes.

8        If you take notes, you cannot take them home with you

9    during the trial.  You must leave them upstairs in the jury

10   room at the end of the each day.  At the end of the trial, my

11   Deputy will collect the notes and none of the lawyers, parties

12   or witnesses will see them.  They will be destroyed.

13       Any notes taken by any juror should not be disclosed to

14   anyone other than a fellow juror.  If you don't take notes,

15   remember it is your own individual responsibility to listen

16   carefully to the evidence.  You cannot give this

17   responsibility to another juror who is taking notes.  You

18   should not be influenced by the notes of another juror, but

19   rely on your own recollection of the testimony.  Notes taken

20   by any juror are not evidence and must not be given any

21   greater weight than the recollection or impression of each

22   juror concerning the evidence received in the case.

23       Please remember too that my job during this trial is

24   different from yours and so that you should not think it

25   important whether or not I'm making notes of something during

1    the trial or not.

2        Now as members of the jury, you will be permitted to

3    submit questions for a witness after the lawyers have finished

4    questioning the witness.  Here is how this procedure works.

5    After each witness has testified and the lawyers have asked

6    all their questions, I will turn to you and see if any one of

7    you has any additional questions.  If you have a question, you

8    should write it down and give it to my courtroom deputy, Ms.

9    Johnson.  You may submit a question for a witness to clarify

10   or help you understand the evidence.

11       Our experience with juror questions indicates that a juror

12   will rarely have more than one or a few questions for one

13   witness and there may be no questions for some witnesses.

14       If you submit a question, the Courtroom Deputy will hand

15   it to me and I will call the attorneys to the side bar to the

16   bench and I'll share your questions with them.  If your

17   question is permitted under the rules of evidence, then I'll

18   read your question to the witness so that the witness may

19   answer it.  In some situations, in some instances, I may

20   modify the form or the phrasing of the question so that it is

21   proper under the rules of evidence.  On other occasions I may

22   not allow the witness to answer a question, either because the

23   question cannot be asked under the law or because another

24   witness might be in a better position to answer the question.

25   Of course, if I cannot allow the witness to answer a question,

1    you should not draw any conclusions from that fact or

2    speculate on what the answer might have been.

3        Now, there are several important things to keep in mind

4    about your questions for the witnesses.  First, all questions

5    must be submitted in writing.  Second, witnesses may not be

6    recalled to the witness stand for additional juror questions

7    generally, so if you have a question for a particular witness,

8    you should submit it at the end of that witness's testimony.

9        And finally, as jurors you should remain neutral and open

10   throughout the trial.  As a result, you should always phrase

11   your questions in a neutral way that does not express an

12   opinion about the case or witness.  Remember that at the end

13   of the trial you will be deciding the case.  For that reason,

14   you must keep an open mind until you hear all the evidence and

15   the closing arguments of counsel and you've received the final

16   instructions of law.

17       Now, at the end of the trial, you will have to make your

18   decision based on what you remember about the evidence.  A

19   written transcript will not be available for you to read.

20   Additionally, it is difficult and time consuming for the Court

21   Reporter to read back testimony.  Therefore, I urge you to pay

22   close attention to the testimony as it is being presented

23   during the trial.

24       Now the trial will proceed in the following order:  Each

25   side will have an opportunity to make a brief opening

1    statement to you.  I use that word "statement", for attorneys

2    are not permitted at this time to argue their case.  Their

3    opening statements are limited to a recitation of what they

4    expect the evidence to show or not show, that is an outline of

5    the factual background of they case they expect to be

6    developed by the evidence.

7         Then we'll start receiving the evidence.  First, evidence

8    will be offered by the plaintiff.  Then evidence will be

9    offered by the defendants.  Then there may be rebuttal

10   evidence.  When all of the evidence is in, the attorneys will

11   make their closing arguments to you.  Then I'll give you the

12   Court's instructions of law and tell you to apply the law to

13   the facts as you and you alone find the facts from the

14   evidence.  You will then retire to the jury room to deliberate

15   your verdict.

16        Faithful performance by you of these duties is vital to

17   the administration of justice in this case.

18        At this time, Mr. Vegeler, if you're ready to proceed with

19   opening argument -- with opening statement for your client,

20   you may do so.

21              **OPENING STATEMENT FOR THE PLAINTIFF**

22        **MR. ROBERT VEGELER:**  Ladies and gentlemen of the

23   jury, as the Judge indicated, this is a statement not

24   argument, not supposed to be argument.  It's not evidence.

25        So upon behalf of Mr. Chapin, I want to break it down into

1    three steps for you to organize how you hear the testimony and

2    hopefully our testimony will follow that pretty close, because

3    it's chronological.

4        So let's go to step one.  That's Mr. Chapin and his

5    involvement with the Fort Wayne Acura Subaru.

6        Now, you'll hear testimony that Mr. Chapin has been in the

7    car sales business for over ten years, and that he had been up

8    in Minnesota, he came back to Fort Wayne and he got a position

9    just for a short time with Toyota, that would be in March of

10   '04 -- 2004.  But that really isn't too much of step one.

11       Step one is April of 2004.  In April of 2004, on April 2nd

12   you have Mr. Chapin starting as used car manager.  Used car

13   manager, new car manager, managerial persons above him.

14       At that point in time, the evidence will show, Mr. Kruse

15   was acting -- Mr. Larry Kruse, gentleman in the courtroom, I

16   was acting as kind of an interim or probationary manager over

17   the Acura-Subaru dealership.  Mr. Chapin is used car manager.

18   Kurt Richards is general sales manager.

19       Then Mr. Nadim Baig is brought into the system.  And he is

20   of Pakistani Muslim ethnicity and origin and religion.  You'll

21   hear testimony that Mr. Chapin is a white, Baptist, U.S.A.

22   citizen, born in the United States.

23       In about the first week, Mr. Baig -- Nadim Baig becomes

24   the, basically the general manager over Acura-Subaru in the

25   month of April of 2004.  And within a week or so, he

1   eliminates Kurt Richards and replaces him with Anwar Al-haq.

2   And the evidence will show, I believe, that he is Pakistani

3   Muslim also.

4        Then, as a couple of weeks progressed at the Acura-Subaru

5   dealership, there will be some evidence that there's kind of

6   rumors floating around that Mr. Chapin's going to be replaced

7   as used car manager, sales manager.

8        Mr. Baig calls a meeting of sales people and

9   managerial-type people at Acura Subaru right around April 28th

10  of 2004, and says, "Now, listen everybody here get it

11  straight.  Mr. Chapin is doing a fine job.  He's doing a good

12  job as used car manager.  He's not being replaced.  If I hear

13  anything about him being replaced, you're going to be fired or

14  terminated."  So two days later Mr. Baig terminates Mr.

15  Chapin, says, "You're terminated.  You're transferred.  Give

16  me your keys."  This was done in front of a couple of

17  witnesses of which you'll hear testimony from.

18       Okay.  Mr. Baig says, "Now, you see Mr. Kruse because you

19  might be able to transfer down to the Toyota Lexus dealership

20  that Mr. Kruse is in charge of.  So about June 1st -- now we

21  go the phase two.  That's phase one.  You're done with step

22  one or phase one.  This transfer or thing, the evidence of

23  step two or phase two.

24       Mr. Chapin then starts as used car manager with Kruse's

25  operation, the Toyota Lexus dealership, which is down the

1    road, and basically does not give Mr. Chapin any of the

2    resources he needs to be productive.  Mr. Chapin will testify

3    he started to get that used car dealer ramping up at

4    Acura-Subaru in the month of April.  Things were going to look

5    better in May and June because of what he had done.  Now he

6    has to start all over down at the Toyota Lexus and try and

7    ramp that up.  But they didn't give him the resources to ramp

8    it up.

9        Well, Mr. Chapin is saying this is not working.  I lost my

10   -- I was terminated because of Pakistani Muslim in the

11   Acura-Subaru.  Now I'm down here at the Toyota Lexus and that

12   just wasn't right.

13       On February 10th of 2005 -- now we're in phase two here --

14   Mr. Chapin files a charge of discrimination, which is a

15   requirement under Federal Law with the local

16   anti-discrimination agency here that works with the EEOC,

17   Equal Employment Opportunity Commission.  You got to do that

18   first.  He files it on February 10th, 2005.  But, of course,

19   then, they notify the Rohrman Group.  They notify Acura-Subaru

20   and, of course, then the Toyota Lexus, everybody knows about

21   it.  They have to file papers, they have to respond to this

22   charge of religious, national origin, race, discrimination

23   against Mr. Chapin, and Mr. Chapin has discussions on how to

24   protect himself, because he knows something bad is going to

25   happen while he's down at Toyota Lexus.

```
1        So he goes to a meeting on February 28th of '05 with Mr.

2   Kruse and two other representatives of the Bob Rohrman Group

3   assigned to the Toyota Lexus, and they have a discussion and

4   this discussion is taped.  There isn't going to be any doubt

5   as to whether or not you're going to listen to an audio tape.

6        Now, what you determine is on that tape and what is said

7   is up to you, as the Judge will instruct.  But there is

8   something more than he said/she said stuff going on here.  And

9   you listen to the tape and Mr. Chapin believes you will hear

10  on that tape, on February 20th, 2005, comments by Mr. Kruse

11  such as, "I need to ask you, what is your mentality in filing

12  an EEOC claim against Bob Rohrman?"  Mr. Kruse:  "What the

13  hell is your mentality?  Did you have a brain fart or what?"

14  And it goes on, Mr. Kruse:  "Do you want to work?

15       Mr. Chapin:  "Yes, I do."

16       And Mr. Kruse goes, "Well, if you wanted to work here on

17  the floor, I wouldn't file suit against him."

18       This goes on back and forth for a little while, it's not

19  very long, but it's pretty telling.  And Mr. Kruse -- Mr.

20  Chapin believes Mr. Kruse stated to Mr. Chapin, he asked him,

21  you need -- Mr. Kruse says, "Then you need to fucking reverse

22  the claim right away.  It needs to be done today."  Believing

23  that refers to the anti-discrimination claim pending in front

24  of the anti-discrimination agency, known as the Human

25  Relations Commission.  Mr. Kruse said further, "Go and do it
```

1    right now.  You aren't going to work here until you get it

2    reversed period."

3        Now that is what Mr. Chapin believes is stated in that

4    tape.  And you will listen to the tape and you decide whether

5    or not that's accurate or not.  But that goes to the

6    retaliation claim.  Don't forget step one, discrimination on

7    that.  Step two, retaliation, which is against the federal law

8    also.  You can't tell a person, "You don't have a job unless

9    you drop that discrimination claim over here then you're going

10   to have a job."

11       So Mr. Chapin is deciding this is not working at Toyota

12   Lexus.  And he's owed a check because they're paid in arrears.

13   And he goes to Mr. Kruse and says, "Well, I want my check, you

14   know, for the month of February," because they get paid at the

15   end of the month.  So on March 4th when he's asking for his

16   check, well, the representatives of Toyota Lexus said, "No,

17   you've got to come in and get your check."  Okay.  So he comes

18   in and gets his check at the meeting on March 4th.  And there

19   are Mr. Larry Kruse again, on behalf of Toyota Lexus has

20   another discussion and Mr. Chapin knows things are really bad

21   now.  And so he tapes the conversation again.  And you will

22   hear that tape.

23       And at that point in time, Mr. Kruse is going, "I never

24   said that stuff to you.  Nah, nah, you're twisting things all

25   around.  I never told you you had to reverse that

1   discrimination charge or anything and you didn't have a job

2   here.  I told you I always wanted you back," basically.  But,

3   "Everything's fine.  I want you back.  I didn't say anything

4   about that."  You can listen to the tape it's a little longer

5   than the first tape, but you listen to it and you come to your

6   own conclusion.

7        But at the end of the day, phase two, step two is over at

8   that point in time because there is no way Mr. Chapin is going

9   to take away his first discrimination charge.  And now he goes

10  ahead and files a retaliation discrimination charge six days

11  later on March 10, 2005.  There's no way he can go back to the

12  Bob Rohrman Auto Group situation.

13       Now, you go to step three.  Step three is under the law,

14  if you find out that he has been unlawfully discriminated

15  against either by straight up intentional discrimination

16  because of race, national origin, so forth, or retaliation,

17  then you have to go to the damage issue.

18       You will be instructed on what you -- how you decide that

19  issue.  But the evidence will be Mr. Chapin now has no job.

20  He has -- the word spreads like wild fire amongst this

21  relatively tightly-knit car dealership, used and new.  He's

22  the guy with the tape.  I mean, we're not going to screw

23  around with Bob Rohrman.  He's the biggest in town.  We don't

24  want to get involved in litigation or anything.  Oh, no.  So

25  he's -- he's out of there.  He's persona non grata in the car

1    business in Allen County, Northeast Indiana, whatever the

2    testimony is.  But at the end of the day, you have to decide,

3    he will testify, he virtually lost his home to foreclosure.

4    He had no money to pay anything.  He had trouble with his two

5    boys that were living with him, and he had to have -- he

6    couldn't hardly buy them groceries half the time.  He had to

7    take menial jobs and try to make a buck here and a buck there

8    just to pay.  Despite that, he lost his home on repossession

9    or foreclosure.  He lost all of his personal property.  He

10   lost two vehicles.  He virtually was stripped down to nothing,

11   and was living in his car because he could not even afford

12   rent.  Now, that's step three.

13       He did eventually find a job, but he found a job out of

14   state in the car business.  So you've got step one, April,

15   '04, Acura-Subaru.  Step two, Toyota Lexus from about June 1st

16   of '04 to March 4th of '05.  And then you have the damages

17   that follow after that and that, in essence, is Mr. Chapin's

18   case.  And I hope you take the time to listen closely to both

19   sides of the story.  I invite you to listen to both sides.

20           **THE COURT:**  Mr. Buchholz, for the defendants.

21           **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

22       (Whereupon, there was a pause in the proceedings while

23   Attorney Buchholz attempts to get some equipment to operate.)

24           **THE COURT:**  Technology is a wonderful thing when you

25   get it to work.  Sometimes it's a challenge to get it to work.

1          **MR. JAMES BUCHHOLZ:**  Judge, this worked this morning.

2     It worked yesterday.  Here we go.

3          **THE COURT:**  Got it?  You never know when the gremlins

4     are going to strike.  It's not coming up.

5          **MR. JAMES BUCHHOLZ:**  I got a blue screen on mine.

6          **THE COURT:**  Why don't we just wait.  We have a

7     choice.  If you give us two minutes to call our technology

8     specialist for the court, see if he's here and he can come

9     upstairs and make it work or we could wait until after the

10    lunch hour if you want to do that.  You have a preference.

11         **MR. JAMES BUCHHOLZ:**  I just as soon get it done,

12    Judge, if that's okay.  But --

13         **THE COURT:**  Is he here?

14         **MR. JAMES BUCHHOLZ:**  I don't want to have the jury

15    waiting around, so whatever, Your Honor --

16         **THE COURT:**  Were you able to get him?

17         **THE CLERK:**  He's not answering his cell phone.

18         **THE COURT:**  Give it one minute.

19       (Whereupon, there was a brief pause.)

20         **THE COURT:**  All right.  Mr. Buchholz, if I could

21    impose on you if you're willing to present an opening

22    statement without the --

23         **MR. JAMES BUCCHOLZ:**  That's okay.

24         **THE COURT:**  -- without the aid of the video

25    presentation, I'll ask you to do it at this time.

1      **MR. JAMES BUCHHOLZ:**  Okay.

2      **THE COURT:**  And we'll try to make sure that the

3    system is fixed over the lunch hour for anything additional.

4                    OPENING STATEMENT FOR THE DEFENSE

5        **MR. JAMES BUCHHOLZ:**  This is my second opportunity to

6    address you in this case.  And as I talked about in the voir

7    dire, every case has two sides, and two sides of the story.

8    This is a civil suit.  Not a criminal suit.  And in the civil

9    suit, there are two sides with the plaintiff, Mr. Chapin, and

10   there's defendants.  And that's what's going on in this case.

11   The plaintiff has the burden of proof.  He's got to prove the

12   allegations were wrong that he claims and he also must prove

13   an injury arising out of that wrong.  And that is his burden

14   of proof, as will ultimately be shown by the Court in this

15   case.

16       My clients are, as we talked about earlier, Fort Wayne

17   Toyota Lexus and Fort Wayne Acura Subaru.  And they've got

18   legal names, if we started utilizing them, it would make

19   everybody goofy.  So everybody understands those names, that's

20   how their trade names are known.  So while they're legal

21   entities, corporations that are doing business as those names,

22   we're going to utilize just the dealership names just to keep

23   them as easy as possible.

24       Let me tell you a little bit about Fort Wayne Toyota.

25   Fort Wayne Toyota started in October of 1989.  And it's in the

1    business of selling new and used automobiles, providing

2    service and financing for the purchase of vehicles.  That's

3    the same thing that Fort Wayne Acura Subaru does.  They --

4    they began in October of 1988.

5         Both dealerships have a similar management structure,

6    okay?  Mr. Rohrman owns both dealerships, but he doesn't live

7    in Fort Wayne.  He lives away.  So he has general managers

8    that operate the dealerships.  Okay?  And each dealership has

9    a general manager that reports directly to Mr. Rohrman.

10   Underneath that general manager, then, are different office

11   functions.  There's an office manager, there's a new car sales

12   manager, there's a used car sales manager, Internet sales

13   managers, finance manager, parts manager, service manager.

14   And all of those managers report to the general manager who

15   reports to Mr. Rohrman.

16        Individual employees in each one of the departments, then,

17   report to the manager, so that there's a stream of information

18   up and down the management chain.

19        Fort Wayne Acura Subaru and Fort Wayne Toyota Lexus are

20   different companies, all right?  They are not the same.

21   They're not under the same umbrella.  So when Mr. Vegeler says

22   in his opening statement, well he's working for the Rohrman

23   Group, he's working for separate corporations.  They're

24   separate corporations in separate locations with separate

25   management, separate employees, separate payrolls, separate

1    bank accounts and separate accounting.

2        Mr. Chapin has two cases and you heard Mr. Vegeler talk

3    about it.  One is a reverse discrimination claim against Fort

4    Wayne Acura and one is a retaliation claim against Fort Wayne

5    Toyota.  The retaliation claim does not apply to Acura, and

6    the reverse discrimination claim does not apply to Toyota.

7    They're separate claim and causes of action.

8        Mr. Vegeler told you that Mr. Chapin had been in the

9    business of selling cars for a extended period of time.  He

10   worked at a number of dealerships in a number of different

11   states.  But the most relevant history for our purposes is

12   2000 to the present.  And in 2000 he was an employee of Fort

13   Wayne Toyota and he left that position to go to Minnesota.

14   And he held various positions in various car dealerships in

15   Minnesota.  He also sold horses while he was in Minnesota, and

16   ultimately made a determination to come back to Fort Wayne in

17   the spring of 2004.

18       And so he called Mr. Kruse and he said, "Do you have any

19   jobs for me?"  And they put him in the position of a

20   salesperson at Fort Wayne Toyota.  The evidence will be that

21   Mr. Chapin didn't like being a salesperson.  He wanted to be

22   in management.  And after about three weeks, he left the

23   employment of Fort Wayne Toyota.  A week after he left the

24   employment of Fort Wayne Toyota, he became a used car manager

25   at the Fort Wayne Acura store, all right?

1        At that time, because I told you earlier today, there

2    would be evidence that the general managers position at Fort

3    Wayne Acura was vacant and Mr. Kruse was keeping an eye on

4    things and Mr. Chapin, wanting a management position, was

5    placed into the Acura store.  Four days after Mr. Chapin

6    started as used car manager, Nadim Baig was introduced by Mr.

7    Rohrman at the dealership as the new general manager.  There

8    wasn't many employees, except to have one or two on the floor

9    when customers came in.

10       Mr. Baig said hey, everybody is going to have a job.  I've

11   I'm going to evaluate what's going on.  I have been brought in

12   to turn things around.  And I'm going to evaluate everybody.

13   Everybody has a job.  Let's make sure we can turn this

14   dealership in the right direction.

15       And so the evaluation process occurs for Mr. Baig, because

16   his ultimate responsible is for Mr. Rohrman.  Mr. Rohrman

17   doesn't really mind what is it that -- Mr. Rohrman is

18   interested in the productivity of the store.  Mr. Rohrman's

19   going to hold accountable the general manager of the store,

20   because everybody reports to that general manager if there's a

21   problem in the store, it's the general manager's problem.

22       So when Mr. Baig begins the evaluation process, and has

23   this employee meeting, at that time on March 12th, 2004, the

24   management team, at that time, as placed by Mr. Rohrman is

25   Nadim Baig, is the general manager; Lucinda Baell is a white

1    female as the office manager; Kurt Richards, a white male as

2    the new car sales manager; Trent Chapin, white male as the

3    used sales manager; Tim Maddox, white male as the Internet

4    Sales Manager; Glenn Richards as the business manager, white

5    male; parts manager, Clayton Doherty, white male; and service

6    manager of Ivan Almodovar, a Hispanic male.

7        Evaluations are going on and there's a determination by

8    Mr. Baig that he and Kurt Richards were not going to be able

9    to continue to coexist within the dealership and continue to

10   be profitable as it relates to what it is Mr. Baig's vision

11   for the dealership was.  And on April 20th, thereabouts, Kurt

12   Richards, the new sales manager, was replaced.  He was

13   replaced by Anwar Al-haq, a middle eastern man.

14       Additional evaluation times came and went.  About two

15   weeks later, the determination was made that Mr. Chapin's

16   position should be changed as well as.  For a period of many

17   months, there were no other management changes by Mr. Baig.

18       Mr. Chapin alleges the reason that he was let go at Fort

19   Wayne Acura Subaru is because he's white, he's an American

20   citizen and because he's a Christian.  It's his burden of

21   proof to show that his separation was based on the color of

22   his skin, white, his national origin, United States citizen

23   and his religious beliefs, Christian.  It's also his burden of

24   proof to show that he was damaged in some fashion by an

25   improper separation.

1       There's no question that Fort Wayne Acura Subaru told Mr.

2  Chapin he didn't need to show up there any longer after April.

3  No question about that. They were all based on

4  non-discriminatory legitimate business reasons.

5       You're going to hear testimony Mr. Chapin failed to lead

6  the sales force. You're going to hear testimony that he

7  failed to train the sales force. You're going to hear

8  testimony he failed to be available. And you're going hear

9  testimony he had failures in production. It was as a result

10  of those problems that Mr. Baig made a determination for the

11  separation.

12       The evidence in this case is going to show when management

13  change occurs, it requires employees within an organization to

14  conform their actions and expectations of the new manager.

15       The evidence is going to show Mr. Chapin's separation had

16  nothing to do with his skin color, his national origin or his

17  religions. His separation was based on legitimate business

18  concerns in terms of his leadership and performance under a

19  new manager, Nadim Baig. There's no question Mr. Baig is from

20  Pakistan and he's Muslim. And there's question that he

21  brought people that he had worked with in other dealerships

22  in the past, and that he felt would follow his leadership,

23  which is what a person in a position of leadership should do.

24  Let's make sure that we bring into work underneath us somebody

25  who is not going to undermine us, follow our new policies and

1   get this organization moving in the right direction.

2       Within 30 days of the separation of Mr. Chapin from Fort

3   Wayne Acura Subaru, he was working as a used car manager for

4   Fort Wayne Toyota.  He had communications with Mr. Kruse and

5   Mr. Kruse said, "Well, I understand you wanted to be in

6   management.  I understand that's why you left as a salesperson

7   at the beginning of April, and I think I've got something that

8   might be able to fit your needs."  And he put him as used car

9   manager on the budget lot.

10      Mr. Chapin alleges that nine months later he was

11  terminated for filing a reverse discrimination claim against

12  Fort Wayne Acura.

13      The evidence in that matter will show that Chapin created

14  two audio tapes.  He was called to the office of Mr. Kruse and

15  the testimony is going to be on February 28th, 2004 or excuse

16  me 2005, that Mr. Kruse was upset, he was wagging (phonetic)

17  his finger, he was visibly upset and distressed, and he said

18  some things within that tape about what are you doing filing a

19  claim against your employer.  You ought to go down and take

20  care of that.  Sometimes people say things, come out the wrong

21  way or are intended the wrong way and interpreted the wrong

22  way.  The tape is what the tape is.  You will hear it and it

23  will ultimately be up to your determination as to what it is

24  that was said and what is meant by that.

25      But the interesting thing about these tapes is that Mr.

1    Chapin taped the second conversation.  And you'll hear in that

2    second conversation Mr. Kruse's voice and perhaps others

3    saying, "You have a job here.  You need to show up and work

4    here.  Don't you want to work here?  Yes, I do.  Well, then I

5    suggest you come here and work.  I'll think about it.  I

6    might.  Well, don't you want to work?  Yes, I do."

7         After that conversation that's taped, there will be

8    testimony there was telephone calls before then, telephone

9    calls after that, three letters sent to Mr. Chapin after that,

10   all of them saying, "You have a job.  Why aren't you showing

11   up?  You got to communicate with us."  Mr. Chapin never came

12   back to work at Fort Wayne Toyota and he provided Fort Wayne

13   Toyota no basis for his refusal for not coming back to work.

14        So at the conclusion of this case, there will be

15   discussions about damages, whether it is they're appropriate,

16   not appropriate, whether he incurred them or didn't incur

17   them, whether he's entitled to them.  At the end of this case,

18   I'm going to stand in front of you, you as a panel and request

19   that you determine that Fort Wayne Acura Subaru did not

20   discriminate against Mr. Chapin for being a white male born in

21   the United States of America with a Christian religious

22   belief.

23        I'm also going to be asking you to make a determination

24   that Fort Wayne Toyota did not fire Trent Chapin.  That they

25   told him repeatedly, "You have a job hear," and he didn't come

1    back.  And as result, even in your determination there's

2    retaliation -- and we submit there's not -- there are no

3    damages.  So we're going to ask for a verdict in favor of Fort

4    Wayne Toyota as well at the end of this case.  Thank you.

5        **THE COURT:**  Ladies and gentlemen, it's 12:25 and

6    we're going to go into our noon recess, at which time you can

7    get some lunch.  Now, the Court has made arrangements, if you

8    want to have lunch on the Court, that you can go to the Don

9    Hall's Gas House restaurant over, I think it's Superior

10   Street.  We used to go to the Palace Restaurant which was

11   convenient, but can't do that anymore.

12       So if you want to go to the Gas House, you're welcome to

13   do that.  You can have lunch.  The Court Security Officers or

14   my Deputy will give you directions on how to get there if

15   you're from out of town.  If you want to lunch on your own,

16   you're free do that, too.

17       What I would just remind you of the Court's continuing

18   admonition that you not discuss the case with anyone, keep in

19   mind with regard to the case now, because it will take you a

20   while to get over to the Gas House and get back here, we'll be

21   back on the record at 2:00 o'clock, and we'll go until about

22   4:00 o'clock-ish.  We'll take a short break in between that

23   time, again, to use the facilities and so on.

24       But if you can report back here by 2:00 o'clock, then

25   we'll get started with proceedings as soon as we're all

1    gathered together.  And remember if you're going to be taking

2    notes or you're going to be asking questions, to bring your

3    notebooks downstairs when you come back.  We'll see you at

4    2:00 o'clock.

5         (Jury absent.)

6         **THE COURT:**  Would you get the door?  Go ahead and be

7    seated, counsel.

8         All right.  Do you want to take up the issue with regard

9    to the subpoena at this time, Mr. Buchholz?

10        **MR. JAMES BUCHHOLZ:**  Sure, Your Honor.  I have an

11   affidavit.  As I indicated to Your Honor a week and a half

12   ago, a week ago, I don't know, regarding a subpoena that was

13   handed to Kelly Helgoe, there's an affidavit from Charles

14   Sloan (phonetic) certifying that on April the 7th that he had

15   a detectives license in Indiana, and that at 4:00 o'clock that

16   day, he was at the Wal-Mart Distribution Center and he

17   observed Kelly Helgoe exit a semi tractor trailer with a

18   numerical designation 52038.  She was confirmed by identity,

19   sight and name and she was handed an envelope containing the

20   subpoena that I've referenced, a copy of which is attached to

21   his affidavit.

22        There was a letter attached to the subpoena asking her to

23   get in touch with me, talk about the time frames to come in

24   and testify and there was a $30 witness free check attached to

25   that as well.

1       In the affidavit, Mr. Sloan indicates that he informed

2  Miss Helgoe of the contents of the envelope and it was her

3  response that she didn't have to take any documents.  And that

4  she threw the envelope containing the documents to the ground.

5  They were re-tendered to her again and she allowed them to

6  exit her truck as she was exiting the Wal-mart Distribution

7  Center.

8       As I indicated to the Court in our final pretrial

9  conference, I thought I might be able to have a telephone

10 conference to get in touch with her.  And in fact, my office

11 did get in touch with her.  And my office confirmed with her

12 that her receipt of the subpoena and her attendance.  And we

13 told her that -- she asked we provide some information to her

14 employer, which we did, and told us we should get back in

15 touch with her about the timing associated with her appearance

16 in court.

17      On Thursday, which I believe was a day or two after the

18 final pretrial conference, I attempted to contact her at the

19 telephone number where she had been communicated with by

20 Courtney Brubaker, my paralegal, and that number had been

21 disconnected and was not responding to any calls.  And I was

22 told it was in longer a valid number.

23      Any further contacts have been less than successful in

24 obtaining her presence here, Your Honor, and it was based upon

25 the affidavit, the service, and the communications that I have

1  had with her and her representations that she would be able

2  the make it here and then has failed to do so that we would

3  request a bench warrant for her.

4        THE COURT:  Let me just ask, the phone number you

5  were trying to contact, was that her home phone or the

6  trucking company?

7        MR. JAMES BUCHHOLZ:  That was a cell to her in her

8  truck.

9        THE COURT:  All right.  So you served her at the

10  Wal-Mart Distribution Center here in Fort Wayne?

11        MR. JAMES BUCHHOLZ:  In Auburn.

12        THE COURT:  In Auburn.  And what's the information --

13  who's actually employing her or is she an independent --

14        MR. JAMES BUCHHOLZ:  She's employed by a trucking

15  company named Warner Express.  Warner for sure, but I believe

16  it's Warner Express.

17        THE COURT:  Where are they out of?

18        MR. JAMES BUCHHOLZ:  They are out of Nebraska I

19  believe.

20        THE COURT:  Nebraska.

21        MR. JAMES BUCHHOLZ:  I believe so.

22        THE COURT:  And where does the witness actually

23  reside?

24        MR. JAMES BUCHHOLZ:  I'm not -- well, the subpoena

25  that was handed to her did not have an address for her.  I

1   believe she resides out of state.

2       THE COURT:  All right.  Any response on the issue,

3   Mr. Vegeler?

4       MR. ROBERT VEGELER:  Your Honor, the Court's

5   probably -- maybe Mr. Buchholz is more familiar with serving

6   subpoenas and the technicalities.  The $30 witness fee,

7   correct me if I'm wrong, just because someone is driving

8   through Fort Wayne, for example, you happen to catch them

9   through and you hand them this $30 fee, even though they may

10  live in Illinois or somewhere else, I don't think that

11  complies with the technical rules for enforcing attendance.

12  You can't just tell somebody oh, by the way, you're in

13  California, and hop on a plane and come here.  You've got to

14  tender ahead of time the travel expenses.  And since they were

15  not able to ascertain where she lives, I don't see how there's

16  been technical compliance with subpoena.

17      Second of all, I do not know what kind of testimony

18  they're going to solicit from her, so I don't know if there's

19  a weighing determination that has to be made by the Court.  I

20  mean if it was something that says, take it to extreme, yeah,

21  I can recognize Trent Chapin, he's in the courtroom, oh you're

22  done, I don't think that merits.  I think maybe the inquiry is

23  what are you going to find out from her that makes her

24  non-cumulative testimony, something like that, even if there

25  were technical compliance.

1    **THE COURT:**  Let's go back to those issues.

2      What was the fee and/or mile that was tendered?

3    **MR. JAMES BUCHHOLZ:**  Thirty dollars, Your Honor.

4  It's my understanding she has no permanent residence.  I think

5  she lives in her truck.

6    **THE COURT:**  I don't know whether she has her

7  chauffeur's license issued, but they don't issue to P.O. Box

8  and they don't issue to trucks.  So she has to have an

9  established residence somewhere to get a chauffeur's license.

10    **MR. JAMES BUCHHOLZ:**  Her representation to Miss

11  Brubaker was that she didn't have any permanent residence,

12  Your Honor.

13    **THE COURT:**  That's her take on it.  All right.  So

14  and what rule are you proceeding under or statute dealing with

15  these trial subpoenas to show the Court that you did have

16  proper service on her, having served her at that distribution

17  center, it not being her residence or the place of her

18  employment?

19    **MR. JAMES BUCHHOLZ:**  Well, she was taking a load to

20  the distribution center and personal service was effected upon

21  her at that time.  And so personal service under the rules is

22  clearly allowed and accepted.

23    **THE COURT:**  Which one?  Which rule?

24    **MR. JAMES BUCHHOLZ:**  Rule 4, I believe.  Rule 4 says

25  that, Your Honor, if my memory serves.  But Mr. Vegeler has

1    indicated to me that he's going to be calling one or two of

2    the children of Mr. Chapin to testify.  And the testimony that

3    Miss Helgoe will deal with would be in materials of damages

4    and perhaps rebuttal of the information that the children

5    would be presenting on their father's behalf.  I mean, it's

6    clear the children were not in the employment settings, are

7    not going to be able to testify about the employment at all.

8    The only thing here would be to testify about damages.  And

9    clearly the mother of the children, who is divorced from Mr.

10   Chapin, would have to bring some testimony to bear on those

11   issues.

12        **THE COURT:**  Do you anticipate -- this is putting the

13   cart before the horse.  Are you anticipating calling the

14   children to testify or are you just going to establish damages

15   through your client?

16        **MR. ROBERT VEGELER:**  We have subpoenaed the oldest

17   son, Trent the Second.  We have not subpoenaed the other

18   child.  In fact, other child isn't here.  And that's one of

19   those things that's kind of dynamic, Your Honor.  When Mr.

20   Chapin is done, we may not need cumulative testimony.

21        **THE COURT:**  How old is the youngster that's been

22   subpoenaed?

23        **MR. ROBERT VEGELER:**  Fifteen.

24        **THE COURT:**  All right.  And that would be the purpose

25   of calling this witness who has been subpoenaed is to rebut,

1    in effect, to rebut or take on the damages issue, is that

2    right?

3         **MR. JAMES BUCHHOLZ:**  She will testify about damage

4    issues would be the reason I would call her.

5         **THE COURT:**  All right.  You have the affidavit, have

6    you had it marked as an exhibit?  And if you have extra copies

7    for Mr. Vegeler, otherwise we can make --

8         **MR. JAMES BUCHHOLZ:**  I think Mr. Vegeler has seen it.

9         **MR. ROBERT VEGELER:**  I haven't seen it, I can

10   guarantee you.

11        **THE COURT:**  Let's do this, and you folks can have a

12   lunch hour too.  We'll make copies of that affidavit after

13   it's been marked and just for miscellaneous exhibit, for

14   purposes of this determination we'll give you a copy of it,

15   give you a copy back and then I'll take a look at it over the

16   lunch hour and take a look at the rules and, you know, all the

17   i's have been dotted and the t's crossed then I'll advise you

18   if we'll issue the bench.  If there's deficiencies under the

19   rules of the statutes, we'll advise you of that as well.

20        **MR. JAMES BUCHHOLZ:**  Why don't we mark it as Exhibit

21   Y, because I don't think we're going to get close to that.

22        **MR. ROBERT VEGELER:**  Your Honor, can I ask a

23   question?

24        **THE COURT:**  Go ahead.

25        **MR. ROBERT VEGELER:**  I still haven't heard a

1    statutory cite.

2         **THE COURT:**  I haven't either.  The Court will look at

3    what it pertains to this and I'll advise of those when we get

4    back on the record after lunch.  So if you all can be back

5    here, say, by ten to 2:00, we can take up the matter then.

6       Let me ask, are there any other issues we need to take up

7    before we break for lunch.  For your client, Mr. Vegeler?

8         **MR. ROBERT VEGELER:**  At some point in time we need to

9    address the issue of '92 small claims suit and '94 small

10   claims suit, documents that have been tendered to me as

11   perhaps being potential cross examination issues.

12        **THE COURT:**  Were these the subject of a Motion in

13   Limine?

14        **MR. ROBERT VEGELER:**  I haven't seen them.

15        **MR. JAMES BUCHHOLZ:**  Well, Your Honor, you might

16   remember there was discussion in our final pretrial conference

17   associated with some impeachment of Mr. Chapin.  You suggested

18   that I provide to Mr. Vegeler copies of all the claims that

19   Mr. Chapin had been involved in by virtue of what his

20   testimony was in his deposition.

21        **THE COURT:**  Mmm-mm.

22        **MR. JAMES BUCHHOLZ:**  I have done that, but it seems

23   to me that if he testifies when he's been involved in two or

24   three courts and there's fifteen claims against him or he's

25   been involved in more cases than that, that's fair on cross

1    examination, regardless of the time frame they were filed.

2    And that would be -- I'm not going to go into the merits of

3    every one of the claims, Your Honor.  It's just a matter

4    weren't you a party to this claim, weren't you a party to that

5    claim and obviously if he admits it, you know on the stand,

6    you know, we accomplish the same thing, so...

7         **THE COURT:**  Are these small claims, like collection

8    cases?  Is he plaintiff in those small claims cases?

9         **MR. JAMES BUCHHOLZ:**  He's not a plaintiff in any.

10        **THE COURT:**  Debt collection type cases, judgment

11   cases.  So you're trying to go to the issue of damages or his

12   credibility or -- wouldn't be damages in '04, '05.  I

13   understand.

14        **MR. ROBERT VEGELER:**  But '92.

15        **THE COURT:**  So the purpose of presenting them --

16        **MR. JAMES BUCHHOLZ:**  I'm not going to present them to

17   the jury.  My question at his deposition was how many times

18   have you been involved in courts and he indicated me on the

19   first occasion twice.  On the second occasion, three times.

20   And on the fourth occasion -- well, I have got a lot more than

21   that.  And he's never admitted any of those.  It's the --

22   yeah, I mean, he's admitted under oath four.  And we talked to

23   Your Honor about the one from Alaska and how to deal with

24   that.  But, you know, you said if there are other claims

25   you're aware of, counsel, give them to Mr. Vegeler.  I've done

1    that.

2          **THE COURT:**  Correct.  So what we've got are two small

3    claims cases from '92 and '94, is that correct?

4          **MR. JAMES BUCHHOLZ:**  I think more than that, Your

5    Honor.

6          **THE COURT:**  So we've got civil cases like collection

7    cases against Mr. Chapin leading up to '04 and '05?

8          **MR. JAMES BUCHHOLZ:**  There's collection cases,

9    there's a bankruptcy case.

10         **THE COURT:**  So goes to credibility as to whether or

11   not he owned up to being involved in litigation --

12         **MR. JAMES BUCHHOLZ:**  Sure.

13         **THE COURT:**  -- during this deposition.

14         **MR. JAMES BUCHHOLZ:**  Sure.

15         **THE COURT:**  And so your question, he limited cross on

16   that is to impeach him on what his previous testimony --

17         **MR. JAMES BUCHHOLZ:**  Right.

18         **MR. ROBERT VEGELER:**  Is he going to break into, I

19   mean it involves a bankruptcy that's over ten years, it

20   involves civil proceedings.

21         **THE COURT:**  Well, go ahead.  That's a criminal

22   conviction.

23         **MR. ROBERT VEGELER:**  No, and I don't want to -- if

24   you tell me about four when, in fact, it's six and, you know

25   ---

1    **THE COURT:** Sounds like it. Sounds like it. Sounds

2    like that's why the defense wants to go with it, which they

3    can. If it's legitimate impeachment, then they'll be allowed

4    to present that. But if there's an issue with regard to the

5    validity of any of those, then I need to hear about that, too.

6       All right. Let's take our lunch break and be back here

7    about ten to 2:00 and I'll tell what you we'll do with this,

8    the subpoena on Helgoe. Anything else I should ask, anything

9    else?

10    **MR. JAMES BUCHHOLZ:** Well, did you want to hear

11    anything further about Mr. Richards, Glenn Richards at this

12    point?

13    **THE COURT:** Are you going to bring that up on your

14    direct of Mr. Chapin; I assume he's the first one up?

15    **MR. ROBERT VEGELER:** Yeah, I'm going to bring up the

16    fact that he attended those meetings which we've already

17    indicated was factual issue at Acura Subaru and how then he

18    was eliminated by Mr. Baig in November or I should say,

19    demoted or down -- I guess demoted is the best term in

20    November, '05 or '04, excuse me.

21    **THE COURT:** Go ahead.

22    **MR. JAMES BUCHHOLZ:** Mr. Chapin's information about a

23    demotion would be through others; he was not at the dealership

24    at that time, and that's, again, if he wants to listen to that

25    testimony from (Inaudible), I suppose that's one thing, but.

1          **MR. ROBERT VEGELER:**  But the problem is --

2          **MR. JAMES BUCHHOLZ:**  -- I don't think it should come

3    out any way, in any fashion.  But if it is going to come out,

4    it needs to come out through Richards not through Chapin.

5          **THE COURT:**  You're going to be inviting hearsay and

6    have to win your way through that objection.

7          **MR. ROBERT VEGELER:**  That's true, but to leave a

8    block in the transcript of the tape leads to problems also.

9    Maybe if the Court saw the transcript --

10         **THE COURT:**  Okay.  Let's do this.  Over the recess,

11   my Deputy will make a copy of the transcript or at least that

12   part where's there a blind --

13         **MR. JAMES BUCHHOLZ:**  It's a three-line entry on the

14   transcript.

15         **THE COURT:**  We'll take a look at it over the lunch

16   hour.  So in answer to your question, we'll take up the

17   Richards issue after lunch in that ten minutes, ten minutes

18   'til 2:00.  In the meantime, I'll see to it that -- you'll get

19   them a copy of the affidavit, get me a copy of the affidavit

20   as well the transcript.

21       Anything else I need the look at over the lunch hour, Mr.

22   Vegeler?

23         **MR. ROBERT VEGELER:**  No, Your Honor.

24         **THE COURT:**  Mr. Buchholz?

25         **MR. JAMES BUCHHOLZ:**  No, Your Honor.  Thank you.

1           **THE COURT:**  Okay.

2       (Whereupon, a luncheon recess was had; thereafter, the

3   following proceedings were held:)

4           **THE CLERK:**  All rise.

5           **THE COURT:**  Go ahead and be seated.  All right,

6   counsel, we're running a little bit behind.  I've been advised

7   all the jurors have returned from lunch, but let's take up

8   those matters that we were discussing before the lunch break.

9       And I told you I'd give you some additional time to

10  present anything else to me, first on the issue regarding the

11  subpoena issued to Miss Helgoe, was there anything further you

12  wanted to present on that?  I looked at the affidavit of the

13  detective, as well as the subpoena duces tecum.  Anything else

14  you want to produce under that?

15          **MR. JAMES BUCHHOLZ:**  No, Your Honor, I think it's

16  Rule 45 for the service of subpoenas.  Everything was complied

17  with and bench warrant should issue.

18          **THE COURT:**  All right.  Now, I've taken a look at it,

19  and I'll tell you I haven't looked at any case law

20  interpreting 45.  I don't think we'll necessarily have to

21  resort to that.

22      Under the language of Rule 45, it would appear that under

23  45(b) regarding service, that there has been service made and

24  that this affidavit provides proof of service.  But what the

25  Court has a problem in going forward in issuing the bench

 1   warrant as has been requested is concern under subsection --

 2   it's Subsection C -- Subsection 3(b), and then triple three.

 3   And to get you there again, it's subsection C(3)(b)(3) which

 4   there needs to be a showing, which I'm not sure has been done

 5   yet on the party on whose behalf this came into issue -- was

 6   issued to show there's a substantial need for the material

 7   that cannot otherwise been met with undue hardship and assures

 8   the person to whom the subpoena is addressed will be

 9   reasonably compensated.

10       The Court is concerned whether or not there exists yet a

11   substantial need for the testimony, whether or not the

12   testimony that wouldn't otherwise be available through another

13   witness who isn't available to the defendant.  I'm concerned

14   as to the reasonable compensation and the circumstances where

15   it's still not clear where this witness resides, where she's

16   employed out of except Werner and you've represented to the

17   Court that may be Nebraska, and whether or not she's regularly

18   transporting business, i.e. dropping off goods at the Wal-Mart

19   Distribution Center in Auburn.

20       So what I will allow at this time is to give counsel an

21   opportunity to make more of a record with regard to the

22   substantial need again, perhaps, that's something you can make

23   at the end of the day when we're done with the proceedings

24   with the jury, before the Court can take any action as

25   requested by the defense.  I'm not saying you wouldn't be able

1    to possibly make that record, but it's just not there yet,

2    okay.

3         **MR. JAMES BUCHHOLZ:**  My one concern is given the

4    length of this trial, the longer we wait, the smaller chance

5    we are going to get her here.  But I understand Your Honor's

6    issue and I'll be happy to deal with it at the end of the day.

7         **THE COURT:**  Well, it's a problem when we don't have

8    her address, her place of employment, or where she's regularly

9    conducting business, too to send out the Marshals, when they

10   say where do we go, I don't have all that information yet

11   either.

12        **MR. JAMES BUCHHOLZ:**  I understand.

13        **THE COURT:**  Or just wait until she runs a red light

14   somewhere, and she's picked up and some red light flashes on

15   the officer's screen, which is another scenario.  Let's take

16   it in turn and I'll give you the opportunity to make an

17   additional record at the end of the day where it's appropriate

18   and just remind me if I forget to remind you.

19        Let's take up the other two because I think we need to

20   address them before we go forward this afternoon.  I think we

21   figured out what we're doing regarding the Rule 403 evidence,

22   the evidence regarding the other suits, the small claim suits.

23   I think we generally discuss, to the extent the witness or the

24   party in this case, Mr. Chapin, had previously testified in

25   deposition as to a limited involvement in other litigation and

1    such and evidence has been developed that addresses that, and

2    goes to the issue of his credibility, I think that can be

3    presented.  I'm assuming you provided that information to Mr.

4    Vegeler.

5              **MR. JAMES BUCHHOLZ:**  I provided Mr. Vegeler all the

6    small claims cases.

7              **THE COURT:**  How many are we dealing with?  I know we

8    talked about a '92 case and a '94 case.

9              **MR. JAMES BUCHHOLZ:**  Right, Judge.

10             **THE COURT:**  Is there anything else ---

11             **MR. JAMES BUCHHOLZ:**  There are seven small claims

12   cases, Your Honor.  Two criminal cases that -- I'm not going

13   to label as such, pursuant to our discussions I'm not going

14   the label as such.

15             **THE COURT:**  How are you going to call them?

16             **MR. JAMES BUCHHOLZ:**  I'm going to say you've been

17   involved with courts in Allen County on at least eight

18   occasions, haven't you?  You've been involved in Federal Court

19   action too, haven't you?  And you've been involved in --

20             **THE COURT:**  Are you going to say you were involved or

21   a party?

22             **MR. JAMES BUCHHOLZ:**  I'm not going to -- I'm going to

23   say -- well, I think he's a party in all of them, but I am not

24   going to describe the --

25             **THE COURT:**  The nature --

1        **MR. JAMES BUCHHOLZ:**  -- the nature of the claims in

2   Alaska.  I'm not going to discuss the nature of the OWI's here

3   in Allen County.  I may well discuss individual cases on the

4   small claims basis, and perhaps the federal claims, but that

5   -- I am -- it is not my intention to go wandering down a

6   slippery stream of small claims cases, Your Honor.  That is

7   not my intention.

8        **THE COURT:**  Okay.  Mr. Vegeler.

9        **MR. ROBERT VEGELER:**  Well, the only -- what gives me

10  pause, two things.  One is I think the Court always has to

11  weigh the relevancy of the fact that if he says yes, I've been

12  involved in some small claims cases, does 1992 make it

13  relevant?  Does 1994 make it relevant?

14       The other thing that gives me pause is oh, by the way, he

15  questions five of the eight, the jury is sitting there going

16  hmmm, I wonder what the other three are that he couldn't talk

17  about.  That leaves me with a harpoon.

18       **THE COURT:**  That does concern me to the extent it

19  does invite speculation by the jury that if you can denominate

20  seven of these as small claims and everybody knows what small

21  claims are, if you kind of hold it out there and you say, and

22  by the way, there were three other cases in Allen County that

23  you were involved in, weren't you?  I mean, there's --

24       **MR. JAMES BUCHHOLZ:**  Well --

25       **THE COURT:**  -- there's a suggestion that those were

1    criminal cases.  That's what I'm saying, how do you avoid

2    doing that?

3         **MR. JAMES BUCHHOLZ:**  Well --

4         **THE COURT:**  Unless you just ask, you lump them all

5    together, you've been involved in at least ten other cases in

6    state courts, haven't you?

7         **MR. JAMES BUCHHOLZ:**  Right, and -- and, you know,

8    that's fine, Your Honor.  And I -- if given leave to discuss

9    one or two of them, I mean when we took his deposition in

10   November, Your Honor, one of the cases had rendered a judgment

11   twelve days before -- twelve days before.  And he tells me

12   he's not involved in any other litigations.

13        **MR. ROBERT VEGELER:**  Well --

14        **MR. JAMES BUCHHOLZ:**  I mean, so it seems to me, I

15   mean, I may not go into all of them, but I may well go into

16   about the twelve days before.

17        **THE COURT:**  It is not a criminal case.

18        **MR. JAMES BUCHHOLZ:**  It is not.

19        **THE COURT:**  Right.

20        **MR. JAMES BUCHHOLZ:**  It is not.

21        **THE COURT:**  Okay.  So I mean, that's one way we can

22   remedy that.  But when you're dealing with issues on

23   impeachment on that, they're inherently going to be messy.

24        **MR. ROBERT VEGELER:**  Well, I can see his point.

25   There are three cases and I'll say one is the Caylor Nickle

 1    case, one is the Grepke (phonetic) case and the other is well,

 2    it's West Side Animal and Auto Liquidators.  Well, Grepke,

 3    Caylor-Nickle, and Auto Liquidators all post-date March 4th,

 4    2005.  So I invite him to bring those up, because that

 5    supports my issue of damages.

 6        Now, if he -- then that only leaves the West Side Animal

 7    Hospital, which Mr. Chapin testified about in his deposition

 8    and then that leaves the '94 and the '92 case.  So that's the

 9    specific facts on that.

10        **THE COURT:**  The '92 and '94, again, are small claims

11    cases?  Neither is criminal.

12        **MR. ROBERT VEGELER:**  Yeah, one is the Yellow Creek

13    (phonetic) crossing and the other is Robert T. Kelly.  Well,

14    Robert T. Kelly is post-judgment too, but those -- those may

15    be fair game.  I invite the Court to go ahead and --

16        **THE COURT:**  You know, I'm almost wondering whether or

17    not you almost reach a saturation point you know, to say well,

18    you were really involved in eight other cases as opposed to

19    weren't you involved in ten other cases.  I wonder if it

20    wouldn't be best to avoid the criminal cases at all or to make

21    that, to suggest that, potentially leave that in front of the

22    jury to speculate on and go with the civil cases that you've

23    discovered existed.  It has the same impeachment fact.  You

24    still have, you know, substantial number of them to point to

25    and can examine on them.  Tell me why that wouldn't work.

1          **MR. JAMES BUCHHOLZ:**  That's fine, Your Honor.

2          **THE COURT:**  I don't know any other remedy.

3          **MR. JAMES BUCHHOLZ:**  We talked about it in the final

4    pretrial conference that my ability to get into the fact that

5    there were matters in other jurisdictions so long as I did not

6    get into the nature and extent --

7          **THE COURT:**  Right.

8          **MR. JAMES BUCHHOLZ:**  -- of those matters.

9          **THE COURT:**  Right.

10         **MR. JAMES BUCHHOLZ:**  You know.

11         **THE COURT:**  I'm just trying to figure out how you do

12   it.  Every case is unique on how you can bring that out

13   without leaving, you know, an obvious suggestion to the jury

14   that it was a criminal matter that you couldn't otherwise

15   bring out evidence on under the rules.

16         **MR. JAMES BUCHHOLZ:**  Well, he also had --

17         **THE COURT:**  You know, I've seen it -- and there were

18   a few other matters, maybe too.

19         **MR. JAMES BUCHHOLZ:**  All right.  I understand where

20   you're coming from.

21         **THE COURT:**  All right.  So I think we're pretty clear

22   on what 403 evidence is coming in.  The last thing is the

23   Richards, the two Richards, Kurt and Glenn, and what evidence.

24   To the extent the Court had used the wrong terminology before

25   and I don't mean to confuse counsel or the parties on the

1    issue in the case, we're not dealing with the Richards as

2    being similarly situated.  There may be facts that --

3    testimony that goes in that describes what their positions

4    were, so on, compared to the plaintiff.  But what is relevant

5    is giving the plaintiff an opportunity to present relevant

6    evidence that may go to establishing a pattern of

7    discrimination.  And so to the extent he may be able to do

8    that through calling Kurt Richards and Glenn Richards, I think

9    he'll be able to do that.  And again, without giving into the

10   nature of the federal suit that Glenn Richards filed.

11       So you anticipate going into that with Mr. Chapin's

12   testimony?

13       **MR. ROBERT VEGELER:**  Anticipate -- yeah, I anticipate

14   having him testify who --

15       **THE COURT:**  To the Richards, what happened to them,

16   to which he has personal knowledge?

17       **MR. ROBERT VEGELER:**  Yeah.

18       **THE COURT:**  All right.  Because you don't invite

19   hearsay.

20       **MR. ROBERT VEGELER:**  I'm not necessarily going to ask

21   Mr. Chapin that, but the problem is it's on the tape.

22       **THE COURT:**  All right.  You know, thank you for

23   reminding me.  Did I get a copy of that transcript?  Do I have

24   a copy, where is it?

25       **THE CLERK:**  Just the four lines or the full

1    transcript?

2         **THE COURT:**  I did look at it, I'm sorry.

3         **MR. JAMES BUCHHOLZ:**  Yeah, the four lines, it seems

4    to me, Your Honor, are easily excised without dealing with

5    that issue.  Without losing the flavor of the conversation or

6    the -- or the import of the tape as claimed by plaintiff or

7    the defendant.

8         **THE COURT:**  All right.  You want to keep those lines

9    in, is that right, Mr. Vegeler?

10        **MR. ROBERT VEGELER:**  Yes, because I think it goes to

11   the fact that part of the mentality of Acura Subaru was just

12   get rid of these people and put in my buddies.

13        **THE COURT:**  And defense position is that it opens up

14   this whole Pandora's box of other claims?

15        **MR. JAMES BUCHHOLZ:**  It does.  And it is hearsay

16   associated -- I mean, the entire tape --

17        **THE COURT:**  Well --

18        **MR. JAMES BUCHHOLZ:**  -- will speak for itself, but

19   his knowledge associated with that is hearsay.  But, you know

20   --

21        **THE COURT:**  All right.  Well, and they have to hear

22   this anyway.

23        **MR. JAMES BUCHHOLZ:**  They're going the hear it.

24        **THE COURT:**  The transcript is only an aid.  There's

25   no question.  All right.  I've reviewed that four-line part of

1    the transcript and I am going to allow -- I am not requiring

2    the redaction be made.  The defense will have a full

3    opportunity to put in their witnesses to the extent the

4    defense thinks it's necessary to deal with that issue

5    specifically regarding the tape.  All right, but not go beyond

6    that today, correct?

7            **MR. ROBERT VEGELER:**  Correct.

8            **THE COURT:**  All right.  And we'll take that in turn.

9    Go ahead.

10           **MR. JAMES BUCHHOLZ:**  Based on that ruling, it's my

11   understanding Mr. Richards is the second person to testify

12   today?

13           **MR. ROBERT VEGELER:**  Yes.

14           **MR. JAMES BUCHHOLZ:**  I would ask for about 15 minutes

15   to supplement the cross examination to try to prepare for

16   Richards to address those issues.

17           **THE COURT:**  Is it Kurt or Glenn?

18           **MR. ROBERT VEGELER:**  Glenn.  I didn't want to mislead

19   the Court.  We do have Chapin Second also who I originally

20   told him would be number two.  I've got to see how that kind

21   of goes.

22           **THE COURT:**  All right.  He just wants to have a break

23   before Glenn Richards.

24           **MR. JAMES BUCHHOLZ:**  And if he wants to bring in

25   Trent the Second, that's fine.  I'm not going to ask for any

1    time on that.

2         **THE COURT:**  All right.  So before we hear Glenn

3    Richards' testimony, you'll be granted a recess to --

4         **MR. JAMES BUCHHOLZ:**  Yeah, if it's today, if it's

5    tomorrow.

6         **THE COURT:**  All right.  Just remind me of that.

7    Anything else before I call the jury down?

8         **MR. ROBERT VEGELER:**  No, Your Honor.

9         **THE COURT:**  Anything else for you, Mr. Buchholz?

10        **MR. JAMES BUCHHOLZ:**  No, Your Honor.  Thank you.

11        **THE COURT:**  All right.  Please bring the jury down.

12      With regard to the technology snafu this morning, I think

13   the Court has made sure that wouldn't happen again.  I

14   understand the time and expense and effort to prepare

15   PowerPoint and I apologize that we did not have our technology

16   man available immediately to correct that.

17        **MR. JAMES BUCHHOLZ:**  That's correct.

18        **THE COURT:**  What he told me afterwards, when he

19   caught up with the situation that apparently -- and I'm not

20   very techie at all, but if we had pressed FN, F4 it would have

21   come up from the feed from our system to your laptop and the

22   laptop back.  So what he did was he pressed that on your

23   laptop, and it relayed back.

24        **MR. JAMES BUCHHOLZ:**  He told me to do that same thing

25   on my computer yesterday, and I thought I was doing that

 1    appropr -- I may not have done it the right way either, Judge.

 2         **THE COURT:**  In any event, he should have been

 3    available to assist on that and you will not have that problem

 4    arise the rest of the trial.  So we'll make sure before any

 5    technology is presented, including yours, that it's tested and

 6    working.

 7         **MR. ROBERT VEGELER:**  Hopefully mine is a little more

 8    pedestrian (phonetic).

 9         **THE COURT:**  Your stereo system looks a lot like the

10    one I have at home which shows you how techie I am not.  As

11    long as it works.

12      (Jury present.)

13         **THE COURT:**  Go ahead and be seated, ladies and

14    gentlemen.  Counsel, you may be seated.

15      All right.  We're going to be proceeding now in the

16    plaintiff's case-in-chief.  At this time, the plaintiff will

17    be calling their first witness.

18      Mr. Vegeler, if you're ready to proceed, you may do so.

19         **MR. ROBERT VEGELER:**  Thank you, Your Honor.  We will

20    call Trent Chapin.

21         **THE COURT:**  All right.  Mr. Chapin, if you would step

22    up to the witness stand and then face my deputy to be sworn in

23    to testify.

24      (Whereupon, the Witness was sworn.)

25         **THE COURT:**  And now, before you get started, put that

```
 1   clip on the notch by your lapel and that should --

 2              THE WITNESS:  How's that?

 3              MR. ROBERT VEGELER:  Your Honor, since I'm mobile

 4   mic, do I need this on?

 5              THE COURT:  No.

 6                       TRENT LOUIS CHAPIN,

 7                    having been first duly sworn

 8                 was examined and testified as follows:

 9                        DIRECT EXAMINATION

10   BY MR. ROBERT VEGELER:

11    Q. Would you please state your name for the jury?

12    A. Trent Louis Chapin.

13    Q. And Mr. Chapin, you're going to have to speak up more than

14   that.

15    A. Trent Louis Chapin.

16    Q. Mr. Chapin, would you spell your last name, please?

17    A. C-H-A-P-I-N.

18    Q. And where do you presently reside?

19    A. 4076 Highway 176, Rockaway Beach, Missouri, 65740.

20    Q. And where did you reside during the period of March of

21   2004 until approximately August of 2006?

22    A. Woodstream Drive, which was the place that I -- they had

23   foreclosed on, and then I moved to Missouri in August.

24    Q. Did there come a time when you lived in New Haven, too?

25    A. Yes, New Haven, Indiana.
```

1   Q. Now, sir when did you graduate from high school?

2   A. Boy, hmmm, I think around '81, '82.

3   Q. And did there come a time, when, when you -- well, let me

4   ask you, let me back up a second.  Where were you born?

5   A. Hudson, Michigan.

6   Q. And have you lived in the United States all your life?

7   A. Yes, sir.

8   Q. And do you have a religion that you practice?

9   A. Yes, I'm a Baptist.

10  Q. And do you -- have you actively practiced that during the

11  period of the last, at least three or four years?

12  A. Yes, sir.

13  Q. Now did there come a time when you became involved in,

14  say, in the last ten years, in new car and used car sales and

15  financing?

16  A. Yes, sir.

17  Q. Prior -- immediately prior to working in Fort Wayne for

18  Toyota Lexus in March of 2004, where were you employed?

19  A. I was in Minnesota.

20  Q. And what did you do there?

21  A. Used car manager.

22  Q. And for whom?

23  A. Uh, Minor (phonetic) Ford.

24  Q. And was there a time -- is that a Lincoln dealership?

25  A. Uh, the Dodge store as well as a Lincoln store.  I worked

1    as a finance director and it's a combination Lincoln Dodge.

2     Q. And what were your duties?

3     A. I basically financed vehicles.  People would come in, they

4    would sell them.  I would do all the paperwork and get the

5    financing filed for the customer at the best rate I could.

6     Q. Were you involved -- did you have any managerial duties?

7     A. Yes, I would do the books, I would do a lot of things.  I

8    would make sure the accounts were accurate, the people who

9    sold, make sure the bonuses were correctly paid out to the

10   salesmen.

11    Q. Now, were you employed at just one dealership in Minnesota

12   or more than one?

13    A. Two.

14    Q. What was the other one?

15    A. That was the Ford store.  I was a used car manager, the

16   Lincoln Mercury store slash Dodge; I was a finance director.

17    Q. And you did that for approximately what period up in

18   Minnesota?

19    A. Five years probably total.

20    Q. Okay.  Did there come a time, then, when you moved back to

21   Allen County, Indiana?

22    A. Yes, sir.

23    Q. And when was that?

24    A. Well, it was in 2004.  I moved back to follow my kids.

25    Q. Okay.  Now, you have children?

1    A. Two boys.

2    Q. And what are their ages back -- well, what are their ages

3    now?

4    A. They're 14 and 15.

5    Q. And where had they lived -- you said you followed them

6    back to Fort Wayne or Allen County?

7    A. Yes, sir.

8    Q. Where had they been living?

9    A. They lived in Minnesota.

10   Q. And you came back, and where did you reside in the Fort

11   Wayne area?

12   A. Basically, I was at the wood -- I can't even think of --

13   the address is 9829 Woodstream Drive.  I believe that was in

14   New Haven, as well as the one out -- I've only had two houses

15   and I can't think of the address of the other one and that was

16   the one they foreclosed on.

17   Q. Okay.  So, were you employed then when you came back in

18   the spring of 2004 to the Fort Wayne area?

19   A. Yes, I was.

20   Q. And by whom?

21   A. By Larry Kruse at the Fort Wayne Toyota store.

22   Q. Did you know Mr. Kruse?

23   A. Yes, I've known him for a long time.

24   Q. And how did you know him?

25   A. Because I had worked for him prior of me moving to

1   Minnesota to follow my children.

2    Q. And what were your duties at Fort Wayne Toyota in March of

3   2004?

4    A. I was a salesperson.

5    Q. Now did there come a time when you became employed by Fort

6   Wayne Acura Subaru?

7    A. Yes.

8    Q. And when was that?

9    A. April 2nd.

10   Q. Of?

11   A. Of 2004.

12   Q. And tell the jury the circumstances under how you got

13  there?

14   A. Well, when I was hired in, Larry said I could start off as

15  a sales person, okay, and I could -- when a manager job comes

16  up, he would make sure I had it.  Well, it was like, I think

17  it was April 1st maybe, the human resource manager, Luke

18  Luther had called Larry Kruse on the phone, which he was in

19  Hawaii at the time on vacation, and I had asked him about the

20  manager position.  He said, "You need to go down and speak to

21  Kurt Richards.  He's the General Sales Manager."  So that's

22  what I did.  He hired me on the spot, so I started there on

23  the second.

24   Q. Of?

25   A. Of April.

1    Q. And where were you then -- who were you working for at

2   that time?

3    A. At that time, I was working for Fort Wayne Acura Subaru.

4    Q. And who was the manager?

5    A. The general sales manager was Kurt Richards.

6    Q. Who was above the general sales manager?

7    A. Larry Kruse.

8    Q. And you were used car sales manager?

9    A. Yes, sir.

10    Q. Tell the jury what that means.

11    A. Basically that means to make sure your inventory is

12   properly displayed, you appraise vehicles.  You train your

13   sales people.  You go in and you close deals, talk to the

14   customers, find out their wants and needs.  Pretty much

15   presentation, that's pretty much the whole thing and making

16   sure you're there every day and your employees are there every

17   day.

18    Q. Did you have -- when you started on April 2nd of 2004,

19   what kind of shape, in your opinion, was the used car

20   operation at the Acura Subaru?

21    A. Oh, it was real bad.  They had cars over 180 days and Mr.

22   Rohrman's policy is within 45 days turn -- if there's some

23   reason a vehicle hasn't sold in 45 days, send it to the

24   auction.  They had 4-Runners, all sorts of vehicles.

25       The salespeople weren't properly trained.  They didn't

1    know how to meet and greet people, go, out and talk to them,

2    find out what they wanted.  The lot was a disaster.  It wasn't

3    lined up.  There was no presentation whatsoever of the

4    vehicles.  So I had my job cut out for me when I got there.

5     Q. And did you start trying to start to attempt to remedy

6    those problems?

7     A. Yes, sir, I did.

8     Q. And had you actually started to take some positive action?

9     A. Oh, sure I did.  I even designed -- we had streamers --

10   tied some streamers to the whole lot, and as well as the back

11   lot, and we also draw some attention, as well as presentation

12   of the vehicles, because the vehicles were in pretty bad

13   shape.  I mean they were there for hundred and some days.

14   Quite a few of them.  So I had to weed them out I could sell

15   them, get rid of them so I could get fresh inventory that

16   people would buy.  Then started working with each salesperson

17   one on one trying to train them so that they would be more

18   efficient to you, or whoever walked on the lot.  So they would

19   know what range or show that person they were talking to what

20   they want.

21    Q. Now who did you report to?

22    A. I reported myself to Kurt Richards.

23    Q. And who do you believe he reported to then?

24    A. He reported to Larry Kruse.

25    Q. And that's Mr. Kruse that's in the courtroom today?

1    A. Yes, sir.

2    Q. Now, did there come a time when Nadim Baig, you became

3    familiar with him?

4    A. Yes, I believe it was like the first few days, maybe four

5    days at tops, I believe, that he had just showed up, and I was

6    told, Kurt told me he was our general manager.  Well, he said

7    hi, you know, kind of just give us a basic rundown of who he

8    was.

9    Q. Let me stop you a second.  Was there a big presentation to

10   all the employees by Bob Rohrman --

11   A. Oh, no.

12   Q. -- "This is Nadim Baig"?

13   A. No, sir.

14   Q. How was that handled?

15   A. I have no idea, because I don't believe he was there.  At

16   least he wasn't there in my presence and I was in every day.

17   Q. Okay.  So there wasn't this big presentation?

18   A. No, sir.

19   Q. So what did Mr. Baig say to you first and what did you say

20   to him?

21        **MR. JAMES BUCHHOLZ:**  Judge, I'm going to object.

22   That calls for hearsay.

23        **MR. ROBERT VEGELER:**  Your Honor, we subpoenaed Mr.

24   Baig.

25        **MR. JAMES BUCHHOLZ:**  That --

1      **THE COURT:**  Do you anticipate he's going to be

2  called?

3      **MR. ROBERT VEGELER:**  Yeah, I've already told him he's

4  going to be called.

5      **THE COURT:**  Are there any issues with regard to his

6  appearance?

7      **MR. ROBERT VEGELER:**  No.

8      **THE COURT:**  Being subpoenaed?

9    (No audible response.)

10     **THE COURT:**  All right.  Subject to Mr. Baig coming in

11  to testifying and tying that up, I'll allow it.

12  BY MR. ROBERT VEGELER:

13  Q. Okay.  What did -- how did that first conversation go with

14  Mr. Baig?

15  A. Just introduced himself, pretty much explained what he was

16  looking for, and pretty much put me on the page that he wanted

17  to be on.  And that was pretty much the gist of it.

18  Q. Now, does -- does the Bob Rohrman group, do they have a

19  procedures manual that you get pages on dated and so forth?

20  A. Yes, sir, they do.

21  Q. And is it pretty extensive?

22  A. Yes, sir, it is.

23  Q. And what's the general -- what's the general content of

24  that?

25  A. It talks about discrimination.  It talks about how to

1    treat other employees in the workplace.  I mean, it goes right

2    down the line as far as what they expect from you, and your --

3    you know, their expectations as far as your job duties and

4    things of that nature.

5     Q. So after Mr. Baig came in, who do you believe he replaced

6    as far as duties?

7     A. Larry Kruse.

8     Q. And so as time goes on, in the next week or two, how were

9    you doing as used car manager?

10    A. I was doing really good.  He just kept telling me every

11   day how great of a job I was doing, how things were starting

12   to shape up.

13    Q. Did Mr. Baig tell you who replaced Kurt Richards?

14    A. Yes, it was his friend Anwar.

15    Q. Anwar Al-haq?

16    A. Yes, sir.

17    Q. And did you have any discussions with Mr. Baig while you

18   were at Acura Subaru about his national origin?

19    A. Yes, sir.  We talked quite a bit.  I mean, you know,

20   meeting in the halls or whatever.  And I was talking to him

21   about Muslim, and --

22         **MR. JAMES BUCHHOLZ:**  Judge, I'm going to object

23   again.  This is hearsay.  It's being offered for the truth of

24   the matter.

25         **THE COURT:**  Is it?

1     **MR. ROBERT VEGELER:**  He's just informing him as to

2  what he said.  He's not saying that Mr. Baig had proven

3  himself to be Muslim.  He's telling this is what Mr. Baig said

4  to him.  He doesn't know whether it's truth or not.

5     **THE COURT:**  It's not being offered for the truth of

6  the matter asserted, but I would ask we be very precise, as

7  precise as this witness can be as to what was said by whom

8  specifically.

9     **MR. ROBERT VEGELER:**  Okay, Judge.  Right.

10  BY MR. ROBERT VEGELER:

11   Q. Do you recall approximately when you and Mr. Baig talked

12  about his national origin?

13   A. I believe it was three or four days after he started,

14  because we were -- all the managers were trying to get to know

15  him, and talk a little bit.  Every time we'd see each other,

16  he would stop in my office, he'd stop for 5 minutes or so and

17  at least chat.

18     **THE COURT:**  You're still in April of '04?

19     **THE WITNESS:**  Yes, ma'am.

20     **THE COURT:**  The first, second, third week there?

21     **THE WITNESS:**  It was in my first, second week, yes.

22     **THE COURT:**  Okay.  Thank you.

23  BY MR. ROBERT VEGELER:

24   Q. And do you recall what Mr. Baig told you about his

25  national origin?

1    A. Yeah, he --

2         **MR. JAMES BUCHHOLZ:**  Again, Judge, I'm sorry, he's

3    asking him to assert out of court comments for the truth of

4    the matter, and that's clearly hearsay.  If he wants to talk

5    to Mr. Baig about these things and he's going to call him,

6    that's fine.  But Mr. Chapin is talking about hearsay

7    testimony.

8         **THE COURT:**  Counsel, would you approach, please.

9         (Whereupon, the following bench conference was held

10   outside the hearing of the jury:)

11        **THE COURT:**  The response is that he's not presenting

12   it for the truth of the matter asserted.  How do you respond

13   on that?

14        **MR. JAMES BUCHHOLZ:**  Well, he is asserting it for the

15   truth of the matter asserted.  What did he tell you his

16   national origin was?  What did he tell you his religion was?

17   That's exactly what he's trying to do is for the truth of the

18   matter asserted.

19        **THE COURT:**  Response?

20        **MR. ROBERT VEGELER:**  I'm trying to, first of all, in

21   the context of hearsay, I don't believe it's hearsay because

22   the witness is subpoenaed, he's subject to cross examination,

23   et cetera.  That was the traditional basis for the exception

24   of the hearsay.

25        Second of all, he can testify as to what these gentlemen

1  told him.

2          **THE COURT:**  Let's lean forward to this.  What's the

3  problem coming up on this, I mean the hearsay issue that part,

4  what's --

5          **MR. JAMES BUCHHOLZ:**  The problem --

6          **THE COURT:**  What's the disclosure here that there's a

7  concern on?

8          **MR. JAMES BUCHHOLZ:**  The problem is he's going to try

9  to get Mr. Chapin to testify about every conversation he had

10  with Mr. Baig and then he doesn't have to call Mr. Baig to

11  associate with what it is.

12          **MR. ROBERT VEGELER:**  Oh --

13          **THE COURT:**  Wait a second, wait a second, wait a

14  second.  Don't do that to the Court.  You say you have him

15  ready to testify, you subpoenaed him.  It's your intent to put

16  him on the stand.  Don't do a show game on me that's -- if you

17  get everything out of this witness, then I don't have to call

18  Baig.

19          **MR. ROBERT VEGELER:**  I already told him --

20          **THE COURT:**  That you --

21          **MR. ROBERT VEGELER:**  -- that we --

22          **COURT REPORTER:**  Can you speak up, please?

23          **MR. JAMES BUCHHOLZ:**  Telling him he wanted him and

24  having his client testify about all these things and boot

25  strapping and saying I don't need it now is not appropriate.

1      **THE COURT:**  That the Court won't allow, to the extent

2    the Court would be inclined to allow this testimony in.

3    Again, he's setting the foundation for plaintiff's claim what

4    Baig did was discriminate against him and put his own friends

5    into the positions.  But, you know, you previously indicated

6    it was subject to connecting up with Baig's own testimony.  So

7    you're not setting -- I don't want to be put in a position of

8    then being told well, now we don't have to call Baig because I

9    got it all in through -- that's that what it's sounding like.

10      **MR. ROBERT VEGELER:**  But at the end of the day, if I

11    told him, I want Baig here now in the next 5 minutes, not have

12    (Inaudible), and put him back on the stand.

13      **THE COURT:**  Oh come on, let's not be doing that kind

14    of stuff.  Now we're cooperating on the producing and

15    presenting witnesses, at least I'm expecting counsel to be

16    doing that.

17      **MR. JAMES BUCHHOLZ:**  Judge, I've asked him when he

18    wants these people available.  He told me Mr. Kruse would be

19    on the stand first tomorrow, Mr. Baig would be on the stand

20    next and Mr. Maddox would be on the stand third.  I told him I

21    would have them here for tomorrow morning to do that, and --

22      **THE COURT:**  They could -- if you don't call them, all

23    of this is going to be stricken.

24      **COURT REPORTER:**  Can you get closer, please, to the

25    microphone.

1        **MR. ROBERT VEGELER:**  Either I die or (Inaudible).

2        **THE COURT:**  All right.  Subject to him connecting it

3   up by calling Baig, the Court will let it in.  But if he

4   doesn't make good on that, it's all stricken.

5        (Whereupon, the bench conference was concluded;

6   thereafter, the following proceedings were held:)

7        **MR. ROBERT VEGELER:**  I think we were -- are we ready?

8        **THE COURT:**  Go ahead.

9   BY MR. ROBERT VEGELER:

10   Q. Okay.  I think we were at a situation where you had a

11   number of discussions with Mr. Baig as -- was he general

12   manager of Acura Subaru?

13   A. That's correct.

14   Q. And you had discussed with him his national origin.  What

15   did he say to you upon that?

16   A. He said he was Pakistani.

17   Q. Did you discuss with him or did he volunteer to you what

18   his religion was?

19   A. Um, we were talking about religion and I told him I was

20   Baptist.  He told me he was Muslim.

21   Q. And did you see some activity on his part that confirmed

22   that in your mind?

23   A. Yes, I saw on occasions Anwar and himself in his office

24   kneeling down with --

25        **MR. JAMES BUCHHOLZ:**  Judge, I'm going object.  This

1  is non-responsive.  He's talking about somebody completely

2  different than who the question was about.  He was asked about

3  Mr. Baig and he's talking about Anwar.

4        **MR. ROBERT VEGELER:**  Well --

5        **THE COURT:**  Sustained.  You can rephrase the question

6  and ask him what, if anything, he may have observed with

7  regard to Baig regarding his religious practices.

8  BY MR. ROBERT VEGELER:

9   Q. What if anything, did you observe Mr. Baig do or have

10  involving his religious practices?

11   A. I've seen him with pretty much kneeling and praying.  And

12  I did see -- I think it's called a Koran -- whatever, their

13  Bible -- I did see that in his office.

14   Q. Did you see him doing that with any other co-employees and

15  participating in those?

16   A. Yes, I did.  Anwar, yes, I did.

17   Q. Now, refresh my memory, Anwar took over whose position?

18   A. Glenn or Kurt Richards, which was the general sales

19  manager.  But Anwar, when he hired in, he didn't become a

20  general sales manager.  He was a new car manager, strictly new

21  car manager.

22   Q. Okay.  So at the point in time you were the used car

23  manager and Anwar Al-haq was the new car manager?

24   A. That's correct.

25   Q. Then what happened?  What next happened with respect to

 1   your involvement with Mr. Baig as far as your duties during

 2   that month of April?

 3   A. As far as my duties?

 4   Q. Yeah, what happened next?

 5   A. Well, basically throughout the month, salespeople would

 6   come and tell me, "I hear you're going to get let go." So

 7   every time that I heard this -- it was more than once -- it

 8   was several times, I would go and confront him.

 9   Q. Confront whom?

10        **MR. JAMES BUCHHOLZ:** Judge --

11        **THE WITNESS:** Confront Nadim Baig.

12        **THE COURT:** Wait, wait.

13        **MR. JAMES BUCHHOLZ:** He's -- judge, he's not

14   indicated what the salespeople -- he's talking about again,

15   these are hearsay comments being offered for the truth of the

16   matter.

17        **THE COURT:** The objection is going to be sustained on

18   that, unless he can identify -- I think we need to find out if

19   he can identify who.

20        **MR. JAMES BUCHHOLZ:** And I would ask for an

21   admonishment to the jury.

22        **THE COURT:** All right. The Court will disregard the

23   last question and answer given by the witness.

24   BY MR. ROBERT VEGELER:

25   Q. You said you had reports from certain salespeople at Acura

1    Subaru about something affecting your status there?

2     A. That's correct.

3     Q. And can you identify who some of those people were?

4     A. Lou Ann Montz was one.

5              **THE COURT:**  Who?

6              **THE WITNESS:**  Lou Ann Montz.

7              **THE COURT:**  Okay.  Thank you.

8              **THE WITNESS:**  Oh, shoot.  I'd have to look at the

9     salespeople list.  I know who they are by names, but there was

10    a couple other ones as well that did --

11    BY MR. ROBERT VEGELER:

12     Q. So without going into what they said, what happened next?

13     A. Well, every time that I heard this, I would go and

14    confront Nadim, because my job is very important.  I have a

15    family to support.  So I would go to him, and I would say, "I

16    keep hearing I'm going to lose my job."  He said, "Oh, no, you

17    do good.  You're doing real good here.  Don't worry about it."

18    And then a couple of days --

19     Q. Let's nail down the date.  When?

20     A. It had to have been around the 27th, 28th.

21     Q. Of?

22     A. Of April.

23     Q. Of 2004?

24     A. That's correct.  And that was when Irfan had came into

25    town.

1    Q. Okay.  Well,let's leave Irfan, and go back to what was Mr.

2    Baig doing?

3    A. Uh, Mr. Baig called a salesperson meeting as well as the

4    managers and we were all together and he explained to them,

5    "If I heard that Trent Chapin was getting fired" --

6         **MR. JAMES BUCHHOLZ:**  Judge, please, we're getting

7    right back into what you just sustained as an objection.

8         **MR. ROBERT VEGELER:**  Your Honor --

9         **THE COURT:**  But he's saying at this point what Baig

10   said at the meeting, correct?

11        **MR. ROBERT VEGELER:**  That's what he said.

12        **THE WITNESS:**  Yeah.

13        **THE COURT:**  The objection is overruled.  The Court

14   will allow him --

15        **THE WITNESS:**  And he told them, "If I hear that Trent

16   is getting fired again, I'm going to fire that person," that I

17   was there to stay, that I was doing a great job.

18        Two days later --

19    Q. What happened?

20   A. Two days later, I was in a meeting with him, because he

21   wanted to --

22    Q. Whose "him"; you got to be precise?

23   A. I'm sorry, Nadim Baig.  Wanted me to fire, I believe it

24   was three or four employees, I think it was three employees.

25   So he sat there, and made me fire them.  After I fired them,

1  then they signed all their papers.  He had called in Tim

2  Maddox and Glenn Richards, which were both managers.

3  Q. And who called them in?

4  A. Nadim Baig.

5  Q. And where was this taking place?

6  A. This was in my office, in the used car building.

7  Q. At the Acura Subaru?

8  A. At the Acura Subaru.

9  Q. And what's the date?

10  A. That would be the 30th.

11  Q. Of?

12  A. Of April 2004.

13  Q. And what did Nadim Baig say to you?

14  A. Basically, he just said I was in transfer mode.  He said

15  he was putting me on transfer mode.  I said, "Well, what is

16  transfer mode, explain yourself."  He told me that my time

17  that I've been with the company account, that I need to go see

18  Larry Kruse at the Toyota store and I believe Kevin something

19  at the -- he was the general manager as well at the Nissan

20  store.  I said, "Well, do I have a job?"  And he said, "Well,

21  you'll have to go speak with them first, but you're in

22  transit."  And at that point, he asked for my keys back to the

23  dealership.  He didn't say I was fired.  He just asked for my

24  keys back.  So I give him the keys back.

25     As I was leaving the dealership, his friend Irfan was

1    coming in the back door.

2     Q. Now, describe Irfan.  I mean --

3     A. He's Pakistani, Muslim I believe as well.

4     Q. And --

5     A. And it's his friend.

6     Q. Now, who was present?  Where did this conversation occur?

7     A. In the used car office at the Subaru building.

8     Q. Okay.  And who was present?

9     A. Nadim Baig, myself, Tim Maddox and Glenn Richards.

10    Q. I'm talking about the one with Irfan?

11    A. Oh, Irfan, I don't know.  I mean -- when I left?

12    Q. Yeah, where did that conversation occur?

13    A. There -- it was just I was walking out the door.

14    Q. Okay.  Well, tell --

15    A. I seen Irfan coming in the back door.

16    Q. Okay.  Did the conversation occur at that time?

17    A. Not at that time, no, sir.

18    Q. Did there come a time when a conversation occurred between

19    you and Mr. Baig --

20    A. That's correct.

21    Q. -- and Mr. Irfan?

22    A. That's correct.  And that was about a day before he had

23    the sales meeting and manager meeting because I had a

24    salesperson, Lou Ann Montz had told me that that's the person

25    I hear is going to replace you.  Well, I was on the side of

1    the Acura store --

2           **MR. JAMES BUCHHOLZ:**  Judge.

3           **THE COURT:**  Sustained.

4           **THE WITNESS:**  He --

5           **THE COURT:**  Sustained.  The jury will disregard that

6    last answer.  That was clearly hearsay and we'll disregard it.

7           **MR. ROBERT VEGELER:**  Now --

8           **THE COURT:**  Could I get a clarification, is Irfan a

9    first or last name?

10          **THE WITNESS:**  First name.

11          **MR. ROBERT VEGELER:**  It's Irfan Hussein.

12          **THE COURT:**  Go ahead.  Next question.

13   BY MR. ROBERT VEGELER:

14    Q. Now, what did you observe without saying what Lou Ann

15   Montz or anybody else said, what did you observe with Irfan,

16   yourself and Nadim Baig?

17    A. I walked over, spoke to Nadim and basically introduced me

18   to Irfan, his friend.

19    Q. No, I don't understand.  Who said what?

20    A. Nadim introduced me as his --

21    Q. To who?

22    A. To Irfan.

23    Q. And what did Nadim say?

24    A. He said that was his friend and he just flew in from

25   Pakistan.

1    Q. Okay.  Now --

2    A. And he had jet lag.

3    Q. And what did you say to Mr. Baig and/or Irfan?

4    A. It was nice meeting you and I told him I'd talked to him a

5    little later and I walked away.

6    Q. Okay.  And this was approximately the day before the sales

7    meeting?

8    A. That's correct.

9    Q. At the end of April?

10   A. Yes, sir.

11   Q. And After you were notified that you were in transfer mode

12   and to turn in your keys, did you again then report back to

13   Acura Subaru to be used car manager or sell cars or anything?

14   A. No.

15          **MR. JAMES BUCHHOLZ:**  Objection to the form, Judge.

16   It's leading.

17          **THE COURT:**  Sustained.  You can rephrase.

18   BY MR. ROBERT VEGELER:

19   Q. What did you do you, then, with respect to any duties at

20   Acura Subaru?

21   A. They were terminated.

22   Q. Did you perform any used car manager duties?

23   A. No, sir.

24   Q. Did there come a time when you found out who assumed the

25   used car manager duties at the Acura Subaru?

1    A. Yeah, the next day I found out.

2    Q. And who assumed those duties?

3    A. Irfan.

4    Q. That's Irfan Hussein?

5    A. That's correct.

6    Q. Did you ever observe Irfan Hussein participating in these

7    prayer meetings with Nadim and Anwar?

8    A. Not myself personally.

9    Q. Now, what did you then do for the period of April 30th,

10   2004; when was the next time -- what was the next activity, I

11   guess is a better question -- you did involving the Bob

12   Rohrman Auto Group?

13   A. Well, I was working with Larry Kruse.  Larry Kruse told me

14   he was opening a new satellite store from the Toyota store

15   that was just down the road.  He didn't tell me that.  He just

16   said that he had a new position that was coming up and he

17   couldn't talk about it, because obviously they didn't close on

18   the building or whatever.  He didn't want to talk about it.

19   He said I was going to be the used car manager, he said it

20   wouldn't be right away, actually it was June first.  So I was

21   terminated on April 30th and I started on June first at the

22   new satellite store at the Rohrman location.

23   Q. And is that the one that has been referred to as the

24   Toyota Lexus store?

25   A. It's part of the Toyota Lexus store that's, I believe 5900

1   Illinois Road.  It's down the road from that.  It's the car

2   lot that didn't have the sign out front.

3    Q. Okay.  But you've heard statements so far that's been the

4   Fort-Rohr defendant?

5    A. That's correct.  That's part of Fort-Rohr.

6    Q. Now, so what -- did you receive any compensation from

7   either Acura Subaru or the Toyota Lexus entities for any work

8   performed between May 1st, 2004, and June 1st, 2004?

9    A. No.

10    Q. And after -- did you talk to Mr. Kruse about being in

11   transfer mode?

12    A. Um, yes, he -- he knew what was going on and I need to

13   rephrase, because it was not June first, it was July 1st.

14    Q. Okay.

15    A. I apologize for that.  It was July 1st of 2004 is when I

16   started at the new car lot.

17    Q. And what was -- well, did you have a discussion with Mr.

18   -- who did you understand was the manager of the Fort-Rohr

19   Toyota Lexus?

20    A. It was Larry Kruse.

21    Q. And what was his title?

22    A. He is the general manager.

23    Q. And did you receive a position from him?

24    A. Yes, I did.

25    Q. And what was that?

1    A. Used car manager.

2    Q. And was there a new car manager?

3    A. Uh, not at my location.

4    Q. Okay.  Was that because you only sold used cars?

5    A. That's correct, sir.

6    Q. Okay.  Now, was there an inventory there with a lot of

7    cars?

8    A. There was an inventory there, that's correct.

9    Q. Was there a sign on the road?

10   A. No, there wasn't.

11   Q. Were you aware that there had been any advertising for

12   that facility?

13   A. Uh, there was spot ads every once in a while.  No, not

14   like he promised me.

15   Q. And how many salespeople did you have?

16   A. Um, I had two and one died in December of 2004, had a

17   stroke, and that left me with the one.

18   Q. And at that point in time, who were you reporting to?

19   A. Larry Kruse.

20   Q. Did you have any further involvement with the Acura Subaru

21   people?

22   A. No, sir.

23   Q. So when did you -- what were some of the activities you

24   did at the Toyota Lexus facility as used car manager?

25   A. Um, I appraised trades.  I had one salesperson at the

1  time.  I passed his deals, made sure the customer was

2  satisfied.  When we sell a car, he'd go down, take the

3  customer to the Toyota store and they'd do the financing down

4  at the Toyota store.  We'd stock in the trades and take them

5  up to the Toyota store.

6   Q. Did there come a time, then, when you filed a charge of

7  discrimination against Acura Subaru --

8   A. Yes.

9   Q. -- entity?

10   A. Yes.

11   Q. And you recall when you filed that?

12   A. I was thinking December -- January, I'm not for sure.

13   Q. So if I you told you it was February 10th --

14   A. February 10th, that's correct.

15   Q. -- 2005, I can show it to you, does that sound right?

16   A. Yes, sir.

17   Q. Can you tell the jury what was the basis of your charge of

18  discrimination?

19   A. Well, I had been thinking about it because it put me in a

20  lot of financial bind not having a job for a couple of months.

21  And the more I thought about it, the madder I got.  I mean, it

22  was wrong what they did by taking us managers out and

23  replacing us with Pakistani and Muslim belief and that's

24  exactly what happened.  They were friends, it wasn't for job

25  performance by no means, because all I did was get credits

1    when I was there.  The salesmen loved me.  They were making

2    money.  There was no reason -- I was there before anybody

3    else.  I was moving cars, I was doing everybody's else's job.

4         **MR. JAMES BUCHHOLZ:**  Judge, this is now

5    non-responsive to the question.  I ask that it be stricken,

6    the non-responsive part be stricken.

7         **THE COURT:**  It's sustained.  The non-responsive part,

8    I think it asked for -- what the basis of the charge was.

9    That, I'll allow him to answer that.  The previous testimony

10   is stricken and is to be disregarded by the jury.  You may

11   answer that.

12   BY MR. ROBERT VEGELER:

13   Q. The basis of the charge.

14   A. Was discrimination.

15   Q. Based upon what?

16   A. Based on race, religion.

17   Q. Origin?

18   A. Origin.

19   Q. And who did you file this charge of discrimination with?

20   A. Um, the discrimination department at Metro.

21   Q. And do you know if there -- what their relationship is to

22   the EEOC?

23   A. Um, they're part of the EEOC.

24   Q. And after you filed that charge of discrimination, did --

25   did there come a time when you became aware that the Bob

1    Rohrman Auto Group became aware of that charge?

2    A. Yeah, I believe it was February 26; it was on a Saturday.

3    I knew Rohrman was in town.

4        **MR. JAMES BUCHHOLZ:**  Judge, I'm going to object.

5    He's asking this man to testify about the knowledge of

6    another.  He can't be in anybody else's head.

7        **THE COURT:**  Right.

8        **MR. JAMES BUCHHOLZ:**  The question is:  Did they

9    become aware of it on a certain date.

10       **THE COURT:**  Did there -- the question was:  Did there

11   come a time when you became aware that Bob Rohrman's Group was

12   aware of the charge.

13       To the -- I'll sustain it as to the phrasing of the

14   question.  The witness can answer within his personal

15   knowledge to the extent of his personal knowledge of whether

16   or not how he came to know, if he did, of Rohrman's knowledge

17   of the charge.

18   BY MR. ROBERT VEGELER:

19    Q. How did you -- how did you become aware that the Bob

20   Rohrman Group, Acura Subaru and/or Toyota Lexus became aware

21   of your February 10th charge of discrimination?

22    A. Because I knew Mr. Rohrman was in town on the 26th.  Mr.

23   Kruse called down to my car lot around 10:00 o'clock at night

24   that night, because we had a midnight madness sale and my

25   salesman had answered the phone.  Mr. Kruse had told my

 1   salesman to have --

 2          **MR. JAMES BUCHHOLZ:**  Judge.

 3          **THE COURT:**  Sustained.  That calls for hearsay.

 4          **MR. ROBERT VEGELER:**  Mr. Kruse is subpoenaed as a

 5   witness and he is a representative.

 6          **THE COURT:**  Well, let's take it one step at a time.

 7   The problem is his answers are becoming narratives.  Let's

 8   take it one step at a time.  He can answer that first question

 9   and then go to the --

10   BY MR. ROBERT VEGELER:

11    Q. Okay.

12          **THE COURT:**  How did you become aware that Rohrman

13   Group --

14   BY MR. ROBERT VEGELER:

15    Q. Right.  The question is and the Judge is right, how did

16   you become aware representatives of the Rohrman Group became

17   aware of that February 10th charge of discrimination?

18    A. It was basically on Sunday I found out Mr. Kruse had

19   called.  That's --

20    Q. And what did you believe was the purpose of Mr. Kruse's

21   call?

22    A. Um, he was very upset, and --

23          **MR. JAMES BUCHHOLZ:**  Judge, I'm going to object

24   again.  He can't know the purpose of Mr. Kruse's call.  He's

25   asking what's in Mr. Kruse's mind.

1      **THE COURT:**  All right.  He can answer it as to Kruse

2    made a call to him take it the next step.

3    BY MR. ROBERT VEGELER:

4     Q. I asked him what did he believe was the purpose of the

5    call?

6     A. My salesman had called me and told me that Mr. Kruse had

7    called that night to talk to me.

8      **THE COURT:**  All right.  Next question.

9    BY MR. ROBERT VEGELER:

10     Q. So did there come a time, then, when you talked to Mr.

11    Kruse?

12     A. Yes, it was the 28th of February.  I got there about 7:30

13    in the morning like I normally do, and I got a phone call from

14    him, told me I had to be down to his office for a meeting.

15        At that point, by his voice, I knew something was wrong.

16     Q. Whose voice was that?

17     A. Mr. Kruse's.

18     Q. Okay.  You recognized his voice?

19     A. Of course I did.

20     Q. And this was on February 28th?

21     A. That's correct.

22     Q. Do you remember what day of the week that was?

23     A. A Monday.

24     Q. Okay.  And he asked you to do what?

25     A. To come down, because there's a couple of managers that

1    wanted to talk to me.

2     Q. And did you then go down to Mr. Kruse's office?

3     A. That's correct.

4     Q. And did you enter Mr. Kruse's office?

5     A. What I did is I parked behind the service drive and I had

6    a cassette recorder.  We decided the discrimination department

7    at Metro --

8            **MR. JAMES BUCHHOLZ:**  Judge.

9            **THE COURT:**  Wait.

10            **THE WITNESS:**  That --

11            **THE COURT:**  Wait, objection.  Hearsay?

12        **MR. JAMES BUCHHOLZ:**  Yes, Judge.

13            **THE COURT:**  All right.  That's sustained.  Mr.

14    Chapin, you cannot testify as to what others told you.  I

15    think you were going to go into a discourse about what you

16    were told to do by Metro or something to that effect.  So I'm

17    going to sustain the objection.  Rephrase it.  What else?

18    Wait.  What else?

19            **MR. JAMES BUCHHOLZ:**  Could you please admonish Mr.

20    Chapin to respond to the question, because I hate to continue

21    to interrupt.

22            **THE COURT:**  I understand.

23            **MR. JAMES BUCCHOLZ:**  And all I'm getting is run on

24    questions and awfully difficult for me to stand up in time to

25    appropriately state an objection when he's going beyond the

1    scope of the questions being asked, Your Honor.

2            **THE COURT:**  All right.  That's what I'm trying to get

3    across.  Listen carefully to the question asked.  You'll be

4    given an opportunity to answer that.  If there's need for

5    further elaboration, your attorney will ask you the next

6    question.

7            **THE WITNESS:**  Okay.

8            **THE COURT:**  But you just need to listen carefully,

9    answer that and do not go into a discourse or narrative,

10   especially when it calls into -- asks or presents hearsay,

11   that is, statements that others made to you.

12           **THE WITNESS:**  Yes, ma'am.

13           **THE COURT:**  Unless the Court gives you specifically

14   leave to do that.  Next question.

15   BY MR. ROBERT VEGELER:

16    Q. So, you -- did you decide to carry a tape recorder with

17   you?

18    A. Yes, I did.

19    Q. And was it your tape recorder?

20    A. Yes, it was.

21    Q. And in your mind, what was the purpose of taking the tape

22   recorder?

23    A. I felt I would be retaliated against.

24    Q. So where did you -- I don't know how you were dressed.

25   How were you dressed on that --

1    A. I had a yellow coat on and it had a zipper here

2   (Indicating) and I had the recorder down in the front pocket.

3   And I -- when I parked by the service drive, I made sure it

4   worked as I was walking through the service department and it

5   did, so and then at that point, I --

6        **MR. JAMES BUCHHOLZ:**  Judge, again, this is

7   non-responsive to the question and I hate to keep

8   interrupting.  I really do.  But I just request we go through

9   a normal orderly course of his testimony, please.

10       **MR. ROBERT VEGELER:**  I can ask him what next, what

11  next, what next or we can move it along.

12       **THE COURT:**  No, he had asked him how were you dressed

13  and he was describing the pockets, so I didn't think he was

14  necessarily totally off the path there.  Overruled.  Next

15  question.

16  BY MR. ROBERT VEGELER:

17   Q. So did you attend this meeting?

18   A. Yes, sir.

19   Q. Again, for the jury's help, who was present?

20   A. Uh, Larry Kruse, the general manager, the (Unintelligible)

21  sales manager, Shane Householder and Luke Luther, the Human

22  Resources Manager.

23   Q. And yourself?

24   A. And, of course, myself.

25   Q. And can you tell the jury --

1          **THE COURT:**  Luke Luther, is that his name?

2          **THE WITNESS:**  That's correct.

3          **THE COURT:**  Go ahead.

4     BY MR. ROBERT VEGELER:

5      Q. Can you tell the jury what Mr. Kruse -- how did this

6     meeting start out, then?

7      A. Uh, well, told me to come in and sit down, so I sat down

8     here.  His desk is right here (Indicating).

9      Q. Who is "he"?

10     A. Larry Kruse.

11     Q. Okay.

12     A. I have Shane Householder straight behind me, okay, which

13    is like a foot behind me.  I have Luke Luther another foot

14    over here.  And as the conversation started, Mr. Kruse stood

15    up, put his finger in my face.

16     Q. How close was he?

17     A. Oh, maybe this close (Indicating) and I was --

18     Q. And where was his finger?

19     A. Pointing down at me.

20     Q. And what did -- how did the conversation -- the

21    conversation start out?

22     A. What is my mentality.  I asked him what does he mean.  He

23    says for filing a discrimination case against Bob Rohrman.  As

24    I don't know verbatim, the tape, the recording is very

25    explicit.

1    Q. And we'll get to that in a second.  What -- did Luke

2    Luther say anything during this?

3    A. No, sir.

4    Q. Did Shane Householder say anything during this meeting?

5    A. No, sir.

6    Q. About how long did the meeting last?

7    A. Hmmm, maybe a minute or so.  It's about as long as the

8    tape.

9    Q. And did -- when did the meeting -- about how long did it

10   last, did you say?

11   A. I said maybe a couple, it's as long as the tape is.

12   Q. And what did you do, then, after the meeting?

13   A. I left.  I left the building.  I went down to my

14   department.  I picked up a few of my things and then I went to

15   Metropolitan Division of the Human Resources, which is the EOC

16   (sic) or the EEOC.

17   Q. Now, did you have an opportunity to review the tape of

18   that February 28th conversation?

19   A. Yes, I did.

20   Q. And did you review a transcript of that tape?

21   A. Yes, I did.

22   Q. And did you, before coming to court today, initial the

23   tape?

24   A. Yes, I did.

25   Q. And --

1    **MR. ROBERT VEGELER:**  Your Honor, I know you told us

2    we didn't have to ask permission, but approach the witness?

3    Q. I'll hand you what's marked as Plaintiff's Exhibit Number

4    1.  If you could open that case.  Can you identify that tape?

5    A. Yes, that's my initials.

6    Q. And prior to coming to court today, did you cue this up so

7    it could be played for the jury?

8    A. That's correct.

9    Q. Does it truly and accurately represent the conversation

10   that you recall having occurred in your presence with Mr.

11   Kruse?

12   A. It's very accurate.

13       **MR. ROBERT VEGELER:**  I move for admission of

14   Plaintiff's Exhibit Number 1, Your Honor, and we have a

15   transcript also to accompany it.

16       **THE COURT:**  Any objection to the playing of the tape,

17   Plaintiff's Exhibit 1?

18       **MR. JAMES BUCHHOLZ:**  No objection to the playing of

19   the tape, Judge.

20       **THE COURT:**  All right.  We'll show the admission of

21   tape one.  You may go ahead and play it.  Do you have the

22   transcript now; did you want to follow it now?

23       **MR. ROBERT VEGELER:**  Yes, we have the transcript.

24       **THE COURT:**  Are there any issues with regard to the

25   transcript, other than those previously made of record?

1          **MR. JAMES BUCHHOLZ:**  None other than we've made of

2     record, Your Honor.

3          **THE COURT:**  All right.  Do you have multiple copies?

4          **MR. ROBERT VEGELER:**  I have in multiple copies, Your

5     Honor.

6          **THE COURT:**  All right.  Do you want to give those to

7     the deputy and she'll pass them in.

8          **MR. JAMES BUCHHOLZ:**  Sure.

9          **THE COURT:**  And do you have a copy of it for Mr.

10    Buchholz?

11         **MR. ROBERT VEGELER:**  Yes.

12         **MR. JAMES BUCHHOLZ:**  I do.  That's fine.

13         **MR. ROBERT VEGELER:**  Your Honor, with your

14    permission.

15         **THE COURT:**  Go ahead.  Position it however it will

16    best play.

17       (Whereupon, the tape was played for the jury.)

18         **THE COURT:**  Now, let me just advise -- instruct the

19    jury with regard to what they just heard and read.

20       Ladies and gentlemen of the jury, you have heard a

21    recording that has been received into evidence.  This

22    recording is proper evidence, and you may consider it just as

23    any other evidence.  You have been given a transcript to use

24    as a guide to help you follow as you listened to the

25    recording.  The transcript is not evidence of what was

1   actually said or who said it.  It is up to you to decide

2   whether the transcript accurately reflects what was said and

3   who said it.  If you notice any difference between what you

4   heard on the recording from what you read in the transcript,

5   you must rely on what you heard and not on what you read.

6        You should also know, too that all of the evidence that --

7   all of the exhibits that are admitted into evidence will be

8   available for you to review during your deliberations.

9             **THE COURT:**  Go ahead.

10            **MR. ROBERT VEGELER:**  Thank you, Your Honor.

11  BY MR. ROBERT VEGELER:

12   Q. Now, what was your understanding as given to you by Mr.

13  Kruse from that February 28th, '04 meeting as to what you had

14  to do?

15   A. If I didn't reverse the discrimination, I didn't have a

16  job period.  He told me that.  So I assumed he would fire me

17  if I didn't reverse the claim, which I did not.

18   Q. Okay.  You said you went down to Metro, the

19  anti-discrimination agency.  Did you go right after this

20  meeting?

21   A. That's correct.  That's -- well, I stopped in my small

22  dealership where I was working at just to pick up a few things

23  off of my desk and then I headed straight down to Metro.  And

24  at that time --

25   Q. Now, let me keep this step by step.  Then you went down to

1   Metro, correct?

2    A. Correct.

3    Q. Did there come a time, then, where you ever reported back

4   to work at Toyota Lexus?

5    A. No.

6    Q. And the February 28th meeting, I think you testified

7   occurred on Monday.  Did there come a time when you again had

8   a meeting with Mr. Kruse?

9    A. Yes.

10    Q. And when did that occur?

11    A. The fourth, I believe of March.

12    Q. Of 2005?

13    A. That's correct.

14    Q. And did you -- did you tape that meeting also?

15    A. That's correct.

16    Q. And what was the purpose of going back down to Toyota

17   Lexus?

18    A. I called to see if I could get my check mailed to me, and

19   I was told I had to come in and speak to Mr. Kruse; he would

20   not give it to me.

21    Q. Now, how is -- how does that payment work at Bob Rohrman

22   Auto Group?  If you -- say, you work the whole month of

23   February, and you're entitled to some commissions and so

24   forth, when do you get that check?

25    A. I'm thinking it's the 5th, right around there.  I'm not

1    for sure.  It has been a long time.

2     Q. Of what month?

3     A. Of the following month.

4     Q. Okay.  So was that the check you're referring to?

5     A. That's correct.

6     Q. And did -- what did Mr. Kruse say about mailing you the

7    check?

8     A. That they wouldn't do that.

9     Q. So did you then make arrangements to go down and meet with

10   him?

11    A. Yes, I did.

12    Q. And on March 4th, 2005, who did you meet with?

13    A. Uh, same people, Larry Kruse, Shane Householder and Luke

14   Luther.

15    Q. And you take the conversation the same way you did the

16   February 28th, 2005?

17    A. That's correct.

18    Q. And did you have an opportunity to review that tape prior

19   to coming to court?

20    A. Yes, I did.

21    Q. Did you use the same tape recorder?

22    A. Yes, I did.

23    Q. Did you use the same technique?

24    A. Yes, I did.

25    Q. And --

1        **MR. ROBERT VEGELER:**  Again, Your Honor, I'll approach

2    the witness.  Thank you.

3    BY MR. ROBERT VEGELER:

4     Q. I'll hand you what has been marked as Plaintiff's Exhibit

5    2 and ask if you can identify that tape?

6     A. Yes, that's it.

7     Q. Did you put your initials on it?

8     A. That's correct.

9     Q. And did you listen to this tape prior to court?

10    A. Yes.

11    Q. Coming to court?

12    A. Yes, I did.

13    Q. And did you cue it up to the relevant portion

14    conversation?

15    A. Yes, I did.

16    Q. And does it accurately reflect what conversation occurred

17    that day between you and Larry Kruse?

18    A. Yes, it does.

19        **MR. ROBERT VEGELER:**  At this point in time, Your

20    Honor, I move for admission of Plaintiff's Exhibit 2.

21        **MR. JAMES BUCHHOLZ:**  Judge, I'd like to be heard.

22        **THE COURT:**  At side bar?

23        **MR. JAMES BUCHHOLZ:**  Yes.

24        **THE COURT:**  Please approach.

25       (Whereupon, the following bench conference was held

1   outside the hearing of the jury:)

2          **THE COURT:**  Okay.  Go ahead.

3          **MR. JAMES BUCHHOLZ:**  Okay.  Fool me once, don't fool

4   me twice.  He cleaned up these tapes significantly.  I've

5   never heard that tape as clear.  I've got a copy of that tape

6   that I've heard and it is rougher than you can imagine.  Now

7   he's trying to testify that these are the tapes he actually

8   (Inaudible).  I've got a copy of that tape as provided by Mr.

9   Vegeler and I challenge Your Honor to believe that these tapes

10  were from -- that there hasn't been doctoring to this tape.

11  Whether it has been cleaned up or changed or whatever, but now

12  we're in a situation where he's, you know, that he's

13  testifying that this is the accurate, absolute tape and I'll

14  be happy to have Your Honor listen to the tape that's been

15  provided through discovery.

16         **THE COURT:**  Is there an issue on this?  What

17  happened?

18         **MR. ROBERT VEGELER:**  Well, we copied the tape.  We

19  came into Court and tried to run these tapes on this system,

20  it gave feedback and everything.  These tapes have been

21  available since October 10th, at any time, of course.  I'm

22  running a sound system so you can play them.

23         **THE COURT:**  Okay.  Let me ask this, we all know you

24  can get bad copies of an original tape.  Did you ever listen

25  to the original tape?

1          **MR. JAMES BUCHHOLZ:**  I was provided a copy.

2          **THE COURT:**  Right.  Do you have -- you have a right

3     to the original and you can request a copy.  My question to

4     you, did you ever listen to the original tape?

5          **MR. JAMES BUCHHOLZ:**  I heard the original at an EEOC

6     mediation before suit was filed and it's the exact quality of

7     what I have on a tape recorder -- on a recording.  I'll bring

8     it over.  Your Honor can hear it.

9          **THE COURT:**  So what you heard at the EEO conference

10    was this microcassette, Exhibit 2?

11         **MR. JAMES BUCHHOLZ:**  I'll tell you, the first one and

12    I believe he's done the same thing to the second one, I

13    haven't heard the -- I've heard the tapes as produced to me.

14         **THE COURT:**  What I'm asking you is you're saying you

15    had access, you had an opportunity to listen to the original

16    tape, I'm assuming both original tapes, which are both

17    microcassettes, correct?

18         **MR. JAMES BUCHHOLZ:**  I listened to one of the two.

19    I've not listened to this one, Your Honor.

20         **THE COURT:**  This being two, but you had a chance to

21    listen to the microcassette, correct?

22         **MR. JAMES BUCHHOLZ:**  Yes.

23         **THE COURT:**  And the microcassette was played at the

24    EEOC mediation?

25         **MR. JAMES BUCHHOLZ:**  Yes.

1    **THE COURT:**  And the microcassette was not -- and the

2    microcassette, what you heard at the mediation was the same

3    quality as tape you heard later on, is that correct?

4    **MR. JAMES BUCHHOLZ:**  Yes.

5    **THE COURT:**  All right.  Has there been any filtering?

6    **MR. ROBERT VEGELER:**  No.  No, these are the exact

7    ones.

8    **THE COURT:**  That were turned over to the EEOC?

9    **MR. ROBERT VEGELER:**  If you want to bring in a sound

10   system and play them, that's fine.  That's why I brought this

11   in because you couldn't hear it as well on the original

12   machine.

13   **THE COURT:**  If you want, we can take a break and you

14   can listen to this tape number two.  You say you haven't heard

15   that.  If there's a dispute on it.  There can be a lot of

16   explanations.  You heard a crummy copy, I can understand that,

17   that there wasn't a comparison made to the original.  I'm not

18   so sure as to what the chronology is regarding these two

19   tapes.  Third, that there was some challenge that there was

20   some filtering done on this, you know, there's got to be some

21   evidence of that before we take any action on that.  So if you

22   want to take a short recess, we could -- and you could compare

23   the quality, but if he's -- what I expected he's going to do,

24   pull out some EEOC receipt saying here's your tapes back, this

25   is what we played, this is what you heard, this is what you

1   heard, is it worth the fight on it.

2        **MR. JAMES BUCHHOLZ:**  I'd like to hear the quality of

3   it before.

4        **THE COURT:**  I got you.  All right.  Let's come back.

5   What?  What?

6        **MR. ROBERT VEGELER:**  This transcript, I assume this

7   transcript is pretty accurate.  He ran this tape, had it

8   transcribed two days ago.

9        **MR. JAMES BUCHHOLZ:**  Judge, I spent two and a half

10   hours on the rotten copy putting it next to my ear in complete

11   and total silence.  I put it away from everything in order to

12   get the transcript in the form that it is.  I'd like to hear

13   this before it is -- I make any kind of objection and/or

14   allowing it to come in so I know what it is I'm dealing with.

15        **THE COURT:**  Let me ask this, who prepared the

16   transcript?

17        **MR. ROBERT VEGELER:**  Chuck Holm, court reporter.

18        **THE COURT:**  Did he also prepare a transcript on this

19   tape too?

20        **MR. ROBERT VEGELER:**  Yeah.

21        **THE COURT:**  So you've got competing transcripts, both

22   the transcripts?

23        **MR. JAMES BUCHHOLZ:**  Yeah.  The transcript Mr. Holm

24   did allegedly off of this tape has so many holes in it that

25   you can't believe it.  And I'm not denigrating Mr. Holm.

 1          **THE COURT:**  Oh, I don't care if you are.  In those

 2    situations, everybody's tapes goes in and everybody's

 3    transcripts can be used.

 4          **MR. ROBERT VEGELER:**  Actually, we're using his

 5    transcripts.  We're dumping mine.

 6          **THE COURT:**  When you have competing interests and

 7    transcripts presented and all transcripts presented, that's

 8    what I've done in the past, when you've got fights over what's

 9    contained on the tapes, so I'm just letting you know if you

10    want to go that route, you've got the right to do that too.

11    If you want to take a short recess and you compare it, we can

12    do that.

13          **MR. JAMES BUCHHOLZ:**  Thanks, Judge.

14       (Whereupon, the bench conference was concluded;

15    thereafter, the following proceedings were held:)

16          **THE COURT:**  All right.  Ladies and gentlemen, it's

17    necessary for us to take about, oh, about a 15-minute break.

18    It's 3:15 now.  We need to cue up this next tape, and as soon

19    as we can, we'll bring you back in the courtroom.  I should

20    tell you we'll go until about 4:00 o'clock, 4:15 or so before

21    we break for the day, all right?

22       Keep in mind the Court's continuing admonition not to

23    discuss this case during the recess.  Take your notes with you

24    up to the jury room and just remember to bring them back down

25    when you're back on the record, okay?

1          (Jury absent.)

2          **THE COURT:**  All right.  You can go ahead and take

3     that off and you can step down.  And counsel, we'll take about

4     a fifteen-minute break and you can do the comparison you want

5     to do and we'll be back on the record at 3:30 and see where

6     we're at.

7          (Whereupon, there was a brief recess taken; thereafter,

8     the following proceedings were held:)

9          **THE COURT:**  Go ahead and be seated.  Counsel, have

10    you had an opportunity to listen to that tape?

11         **MR. JAMES BUCHHOLZ:**  I have, Your Honor.  I saw Mr.

12    Vegeler has an equalizer that deals with some of these issues.

13    If these tapes are going back to the jury, my concern is that

14    without those same devices we're in a heap of trouble, because

15    I think that what this equalizer has done is taken what is a

16    extremely poor transcription, as I made representations about

17    in opening statements, and made it at least a little more

18    bearable.  But I have a concern that if that's not available

19    to them, and they want to listen to these tapes in the jury

20    room, that what -- there's going to be an issue.

21         **THE COURT:**  That's better than the Court's equipment

22    actually.

23         **MR. JAMES BUCHHOLZ:**  Well, that's fine.

24         **THE COURT:**  Which, I'll see what I can do to remedy

25    that, but there's no issue.  If the jury wants the play

```
 1   back -- and I've done this different times -- they can take

 2   that upstairs and they use it to play during deliberations if

 3   they want to, or I can bring them back here, and they can

 4   request a playback in the courtroom.  But under the

 5   circumstances, that's something -- as we get closer to the

 6   time, to deal with.  But my question right now, will there be

 7   an objection to the plaintiff tape two?

 8        MR. JAMES BUCHHOLZ:  I don't have an objection that

 9   would be (Inaudible).  I don't like it, but --

10        THE COURT:  That's what I said.  You can still make

11   your record on the tape you have, and the questions of the

12   transcript.  Now, anything else then?  Otherwise, you've got

13   the transcripts ready to go?

14        MR. ROBERT VEGELER:  Now, these transcripts are his

15   transcripts.

16        THE COURT:  Somebody is going to put them in now?

17        MR. ROBERT VEGELER:  Well, they need to follow along,

18   that's for sure.

19        MR. JAMES BUCHHOLZ:  They need to follow language.

20        THE COURT:  Okay.  Well, do we have sufficient copies

21   for everybody?  We have eight copies for everybody, and one

22   for the Court?

23        MR. JAMES BUCCHOLZ:  She says we didn't have

24   sufficient copies, Your Honor.  Can we indulge Your Honor's --

25        THE COURT:  How many do we need?  How many do you
```

1    have?

2                  **MR. ROBERT VEGELER:**  I have one.

3                  **THE COURT:**  You have one.  Do you have one, Mr.

4    Buchholz?

5                  **MR. JAMES BUCHHOLZ:**  I have a lower upper lip, Judge.

6                  **THE COURT:**  Okay.  So make nine copies.

7                  **MR. JAMES BUCHHOLZ:**  I do have one copy.  No, I

8    don't.

9                  **THE COURT:**  Make nine copies of what Mr. Vegeler has.

10   It won't pick up the yellow, will it?

11                 **THE CLERK:**  No.

12                 **THE COURT:**  Now, is there a stipulation that the

13   transcript that they will be provided to use, how do you want

14   to make your record on that?

15                 **MR. ROBERT VEGELER:**  We have agreed to let --

16                 **MR. JAMES BUCHHOLZ:**  We've agreed -- we've agreed

17   that on each of one of the transcripts, Judge.

18                 **THE COURT:**  All right.

19                 **MR. JAMES BUCHHOLZ:**  So long -- I'm not agreeing they

20   go back to the jury room, but for assistance here.

21                 **THE COURT:**  Right.  Well, sometimes there's an issue

22   as to who prepared the transcript and such.  If there's an

23   agreement on it, then that's fine, too.  That's all they need

24   to know.  And then I'll just advise the Court's previous

25   instruction to them regarding how they are to utilize the

1    transcript as an aid to their listening to the recording

2    remains in effect with regard to this exhibit as well.

3        Let's wait until she makes those copies.

4        **MR. JAMES BUCHHOLZ:**  Your Honor, Mr. Vegeler and I

5    had a conversation.  He said he's got approximately another

6    half hour.  I know you said we're going to knock off at four

7    today.  I don't have a problem with commencing with cross

8    examination of Mr. Chapin in the morning if it pleases Your

9    Honor.

10        **THE COURT:**  Well, that's fine with me, start fresh

11   then.  I'm sure the jury won't mind.  We can do that.

12        **MR. ROBERT VEGELER:**  What time would that be, Your

13   Honor?

14        **THE COURT:**  Probably nine.

15        **MR. ROBERT VEGELER:**  Okay.  I have Mr. Richards out

16   here.

17        **THE COURT:**  Why don't you excuse him until then,

18   until tomorrow.  Could you please bring the jury down.

19       Right now, it's about twenty 'till.  We'll go until about

20   twenty after.

21        **MR. ROBERT VEGELER:**  I'm going to finish with him,

22   hopefully, ten after, 4:10.

23        (Jury present.)

24        **THE COURT:**  Go ahead and be seated, ladies and

25   gentlemen.

1       At this time, we're ready to proceed.  Counsel, you may be

2   seated.  The Court will show the admission of Plaintiff's

3   Exhibit 2 now and plaintiff is now -- can now go ahead and

4   play tape two.

5       And Mr. Chapin, if you want to resume the stand.

6       Also, the jury is also being provided with a copy of the

7   transcript that has been made with regard to Plaintiff's

8   Exhibit 2.  Copies of that are being handed out to you by my

9   deputy.

10      Ladies and gentlemen of the jury, I just need to remind

11  you that the transcript of the recording is simply a guide or

12  an aid for your use in listening to the recording, that it's

13  the recording that's actually in evidence, and is to be

14  considered by you.  Any discrepancy that you find exists

15  between the transcript and the recording, it is the

16  recordings -- which, you must ignore the transcript to the

17  extent there's any disparity, all right?

18      Also, the Court will again remind you that the tape will

19  be available to either replay here in the courtroom on that

20  stereo system or the Court will otherwise make provision for

21  you, if you wish, during deliberations to hear the tape again.

22      All right.  With that, you may proceed, Mr. Vegeler.

23          **MR. ROBERT VEGELER:**  Thank you.

24      (Whereupon, the tape is being played.)

25  BY MR. ROBERT VEGELER:

1    Q. Mr. Chapin, what was your bottom line understanding of

2   that conversation between you and Mr. Kruse?

3           **MR. JAMES BUCCHOLZ:**  Judge, which conversation are we

4   referring to?

5           **THE COURT:**  Let's get clarification on that.

6           **MR. VEGELER:**  The one that was on the tape.

7           **THE COURT:**  Tape two.

8   BY MR. ROBERT VEGELER:

9    Q. Tape two.

10   A. Basically he denied saying that he fired me.  He denied

11  saying that he was going to fire me for lack of production,

12  unless I went down and reversed the claim, which is on the

13  first tape.  Um, that's -- and he wanted me to come back to

14  work, and that I don't deal with things by filing reverse

15  discrimination cases.  I take Nadim out back and beat his ass

16  is what he says I should do.  The only thing I wanted to do

17  was get my check and get out of there.

18   Q. Did there come a time, Mr. Chapin, when you received a

19  letter from Larry Kruse of March 8, 2005, you recall that

20  letter?

21   A. Yes, I do.

22   Q. Hand you what has been marked as Plaintiff's Exhibit 5.

23  That a copy of the letter purported to be written to you, by

24  Larry March 8, 2005?

25   A. That's correct, that's his signature.

1   Q. Did you receive that letter?

2   A. Yes.

3   Q. And hand you a copy -- is Plaintiff's Exhibit 5 an

4   accurate copy of that letter?

5   A. Yes.

6        **MR. ROBERT VEGELER:**  I would move for admission of

7   Plaintiff's Exhibit 5, Your Honor.

8        **THE COURT:**  Any objection to 5?

9        **MR. JAMES BUCHHOLZ:**  No objection, Your Honor.

10        **THE COURT:**  Five is admitted.  You can magnify it a

11   little bit.  It might help to read it.

12        **MR. ROBERT VEGELER:**  I also, Your Honor, have a copy

13   for -- I have enough copies to distribute to the jury, too, if

14   that would be beneficial.

15        **THE COURT:**  Either.  Help him magnify it.

16        **MR. ROBERT VEGELER:**  We might have to share, but at

17   least it's a start.

18        **THE COURT:**  Why don't you just magnify it.  She can

19   do that.  Can't we do that?

20        **MR. ROBERT VEGELER:**  I did.

21        **THE COURT:**  Go ahead.  Sorry.  Go ahead.  We can pass

22   that through, too.

23   BY MR. ROBERT VEGELER:

24   Q. Mr. Chapin, you received this correspondence that's been

25   admitted as Plaintiff's Exhibit number 5; it refers in here,

1    too, it's our understanding that upon clarification of your

2    misunderstanding, what do you believe Mr. Kruse is referring

3    to as your understanding, "you", being Mr. Chapin?

4     A. I believe that was the 20th of February cassette tape

5    where he told me basically I didn't have a job if I didn't go

6    reverse the discrimination case.

7     Q. And you did not reverse the discrimination case, did you?

8     A. No, sir.

9     Q. Did you end up calling Mr. Kruse based upon this letter?

10    A. No, I did not.

11    Q. Hand you what has been marked as Plaintiff's Exhibit

12    Number 6.  Did you again receive a letter from Mr. Kruse

13    dated -- under date of March 15th, 2005?

14    A. Yes, I did.

15    Q. And is that an accurate copy of the letter?

16    A. That's correct.

17         **MR. ROBERT VEGELER:**  I'd move for admission of

18    Plaintiff's Exhibit Number 6, Your Honor?

19         **MR. JAMES BUCCHOLZ:**  No objection to 6, Your Honor.

20         **THE COURT:**  Six is admitted.

21    BY MR. ROBERT VEGELER:

22    Q. Now, Mr. Chapin, you received this letter, Plaintiff's

23    Exhibit Number 6?

24    A. That's correct.

25    Q. Okay.  And did -- did you receive any numerous attempts or

1    mail from Mr. Kruse during the period of March 4th, through

2    March 14th?

3    A. These two.

4    Q. Okay.  And did you receive numerous contacts by telephone

5    from Mr. Kruse?

6    A. No.

7    Q. At this point in time, based upon the facts that have

8    occurred up through March 4th of 2005, did you have any

9    intention to go back to the Toyota Lexus or Acura Subaru?

10   A. No, I did not, and the tape explicitly says that.  I

11   didn't tell him I would be back.  I told him I would call him.

12   Q. Hand you what has been marked as Plaintiff's Exhibit 7 and

13   ask you if you can identify that document.

14   A. Yes, I did get this.

15   Q. And is that an accurate copy of the correspondence you

16   received --

17   A. Yes.

18   Q. -- from Mr. Kruse March 18th, 2005?

19   A. This is from Luke Luther.

20   Q. Oh, Luke Luther.

21   A. He's the Human Resources Manager.

22   Q. Is that an accurate letter, copy of the letter from Luke

23   Luther that you received?

24   A. It's an accurate copy, yes.

25        **MR. ROBERT VEGELER:**  I move for admission of

1    Plaintiff's Exhibit Number 7, Your Honor.

2            **MR. JAMES BUCHHOLZ:**  Judge, I have an objection to

3    the current form.  It's in violation of one of your Motions in

4    Limine.

5            **THE COURT:**  May I see a copy of it?

6            **MR. ROBERT VEGELER:**  Sorry.  I'm sorry.

7            **MR. JAMES BUCHHOLZ:**  If you'd like me to approach,

8    I'd be happy to.

9            **THE COURT:**  No, I know what you're talking about.

10   Let me ask you both to approach.

11       (Whereupon, the following bench conference was held

12   outside the hearing of the jury:)

13           **THE COURT:**  This deals with the employment, issue,

14   right?

15           **MR. JAMES BUCHHOLZ:**  Right.

16           **THE COURT:**  Correct, which is --

17           **MR. JAMES BUCHHOLZ:**  I don't have a problem with the

18   redaction of that information out.  A redaction in the current

19   form it's violative of your motion.

20           **MR. ROBERT VEGELER:**  I'll withdraw it.

21           **THE COURT:**  I just want to confirm the date he

22   received the notice that he was terminated; that's being

23   withdrawn.  It doesn't say you're being terminated.

24           **MR. JAMES BUCHHOLZ:**  It says I don't know how you can

25   have the position you were terminated.  We've been contacting

1    you with letters, blah, blah, blah, so.

2         **THE COURT:**  Okay.  Well, let's go.  He'll withdraw

3    it.

4         (Whereupon, the bench conference was concluded;

5    thereafter, the following proceedings were held:)

6         **THE COURT:**  Exhibit's withdrawn.

7    BY MR. ROBERT VEGELER:

8     Q. Mr. Chapin, you made reference to -- let's move on.  You

9    made reference to in -- or let me -- better way to ask it, in

10   the tape, the second tape, the jury just heard a statement,

11   "Well, I can get my check so I can go, you know, and get my

12   kids some groceries."  Do you recall making that statement.

13    A. Yes, sir, I did.

14    Q. Can you tell the jury what -- where you were living in

15   March of '05?

16    A. I was living on not Woodstream Drive -- it was real close

17   to the dealership.  It was my house that got repossessed.

18    Q. Okay.  Now, these letters, Plaintiff's Exhibit 5 and 6 are

19   dated -- are sent to you at Woodstream Drive?

20    A. Woodstream Drive, correct, 9829 Woodstream Drive.

21    Q. And were you there in March and April of '06.

22    A. '05, yes.

23    Q. In '05?

24    A. Yes.

25    Q. Maybe I misspoke.  I might have said '06.  I'm sorry.

1          And were you buying that home?

2     A. That's correct.

3     Q. And how were you buying that home?

4     A. On land contract.

5     Q. Land contract.  Can you explain to the jury what that is?

6     Some of them may not know.

7     A. I put money down and made $1,000 monthly payments on it.

8     Q. Were you making monthly payments?

9     A. A thousand dollars a month.

10    Q. Did you have an option to purchase that?

11    A. It was a purchase.

12    Q. Okay.  Yeah.  Did there come a time when you had to vacate

13    that premises?

14    A. That's correct.

15    Q. And about when?

16    A. Oh, I'm thinking May or June of 2004.  2005, excuse me.

17    Q. Okay.  So what happened?

18    A. Basically, I didn't have any money.  I mean, I couldn't

19    get a job.  I had no money.  Um, I had to get pretty much to

20    do something, so basically, I lost the house.  I mean the guy

21    told me I had to get out.

22    Q. Was there foreclosure proceedings?

23    A. No, he just come in and basically took over the house

24    because he owned it.  And after so many attempts, I couldn't

25    pay him anything; I had no income coming in.

1    Q. Okay.  Let's talk about that a second.

2       Did you go out and tray to find another job?

3    A. Yes, I did.  Several.

4    Q. And where did you go?

5    A. Um, Glenbrook Dodge.  Um, you know, I went to a lot of

6    different car lots.  I did put my application in a lot of

7    them.  I made phone calls, seeing if they were hiring.  I did

8    on-line trying to search for some other employment, because I

9    haven't been hired in my field since this has happened, I mean

10   in Fort Wayne.  So I was trying to find other work that I

11   could be qualified for, but it wasn't doing any good.

12   Q. Did you about -- did you tell the jury what maybe new car

13   lots or dealers you contacted to try to get employed?

14   A. Glenbrook Dodge, the Jeep store out on Illinois Road, um,

15   some little car lots.  I'm thinking it was Prestige.  I'm not

16   familiar with the little strip down here on Clinton.  That's

17   pretty much it.  One of the car lots I did stop at on Clinton,

18   it was a car lot, I spoke to the guy and asked if he was

19   hiring and he started talking and he told me, "Well," -- the

20   first thing I knew --

21          **MR. JAMES BUCCHOLZ:**  Judge, I object.

22          **THE COURT:**  Once there's an objection you stop

23   testifying.  Sustained to the extent --

24          **MR. ROBERT VEGELER:**  You can't say what he said.

25          **THE COURT:**  What somebody else is saying.  To the

1   extent the witness made any response, the jury is to disregard

2   it.

3   BY MR. ROBERT VEGELER:

4    Q. Did you go to the any of the other -- did you go to any of

5   the other major car dealers other than the Bob Rohrman Group?

6    A. Yeah, like I said, I went to the Glenbrook Dodge.  I went

7   to the Jeep store.  Tomkinsons, I believe that's their name.

8   Kelly.  That's pretty much all the major players in town.

9    Q. Okay.  Did you have any interviews?

10    A. Um, I did with the Glenbrook Dodge.  I actually filled

11   out, went on line they have a test you take.  I took the test.

12   The used car manager said, "Wow, you're management material."

13   I said, "All I want is a sales position.  I just want a sales

14   position."  He said, "No problem.  I'll call you the next

15   day."  I went through all the stuff, he was real excited.

16   Next day comes, I called him.  He wouldn't answer my calls,

17   next day or the next day.  Finally I gave up, because I didn't

18   get any response from him.

19    Q. So you haven't worked -- did you use work in the used car

20   business or the car sales business since March 4th of 2005 in

21   the local area?

22   A. Not in the local area, no.

23   Q. Okay.

24   A. It would be auto liquidation.

25   Q. And tell the jury who or what auto liquidation is?

1    A. It's a buy here pay here and basically my job was to sell

2    the cars and do all the paperwork and finance them.  That's

3    what I did.

4    Q. And how long did that job last?

5    A. I believe at the time maybe five or six months.

6    Q. But you couldn't -- you didn't get back with any of the

7    major players?

8    A. No.

9    Q. So you had to vacate your home on Woodstream.  Where did

10   you move to?

11   A. On the street.  I lost my vehicles.  My father had given

12   me a vehicle, so I pretty much stayed in the vehicle.

13   Q. Now, let's back up.  You say you lost vehicles.  What

14   vehicles?

15   A. 2004 T-Bird, '98 Suzuki -- or '94 -- 2004 Suzuki 800.  I

16   had a BMW that my dad had just given me.

17   Q. Was it in working condition?

18   A. That was, yes, it was.  And that's the one pretty much

19   that I lived in.

20   Q. How long did you live in your vehicle?

21   A. A month and a half maybe.

22   Q. And did there come a time when you were able to move back

23   into a home, a house?

24   A. No, I was -- it was quite a few months later.  I got a job

25   out of -- out of state or out of -- out of the city, I should

1  say, and started working.  And then I got in a hotel and

2  started staying in a hotel when I had some money coming in.

3   Q. Okay.  This was the job out of state?

4   A. Yeah.

5   Q. And is that where -- same area you're residing at?

6   A. Yes.

7   Q. And what do you do now?

8   A. Well, I just got laid off, but I was working for a

9  transmission -- Able Auto Sales in Tennessee.  I was doing

10 repairs (phonetic), and they were training me to do all sorts

11 of stuff.

12  Q. Did you sell cars?

13  A. Yes.

14  Q. Now, during this period of time in March of '05, you had

15 two sons, I believe you testified, that correct?

16  A. That's correct.

17  Q. Who were they living with?

18  A. In March, they were living with me.

19  Q. Okay.  Was that on Woodstream?

20  A. Yes, it was.

21  Q. And when you got foreclosed out of the house, what

22 happened?

23  A. They had to go back to their mother.  I had nowhere to put

24 them.  It was the worst thing I ever did in my life, but she

25 took care of them.

1    Q. Now, did -- you indicated you lost a T-Bird and a Suzuki

2    and a BMW?

3    A. No, I had the BMW.

4    Q. Okay.  That's what you were living in?

5    A. Yes, sir, it was an old one.

6    Q. Okay.  And you lost the house?

7    A. Lost the house and all the furnishings.

8    Q. And who did the furnishings go to?

9    A. Some of it, I -- I basically gave in garage sale.  I tried

10   to get some money.  I mean as short term, as I had to get out,

11   I pretty much lost everything.  I have no idea.  I had no

12   running water.  I had no electricity.  And at that point, I

13   had to call my ex-wife and tell her to come and get the kids

14   because I had no way of supporting them.

15   Q. You did a summary, did you not, of the things that -- the

16   property you lost or had to sell?

17   A. Yes.

18   Q. And hand you what's marked as Plaintiff's Exhibit Number

19   8, and ask if that is an accurate copy of the summary that you

20   had caused to be typed up by our office?

21   A. That's correct.

22   Q. Okay.  And does that accurately reflect the information

23   that you had given us to be typed?

24   A. Yes, to the best --

25          **MR. ROBERT VEGELER:**  I'd move for the Plaintiff's

1    Exhibit -- it's marked as number 8, Your Honor.  I'd move for

2    Plaintiff's Number 8.

3         **MR. JAMES BUCHHOLZ:**  We have an objection.  It's an

4    improper summary as well as documents associated with this

5    report unless there's -- and not provided -- as well as, I

6    think the numbers are hearsay.  The numbers are based upon the

7    testimony the plaintiff rendered in his deposition.

8         **THE COURT:**  All right.  So you've not seen this

9    before or you have seen --

10        **MR. JAMES BUCHHOLZ:**  No, I've seen this document in

11   this form, Your Honor.

12        **THE COURT:**  But you're objecting to the hearsay

13   nature of the document?

14        **MR. JAMES BUCHHOLZ:**  Yes, ma'am, because of the

15   values and the testimony of the plaintiff associated with how

16   does he arrive at those values and the failure to provide

17   documentation associated with those issues as requested.

18        **THE COURT:**  The Court will withhold ruling on eight

19   and I'll hear it outside the hearing of the presence of the

20   jury later this afternoon.

21   BY MR. ROBERT VEGELER:

22    Q. Okay.  Okay.  Mr. Chapin, you also at this period of time

23   in '05, Spring of '05, summer of '05, prior to that, during

24   that period of time were you -- did you raise specialty cats?

25    A. Yes, I had an African Serval.  She was maybe 55 pounds,

```
1    small little leopard, beautiful little cat.  I had several

2    cages, lots of toys.  I love animals.

3     Q. And what happened to those animals after you lost your

4    job?

5     A. I had to give her to a friend, you know.  That's what I

6    did.

7     Q. Did you ever get the animal back?

8     A. No.  I guess he had given away to a breeder.  I don't

9    know.

10     Q. So give the jury your general -- what I want to say, while

11    you were employed prior to March 4th, 2000 (sic) or February

12    28th of 2005, how would you describe your health in general?

13     A. It went bad.

14     Q. No, prior to.

15     A. Oh, great prior to that.

16     Q. Yeah, I mean, were you being doctored by anybody?

17     A. No, I was healthy.

18     Q. Were you taking any kind of medications?

19     A. Not that I recall, no.

20     Q. Okay.  How was your sleep patterns; how did you do

21    sleeping after March 4th, 2005 after you lost your job from

22    the past?

23     A. I didn't sleep at night.

24     Q. And how was your general demeanor with respect to stress?

25              MR. JAMES BUCHHOLZ:  Judge, I'm going to object to
```

1   the form of the question.  He can ask these questions but he's

2   leading this witness.

3          **MR. ROBERT VEGELER:**  Okay.

4   BY MR. ROBERT VEGELER:

5    Q. What other conditions did you have that started after

6   March 4th, 2005?

7    A. I had a lot of depression.  I was eating -- I was

8   prescribed acid flax (phonetic) because a lot of stress in my

9   stomach.  And I was chewing them like it was nothing, because

10  there was so much nervousness, no sleep.  They put me on Xanax

11  I had bleeding going on in my stomach, my rectal.

12         **MR. JAMES BUCHHOLZ:**  Judge.  Judge.

13         **THE COURT:**  Stop.

14         **MR. JAMES BUCHHOLZ:**  I object.  This goes into the

15  issues we discussed with the Motions in Limine.

16         **THE COURT:**  That's correct.  I'll let you rephrase

17  unless you want to approach on it.

18         **MR. ROBERT VEGELER:**  I'd like to approach on this

19  one, Your Honor.

20      (Whereupon, the following bench conference was held

21  outside the hearing of the jury:)

22         **THE COURT:**  The Court had ruled on a Motion in Limine

23  that he can testify as a lay person as to --

24         **MR. JAMES BUCHHOLZ:**  That's right.

25         **THE COURT:**  -- some of his maladies, but he's getting

1   into they prescribed things for him and so on and that's going

2   to be a problem.

3        **MR. ROBERT VEGELER:**  Well, I understand.  What I'm

4   trying to do is just get him to say what he needs, what he was

5   taking before and what he's taking after and how he felt.

6   That's all I want to do.

7        **MR. JAMES BUCHHOLZ:**  Judge, that's a back door method

8   associated with the Motion in Limine as well and clearly, he's

9   not in a position to talk about bleeding.  The only way he --

10  bleeding in his stomach, he's not --

11       **THE COURT:**  Rectally.

12       **MR. JAMES BUCHHOLZ:**  He said in his stomach.

13       **THE COURT:**  Nervous stomach, rectal bleeding.

14       **MR. JAMES BUCHHOLZ:**  We're going down a slippery

15  slope we tried to avoid going on.  Letting the plaintiff go in

16  through the back door is not appropriate and is in violation

17  of your motion with the order.

18       **THE COURT:**  Yeah, well, he can testify within the

19  ambit of a lay person as to his maladies, but going into

20  prescriptions and I wouldn't even tread into that.  Well, what

21  prescriptions were you on before and what were you on after,

22  which it sounded like maybe you were going down that, he can

23  talk about having a nervous stomach and having that all day

24  long, and not sleeping.  Beyond that, you're begging for

25  trouble.

1          **MR. ROBERT VEGELER:**  I never -- what I asked him what

2     prescriptions he was getting into.

3          **THE COURT:**  I know.  You've got to get off it because

4     you draw the objection.

5          (Whereupon, the bench conference was concluded;

6     thereafter, the following proceedings were held:)

7     BY MR. ROBERT VEGELER:

8      Q. Mr. Chapin, we're not going into any specific medications

9     you were taking or anything after the incident.  But you've

10    talked about depression, you've talked about some bleeding,

11    sleeplessness, nervousness, stress.  Is there any other

12    emotional --

13     A. Surgeries.

14     Q. No, we're not going to get into surgeries.?

15          **MR. JAMES BUCHHOLZ:**  Judge, I'd move to -- I'd

16    request a instruction --

17          **THE COURT:**  All right.

18          **MR. JAMES BUCHHOLZ:**  -- to the jury on that issue.

19          **THE COURT:**  The Court will dis -- sorry -- the jury

20    will disregard the witness' last statement with regard to any

21    surgeries.  There are no surgeries that are being claimed as

22    damages with regard to this case.

23          Does that address your concerns?

24          **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

25          **THE COURT:**  You may proceed.

1    BY MR. ROBERT VEGELER:

2     Q. Not getting into that technical stuff.  I'm asking you as

3    a lay person how you felt.

4     A. I felt bad.  I didn't sleep, I didn't eat.  Very

5    depressed.  I mean, I just lost my kids.  I mean, I've had

6    them for a long time.  They're always with me.  If not, I was

7    always close to them, you know.

8     Q. Now, as a result of losing your job, I mean, were you the

9    subject of some small claims suits to try to collect money

10   against you?

11    A. Yes, I was.

12    Q. And did the person who foreclosed on your house sue you in

13   small claims court?

14    A. Yes, he did.

15    Q. And did an animal hospital sue you?

16    A. Yes.

17    Q. For a hundred bucks?

18    A. Yes.

19    Q. And I believe there were several other small claims suits

20   that occurred after you lost your job, is that correct?

21    A. I believe so.

22    Q. And, in fact, what was the reason that you -- well, I

23   think you already testified you couldn't pay for the house.

24   How about a Caylor-Nickle clinic; was there a bill you

25   couldn't pay?

1          **MR. JAMES BUCHHOLZ:**  Judge, I object.

2          **THE COURT:**  That's problematic.  He's not making any

3  claim for any mental --

4          **MR. ROBERT VEGELER:**  I understand.  He's okay.

5          **MR. JAMES BUCHHOLZ:**  Judge.  Judge.

6          **THE COURT:**  Come on.

7          **MR. JAMES BUCHHOLZ:**  Could we approach the bench?

8          **THE COURT:**  Approach once more.

9     (Whereupon, the following bench conference was held

10  outside the hearing of the jury:)

11          **MR. JAMES BUCHHOLZ:**  I'm going ask for a mistrial,

12  because the way the testimony for this witness has gone,

13  violating Motions in Limine, going forward with -- in -- the

14  response is not responsive to questions, getting into hearsay

15  with all kinds of other witnesses.  I mean, if not that, at

16  least an admonishment to counsel to conform to the rules

17  because I really don't like being a jack in the box jumping up

18  and down in front of this jury.  I don't want to do that.

19          **THE COURT:**  Well, you have to do your job and if the

20  record requires that, that's fine.  But the Court is not

21  noticing, has not taken note of any intentional wrongdoing by

22  plaintiff's counsel in trying to go outside of the Motion in

23  Limine or trying to draw improper testimony from the witness.

24  Sometimes there's inadvertent statements made.  The Court at

25  every juncture has tried to reign in the witness when he's run

1   off on a narrative.  That's not an uncommon occurrence when

2   you have a case like this.  That happens all the time.

3   There's nothing extraordinary that has been produced before

4   this Court or before this jury that would support a motion for

5   a mistrial at this time.

6       Now, you're free to make your record however you want to,

7   but I have not observed it and I would not characterize it in

8   any way as being intentional.

9       Now at the end of the day, I'll give fair warning before

10  we go into cross examination tomorrow to your client to again

11  listen carefully to the question and not have a run away

12  narrative and trying to explain himself, but now let's get to

13  this exhibit.

14      **MR. ROBERT VEGELER:**  Now this was given to me by him.

15  This is one of the seven cases --

16      **THE COURT:**  Right.

17      **MR. ROBERT VEGELER:**  So I thought --

18      **THE COURT:**  Let him finish.  You want to diffuse it?

19      **MR. ROBERT VEGELER:**  Yeah, I want to diffuse it.  You

20  can't have it both ways.

21      **MR. JAMES BUCHHOLZ:**  Judge, you admonished me to deal

22  with the court actions by not getting into them and not

23  talking about the plaintiffs.  I'm not doing all those things.

24  I indicated to Your Honor on the record that's the way I would

25  do it.  Now counsel is doing it.  I mean, your ruling --

1    **THE COURT:**  No, what he can say, you were to subject

2    to collection cases because you didn't pay your bills after

3    this?  Yes.  Did they include doctor and medical bills?  Yes.

4    That's the same as making a claim for those doctor bills or

5    medical bills.  That you can ask.

6         (Whereupon, the bench conference was concluded;

7    thereafter, the following proceedings were held:)

8    BY MR. ROBERT VEGELER:

9     Q. Mr. Chapin, after you lost your job and your income, you

10   got sued for not being able to pay your doctor's bills, right?

11    A. Yes.

12    Q. And several other claims were made against you because you

13   couldn't pay your bills, right?

14    A. Yes.

15    Q. What did they do to your stress level?

16    A. Went crazy.

17        **MR. ROBERT VEGELER:**  Now, Your Honor, I think we're

18   at the point where I have to ask you about Plaintiff's Exhibit

19   8, because you reserved ruling on that.

20        **THE COURT:**  Well, I was going to hear testimony with

21   regard to the evidence that was --

22        **MR. ROBERT VEGELER:**  Okay.  Well, I can go through

23   that item by item.

24        **THE COURT:**  It's not in evidence.  You can ask him

25   questions about what if any property he tried to sell and got

1    whatever out of.  But just don't reference that which is not

2    yet in evidence.  Don't reference that which is not yet in

3    evidence.

4         **MR. ROBERT VEGELER:**  Okay.

5         **THE COURT:**  I'll let you use it to refresh

6    recollection.

7         **MR. ROBERT VEGELER:**  Okay.

8         **THE COURT:**  There's lots of ways.

9    BY MR. ROBERT VEGELER:

10    Q. Okay.  Mr. Chapin, in order to keep things moving here

11   with the jury, I think you testified about the loss of

12   vehicles because you couldn't pay for them or you sold them,

13   furniture, et cetera, your cat.

14        In general, when you -- did you end up selling everything?

15    A. No.

16    Q. What did you keep?

17    A. I don't recall what I kept.  Everything went so fast as

18   far as not having a place to go, uh, you know, I give things

19   away to some friends because they couldn't afford it or I

20   tried to sell them at a garage sale.  You know, pennies on the

21   dollar.  I did what I could do just to feed my family.

22    Q. And that was the general purpose of selling these items?

23    A. Yeah.

24    Q. Now, you had purchased -- ah, forget that.

25        At the end of the day, Mr. Chapin, what did you -- what

1    did you end up, with anything?

2     A. No, not even my brother's pictures.

3     Q. Okay.

4         **MR. ROBERT VEGELER:**  Your Honor, I think I have no

5    further questions of this witness.

6         **THE COURT:**  All right.  Ladies and gentlemen, it's

7    now 4:20.  Given that we've completed direct examination of

8    this witness, we'll go into our evening recess at this time

9    and when we resume tomorrow morning, we'll be resuming with

10   the cross examination of the witness.

11        What I need to remind you about is the Court's continuing

12   instruction regarding recesses.  And let me again go over it.

13   You're not to discuss the case amongst yourselves nor with

14   anyone else.  During this recess you're not to permit anyone

15   to discuss it in your presence.  It is your duty not to form

16   or express any opinion on the case until it is finally

17   submitted to you for your deliberations.

18        During this recess, please make sure you leave your notes

19   upstairs in the jury room overnight.

20        You're not to do any independent investigation with regard

21   to the case over the recess and you're not to expose yourself

22   to any media coverage, if there is any, with regard to the

23   case.

24        Tomorrow morning, we'll have some Continental breakfast

25   brought in for you and that will be here by eight or so.  And

1    so if you come in early, we'll have breakfast for you

2    upstairs.  We will try to stick to the same schedule as we did

3    today, that is we'll go from 9:00 to 5:00.  We'll take that

4    break for lunch and that worked out pretty good.  And we'll

5    take a short mid-morning break and a short mid-afternoon

6    break, similar to what we did today.

7        With that, I would ask you to report in by ten 'til 9:00,

8    and as soon as everyone is here, we'll proceed.  We'll see you

9    tomorrow morning.

10       Also, could you hand my deputy the copies of the

11   transcripts that you have?  And if you got any copies of

12   exhibits.  All you should have right now are your notes.

13           **JUROR:**  There's one upstairs.

14        **THE COURT:**  Well, she'll get that after today.  All

15   right.  See you tomorrow morning.

16       (Jury absent.)

17        **THE COURT:**  Okay.  You may step down.  Do you want to

18   retrieve your 7, Mr. Vegeler?

19        **MR. ROBERT VEGELER:**  Yeah.

20        **THE COURT:**  All right.  Go ahead and be seated.  Let

21   me also suggest, so we're making the proper record when we're

22   dealing with transcripts in court, you can sit down.  We have

23   marked as an exhibit the transcript to the tape one and that

24   was marked as Plaintiff's Exhibit 3.  Now the way we usually

25   make our record is the transcripts are marked as an exhibit.

1   They don't go back to the jury.  They're not an exhibit that

2   is reviewed by the jury, again, unless we do a play back with

3   the aid of the transcripts.  But to make the record on what

4   the transcripts are, and what they contain, you want to have

5   those exhibits into the record.

6       So with regard to the transcript as to tape one that was

7   marked as Plaintiff's Exhibit 3, is there any objection to 3

8   going in as an exhibit to make the record?

9           **MR. JAMES BUCCHOLZ:**  Not associated with us.

10          **THE COURT:**  Pardon?

11          **MR. JAMES BUCHHOLZ:**  No, I have no objection.

12          **THE COURT:**  We'll show its admission.  It doesn't go

13  back as part of the record.

14      Now, let's get this exhibit as tape two marked.  If you

15  want to show it as a joint exhibit, whatever you want to, but

16  let's get that marked and what are we on?

17          **MR. ROBERT VEGELER:**  Four.  Four was specifically

18  left open for that one.

19          **THE COURT:**  All right.  Let's mark it.  Any objection

20  to four then, the transcript --

21          **MR. JAMES BUCHHOLZ:**  No objection, Your Honor.

22          **THE COURT:**  We'll show the admission of Plaintiff's

23  4.  And that will take care of that.

24      Now, what's the -- let's take care of the issue with

25  regard to Exhibit 8.  Did you still want to put that in

1    evidence?

2            **MR. ROBERT VEGELER:**  No, Your Honor.

3            **THE COURT:**  All right.  So that's not in issue

4    anymore.

5            **MR. JAMES BUCHHOLZ:**  Your Honor, I think that Mr.

6    Vegeler has opened the door associated with compensation made

7    to Mr. Chapin by unemployment, because he's now left the jury

8    with the impression that he has zero money, no fashion by

9    which he had money coming and clearly, he received

10   unemployment checks during the time he left Fort Rohr.  He's

11   left this jury with the impression that he had no money coming

12   in, couldn't do anything and was destitute, and living in a

13   car.  Clearly that opens the door as relates to that issue.

14           **THE COURT:**  Whose motion in limine was that?

15           **MR. JAMES BUCCHOLZ:**  I believe it was Mr. Vegeler's.

16           **MR. ROBERT VEGELER:**  I don't believe -- specifically

17   addressed.  I had asked the Court if the Court was going to

18   determine if liability was found, both back wages and front

19   pay, and that's the way we left it.  That exhibit on

20   unemployment never got in in front of the jury.

21           **THE COURT:**  It was defendant's motion in limine.

22           **MR. JAMES BUCCHOLZ:**  Okay.

23           **THE COURT:**  Your item two as to the Indiana Workforce

24   Development determination and so on, so and we had talked

25   about that at length on how to set up the situation without

1  going into the whole unemployment claim, and the fact that it

2  was uncontested by --

3       **MR. JAMES BUCHHOLZ:**  Right.

4       **THE COURT:**  -- Fort-Rohr and all that.  And I thought

5  we had an agreement worked out that the Court, the parties

6  agreed the Court would make any post-trial determination --

7       **MR. JAMES BUCHHOLZ:**  Your Honor, I've got --

8       **THE COURT:**  -- as to damages.

9       **MR. JAMES BUCHHOLZ:**  And Your Honor, I've got no

10  problem making that determination, but based on the testimony

11  this plaintiff has now rendered associated with not having a

12  single dollar when, Your Honor, it's not -- it's not credible

13  based upon the unemployment determination.

14       **THE COURT:**  Well --

15       **MR. JAMES BUCHHOLZ:**  But by that definition if he's

16  receiving the money, he's not destitute as he's testified on

17  the --

18       **THE COURT:**  Go ahead.

19       **MR. ROBERT VEGELER:**  First of all, it's a matter of

20  what the evidence and the weight given by the jury.  He

21  already testified he was doing nickel, dime jobs.  He was

22  selling stuff to pay bills.  He also indicated he worked for

23  Auto Liquidation.  He also indicated he was --

24       **THE COURT:**  Painting.

25       **MR. ROBERT VEGELER:**  -- painting.  He was doing what

1    he could to make money.  I don't think the jury has been left

2    with a -- if he says he was destitute, that's a matter of

3    decree, not a matter of admissibility of evidence.

4        **MR. JAMES BUCCHOLZ:**  Said he was sleeping in his car.

5        **MR. ROBERT VEGELER:**  Well --

6        **THE COURT:**  I'm not sure what do you want to do with

7    the situation now?  You said he's opened the door.  What is it

8    you want to bring in?  The fact that he filed for

9    unemployment?

10       **MR. JAMES BUCCHOLZ:**  No, that he was receiving

11   compensation during that time frame.

12       **MR. ROBERT VEGELER:**  Well, then I would suggest,

13   then, let's go ahead and stipulate that and say that the

14   defendants didn't oppose his unemployment compensation.

15       **THE COURT:**  Well, you see, it seems to me that it's a

16   catch 22 for asking that it be had both ways.  The Motion in

17   Limine was to exclude it. The Motion in Limine was granted.

18   So he gets up there and testifies the way he does.  Defense

19   isn't satisfied with it and says, "Well, now it sounds like

20   he's destitute.  Now it sounds like we want to bring in the

21   fact that he's got unemployment."

22       **MR. JAMES BUCHHOLZ:**  I see, Your Honor.

23       **THE COURT:**  Tell me how we correct it, or tell me how

24   we got forward tomorrow.  You've got the problem if he asks an

25   un-asked question from today and addresses it on direct.  I

1  don't know.  What do you want to do?  I understand what you're

2  arguing.  I'm just saying that, you know, the way it's set up

3  on the Motion in Limine this is what we have.

4      **MR. JAMES BUCHHOLZ:**  Can we address this in the

5  morning after I do some research, Your Honor?

6      **THE COURT:**  Sure.  Sure.  All I would ask is that we

7  be here by 8:30 and be ready to go on it.

8      **MR. JAMES BUCHHOLZ:**  Yes.

9      **THE COURT:**  And we can just, remind me on that issue,

10  we'll figure out whether or not you want to recall him on

11  direct and that you address it, let me ask you, you know, did

12  you file for unemployment, was it contested whatever, or he's

13  going to handle it on cross.

14      **MR. ROBERT VEGELER:**  I'll be happy if he wants to

15  handle it on cross because I'll come back in on redirect.

16      **THE COURT:**  Okay.  Well, maybe you can work it out

17  and see where you're at tomorrow morning at 8:30.

18      Now, one other thing, I just want to make a short record

19  on, I know when we first started the testimony of the

20  plaintiff, there was objections about -- I wrote his name

21  down, now I can't find it, is it Baig, B-A-I-G?

22      **ALL COUNSEL:**  Baig.

23      **THE COURT:**  Baig, okay.  And there was objections on

24  that, in addition to the record that the Court had previously

25  made allowing those statements in for various reasons

```
1   including that it would be subject to Baig being called

2   tomorrow.  That's still -- he's still under subpoena.  It's

3   anticipated he is going to be here, but in addition to that,

4   the Court was allowing those statements into the record by

5   Chapin under 801(d)(2) admissions by party -- parties'

6   admissions against interest.  All right.

7        Anything else, then, to put into the record today before

8   we adjourn, before tomorrow morning?

9        MR. JAMES BUCCHOLZ:  Well, Your Honor, I suppose we

10  need to address Kelly Helgoe because of the testimony.

11       THE COURT:  Are you --

12       MR. JAMES BUCHHOLZ:  Well, the testimony of Mr.

13  Chapin certainly there's one conclusion and certainly we

14  believe the testimony of Kelly Helgoe would be contrary to

15  what it is we've heard from the witness stand today, and she

16  is a material witness.  He's talking about how he had to give

17  up his children to her and all of these things.  The basic

18  point is financial condition based after at least, incidents.

19  He's testified and I think that her testimony becomes more

20  material now based upon his testimony because it goes directly

21  to the damages as we indicated before.

22       THE COURT:  Are you representing to the Court there's

23  no other way to present that evidence?

24       MR. JAMES BUCCHOLZ:  I think she --

25       THE COURT:  Which is the test under -- it would
```

1  appear to be part of the requirement under Rule 45 -- under

2  Rule 45.  Let's see, subsection -- well, subsection C.

3         **MR. JAMES BUCCHOLZ:**  It seems to me, Judge --

4         **THE COURT:**  3(a)(b)(3).

5         **MR. JAMES BUCCHOLZ:**  It seems to me as the other

6  parent has testified to by Mr. Chapin associated with the care

7  of his children, associated with -- she's in the best position

8  to talk about that.

9         **THE COURT:**  Are the children going to be testifying,

10  either one?

11         **MR. ROBERT VEGELER:**  Your Honor, at this point in

12  time we were not going to call them, because we indicated we

13  would have Glenn Richards and then Mr. Kruse, then Baig then

14  Maddox.

15         **THE COURT:**  It's something you're going to draw out

16  on cross.  Is there anyone else going to be testifying as to

17  that situation, that is, the part of his claim being the

18  necessity of giving up his children?

19         **MR. ROBERT VEGELER:**  No.

20         **THE COURT:**  Or sending them back to live with the

21  mother?

22         **MR. ROBERT VEGELER:**  No.

23         **THE COURT:**  Was anybody else deposed or any other

24  evidence developed during discovery on that issue?

25         **MR. JAMES BUCCHOLZ:**  There was nobody else deposed on

1    that issue, Your Honor.

2            **THE COURT:**  Well, let me hear what's going to be said

3    on the cross examination of the plaintiff with regard to that

4    issue.  There may very well be a record made, then, that bears

5    on that.  If not, then the Court will consider the defendant's

6    request then for the issuance of a bench warrant based on the

7    criterion under Rule 45.

8        All right.  Anything else tonight?

9            **MR. ROBERT VEGELER:**  No, Your Honor.

10           **MR. JAMES BUCCHOLZ:**  Not from me, Your Honor.

11           **THE COURT:**  All right.  If you could be in here by

12   8:30 tomorrow morning and we'll take up any issues that we

13   need to.

14       Also let's get these exhibits -- make sure that my deputy

15   has any original exhibits that were marked and admitted before

16   you leave here today, okay?

17       (No audible response.)

18           **THE COURT:**  All right.  See you tomorrow morning.

19           **THE CLERK:**  All rise.

20

21                            *    *    *

22

23

24

25

1

2

3

4                    **CERTIFICATE OF THE REPORTER**

5

6        I hereby certify that the foregoing proceedings is true

7    and correct, as taken down by me, and transcribed to the

8    best of my ability, with the aid of realtime computer-aided

9    transcription and/or transcriptionist.

10

11

12                         s/ Tina M. Gallucci_____
                          **Tina M. Gallucci, RMR, CRR, FCRR**
13                        **United States District Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25