IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

TRENT L. CHAPIN,                        )
                                        )
            Plaintiff,                  )
                                        )  CIVIL
vs.                                     )  CAUSE NO:
                                        )  1:06-CV-34
MID-STATES MOTORS, INC.,                )
            Defendant.                  )  VOLUME I of I
-------------------------------------

TRANSCRIPT OF TRIAL PROCEEDINGS HELD
APRIL 18, 2007, BEFORE THE
HONORABLE THERESA L. SPRINGMANN, UNITED STATES
DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          ROBERT VEGELER,ESQ.
                            110 West Berry Street
                            Fort Wayne, In  46802

FOR THE DEFENDANT           JAMES BUCHHOLZ, ESQ.
                            1400 One Summit Square
                            Fort Wayne, IN  46802

OFFICIAL COURT REPORTER:    TINA M. GALLUCCI,
                            RMR, CRR, FCRR
                            U.S. DISTRICT REPORTER
                            1300 S. HARRISON STREET
                            SUITE 2105
                            FORT WAYNE, IN  46802
                            (260) 423-3060

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1                              **INDEX**

2

3          **TRENT CHAPIN -**
                   Direct Examination (Continued).   Page   21
4                  Cross Examination..............   Page   25
                   Redirect Examination...........   Page  105
5                  Recross Examination............   Page  114
                   Further Redirect Examination...   Page  117
6                  Further Recross Examination....   Page  117
                   Further Redirect Examination...   Page  118
7                  Further Recross Examination....   Page  120

8

9          **GLENN C. RICHARDS -**
                   Direct Examination.............   Page  135
                   Cross Examination..............   Page  153
10                 Redirect Examination...........   Page  171

11         **LARRY KRUSE -**
                   Direct Examination.............   Page  172
12                 Cross Examination..............   Page  188
                   Redirect Examination...........   Page  206
13                 Recross Examination............   Page  208

14         **NADIM BAIG -**
                   Direct Examination.............   Page  212
15                 Cross Examination..............   Page  227
                   Redirect Examination...........   Page  250

16

17                          *   *   *

18                     **CASE CITATIONS**

19

20    *Cooley vs. Carmike Cinemas*...............   Page  129

21    *Heno vs. Spring United Management*........   Page  130

22    *Kansas City Southern Railway*.............   Page  129

23    *Simms vs. State of Oklahaoma*.............   Page  126

24

25

 1          (Whereupon, the following proceedings were held on

 2    April 18, 2007; the parties appearing in person and with

 3    their counsel:)

 4          **THE CLERK:**  All rise.

 5          **THE COURT:**  Go ahead and be seated, please.

 6       Good morning, counsel.

 7       I've been advised the jurors are all here now and ready.

 8    It's about a quarter to 9:00.  We left a couple of issues open

 9    at the end of yesterday's proceedings.  One dealt with the

10    issuance of the bench warrant with regard to one of the

11    witnesses, Kelly Helgoe, and the Court will hear any further

12    argument, limited argument there may be with regard to issuing

13    that bench warrant today or for this morning.

14       And we also left open the issue of the unemployment

15    application and benefits that were received by the plaintiff

16    and the issue raised by the defense with regard to the

17    previous Motion in Limine made by the defense, granted by the

18    Court on that same issue.

19       I had invited counsel to discuss the issue prior to the

20    start of proceedings today.  Let me ask if you've done that,

21    and if you've reached an agreement on how best to handle that

22    situation, Mr. Buchholz.

23          **MR. JAMES BUCHHOLZ:**  We have discussed it, Your

24    Honor.  As I understood the positions yesterday, it was Mr.

25    Vegeler's position that if I brought anything into my cross

1    examination associated with payments that were received by Mr.

2    Chapin, that that would somehow open the door for the

3    testimony about the unemployment compensation determination.

4        I don't see the connection there frankly.  Plaintiff

5    testified that he was destitute, had to live in his car after

6    he left the employment of Fort-Rohr, and asserted that he

7    couldn't feed his children and had no money and basically had

8    to get rid of all of his worldly positions.  We know he was

9    receiving payments.  It seems to me, he was receiving payments

10   under the determination of the unemployment claim are separate

11   issues.  And so if Your Honor is going to rule as it relates

12   to the testimony that if I get into payments to him, they get

13   a deal with the determination or lack of fight associated with

14   the determination and I'm not going to go down that road.  I

15   see there's a disconnect between the two, but that's my

16   position.

17           **THE COURT:**  Okay.  Mr. Vegeler.

18           **MR. ROBERT VEGELER:**  I think it's self explanatory,

19   Your Honor.  Your Honor recalls the testimony as well as

20   anybody.  He testified as to various post-termination sources

21   of income.  It's his statement that he didn't have enough

22   money to pay the bills.  That's one of weighing the evidence

23   and doing the math.  It doesn't have anything to do with him

24   saying --  he never said I didn't receive unemployment

25   compensation.  So the door's never been opened.  If that were

 1    true, we would have to go into everything, we'd have to go

 2    through the whole back way and credits scenario that's going

 3    to be determined by the Court post-trial, if necessary.

 4         **THE COURT:**  Well, and I think one of your arguments

 5    at the end of the day yesterday, Mr. Buchholz, was that in the

 6    direct examination that plaintiff opened the door with regard

 7    to what monies he had coming in, what his income stream was,

 8    if any, after he left Rohrman companies.  And to an extent I

 9    agree that listening to the testimony the jury may very well

10    have been left with the impression he had no monies coming in

11    except for a garage sale where he might have been able to sell

12    a few items, as the plaintiff said for pennies on the dollar.

13         Otherwise, there's no indication of any income coming in

14    from any other source, but we hear he had to give up the kids

15    and you have to live in your car and you can't get a job

16    anywhere in town.

17         So what you would propose to do on cross is bring up the

18    fact that he, in fact, applied for and received unemployment?

19         **MR. JAMES BUCHHOLZ:**  I wasn't even going to talk

20    about where it came from.  I was going to say you were

21    receiving payments of a certain amount on a weekly basis after

22    you left Fort-Rohr.  I'm not even going to talk about

23    unemployment.  I don't intend to do that.

24         **THE COURT:**  Well what impression does that leave?

25    I'm not sure if we're trying to clarify the situation, to take

1    away one impression that's left with the jury to put out there

2    that he received payments without putting them in context, I'm

3    not sure --

4            **MR. JAMES BUCHHOLZ:**  I wouldn't suggest to the jury

5    or try to elicit that any of those payments were coming from

6    my clients, because they weren't -- that would not be my -- if

7    that's what Your Honor --

8            **THE COURT:**  No, but it almost sounds like, there

9    could be a suspicion that he was on the take and getting

10   illegal payments of a scam.  There's all sorts of speculation

11   that could go into or the jury could speculate on.  If you

12   just say, well, you were saving some kind of payments weren't

13   you, wink, wink how useful is that?  I'm not sure.

14           **MR. JAMES BUCHHOLZ:**  Well, Your Honor, I don't have a

15   problem, but I don't want to have any discussion about

16   determinations whether we fought it or not fought.  If you're

17   receiving payments, you're receiving payments.  But if there's

18   going to be a connection with our not fighting it, I'm not

19   going to get into it, that's your ruling, I'm not going to get

20   into it.

21           **THE COURT:**  I haven't ruled on it yet.  I'm trying to

22   make sense of where the testimony is going to go for that

23   purpose.  So I'm still listening to your argument, what you

24   want to present, how you want to present and I'm anticipating

25   what the jury is going to receive.

1     **MR. JAMES BUCHHOLZ:** Well, I want to present that

2  he's receiving unemployment compensation.

3     **THE COURT:** Without saying unemployment compensation.

4     **MR. JAMES BUCHHOLZ:** If Your Honor says that's not a

5  fair representation to the jury, I'll be happy to say

6  unemployment compensation, but I don't want any discussion

7  about whether we did or did not contest his filing and he's

8  saying he needs to do that. To me, there's a disconnect, but

9  that's my position.

10     **THE COURT:** All right. So if he brings out on cross

11  your client was receiving payments, they were unemployment

12  payments or compensation, that's it. Why would you need to go

13  into the fact that Rohrman didn't contest it?

14     **MR. ROBERT VEGELER:** Because the basis of the

15  payment.

16     **THE COURT:** Why is the disconnect --

17     **MR. ROBERT VEGELER:** It indicates it was a

18  well-founded claim --

19     **THE COURT:** No, there's a different standard that

20  applies with regard to the award of -- with regard to the

21  award.

22     **MR. ROBERT VEGELER:** -- that he did not do anything

23  wrong. Basically, he did not violate a well known workplace

24  rule.

25     **THE COURT:** Obviously, anybody on the jury who is

1    familiar with how unemployment works understands the

2    circumstances of how you apply for it, when you get it, when

3    it's contested and when you don't.  So, I mean, unless it's

4    clarified, they're going to be left with applying their own

5    experiences, if any, to the situation.  So...

6            **MR. ROBERT VEGELER:**  Apparently, it was contested.

7            **THE COURT:**  Well --

8            **MR. ROBERT VEGELER:**  Your Honor, I'm not going to

9    spend tons of time on it.

10           **THE COURT:**  I can see this, what I didn't want to

11   have, is either side being put in a trick bag because we had

12   the motion in limine in the record, it was granted, reference

13   to the unemployment situation or unemployment -- yeah,

14   payments was going to be excluded, and then it comes up in the

15   middle of the trial, we have to address it, and I'm trying to

16   see what's fair for everybody concerned, and leave, you know,

17   proper evidence in front of the jury.

18       It seems to me at this point, you know, putting the brakes

19   on it now, it gives the plaintiff the opportunity if you want

20   to recall him on your direct and bring that out, you can do

21   that or you can save it for the cross.  But I think what needs

22   to come in, given the impression the jury is left with now,

23   it's appropriate cross for the defendant, in these

24   circumstances, to bring out the fact that he received

25   unemployment payments without going into whether they -- the

1    unemployment payment process was contested or not, or whether

2    award was or the amounts were -- I don't think we need to go

3    into all of those details.  So you have the choice, either you

4    bring it in on direct or you bring it in on cross.

5         **MR. JAMES BUCHHOLZ:**  Your Honor, from my position,

6    he's a tendered the witness.  I'll ask one question on cross.

7    I don't think re-tendering him in the plaintiff's case is

8    appropriate, given that I'm the one requesting to be able to

9    deal with it associated with an impeachment issue.

10        **THE COURT:**  I understand.  But he also has a right to

11   ask this Court, if he wants to, given the fact that he was

12   working under the supposition that the motion in limine and

13   the Court's ruling on it, which was the defendant's Motion in

14   Limine, was going to stick.  It was after the end of his

15   direct that you asked that the Court re-visit that, and

16   unstick it.  So now that's why he is in the position to

17   properly ask this Court to recall his client, to put him on

18   the stand, and address this very issue.  So I appreciate the

19   record that you're making, but I didn't think it's

20   inappropriate given the procedural set up on it.  Go ahead.

21        **MR. ROBERT VEGELER:**  Kind of a conjunction issue

22   before we get to the Kelly Helgoe issue.  In reviewing my

23   notes and in trying to get done by 8:10 or 4:15 yesterday, I

24   really would ask the Court permission to recall Mr. Chapin

25   with respect to the tendered Plaintiff's Exhibit 8 that was

1    objected to to introduce that pursuant to Federal Rule of

2    Evidence 8035 on recorded recollection.  And to ask -- it's an

3    issue that I discussed with opposing counsel, but I do not --

4    I don't want to leave it open.  It's an issue that I think

5    there is some evidence in and quite frankly, it is, he talked

6    about filing a charge of discrimination on February 10th, and

7    he also talked about filing this second charge of

8    discrimination, retaliation on March 10th of '05.  And I

9    believe he testified he received the right to sue case in

10   December of '05 and the suit was filed in February of '06.

11       I do not want to get into the position of having some

12   technical issue of --

13            THE COURT:  Are you talking about your eight?

14        MR. ROBERT VEGELER:  Yeah, I was talking about my

15   eight.

16            THE COURT:  That's the summary of property?

17        MR. ROBERT VEGELER:  Yeah.

18            THE COURT:  Okay.  Go ahead.

19        MR. ROBERT VEGELER:  Now, I'm shifting into -- I

20   indicated I would like to address that issue briefly under

21   8035.

22            THE COURT:  Because I wasn't following when you were

23   talking about --

24        MR. ROBERT VEGELER:  And then I wanted to -- maybe

25   I'm not as skilled in practice in Federal Court, but I do not

1   know if I have to put into the record succinctly the charges,

2   the dates of the charges, the dates of the right to sue, and

3   the filing.

4          **THE COURT:**  I --

5          **MR. ROBERT VEGELER:**  No summary judgment motion.

6          **MR. JAMES BUCHHOLZ:**  Judge, if I had a motion to file

7   associated with those dates and the filings, I certainly had

8   the ability to do that.  I certainly could have made -- done

9   whatever I needed to do.  Those deadlines have passed.  I

10  don't intend to be arguing at the end of this evidence about

11  that, so...

12         **THE COURT:**  I think those were jurisdictional, more

13  of jurisdictional issues.  And so you don't necessarily have

14  to put them into the record at this point.  There's no contest

15  that it wasn't properly, timely presented.

16         **MR. ROBERT VEGELER:**  Well, it was denied.  If you

17  look at the paragraphs and answers, they admit that the right

18  to sue letter was received in December of '05, and it's

19  (Inaudible) shows the case was filed in February of '06.  But

20  they wouldn't admit that 90 days had not passed in their

21  answer so I did know if that created a problem.

22         **THE COURT:**  In the Pre-trial Order and the

23  contentions presented in that, all pleadings prior to that are

24  subsumed in it.  So if there weren't defenses, if there

25  weren't issues left presented in the Pre-trial Order, they're

1    done.

2         **MR. ROBERT VEGELER:**  Okay.  That cleans that up.

3         **THE COURT:**  Let me just confirm, there was no such

4    issue with timeliness, propriety or anything with regard to

5    the EEOC charges, well by the defense.

6         **MR. JAMES BUCHHOLZ:**  That's correct.

7         **MR. ROBERT VEGELER:**  All right.

8         **THE COURT:**  That answers that.  So let's come back to

9    Exhibit 8.  As I remember the problem was going to be in

10   discovery, there was a request made for receipts or

11   documentation to support any claims, including, you know,

12   property.  And I think that's where the defense was coming

13   from to say hey, you got this summary exhibit you want to put

14   in, but we never saw the basis for it during discovery.  So is

15   that right?

16        **MR. JAMES BUCHHOLZ:**  But, I saw the list itself.

17        **THE COURT:**  Right.

18        **MR. JAMES BUCHHOLZ:**  And it was provided to me during

19   the deposition of Mr. Chapin.

20        **THE COURT:**  Okay.

21        **MR. JAMES BUCHHOLZ:**  And I asked him questions about

22   it in the deposition.  He said he had receipts, he said he had

23   other things.  He said that the numbers he's utilizing there

24   are his estimates and guesses associated with the values.  He

25   said in some fashion, he was relying on things that other

1    people bought that he wasn't even sure of.  So I mean, we've

2    got -- we've got hearsay issues associated with that, we've

3    got lack of providing the documentation to prove it up, and

4    we've got his own testimony -- I'm sorry.

5              **THE COURT:**  No, go ahead.

6              **MR. JAMES BUCHHOLZ:**  And we've got his own testimony

7    about not having personal knowledge of all of the items.  And

8    so in the form it is, it doesn't apply to the rules.  And --

9    and as a result, it should have come in.

10             **THE COURT:**  All right.  But now what I'm

11   understanding is that you had a copy of Exhibit 8, what's now

12   Exhibit 8, this list of property, at the time of his

13   deposition, and you were able to examine him with regard to

14   the same at that time, correct?

15             **MR. JAMES BUCHHOLZ:**  And I requested supporting

16   documentation associated with the numbers relating to this

17   exhibit, and they were never provided.

18             **THE COURT:**  Was there any response that said there

19   are no receipts or we can't find them?

20             **MR. JAMES BUCHHOLZ:**  Silence.

21             **THE COURT:**  And you never followed up with a motion

22   to compel to say, hey, we did not get a response to this

23   request for production.

24             **MR. JAMES BUCHHOLZ:**  I did not file a motion, Judge.

25             **THE COURT:**  Well, that goes to weight.  Your argument

1    sounds like it goes to weight, not admissibility.  If he wants

2    to come in as a lay person and say, you know, I had to give

3    away all my couch and end tables and he says that they were

4    worth a thousand dollars or something in his lay opinion or

5    his best recollection, that can come in.  That's within the

6    ambit of what he can testify to as the property owner.  That's

7    property law, you know.  That's pretty basic.

8        You can cross examine him until the cows come home on the

9    lack of support for it.  You can bring out the fact that you

10   had requested the copies of the receipts and everything else,

11   and never got a response to it.  That's all fair game for

12   cross.  But I don't see where it bars the admission of it.

13   That's a different.  That's a horse of a different color.  So

14   that's how I foresee that coming in.

15           **MR. JAMES BUCHHOLZ:**  Your Honor, I think we're going

16   to be able to find him.

17           **THE COURT:**  Fine.  I've got the day set aside.  Maybe

18   we'll find someone by then.

19           **MR. ROBERT VEGELER:**  That will give them an extra day

20   to find him.

21           **THE COURT:**  Pardon?

22           **MR. ROBERT VEGELER:**  That will give them an extra day

23   to find him.

24           **THE COURT:**  They're the ones that have to go find

25   him.

1      **MR. ROBERT VEGELER:**  Anyway, Your Honor, you've

2    solved my two problems.  So I'm going re-open, with the

3    Court's permission, re-open to ask him about Exhibit 8.

4      **THE COURT:**  All right.  Exhibit A?

5      **MR. ROBERT VEGELER:**  Eight.

6      **THE COURT:**  Eight.  And what about the payments

7    issue; you going to touch on that?

8      **MR. ROBERT VEGELER:**  No, I'll let him open the door.

9      **THE COURT:**  Okay.  So you're going to open to bring

10   out -- you want to show an objection to that.  We'll show the

11   objection at this time, and you'll preserve it and it will be

12   preserved so you don't have to do that in front of the jury.

13      Anything else before I bring the jury down?

14      **MR. JAMES BUCHHOLZ:**  Two other issues, Judge.  One of

15   the -- some of the exhibits that I was shown associated with

16   Mr. Vegeler's were interrogatory responses for request for

17   production of documents response.  I don't think those are

18   appropriate exhibits under the rule.  If he wants to use them

19   for cross examination or utilize them for some other purpose

20   or lay a foundation for individual documents, that's fine.

21   But I don't think the admission of the responses to

22   interrogatories or in bulk the production of documents are

23   appropriate exhibits.  I don't want to have to deal with that

24   in front of the jury, and so I'd have an objection to those on

25   that basis.

1    In addition, and we can deal with that, and I've got one

2    other issue I'd like to bring up.

3         **THE COURT:**  Okay.  Well, let's take it up one at a

4    time.  Is it your intention, Mr. Vegeler, to put -- are you

5    going to examine on interrogatories responses?

6         **MR. ROBERT VEGELER:**  Yes, you bet.

7         **THE COURT:**  Or are you going to put them into

8    evidence?

9         **MR. ROBERT VEGELER:**  I was going to -- I had them

10   marked, in case the Court said let's mark them.  But we won't

11   introduce them as an exhibit.  We won't leave them with a

12   jury.  I'm ready to go either way.  I'm just going to ask upon

13   cross examination or direct examination some questions.

14        **THE COURT:**  Right.  And it's my experience you can

15   use them in that way, you can even put them up on Elmo.

16        **MR. ROBERT VEGELER:**  And that's my point.

17        **MR. JAMES BUCHHOLZ:**  I have no problem with that,

18   Judge.

19        **THE COURT:**  Okay.  So what's the next one?

20        **MR. JAMES BUCHHOLZ:**  Then as it relates to Mr.

21   Richards, Glenn Richards, we talked yesterday that you're

22   going to allow him to testify, and Mr. Vegeler to get into the

23   circumstances of his separation or actually demotion in

24   November, December of 2004 as well as his ultimate vacation of

25   a position in January of 2005.

1    It is my understanding, your ruling, it's because the

2    action with respect to Mr. Richards in November of 2004 might

3    show some form of pattern relating to Mr. Chapin's separation

4    in April of 2004.  I understand your ruling.  I -- it would be

5    my position and I don't want to continue to object, but would

6    like on the record, be a continuing objection that something

7    that happens nine or ten months after the time frame of Mr.

8    Chapin's separation doesn't establish a pattern for his

9    separation.  If we were here in Mr. Richards' case, I can

10   understand how it is there would be some pattern.  But it

11   seems to me post-separation conduct, especially separated by

12   eight or nine months is not something that is subject to a

13   pattern under -- under the case law.  So rather than jump up

14   and down and continue to object during the time that Mr.

15   Richards testifies, I would like a continuing objection,

16   because I don't think it's appropriate testimony as it relates

17   to Mr. Chapin's claim.

18        **THE COURT:**  What's the case law you're relying on?

19        **MR. JAMES BUCHHOLZ:**  Well, the case law associated

20   with showing a pattern deals with showing a pattern at or

21   around the time of the separation, Judge.  It's my position

22   that eight or nine or ten months later is not showing a

23   pattern as it relates to Mr. Chapin's separation in April.

24        **THE COURT:**  Do you have a case that says precisely

25   that, that nine to ten months post-event, but post-plaintiff's

 1    event, it is not allowable evidence to show pattern?

 2              **MR. JAMES BUCHHOLZ:**  I don't have it this second.

 3    Before Mr. Richards testifies, perhaps I will.

 4              **THE COURT:**  Okay.

 5              **MR. JAMES BUCHHOLZ:**  I'll have somebody do some work

 6    on that.

 7              **THE COURT:**  If you have it, I want to see it, because

 8    I don't want to put error in this record where we can

 9    otherwise avoid it --

10              **MR. JAMES BUCHHOLZ:**  I understand.

11              **THE COURT:**  -- having case law to the Court.  My

12    recollection of the case law is such that you can have pattern

13    evidence come in and there can be some reasonable time period

14    before and after the plaintiff's event that's at issue in the

15    case.  The question is is nine or ten months reasonable under

16    the case law.  You can show me it isn't, I'll look at it and

17    we can decide before Richards testifies.  So let me see it.

18    You got it.

19              **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

20              **THE COURT:**  All right.  Anything else?

21              **MR. ROBERT VEGELER:**  Nothing else.

22              **THE COURT:**  Let me go back two things from my view.

23    We need verdict forms.  I know we get your instructions.  We

24    need proposed verdict forms for both sides.  So if you can get

25    those to me by the end of the day.  Verdict forms.

1       **MR. ROBERT VEGELER:**  Ours will be E-mailed this

2    morning we speak.

3       **THE COURT:**  All right.  Just as long as they're

4    coming in.  Is there anything else you wanted to argue

5    regarding Helgoe on that?  We issued it this morning, based on

6    now the testimony that the defense has substantial need for

7    her testimony in order to respond to the plaintiff's testimony

8    that he had no alternatives other than to give up the custody

9    of his sons back to the ex-wife, and there's no one else you

10   can get that information from, again, to satisfy Rule 45.

11       The Court can issue the arrest -- the bench warrant.  We

12   would need information, though, with regard to her last known

13   whereabouts, employer and so on, in order to try to pick that

14   up, and I assume you have that information.

15       **MR. JAMES BUCHHOLZ:**  I do have information.

16       **THE COURT:**  Because it's not on the face.

17       **MR. JAMES BUCHHOLZ:**  It's not on the face to have the

18   subpoena, that's right.

19       **THE COURT:**  Was there any further argument on that?

20       **MR. JAMES BUCHHOLZ:**  No.

21       **THE COURT:**  Nothing further from the plaintiff on

22   that issue?

23       **MR. ROBERT VEGELER:**  No, Your Honor.

24       **MR. JAMES BUCHHOLZ:**  I've said everything I can say

25   about that issue, Your Honor.

1    **THE COURT:** We'll issue the bench warrant based on

2   the record that's been developed so far and we'll advise on

3   the status of it as we go along. My deputy will get that

4   information from you. It might be helpful to have your

5   paralegal get it to her so we can expedite it. If there's

6   nothing else, let's bring the jury down.

7    I should add, with regard to that issue, based on that

8   bench warrant, it would appear at this time, Miss Helgoe is in

9   contempt of this court, and we will issue the bench warrant to

10   have her appear to answer to that. And that's under 45E.

11    (Whereupon, the Jury is present.)

12    **THE COURT:** Go ahead and be seated, ladies and

13   gentlemen. Counsel, you may be seated. And good morning to

14   you. We're on day two of the trial of this case and we remain

15   in the plaintiff's case-in-chief. Where we left off yesterday

16   was the plaintiff's direct examination. However, there has

17   been a request made by plaintiff's counsel to recall or to

18   call Mr. Chapin back to the stand to ask him one additional

19   question with regard to an exhibit. The Court will allow

20   that, and when we're concluded with that questioning, then the

21   Court -- we will be proceeding to cross examination of the

22   plaintiff.

23    With that said, Mr. Chapin, if you would please resume the

24   stand. Mr. Chapin, let me remind you that you do remain under

25   oath with regard to your testimony. Go ahead and be seated

1    and if you would put the microphone back on.

2              **THE COURT:**  Mr. Vegeler.

3              **MR. ROBERT VEGELER:**  Thank you, Your Honor.

4                   **DIRECT EXAMINATION (Continuing)**

5    BY MR. ROBERT VEGELER:

6     Q. Mr. Chapin, I'm going to approach you and hand you what

7    has been marked as Plaintiff's Exhibit Number 8, and ask if

8    you can identify that for the record?

9     A. Yes.

10    Q. And what is that, sir?

11    A. Um, these are things that --

12              **THE COURT:**  I'm not hearing you.

13              **THE WITNESS:**  Oh, I'm sorry, these are things that I

14   lost.

15   BY MR. ROBERT VEGELER:

16    Q. After you lost your job?

17    A. That's correct.

18    Q. From Toyota Lexus?

19    A. That's correct.

20              **THE COURT:**  And again, for jury's benefit, this it

21   the same Exhibit 8 that was referenced yesterday on direct.

22   Go ahead.

23   BY MR. ROBERT VEGELER:

24    Q. Okay.  And this is -- was prepared with your help?

25    A. That's correct.

1    Q. And this is your itemization?

2    A. That's correct.

3    Q. And there's some figures on it too, is that correct?

4    A. That's correct.

5         **MR. ROBERT VEGELER:**  I would move for admission of

6    Plaintiff's Exhibit 8 as discussed, Your Honor.

7         **THE COURT:**  Just to clarify, approximately when was

8    the list prepared?

9         **THE WITNESS:**  November -- December of 2005, if I'm

10   not mistaken.

11   BY MR. ROBERT VEGELER:

12   Q. Okay.  And it accurately reflected your knowledge back

13   then?

14   A. That's correct.

15   Q. And you currently don't -- you can't remember all these

16   items and figures now, is that correct?

17   A. That's correct.

18        **THE COURT:**  If I could just ask again for

19   clarification, the numbers that are next to these -- the

20   property description, what is the basis for those values?

21        **THE WITNESS:**  It was approximately my recollection at

22   the time.

23   BY MR. ROBERT VEGELER:

24   Q. But what was the basis, was it cost?

25   A. Cost.

1    Q. Okay.

2         **THE COURT:**  All right.  Any objection to Plaintiff's

3    Exhibit 8?

4         **MR. JAMES BUCHHOLZ:**  None other than we've already

5    stated, Your Honor.  That I believe you've noted on the

6    record.

7         **THE COURT:**  All right.  We'll show the admission of

8    Plaintiff's Exhibit 8.  Did you want to display that to the

9    jury at this time?

10        **MR. ROBERT VEGELER:**  I have copies for the jury, Your

11   Honor.

12        **THE COURT:**  Yes.  And if you have an extra copy for

13   me.

14        **MR. ROBERT VEGELER:**  I was just making sure you have

15   enough.

16        **THE COURT:**  Anything else?

17        **MR. ROBERT VEGELER:**  No, Your Honor.

18        **THE COURT:**  Okay.

19        **MR. ROBERT VEGELER:**  Well, I think -- I shouldn't say

20   what he testified to.

21   BY MR. ROBERT VEGELER:

22    Q. Mr. Chapin, in analyzing Plaintiff's Exhibit Number 8, did

23   you receive -- after you disposed of all this property, paid

24   bills, did you receive this money that's listed in the

25   Plaintiff's Exhibit 8?

1    A. No, sir.

2    Q. Did you receive anything on the home?

3    A. No, sir.

4    Q. Anything on the cat?

5    A. No, sir.

6    Q. Anything on the T-bird or the Suzuki?

7    A. No, sir.

8    Q. As far as the furniture, through the go-cart items, did

9    you dispose of those items?

10   A. Yes.

11   Q. And what was the reason?

12   A. I needed money.

13   Q. And approximately, do you recall the percentage you

14   received on the values on the left that you received in money?

15   A. If I remember right, I believe I got $400 for the master

16   bedroom suit, 200 for my son's furniture, $100 I think I sold

17   his -- my other son's room, 300 for the T.V., 200 for the

18   living room suit, 300 from the stereo system, 75 for the

19   barbecue grill, a couple hundred dollars for the family

20   clothes, that's my best recollection; $75 for the three T.V.'s

21   couple hundred dollars, I believe, for the tools, couple

22   hundred dollars for the dining room set, and $100 for the

23   go-cart and nothing for my brother's stuff or --

24   Q. And those are figures you developed based on your best

25   recollection?

1   A. Yes, sir.

2        **MR. ROBERT VEGELER:**  Nothing further of this witness,

3   Your Honor.  Thank you.

4        **THE COURT:**  Cross examination, Mr. Buchholz?

5        **MR. JAMES BUCHHOLZ:**  Sure, Your Honor.

6                   **CROSS EXAMINATION**

7   BY MR. JAMES BUCHHOLZ:

8   Q. Good morning, Mr. Chapin.

9   A. Good morning.

10  Q. How are you today?

11  A. I'm great.

12  Q. Under oath today, right?

13  A. That's correct.

14  Q. You were under oath yesterday, right?

15  A. That's correct.

16  Q. Protected person has to be under oath to tell the truth?

17  A. No.

18  Q. So yesterday was nothing different for you than any other

19  day, correct?

20  A. No.

21  Q. Because you always tell the truth; you don't have to be

22  under oath in order to tell the truth, correct?

23  A. Correct.

24  Q. So today is nothing special for you in terms of telling

25  the truth, correct?

1    A. I think I've answered it, sir.

2    Q. So today is nothing different from yesterday or any other

3    day in terms of you telling the truth, being under oath one

4    way or the other doesn't matter to you, does it?

5    A. No.

6    Q. Most of your work, as I understand it, Mr. Chapin, has

7    been in the car business, is that fair?

8    A. That's correct.

9    Q. Okay.  And in the car business --

10           **THE COURT:**  She's adjusted it.

11           **THE CLERK:**  Can you move the microphone up, please.

12   BY MR. JAMES BUCHHOLZ:

13   Q. -- in the car business, you've had used car manager

14   positions, right?

15   A. Correct.

16   Q. Sales positions, right?

17   A. Yes.

18   Q. Finance positions?

19   A. Correct.

20   Q. And all of the -- all of those positions rely on paperwork

21   in order to commemorate what it is that's being discussed

22   between the customer and you the salesperson on behalf of your

23   employer, right?

24   A. Right.

25   Q. And it's important that the paperwork is accurate so that

1   everybody knows what it is that has been discussed and what

2   the transaction is, right?

3    A. Correct.

4    Q. So for financing, it's important to know and to accurately

5   put on documents percentage rates and how much is being

6   financed and what the purchase prices are, right?

7    A. That's correct.

8    Q. And everybody at the end of the -- during the process is

9   signing different documents to make sure that everybody agrees

10   that's what they agreed to, right?

11    A. That's correct.

12    Q. It's important because the employer relies upon it, bank

13   relies upon it, employees rely upon it for being paid, and

14   customers rely upon it so they know what the deal was, right?

15    A. Correct.

16    Q. You'd agree that people rely on paperwork in situations

17   outside of car transactions, correct?

18    A. No.

19    Q. Okay.  You wouldn't agree that people rely on paperwork or

20   information on paper that is signed by an individual as being

21   accurate outside the car dealerships?

22    A. In some cases, yes.

23    Q. Some paperwork is important to make you execute it and all

24   information is true and accurate, isn't it?

25    A. Some cases.

1    Q. All right.  Now, as I understand it, you currently live in

2    Missouri, right?

3    A. Correct.

4    Q. And you live there with your wife, Tracy?

5    A. Correct.

6    Q. And both your boys?

7    A. Correct.

8    Q. You got married to Tracy in June of last year?

9    A. Correct.

10   Q. You were married before Tracy to Kelly, correct?

11   A. Correct.

12   Q. And you were also married before Tracy to another Kelly,

13   correct?

14   A. Correct.

15   Q. And those are the only other times you've been married,

16   correct?

17   A. Yes.

18   Q. That's what you testified to in your deposition, right?

19   A. I believe I did, yes.

20   Q. Now, you're still married to Tracy, right?

21   A. Correct.

22   Q. The one Kelly is Kelly Helgoe, correct?

23   A. Correct.

24   Q. And the other Kelly is Kelly Hague (phonetic), correct?

25   A. Correct.

1    Q. As I understand it, Miss Helgoe is somebody you married in

2    1989?

3    A. Correct.

4    Q. And that was here in Allen County?

5    A. Correct.

6    Q. So all the paperwork associated with that marriage was

7    here in Allen County?

8    A. I believe so, yes, that's correct.

9    Q. And then you had two children with Kelly Helgoe?

10   A. Yes, that's correct.

11   Q. Okay.  And their names are Trent and Sterling?

12   A. Correct.

13   Q. And you talked to Mr. Vegeler about them yesterday?

14   A. Correct.

15   Q. You had no children with Kelly Hague (phonetic), correct?

16   A. No.

17   Q. Is that correct?

18   A. No, that's correct.

19   Q. Married Kelly Hague (phonetic) here in Allen County?

20   A. No.

21   Q. Okay.  Where did you marry her?

22   A. Boy, it's been a long time.  I believe it was around

23   Chicago area, where her family is from.

24   Q. Okay.

25   A. My best recollection.

1    Q. And what was the year of that marriage?

2    A. I don't recall.

3    Q. Before or after Kelly Helgoe?

4    A. It was after.

5    Q. You also married Lillian, didn't you?

6    A. Lillian?  No.

7    Q. You're telling me you were never married to anybody in

8    Alaska named Lillian?

9    A. No.

10   Q. Is that what you're saying?

11   A. Yes.

12   Q. You're telling me that Lillian never had any children with

13   you, is that correct?

14   A. No, that's correct.  Don't even know her.

15   Q. Okay.  On your deposition, you told me, other than the

16   claim that we were about here today against Fort Rohr and the

17   claim with Mr. Thayer, you were not involved in any other

18   legal actions, correct?

19   A. I did, yes.

20   Q. You said that, didn't you?

21   A. Yes.

22   Q. But there are ten matters you've been involved with in the

23   Allen County state courts, right?

24   A. That's correct.

25   Q. And there are two matters you've been involved in in

1   Alaska, correct?

2    A. That's correct.

3    Q. Okay.  And there's two matters you've been involved with,

4   or there's another matter you've been involved in with this

5   Federal Court, correct?

6    A. That's correct.

7    Q. So by my count, that's 14 other matters that you didn't

8   tell me about in your deposition in response to that question,

9   right?

10   A. That's correct.

11        **MR. JAMES BUCHHOLZ:**  Your Honor, may we approach real

12   briefly?

13       (Whereupon, the following bench conference was held

14   outside the hearing of the jury:)

15        **THE COURT:**  I'm not contagious.  I'm just coughing

16   because it's dusty.

17        **MR. JAMES BUCHHOLZ:**  I can deal with contagious.

18   Now, over these last days, Your Honor -- Judge, I have a trial

19   brief to enter, I've got some information associated with his

20   applications for marriage as well as the bankruptcy

21   application wherein, he -- whereby, statements under oath,

22   I've got the two marriage certificates that I have for him

23   indicate marriages to people other than what it is he said.

24   He's also got other false information on them within the

25   marriage certificate, information which I have certified

 1  copies of.  As indicated under Indiana Code, that all the

 2  information within the document is true and accurate under

 3  oath, I believe that goes to his credibility and dealing with

 4  his credibility.  I want to get into those things.  I didn't

 5  want to get into it without bringing Your Honor's attention to

 6  it, because of Rule 608.  And also, with respect to the

 7  bankruptcy petition he executed under oath with a person

 8  claimed to be his wife, he has not testified to as well.

 9          **THE COURT:**  Have you seen these?

10          **MR. ROBERT VEGELER:**  No.

11          **THE COURT:**  Or are you aware of them?

12          **MR. ROBERT VEGELER:**  I guess he didn't want me to see

13  them either.

14          **THE COURT:**  But it's impeachment.

15          **MR. ROBERT VEGELER:**  But if he knew about them prior

16  to the trial --

17          **MR. JAMES BUCHHOLZ:**  Judge, it is impeachment, but

18  they're not going to be exhibits in this trial.

19          **MR. ROBERT VEGELER:**  Well, I asked about every

20  document.

21          **MR. JAMES BUCHHOLZ:**  Impeachment is not --

22          **MR. ROBERT VEGELER:**  I asked for every document in

23  this trial, and he objected again and again.  They never

24  produced them.  I'm going to object.  First of all, the Motion

25  in Limine said you -- limited to say he's not going to talk

1    about 10, 12, 14 causes of action and he blurted right through

2    that.

3          **THE COURT:**  He said just don't talk about any of them

4    that are criminal.  I said I'm not sure how you're going to

5    wind your way around it, but he did it suggesting they were

6    criminal.  So I don't have him bringing in the lawsuits, but

7    it's news on the court with regard to these other marriages

8    and the bankruptcy.  So let me just get back to you want to

9    impeach him on this?  You've got some documents that indicate

10   this, but you don't want to put the documents in evidence?

11   I'm not following that.

12         **MR. JAMES BUCHHOLZ:**  Well, I mean, I suppose since

13   he's now testified contrary to what -- I would have to put in

14   evidence that he was not accurate with that, but it isn't --

15   those are impeachment items.  Those are not exhibit items.

16   And I don't agree that I've got to provide to him impeachment

17   material before the time frame of trial starts.  If his client

18   testifies appropriately, never comes in.  But if a client

19   testifies in a fashion that is not accurate and not truthful,

20   then I have the right to get into those issues.

21         **THE COURT:**  Not all impeachment comes in.  You know,

22   has to be disclosed prior to trial, usually is, but doesn't

23   have to be.  We're going to take a short recess, give him a

24   copy of that.  Give him a copy of that.  We'll make a ruling.

25         (Whereupon, the bench conference was concluded;

1    thereafter,the following proceedings were held in open

2    court:)

3         **THE COURT:**  Ladies and gentlemen we're going to need

4    to take a short recess with regard to an issue that has been

5    presented.  It's 9:30.  I anticipate that we will be able to

6    resolve this issue and be back in court within ten minutes.

7    Please keep in mind the Court's admonition to you not to

8    discuss this case amongst yourselves and keep an open mind

9    with regard to it until it's finally presented to you for your

10   deliberations.

11        We'll be back here hopefully by twenty 'til 10:00.  Leave

12   those there, too, the exhibits, and then my deputy will

13   collect those copies.

14        (Jury absent.)

15        **THE COURT:**  You can step down.

16        **THE WITNESS:**  Thank you.

17        **THE COURT:**  All right.  Counsel, if you want to take

18   about 5 minutes, take a look at that information, let me grab

19   one of my rule books from the back and I'll be out back here,

20   in about 5 minutes.

21        (Whereupon, the Court was in recess for five minutes.)

22        **THE COURT:**  Go ahead and be seated.  Mr. Vegeler, do

23   you want to make any -- what response do you want to make now

24   with regard to the issue that's been brought up by the

25   defense?

1      **MR. ROBERT VEGELER:**  Well, first of all, we have been

2  asking pursuant to discovery for any documents that were

3  supportive of the answers to our discovery requests, and

4  potential exhibits, documents relied upon.  We have not

5  received any of these documents previously.  Defendant's trial

6  brief obviously, was filed or -- I don't know if it was filed,

7  but it was brought to our attention just recently.  And

8  understanding that there is some latitude on impeachment

9  situations, it's obvious that the application for marriage

10  license has been available to opposing counsel and, therefore,

11  to be available to be produced as it is, apparently, a joint

12  petition for bankruptcy.

13      Now, my question is are these -- are the birth

14  certificates of the children going to be introduced?  I mean,

15  I'm trying to get a handle on what the exhibit.  I mean, they

16  haven't shown us any exhibits yet.  I mean you put us in

17  recess to discuss this and they haven't given me any exhibits.

18  I don't know what they're doing.

19      **THE COURT:**  All right.  Anything else?  What you are

20  doing, you had made a request through all discovery of any and

21  all documents that the defense was going to be relying upon.

22      **MR. ROBERT VEGELER:**  Or relied upon in their

23  discovery responses and I asked them for all their defenses,

24  the -- they objected even to their own -- answering their

25  own -- they objected to their answers to interrogatories to

1   even explaining what the basis of their affirmative defenses

2   were.

3        **THE COURT:**  Was there any agreement in the Pre-trial

4   Order, perhaps I missed it, with regard to the disclosure or

5   handling of impeachment information through documents?

6        **MR. ROBERT VEGELER:**  I don't recall anything

7   specific, Your Honor.

8        **THE COURT:**  All right.  Let me clarify something.

9   The briefs that you tendered to the Court, called defendant's

10  trial brief on this issue, it has a certificate of service on

11  the back that indicates that it was filed on the 17th.  Wasn't

12  that yesterday?

13       **MR. JAMES BUCHHOLZ:**  It was not filed, Judge.  I

14  thought we were going to get to Mr. Chapin's cross examination

15  yesterday.  I tendered it today and that certificate is not

16  accurate, because I didn't look at it before coming up today

17  at the side bar.  I'll be happy to amend that.  It was our

18  anticipation that cross examination of Mr. Chapin, based upon

19  the discussion with counsel, was going to be completed

20  yesterday.

21       **THE COURT:**  Okay.

22       **MR. JAMES BUCHHOLZ:**  So that's why the certificate

23  says the 17th.  It has not been filed and has not been

24  tendered.

25       **THE COURT:**  I just want to make sure that goes into

1    the record as being clarified now.  It was not previously

2    served at the time it was tendered up at side bar.

3        Now, let me ask you, Mr. Buchholz, was there any local

4    rule, any federal rule, any agreement in the Pre-trial order

5    that addressed or provided for materials or issues that may e

6    subject or the subject matter of impeachment?

7        **MR. JAMES BUCHHOLZ:**  Not that I'm aware of, Your

8    Honor, and the discovery requests he's referring to relating

9    to our position associated with liability determinations.

10   These issues only go to Mr. Chapin's credibility.  I would

11   expect Mr. Chapin to testify under oath accurately and

12   truthfully.  And if there are issues out there that aren't

13   very savory to him, he would own up to it.  He hasn't at this

14   point, I think I laid a proper foundation by which to impeach

15   him with these things.  It's not something I'm relying upon as

16   a defense to his liability claims.  It's -- it goes directly

17   to credibility.  And if there's a credibility issue that deals

18   with these discovery issues, that's one thing.  But these -- I

19   asked Mr. Chapin in his deposition about who has he been

20   married to, when he has been married, where they separated,

21   where the documents were filed.  We went about the bankruptcy

22   petition, I asked him in his deposition about whether it is he

23   looked at the bankruptcy petition and everything in there

24   would be accurate.  He said I assume it is because of the

25   lawyers, and so it's not like Mr. Vegeler is not -- didn't

1    have any warning or notice associated with these items.  These

2    go to his credibility.

3          **THE COURT:**  Let me ask you this, under Rule 608,

4    which would appear to cover this situation and specifically

5    608(b), it provides that specific instances of the conduct of

6    a witness for the purposes of attacking or supporting the

7    witness' character for truthfulness other than convictions of

8    a crime, it goes on on that, may not be proved by extrinsic

9    evidence.  They may, however, in the discretion of the Court,

10   if probative of truthfulness, be inquired into on cross

11   examination of a witness, one, concerning the witness'

12   character for truthfulness or untruthfulness or two,

13   concerning the character of truthfulness or untruthfulness of

14   another witness as to which character witness being cross

15   examined and testifying.

16       It would appear you're seeking to move for an opportunity

17   to examine under 608(b)(1), in which instance, the rule would

18   suggest that leave of Court be sought before going into the

19   cross examination so that the Court is made aware of the

20   issues to be presented.

21         **MR. JAMES BUCHHOLZ:**  Which is what I've done.

22         **THE COURT:**  No, you waited until you were in the

23   midst of the cross examination and you brought the issue up in

24   front of the jury.  The Court did not have any warning nor did

25   you seek to ask for a side bar to be able to present this

1    until you came up after you had examined him, asked him the

2    questions and had gotten his answers.  And then you came up to

3    the side bar and said, "Judge, here's my brief and I've got

4    evidence."

5              **THE COURT:**  What did I miss?

6         **MR. JAMES BUCHHOLZ:**  Well, I asked him a series of

7    questions.

8              **THE COURT:**  Did you ask this Court for leave to make

9    this examination under 608(b)(1) before you started the cross

10   examination of the plaintiff?

11        **MR. JAMES BUCHHOLZ:**  I asked leave before I went into

12   dealing with any of the documents, Judge, which is exactly

13   what -- I mean, I have not talked in front of this jury about

14   the false statements within these documents.

15             **THE COURT:**  No, tell me if I -- let me finish.

16        **MR. JAMES BUCHHOLZ:**  I'm sorry.

17        **THE COURT:**  Don't talk over me.  It's hard for my

18   court reporter to record it.  Yesterday was one day we

19   tolerated it, but let's get back into a rhythm in this case

20   today.  Did you ask for this Court for leave to inquire on

21   these 608(b) issues before you started this cross examination?

22        **MR. JAMES BUCHHOLZ:**  As it relates to the documents

23   that I was going to utilize, I believe I have, Your Honor.

24   Now, there's no question that I asked him questions about

25   whether it's appropriate to execute documents appropriately.

1    I asked him questions associated with his truthfulness.  But

2    those issues are -- those issues, I can deal with.  Beyond

3    these, beyond these, and before I asked him any questions

4    associated with these documents, and the extrinsic evidence

5    that I wanted to bring in terms of 608, I did ask for a side

6    bar, I didn't go any further.  That's why --

7          **THE COURT:**  With regard to the documents, but you

8    didn't even advise the Court as to going into the subject

9    matter of additional marriages or false statements presented

10   to the Bankruptcy Court, did you?  Did I miss that?

11         **MR. JAMES BUCHHOLZ:**  Well, Judge --

12         **THE COURT:**  Did you ever tell me, number one, about

13   another marriage that you were going to assert?

14         **MR. JAMES BUCHHOLZ:**  Judge, I have evidence beyond

15   this that I can give --

16         **THE COURT:**  No, answer that.

17         **MR. JAMES BUCHHOLZ:**  No, I didn't tell you.

18         **THE COURT:**  Did you ever tell me previously before

19   starting into the cross examination that you had evidence of

20   falsification of bankruptcy applications by this plaintiff?

21         **MR. JAMES BUCHHOLZ:**  Not until I brought it up with

22   the trial brief, Judge.

23         **THE COURT:**  Then did you not go against the procedure

24   that's provided for under this rule and to give the Court

25   adequate time and opportunity to consider the specific issues

1    and the specific evidence that you would seek?  Because what

2    you've not only caught the plaintiff and this may or may not

3    be appropriate trial strategy, we'll argue the parameters of

4    acceptable impeachment another day -- but what I'm concerned

5    about is the Court not being given the opportunity to be able

6    to give appropriate time and consideration for issues like

7    this coming up during the course of the trial that should

8    follow this rule, especially very powerful evidence if it's

9    allowed in.

10       Now, that's one issue.  Secondly, you have these documents

11    and it sounds as if you're seeking to admit them now, is that

12    correct?

13       **MR. JAMES BUCHHOLZ:**  It will depend on his responses

14    to my questions relating to them.

15       **THE COURT:**  He's already answered the question with

16    regard to have you ever been married to a Lillian before, he

17    said no.

18       **MR. JAMES BUCHHOLZ:**  I didn't have a document

19    associated with that, Judge.  That is not going to be a

20    document I deal with.  I have other facts by which I can prove

21    that up.

22       **THE COURT:**  And let me ask you this, did you already

23    ask him whether or not he, because I believe you did, did you

24    make a bankruptcy application listing another wife on it?

25       **MR. JAMES BUCHHOLZ:**  No, actually what I said to him,

1    "You had another Federal Court matter, didn't you?"  And he

2    said, "Yes."  And I did not talk to him about bankruptcy.  I

3    did not mention the word bankruptcy.  That will nowhere appear

4    in this record before the time frame that I brought the trial

5    brief up.

6         **THE COURT:**  Now what documents do you think you can

7    bring in to follow up on this 608(b)(1) inquiry?

8         **MR. JAMES BUCHHOLZ:**  As it relates to the bankruptcy?

9         **THE COURT:**  As relates to any of these documents that

10   you have, that I haven't seen yet that you want to try to have

11   come in.  Because as I understand Rule 608(b)(1), there's no

12   extrinsic evidence that is allowable.

13        **MR. JAMES BUCHHOLZ:**  Judge, my reading of 608 and the

14   trial brief says that before I get into the specifics of those

15   instances of conduct, I have to let Your Honor know.  And

16   that's what I did with the trial brief.  Now, if Your Honor

17   wants to read the rule --

18        **THE COURT:**  I've read it.  I've read it.  I've read

19   the treatise, the comments on it during the recess before I

20   came out here and that's why I'm asking for clarification.

21        **MR. JAMES BUCHHOLZ:**  My clarification.

22        **THE COURT:**  About why you think you followed

23   608(b)(1).

24        **MR. JAMES BUCHHOLZ:**  Because before I dealt with any

25   of the documents that I want to talk with him about, I did

1    bring it to the Court's attention about the documents in terms

2    of him signing them under oath, and having -- and making

3    applications to public bodies, and to the courts and other

4    areas about information, and I've not -- I have not in the

5    questions that I have asked to date of this witness, I mean

6    they all can stand on their own, even -- I even have an

7    ability to show, because he testified he had been married on

8    two occasions.

9         **THE COURT:** But 608(b) says specific instances of the

10   conduct of the witness. It doesn't say documents, specific

11   instances --

12        **MR. JAMES BUCHHOLZ:** Okay.

13        **THE COURT:** -- they may, however, in the discretion

14   of the Court, if probative of truthfulness be inquired into

15   it.

16        **MR. JAMES BUCHHOLZ:** Judge --

17        **THE COURT:** Those specific instances were not relayed

18   to this Court in advance of the cross examination. You're

19   saying, well, you didn't show, you didn't talk about the

20   specific documents yet. You don't even get to that point.

21   He's asked and answered the question with regard to any

22   marriage to Lillian. That's it on that issue.

23       You show me any of the cases because I don't see them in

24   your brief, and I don't see them in the rules commentary and I

25   don't see them in Weinstein that says you can go any farther

1    on the issue once you've got his answer.  Now, you may be able

2    to assert some other foul play in the process or that he's

3    lying or committing perjury or something else, but within the

4    ambit of 608(b)(1), you've asked your questions question, you

5    did it without leave of court, you got your answer and that's

6    as far as you go.

7              **MR. JAMES BUCHHOLZ:**  So you're telling me --

8              **THE COURT:**  If he's denied it, he's denied it.  The

9    extrinsic evidence does not come in.

10             **MR. JAMES BUCHHOLZ:**  So you're telling me if I have

11   another witness to testify about a party admission of him

12   having married somebody else, you're not going to let me bring

13   that in either?

14             **THE COURT:**  You show me where, with the set up that

15   exists in this record right now, you can ask him further

16   questions with regard to these two issues, these apparently

17   false bankruptcy papers, and this other marriage under

18   608(b)(1).

19             **MR. JAMES BUCHHOLZ:**  Judge, I don't mean to -- maybe

20   --

21             **THE COURT:**  Or are you just setting up to say, and

22   especially where you haven't notified the Court that you were

23   going to do it from the start.  So it's your intention to call

24   in other witnesses to say he's married to Lillian and another

25   witness to say he filed a false bankruptcy application?

1      **MR. JAMES BUCHHOLZ:**  No, Your Honor, if I may.

2        **THE COURT:**  -- disclosure and --

3      **MR. JAMES BUCHHOLZ:**  If I may, please.

4        **THE COURT:**  -- disclosure during discovery avoids

5   these trap (phonetic) falls during trial.  Go ahead.

6      **MR. JAMES BUCHHOLZ:**  The application made by Mr.

7   Chapin to the Allen County courthouse associated with seeking

8   a marriage certificate and a license has nothing to do with

9   Lillian.  It has to do with Kelly Helgoe, and the information

10  associated with that application.  It has nothing to do with

11  Lillian.  The bankruptcy petition was filed with Kelly Helgoe,

12  but also contains false information.  It has nothing to do

13  with Lillian.  Now, if Your Honor wants to --

14       **THE COURT:**  All right.  Then put Lillian to the side.

15  You want to bring in evidence that he made a false application

16  for bankruptcy with Kelly Helgoe?

17     **MR. JAMES BUCHHOLZ:**  Right.  Well, Kelly Helgoe is

18  who it is he's indicated he married.  The application for

19  marriage certificate indicates somebody else.

20       **THE COURT:**  Is there any issue that you're intending

21  to bring in, since you inquired on it on cross, about some

22  additional wife named Lillian in Alaska?

23     **MR. JAMES BUCHHOLZ:**  No, I mean, I shouldn't have

24  thrown that out.  I suppose Your Honor, I had information he

25  was married to somebody in Alaska named Lillian, but that's

1    not the thrust of what it is my style (phonetic) is.   It

2    really isn't.

3         **THE COURT:**  We'll put that to the side.   Let's just

4    look at this bankruptcy issue.

5         **MR. JAMES BUCHHOLZ:**  The things and I'll be happy to

6    tender to Your Honor what it is I'm referring to.   The

7    application for marriage certificate to Kelly Helgoe indicates

8    that he's marrying some woman named Kristin English, okay?

9    The bankruptcy petition says that he's marrying -- that it was

10   with Kristin English.   The birth certificate says that the

11   children have been born to Kristin Chapin.   He's testified

12   under oath that he's been married to Kelly Helgoe.   He had no

13   other children except with Kelly Helgoe.   That's what I'm

14   referring to, Your Honor.   I'm not referring to Lillian.   I'm

15   referring to those issues.   And that's why I brought it to the

16   Court's attention before bringing any of those things out.

17      Now he's heard about these things and I suppose we'll deal

18   with that, but I believe I have complied with Rule 608 in

19   notifying you associated with these issues.   I understand what

20   you've told me, but that's the fashion by which I -- and those

21   are the items I'm concerned about dealing with.

22        **THE COURT:**  And what do you anticipate -- do you

23   anticipate going into anything further on that on the cross?

24        **MR. JAMES BUCHHOLZ:**  Other than what it is I just

25   referred to, no.   And by that, would be the birth

1    certificates, the applications -- and by the way, there are

2    two marriage certificate applications.  The one is with the

3    false name and then the second one with the latest wife, he

4    doesn't indicate that he's been married only one other time

5    not the number of times that is required or that he was

6    actually testified to being married.  So that would be the

7    reason for utilizing the other one.  Those are the only things

8    I would go into under 608.  And I believe that because the

9    certificate says it's being signed under the penalties of

10   perjury, all the information on here is true and accurate,

11   that goes to his credibility of being a truthful person. The

12   bankruptcy petition saying on here, all the information on

13   here is true and accurate, goes to his credibility about being

14   a truthful person.  The testimony that he's rendered about who

15   the mother of his children is, and the birth certificates goes

16   to his truthfulness.  And the last marriage application where

17   he says he's only been married one other time goes to his

18   truthfulness, all under 608.  And that's what I'm getting at,

19   that's what I'm looking to go into.  So I apologize about this

20   Lillian.  That's not where I'm going.

21        **THE COURT:**  Well, okay so you've got marriage

22   applications, bankruptcy applications and what else on these

23   -- on this issues?

24        **MR. JAMES BUCHHOLZ:**  Birth certificates.  Birth

25   certificates.

1    **THE COURT:**  And you think those documents can come in

2    not through the plaintiff, but through other witnesses that

3    you have prepared to come into court to authenticate or

4    they're self-authenticating to testify, is that correct?

5    **MR. JAMES BUCHHOLZ:**  I guess, Kelly, Helgoe would be

6    that person, which I've indicated I need her.

7    **THE COURT:**  You indicated you needed her, what I

8    heard, you needed her with regard to the damages issue.

9    **MR. JAMES BUCHHOLZ:**  Isn't his credibility associated

10   with -- isn't his credibility about damages dealt with

11   associated with this as well?  I mean if he's not truthful in

12   these matters, is he being truthful about damages?  I mean,

13   that's my issue, Judge.

14   **THE COURT:**  What you had told this Court, and this

15   Court takes plainly what you said was that Kelly Helgoe is

16   necessary with regard to the issue of damages.  It is

17   disingenuous to argue to this Court that, gee whiz, if his

18   credibility goes to damages and it's going go to all these

19   issues.

20   **MR. JAMES BUCHHOLZ:**  She's also --

21   **THE COURT:**  Please don't speak over me.  These --

22   that is a separate issue now.  Now you're bringing out to the

23   Court, "I need Helgoe because she's going to testify to all of

24   these character issues."

25   **MR. JAMES BUCHHOLZ:**  Judge --

1    **THE COURT:**  -- truthfulness issues with regard to the

2    plaintiff as well, is that correct?  Is that what I'm

3    following?

4    **MR. JAMES BUCHHOLZ:**  I need her for the damages

5    issues associated with what it is he's claiming was the effect

6    of him as relates to damages during the time frame after he

7    left Fort-Rohr and for these issues, yes, both.  Both.

8    **THE COURT:**  And she's never been deposed?

9    **MR. JAMES BUCHHOLZ:**  She has not been deposed.

10   **THE COURT:**  And if she's not successfully found on

11   the bench warrant and comes to court, are you going to be

12   seeking a continuance of the trial then?

13   **MR. JAMES BUCHHOLZ:**  That's a possibility.

14   **THE COURT:**  Or requesting again, a mistrial?

15   **MR. JAMES BUCHHOLZ:**  I'm not going to be requesting a

16   mistrial.

17   **THE COURT:**  Based on Helgoe's availability or not?

18   **MR. JAMES BUCHHOLZ:**  Right.

19   **THE COURT:**  Any further response, then, on these

20   issues?  And let me clarify again so we're all speaking

21   plainly into the record and there's no issues as we keep going

22   further, you anticipate being able to have Helgoe come in to

23   testify then with regard to the marriage application, the

24   bankruptcy application and the birth certificates, correct?

25   Correct?

1     **MR. JAMES BUCHHOLZ:**  Yes.

2     **THE COURT:**  And there's no other witness that you can

3   call with regard to those issues, correct?

4     **MR. JAMES BUCHHOLZ:**  No other witnesses -- that's

5   correct, other than Mr. Chapin.

6     **THE COURT:**  Which you're not going to be handing him

7   those documents, are you?

8     **MR. JAMES BUCHHOLZ:**  Well, if he testifies

9   appropriately as it relates to yeah, I signed a marriage

10  certificate under somebody else's -- that I was marrying

11  somebody else, then there would be no reason to provide it to

12  him.  But if he denies it, then as an impeachment item, yes.

13    **THE COURT:**  He's already testified with regard to

14  other children.

15    **MR. JAMES BUCHHOLZ:**  He's testified with respect --

16  he says he's had two children.

17    **THE COURT:**  And what you want to show are the birth

18  certificate of the children but listing another mother's name?

19    **MR. JAMES BUCHHOLZ:**  Right.  Right.

20    **THE COURT:**  And the bankruptcy application listing

21  another wife by another name?

22    **MR. JAMES BUCHHOLZ:**  Right.

23    **THE COURT:**  May or may not be an a/k/a, may or may

24  not be an a/k/a of Kelly Helgoe, is that where it's going?

25    **MR. JAMES BUCHHOLZ:**  Yeah.

1    **THE COURT:**  Any further response from the plaintiff?

2    **MR. ROBERT VEGELER:**  I think the Court was on the

3    right track with respect to 608(b)(1).  I have not -- it's

4    very specific, it indicates, it may not be proved by extrinsic

5    evidence.  So in order to bring that in by impeachment, when

6    Mr. Chapin has already testified, seems to me to be a

7    misdirection, plus I still think it's a misdirection on the

8    subpoena.  Now all of a sudden, the true light of this is

9    coming forward on the bench warrant as to what they really

10   want it for.  And second of all, my request for production

11   number twelve was all documents defendant intends to use at

12   trial.  There's never been any supplementation on that.  That

13   was back in October.

14   **THE COURT:**  It was a response to the no

15   supplementation on it?

16   **MR. ROBERT VEGELER:**  Response:  Not known yet.  There

17   was never any supplementation.

18   **THE COURT:**  Okay.  As I see it, the jury can be

19   brought down now, and with, though, this is -- the Court

20   allowing this, since you haven't appeared in trial before this

21   Court before and giving counsel the benefit of the doubt in

22   not understanding the Court's procedures on these kinds of

23   matters, giving you the opportunity to go back and on this

24   cross examination now, inquire on those issues not already

25   inquired on with regard to this marriage application with the

1   name of yet possibly another wife and birth certificates that

2   show possibly the name of another wife or an a/k/a Kelly

3   Helgoe, and bankruptcy application, but it can only be the

4   questions with regard to those issues, without identifying

5   documents, the documents don't come in yet.

6           **MR. JAMES BUCHHOLZ:**  Okay.

7           **THE COURT:**  You can't reference them into the record

8   yet, because right now with him, with this plaintiff on the

9   stand under 608(b)(1), all that can be asked within the

10  discretion of the Court, prior to the question being asked,

11  with that disclosure, you can inquire on those.  And then at

12  such time as you can further develop the record with Kelly

13  Helgoe or otherwise, you may be able to show, you know, the

14  lack of truthfulness on the part of the plaintiff.  I don't

15  know what his answer is going to be.

16          **MR. JAMES BUCHHOLZ:**  All right.

17          **THE COURT:**  But you can't waive any papers in front

18  of him.  You know, you can't tell the jury, well what if I

19  have this birth certificate that says you had these two

20  children by somebody named Krista, whatever her name.  Can't

21  do that.

22          **MR. JAMES BUCHHOLZ:**  Okay.

23          **THE COURT:**  You can't show boat on these documents

24  that are not yet in evidence, and may not come in possibly,

25  because they're extrinsic.

1    **MR. JAMES BUCHHOLZ:**  Okay.  So -- I want to make sure

2    I understand your ruling because I do not want to upset this

3    Court.

4         **THE COURT:**  I'm not upset.  But I must tell you that

5    I have not -- well, I am not upset.  I don't get upset with

6    counsel.  I try to have patience and especially if I haven't

7    had a trial with a lawyer before, and that's why I say I'm

8    giving you the benefit of the doubt in going forward on this.

9         **MR. JAMES BUCHHOLZ:**  I just want to make sure --

10        **THE COURT:**  It sounds like I am allowing what you

11   wanted to inquire on --

12        **MR. JAMES BUCHHOLZ:**  Right.

13        **THE COURT:**  -- and I'm setting out what I understand

14   608(b)(1) to exclude at this point with regard to this witness

15   on the stand.  Now --

16        **MR. JAMES BUCHHOLZ:**  I want to tell Your Honor the

17   questions -- what I would indicate, I want to make sure that

18   I'm not going afoul of your ruling when I say Mr. Chapin, when

19   you filed an application with Allen County associated with a

20   marriage license to a woman named Kristin English, didn't you?

21        **THE COURT:**  Aren't you suggesting you have that

22   application?

23        **MR. JAMES BUCHHOLZ:**  Well, that's why I'm asking Your

24   Honor if that's not an appropriate fashion by which to proceed

25   with that, that's fine.

1        **THE COURT:**  You can rephrase the question so that

2    you're not referencing evidence which matters or documents

3    that are not in evidence.  That application is not in

4    evidence.  You have neither the birth application nor the

5    birth certificates, nor the bankruptcy application are in

6    evidence.  You can phrase the question as to whether or not

7    he's ever under oath represented, boom, boom, boom and he'll

8    say yes or no.

9        **MR. JAMES BUCHHOLZ:**  Okay.  Okay.

10        **THE COURT:**  But you can't represent a document not in

11   the evidence.

12        **MR. JAMES BUCHHOLZ:**  Okay.

13        **THE COURT:**  May not come in evidence.

14        **MR. JAMES BUCHHOLZ:**  Okay.  I understand, Your Honor.

15        **THE COURT:**  All right.  Any other questions before we

16   bring them down and resume?

17      (No audible response.)

18        **THE COURT:**  All right.  Please bring the jury down.

19   Well, at least we won't have to take a mid-morning break.

20      (Jury present.)

21        **THE COURT:**  Go ahead and be seated, ladies and

22   gentlemen.  Counsel, you may be seated.  Thank you for your

23   patience.  Again, I under estimated that by about 35 minutes.

24   But again, we've been working with regard to certain issues

25   and we're now ready to proceed with the cross examination,

1    further cross examination of the plaintiff.  Mr. Chapin, if

2    you would please resume the stand.

3        (Witness doing as indicated.)

4        **THE COURT:**  If you would put the mic on.  Mr.

5    Buchholz, you may ask your next question.

6        **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

7    BY MR. JAMES BUCHHOLZ:

8     Q. Mr. Chapin, have you ever under oath indicated that you

9    were marrying or were married to Kristin English?

10    A. Yes.

11       **THE COURT:**  Gentlemen, I can't hear either of you.

12   Can you turn the mic up.

13       **MR. JAMES BUCHHOLZ:**  If nobody heard, I'll be happy

14   to ask that question again.

15       **THE COURT:**  Please do.

16   BY MR. JAMES BUCHHOLZ:

17    Q. Mr. Chapin, have you ever under oath indicated that you

18   were married to Kristin English?

19    A. Yes.

20    Q. Have you ever under oath indicated that she was the mother

21   of your children?

22    A. No.

23    Q. Have you ever under oath indicated that Kristin Chapin was

24   the mother of your children?

25    A. No.

1      **MR. JAMES BUCHHOLZ:**  Your Honor, I'd ask leave

2   associated with that issue.

3      **THE COURT:**  Did you wish to approach --

4      **MR. JAMES BUCHHOLZ:**  Sure.

5      **THE COURT:**  -- on this?

6      (Whereupon, the following bench conference was held

7   outside the hearing of the jury:)

8      **THE COURT:**  Leave for what?

9      **MR. JAMES BUCHHOLZ:**  Birth certificate says the one

10  mother of the children is Kristin Chapin under oath.

11     **THE COURT:**  I --

12     **MR. ROBERT VEGELER:**  It's not questions under oath.

13     **THE COURT:**  Can re-ask the question, but if he says

14  no, again, well, whatever he says, you can't get them in under

15  608 one B they don't come in, they're extrinsic.

16     **MR. JAMES BUCHHOLZ:**  Okay.

17     **THE COURT:**  Show where I'm wrong and I'll consider

18  it.  I'm looking at 608.  Mr. Vegeler.  I'm looking at

19  608(b)(1) and the extrinsic evidence does not come in.

20     **MR. JAMES BUCHHOLZ:**  Well, unless it goes to the

21  credibility and the truthful -- truthfulness for the witness.

22     **THE COURT:**  If inquiry can be made, but the evidence

23  does not; the documents don't.  There has to be another basis

24  or another way to do it, but under 608(b)(1) it doesn't.

25     **MR. JAMES BUCHHOLZ:**  Okay.

1        **THE COURT:**  Come at me again if you find some

2    authority for it, but that's -- we took the break and I looked

3    it up and I can't find it to allow it.

4        **MR. JAMES BUCHHOLZ:**  Okay.

5        **THE COURT:**  This way, in this form through this

6    witness.

7        **MR. ROBERT VEGELER:**  I think what he's going to the

8    fact that the birth certificates are not signed under oath,

9    there may be a different way of stating it.

10        **THE COURT:**  You can rephrase the question and ask on

11   it.

12        **MR. ROBERT VEGELER:**  Don't know how he's going to do

13   it.

14        **THE COURT:**  I don't either.  Haven't seen it done.

15      (Whereupon, the bench conference was concluded;

16   thereafter, the following proceedings were held:)

17   BY MR. JAMES BUCHHOLZ:

18    Q. As I understand your testimony, Mr. Chapin, Exhibit 8, you

19   testified about earlier your damages, didn't you?

20    A. Right.

21    Q. And as I understand your testimony, the cat was given

22   away, correct?

23    A. Correct.

24    Q. And now it's an African cat?

25    A. African Serval.

1    Q. I seem to recall you said it was a leopard type?

2    A. It's leopard-type cat, yes.

3    Q. Wild cat?

4    A. Exotic cat.

5    Q. Fifty-five pounds?

6    A. Right around there.

7    Q. Now, you indicate in this Exhibit, a house, right?

8    A. That's correct.

9    Q. Now, this is the house that you claim you were buying on

10   land contract, correct?

11   A. That's correct.

12   Q. And this is the house that you claimed you had to stop --

13   you couldn't pay on any longer, correct?

14   A. That's correct.

15   Q. And that house, you entered into the land contract in June

16   of 2004, didn't you?

17   A. That's correct.

18   Q. And when I took your deposition, you were not able to tell

19   me the address to that house, were you?

20   A. No, I could not.

21   Q. And in 2004/2005 who did you live with in that house?

22   A. My kids.

23   Q. Okay.  So that would be Sterling and Trent, the Second?

24   A. That's correct.

25   Q. Anybody else?

1     A. Some friends stopped over every once in a while and

2   stayed, no.

3     Q. Okay.  It's my understanding that you ended up moving out

4   of that house, correct?

5     A. That's correct.

6     Q. When do you claim you moved out of the house?

7     A. I'm going to say September/October.  I may be off, but I

8   can't recall, best of my knowledge.

9     Q. Okay.  So you think September or October of 2005 is when

10   you moved out of that house, but you can't remember the

11   address to that you were buying?

12     A. It was a few months, um, since February, March, I believe.

13   It would be around -- I take that back.  It had to have been

14   around June of 2005.

15     Q. Okay.  So June of 2005 is when you're telling me you had

16   to move out of that house because you couldn't pay for it any

17   longer, right?

18     A. It was 2004 that I had purchased the house I believe.

19     Q. Okay.  June 2004 you told me you purchased the house on a

20   land contract, right?

21     A. Right around that area.

22     Q. And you're telling me in June of 2005, not

23   September/October, but June of 2005 is when you're moving out

24   because you can't pay for it anymore, right?

25     A. I believe that's around that time frame.

1    Q. Okay.  And at that time, you said some friends would come

2    in and out, but you were living with both your sons there?

3    A. Correct.

4    Q. Now you're buying that house on a land contract, right?

5    A. That's correct.

6    Q. And land contract is a pay-as-you-go seller finance, isn't

7    it?

8    A. That's correct.

9    Q. So it's not as -- it's not as if you are paying a bank

10   financing charges.  You're paying -- it's almost like

11   rent-to-own/deal, isn't it, on a land contract?

12   A. No.  No.

13   Q. It's not?

14   A. No, it's not.

15   Q. Okay.  As I understand it, you were paying a thousand

16   dollars a month for this house, right?

17   A. Correct.

18   Q. So between June of 2004 to June of 2005, you're telling me

19   you spent less than $12,000 because you couldn't pay for it

20   any longer, right?

21   A. Approximately, that's correct.

22   Q. Okay.  As I understand it, it's your testimony that you

23   couldn't pay for it because of your separation from Fort-Rohr?

24   A. That's correct.

25   Q. You stopped making payments to Mr. Grepkey in the spring

1   of 2005, didn't you?

2    A. What month would that have been, sir?

3    Q. You tell me.

4    A. I'll say it was June of 2005, to the best of my knowledge.

5    Q. Okay.  So that I understand it, it's your testimony now

6   that you paid Mr. Grepkey from June of 2004 all the way until

7   June of 2005 a thousand dollars a month for that property, is

8   that what you're telling me?

9    A. No, sir, that's not what I'm telling you.

10   Q. Okay.

11   A. Right around there is when I moved out.

12   Q. Okay.  Well, when is it that you stopped making payments

13  to Mr. Grepkey then?

14   A. I think it was around March/April.

15          **THE COURT:**  Of '05?

16          **THE WITNESS:**  Of '05.

17  BY MR. JAMES BUCHHOLZ:

18   Q. Okay.  All right.  Now, you told Mr. Vegeler that this

19  itemization was created in November of 2005, right?

20   A. To the best of my knowledge.

21   Q. Okay.  That's when the values were more clearly succinct

22  in your mind as it relates to what it is that you were

23  claiming as a loss, right?

24   A. That's correct.

25   Q. Okay.  Because the closer you are to something, the more

1  understanding you have about those values, right?

2   A. Yes.

3   Q. And the further away you get, the less understanding you

4  have about those values, right?

5   A. That's correct.

6   Q. Okay.  Remember, you and I were together with Mr. Vegeler

7  in his office in November of 2006, right?

8   A. That's correct.

9   Q. I asked you some questions under oath there, didn't I?

10   A. Yes, you did.

11   Q. You and answered those, right?

12   A. To the best of my knowledge.

13   Q. Okay.  On page 174, starting at line four.

14       **THE COURT:**  Wait.  Do I have a deposition, copy of

15  that?  I should have copies of any and all depositions that

16  might be referenced.  I'll use the copy now, but the original

17  should be filed into the record.

18       **MR. JAMES BUCHHOLZ:**  Okay.

19       **THE COURT:**  What page are you on?

20       **MR. JAMES BUCHHOLZ:**  Page 174, line four.

21       **THE COURT:**  Go ahead.

22  BY MR. JAMES BUCHHOLZ:

23   Q. Did I ask you this question:  "Who created this exhibit?

24       "ANSWER:  I created it and faxed it to him when I was in

25  Missouri."

```
 1          "When did you create this?"

 2          "A week ago maybe."

 3          Did I ask those questions and did you give those answers?

 4     A. I believe you did.  I can explain that.

 5     Q. Okay.  Now --

 6              THE COURT:  This doesn't do me any good.  Pages

 7     aren't in order.

 8              MR. JAMES BUCHHOLZ:  Excuse me?

 9              THE COURT:  Pages aren't in order on that copy.  You

10     have a copy you're --

11              MR. ROBERT VEGELER:  Yes, Your Honor.

12              THE COURT:  No, no.  Keep it.  I just want to make

13     sure you follow the testimony.  We'll wait for the original.

14              MR. JAMES BUCHHOLZ:  I have a (Inaudible) Your.

15     Honor, I apologize.

16              THE COURT:  Do you have a copy you need for your

17     examination?

18              MR. JAMES BUCHHOLZ:  I've got a copy.

19              THE COURT:  Go ahead.

20     BY MR. JAMES BUCHHOLZ:

21     Q. Okay.  Now, the T-Bird, you only had 50 percent ownership

22     in, didn't you?

23     A. That's correct.

24     Q. And the Suzuki, you only had 50 percent ownership in?

25     A. That's correct.
```

1     Q. That type of cat, you need licenses for that?

2     A. Some states.

3     Q. In Indiana do you need a license for that?

4     A. Not that I'm aware of.  Minnesota I didn't.

5     Q. Are there ordinances that regulate exotic animals like

6     that?

7     A. In this state, is that what you're asking?

8     Q. In Fort Wayne, Indiana.

9     A. Not that I'm aware of.

10    Q. Have you ever indicated to anybody that licenses or

11    ordinances applied to African cats like that?

12    A. Not that I'm aware of.

13    Q. Okay.  You're not a home appraiser, are you?

14    A. Oh, no.

15    Q. Never done that, have you?

16    A. Only on-line.

17    Q. Looking for properties to purchase?

18    A. Just looking what property values were worth.

19    Q. Okay.  Now, as I understand the master bedroom suite you

20    were referring to in Exhibit 8, that was purchased by your

21    fiance or girlfriend at the time?

22    A. No.

23    Q. Okay.  Okay.  So you're telling me your fiance or

24    girlfriend didn't go pick out the material that you were

25    claiming as the master bedroom suite?

1    A. No, no, not that I recall.  No.

2    Q. Okay.  So your testimony is it was your money, but you

3    were the one that picked it out on your own, is that what

4    you're saying?

5    A. No, I had help picking it out.

6    Q. Okay.  And that was your girlfriend at the time that you

7    did that?

8    A. A friend.

9    Q. Okay.  And her name?

10   A. Um, I think it was Amber.

11   Q. Okay.  Amber Okpara?

12   A. Yes.

13   Q. Okay.  Was she one of the people that was residing with

14   you at the house that you can't remember the address to that

15   you were buying at the time frame of the spring of 2005?

16   A. Short term.

17   Q. Okay.  When you say "short term", what time frame do you

18   testify she was there?

19   A. I don't recall exactly, but it was short term.

20   Q. Well, does that mean she was there for a day, months, a

21   month; can you describe for us in any fashion the time frame

22   she was there?

23   A. I don't recall.  I know it was a short term.  She was

24   there off and on.

25   Q. Okay.  So it's your testimony she wasn't there

1    continuously?

2    A. No.

3    Q. Right?

4    A. Correct.

5    Q. Did she have any children?

6    A. Yes.

7    Q. Okay.  Were they ever staying there?

8    A. Yes.

9    Q. Now this bedroom suite, you said under oath with Mr.

10   Vegeler you sold for $400, correct?

11   A. To the best of my knowledge.

12   Q. Okay.  Now -- and who did you sell that to?

13   A. I have no idea.

14   Q. Okay.

15   A. I didn't --

16   Q. In your deposition, you indicated you sold it to Dan

17   Twomey.  Do you have any reason --

18   A. I didn't sell --

19   Q. Do you have any reason to dispute that today?

20   A. Yes, I do.  I can explain that.

21   Q. So when you told me in November of 2006 that you sold the

22   bedroom suite to Dan Twomey, that wasn't true?

23   A. I can explain that.

24   Q. Was it true?

25   A. No, I can explain that.

1    Q. Page 179, line 21, did I ask you this question, and did

2    you give this answer:  "Who did you sell the bedroom suite

3    to?"

4        "I believe that one I sold the bedroom suite to Dan Twomey

5    and his family."

6     A. That's correct, I did say that.

7     Q. Okay.  So it's my understanding that the bedroom suites

8    that you purchased for your sons you paid for in cash, right?

9     A. That's correct.

10    Q. You got receipts for those, right?

11    A. I couldn't find them.  Couldn't find hardly any of my

12   documentation.

13    Q. Okay.  So the documentation that would support some of the

14   values that you've placed on Plaintiff's Exhibit 8, you

15   haven't been able to find or review, have you?

16    A. No.

17    Q. Okay.  So all of the numbers on Plaintiff's Exhibit 8 are

18   your estimates, then, of those values, correct?

19    A. That's correct.  That's correct.

20    Q. You're not telling this jury that you sold pictures of

21   your deceased brother, are you?

22    A. No.

23    Q. All right.  Now, yesterday, you talked about having to --

24   after you left Fort-Rohr, had to sell all of your items and

25   live in a car, remember that testimony?

1    A. I was, yes.

2    Q. What time frame do you claim you had to stay in a car?

3    A. I believe it was June and July when I got kicked out, I

4    was on the street, um, I got a car at that point.  I stayed in

5    the car, I'm thinking, until maybe the end of July.

6    Q. Okay.  So from -- in June and July of 2005, it's your

7    testimony that you lived out of your car, correct?

8    A. That's pretty -- yes, sir.  That's pretty much it.  The

9    worst in my life.

10   Q. It's my understanding then that you just got laid off from

11   Able Transmission, is that true?

12   A. Yes, it is true, two weeks ago.

13   Q. And you've been working at Able Transmission since August

14   of 2006?

15   A. That's correct.

16   Q. And before that, you worked for Mr. Thayer, correct?

17   A. No, that's not correct.

18   Q. Okay.  What time frame do you believe you worked for Mr.

19   Thayer or one of his companies?

20   A. I never worked for Mr. Thayer.

21   Q. Ever perform any jobs for Mr. Thayer?

22   A. Yes, I did.

23   Q. You receive compensation from Mr. Thayer?

24   A. Yes, two jobs in particular.

25   Q. Okay.  So there were time frames that you performed work

```
 1    for Mr. Thayer, right?

 2     A. Two times.

 3     Q. Okay.  And the time frames you claim you were providing

 4    work for Mr. Thayer was when?

 5     A. I don't recall.

 6     Q. Okay.  In 2006?

 7     A. I don't recall.  I don't recall when I did it.  I really

 8    don't.

 9     Q. Well, you know it wasn't 1988, I suppose?

10     A. No, I don't know that.

11     Q. You know that, right?

12     A. Yeah.

13     Q. So you can't narrow it down at all associated with the

14    time frame you did work for Mr. Thayer?

15     A. Do you know what you did two years ago, sir?

16     Q. Actually I do.

17     A. I don't.

18     Q. Well, you're telling me you worked for Mr. Thayer two

19    years ago?

20     A. I didn't say that.

21     Q. Okay.  You have any time frame that you can tell me

22    associated with Mr. Thayer, sir?

23     A. No, I don't.

24     Q. Worked for Auto Liquidators, correct?

25     A. Correct.
```

1   Q. That was from October of '05 to January of '06, right?

2   A. That sounds close.

3   Q. And the reason you left there was for personality

4   conflicts, correct?

5   A. Correct.

6   Q. No other reason, correct?

7   A. Correct.

8   Q. On your side, the personality conflict was he was losing

9   his customers and enough was enough, right?

10   A. Rude to me.

11   Q. And enough was enough, right?

12   A. Exactly.

13   Q. And as I understand, you voluntarily left there, correct?

14   A. Yes.

15   Q. Page 18, line 16, did I ask you this question in your

16   deposition, sir:  "Work anywhere between January of '06 and

17   August of '06?"

18       "ANSWER:  I did a few odd jobs for driving."

19       "Who did you do those odd jobs for driving?"

20       "Bill Thayer."

21       Did I ask those questions and did you give me those

22   answers?

23   A. I suppose.  Maybe I don't recall the certain time in those

24   two when I gave that answer.

25           **MR. JAMES BUCHHOLZ:**  Judge, move to strike the

1    non-responsive portion of that response.

2            **THE COURT:**  Granted.  The jury is to disregard the

3    witness' last comment.  You need the listen carefully to the

4    question asked, and answer that.  Your attorney will be given

5    the opportunity to ask you follow-up questions and further

6    explanation, if it's necessary.

7            **THE WITNESS:**  Thank you.

8    BY MR. JAMES BUCHHOLZ:

9     Q. Okay.  Is it your testimony that the first place that you

10   worked after Fort-Rohr as an employee was Auto Liquidators?

11    A. Yeah, I believe it is.

12    Q. Okay.  Except in the fall of 2005, you worked for Raisor

13   Ford, didn't you?

14    A. For two -- a week and a half, it was, yes.  I did for a

15   week and a half and then I came home.

16    Q. Okay.  And what time frame do you claim that occurred?

17    A. I don't know.  I'm sure you have the documents.  I don't

18   know.  I don't recall.

19    Q. August, September of '05 sound about right to you, sir?

20    A. I don't recall the dates.

21    Q. Any reason to quarrel with August or September of '05?

22    A. No.

23    Q. Okay.  Now, as I understand it, when you came back from

24   Minnesota, you had been working at a place called Minor Ford,

25   correct?

1    A. Correct.

2    Q. And before that, you had sold some horses, correct?

3    A. Correct.

4    Q. Did some farming?

5    A. And llamas.

6    Q. Excuse me?

7    A. And llamas.

8    Q. Okay.  And you did that for about six months, right?

9    A. Ballpark, yes.

10   Q. And did you it on your own, right?

11   A. Correct.

12   Q. And your income from that was $35,000, correct?

13   A. Roughly maybe.  I don't know.  It wasn't income.  It's --

14   it was total, you know, so income could have been 5 or 6,000

15   after you paid for the animals and what not.

16   Q. Did I ask you this question on page 94 of your deposition:

17   Line 17 -- well, to give some context, starting at line 7:

18   "So you were self-employed?"

19       "Yes."

20       "How long did you do the farming?"

21       "Short term, six months just buying horses, things like

22   that."

23       "I'm sorry, you did what?"

24       "Buying horses, retail selling them wholesale.

25       "Did you have your own operation for that or did you work

1   under the auspices of somebody else?"

2        "I worked on my own."

3        "What do you say your income was for that?"

4        Answer:  $35,000 maybe.

5        Question:  $35,000?"

6        Answer:  Maybe.

7        Did I give you those questions, did you answer in that

8   fashion, sir?

9    A. Yes, I did.

10   Q. Okay.  All right.  Now, you come back from working in

11  Minnesota from two dealerships and selling these horses as I

12  understand it, right?

13   A. Yes.

14   Q. Okay.  And before you had gone up there, you had worked at

15  Fort Wayne Toyota?

16   A. Correct.

17   Q. And the reason that you asserted that you were leaving is

18  to follow your children at that point, correct?

19   A. Exactly.

20   Q. Okay.  Now, when you were working at Fort Wayne Toyota,

21  you reported to Mr. Kruse?

22   A. Of course.

23   Q. Yes?

24   A. Yes.

25   Q. He was the general manager?

1    A. Yes.

2    Q. Okay.  And you had to sign some employment documents when

3    you signed on there, correct?

4    A. I believe I did.

5    Q. And you worked for Fort Wayne Toyota on and off on four

6    different occasions before you had left for Minnesota, right?

7    A. Correct.

8    Q. Some of the documents that you signed would be a handbook

9    with discrimination policies, right?

10   A. Yes, I'm sure.

11   Q. Okay.  And that's the same thing that you signed at Fort

12   Wayne Toyota when you came back in 2004, right?

13   A. I'm not sure if I signed anything, but I may have, yes.

14   Q. And when you were over at Acura, I thought your testimony

15   was that, among the documents you signed, was a discrimination

16   policy?

17   A. At the Acura, yes.

18   Q. Okay.  And also at Toyota?

19   A. I just don't recall signing it at Toyota but I probably

20   did.

21   Q. Do you have any reason to believe you didn't sign a

22   discrimination policy at Fort Wayne Toyota when you came back

23   in March --

24   A. I don't know.

25   Q. -- of 2004?

1    A. I don't know if it was presented to me at that time.  It

2    might have been.  I just don't recall it.

3    Q. You have no reason to dispute Mr. Kruse's testimony if he

4    comes up and says you did sign one, do you?

5    A. I'd like to see it.

6    Q. Do you have any reason to dispute is my question, sir?

7    A. Well, sure.

8    Q. Yes, you would dispute it?

9    A. Well, sure.

10   Q. All right.  So you started at Fort Wayne Toyota on March

11   11th of 2004, correct?

12   A. That's correct.

13   Q. And you left Fort Wayne Toyota on April 2nd, 2004,

14   correct?

15   A. April 1st.  April 2nd, I started at the Acura store.

16   Q. I'm going to hand you what has been marked as Defendant's

17   Exhibit H.  Have you had a chance to review defendant's

18   Exhibit H?

19   A. Yes.

20   Q. Okay.  It was dated -- you've seen this document before?

21   A. Yes.

22   Q. You've signed it at the bottom?

23   A. Yes.

24   Q. That's your signature on April 2nd --

25   A. Yes.

1    Q. -- 2004, right?

2    A. Correct.

3    Q. Okay.

4         **MR. JAMES BUCHHOLZ:**  I'd move the admission of

5    Defendant's Exhibit H, Your Honor.

6         **MR. ROBERT VEGELER:**  No objection, Your Honor.

7         **THE COURT:**  H is admitted.

8         **MR. JAMES BUCHHOLZ:**  Can I spread copies to the jury,

9    Your Honor?

10        **THE COURT:**  Certainly.  Oh, the deputy will hand them

11   up.  You can put them on Elmo or you can do both.

12   BY MR. JAMES BUCHHOLZ:

13   Q. Mr. Chapin, the document, the termination report for the

14   April 2nd, 2004, right?

15   A. That's what it says.  That's what that refers --

16   Q. It says the reason for separation was that you've taken an

17   employee home and you failed to return to work on April the

18   1st, correct?

19   A. At 8:30 at night.  Work was over at 9:00, that's correct.

20        **THE COURT:**  Listen carefully to the question and

21   answer yes or no as to what the document stated.  Again,

22   you'll be given an opportunity to offer further explanation

23   later, but listen to his question.

24        **MR. JAMES BUCHHOLZ:**  Judge, I move to strike the

25   non-responsive portion of that response.

```
 1        THE COURT:  It's granted.  That witness' last

 2   statement, it was non-responsive, is stricken from the record

 3   and the jury is to disregard it.

 4   BY MR. JAMES BUCHHOLZ:

 5    Q. This document indicates that you took an employee home,

 6   and failed to return to work on April the 1st, 2004, correct,

 7   sir?

 8    A. That's correct.

 9    Q. Now, that wasn't the first time that you had had a

10   disciplinary action at Fort Wayne Toyota between March 11th

11   and April the 2nd, is it?

12    A. Yes, that I'm aware of.

13    Q. Mr. Chapin, I'm going to hand you what has been marked as

14   Defendant's Exhibit R.  See that document, sir?

15    A. Yes.

16    Q. Your signature appears in the lower left portion of that

17   document?

18    A. That's totally correct.  Yes, that's my signature.

19    Q. All right.

20        MR. JAMES BUCHHOLZ:  So I move the admission of

21   Defendant's Exhibit R, Judge.

22        THE COURT:  Any objection?

23        MR. ROBERT VEGELER:  No objection.

24        THE COURT:  It's admitted.

25   BY MR. JAMES BUCHHOLZ:
```

1    Q. Mr. Chapin, what's the date on this document?

2    A. 22nd.

3    Q. Okay.  March 18th, 2004, appears in the upper right hand

4    corner, does it not?

5    A. Yes.

6    Q. Okay.  And it says that the violation relates to

7    attendance, correct?

8    A. I -- yes.

9    Q. And the description says that you didn't report to work as

10   scheduled that day, doesn't it?

11   A. Yes, it does.

12   Q. It indicates that further violations of the policy would

13   result in separation, a termination, correct?

14   A. Yes.  I'm disputing my signature, though, because I -- you

15   know, it kind of looks like it.  See, I don't recall this at

16   all.  I don't recall this at all.

17   Q. So is it your testimony now -- that you told me earlier it

18   was your signature, you telling me now it's not your

19   signature?

20   A. Well, when I took a quick glance and I'm sitting here

21   looking at it, no, I never write my R's all the way up the

22   middle.

23   Q. Okay.  So it's your testimony that this document does not

24   contain your signature, even though earlier you told me it

25   did?

1    A. Yeah, because I never recall getting in trouble on the

2    18th of March for a flat tire.  I mean, come on.

3    Q. Now, it's my understanding you went down to Fort Wayne

4    Acura on April the 8th seeking a piece of -- a position of

5    employment, correct?

6    A. I believe it was the second.

7    Q. So it's your testimony that an application of employment

8    was not executed by you on April the 8th, 2004?

9    A. I filled it in later after I started there.

10   Q. Oh, okay.  So it's your testimony that you started working

11   before any of the documents associated with employment were

12   created?

13   A. That's right.

14   Q. I see.  In any event, four days after you start, Mr.

15   Richards -- as a used car manager, Mr. Richards is let go,

16   right?

17   A. Give or take a few days, yes, I'm sure.

18   Q. Well, you reported to Kurt Richards down at Fort Wayne

19   Acura, correct?

20   A. Correct.

21   Q. Okay.  And you reported to him for a few days, right?

22   A. Yes.

23   Q. And you testified yesterday within four days Mr. Richards

24   was let go, right?

25   A. Yes.

1    Q. Okay.  And Mr. Baig was there four or five days tops,

2    after you started, wasn't he?

3    A. I believe so.  I don't believe it was that long.

4    Q. Page 101, line 21: "So when do you claim Mr. Baig

5    started?"

6       "ANSWER:  It wasn't four or five days tops after I

7    started.  I don't believe it was even that long."

8       Did I ask that question and did you give that answer?

9    A. Yes, I believe you did, to the best of my knowledge.

10   Q. So you told this jury and Mr. Vegeler yesterday that when

11   Mr. Baig started, he was the general manager, correct?

12   A. Rephrase that question.

13   Q. Sure.  You told this jury and Mr. Vegeler yesterday that

14   when Mr. Baig started he was placed as the general manager?

15   A. Yes, that's correct.

16   Q. And the general manager within that dealerships has

17   reports of used car manager, correct?

18   A. Correct.

19   Q. Has reports of new car manager, correct?

20   A. Correct.

21   Q. Okay.  The officer manager reports to him, correct?

22   A. Correct.

23   Q. The parts manager reports to him, correct?

24   A. Correct.

25   Q. The service manager reports to him, correct?

1    A. Correct.

2    Q. And the finance people report to him, correct?

3    A. Correct.

4    Q. And the general manager reports to Mr. Rohrman, right?

5    A. Correct.

6    Q. Okay.  And when you started, Kurt Richards was the new car

7    manager, correct?

8    A. No, he was a general sales manager.

9    Q. Okay.

10   A. Is what I was told.

11   Q. Okay.  Well, Mr. Richards was the new car manager as a

12   result of Mr. Baig's installation as the general manager,

13   wasn't he?

14   A. When they hired -- no, not that I'm aware of.

15   Q. Okay.  So it's your testimony, then, as I understand it,

16   that Mr. Richards was the general manager of Fort Wayne Acura

17   when you started?

18          **MR. ROBERT VEGELER:**  Your Honor I'm going to object.

19          **THE WITNESS:**  That's not what I said.

20          **THE COURT:**  Wait, objection.

21          **MR. ROBERT VEGELER:**  Misstates the testimony.  He

22   very clearly said general sales manager.  He didn't use the

23   term "general manager".  He's misstating the testimony, trying

24   to mislead the jury.

25          **THE COURT:**  I'll let you rephrase it.  Let's get

1   clarification on because I'm not sure the jury is following

2   these different designations, so I'll let you rephrase it.

3   Listen carefully and answer that.

4   BY MR. JAMES BUCHHOLZ:

5    Q. Okay.

6        Is it your testimony that when you began at Fort Wayne

7   Acura on April -- the beginning of April 2004, that Kurt

8   Richards was the lead person there?

9    A. Yes, sir.

10   Q. Okay.  Did you have any understanding as to who he

11   reported to?

12   A. Larry Kruse.

13   Q. So Mr. Kruse was the acting general manager is what you're

14   telling me?

15   A. That's correct.

16   Q. Okay.  Now, Mr. Baig is introduced to a dealership on the

17   12th, correct?

18   A. I don't recall the date, sir.

19   Q. Four or five days tops after you started, right?

20   A. Fair enough.

21   Q. You told Mr. Vegeler yesterday that Mr. Rohrman was not

22   present when that occurred, correct?

23   A. Yes.

24   Q. Okay.  And so who made the introduction of you to Mr.

25   Baig?

1    A. I believe it was Kurt Richards.

2    Q. And it's my understanding, from your testimony Mr. Rohrman

3    was not in the dealership at all that day?

4    A. Not that I'm aware of.

5    Q. It's also, as I understand your testimony, no meeting

6    occurred that day?

7    A. Not that I was aware of.

8    Q. You're unaware of Mr. Baig's background in the auto

9    business, aren't you?

10   A. A little bit.

11   Q. Okay.  In any event, as I understand your testimony, you

12   were doing everything exactly how you were supposed to be

13   doing it and there should have been no reason for separation,

14   right?

15   A. Correct.

16   Q. But you only have a personal belief associated with

17   national origin, race, and religion in terms of your

18   separation, correct?

19   A. Say that one more time, please.

20   Q. Sure.  Nobody ever told you you were being let go because

21   you were white, because you were an American citizen and

22   because you were a Baptist, correct?

23   A. Of course not.

24   Q. That's not correct?  Nobody ever said that to you, did

25   they?

1    A. No, they didn't.

2    Q. Okay.  When Mr. Baig started on -- in the beginning of

3    April 2005, Mr. Richards was a used car manager, Kurt

4    Richards?

5    A. I don't know, sir.

6    Q. Okay.  When Mr. Baig started in March -- April of 2005

7    were you the used car manager?

8    A. I was, yes.

9    Q. Okay.  Was Mr. Richards the new car manager?

10   A. At that point, yes.

11   Q. Okay.  Was Glenn Richards the finance manager?

12   A. Yes, he was.

13   Q. Was Lucinda Baell the office manager?

14   A. Yes.

15   Q. Was Clayton Doherty the service manager, or excuse me, the

16   parts manager?

17   A. I'm not for sure, sir.

18   Q. What about Mr. Almodovar (phonetic), first name is Ivan,

19   he was the service manager?

20   A. I don't remember an Ivan.

21   Q. All except for Ivan were white, weren't they?

22   A. Oh, of course.

23   Q. Okay.  Ivan was Hispanic, wasn't he?

24   A. I believe he was.

25   Q. It's your testimony that Mr. Baig came into your office

1    with Mr. Maddox and Mr. Richards and you were separated from

2    employment, right?

3    A. Told me I was, yes.

4    Q. Okay.  April 30th, 2004, correct?

5    A. It was, yes, a Saturday.

6    Q. Okay.  And after that conversation, you never made any

7    complaints to Lucinda Baell, the office manager, or anybody

8    else about a concern about discrimination, did you?

9    A. No.

10   Q. Okay.  The first time you made a claim of discrimination

11   associated with that separation that occurred, according to

12   you on April 30th, 2004, was not in May, not in June, not in

13   July, not in August, September, October, November, December,

14   January of 2005, until February of 2005 when you made an

15   application with a public body, correct?

16   A. Correct.

17   Q. So you leave Fort Wayne Toyota and I understand it you

18   start as a used car manager for Mr. Kruse June 1, 2004 on the

19   budget lot, right?

20   A. I thought it was July 1st.  I may be wrong.  I believe it

21   was July 1st.

22   Q. On the tape you -- yesterday, you indicated -- I've been

23   down there since June the 1st, what does it take to get a

24   sign, right?

25   A. Then I rephrased it July 1st I thought.

1    Q. On the audio tape that was played yesterday in the

2    courtroom?

3    A. Yeah.

4    Q. You said --

5    A. I know I -- yes.

6    Q. -- did you not -- please let me finish.

7        On the audio tape played in this courtroom yesterday, you

8    said, "I've been down there since June the 1st, why can't I

9    have a sign," right?

10   A. Exactly, I was promised it.

11   Q. Okay.  And so June the 1st of 2004, you start at Toyota on

12   the budget lot and you're complaining to Mr. Kruse in March of

13   2005 associated with the sign, right?

14   A. Been (Unintelligible), yes.

15   Q. So you're 30 days off between April 30th and June 1,

16   right?

17   A. Yes.

18   Q. Correct?

19   A. Yes.

20   Q. During June, July, August, September, October, November,

21   December, January of 2000 -- '04 to January of 2005, did you

22   ever make any complaints on a discrimination basis to Mr.

23   Kruse about your separation at Fort Wayne Acura?

24   A. No.

25   Q. And as I understand it, your application with the public

1    body was February the 10th, 2005, correct?

2     A. It was in the legal parameters, I believe so, yes.

3     Q. You got a reason to dispute that date?

4     A. No.

5     Q. Okay.  And then I think you testified that Mr. Rohrman

6    came into the dealership on February 26th, 2005, right?

7     A. Not my dealership where I worked.

8     Q. To the Toyota dealership?

9     A. And Acura.

10     Q. So it your position, Mr. Rohrman visited Fort Wayne Acura

11    on February 26 and also Fort Wayne Toyota on February 26th?

12     A. To me, yes.

13     Q. That was a Saturday, correct?

14     A. Correct.

15     Q. Okay.  So on Saturday the 26th, he comes to visit two

16    dealerships in Fort Wayne, you didn't see him?

17     A. No.

18     Q. You understand that he was there?

19     A. Yes, everybody said yes, he was here.

20     Q. Okay.  Now, it's your testimony, as I understand it, that

21    Mr. Kruse was very upset when you met with him on the morning

22    of Monday, February 28th?

23     A. Yeah, he was.

24     Q. He had tension in his voice?

25     A. Yeah.

1    Q. You said he was shaking his finger?

2    A. That's correct.

3    Q. Right?

4    A. That's correct.

5    Q. Color in his face was flushed?

6    A. Yeah, a little bit.

7    Q. Okay.  Clear he was upset is what you're telling me,

8    right?

9    A. Yes, he was.

10   Q. Okay.  And that meeting lasted, what, a minute, minute and

11   a half?

12   A. Roughly.

13   Q. After that meeting you go down to Fort Wayne Metro?

14   A. With the tape?

15   Q. Did you go down to Fort Wayne Metro after the meeting with

16   Mr. Kruse on February 28th, 2005?

17   A. Yes.

18   Q. Okay.  So the same day you talked to Mr. Kruse, you went

19   down to Fort Wayne Metro?

20   A. That's correct.

21   Q. Then after that day, you received telephone calls and

22   messages from different people at the dealership from Toyota,

23   correct?

24   A. No.

25   Q. Okay.  So it's your testimony that you never received any

1    calls from Luke Luther or Kurt -- or Larry Kruse or anybody

2    else from the dealership after the 28th of February 2005?

3    A. Letters, no.

4    Q. You only got letters?

5    A. Mmm-mm.

6    Q. No telephone calls is your testimony, right?

7    A. Not that I recall.

8    Q. Okay.  So you got a letter, then, informing you to come

9    down and see Larry to get your check?

10   A. No.

11   Q. Okay.  Well, how did you get that information?

12   A. I called.

13   Q. Okay.

14   A. I called.

15   Q. Okay.  You called them is your testimony?

16   A. And speak to Luke Luther.

17   Q. And it's your testimony he had never left any messages to

18   you before you called and nobody else from Fort Wayne Toyota

19   had attempted to contact you before you called them?

20   A. I didn't say that.  He said he tried to attempt to call

21   me.

22   Q. Okay.  So you speak to Mr. Luther and he says, "You got to

23   come down.  We want to talk to you," right?

24   A. Yeah, "I'm not mailing your check.  You have to come down

25   and talk to me."

1    Q. So you go down on March the 4th, right?

2    A. Correct.

3    Q. Okay.  That's three days after the time frame that you had

4    been there on the 28th, right?

5    A. Correct.

6    Q. So that's the Friday, right?

7    A. That's correct.

8    Q. As I understood your testimony yesterday, you're paid one

9    time at the end of the month and that's why it is you needed

10   to get your check, true?

11   A. You're paid your commission the following month in the

12   first week.  You get a draw check throughout the middle of the

13   month.

14   Q. So it's not like there's no payments then for a month;

15   that testimony --

16   A. Correct.

17   Q. If that was the impression left, that wasn't what you

18   meant apparently?

19   A. Exactly.

20   Q. To be fair.

21   A. To be fair.

22   Q. Okay.  I want to be fair.  So you're coming in, then, to

23   get commission check, as I understand it?

24   A. Yeah, that's correct.

25   Q. And so you have a meeting with Mr. Householder, correct?

1   A. He was there.

2   Q. Mr. Luther?

3   A. He was there.

4   Q. And Mr. Kruse?

5   A. He was there as well.

6   Q. And you told me that his demeanor on the 4th was different

7   than on the 28th, right?

8   A. Correct.

9   Q. And he wasn't -- didn't have a flush of a face, did he?

10  A. No.

11  Q. Wasn't shaking his finger, according to your testimony?

12  A. No.

13  Q. Right?  Correct?

14  A. Correct.

15  Q. Didn't have tension in his voice what you're telling me?

16  A. Right.

17  Q. So his demeanor was different when you met with him on the

18  4th than on the 28th, right?

19  A. Correct.

20  Q. At that time, he indicated to you that you had a position

21  at Fort Wayne Toyota, didn't he?

22  A. Yes, he did.

23  Q. He told you repeatedly that you had a job position

24  available for you to pursue and to work in at Fort Wayne

25  Toyota, correct?

1    A. That's correct.

2    Q. And you indicated to him that you would be calling him

3    back associated with working, didn't you?

4    A. I'd call him.

5    Q. And you indicated to him that you had not been able at

6    that point to speak to anybody at the EEOC, or local agency,

7    right?

8    A. Right.

9    Q. But in fact you had?

10   A. That's correct.

11   Q. Now, Mr. Kruse indicated to you on at least four occasions

12   on March the 4th that you had a position ready and waiting for

13   you, didn't he?

14   A. Yes.

15   Q. And he indicated to you things that needed to be done

16   associated with increasing production down at the budget lot,

17   didn't he?

18   A. Yes.

19   Q. And you said that you needed to complete a painting

20   project and that's why you couldn't come back to work within a

21   day or two, correct?

22   A. Correct.

23   Q. And you indicated that there would be communication

24   associated when you would be coming back to work, right?

25   A. Yes, I told him I would call him.

1    Q. But you never did, did you?

2    A. No.

3    Q. You were sent two letters we talked about yesterday from

4    Mr. Kruse, correct?

5    A. Yes, I believe there was one.

6         **MR. JAMES BUCHHOLZ:**  May I have a brief side bar with

7    Your Honor?

8         (Whereupon, the following bench conference was held

9    outside the hearing of the jury:)

10        **MR. JAMES BUCHHOLZ:**  Yesterday, there was tendered,

11   and I objected based upon failure to have redaction of the

12   March 18th, based upon the motion in limine, I have created

13   the redaction, would offer it at that this point to Mr.

14   Chapin.

15        **THE COURT:**  Let me see it.  Is it marked as the same

16   exhibit?

17        **MR. JAMES BUCHHOLZ:**  No, it's not.  I'll be happy to

18   clarify for the record what it is.

19        **THE COURT:**  Do you remember the prior marked --

20        **MR. JAMES BUCHHOLZ:**  It was 8.

21        **THE COURT:**  Okay.

22        **MR. ROBERT VEGELER:**  No, 7, Your Honor because 8 is

23   the list.  It's 5, 6, 7.

24        **THE COURT:**  Okay.  Now, looking at the redactions,

25   will you have any objections to it?

1          **MR. JAMES BUCHHOLZ:**  That's right, it is 7.

2          **MR. ROBERT VEGELER:**  I've seen this before, Your

3    Honor.  I've seen it before, and I'm not going to have any

4    objection.

5          **THE COURT:**  Okay.  No objections as this is redacted?

6    It's now Defendant's Exhibit C, previously identified

7    pre-redaction as Plaintiff's Exhibit 7, is that correct?

8          **MR. JAMES BUCHHOLZ:**  Correct, it's Defendant's (sic)

9    Exhibit 7.

10          **THE COURT:**  It's marked as Defendant's --

11          **MR. JAMES BUCHHOLZ:**  I know he tendered it as

12    Plaintiff's --

13          **MR. ROBERT VEGELER:**  Plaintiff's 7.

14          **THE COURT:**  No objection.

15          **MR. JAMES BUCHHOLZ:**  Yeah that's -- that's fine.

16       (Whereupon, the bench conference was concluded;

17    thereafter,the following proceedings were held in open

18    court:)

19    BY MR. JAMES BUCHHOLZ:

20     Q. Going to hand you what has been marked as Defendant's

21    Exhibit C, previously Plaintiff's 7, and ask if you recognize

22    that document, sir?  You recognize that document?

23     A. Oh, yes.

24     Q. You received that letter, did you not?

25     A. Oh, yes.

1        **MR. JAMES BUCHHOLZ:**  Judge, I would move to publish

2   it to the jury.

3        **THE COURT:**  There being no objection to it,

4   Defendant's Exhibit C is admitted.  You can now publish it to

5   the jury.  What's the date on that letter again?

6        **THE WITNESS:**  18th of March.  What's the blank?  Why

7   is this --

8        **THE COURT:**  That was something done with the Court's

9   permission.

10       **THE WITNESS:**  Oh.

11  BY MR. JAMES BUCHHOLZ:

12   Q. Okay.  Mr. Chapin, this letter was sent to you by Mr.

13  Luther?

14   A. Yes.

15   Q. He's the human resource person for Fort Wayne Toyota?

16   A. Correct.

17   Q. Okay.  It indicates within this correspondence that you

18  had not been communicating with them, last line, "we have been

19  attempting to communicate to you with no response"?

20   A. That's what it says.

21   Q. And you agree with that, don't you?

22   A. No, I don't.

23   Q. So after March the 4th, 2005, you told me you never

24  contacted him again.  What communication did you give to them

25  after March the 4th of 2005?

1    A. I never called him.

2    Q. Okay.  You never communicated to them in any form after

3    March the 4th, 2005, correct?

4    A. Yes.

5    Q. Okay.  The last line says, "We've been attempting to

6    communicate with you with no response," right?

7    A. That's what it says.

8    Q. Okay.

9    A. Doesn't mean they did it.

10   Q. Now, that was the third letter that had been sent to you,

11   correct?

12   A. I'm not for sure the chronological order, but I assume it

13   would be or close to.

14   Q. Okay.  Well, let's go through it then, because I want to

15   make sure I'm not being unfair to you.

16       You were sent -- Plaintiff's Exhibit 5 was sent to you

17   March the 8th, correct?

18   A. Okay.  I don't have it, so I don't know.

19       **THE COURT:**  It's on the Elmo.  You'll see it on the

20   screen.  Just a moment.

21       **THE WITNESS:**  Okay.

22   BY MR. JAMES BUCHHOLZ:

23   Q. Okay.  So March the 8th, 2005, you were sent this letter

24   and that's four days after your meeting.  So Tuesday of the

25   week after your meeting with Mr. Kruse, Mr. Householder, Mr.

1  Luther where you were told that you still had a position,

2  correct?

3   A. Yes.

4   Q. Okay.  And it says within that letter, does it not, that

5  there had been messages left with individuals at your

6  residence for you to call?

7   A. That's what it says.

8   Q. Okay.  Do you have any reason to dispute that occurred?

9   A. Of course I do.

10   Q. Okay.  So you don't believe that there was any telephone

11  message taken by anybody at your residence associated with

12  this correspondence?

13   A. I guess yes.  Yes, nobody at my residence.

14   Q. Okay.  Then you were also sent a correspondence on March

15  14th, right?

16   A. Yes, that's correct.

17   Q. So Defendant's Exhibit D is, in fact, the third letter you

18  received from --

19   A. That's correct.

20   Q. -- Fort Wayne Toyota, right?

21   A. That's correct.

22   Q. So you have the communications from Mr. Kruse, Mr.

23  Householder, Mr. Luther in person about you having the job,

24  right, on March the 4th?

25   A. Right.

1    Q. You've got three correspondence indicating that you have a

2    job, right?

3    A. Correct.

4    Q. It's your position you didn't have one, isn't it?

5    A. I didn't have one.

6    Q. It's your position that all those assertions about you

7    having a job were not accurate, right?

8    A. Yeah, that's correct.

9    Q. It's your position by all that communication Fort Wayne

10   Toyota did not want you as an employee, right?

11   A. He told me so in the tape.

12   Q. Okay.  And you're referring to the February 28th tape --

13   A. That's correct.

14   Q. Excuse me, let me finish.

15       You're referring to the February 28th tape, which was

16   Exhibit Number 1, correct, that was played yesterday?

17   A. That's correct.

18   Q. Okay.  And because of that communication, that

19   communication overrides all the other discussions that

20   occurred from the dealership, is that what you're telling me?

21   A. I didn't want to be retaliated against again, that's

22   correct.

23   Q. So, as I understand it, the discussion on February 28th in

24   your mind trumps all the other communication, right, is that

25   your testimony?

 1    A. And Metro as well, yes.

 2        **MR. JAMES BUCHHOLZ:**  Judge --

 3        **THE COURT:**  That last comment by the witness is

 4    stricken from the record.  You're to disregard it.

 5    BY MR. JAMES BUCHHOLZ:

 6     Q. As far as you were concerned, February 28th rang supreme

 7    no matter what was said after that, correct?

 8     A. That's correct.

 9     Q. Now, and so you didn't work, then, at Fort Wayne Toyota or

10    the budget lot at any other time after February 28th, 2005,

11    correct?

12     A. Correct.

13     Q. All right.  You didn't begin looking for another job until

14    6 to 8 weeks later, correct?

15     A. No, I don't believe it was that far out.

16     Q. Page 144, line 15, "QUESTION:  When did you begin looking

17    for another job" -- well strike that.  For context I'll read a

18    little earlier, if that's all right with Your Honor.

19        **THE COURT:**  Go ahead.

20    BY MR. JAMES BUCHHOLZ:

21     Q. Line ten:  "What violence did you believe you would be

22    subjected to by returning to the used car manager position at

23    5500 Illinois Road?"

24        "I wasn't taking the chance to come back, was I?"

25        5500 Illinois Road was the budget lot, wasn't it?

1    A. That's correct.

2    Q. "When did you begin looking for another job?"

3       "ANSWER:  6 to 8 weeks later probably."

4       "So it would have been sometime in June of 2005?"

5       "ANSWER:  Probably."

6       Did I ask you those questions; did you give those answers?

7    A. Yes, that's what I said probably.

8    Q. All right.  So 6 to 8 weeks after you had your meeting

9    with Mr. Kruse is the first time you began looking for another

10   job, right?

11   A. That's correct.

12   Q. Okay.  And as I understand it, the first job you got was

13   Raisor Ford?

14   A. Correct.

15   Q. You were at Fort Wayne Acura when you had your meeting

16   with Mr. Baig in the office; you said Tim Maddox was there

17   correct?

18   A. Tim Maddox and Glenn Richards.

19   Q. Okay.  And that meeting lasted maybe 15 minutes, right?

20   A. Probably less than that.

21   Q. Glenn Richards said nothing in that meeting, correct?

22   A. No, he did not.

23   Q. He didn't say anything, am I right?

24   A. That's correct.

25   Q. Did Maddox say anything?

1    A. No.

2    Q. Did you ever have any discussions with Mr. Maddox about

3    the tapes?

4    A. I don't believe so.  I don't recall.

5    Q. Did you ever have any discussions with Mr. Maddox about

6    these litigations?

7    A. I believe I did at one point.

8    Q. Page 91, line 19, did I ask this question, did you give

9    this answer:  "Have you ever had a conversation with Mr.

10   Maddox about these litigations?"

11       "ANSWER:  No."

12       Did I ask that question, did you give that answer?

13   A. I believe I did, yes, sir.

14   Q. He's never said anything to you about these litigations,

15   right?

16   A. Not that I'm aware.  I haven't spoke to him in a long

17   time.

18   Q. So as far as you know, he knows nothing about them, is

19   that right?

20   A. No, I believe he knows something about them.

21   Q. Page 92, line 1:  "So as far as you know, he knows nothing

22   about them, correct?"

23       "ANSWER:  I suppose, yes."

24       Did I ask that question, did you give that answer, sir?

25   A. Yes, but he just got subpoenaed, too.

1          **MR. JAMES BUCHHOLZ:**  Judge, I ask to strike

2     non-responsive portion.

3          **THE COURT:**  That's stricken.  The jury is to

4     disregard the last comment.

5     BY MR. JAMES BUCHHOLZ:

6      Q. As far as you know, he knows nothing about these

7     litigations, correct?

8      A. That's correct.

9      Q. And on the audio tape, from March the 4th, 2005, you

10    indicated to Mr. Kruse that you wanted to work at Fort Wayne

11    Toyota, didn't you?

12     A. I'd say anything to get out of there.

13     Q. So anything that was appropriate --

14     A. To get my check.

15     Q. Anything to get you out, you were going to say, right?

16     A. I wanted out of that office.

17     Q. Okay.

18     A. Didn't say I would return.

19     Q. Even though --

20         **MR. JAMES BUCHHOLZ:**  Judge, I don't think there was a

21    question pending.

22         **THE COURT:**  What came out is "I didn't say I would

23    return."

24    BY MR. JAMES BUCHHOLZ:

25     Q. You said, "I want to work here" on the tape, did you not,

1    Mr. Chapin; that's your voice that says that, right?

2    A. Yeah, that's my voice.

3    Q. Now, and you've been in the car business a long time,

4    right, true?

5    A. Yeah.

6    Q. When a general manager comes in, he wants to have people

7    loyal to him that implement his directives to change the focus

8    of the dealership, correct?

9    A. No.

10   Q. You don't understand that is what you're telling me?

11   A. No, I don't understand that.

12   Q. Okay.  So when you said to Mr. Kruse on the March 4th

13   tape, "I understand he needs to bring his own people in," you

14   didn't believe that then either is what you're telling me?

15   A. Qualified, but not by race or Muslim belief, yes.

16   Q. But you didn't know what qualifications those individuals

17   have, do you?

18   A. A little bit.

19   Q. You have no personal knowledge of the qualifications of

20   Irfan Hussein, do you?

21   A. No.

22   Q. You have no --

23          **THE COURT:**  Is there an objection, Mr. Vegeler?

24          **MR. ROBERT VEGELER:**  No, but I'm standing up because

25   I think we better approach.

1        **THE COURT:**  All right.

2        (Whereupon, the following bench conference was held

3    outside the hearing of the jury:)

4        **MR. ROBERT VEGELER:**  I'm anticipating a litany of

5    questions, and perhaps I spoke too soon when he started with

6    Irfan.  He said he was going to start with Mr. Baig.  Mr.

7    Chapin has told me he has knowledge that the reason that Mr.

8    Baig was hired as the general manager of Acura Subaru on April

9    4 is because he settled a discrimination suit for national

10   origin and religion against Rohrman and that was part of the

11   settlement package.  Now if he wants to open that up as to why

12   Baig has a job, I'll let him.

13       **THE COURT:**  Is that a public record?  Is there a

14   public record with regard to the terms of the settlement.

15       **MR. ROBERT VEGELER:**  I don't care if Baig gets on the

16   stand as my witness, which I subpoenaed him.  I won't ask him,

17   but he's opened the door now and if he has knowledge of it --

18       **THE COURT:**  Has to be personal knowledge.

19       **MR. ROBERT VEGELER:**  Well, he may.  He may very well

20   talk to Baig about it.

21       **THE COURT:**  Wait, wait, wait, you mean your man had

22   talked to Baig and Baig told him that?

23       **MR. ROBERT VEGELER:**  Yeah.

24       **THE COURT:**  At the time or subsequent to?

25       **MR. ROBERT VEGELER:**  Well, I would have to develop

1    that on voir dire.  I don't know.

2           **THE COURT:**  You don't know.

3           **MR. ROBERT VEGELER:**  He told me he knows Baig got his

4    job because he settled his discrimination suit with Rohrman

5    for national origin.

6           **MR. JAMES BUCHHOLZ:**  My next question was going to

7    be -- I'm sorry.  My next question was going to be his

8    personal knowledge associated with the background of the other

9    fella, Anwar Al-haq.  I was not going to talk or discuss in

10   any fashion Mr. Baig.

11          **MR. ROBERT VEGELER:**  No, no, that was premature.

12          **THE COURT:**  That's all right.  Let's go back to it.

13      (Whereupon, the bench conference was concluded;

14   thereafter, the following proceedings were held:)

15   BY MR. JAMES BUCHHOLZ:

16    Q. You have no personal knowledge of the qualification or

17   background of Anwar Al-haq, do you?

18    A. No.

19          **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

20          **THE COURT:**  Redirect.

21          **MR. JAMES BUCHHOLZ:**  Thank you, Mr. Chapin.

22                      <u>**REDIRECT EXAMINATION**</u>

23   BY MR. ROBERT VEGELER:

24    Q. Mr. Chapin, Mr. Buchholz read to you various questions and

25   answers in your deposition.  You recall those throughout his

1   cross examination?

2    A. Correct.  Correct.

3    Q. With respect to the question involving page 174, line 3,

4   and the creation which is now Exhibit 8, admitted into

5   evidence, that summary of the house and the cars and so forth,

6   and the losses?

7    A. Correct.

8    Q. He asked you, I believe you testified that you had created

9   it in November of 2005 and he asked you with regard to the

10  question, "Well, who created this exhibit?"  And your answer

11  was I -- at line 5, "I created it and I faxed it to him when I

12  was in Missouri."

13       "When did you create that?"

14       "ANSWER:  A week ago maybe."

15       Could you explain the apparent discrepancy?

16   A. Yes, I took -- I have a been doing it for quite a while

17  and I just put it on typing paper and I faxed it to my

18  attorney in November.  It was done prior to that, but that's

19  when they actually received it.

20   Q. Had you done a handwritten summary before?

21   A. Yes.  Yes.

22   Q. Now, with respect to questioning of Mr. Buchholz at page

23  179 of your deposition, (Indicating) some issue as to apparent

24  importance as to who you have sold this bedroom suite to, at

25  page 179, he asked you:  "Who did you sell the bedroom suite

1    to?"  This is page -- line 21.

2        Answer from you: "I believe I sold the bedroom suite to

3    Dan Twomey and his family."

4        You indicated you had an explanation for that.  Is there

5    some inaccuracy here?

6     A. Yes, I was just tired.  I had left Missouri, woke up at

7    4:00 in the morning.  On Monday I worked all day.  I got off

8    work at 5:00, went home, took a shower.  At 7:00 o'clock I

9    left Missouri.  I drove twelve hours, got here at 6:00 in the

10   morning.  I spent 7:30 in the morning until 11:00 with my

11   attorney, and at 1:00 o'clock I started this deposition and

12   didn't end until almost 7:00 o'clock at night.  And I had no

13   sleep.  So yes, I was a little frustrated and a little tired,

14   little weary, but that's what I did.

15    Q. Did you intend to mislead Mr. Buchholz or the jury as to

16   the importance of who actually bought that bedroom suite?

17    A. No, I did not.

18    Q. Now, Mr. Buchholz asked you as to page 94 of the

19   deposition, starting at line 17, the question was:  "What

20   would you say your income was for that," referring to horses.

21        "ANSWER:  35,000 maybe."

22        "QUESTION:  35,000?

23        Line 21, "ANSWER:  Maybe."

24        At the time your deposition was taken, what were you

25   referring to as income for a horse/llama operation; was that

1   gross revenue or profit?

2    A. That was gross revenue.

3    Q. So you had expenses to take out of that?

4    A. Of course.

5            **MR. ROBERT VEGELER:**  This is Exhibit H, Your Honor.

6            **THE COURT:**  Go ahead.

7            **MR. ROBERT VEGELER:**  Admitted into evidence.

8            **THE COURT:**  Go ahead.

9   BY MR. ROBERT VEGELER:

10   Q. I'll show, this is Exhibit H here now, Mr. Chapin, the top

11   of this it states "termination report", does it not?

12   A. Correct.

13   Q. Okay.  And there's an explanation of reason right here at

14   this line (Indicating).

15       Whose handwriting is that, that your handwriting for the

16   explanation of reason?

17   A. No.

18   Q. And it says took -- what's that say?

19   A. Uh, I took a salesperson home and failed to return to

20   work.

21   Q. Okay.  So it says "took EMP", paren, took employee?

22   A. Employee home that's what it was.

23   Q. Failed to return on 4-1-04?

24   A. Right.

25   Q. Now, in trying to explain that to opposing counsel, what

1    happened?

2     A. Well, the salesman told me his wife had the vehicle and

3    this is around 8:00, 8:15, 8:30 at the latest.

4     Q. At what, morning or night?

5     A. At night.

6     Q. Okay.

7     A. We were open until 9:00 o'clock.  Well, he got permission

8    from -- our manager at the time was William Hollowick

9    (phonetic), me and Bill had had conflicts before.  And he told

10   me, "Yeah, just go ahead and take him home."  Well, I took him

11   home and it was like ten more minutes before we closed, so

12   there was no point for me to go back.  Well, when I got back

13   the next day, which was on the second, okay, this was when

14   this happened, and that's when I called Mr. Kruse in Hawaii,

15   Luther and I, and he sent me down to the Acura store.

16    Q. So --

17    A. As a manager.

18    Q. Okay.

19    A. He demoted me.

20    Q. You took an employee home --

21    A. Yes.

22    Q. -- half an hour before closing hours, which you perceived

23   to be with permission of the general manager --

24    A. Used car manager.

25    Q. -- used car manager at the Toyota Lexus?

1    A. That's correct.

2    Q. You don't show back up the last ten minutes until they

3    turn off the lights, whatever, of the dealership?

4    A. That's correct.

5    Q. And you get a termination report?

6    A. The next day.

7    Q. The next day?

8    A. Exactly.

9    Q. And what did you do after that?

10   A. Went straight down to the Acura store and -- or actually

11   Larry Kruse after that, Luther called Larry Kruse, he was in

12   Hawaii, spoke to him and he said he had spoke to Kurt Richards

13   and I need to go speak to him and he was going to put me as

14   used car manager.

15   Q. And that's what you did the next day?

16   A. Yeah, started working at the Acura store.

17   Q. Now, Mr. Buchholz was extensive in questioning you about

18   being terminated on April 3rd, 2004 by Mr. Baig from the Acura

19   Subaru store, correct?

20        **MR. JAMES BUCHHOLZ:**  Judge, I object.  That is not

21   the time frame that I talked about.  I've never indicated any

22   date other than April 30th, which is what the reports have

23   indicated, and the prior testimony from this witness was.

24        **MR. ROBERT VEGELER:**  Well, maybe my question is

25   unclear.

1          **THE COURT:**  All right.  Go ahead and rephrase it.

2          **MR. ROBERT VEGELER:**  Okay.

3    BY MR. ROBERT VEGELER:

4     Q. Mr. Buchholz asked you if you made any claims to anybody

5    at Acura Subaru or Mr. Kruse about discrimination because of

6    national origin, religion, race at any time from April 30th

7    until February 10th, 2005 when you filed your charge of

8    discrimination, and your answer was --

9     A. No.

10    Q. And why not?

11    A. Afraid of retaliation.

12    Q. By that time, you had started with the Toyota Lexus with

13   Mr. Kruse, right?

14    A. That's correct.

15    Q. And you started either in June 1st of '04 or July 1st of

16   '04, correct?

17    A. That's correct.

18    Q. Did you run right down on May 1st, 2004 to the

19   anti-discrimination public office and file a charge of

20   discrimination the day after you were fired by Mr. Baig?

21    A. No, I thought about it.

22    Q. Okay.  Did you go April 3rd?

23    A. No.

24    Q. In fact --

25          **MR. JAMES BUCHHOLZ:**  Judge, again, I object.  April

1    3rd he was still an employee.

2         **MR. ROBERT VEGELER:**  I mean -- I don't know what the

3    objection is.

4         **THE COURT:**  Wrong date.

5         **MR. JAMES BUCHHOLZ:**  I'll withdraw it.

6         **THE COURT:**  Withdrawn.  Go ahead.  Did you complain

7    on April 3rd is the question.

8         **THE WITNESS:**  No.

9    BY MR. ROBERT VEGELER:

10   Q. Yeah, did you go down on May 3rd, May 15th?

11   A. No.

12   Q. Okay.  Did you need that job that Larry Kruse had given

13   you as used car manager at Toyota Lexus?

14   A. Yes, I did.  Yes, I did.

15   Q. After being at Toyota Lexus, June or July, August,

16   September, October, November, December, had Mr. Kruse ever

17   authorized a sign for your lot?

18        **MR. JAMES BUCHHOLZ:**  Judge, I'm going to object to

19   the form of the question.  It's leading.

20        **THE COURT:**  Overruled.

21        **THE WITNESS:**  He told me that when I first started

22   there, that we were going to get a sign up, have big signage,

23   because at the time we just had a building with cars around

24   and no sign.  We had a post.  And he was also going to do some

25   advertising, good advertising and help me with the salespeople

1    because everything come from his lot.  I mean, he would buy

2    the vehicles and he would ship them down to my lot.  His

3    salesmen could come down and sell from mine, my salesmen could

4    come down and sell from his.  That's the way it is with all

5    the Rohrman stores.  I had no help.

6    BY MR. ROBERT VEGELER:

7     Q. Okay.  So did the situation get worse and worse, in other

8    words, as far as your opportunity to make money for Toyota

9    Lexus in the rest of '04 and early '05?

10    A. Correct.

11    Q. And was that or was that not a factor you decided you had

12   had enough and filed the charge of discrimination?

13           **MR. JAMES BUCHHOLZ:**  Objection.

14           **THE COURT:**  Sustained.  That is leading.

15   BY MR. ROBERT VEGELER:

16    Q. Okay.  In your mind, what finally caused you to file the

17   first charge of discrimination in February -- on February 10th

18   of '05?

19    A. Well, I -- I thought about it, and I kept thinking about

20   what he did to myself, Glenn, uh, I seen what he did to Glenn

21   Richards and that was it.  I was done.  Someone had to stay --

22           **MR. JAMES BUCHHOLZ:**  Judge, show my continuing

23   objection to this line based on our previous discussions.

24           **THE COURT:**  It's shown as a continuing objection.

25           **THE WITNESS:**  You know, enough is enough.  You know,

1    people have to stand up for their rights, you know, and they

2    can't be bullied around.  And that's what I did.  I stood up

3    for my rights.  I filed.

4         **MR. JAMES BUCHHOLZ:**  Judge, move to strike the

5    non-responsive portion of this narrative.

6         **THE COURT:**  Overruled.  The response is what caused

7    you to file.  He's explaining what caused him to file.

8       Are you finished with your answer?

9         **THE WITNESS:**  Yes.

10         **THE COURT:**  Next question.

11         **MR. ROBERT VEGELER:**  Yeah.  Thank you, Your Honor.

12    No further questions, Your Honor.

13         **THE COURT:**  Any re-cross?

14         **MR. JAMES BUCHHOLZ:**  Yes, Judge.

15                    <u>**RECROSS EXAMINATION**</u>

16    BY MR. JAMES BUCHHOLZ:

17     Q. You had the opportunity to review your deposition before

18    it became final, didn't you?

19     A. Yes.

20     Q. Make any changes, make any clarifications of any type, if

21    there were any inaccuracies associated with that transcript

22    couldn't you?

23     A. I didn't realize that, but I guess I could have.

24     Q. Right.  And you didn't, did you?

25     A. No.

1    Q. So even though you knew the deposition had been set for a

2    period of time, you're the one that made the decision about

3    what time frame you would have, how you would prepare, how you

4    would be rested as it relates to that exercise, right?

5    A. I didn't read the whole thing, re-read it.

6    Q. But you knew well in advance of November 27th when we got

7    together for the deposition that that was the day we were

8    going to be talking about this case, right?

9    A. That's correct.

10   Q. It was your decision about what time frame to get in town,

11   what to do to prepare, how you would be rested, how you would

12   not be rested or any other fashion of measures by which you

13   would be seated across the table from me to answer questions

14   about your claims about my clients, right?

15   A. That's not correct.  It wasn't my decision.

16   Q. Did the court tell you the time frames that you had to be

17   in town associated with preparing for the deposition?

18   A. It was my financial situation.

19       **MR. JAMES BUCHHOLZ:**  Judge, I'd ask him to respond to

20   my question.

21       **THE COURT:**  If you can answer the question, did the

22   Court tell you what time to show up for the deposition?

23       **THE WITNESS:**  No.

24   BY MR. JAMES BUCHHOLZ:

25   Q. You had documents and things that you could review during

1   the times you were off of work in Missouri, correct?

2    A. Yes.

3    Q. Nothing prevented you from contacting Mr. Vegeler by

4   telephone from Missouri when you're not working, is there?

5    A. No.

6    Q. Okay.  So you had control about the preparation time that

7   you utilized associated in preparing to talk about this case

8   with me in November, right?

9    A. Yes.

10   Q. Okay.  But you chose to prepare for it the day of and to

11  drive all night to get here, right?

12   A. No.

13   Q. That's what you did, isn't it?

14   A. That's what I did, but it wasn't my choice.

15   Q. You were ordered in some fashion to act in the fashion you

16  did is that what you're telling me?

17   A. I think I answered that question.

18          **MR. JAMES BUCHHOLZ:**  Judge.

19          **THE COURT:**  Overruled.

20  BY MR. JAMES BUCHHOLZ:

21   Q. Mr. Vegeler tell you that's the way you ought to do it?

22   A. No.

23          **MR. JAMES BUCHHOLZ:**  Thank you, Judge.

24          **THE COURT:**  Mr. Vegeler, anything else?

25

1              **FURTHER REDIRECT EXAMINATION**

2    BY MR. ROBERT VEGELER:

3    Q. In fact, Mr. Chapin, this deposition was noticed by Mr.

4    Buchholz at his request, right?

5    A. That's correct.

6    Q. Was it not true that two times prior to this they had

7    scheduled a deposition, we agreed to be there, and they

8    canceled it?

9    A. That's correct.

10   Q. So you made arrangements twice before to leave work,

11   travel all the way, and it was canceled at their request?

12   A. That's correct.

13   Q. And so the third time you finally drove all night and met

14   his request?

15   A. That's correct.

16          **MR. ROBERT VEGELER:**  No further questions.

17          **THE COURT:**  Anything else?

18          **MR. JAMES BUCHHOLZ:**  Oh, yeah.

19             **FURTHER RECROSS EXAMINATION**

20   BY MR. JAMES BUCHHOLZ:

21   Q. The reason we canceled is because you didn't respond to

22   the discovery, isn't it, sir?

23          **MR. ROBERT VEGELER:**  Your Honor, he's saying -- if he

24   wants to testify, fine as to the reason.

25          **THE COURT:**  What's your question?  Let's go back to

1    it.  The question was:  The reason we canceled is because you

2    didn't respond to the discovery, isn't that, it, sir?  Can you

3    answer that question.

4         **THE WITNESS:**  I'm sorry, ma'am, I didn't --

5         **THE COURT:**  The question is -- the objection is

6    overruled.  The reason we canceled is because you didn't

7    respond to the discovery, isn't it, sir?  Can you answer that

8    question?

9         **THE WITNESS:**  Not that I'm aware of.

10   BY MR. JAMES BUCHHOLZ:

11    Q. Okay.  So it's your testimony that the discovery was

12   provided long in advance of the previously scheduled

13   depositions, is that your testimony, sir?

14    A. I said not that I'm aware.  I'm not for sure how that

15   worked out.

16    Q. So you concede that the reason the depositions were moved

17   could be because you didn't provide information as -- under

18   the court rules; you concede that's a possibility, right?

19    A. I don't believe it was twice, though, sir.

20    Q. You concede that's a possibility, don't you, sir?

21    A. Anything is a possibility.

22         **MR. JAMES BUCHHOLZ:**  Nothing further, Judge.

23                    **FURTHER REDIRECT EXAMINATION**

24   BY MR. ROBERT VEGELER:

25    Q. Mr. Chapin, when was your deposition taken?

1    A. November.

2    Q. November 29, 2006?

3    A. Yes, sir.

4    Q. Do you recall seeing the discovery responses, both

5    interrogatories and request for productions from both Acura

6    Subaru and Toyota Lexus prior to your deposition being taken

7    by Mr. Buchholz?

8    A. Yes.

9    Q. You remember with a certificate of service of one-day

10   prior to your deposition of having received their discovery

11   responses?

12   A. Yeah.

13   Q. November 20th, 2006?

14   A. May I see that?  Oh, yes.  Yes, I remember that.

15   Q. So we had their discovery responses after months of

16   requesting one day before your deposition?

17   A. Yes.

18          **MR. JAMES BUCHHOLZ:**  Object to the form, Judge.

19          **THE COURT:**  Overruled.

20   BY MR. ROBERT VEGELER:

21   Q. That's why -- that's when we finally got their answers,

22   right?

23   A. That's correct.

24   Q. One day before your deposition?

25   A. That's correct.

```
 1            MR. ROBERT VEGELER:  No further questions.

 2            THE COURT:  Anything else?

 3                FURTHER RECROSS EXAMINATION

 4   BY MR. JAMES BUCHHOLZ:

 5    Q. You'd agree that information associated with your claims

 6   against my clients are something that you got personal

 7   knowledge of, right?

 8    A. Well, of course.

 9    Q. Okay.  And the damages that you're claiming in this case,

10   you're claiming to have personal knowledge of, right?

11    A. Of course.

12    Q. Nothing associated with employment documents are going to

13   change what it is you already know about the case, is it?

14    A. I'm not for sure what you're talking about, sir.

15    Q. You already have the information associated with what's

16   going on in the case, because you're the one making the

17   claims, aren't you?

18    A. Yes, I am.

19            MR. JAMES BUCHHOLZ:  Thank you.

20            MR. ROBERT VEGELER:  No further questions, Your

21   Honor.

22            THE COURT:  Well, the jurors have some.

23       Ladies and gentlemen of the jury, as the Court had

24   previously told you, you have an opportunity at this time if

25   you have any questions for this witness before he's excused
```

1  from the stand, you can write those questions down.  If you

2  have more than one question, you can number them.  Please do

3  not sign your name to the questions.  If you have any

4  questions, write them down at this time, and then my Deputy

5  will retrieve them and then I'll confer with counsel on

6  whether or not they can be presented to the witness.  You want

7  to take a moment, a minute or so and do that, I'll give you

8  the opportunity.  If at the end of that time, there's no

9  questions or no indications of question, then we'll go into

10  our recess.

11      (Whereupon, there was a pause in the proceedings while the

12  Jurors do as indicated.)

13          **THE COURT:**  Counsel, if you would please approach.

14      (Whereupon, the following bench conference was held

15  outside the hearing of the jury:)

16          **THE COURT:**  The questions, presented on one sheet.

17  The question, "What is an MPLS?"  And second question was --

18  it reads, "Why is it reasonable to expect a used car manager

19  to know what an MPLS is?"

20          **MR. JAMES BUCHHOLZ:**  MPLS is -- it's MSRP.

21          **MR. ROBERT VEGELER:**  MSRP.

22          **MR. JAMES BUCHHOLZ:**  I think that's what he's looking

23  for.

24          **THE COURT:**  It might put --

25          **COURT REPORTER:**  I can't hear you.

1      **MR. ROBERT VEGELER:**  It's a Manufacturer's Suggested

2  Retail Price, what you're selling cars on --

3      **THE COURT:**  Okay.

4      **MR. JAMES BUCHHOLZ:**  This question goes specifically

5  to the Glenn Richards issue, Judge.  I've got counsel here

6  with cases I understand.  I haven't had a chance to confer.

7  As you know, it seems to me the time to bring that question up

8  would be after you hear further argument relating to Mr.

9  Richards, because that's exactly what that goes to, because

10  the testimony --

11      **THE COURT:**  He wants to know what the abbreviation

12  is.

13      **MR. JAMES BUCHHOLZ:**  He also wants to know about this

14  used car manager thing because he believes Glenn Richards --

15      **THE COURT:**  Do you have any objection to the first

16  one?

17      **MR. JAMES BUCHHOLZ:**  MSRP, I have no objection to

18  that.

19      **MR. ROBERT VEGELER:**  I don't either, of course.

20  Glenn Richards --

21      **THE COURT:**  Go ahead.

22      **MR. ROBERT VEGELER:**  Nadim Baig could talk about

23  this.  Larry Kruse could talk about this.

24      **THE COURT:**  What's the proper abbreviation?

25      **MR. JAMES BUCHHOLZ:**  MSRP, Manufacturer's Suggested

1    Retail Price.

2            **THE COURT:**  All right.  You object to two?

3            **MR. JAMES BUCHHOLZ:**  I do until we hear what it is --

4    until we deal with that issue because what is -- what that

5    goes to is on the tape.  Mr. Chapin --

6            **THE COURT:**  I understand.

7            **MR. JAMES BUCHHOLZ:**  -- talks about it and I also

8    talked about it a little bit with Mr. Richards, which is where

9    that comes from.

10           **THE COURT:**  I can ask -- there's no objection to one.

11   I can ask that, we'll see where we develop the evidence,

12   whether or not -- well, I won't ask number two.  I'll hear

13   your arguments with regard to that as we get further into it.

14           **MR. JAMES BUCHHOLZ:**  If I might, Your Honor.  If

15   those are the only two questions they have, it might be better

16   if we just bring him back and ask those two questions after

17   the argument, one way or the other, because if -- it seems to

18   me, we're at a natural braking point right now anyway, at

19   noon, and you the ask one and you don't ask the other and you

20   come back afterwards, it might draw undue attention.  That's

21   my only point.

22           **THE COURT:**  I'm not sure I'm going to ask this

23   witness to answer the second question.  That's my point.

24           **MR. JAMES BUCHHOLZ:**  Okay.

25           **THE COURT:**  So I think it's reasonable to ask the

1    first one to be able to give clarification on the

2    abbreviation, and then we'll deal with the rest of it over the

3    hour and see if we come back to it or not with this witness,

4    or not.  But I doubt it's going to be answered by this

5    witness, unless you want to recall him at a later time.

6          (Whereupon, the bench conference was concluded;

7    thereafter, the following proceedings were held:)

8          **THE COURT:**  Let me ask the witness this question, I

9    think there's been a term that come up during your testimony

10   with reference to the initials MSRP.

11         **THE WITNESS:**  Oh.

12         **THE COURT:**  Could you please tell us what MSRP stands

13   for.

14         **THE WITNESS:**  Manufacturer's Suggested Retail Price.

15         **THE COURT:**  All right.  With that, then, ladies and

16   gentlemen, we are going to -- it's unanimous, we're going to

17   go into our noon recess.  We've made the same arrangements for

18   you as we did yesterday.  So if you want to take us up on that

19   lunch hour, again you're welcome to it.  If you want to lunch

20   on your own, you're welcome to do as well.  I think the hour

21   and a half worked out for timing.  Did that give you enough

22   time yesterday to drive over there, get back and settle in?

23       So let's stick to that.  If you could report back in at

24   1:30, we'll be back on the record at that time, and again,

25   we'll go until 5:00 o'clock or a natural breaking point in the

 1    evidence, and we'll take a short break sometime during the

 2    middle of the afternoon.

 3         I do need to remind you again of the Court's continuing

 4    admonition during this recess and all others, you cannot yet

 5    discuss this case amongst yourselves.  You must keep an open

 6    mind with regard to the evidence, until all the evidence has

 7    been presented, and you've heard the closing arguments of

 8    counsel and received the Court's instructions of law.

 9         Again, if anyone approaches you with regard to the case,

10    please advise me of that immediately, and with that, we'll see

11    you at 1:30.

12         (Jury absent.)

13         **THE COURT:**  Go ahead and be seated now.  I have a

14    telephone conference I have to do in another case.  It will be

15    about 15 minutes before I can conclude that.  If you want to

16    take the opportunity to regroup on any argument that you want

17    to present on the Glenn Richards issue, I'll hear that.

18         Again, as far as the jury is concerned, Mr. Chapin has

19    stepped down.  We'll determine whether or not we'll allow him

20    to answer that second question or whether or not it's going to

21    be a question that -- or that might be -- the issue might be

22    covered with another witness.  Okay?  All right.

23         So 15 minutes and then we'll be back on the record for a

24    short time to hear argument.  And if you have any cases,

25    please provide them to opposing counsel and to the Court right

1    now so we can take a look at them, too, over this recess.

2         (Whereupon, the Court is in recess while it handles

3    another court matter; thereafter, the following proceedings

4    were held:)

5         **THE COURT:**  All right.  Let's go back on the record.

6    The defendant has tendered to the Court two cases, one out of

7    the Tenth Circuit -- both out of the Tenth Circuit.  One

8    entitled:  *Simms against The State of Oklahoma*, 165 F.3d 1321,

9    and the other one is *Heno*, H-E-N-O, and it's *Sprint United*

10   *Management Company*, 208 F.3d 847.  The first one a 1999 case,

11   and the second one a 2001 case.  Counsel, again, do we need to

12   make copies of these for Mr. Vegeler?

13        **MR. JAMES BUCHHOLZ:**  Yeah.

14        **THE COURT:**  And you need a copy back?

15        **MR. JAMES BUCHHOLZ:**  Well, Your Honor, I can pull

16   them up.  I've got the notes from Ms. Bauer I can deal with.

17        **THE COURT:**  Well, we'll make a copy for both of you,

18   too.  I do want you to have a lunch hour before we're back at

19   it.  But let me ask is there any additional brief argument

20   that you wanted to make with regard to the Glenn Richards or

21   Kurt Richards issue before we start back up at 1:30?

22        **MR. JAMES BUCHHOLZ:**  Well, just, Your Honor, that the

23   same thing that I've indicated and this is not a class claim.

24   Mr. Chapin's claim is not a class claim.  This claims rises

25   and falls on its on own from our position.

1      It seems to me that anything that happens subsequent to

2    his employment, especially eight or nine months after his

3    employment, is of no moment as it relates to this claim.  Now

4    if we were talking about, again, Mr. Richards claim, which as

5    I understand it, emanates from November of 2004, January of

6    2005, I understand since the Chapin and the Kurt Richards

7    separation were prior, how they could be relevant.  But

8    post-action is what it is that we're concerned about, and we

9    -- from my understanding, from my discussions without reading

10    anything from Ms. Bauer, is what the cases that we have

11    submitted indicate that generally the -- a termination many

12    months after is not sufficiently connected to allow discussion

13    within a prior termination, which would be Glenn Richards

14    being post, and Chapin being the prior.

15          **THE COURT:**  Okay.  The Court will take a look at the

16    cases over the noon hour.  We'll be back on the record about

17    1:30, and if there's any additional argument, I'll hear from

18    Mr. Vegeler in response, if you want to add anything else in

19    reply, and I think we'll be in a position to rule on it going

20    forward and determine first, whether or not Chapin can answer

21    that additional jury question with regard to the

22    reasonableness.  Perhaps he can respond to it, as to his

23    positions with the company, or whether or not it is an area

24    that can be gotten into along with any other evidence

25    involving Glenn Richards, okay?  All right.  We'll see you

 1    back here at 1:30.

 2         (Whereupon, a luncheon recess was had; thereafter, the

 3    following proceedings were held:)

 4         **THE COURT:**  Go ahead and be seated, please.  Counsel,

 5    I've been advised that all the jurors have reported back from

 6    lunch.  I said during the lunch I would take a look at the

 7    cases tendered by the defendant on the Glenn Richards issue,

 8    and I have had an opportunity to do that.  The Court also

 9    advised the plaintiff had an opportunity to respond with

10    respect to applicability of those cases or not.  You want to

11    take that opportunity at this time, Mr. Vegeler?

12         **MR. ROBERT VEGELER:**  Yes, Your Honor.  I believe the

13    one case, the Colorado District Court case, talks in terms of

14    some prior factual notes or exactly what they were, they were

15    years before the incident.  And I think that -- I think this

16    was -- both of them were pretext cases.  And so I didn't gain

17    much from that.

18         And so then I looked at that the Oklahoma District Court

19    case, both of them in the Tenth Circuit.  And that one was

20    what I thought was dicta in there, indicated something about

21    prior instances to the date or the relevant period, and that

22    too far time-wise ahead of the incident.  And I believe I

23    wanted to say something about subsequent instances.  And I

24    thought maybe that came closest to shedding light on the

25    issues, but I can't tell you that being pretext and I don't

1    think those were the facts of the case, as far as I was

2    concerned with dicta.  So I went and tried to locate it in the

3    Seventh Circuit, and the only thing I found that might have

4    been relevant was the fact that it -- since, I believe,

5    discovery is allowed for other cases, other instances, and

6    maybe one beyond the Seventh Circuit, that I had kind of a

7    summary of all the District Court, other cases in the seminar,

8    I can't represent to the Court that I was able to clearly

9    define that that included both -- both prior and subsequent or

10   just prior.  Except there's an EEOC case, Kansas City Southern

11   Railway, 195 FRD 678, D Kansas 2000, where there was a Title 7

12   case.  But that really -- the time limits for discovery were

13   three years before and one year after plaintiff's employment,

14   period of discovery, prior two years after.

15       I didn't know if that -- absent some better authority,

16   which the court probably has found, I just couldn't put my

17   hands around it and in a half an hour.

18           **THE COURT:**  All right.  I did indicate that I would

19   give Mr. Buchholz an opportunity for a short reply.  You have

20   that at this time.

21           **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.  In the

22   Colorado case, there's a citation to *Cooley versus Carmike*

23   *Cinemas*, and I have not read that case, Your Honor.  But

24   according to this citation, and it's on page 11, page 12 of 17

25   of the upper right hand corner, it looked like page 11 of the

1   opinion, "Discriminatory incidents which occurred either

2   several years before the contested action or anytime after are

3   'not sufficiently connected to the employment action in

4   question to demonstrate pretext'."  So I understand this is a

5   pretext case, but this is also not a class case.  And it

6   strikes me as not a pattern case.  And as a result, it's our

7   position that the issues associated with Mr. Glenn Richards'

8   demotion and then subsequent quitting of employment, should

9   not be available as evidence in this case.

10          **THE COURT:**  The Court has reviewed both cases.  The

11  first case -- well, the first case is the Heno -- *Heno against*

12  *Sprint United Management Case*, 208 F.3d 847 case out of the

13  Tenth Circuit in 2000.  Specifically, it's pointed to the

14  Court on page 11, under what would be notes twelve --

15  paragraph notes 12, 13, 14.  The *Heno* case cites to the *Simms*

16  case specifically for the proposition that discriminatory

17  incidents that occur, either several years before the

18  contested action or anytime after are, quote, "not

19  sufficiently connected to the employment action in question to

20  demonstrate pretext", end quote period, citing to page 1331 of

21  *Simms*.

22       Going to *Simms*, however, in the *Simms* case the -- and

23  again, *Simms*, S-I-M-M-S, *against Oklahoma* under 165 F.3d 1321

24  cited by the Circuit in 1999 on page 11, what's referenced is

25  employment action that occurred years before what was -- what

1    was at issue is whether or not to allow evidence that occurred

2    years before the incident at issue would be allowed in.  And

3    that's in paragraph 18 as put in the notes.

4         There was no specific action involved in the *Simms* -- in

5    the *Simms* case for the proposition that any evidence of a past

6    or a subsequent event or let me put it this way, any evidence

7    of subsequent actions or patterns were at issue.  So there was

8    no evidence that that was subsequent to the employment action

9    taken.

10        So *Heno* is citing to *Simms* for the proposition that does

11   not exist in *Simms*, deals with an employment action years

12   before the action against the employee initiated the case and

13   it says nothing about actions taken after the employment

14   action.

15        What the Court has to determine in this case, and let me

16   just confirm, is whether or not -- and I differ with the

17   counsel's argument that this is not a pattern case.  I think

18   that's exactly how this case is being presented that that is

19   the claim.  And that's why this evidence regarding the

20   Richards employment being presented for the proposition to the

21   effect that Baig, the Pakistani non-Christian was hiring other

22   Pakistani non-Christians to replace white American

23   non-Christians -- did I say white Christians?  White American

24   Christians and them being replaced.  So and Baig is at the

25   heart of this.  He is at the heart, in that he is the manager

1    in any event, who is, you know, in effect, being a part of the

2    termination of Chapin, being a part of the termination of Kurt

3    Richards, being part of the termination of Glenn Richards.

4          **MR. JAMES BUCHHOLZ:**  Demotion.

5          **THE COURT:**  Demotion Chapin's position, and putting

6    in place of these white American Christian Pakistani

7    non-Christians Muslims.  So that to me is relevant evidence,

8    it's relevant of motivation and showing a pattern of

9    motivation on the part of -- of Baig as an agent of these

10   defendants.  So that's why the Court remains convinced that

11   the evidence involving Richards should come in.  And I would

12   even back up to the extent of saying to the extent that the

13   jury question that was presented to Mr. Chapin with regard to

14   what's reasonable to expect of a used car manager, whether or

15   not he should know what a Manufacturer Suggested Retail Price

16   is, to allow the plaintiff to resume the stand to answer that,

17   because it goes directly to his -- this plaintiff's experience

18   or opinions with regard to the used car manager.  It relates

19   to the statement that was on the tape with regard to, you

20   know, Richards being demoted, and then that whole situation.

21        So the Court is going to allow the evidence in as pattern

22   evidence showing motivation.  The Court is going to allow Mr.

23   Chapin to answer that jury question and then we'll be done.

24          **MR. JAMES BUCHHOLZ:**  That's fine.

25          **THE COURT:**  With Chapin, and we're ready to move on,

 1    right?

 2              **MR. JAMES BUCHHOLZ:**  That's fine, Your Honor.

 3              **THE COURT:**  Who is your next witness?

 4              **MR. ROBERT VEGELER:**  Mr. Richards, Glenn Richards.

 5              **THE COURT:**  Anything else before I call the jury

 6    down?

 7              **MR. JAMES BUCHHOLZ:**  Other than if we could note on

 8    the record -- I think I've preserved the record consistent

 9    with that.  I'm not going to jump up during Mr. Richards'

10    testimony about that testimony, so not to waste our time.  Is

11    that fine, Your Honor?

12              **THE COURT:**  You've made your record on that.

13              **MR. JAMES BUCHHOLZ:**  Okay.

14              **THE COURT:**  Let's bring the jury down.  Please resume

15    the stand.

16              **MR. ROBERT VEGELER:**  Are you going to read the

17    questions?

18              **THE COURT:**  Pardon?

19              **MR. ROBERT VEGELER:**  Are you going to read the

20    question, because it may not be artfully because I may have --

21              **THE COURT:**  Yes.  Well, it may not be artful, but

22    I'll ask the question.

23         (Jury present.)

24              **THE COURT:**  Go ahead and be seated, ladies and

25    gentlemen.  Counsel, you may be seated.

1    Ladies and gentlemen of the jury, the Court has allowed

2    Mr. Chapin to resume the stand to answer one remaining

3    question that was presented by the jury.  And that is why is

4    it reasonable to expect a used car manager to know what an

5    MSRP is?  And we know MSRP is what is being referenced, and

6    that is referring to the Manufacturer's Suggested Retail

7    Price.  You may answer that question.

8        **THE WITNESS:**  Basically, a new car --

9        **THE COURT:**  Do you have the mic on?  Could you turn

10   that.

11       **THE WITNESS:**  Hello.

12       **THE COURT:**  Go ahead.

13       **THE WITNESS:**  Basically a new car is the Manufacturer

14   Suggested Retail Price.  Leases are based upon that.  So

15   whatever the car, if it sells for $32,000, that's what the

16   MSRP is of the vehicle.  And if the lease residual is 40

17   percent, it's 40 percent of that price for a lease purchase.

18   That's what that's based upon.

19     So as a manager, you would need to know, you look in a

20   book and you'd see what the percent of that MSRP.  It doesn't

21   matter what vehicle it is, because they're all different

22   MSRP's.  But you need to know the percent and the MSRP so you

23   can base your lease upon that, your payments.

24       **THE COURT:**  Okay.  All right.  With that answered,

25   then, if there's nothing further, I'll allow this witness to

```
 1   step down and the next witness.  Anything else, based on that?

 2         MR. ROBERT VEGELER:  Nothing more Your Honor.

 3         THE COURT:  Anything else based on that, Mr.

 4   Buchholz?

 5         MR. JAMES BUCHHOLZ:  No, Your Honor.

 6         THE COURT:  All right.  You may step down.  Next

 7   witness.  Sir, if you please come up to the stand.

 8      And now if you would please face my Deputy to be sworn in

 9   to testify.

10      (Whereupon, the witness was sworn.)

11         MR. ROBERT VEGELER:  You need to put that mic on.

12         THE COURT:  See that clip mic right in front of you?

13   If you would put that up on your lapel on your left side, left

14   side close to the notch.

15         MR. ROBERT VEGELER:  Higher.

16         THE COURT:  That will work.  All right.  Thank you.

17   Go ahead Mr. Vegeler.

18         MR. ROBERT VEGELER:  Thank you.

19                    GLENN C. RICHARDS,

20                 having been first duly sworn

21               was examined and testified as follows:

22                    DIRECT EXAMINATION

23   BY MR. ROBERT VEGELER:

24    Q. Thank you.  Would you please state your name for the jury.

25    A. Glenn C. Richards.
```

1    Q. Would you spell your last name?

2    A. R-I-C-H-A-R-D-S.

3    Q. And Mr. Richards, when were you born?

4    A. April 6, 1952.

5    Q. And what country were you born in?

6    A. In the United States.

7    Q. And Mr. Richards, are you a Christian?

8    A. Yes.  (Nodding.)

9    Q. Okay.  Now, have you had some experience in the car

10   business, sales, et cetera, finance?

11   A. Yes, I have.

12   Q. And could you tell the jury about how many years of

13   experience you've had in that business?

14   A. About 10 to 12 years in the car business.

15   Q. Focusing on the period of 2004, did there come a time when

16   you were employed by Mid-States Motors, Inc., but in the trial

17   it's known as Acura Subaru?

18   A. Yes, I was.

19   Q. And that's one of the Rohrman Auto Group?

20   A. Yes, it was.

21   Q. When did you start with Acura Subaru?

22   A. I believe it was February of 2004.

23   Q. And what was your position?

24   A. Initially, it was a sales consultant.

25   Q. And how long were you a sales consultant?

1       A. For a couple of months.

2       Q. And tell the jury what a sales consultant does.

3       A. Sales consultant is basically there in this day and age to

4    help people find the right car at the right price at the right

5    payment, and get the whole process along.

6       Q. And after you were -- well, who hired you at Acura; was it

7    Toyota Lexus or Acura Subaru?

8       A. Acura Subaru.

9       Q. Acura Subaru.  Okay.  Who hired you?

10      A. There were two sales managers there at the time.  One

11   gentleman's name was Rob Bixby, he was the used car manager.

12   And the other gentleman's name was Tim Maddox.  He was the new

13   car sales manager.

14      Q. And for how long were you a sales associate?

15      A. Just for roughly two months.

16      Q. And then what happened?

17      A. I was promoted to business manager.

18      Q. And could you tell the jury what a business manager does?

19      A. Business manager is typically the last person in the sales

20   process who takes and puts together all the financial

21   documents, helps -- helps the people obtain financing if they

22   need it, if they need warranties or they need credit life and

23   disability or they need those types of products, business

24   manager handles that, and makes sure all the documentation is

25   ready for the bank.

1    Q. And does the business manager actually close the deal with

2    the people signing the documents?

3    A. The deal is usually closed by the time it gets to the

4    finance process.

5    Q. And as business manager at Acura Subaru, in that I think

6    you said it was a couple months later, let's say, in April of

7    '04?

8    A. Right, April, '04 was when I moved into the finance

9    office.

10   Q. Who did you report to?

11   A. I reported to a gentleman by the name of Kurt Richards.

12   He was interim general manager; no relation to me.

13   Q. And did there come a time when a Mr. Nadim Baig became

14   involved with Acura Subaru in 2004?

15   A. Yes, he came afterwards, month or two later as a general

16   manager of Fort Wayne Acura Subaru.

17   Q. So who did you report to when Mr. Baig became the general

18   manager?

19   A. Nadim Baig.

20   Q. Are you familiar with a Trent Chapin?

21   A. Yes, I am.

22   Q. Gentleman that's sitting here in court?

23   A. Yes, I am.

24   Q. And how did you become familiar with him?

25   A. Shortly after I became business manager, he came over as

1    used car manager.

2     Q. For?

3     A. Acura Subaru.

4     Q. And about how long was he used car manager?

5     A. Probably a couple months.  I'm not sure of the exact

6    amount of time, but it was a couple of months.

7     Q. And as used car manager, who did he report to?

8     A. When he was initially hired, Kurt Richards.  But when

9    Nadim came on board, he reported to Nadim.

10     Q. And now, how long were you business manager at Acura

11    Subaru?

12     A. About eight months.

13     Q. And during that whole eight-month period, who was the

14    general manager that you reported to at Acura Subaru?

15     A. After Kurt Richards, it was Nadim until I left Acura

16    Subaru.

17     Q. Then could you help little bit, when -- when was Kurt

18    Richards replaced?

19     A. As soon as I -- shortly after Nadim Baig came on board.

20     Q. Do you know who assumed his duties?

21     A. Who, Kurt Richards?

22     Q. Yeah.

23     A. Nadim Baig did.

24          **THE COURT:**  And again, if I could get, as best you

25    recollect, when did Mr. Baig come on board at Acura?

 1          **THE WITNESS:** When did he come on board?

 2          **THE COURT:** As best you recall.

 3          **THE WITNESS:** It was sometime in May of 2004, I

 4  believe, maybe late May. I can't be exactly sure.

 5          **THE COURT:** Just approximate month.

 6          **THE WITNESS:** May.

 7          **THE COURT:** '04, all right. Go ahead.

 8  BY MR. ROBERT VEGELER:

 9   Q. Now, okay, you were business manager until when in 2004?

10   A. Until the end of November of 2004.

11   Q. Okay. Now, let's go back to April/May of 2004 when Mr.

12  Baig was and Kurt Richards were the managers, okay?

13   A. Right.

14   Q. Did you have an obser -- did you have the ability to

15  observe Mr. Chapin as used car manager at Acura Subaru during

16  that period?

17   A. Yes, I did.

18   Q. And could you describe for the jury in general the work

19  ethics of Mr. Chapin as used car manager?

20   A. The car business is a highly competitive business, and it

21  takes a special type of person to be successful in sales

22  management. As far as a used car manager goes, you have to be

23  on top of your used car values. You have to know what cars

24  are worth, what trades are worth. You have to buy them

25  properly. You have to be able to look at your inventory and

1  look at the values, look how long the cars have been on the

2  lot, make adjustments as necessary.  You have to be able to

3  present those cars on the lot so that it has curb appeal for

4  the cars that might be going by.  You have to be able to

5  motivate and train your sales force.  You have to be a people

6  person and be able to hound your sales people, close the deal

7  if necessary.  You have to be able to structure deals

8  properly, so that the dealership makes money and that's just a

9  small amount of things that the user car manager has to do.

10  Q. And how did Mr. Chapin do, from your observations?

11  A. He fulfilled all those expectations as far as I was

12  concerned.  He'd even come into the office -- and he was

13  usually, typically the first manager there in the morning.

14  And on some occasions he had rearranged a lot all by himself

15  so that the cars looked better out on the lot.  He was always

16  there for salespeople.  He has a background of finance.  He

17  even gave me a day off occasionally so I could take a day off

18  so I didn't have to work 70 hours a week.

19      But as far as I was concerned, he has all the tools

20  necessary to be highly successful in the used car business in

21  any type of sales management position.

22  Q. Was he there at the end of the day, too?

23  A. Yes, he was.

24  Q. Did you ever notice him not being available or absent?

25  A. No, I -- as a matter of fact he probably spent more hours

1    than most of us.

2     Q. As part of being a good used car manager, do you have to

3    know what MSRP is, Manufacturer's Suggested Retail Price?

4     A. Right, well, as far as new cars goes, yes, you have to

5    know what MSRP is, right.

6     Q. Does that help with the sale of used cars, too?

7     A. You have to know -- as far as the used cars goes, you have

8    to know what the market will bear as far as used cars.  With

9    used cars that can fluctuate, you know, depending on demand.

10    Q. As business manager, is it important for a person, such as

11   you, performing your duties to know what MSRP is?

12    A. Yes, absolutely.

13    Q. Is it critical?

14    A. It's critical.

15    Q. So if you don't know what MSRP is and you're the business

16   manager, does that foretell problems?

17         **MR. JAMES BUCHHOLZ:**  I object as leading.

18         **THE COURT:**  Sustained.

19   BY MR. ROBERT VEGELER:

20    Q. Okay.  If you're a business manager and you're trying to

21   do your job well and you don't know what MSRP is, what's the

22   result?

23    A. Depending on -- if you don't know what MSRP is, you don't

24   know how to value the car at all.  And -- and as far as a

25   lease goes, I mean, if you have no idea what MSRP is, a lease

1    is determined by MSRP.  And the banks use that to determine

2    lease payments and values at the end of the lease term.

3    Q. Is it critical?

4    A. It's absolutely critical.

5    Q. Now, do you recall when Mr. Baig was introduced to the

6    Acura Subaru personnel as being the manager?

7    A. I'm trying -- it may have been Kurt Richards that came and

8    introduced him to me.  It's hard to recall.  I had heard that

9    -- rumors that there had -- that there was a new general

10   manager coming and that he had been in the dealership, but I

11   hadn't seen him, I think until Kurt I think introduced him to

12   me.

13   Q. Was there a big meeting with Bob Rohrman coming in and

14   introducing Nadim Baig to everybody?

15   A. Not that I recall, no.

16   Q. But that would have been something you would have seen

17   from your office or heard about?

18   A. Yeah, I was right in the middle of the dealership.

19   Q. Now, being in the middle of the dealership after Mr. Baig

20   was there, where was your office in relation to his?

21   A. His was just down a couple of offices from mine.

22   Q. Does your office have a window in it so somebody on the

23   floor can look in?

24   A. Yes.

25   Q. Did Mr. Baig's office have a window in it so that you

1    could look in?

2     A. I don't recall that his office had a window.

3     Q. Did there come a time when you attended a meeting that Mr.

4    Baig called towards the end of April concerning Trent Chapin?

5     A. I remember -- I remember a sales meeting.  I don't recall

6    exact when it happened.

7     Q. And was Mr. Baig there?

8     A. Yes.

9     Q. And was Mr. Chapin there?

10    A. Yes.

11    Q. And were some other sales people and manager people there?

12    A. Yes.

13    Q. Do you recall what the purpose of that big meeting was?

14    A. It may have just been a routine sales meeting.  I can't

15    recall exactly, but...

16    Q. Did there come a time when you were asked to attend the

17    meeting in -- with Mr. Chapin and Mr. Baig concerning

18    termination of salespeople?

19    A. Yes.  I remember it may have been that same meeting, that

20    same sales meeting where I recall Mr. Baig, something to the

21    effect that Trent was doing a fine -- a fine job, and any --

22    and if there were rumors going around that he was going to be

23    discharged and he didn't want to hear it anymore or those

24    employees could possibly face discharge.

25    Q. Did there -- and did there come a meeting after that you

1    attended where Mr. Chapin was discharged or separated by Mr.

2    Baig?

3     A. Yes, there was a meeting later.

4     Q. Who attended that meeting?

5     A. It was myself, Mr. Baig, Mr. Chapin, and Tim Maddox.

6     Q. And what did Mr. Baig say to Mr. Chapin?

7     A. He -- he told -- I'm trying to recall exactly.  The gist

8    of the meeting was he was going to transfer Trent to another

9    -- to another position at another dealership.

10    Q. How many days after this meeting where Mr. Baig told

11   everybody he's doing a fine job, I don't want to hear any

12   rumors, anybody says that could be in trouble; how many days

13   after that meeting did he transfer?

14    A. It couldn't have been anymore than two or three days.

15    Q. Did Mr. Baig ever tell you or in your presence tell Mr.

16   Chapin in your presence why after two days he was now in

17   transfer mode?

18    A. I don't recall it, the reasoning other than he was in

19   transfer mode.  I don't remember the reasoning behind it.

20    Q. Now, as you were around the Acura Subaru -- was that just

21   in one building?

22    A. The Subaru building was separate from the Acura building.

23    Q. Okay.  Was your office in the same building as Mr. Baig's?

24    A. My office was the same as Mr. Baig's, right.

25    Q. So did you see him on a regular basis if he was there?

1    A. If he was there, yes, I saw him.

2    Q. Did there come a time when you became familiar with a

3    Anwar Al Haq, a gentleman at the dealership?

4    A. He became the new sales manager.

5    Q. And who did he replace?

6    A. Kurt Richards.

7    Q. And did there come a time when you became familiar with an

8    Irfan Hussein?

9    A. Yes.

10   Q. And when was that?

11   A. That was right after Trent was put in the transfer mode.

12   Q. Okay.  Did you ever talk to Nadim Baig about his country

13   of origin?

14   A. I don't know if I ever talked specifically about it, but

15   he told me about Pakistan.

16   Q. Did you ever talk to Mr. Baig about his religion?

17   A. Once again, not specifically, but he made it -- he made it

18   clear that he was -- a Muslim as far as his religion.

19   Q. Did you have a discussion with Mr. Al Haq about his

20   country of origin?

21   A. Anwar, yes.  He was from Pakistan also.

22   Q. And did you have a discussion with him about his religion?

23   A. He was a devout Muslim, takes his religion very seriously.

24   Q. And what about Irfan?

25   A. Irfan was from Pakistan.

1    Q. And did you discuss with him his religion?

2    A. He wasn't as devout as Anwar, but he was also a Muslim.

3    Q. Did you ever observe them doing prayer meetings or

4    anything during the day?

5         **MR. JAMES BUCHHOLZ:**  Judge, who is he referring to as

6    "they"?

7         **MR. ROBERT VEGELER:**  They.

8         **THE COURT:**  If you would indicate, are we talking

9    about Baig, Anwar and Irfan?

10        **MR. ROBERT VEGELER:**  Yeah.

11        **THE COURT:**  Did you watch them pray -- did they pray

12   during the day?

13        **THE WITNESS:**  I know Anwar would leave to pray during

14   the day.  I know that they celebrated religious holidays,

15   Ramadan, I believe they called it at the dealership.

16   BY MR. ROBERT VEGELER:

17   Q. As finance or as business manager, you were able to -- you

18   had access to information as to monthly sales of the Acura

19   Subaru, is that correct?

20   A. Yes.

21   Q. And during that period, that -- from April of 2004 until,

22   I believe you said November of 2004, do you recall what the

23   monthly sales were that were passed through your control?

24   A. It varied, but anywhere from 40 to 80.

25   Q. What?

1    A. Vehicles total.

2    Q. And how much is that in dollars?

3    A. It depends on the type of vehicles sold.

4    Q. On the average?

5         **MR. JAMES BUCHHOLZ:**  Judge, I would object to the

6    relevance of this inquiry.

7         **MR. ROBERT VEGELER:**  Well, we can approach, Your

8    Honor.

9         **THE COURT:**  Let's do that.

10     (Whereupon, the following bench conference was held

11   outside the hearing of the jury:)

12        **THE COURT:**  Go ahead.

13        **MR. ROBERT VEGELER:**  We have tendered an instruction

14   on punitive damages and it's my understanding, based on recent

15   Supreme Court case and other Seventh Circuit case, sales is

16   relevant for a jury to determine as to punitive damages.

17        **MR. JAMES BUCHHOLZ:**  Judge, as relates to that, the

18   testimony he's going to talk about is the time frame not at

19   issue.  And he's claiming during the time frame that he was --

20   he's testified he was the finance manager for a period of that

21   time.  But it seems to me, under a punitive damage standard,

22   it's (Inaudible) to be present for a damage claim case.

23     What happened two or three years ago may not be the same

24   as what's going on now.  And as a result of that, any

25   testimony he may render in this regard would be inappropriate,

```
 1    because you're supposed to sting (phonetic), not kill.  But if
 2    they have post-information or outdated information, they can
 3    provide that.
 4         THE COURT:  I thought you were going to use that
 5    information for another matter, but you want to establish the
 6    value of the company for punitive damages purposes.  Usually
 7    that comes in by way of a stipulation or from some kind of
 8    public document, if there has been an accounting report,
 9    annual statement during discovery.
10         MR. JAMES BUCHHOLZ:  Judge, he asked -- he asked no
11    discovery questions related to financial information.  I will
12    report to Your Honor that I expect Mr. Rohrman will be
13    testifying in this case.
14         THE COURT:  You can ask him that, Rohrman -- you
15    didn't subpoena Rohrman, so he may or may not come.
16         MR. ROBERT VEGELER:  But I have Mr. Nadim -- manager
17    Baig, the general manager and Larry Kruse, the general
18    manager, and they'll know.
19         THE COURT:  They'll know and that's probably a better
20    way to do than by way of a sales comparison three years ago.
21    So sustained.
22         MR. ROBERT VEGELER:  All right.
23         THE COURT:  Would you take these.  Not you, my
24    deputy.
25         (Whereupon, the bench conference was concluded and the
```

1   following proceedings were held:)

2   BY MR. ROBERT VEGELER:

3    Q. As business manager, though, based upon those number of

4   units sold, those are your responsibility, are they not, to

5   make sure those figures, information, and all the I's are

6   dotted, and T's crossed?

7    A. Right.  Right, as far as final selling prices, making sure

8   all the paperwork was complete, documentation complete, yes,

9   that was my responsibility.

10   Q. Now, there came a time when you changed job positions at

11  Acura Subaru?

12   A. Yes.

13   Q. And tell the jury again, was it November?

14   A. It was -- it was the end of November.

15   Q. Of 2004?

16   A. Of 2004.

17   Q. And what position did you -- were you transferred to?

18   A. I was transferred to the position of customer care

19  manager.  I guess it would be the best way to describe it.

20   Q. And from your point of view, were you compensated at the

21  same level?

22   A. No.

23   Q. Were you compensated less?

24   A. Considerably less.

25   Q. And were your duties different than being business manager

1   and being responsible for all the 40 to 80 cars sold every

2   month?

3    A. Yes, much less responsibility.

4    Q. And who was the person who informed you of the demotion?

5    A. Nadim Baig.

6    Q. And was he still general manager at that time?

7    A. Yes, he was.

8    Q. And you were reporting to him at that time?

9    A. Yes.

10   Q. How did he -- how did he tell you that you were being

11   transferred to a lesser-paying position with Nadim without the

12   responsibility?

13   A. Just -- I think he just basically came in and said he was

14   going to move another individual into the business office and

15   wanted to move me into the customer care-type position.

16   Q. And do you recall what that person's name is?

17   A. That replaced me?

18   Q. Yeah.

19   A. Khurram Solheil.

20   Q. And Khurram Solheil, do you know what country of origin

21   he's from?

22   A. Pakistan.

23   Q. And do you know what religion he is?

24   A. Muslim.

25   Q. During the period of April of '04 until November of '04,

1   how many times did Mr. Baig summon you into the office and

2   indicate you were not performing?

3    A. I don't recall that you happening.

4    Q. Did you sign some piece of paper that says oh, by the way,

5   I'm not doing my job right?

6    A. No, I did not.

7           **THE COURT:**  Can we just get clarification.  It's been

8   referred to as a transfer or a demotion, but I need to hear

9   from the witness.  What did he consider the move from his --

10  the position into customer care manager.

11          **THE WITNESS:**  I -- I considered it a demotion, by all

12  means.

13          **THE COURT:**  All right.  Go ahead.

14          **MR. ROBERT VEGELER:**  I have no other questions, Your

15  Honor.

16          **THE COURT:**  Just to establish, too, you're Caucasian?

17          **THE WITNESS:**  Yes, ma'am.

18          **THE COURT:**  Go ahead.  Cross.

19          **MR. ROBERT VEGELER:**  Can we approach, your Honor,

20  real quick?

21      (Whereupon, the following bench conference was held

22  outside the hearing of the jury:)

23          **MR. JAMES BUCHHOLZ:**  I never asked technically that

24  of Mr. Chapin either.

25          **THE COURT:**  Well, eventually he'll have to, but that

1    was in his allegations, those are, you mean, that he's white

2    you mean?

3            **MR. ROBERT VEGELER:**  Yeah.

4            **THE COURT:**  That's not being contested?

5            **MR. ROBERT VEGELER:**  Yeah, no --

6            **THE COURT:**  Sometimes when we're trying to make a

7    record, some things just get assumed and you haven't made a

8    record and there wasn't a record made as to this witness' race

9    and race is one of the issues and part of the pattern.

10           **MR. JAMES BUCHHOLZ:**  I think actually it is in

11   evidence, Judge, because I indicated I haven't asked Mr.

12   Chapin all those questions about race in his cross

13   examination.  Mr. Richards was white.

14           **COURT REPORTER:**  Can you speak closer to the

15   microphone, please?

16           **THE COURT:**  There's a reference to it about when the

17   witness is on the stand and the evidence being offered as to

18   that witness, and I think it's appropriate too to meet that

19   record.  Let's go onto the next one.  It's your cross.

20       (Whereupon, the bench conference was concluded;

21   thereafter, the following proceedings were held:)

22           **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

23                      **CROSS EXAMINATION**

24   BY MR. JAMES BUCHHOLZ:

25    Q. Good afternoon, Mr. Richards.  How are you?

1    A. Good.  How are you?

2    Q. Good.   Thanks.

3       When Nadim Baig started at Fort Wayne Acura as the general

4    manager, Kurt Richards was the general -- was the used car

5    manager, or excuse me, new car manager, correct?

6    A. Kurt Richards was the acting general manager.

7    Q. When Nadim Baig started, Kurt Richards was placed into a

8    new car manager's position?

9    A. Yes, he became new car sales manager.

10   Q. Trent Chapin was the used car sales manager?

11   A. Shortly thereafter.

12   Q. So Mr. Chapin started after Mr. Baig?

13   A. No, he started after -- after Kurt came over as interim

14   general manager?

15   Q. Okay.  My question relates to Mr. Baig.  When he started

16   as the general manager, Trent Chapin was the used car manager?

17   A. Yes.  Yes, Trent Chapin was the used car manager.

18   Q. And Kurt Richards was the new car manager?

19   A. New car sales manager, yes.

20   Q. You were a business manager, finance person, correct?

21   A. Yes.

22   Q. Clayton Doherty (phonetic) was the parts manager?

23   A. Yes.

24   Q. Lucinda Baell was the office manager?

25   A. Yes.

1    Q. Ivan Almodovar was the service manager?

2    A. Yes.

3    Q. Now, as I understand it, not too long after Mr. Baig

4    began, Kurt Richards was replaced in his position, correct?

5    A. That is correct.

6    Q. And then I understand a couple of weeks after that, Mr.

7    Chapin was replaced in his position, correct?

8    A. That's correct.

9    Q. And from then, until the end of November of 2004, there

10   were no other changes in the management structure at Acura,

11   correct?

12   A. You'll have to bear with me.  Service manager was

13   replaced.  Other than that, no changes that I can recall.

14   Q. So it's your testimony that Ivan was replaced between the

15   time frame that Mr. Chapin left, and the time of your transfer

16   from finance manager to customer relations manager?

17   A. Right.

18   Q. And what time frame do you contend that Ivan's position

19   was changed?

20   A. Once again, you'll have to bear with me.  I have a hard

21   time remembering what I did yesterday sometimes.  I can't

22   recall exactly when Ivan was replaced.

23   Q. Okay.  So it's possible that Ivan's change occurred after

24   your change?

25   A. After my change?  No, it was before.

1    Q. Okay.  So you're saying it's not possible that occurred?

2    A. Ivan was replaced before -- before I moved.

3    Q. Okay.  And then who took his place?

4    A. I don't recall the gentleman's name now.

5    Q. You don't recall that gentleman's name?

6    A. I don't recall his name.  I can picture him; I just don't

7    remember the name.

8    Q. Well, tell me your description of his picture.

9    A. He was tall and Caucasian; middle-aged.

10   Q. Okay.  So Mr. Almodovar, the Hispanic service manager, was

11   replaced by a tall, Caucasian, white male in the service

12   department is your testimony, right?

13   A. Yes.

14   Q. Okay.  And that occurred, you say, before the time frame

15   that you changed from business manager to customer relations

16   manager, right?

17   A. Right, yes.

18   Q. I left one out earlier.  There was an Internet manager,

19   that was Tim Maddox?

20   A. Tim -- Tim Maddox, I believe, he just kind of took over

21   the Internet.

22   Q. And he was a white male, correct?

23   A. Yes.

24   Q. April, May and June of 2006, you lived with Mr. Chapin,

25   didn't you?

1    A. Yes.

2    Q. Didn't pay him any rent, did you?

3    A. No.

4    Q. Lived with him in New Haven, Indiana?

5    A. Yes, sir.

6    Q. Mr. Chapin never asked you to move out, did he?

7    A. It was -- it was kind of a mutual-type thing when he

8    became involved with the young lady that he, you know, it was

9    time for me to move on.

10   Q. Okay.  Page 21, line 22.

11        **THE COURT:**  He's referring to your deposition that

12   you gave previously in this case.

13   BY MR. JAMES BUCHHOLZ:

14   Q. Mr. Richards --

15        **MR. ROBERT VEGELER:**  May we approach?

16        **THE COURT:**  Certainly.

17     (Whereupon, the following bench conference was held

18   outside the hearing of the jury:)

19        **THE COURT:**  Okay.  What page are you going to?

20        **MR. ROBERT VEGELER:**  It was not in this case.  It was

21   never taken.

22        **THE COURT:**  Thank you for pointing that out.

23        **MR. JAMES BUCHHOLZ:**  I was not going to relate to him

24   the cases taken, but I certainly wanted to impeach him out of

25   it.  That was not part of the Motion in Limine.

1      **THE COURT:**  Any sworn statement --

2      **MR. JAMES BUCHHOLZ:**  All I'm going to say is we took

3  your deposition March 16th and you gave this answer and I

4  asked this question and you gave that answer.

5      **THE COURT:**  Well, if you want to clarify in his own

6  case that's going to come out anyway, I assume.

7      **MR. JAMES BUCHHOLZ:**  Well, the -- there's a Motion in

8  Limine about the existence of this claim, but the fact that

9  there was -- there's a deposition taken doesn't mean that I

10  violate the motion by going into that testimony.

11      **THE COURT:**  He can -- he can use any -- he can ask

12  whether or have you ever given a deposition with regard to the

13  events at issue in this case, and I'm assuming there's some

14  overlap or relation.  You can ask have you ever given a

15  deposition under oath at a prior time and made the following

16  -- the following question and were asked the following

17  question and gave the following statement and that doesn't

18  identify the cause of action.

19      **MR. ROBERT VEGELER:**  I'm not objecting -- you said it

20  was in this case.

21      **MR. JAMES BUCHHOLZ:**  I misspoke.  I should correct

22  that now.

23      **THE COURT:**  And I'm glad you pointed out.

24      **MR. JAMES BUCHHOLZ:**  All I'm going to say is I took

25  your deposition, I asked this question, and you gave that

1    answer under oath.

2           **THE COURT:**  Do you have a copy of this?  I assume you

3    do.

4           **MR. ROBERT VEGELER:**  Yes.

5           **THE COURT:**  All right.  What's the page?

6        (Whereupon, the bench conference was concluded;

7    thereafter, the following proceedings were held:)

8           **MR. JAMES BUCHHOLZ:**  21, I believe.  21.  Line 22.

9    BY MR. JAMES BUCHHOLZ:

10    Q. Mr. Richards, you and I got together for a deposition,

11    didn't we?

12    A. Yes.

13    Q. And I asked you some questions under oath, didn't I?

14    A. Yes.

15    Q. And you answered those questions?

16    A. Yes.

17    Q. Page 21 line 22, did I ask you this question and did you

18    give this answer:

19        "Mr. Chapin didn't ask you to move out in any form, did

20    he?"

21        "ANSWER:  No."

22        Did I ask you that question and did you give that answer?

23    A. Yes.

24    Q. Now, when you were employed -- when you were living with

25    Mr. Chapin, you were not employed, correct?

1    A. That is correct.

2    Q. And he was not employed, correct?

3    A. That is correct.

4    Q. And during that time frame, Mr. Chapin indicated to you

5    that he was nervous, correct?

6    A. During that period of time, nervous?  Maybe he was because

7    of lack of income and things like that.  He may have.

8    Q. Okay.  Page 37, line 12 did I ask you this question, and

9    did you give this answer:

10       "What did he indicate in terms of how he was doing?"

11       "ANSWER:  Said he was nervous."

12       "QUESTION:  Did he tell you what he was nervous about?"

13       "He said he received some kind of letters threatening in

14   nature."

15   A. That was not during the time when I was living with him.

16   No, that does not refer to that at all.

17   Q. Refers to a different time frame?

18   A. Yes.

19   Q. Okay.  Those letters came from the State of Ohio?

20   A. I don't -- I never saw the letters.  I have no idea.

21   Q. Okay.  Did Mr. Chapin indicate to you that they came from

22   the State of Ohio?

23   A. Yes, he did.

24   Q. Okay.  Every deal that you do work on as a business

25   manager has to go through the office, doesn't it?

1    A. Yeah, I turned in every deal to the office, yes.

2    Q. That's right.  And Lucinda Baell is the person that

3   manages that office --

4    A. Yes.

5    Q. -- at Acura, correct?

6    A. Yes.

7    Q. She's still there today?

8    A. I'm not aware of that.  I don't know.

9    Q. You don't know one way or the other?

10    A. No.

11    Q. All right.  Now, you testified in direct examination about

12   the performance of Mr. Chapin in the position of used car

13   manager, correct?

14    A. Yes.

15    Q. You thought that he was doing a fine job from what you

16   observed, right?

17    A. From what I observed, yes.

18    Q. Did I ask you this question in your deposition at page 85

19   and did you give this answer, line 15:

20       "You have any understanding of in terms of the performance

21   that Mr. Chapin had in the position of used car manager, in

22   context, used car manager?"

23       "ANSWER," line 18, "He wasn't in it long enough for me to

24   really know."

25       "QUESTION:  How long was he in the position?"

1      "ANSWER:  Maybe a couple of months, couple three months."

2      When I asked that question, did you give that answer?

3   A. Yes, I may have.

4   Q. Okay.  When he was the used car manager, you were in

5   finance, right?

6   A. Yes.

7   Q. Okay.  Now, your office was in the main building next to

8   Mr. Baig's office is what you testified to, right?

9   A. Yes.

10  Q. Mr. Chapin's office was in a different building, wasn't

11  it?

12  A. Yes, in the Subaru building.

13  Q. So when you're doing work at the finance office, you're

14  not really seeing what's going on in the other building,

15  right?

16  A. Unless I walk over there like I did occasionally.

17  Q. You have no understanding of the circumstances associated

18  with Kurt Richards leaving the dealership, do you?

19  A. I have no understanding of why, no.

20  Q. You had no discussions with Nadim Baig associated with

21  Trent Chapin, did you?

22  A. No.

23  Q. Now, as I understand it, your testimony is that the

24  termination or the discussion with you and Mr. Maddox and Mr.

25  Chapin occurred in your office?

1   A. I've been thinking about it if it was in my office or

2   Trent's office exactly.  I know we were there, the four of us.

3   Q. And did I ask you this question, and did you give this

4   answer, line 5 --

5            **THE COURT:**  Page?

6            **MR. JAMES BUCHHOLZ:**  Ninety.

7   BY MR. JAMES BUCHHOLZ:

8   Q. "Was anybody else present in that office?"

9       "No, just Nadim, Trent and me."

10      Did I ask that question and did you give that answer?

11  A. I don't recall giving that answer.

12  Q. Okay.  You had not been informed in any fashion that the

13  meeting would be occurring, correct?

14  A. I don't recall being informed, no.

15  Q. And you had the information that Mr. Chapin was going to

16  be separated because it occurred in your office?

17  A. What's happening is that a lot of times any type of

18  termination would take place in my office.  That's why I may

19  have gotten mixed up in where it took place.  There were other

20  terminations that did take place in my office.

21  Q. So page 90, line 2, "How did you have that information?"

22      "Because I was -- Nadim brought him into in my office to

23  terminate him."

24      Did I ask you that question and did you give that answer?

25  A. Nadim brought him into my office and terminated him.  I

1    probably gave that answer.

2    Q. And nobody else was present but you, Nadim and Trent, is

3    your testimony, right?

4    A. If that's what I said, but...

5    Q. You said something different today, but that's what you

6    told me in deposition, right?

7    A. I may very well have, yes.

8    Q. And you don't recall any responses that Mr. Chapin had

9    associated with the discussion about him leaving as the used

10   car manager at Acura, correct?

11   A. I know there was discussion, some discussion about where

12   he was going to go to work, you know, since he was being

13   transferred.  I don't remember the specifics, no.

14   Q. Okay.  Did I ask you this at page 91, line 20:  "Did Trent

15   make any responses?"

16       "ANSWER:  He may have.  I don't recall what they were."

17       "Is there anything that would refresh your memory about

18   what Trent said in response to Nadim's comments?"

19       "ANSWER:  No."

20       Did I ask you those questions and did you give those

21   answers?

22   A. I probably did, yes.

23   Q. And you've had the opportunity to review this transcript,

24   haven't you?

25   A. Yes.

1    Q. To make changes if there were any problems with what it is

2    that was said, right?

3    A. Yes.

4    Q. Now, the time frame that you were at the Acura store, who

5    does the general manager of that store report to?

6    A. Mr. Rohrman.

7    Q. Okay.  And all the other managers in the store report to

8    who?

9    A. The general manager.

10   Q. Now --

11       **MR. JAMES BUCHHOLZ:**  Your Honor, may we approach real

12   quick?

13       (Whereupon, the following bench conference was held

14   outside the hearing of the jury:)

15       **MR. JAMES BUCHHOLZ:**  I don't want to run afoul and I

16   don't want to try more than one case.  He made a decision to

17   quit the dealership.  And as part of and parcel, one, wrecked

18   one of his demos and never made a call to the dealership with

19   this, and two people had to go out and pick it up.  He said:

20   "Well, I was going to take it in that day."  He drove it

21   Friday, then we had to go out on Monday afternoon.  And the

22   reason he didn't call on Saturday, because it was snowing, he

23   was the only one out and did other errands that day.  It seems

24   to me some of those things go to his credibility as relates to

25   a bias against my clients.  But I'm mindful of what your

1    ruling as been associated with the limited nature of this and

2    so I don't want to run afoul of that by virtue of getting into

3    that line of cross examination.

4         **THE COURT:**  Is that while he was still working at

5    Rohrman?

6         **MR. JAMES BUCHHOLZ:**  Yeah, what happened was he made

7    a decision ultimately in January of '05 to quit and he made a

8    decision on a Friday night, but he took the demo car with him.

9         **THE COURT:**  Okay.

10        **MR. JAMES BUCHHOLZ:**  Okay.  And he didn't call.

11        **THE COURT:**  Right.

12        **MR. JAMES BUCHHOLZ:**  He didn't make any notification

13   associated with that.

14        **THE COURT:**  So you're going to ask him the question

15   about did you ever return the demo car, was there a problem

16   that occurred on it or whatever?

17        **MR. JAMES BUCHHOLZ:**  Right.  Well, actually what I'm

18   going to do, I'm going to say you ultimately quit in January

19   of '05; at that time you made the decision on Friday evening

20   you didn't return the car Saturday, you didn't return it

21   Sunday, it had to be repossessed, it was repossessed by two

22   people from the dealership on Monday afternoon, it was

23   damaged.

24        **MR. ROBERT VEGELER:**  If he opens it up, what's wrong

25   with it because he'll explain how it got damaged.

1          **THE COURT:**  How did it get damaged?

2          **MR. ROBERT VEGELER:**  He says somebody hit it in a

3     parking lot; we're getting a little remote.

4          **THE COURT:**  If you want the dig, I'm not sure how

5     much value there is in that, and I'm not understanding how it

6     goes to any bias or prejudice that he has against your client.

7     Because, what, did the dealership come back for him for the

8     damages?

9          **MR. JAMES BUCHHOLZ:**  Counterclaim and (Inaudible).

10          **THE COURT:**  You know, again, we're in a situation

11     where it's hard to have it both ways.  You know, we limited

12     out reference, the specifics in the case.  If it goes to the

13     counterclaim in the case, you can't set up a counterclaim and

14     say well, you know --

15          **MR. JAMES BUCHHOLZ:**  And that's why I wanted to speak

16     to Your Honor associated with --

17          **THE COURT:**  No, I'm asking you if there's a way you

18     think you can get around it and get around -- any information

19     you get is worth your while here, you know, I'm interested in

20     hearing it.  But I'm saying, on the face of it, that's a

21     problem.

22          **MR. JAMES BUCHHOLZ:**  Okay.  Thank you.

23          (Whereupon, the bench conference was concluded;

24     thereafter, the following proceedings were held:)

25     BY MR. JAMES BUCHHOLZ:

1    Q. You testified earlier that it's important as a business

2   manager to dot the I's and cross the T's as relates to the

3   documents being passed along to the office, correct?

4    A. Correct.

5    Q. That's an essential function of that position, isn't it?

6    A. Yes.

7    Q. Because if the numbers aren't correct and there's problems

8   with the documentation, there may be problems with the

9   financing at the bank, there may be problems with the customer

10   having to come back and there may be other issues, correct?

11    A. There could be, yes.

12    Q. That's a pretty important position within the dealership?

13    A. Yes, it is.

14    Q. Now, you determined, after being in the customer relations

15   position, ultimately to quit your employment, correct?

16    A. Yes, that's correct.

17    Q. And you made that decision to quit the employment in

18   January of 2005, right?

19    A. That is correct.

20    Q. How is it that you -- you didn't inform anybody at Fort

21   Wayne Acura about that decision until two or three days later,

22   did you?

23    A. I did not.

24    Q. In fact, the way that it was -- that it was communicated

25   was on your front door step, wasn't it?

 1    A. Yes.

 2    Q. You didn't call the dealership to tell them of your

 3    decision to quit employment, correct?

 4    A. No, I did not.

 5    Q. You did not go to the dealership to tell them that you

 6    decided to quit employment, is that correct?

 7    A. That is correct.

 8    Q. The only thing you told them on your door step was I can't

 9    work there anymore, is that correct?

10    A. That is correct.

11    Q. And you didn't have any discussions with Mr. Baig about

12    the change from your position as a finance person to the

13    customer relations person, correct?

14    A. I didn't -- I had discussion Mr. Baig when I was changed

15    from business manager to customer relations.

16    Q. Okay.  Page 110, line 14:  "Did you have any conversation

17    with him about the reason for the change?"

18        "If I remember right, he said he was going to try K. out,

19    K. Solheil, Khurram is his real name, we called him K."

20        "Did you have any other discussions with him about the

21    reasons for the change."

22        "ANSWER:  I can't recall exactly what happened."

23        "Would anything refresh your recollection about that?"

24        "ANSWER:  No."

25        Did I ask those questions and did you give those answers,

1    sir?

2    A. Yes.

3    Q. It's your understanding that the individual that replaced

4    you was replaced, correct?

5    A. That the individual who replaced me what?

6    Q. That was placed in the finance position, Khurram Solheil,

7    he was replaced as well, correct?

8    A. Yes, he was replaced later I understand.

9    Q. And who was placed into that position?

10   A. Tim Maddox.

11   Q. The same person that was the Internet Manager?

12   A. Correct.

13   Q. And he was the Internet finance manager when Mr. Baig

14   started in April of 2004, correct?

15   A. I'm not sure exactly what his capacity was.  He was a

16   sales consultant who handled the Internet for us.

17   Q. So you don't think he was the Internet manager?

18   A. I -- he handled the Internet.  I'm not sure he had a

19   manager title.  I don't know.

20   Q. You don't know one way or the other whether he was

21   considered a management title, is that fair?

22   A. That's fair.

23   Q. Okay.  Now -- thank you, sir.

24        **MR. JAMES BUCHHOLZ:**  Nothing further, Your Honor.

25

1          **REDIRECT EXAMINATION**

2     BY MR. ROBERT VEGELER:

3      Q. Mr. Richards, you asked the question as to Khurram Solheil

4     who replaced you, correct, by Mr. Buchholz?

5      A. Yes, Khurram Solheil replaced me.

6      Q. Yeah, and weren't you asked in response to the question by

7     Mr. -- Attorney Buchholz, he -- you told him who replaced

8     Koran (sic), Khurram, is that correct, Tim Maddox?

9      A. That's what I was aware of.  I don't know for sure.  I

10    wasn't working there at the time.

11     Q. Thank you.

12          **MR. ROBERT VEGELER:**  No further questions, Your

13    Honor.

14          **MR. JAMES BUCHHOLZ:**  Nothing further, Your Honor.

15          **THE COURT:**  Does the jury have any questions for this

16    witness?  If you at this time would write those down and my

17    Deputy will collect them.

18          **THE COURT:**  No one has any questions?

19          **JURORS:**  (No audible response.)

20          **THE COURT:**  All right.  This witness may step down.

21    Was the witness subpoenaed?

22          **MR. ROBERT VEGELER:**  Yes.

23          **THE COURT:**  Is he now released?

24          **MR. ROBERT VEGELER:**  Yes.

25          **THE COURT:**  All right.  You're now released from your

1    subpoena.

2              **THE WITNESS:**  Okay.  Thank you.

3              **THE COURT:**  Plaintiff's next witness?

4              **MR. ROBERT VEGELER:**  We'll call Mr. Kruse.

5              **THE COURT:**  Mr. Kruse, if you face my deputy to be

6    sworn.

7         (Whereupon, the Witness was sworn.)

8              **THE COURT:**  If you would put the mic on.  Mr.

9    Vegeler, was there a deposition taken that should be filed?

10             **MR. ROBERT VEGELER:**  No.

11                          **LARRY KRUSE,**

12             **having been first duly sworn,**

13          **was examined and testified as follows:**

14                     <u>**DIRECT EXAMINATION**</u>

15   BY MR. ROBERT VEGELER:

16    Q. Would you state your name for the jury?

17    A. Larry Brent Kruse.

18    Q. Would you spell your last name, please?

19    A. Spelled K-R-U-S-E.

20    Q. Mr. Kruse, you have been sitting in this trial since its

21   beginning as a representative of Fort-Rohr Motors, Fort Wayne

22   Toyota Lexus, is that correct?

23    A. That is correct.

24    Q. And you've heard the testimony so far, is that correct?

25    A. That I have, yes.

1    Q. Now, with respect to this case, when was the first time

2    you became familiar with Trent Chapin?

3    A. When I first met him, is that what you're asking?

4    Q. And when was that?

5    A. Uh, late 1990 when he first came to work for me at the

6    Toyota store.

7    Q. And did there come a time when Mr. Chapin came back to

8    Fort Wayne in March of 2004 and did you have contact with him

9    then?

10   A. Yes, I did.  He contacted me when he came back in town.

11   Q. And what were -- what was your relationship at that time

12   with Acura Subaru?

13   A. In March of 2004?

14   Q. Yes.

15   A. At that time, I was general manager of Fort Wayne Toyota

16   Lexus, and just associated with that dealership.

17   Q. Did you have any responsibilities, managerial or

18   otherwise, with Acura Subaru?

19   A. Not in March of 2004.

20   Q. Were you aware of a time when Mr. Chapin became a

21   salesperson with the Toyota Lexus dealership on or about March

22   11th, 2004?

23   A. Yes, I am.

24   Q. And do you know how he received that employment?

25   A. How he happened to get hired?

1    Q. Yeah.

2    A. Through one of the managers at the store.  I'm not sure

3    which manager hired him.

4    Q. Okay.  But were you the general manager, though, of Toyota

5    Lexus at that time?

6    A. Yes, I was.

7    Q. Were you aware that he had been hired?

8    A. Yes, I was.

9    Q. And did there come a time when Mr. Chapin or another

10   person contacted you concerning Mr. Chapin leaving the Toyota

11   Lexus employment in late March of 2004, early April of 2004?

12   A. Yes, I believe it was on April 2nd of 2004.

13   Q. Did you respond to a telephone communication -- I believe

14   you were in Hawaii -- either from Mr. Chapin or somebody else

15   concerning the possibility of Mr. Chapin being employed by one

16   of the other Bob Rohrman Auto Group dealerships?

17   A. You know, I don't know if I -- it was over the telephone

18   or if it was when I got back from Hawaii.  But I did learn of

19   him becoming employed at Fort Wayne Acura Subaru.

20   Q. Now, directing your attention to the end of April 2004,

21   did you have a discussion with Nadim Baig -- well, let me ask

22   you this, what was your understanding of Nadim Baig's position

23   with Acura Subaru at the end of April 2004; what was his

24   title?

25   A. Nadim was general manager.

1    Q. And did there come a time around April 30th, 2004 that you

2    had a discussion with Nadim Baig with respect to Trent Chapin,

3    and Trent Chapin's continued employment with the Acura Subaru?

4    A. Uh, I do recall talking to Nadim at some point in April of

5    2004, I'm not sure how chose to the end it was.  But I was

6    aware that he was probably going to make a change.

7    Q. And did you have any input in that change?

8    A. No, it was his store to run, so I wasn't going to get

9    involved in his decision making.

10   Q. And you heard some testimony that he -- Mr. Chapin was

11   told he was in transfer mode.  Were you made aware that Mr.

12   Chapin was in transfer mode at the end of April of 2004?

13   A. No discussion was ever made with me about transfer mode I

14   hope.  I made it aware that I didn't have a position for him

15   in management at that time, but maybe down the road I would be

16   opening up the budget lot soon, and might have an opportunity

17   for him at that point that he could come and talk to me about

18   it.

19   Q. And did he continue to pursue that potential opportunity

20   with you, Mr. Chapin?

21   A. Yes.  I remember talking to him on numerous occasions.  He

22   did come and talk to me just about every week about it.

23   Q. And did there come a time when the Toyota -- Fort Wayne

24   Toyota dealership of the Bob Rohrman Auto Group opened up a

25   used car lot at 5500 Illinois Road?

1    A. Yeah, we opened up the budget lot on June 1st of 2004; it

2    was a former Auto Corp. lot.

3    Q. And as general manager of Toyota, did you employ Mr.

4    Chapin for used car sales manager?

5    A. That is correct.

6    Q. And at that point in time, was there a sign at the budget

7    lot?

8    A. There was a sign at the budget lot.  The sign said "Auto

9    Corp." on it.

10   Q. And do you know how many salespeople Mr. Chapin had that

11   reported to him as used car sales manager?

12   A. I'm not sure how many initially he started with, if it was

13   one or two, but he had as many as three people at one point,

14   and as few as one.

15   Q. And was there any kind of focus consistent advertising for

16   the focus in the media for this used car budget lot in

17   April -- or not April -- in, say, June, July and August of

18   2004?

19   A. Um, I allowed him to place liner adds in Fort Wayne

20   newspaper.  We would mention that lot on the radio, in our

21   radio advertising.  And Illinois Road has tremendous drive-by

22   traffic, 30 to 40,000 cars go by there every day, so a lot of

23   drive-by traffic.  On a smaller location like that, it was

24   never my intention to aggressively advertise that because we

25   would get a lot of business from our lot and just being in the

1   area where there's a lot of car dealerships, you just get a

2   lot of drive-through traffic.

3    Q. Now did there come a time when you became aware that Mr.

4   Chapin had filed a charge of discrimination for race, national

5   origin and religion discrimination in early February of 2005

6   with the local EEOC agency?

7    A. I learned about it, but it wasn't until late February of

8   2005.

9    Q. And did you attend a meeting with Mr. Chapin on February

10   28th, 2005 on a Monday where you were present, Mr. Chapin was

11   present, Luke Luther was present and Shane Householder was

12   present?

13    A. Yes, I did.

14    Q. And you heard the Plaintiff's Exhibit Number 1 played to

15   the jury.  Does that tape accurately portray your discussion

16   with Mr. Chapin?

17    A. It does.

18    Q. And you had an opportunity to follow along with the

19   transcript, did you not, which was marked as Exhibit 3?

20    A. Yes, I did.

21    Q. And did that, as best possible, report the conversation

22   between you and Mr. Chapin?

23    A. As best as I could make it out, yes.

24    Q. And thereafter, did you -- when is the next time you

25   talked to Mr. Chapin?

```
 1    A. Um, the next time I actually talked to him?

 2    Q. Yes.

 3    A. Was in a conversation on March 4th of 2005.

 4    Q. And that was a Friday?

 5    A. That was a Friday, yes.

 6    Q. And where did that meeting take place?

 7    A. Also in my office.

 8    Q. And who was present?

 9    A. Uh, myself, Mr. Chapin, Luke Luther and Shane Householder.

10    Q. And you heard the tape that Mr. Chapin did that was

11    Plaintiff's Exhibit Number 2 admitted, did you hear that tape

12    played in the courtroom?

13    A. Yes, I did.

14    Q. And did that accurately portray what you believe you said,

15    Mr. Chapin said to you during that meeting?

16    A. Yes.

17    Q. And you also had the benefit of what's been marked as

18    Plaintiff's Exhibit Number 4, which was a transcript of that

19    prepared by your counsel.

20        Did that accurately reflect, as best as possible, the --

21    what was said at that March 4th, 2005 meeting?

22    A. Yes, there was some minor changes on that, but it was a

23    little more accurate.

24    Q. Okay.  Now, you've been general manager of Toyota that's

25    been referred to as Fort-Rohr Motors, Inc., but Toyota Lexus
```

1    has been referred to in this litigation.  As general manager,

2    are you familiar with the annual sales for 2006 of both new

3    and used cars for that dealership?

4     A. As far as the total number?

5     Q. Yeah.

6     A. Off the top of my head, without looking at the financial,

7    I couldn't tell you the exact number.

8     Q. Okay.  Well, give me a ball park number.

9     A. Um, probably total new cars, 900 to a thousand with Toyota

10   and Lexus combined.

11    Q. And what's the dollar amount in revenues?

12    A. I don't know the total -- total revenues.  I thought you

13   were talking about new -- total number of new cars.

14    Q. Yeah, I'm talking about -- okay, how many used cars?

15    A. Uh, used cars, hmmm, let me think here.  Probably in the

16   1500 plus range on used cars, total numbers.

17    Q. These are per year?

18    A. Yes, on an annual basis.

19    Q. And what were the new cars again?

20    A. It would have been around 900 to a thousand.

21    Q. And sales somewhat similar in 2007?

22    A. For -- for this year?

23    Q. Yeah.

24    A. We're probably on a slightly higher pace.

25    Q. And as general manager, do you review the sales figures

1    every month for the dealership?

2     A. I do look over the sales figures.  I'm not the one

3    responsible for putting those numbers together.

4     Q. No, but you look it over, don't you; you see if you're

5    doing better or worse?

6     A. Sure.  Sure.

7     Q. And you looked over 2006 at the end of the year, did you

8    not?

9     A. Yes.

10    Q. And what was the total sales in general figures?

11    A. Um, again, I couldn't tell you off the top of my head what

12   the total sales were.  As far as dollars?

13    Q. Yeah.

14    A. I couldn't tell you.

15    Q. Was it more than a million?

16    A. Yes.

17    Q. Was it more than ten million?

18    A. Probably in that area.

19    Q. Right around ten million?

20    A. I would guess.

21    Q. And does that Toyota --

22    A. I'm not talking about profit, I'm talking about --

23    Q. No, just gross sales.  And does that Toyota Lexus rent or

24   lease the building and land?

25    A. We rent the property from Mr. Rohrman, rent it and lease

1    it from him.

2    Q. And now that was new cars -- new car sales and used car

3    sales, correct, was about ten million; what about repairs?

4    A. Yeah, it's probably higher than that, again --

5    Q. What about repairs?

6    A. Repairs on service?

7    Q. Yeah.  What was that in 2006?

8    A. Again, I don't look at the total sales figures per se

9    themselves.  I look more at the profit.

10   Q. Okay.  But as general -- general manager, wouldn't you be

11   concerned whether or not repairs for, say, the year before

12   were 5 million and the next year they were 6 million, wouldn't

13   that be --

14   A. Yeah, I know our sales have increased.

15   Q. Well, what about repairs?  I don't know what you mean by

16   sales --

17   A. Yeah, sales on both service side and the sales side have

18   increased.

19   Q. Were those all included in that ten million dollar figure?

20   A. Yeah.

21   Q. Well, what was repairs about?

22   A. Um, you know, several million.

23   Q. Okay.  Is there anything else you're selling at that

24   dealership?

25   A. No, we do not have a body shop, so no.  Finance income,

1    but that's part of sales.

2     Q. Did those result in profits for 2006?

3     A. Yes.

4     Q. And when you add in the new car sales, used car sales,

5    repairs and so forth, did that generate a profit at Toyota

6    Lexus for 2006?

7     A. Yes, it did.

8     Q. And what was the general amount?

9     A. It was between four and five million.

10    Q. And that was after paying rent to Mr. Rohrman for leasing

11   the building and the land?

12    A. That was after paying rent, after all expenses were paid.

13    Q. Four to five million?

14    A. Yes.

15    Q. You have access to the financial statements, do you not,

16   at Toyota Lexus?

17    A. I do have access to them, yes.

18    Q. And that includes, if you talk about revenues, profit,

19   expenses, that's one side.  What about assets and liabilities?

20    A. Yes, I have access to that.

21    Q. Can you tell the jury what the 2006 asset value was of

22   that Toyota Lexus dealership?

23    A. No, I couldn't tell you off the top of my head.

24    Q. Was it more than a million?

25    A. Oh, sure.

1    Q. Was it more than five million?

2    A. It's probably more than ten million.

3    Q. Okay.  So you have sales of new and used cars in excess of

4    ten million, you've got repairs and maintenance in excess of

5    two million or so, and you've got asset value in excess of ten

6    million for just the Toyota Lexus and that's 2006, correct?

7    A. Yeah, and the assets obviously have accumulated over time,

8    not just --

9    Q. And are things about the same in 2007 or better?

10   A. I think things are slightly better.  They're slightly up.

11   Q. Now, you signed under oath, did you not, some

12   interrogatory answers; you recall those that were tendered to

13   you for Fort-Rohr, Inc.?

14   A. Yeah, it's been some time ago I believe.

15   Q. Okay.  Let me ask you this, do the tapes, both tapes speak

16   for themselves?

17   A. Yes.

18   Q. Is that a fair statement?

19   A. Yeah, that's a fair statement.  There's, you know,

20   obviously there's two sides to every story.

21   Q. Sure, and I understand that.  But you in -- when you made

22   your statements in those tapes, you meant them, didn't you?

23   A. The statements are what they are.

24   Q. Yeah, but you meant them; nobody forced you to make false

25   statements, did they?

1    A. No, the statements on the first tape, I said when I was

2    angry and upset.  I didn't mean those.

3    Q. Okay.  Well, that brings up a good point.  Did you not

4    instruct Mr. Chapin to immediately go down to the EEOC office

5    and reverse that discrimination charge?

6    A. I did say that at the time, yes.

7    Q. And so when is it that you found out that Mr. Chapin

8    reversed those discrimination charges?

9    A. That he reversed them?

10    Q. Yeah, made them go away, dismissed them?

11    A. I don't believe that he ever did.

12    Q. Okay.  When did you find out that he didn't make them go

13    away, reverse them, dismiss them, asked them to be dismissed?

14    A. Um, I really didn't expect him to reverse them.

15    Q. Did you talk to anybody such as Luke Luther, Shane

16    Household (sic), Mr. Rohrman, attorneys, between -- let me

17    back up.

18       Did you talk to Mr. Householder or Mr. Luther or Mr. Baig

19    or Mr. Rohrman about the February 10th, 2005 charge of

20    discrimination after tape number one of February 20th, 2005

21    and before March 4th of 2005, during that 6-day period, did

22    you talk to Mr. Householder about --

23    A. I did talk to Mr. Householder and Mr. Luther.

24    Q. Did you talk to Mr. Rohrman?

25    A. No, I did not.  Not at that point.

1    Q. Did you talk to Mr. Baig about it?

2    A. Uh, between that time period, no.

3    Q. Okay.  Now that charge of discrimination had only really

4    to do with Mr. Baig's dealership, the Acura Subaru, not your

5    Toyota Lexus, correct?

6    A. That is correct.

7    Q. Did you ask Mr. Baig to come down and clear the air and I

8    think your letter said get rid of that misunderstanding?

9    A. No, because the discrimination charges from approximately

10   ten months earlier and I was quite surprised, and that was why

11   I became upset about it at the time was because I first

12   thought it was toward our store, and then, you know, came to

13   find out it was towards the Acura store and I just didn't

14   understand that.

15   Q. Okay.  Well, the charge was filed 2-10 of '05.

16   A. Mmm-mm.

17   Q. You agree with me there?

18   A. Oh, from what I understand, yes.

19   Q. So when Mr. Chapin said to you it's actually against

20   Nadim, is that correct your question was (Inaudible).

21       Doesn't that mean you're talking about Rohrman Auto Group

22   and you're talking about a complaint against Mr. Baig, because

23   Mr. Chapin told you it was against Mr. Baig?

24   A. Mmm-mm.

25   Q. So you knew at that time, it wasn't involving you,

1    correct?

2     A. Yes, at that time, I knew that.

3     Q. Okay.  And yet, you continued to tell him, "Get it

4    reversed", right?  "You decide if you're working here or not"?

5     A. I did in a moment of anger, yes.

6     Q. Okay.  So when Mr. Chapin goes back, and you have this

7    second discussion after you got over your anger and so forth,

8    when Mr. Chapin told you, you asked, "What's going on?"

9    Chapin says, "I understand I should call him.  I'm going to

10   call him."

11        You said, "What is it on?

12        Chapin says:  "For reverse discrimination."

13        Kruse says, "Reverse discrimination?"

14        Chapin says, "Yes, uh."

15        Chapin said, "You told me don't come back unless I reverse

16   it.  That's your exact words."

17        Your statement was, "You misunderstood."

18        Chapin:  "I don't understand.  You were very clear."

19        Kruse:  "I didn't tell you --

20            **MR. JAMES BUCHHOLZ:**  Judge, is there a question here

21   or is this a narrative?

22            **MR. ROBERT VEGELER:**  This is a question.

23   BY MR. ROBERT VEGELER:

24    Q. Did you state that too, is that accurate?

25    A. That's the way it came out on the tape; that's what I

1    stated.

2     Q. Okay.  And you stand on that?

3     A. As far as what the tape says, yes.

4     Q. So after 6 days and you got over your anger, now you're

5    telling Mr. Chapin, "Oh, by the way, Kings X, I didn't mean

6    it," right?

7     A. Absolutely, I didn't mean it.

8     Q. Okay.  And you're also, are you not, telling Mr. Chapin,

9    you never said that in the first place?

10    A. I didn't intend it to come out the way it came out is what

11   I meant.

12    Q. So as you indicated, is it accurate to say you told Mr.

13   Chapin you were trying to twist things?

14    A. I did say that, yes.

15          **MR. ROBERT VEGELER:**  May I have a moment, Judge?

16          **THE COURT:**  Certainly.

17          **MR. ROBERT VEGELER:**  No further questions, Your

18   Honor.

19          **THE COURT:**  Did you want to cross at this time?

20          **MR. JAMES BUCHHOLZ:**  We can or you can take a break,

21   Judge.  Whatever you like.  Doesn't matter to me.

22          **THE COURT:**  Do you want to take a break now or

23   mid-afternoon break, go on until about 3:30?

24          **JURORS:**  (Nodding.)

25          **THE COURT:**  All right.  Let's go on until about 3:30.

1      **MR. JAMES BUCHHOLZ:**  Well, let's just get rid of it.

2  Let's get done with this case.  I'll take him now, if that's

3  okay, with leave to go outside the scope on a limited basis.

4      **THE COURT:**  Go ahead.

5                    <u>**CROSS EXAMINATION**</u>

6  BY MR. JAMES BUCHHOLZ:

7  Q. Mr. Kruse, you've been with Fort Wayne Toyota how long?

8  A. I've been with Fort Wayne Toyota since the store opened in

9  October of '89.

10  Q. Okay.  And what was your position in October of '89?

11  A. I started there as used car manager.

12  Q. Okay.  And had you worked in any car dealerships before

13  the time frame that you started with Fort Wayne Toyota in

14  1989?

15  A. Yes, I worked for one other dealership; it was Bob Jackson

16  Ford.

17  Q. Okay.  And is that where you got your start in the car

18  business?

19  A. Yes, it is.

20  Q. And when did you start with them?

21  A. I started February 4 and worked there until April of '89.

22  Q. Okay.  And was there a job position in terms of sales at

23  Jackson that you didn't handle?

24  A. No, basically every position in the front end of the

25  operation, front end would be in the sales end, I worked as a

1    sales representative, I worked as a closing manager, worked as

2    a finance manager, as a new car manager, as a used car

3    manager, and as a finance director.

4     Q. Okay.  And so you come over to Fort Wayne Toyota, I take

5    it you had an opportunity there?

6     A. Yes.  Yes.

7     Q. And was that -- was that one of the first Rohrman

8    dealerships in Fort Wayne?

9     A. The Acura store opened up the year before that, and the

10   Toyota store opened up in '89.

11    Q. So 1988 Acura opens up, 1989 Toyota opens up?

12    A. That's correct.

13    Q. And then as you were at Fort Wayne Toyota from a used car

14   manager, I take it you progressed a little bit?

15    A. Yeah, I took over as general manager in January of 1991.

16    Q. Okay.  And you've held that position since?

17    A. I've held that position since.

18    Q. Now, I think you said earlier your first experience with

19   Mr. Chapin was in the early 1990's?

20    A. Yeah, I believe it was in December of 1990.

21    Q. And how many times are you aware of him working in some

22   auspices at your location?

23    A. Uh, I am aware that he worked for us on seven different

24   occasions from the first time.

25    Q. Can you explain the reason for so many different times of

1   work at your dealership operated from Mr. Rohrman by Mr.

2   Chapin?

3    A. Well, I believe, you know, the longest period of

4   employment was 15 months.  And there were a couple of

5   occasions where he worked only a few months.  You know, Trent

6   did have some abilities.  He was a good closer, you know, so

7   he could come in and do the job quickly.  So I never really

8   held it against him that he didn't stay there long.  I never

9   really looked at him as a long-term employee.  I looked at him

10  more as a quick fix.

11   Q. Now, is it my understanding you were keeping an eye out at

12  some point in late March, early April in 2004 for the Acura

13  store as the interim general manager?

14   A. Um, yes.

15   Q. Okay.  And at that time, that was at the request of Mr.

16  Rohrman?

17   A. That is correct.

18   Q. Okay.  And the time frame you were no longer involved in

19  that position was when?

20   A. Um, when Nadim Baig came in in 2005.

21   Q. Okay.  Well, the testimony from Mr. Chapin is April of

22  2004 is when it is Mr. Nadim Baig came in; would you have any

23  reason to dispute that?

24   A. 2004.  Oh, that's correct.  It's 2004, I'm sorry.

25   Q. Okay.  Did you have any understanding as to what position

1    Mr. Chapin would be taking at Fort Wayne Acura after he left

2    Fort Wayne Toyota in 2004?

3    A. Did I understand what position he was going to be taking?

4    Q. (No audible response.)  Yes, that's my question.

5    A. Yes, that's what I --

6    Q. And what was your understanding after he left Fort Wayne

7    Toyota in 2004 that he would be taking?

8    A. A used car manager position.

9    Q. Now, we talked earlier or you saw earlier a separation

10   report from Fort Wayne Toyota; correct?

11   A. That's correct.

12   Q. And that was April 2nd of 2004?

13   A. Yes, April 2nd, 2004.

14   Q. Okay.  I'm going ask you to look at Defendant's Exhibit H.

15   Do you see this termination report?

16   A. Yes, I do.

17   Q. Okay.  And it indicates there you took the employee home

18   and failed to return to work, is that correct?

19   A. That is correct.

20   Q. What's your understanding of the time frame -- you heard

21   Mr. Chapin's explanation as to failure in terms of his failure

22   to return.  What's your understanding with this separation

23   report and circumstances?

24   A. Uh, I understand he took an employee home mid- to late

25   afternoon and never returned to work; he did not return on 4-1

1  as he was supposed to.

2   Q. Also, I'm going to show what you has previously been

3  marked as Defendant's Exhibit R; you see that document?

4   A. Yes, I do see that document.

5   Q. Okay.  Do you recognize the signatures at the bottom of

6  that document?

7   A. Yes, I do.

8   Q. Okay.  What are the signatures at the bottom of that

9  document?

10   A. Trent Chapin is the first signature, and Luke Luther is

11  the second signature.

12   Q. And who was Luke Luther?

13   A. Luke Luther is our slash -- human resource manager slash

14  CR manager; he encompasses both positions.

15   Q. Okay.  Does he have any responsibilities for any operation

16  other than the Fort Wayne Toyota Lexus operation?

17   A. No, exclusively Fort Wayne Toyota Lexus.

18   Q. So the only things he does is at your request-type

19  situation?

20   A. Yes, that is correct.

21   Q. Is the writing on this document Mr. Luther's writing?

22   A. To the best of my knowledge it's Mr. Luther's writing,

23  yes.

24   Q. Okay.  And on the prior document, Exhibit H, does that

25  appear to be Mr. Luther's writing on that document as well?

1   Be happy to put it back up there for you.

2    A. Yes.

3    Q. And at the bottom of that document, do you recognize those

4   signatures?

5    A. Yes, I do.

6    Q. And what are they --

7    A. It's Trent Chapin and Luke Luther.

8    Q. So the top one is Mr. Chapin --

9    A. The top one is Trent Chapin.  The bottom one is Luke

10   Luther.

11    Q. Okay.  After Mr. Baig became general manager at Fort Wayne

12   Acura, did you have anything to do with what went on within

13   management structure at that location?

14    A. Absolutely nothing.

15    Q. Okay.  Now, is Fort Wayne Acura in terms of a management

16   structure set up similarly to the management structure at Fort

17   Wayne Toyota?

18    A. Yes, pretty -- pretty similar.  They're not quite as big a

19   corporation, not as many employees, so they don't have as many

20   management positions.

21    Q. Okay.  Who does the service manager at Toyota report to?

22    A. At Toyota Lexus, we have a parts and service director.  I

23   don't believe they have a parts and service director at the

24   Acura Subaru store.

25    Q. And that's based upon the size of the --

1    A. Based upon the size, yes.

2    Q. Okay.  Now, is there an office manager?

3    A. There is an office manager and an assistant office

4    manager.

5    Q. Are there new cars managers and used car sales managers?

6    A. Yes.

7    Q. Okay.  Internet sales managers?

8    A. Yes.

9    Q. Are there finance managers?

10   A. At the Toyota Lexus store, we have a number of finance

11   managers.

12   Q. Okay.  So while there may not be as many at Acura, because

13   it's a smaller operation, the management structure is the

14   same?

15   A. Yes, it is.

16   Q. Is Fort Wayne Acura and Fort Wayne Toyota the same

17   corporation?

18   A. No, they're different corporations.

19   Q. Okay.  Are they at the same locations?

20   A. No, they're different locations.

21   Q. Do they have the same management?

22   A. Have entirely different management.

23   Q. Do they have the same employees?

24   A. Entirely different employees.  They don't share employees

25   at all.

1    Q. Okay.  Separate payrolls?

2    A. Separate payrolls.

3    Q. Separate bank accounts?

4    A. Yes.

5    Q. Separate accounting?

6    A. Yes.

7    Q. All right.  Now, you talked about -- you've heard

8    testimony about the introduction of a general manager at Fort

9    Wayne Acura, correct?

10   A. Yes, I have.

11   Q. Okay.  And you've been a manager in the Rohrman Group for

12   a extended number of years, correct?

13   A. Yes, I have.

14   Q. Do you have an understanding as to how it is a manager is

15   introduced to the dealership when there's been a change of the

16   general manager position?

17   A. Yes, I do.

18   Q. And could you tell us what it is, the procedure that

19   occurs when that happens?

20   A. Well, when a management change, are you talking about

21   general manager?

22   Q. Yes.  Yes, sir.

23   A. When a general manager is changed, usually Bob Rohrman

24   comes in, and will introduce the new -- the new general

25   manager.

1    Q. Okay.  And so are there meetings that occur associated

2    with the introductions?

3    A. Usually if Bob Rohrman makes a change with a general

4    manager, he'll come in and have a meeting with the whole

5    management team.

6    Q. And the purpose of those meetings, from your understanding

7    within the group, it would be to do what?

8    A. To give the new general manager his support, and let

9    everybody know that he's in charge and the direction of the

10   ship needs to go the same way that the general manager is

11   going, and the decisions that he makes are the decision as far

12   as Bob Rohrman is concerned are the ones that should be made

13   for the store.

14   Q. Okay.  In your experience is it common when a general

15   manager is brought into a location that there are management

16   changes below the general manager position after a period of

17   time?

18   A. Almost always when you have a new general manager come in,

19   there are management changes that follow, if not immediately,

20   shortly thereafter.

21   Q. What's your understanding as to why that occurs?

22   A. Uh, well, he's got -- he wants to get people in place that

23   he's familiar with, that he knows, their experience, their

24   knowledge, their abilities.  And chances are if there's a

25   change with the general manager, it isn't just the previous

1    general manager that wasn't getting the job done, probably

2    some of the other managers that were there weren't, too.

3     Q. All right.  Now, I understand that the budget lot was

4    opened at what time frame?

5     A. It opened in June of '04, June 1st of '04.

6     Q. Okay.  And were there any used car managers at that lot

7    before the time frame that Mr. Chapin was there?

8     A. No, it was a brand new lot, so there were no management

9    there.

10    Q. Okay.  Now, you've told us earlier about the efforts

11   associated with advertising and staffing.  Was that his -- was

12   that within his bailiwick in terms of advertising, staffing at

13   that lot?

14    A. He had the ability to place advertising within Fort Wayne

15   newspapers, get me information to place on the radio.  I would

16   place the radio adds.  If he wanted to do any other kind of

17   promotions at the stores, um, some kind of special promotion

18   where you display things on the lot, then that was up to him

19   to approach me on.

20    Q. Okay.

21    A. There also was a -- a sign, a mobile sign on the lot that

22   had wheels on it that you could use to display advertising.

23    Q. Between April 30th of 2004, and June 1st of 2004, did Mr.

24   Chapin ever make any complaints to you about what he perceived

25   to be discrimination at the Acura store?

1    A. Never.

2    Q. At any point in time until February of 2005, did Mr.

3    Chapin make any complaints to you about what he perceived to

4    be discrimination at the Acura store?

5    A. I never heard word about any discrimination until February

6    of 2005.

7    Q. Now, you told Mr. Vegeler on direct examination that you

8    were upset when you had your meeting with Mr. Chapin, correct?

9    A. That is correct.

10   Q. Okay.  And I think you said that things didn't come out

11   the way you wanted?

12   A. No, they didn't.

13   Q. Okay.  Did you express to Mr. Chapin that -- did you ever

14   make an expression to Mr. Chapin that what you said was not

15   what you meant?

16   A. Um, I tried to -- I tried to call him on a number of

17   occasions and talk to him about it, could not get a return

18   call.

19   Q. How many times after -- after the 28th of February did you

20   attempt to get in touch with Mr. Chapin?

21   A. There were several times, at least two times that I

22   personally tried to get in touch with him by letter, and at

23   least a half a dozen times on the telephone.

24   Q. When you called on the phone, did you ever get anybody to

25   answer the other end?

1    A. At one point, there was a female that answered the

2    telephone.

3    Q. Okay.

4    A. And I left a message with.

5    Q. You left a message for him to call?

6    A. Yes, to get back with me.

7    Q. Did he ever call you?

8    A. No, he did not.

9    Q. So you have this meeting and you're upset and things come

10   out differently than you intend, correct?

11   A. Exactly, correct.

12   Q. And you try and have a conversation with Mr. Chapin about

13   that, but you can't get a return call?

14   A. That's correct.

15   Q. So you have another meeting with him, I understand, from

16   the testimony from direct exam?

17   A. Had a meeting with him on March 4th, yes.

18   Q. During that meeting were you upset?

19   A. Uh, no, I really wasn't upset during that meeting, no.

20   Q. Okay.  And at that time, did you indicate to him that

21   there was a misunderstanding, that there was no termination?

22   A. Yes, I welcomed him to come back in employment at the

23   Toyota store, requested that he come back and, you know, start

24   immediately.

25   Q. Did you ever say -- did you ever indicate to him that he

1    was terminated in the February 28th meeting?

2     A. I never told him in either meeting that he was terminated.

3     Q. Okay.  Now, there was discussion associated with

4    production in both tapes, correct?

5     A. That's correct.

6     Q. Would you explain to the jury what the issues associated

7    with production of Mr. Chapin were?

8     A. Yeah, the store just was not producing the volume that I

9    felt like it should be producing.  They weren't selling enough

10   cars to make it worth keeping the location open.  We were

11   losing -- frankly, we were losing money at the location.

12    Q. Okay.  Now, in the second tape, Mr. Chapin made some

13   suggestions about how to increase traffic, correct?

14    A. Mmm-mm.

15    Q. Is that a "yes"?

16    A. Yes, that is correct.

17    Q. Okay.  Was it your belief that he had an interest in

18   increasing the traffic at that location in the March 4th, 2004

19   meeting?

20    A. I believe that he stated that he had an interest.  Whether

21   he was sincere about it, I don't know.

22    Q. Okay.  Was there anything else that you were aware of that

23   you could say to him in the March 4th meeting to indicate that

24   he had a job position?

25    A. I think I made it pretty clear with him.

1    Q. Okay.  Did you indicate your willingness to assist in

2    terms of increasing sales traffic and volume at that location?

3    A. Yes, I was willing to talk about it.  You know, indicated

4    that I would be willing to do something with the sign.

5    Q. Okay.  Now, you heard Mr. Chapin say earlier today that

6    one of the reasons that he couldn't do anything is because he

7    had no people.  Did you ever limit the number of people that

8    he could hire?

9    A. Sales managers are responsible for hiring their own

10   salespeople.  It's not up to me as a general manager to hire

11   the people for them.  I hire the management team, and they

12   hire their people.  So I never placed a limit on who he could

13   hire or restricted advertising for salespeople.  Um, it's up

14   to them to run with the ball.

15   Q. Do you open locations for the purpose of losing money?

16   A. Absolutely not.  We open the location there because I felt

17   like it was a great location among all the other car

18   dealerships, and it would be a viable opportunity for us to

19   sell more vehicles.

20   Q. Were you interested in limiting his inventory or in any

21   other fashion squelching the opportunity at the budget lot?

22   A. No, in fact, we had his lot full of cars, and he had

23   access to all the inventory at our location, as well as any of

24   the other Rohrman stores in Fort Wayne.  He could buy cars for

25   his store from any of those locations.  All I needed to do was

1    have the salespeople come over to the other store, pick up the

2    car, go back to his location and sell it.

3     Q. Okay.  You sent two letters to Mr. Chapin reiterating the

4    communication that he had a job, correct?

5     A. That is correct.

6     Q. Okay.  And you've seen the other exhibits sent by Mr.

7    Luther, correct?

8     A. Yes, I have.

9     Q. Are you aware of any telephone calls made by Mr. Chapin --

10   to Mr. Chapin, excuse me, by Mr. Luther during this time

11   frame?

12    A. I'm aware Mr. Luther made calls to Mr. Chapin as well.

13    Q. Okay.  Now, as I understand it, the charge for retaliation

14   was filed March 10th, 2005, is that your understanding?

15    A. That's my understanding.

16    Q. Okay.  So that's a little more than six days after your

17   communication to Mr. Chapin that he had a job?

18    A. That is correct.

19    Q. And it's also after the time frame that the first letter

20   was sent associated with him having a job?

21    A. That's correct.

22    Q. Did Mr. Chapin ever indicate to you the reason for his

23   refusal to come back to work?

24    A. No, he never indicated to me why he wouldn't come back.

25    Q. Are you aware of Mr. Chapin communicating with anybody

1   else within your organization in terms of the reason he

2   wouldn't come back?

3    A. No, I am not.

4    Q. When the February 28th meeting occurred, what was the

5   positioning of you within that office?

6    A. I was sitting behind my desk.

7    Q. Okay.  Is your desk any wider than the Court Reporter's

8   desk here?

9    A. No, it's about -- about the same amount of area.  This

10   desk down here (Indicating)?

11    Q. Yeah.

12    A. Yeah, it's probably the same amount of area.

13    Q. And where was Mr. Chapin located?

14    A. Uh, Mr. Chapin was sitting on the other side of the desk

15   across from me.

16    Q. Okay.  Mr. Householder was in the meeting?

17    A. Yeah.  In fact, they're across from me, there are three

18   chairs that sit across from my desk.  Um, Mr. Householder was

19   in one chair, Mr. Luther was in another, and Trent Chapin was

20   in the other chair.

21    Q. Okay.  So everybody was seated at this meeting?

22    A. Everybody was seated.

23    Q. During the February 28th meeting, was there ever a time

24   when you stood up out of your chair?

25    A. Never.

1   Q. Was there ever a time during the meeting that Mr.

2   Householder or Mr. Luther stood up out of their chairs?

3   A. No, they didn't.

4   Q. Is it fair to say -- only time people stood up was when

5   the making was over?

6   A. That's correct, once Trent got up to leave.

7   Q. Okay.  Then on the March 4th date, what was the placement

8   of individuals within your office?

9   A. The very same.  All the same parties were there, the

10   seating arrangement was the same.

11   Q. Okay.  I sensed within the tape that on the 28th, the

12   atmosphere in the room was a little tense?

13   A. On the 28th, it was a little tense.  It was when it was

14   first drawn to my attention, and --

15   Q. Okay.  You had some intensity that day?

16   A. I had a little intensity, you know.  I get a lot of things

17   thrown at me and I was a little fired up at that particular

18   moment.

19   Q. Okay.  Did you have the same intensity on March the 4th?

20   A. No, not nearly.

21   Q. Okay.  Was it your intention at any point during the 28th

22   -- the meeting of the 28th, to have Mr. Chapin walk out of

23   there with the intention he had been terminated?

24   A. No, I did not intend to terminate him, and realized

25   shortly thereafter that he left that, you know, I had talked

1    to him the wrong way.

2     Q. Okay.  And you felt there might be some fashion to

3    misinterpret your comments?

4     A. Yes, I could see how he could misinterpret my comments.

5     Q. You could see how he would have considered he had been

6    fired, listening to the tape?

7     A. Yes.

8     Q. That was not your intent?

9     A. It was not my intent.  It was not my intent.  I never said

10   he was fired.

11    Q. No matter how many -- and you explained to him that

12   apparently in letters and in conversations, apparently he's

13   not accepted that, is that your understanding?

14    A. He never accepted that, no.  Never gave me a chance.

15    Q. And the figures you provided earlier were your best guess

16   associated with the questions responded to by Mr. --

17   propounded by Mr. Vegeler?

18    A. Yeah, without looking at the financial statements, yeah,

19   that's all I can do is make a guess.

20           **MR. JAMES BUCHHOLZ:**  I don't have anything further,

21   Judge.  Thank you.

22           **THE COURT:**  Redirect.  We'll try and finish this

23   witness and then we'll take our break.

24

25

1                    **REDIRECT EXAMINATION**

2    BY MR. ROBERT VEGELER:

3     Q. Did you call the meeting of February 28th, 2005 with Mr.

4    Chapin, Mr. Luther and Mr. Householder?

5     A. Yes, I did call it.

6     Q. And when did that meeting occur during the day?

7     A. I believe it was in the afternoon.  I couldn't tell you

8    the exact time.

9     Q. When did you become aware of the first charge of

10   discrimination that was filed February 10th, 2005?

11    A. Uh, would have been -- the meeting was on a Monday, so it

12   would have been the previous Friday or previous Saturday.  One

13   of those two days.

14    Q. How did you become aware of it?

15    A. From management down at the Acura store.

16    Q. Okay.  So you had from either Friday, Saturday, Sunday,

17   and half of Monday to collect your thoughts, talk to people or

18   you either had Saturday, Sunday and half of Monday to collect

19   your thoughts before this meeting on February 28th in the

20   afternoon, correct?

21    A. I -- there was some time before I approached him, yes.

22    Q. Yeah.  But if you knew about it either Friday or Saturday,

23   you had at least up to 72 plus hours to be calm, talk to

24   people, figure out how you're going to approach this

25   methodically or 48 some odd hours, correct?

1    A. Yeah, but I was still fired up about it.

2    Q. Okay.  You said in -- the question to you was did you ever

3  make an expression to remedy the situation; that was the

4  question by your attorney and your response was a number of

5  times, two by letter, six by telephone or --

6    A. At least a half dozen by telephone, yes.

7    Q. And were those two letters the letters that are in

8  evidence, Exhibit 5, 6?

9    A. Yes, there are.

10   Q. So those are after the March 4th meeting, at least four

11 days after the March 4th meeting and some eight days after the

12 March 4th meeting correct?

13   A. That's correct.

14   Q. No letters between the meeting of February 28th, 2005 and

15 March 4th of 2005, were there?

16   A. No it's my understanding on the March 4th meeting that he

17 was going to be coming back.

18   Q. No.  You testified on February 28th of 2005 you never

19 thought he was going to reverse the charge.

20   A. I didn't think he was going to reverse the charge, but I

21 thought he would come back.

22   Q. After what you said to him in that tape?

23   A. After I was able to talk to him on March 4th, yes.

24   Q. Well, I'm talking between February 28th and March 4th, did

25 you ever send him a letter, certified, first class or

1    anything, saying, "I'm sorry.  I made a mistake"?

2     A. No, because I wanted to meet with him in person.

3     Q. Did you ever send a courier over, you know, with a

4    handwritten letter or note of apology saying, "Come on back.

5    I made a mistake" during that period?

6     A. Did not send a letter during that period.

7     Q. Did you send a certified letter to Mr. Chapin during that

8    period so that you knew he would sign for it?

9     A. No, I did not.

10    Q. Did you personally go over to his house and try to explain

11   what had happened February 28th, 2005?

12    A. No, I'm not sure if I knew where he lived.

13    Q. Did you ask?

14    A. Uh, no.

15         **MR. ROBERT VEGELER:**  No further questions, Your

16   Honor.

17         **MR. JAMES BUCHHOLZ:**  Limited, Judge.  And I do have

18   one that's outside the scope if I may.

19         **THE COURT:**  Go ahead.

20         **MR. JAMES BUCHHOLZ:**  Is that fine?

21         **THE COURT:**  Go ahead.

22                    <u>**RECROSS EXAMINATION**</u>

23   BY MR. JAMES BUCHHOLZ:

24    Q. Can you tell the ladies and gentlemen of the jury why you

25   were fired up during that period of time, Mr. Kruse?

1    A. Yeah, I can tell you why I was fired up.  You know, I had

2    given Trent opportunity to work for the company a number of

3    occasions.  You know, I loaned him money myself, um, to help

4    him out around Christmas time, and, you know, I just felt like

5    he was being disloyal to the company.  I'm a very loyal-type

6    person.  I think I've displayed that by my employment.  I've

7    worked for two car dealers in my entire career.  And to me

8    loyalty was important, and there was a 10-month period from

9    the time he left Acura Subaru to when he, um, filed the claim.

10   So you know, I just -- I was fired up because I felt it was

11   bogus, you know.  I felt it was unjustified for him to be

12   filing a claim 10 months later, and I just couldn't believe

13   it.

14    Q. There's been testimony in this case that Mr. Rohrman, by

15   Mr. Chapin, that Mr. Rohrman was present at Fort Wayne Toyota

16   on February 26th, 2005, remember that testimony?

17    A. I remember the testimony, yes.

18    Q. Was Mr. Rohrman, did you observe Mr. Rohrman or was he

19   present on that day?

20    A. He was not present that day in Fort Wayne.

21    Q. If Mr. Rohrman comes to the dealership, would there ever

22   be a time frame that you would be aware of it?

23    A. Mr. Rohrman always let's me know when he's in town and

24   almost always comes by the Toyota Lexus store and sees me if

25   he's in town and I've never seen him come in town on the last

1    of the month, the last Saturday of the month.  He doesn't want

2    to come in and disrupt business, because he knows we are going

3    to be extremely busy.

4     Q. Thank you.

5            **MR. JAMES BUCHHOLZ:**  Nothing further, Your Honor.

6            **MR. ROBERT VEGELER:**  Nothing further, Your Honor.

7            **THE COURT:**  Any questions by the jury of this

8    witness?  At this time if you would please jot them down.

9        (Whereupon, there was a brief pause in the proceedings to

10   allow the jurors to write down questions.)

11           **THE COURT:**  There being no questions by the jury, you

12   may step down and then we'll go into our mid-afternoon break.

13   Let's take about 15 minutes.  It's about twenty 'till.  We'll

14   be back on the record at 5 'til 4:00.  We'll go until 5:00

15   o'clock.

16       (Jury absent.)

17           **THE COURT:**  Okay.  Fifteen minutes, counsel.

18        (Whereupon, a break was taken; thereafter, the

19   following proceedings were had:)

20           **THE COURT:**  Go ahead and be seated, counsel.  And who

21   is the next witness going to be?

22           **MR. ROBERT VEGELER:**  Nadim Baig.

23           **THE COURT:**  Please bring the jury down.

24           **MR. JAMES BUCHHOLZ:**  Your Honor, is it all right if I

25   get him?  I'll put him in the chair back here.

1      (Jury present.)

2          **THE COURT:**  Go ahead and be seated, ladies and

3    gentlemen.  Go ahead and be seated, counsel.  At this time, is

4    the plaintiff ready to call his next witness?

5          **MR. ROBERT VEGELER:**  Yes, Your Honor.

6          **THE COURT:**  Mr. Vegeler.

7          **MR. ROBERT VEGELER:**  Call Nadim Baig.

8          **THE COURT:**  Sir, if you please approach the witness

9    stand.

10     (Witness doing as indicated.)

11         **THE COURT:**  And now, if you please raise your right

12   hand to be sworn to testify.

13      (Whereupon, the witness was sworn.)

14         **THE COURT:**  Mr. Baig, there is a microphone there at

15   the end of that wire.  No, over the top.  And if you could put

16   that on the left side of your lapel up by the notch, up

17   higher, up there by the -- okay, that should work.

18      All right.  Mr. Vegeler.

19         **MR. ROBERT VEGELER:**  Thank you, Your Honor.

20

21

22

23

24

25

1          **NADIM BAIG,**

2      **having been first duly sworn**

3     **was examined and testified as follows:**

4          **DIRECT EXAMINATION**

5   BY MR. ROBERT VEGELER:

6    Q. Would you please state your name for the jury.

7    A. Yes, my name is Nadim Baig.

8    Q. And could you spell your last name?

9    A. B-A-I-G.

10   Q. Mr. Baig, where were you born?

11   A. I'm born in Karachi, Pakistan.

12   Q. And do you practice a religion; did you practice a

13   religion in 2004/2005?

14   A. I don't understand that question.  Can you --

15   Q. Do you have a religion?

16   A. Yes, I do.

17   Q. And what is it?

18   A. Islam.

19   Q. Islam?

20   A. Yeah.

21   Q. Term is used as "Muslim"; what does that term mean?

22   A. The people who follow that religion, Islam, they call

23   them, people who follow that Muslim.

24   Q. Okay.  And did there come a time when you became the

25   general manager of the -- what is known as Mid-States Motors,

1  Inc. doing business as Acura Subaru, Fort Wayne Acura Subaru?

2   A. When I become a general manager you said?

3   Q. Did there come a time when you became the general manager

4  of that dealership?

5   A. I'm sorry, can you repeat that question?  I didn't

6  understand what your question meant.

7   Q. Okay.  Let me ask you this.

8   A. Okay.

9   Q. In -- on or about April 1st of 2004, did you commence

10  employment with a dealership in the Bob Rohrman Auto Group?

11  A. Yes, I did, in April 2004.

12  Q. And what dealership was that?

13  A. Fort Wayne Acura and Subaru.

14  Q. And what was your title?

15  A. I was hired in as a general sales and floor manager.

16  Q. And at the point in time you were hired in as the general

17  manager, who was the new car sales manager or general sales

18  manager?

19   A. There was three or four different people.  I don't know

20  what their titles were at the time when I was introduced to

21  the dealership.

22   Q. Okay.  At the time you became general manager at Acura

23  Subaru, was Kurt Richards employed at Acura Subaru?

24   A. Yes, Kurt Richards was employed.

25   Q. What was his title?

```
1     A. His title was to overlook the dealership while the

2    dealership was running under Larry Kruse's control.

3     Q. And when you became general manager, did Kurt Richards

4    report to you?

5     A. Yes, he -- yes.

6     Q. And did there come a time when you terminated Kurt

7    Richards' employment with Acura Subaru?

8     A. Yes, I did.

9     Q. And who did you -- did you replace him?

10    A. Yes, I did.

11    Q. With whom?

12    A. There was a salesperson at that time when I came in, I

13   brought in a few salesperson.  There was a guy named Anwar.

14    Q. Anwar, what was his last name?

15    A. H-A-Q I believe.

16    Q. Can't you pronounce that for the jury?

17    A. Haq.

18    Q. Now, was he of Pakistani birth?

19    A. Yes, he was.

20    Q. And was he -- practice Islam, known as Muslim?

21    A. Yes.

22    Q. About when did you replace Kurt Richards?

23    A. I don't know the exact indicate, sir.

24    Q. Well, how about a round-about date?

25    A. I would say within four or five days when I came as a
```

1   general manager at that dealership.

2    Q. And why did you replace him?

3    A. Well, I was brought in as general manager, and I felt he

4   wasn't going to the direction where Mr. Rohrman brought me for

5   the dealership to take it to the next level, because we were

6   losing money at that dealership.  So that's the reason I made

7   some changes.

8    Q. And how much time did you give Mr. Kurt Richards to follow

9   your leadership in the Bob Rohrman vision for Acura Subaru?

10   A. He was there with me for only four or five days.

11   Q. Did there come a time when you became familiar with Trent

12   Chapin?

13   A. When I came in, he was a used car manager at that

14   dealership.

15   Q. And had he been used car manager prior to you being

16   general manager or was he -- get that position after you

17   became general manager?

18   A. Prior to when I came in.

19   Q. Okay.  Now, did there come a time when you told Mr. Chapin

20   on or about April 30th, 2004, that he no longer was going to

21   hold the position of used car manager?

22   A. I don't know the date, but probably around that time, yes

23   I did.

24   Q. And did you tell that to Mr. Chapin?

25   A. Yes, I did.

1    Q. And what did you tell him was the reason?

2    A. I told him his poor performance, that I feel that we're

3    not going in the right direction at the dealership, because we

4    -- because of poor performance that he wasn't performing the

5    job what was required by the dealership and the standard by

6    Mr. Rohrman.

7    Q. And do you know how long he had been at that position,

8    used car manager?

9    A. That, I didn't know, sir.

10   Q. Well, did you look up his records to see if he had been

11   start -- you know, if he had been there six months and built

12   the department up, or did you look at those sales records?

13   A. It was not available to me.  It was not discussed.  I

14   always judge people by the performance.

15   Q. Okay.  So you knew him for how many days?

16   A. I was hired in on April 12, 2004, and I don't know exact

17   date, but April 30th or 29 when we decided to separate apart.

18   Q. So you gave him a whole 18 days to judge his performance,

19   right?

20   A. If that's what you call it, want to call it, yeah.

21   Q. Well, I subtracted 12 from 30 and got 18.  Do you disagree

22   with me on that?

23   A. Well, there's some Sundays we're not open for business.

24   Q. Okay.  So let's make it even less days.  So now you're

25   judging Mr. Chapin's performance on less than almost, about

1  two weeks, after you take out the Sundays.

2  A. Mmm-mm.

3  Q. And who did you replace him with?

4  A. I brought a used car manager, actually general sales

5  manager because I needed at that time when Kurt was gone.  His

6  name is Irfan Hussein.

7  Q. And was he of Pakistani national origin?

8  A. Yes.  Yes, sir.

9  Q. Does he practice Islam and Muslim?

10  A. That's what his belief is.  I don't know if he practice or

11  not, but that's what his religion, yes.

12  Q. And how did you know Irfan?

13  A. I work with him at Bob Rohrman, different dealership, with

14  Larry Kruse, with my general manager; we worked over there

15  together.

16  Q. So you were employed with Bob Rohrman Auto Group prior to

17  April of 2004, correct?

18  A. That's correct.  That is correct.

19  Q. And what position did you hold then, back then, the last

20  position?

21  A. The last position I hold for Mr. Rohrman, that was a used

22  car manager.

23  Q. And where was that?

24        **MR. JAMES BUCCHOLZ:**  Judge, could I -- yeah.

25        **THE WITNESS:**  That was at Fort Wayne Nissan.

1   BY MR. ROBERT VEGELER:

2    Q. And when did you leave Fort Wayne Nissan?

3    A. I don't know the exact month, but it was 2002.

4    Q. Now, Irfan, Irfan Hussein, correct?

5    A. That is correct.

6    Q. Well, did you introduce Irfan to Trent Chapin on or about

7   April 27th, 2004?

8    A. No, I did not.

9    Q. Did you not have -- I don't want to call it a meeting, but

10   did there come a time when you and Mr. Chapin and Irfan were

11   standing outside the Acura Subaru building after Mr. Irfan

12   just got off a plane from Pakistan?

13   A. No, I don't remember any of that.

14   Q. You don't remember it?

15   A. No.

16   Q. Could it have happened and you don't remember it?

17   A. No, I would have remembered it if it had happened.

18   Q. So you didn't introduce Irfan as your friend from Pakistan

19   who just got off the plane on or about April 27?

20   A. No, I did not.

21   Q. Do you know where Mr. Irfan Hussein had been employed

22   prior, or let's say, during the month of April of 2004?

23   A. He was working before I hired in for Evans Toyota.

24   Q. Where?

25   A. Evans Toyota.

1    Q. What is that?

2    A. That's the name of the dealership; it's in Fort Wayne on

3    the corner of Coliseum and Lima Road.

4    Q. Okay.  Now, are you still the manager of Acura Subaru,

5    general manager?

6    A. At this time?

7    Q. Yeah.

8    A. Yes, I am.  Yes.

9    Q. And is Anwar Al Haq still new car manager?

10   A. No, he's not.  No, he's not.

11   Q. And what about Irfan Hussein, is he still the used car

12   manager?

13   A. Yes, he just came back mostly recently, yes.

14   Q. What does that mean "came back"?

15   A. He got promoted to general manager out at Bob Rohrman

16   dealership in Indianapolis.

17   Q. And then --

18   A. And then he moved back to Fort Wayne, and I was asked to

19   hire him back per Mr. Rohrman.

20   Q. Okay.  Now, you familiar with a Khurram Solheil?

21   A. Yes, I do.

22   Q. And did you replace Kurt Richards with Khurram Solheil?

23   A. After Glenn Richards, it was right away replaced by him,

24   but the Khurram did work in that position; we call him as a

25   business manager.

1    Q. Okay.  So he replaced Glenn Richards?

2    A. I don't remember he replace him, but he was at that

3    position.

4    Q. Okay.

5    A. Working where Glenn Richards worked.

6    Q. And did you make that decision?

7    A. Yes, I did.

8    Q. Did you make the decision to replace Glenn Richards with

9    Anwar?

10   A. No, sir.

11   Q. Who did?

12       **MR. JAMES BUCCHOLZ:**  Judge, I am going to object.  I

13   don't think there's ever been any assertion that Glenn

14   Richards was replaced by anybody.

15       **THE COURT:**  Could he shirt.

16       **MR. JAMES BUCCHOLZ:**  Talking about Kurt Richards?  I

17   I'd just like clarification.

18       **THE COURT:**  I think he misspoke as to who replaced

19   who.  The question is:  Did this witness -- who did this

20   witness replace in the position of Glenn Richards.

21       **THE WITNESS:**  Our records should say who I replaced

22   with, but K. Solheil, as I said before, he worked in that

23   position when Glenn Richards had that.

24       **MR. ROBERT VEGELER:**  K.

25       **THE COURT:**  K.

1              **MR. ROBERT VEGELER:**  K.

2              **THE WITNESS:**  K. Solheil.  He goes by K. Solheil.

3    BY MR. ROBERT VEGELER:

4     Q. And is he Pakistani-Muslim?

5     A. Yes, he is.

6     Q. And did you make that decision?

7     A. I'm sorry?

8     Q. Did you make the decision about replacing Trent Chapin

9    with Irfan?

10    A. It was with Mr. Rohrman discussion, yes, I did.

11    Q. And when did that discussion occur with Mr. Rohrman?

12    A. Um, probably end of April, 2004.

13    Q. And was that a face-to-face discussion?

14    A. No, sir.

15    Q. And who -- who made the decision to replace Kurt Richards

16   with Anwar Al Haq?

17    A. Again, every position I change, I have to discuss with the

18   owner.  I made the decision with Mr. Rohrman approval.

19    Q. Okay.  Now, as general manager, you're familiar with the

20   sales of the Acura Subaru dealership, are you not, in

21   2006/2007?

22    A. We should have the record provided to you, but I don't

23   know.

24    Q. Well, you look at them, don't you?

25    A. Yes, every month.

1    Q. Okay.  So looking at the sales for 2006 for new and used

2    cars, what were the total sales for 2006 for Acura Subaru?

3    A. I don't recall the numbers, but it should be provided.

4    Q. Well, you didn't produce it, so --

5    A. Okay.

6    Q. -- I'm asking you what you know.

7           **MR. JAMES BUCHHOLZ:**  Judge --

8           **THE WITNESS:**  I don't recall that, sir.

9           **THE COURT:**  Is there an objection?

10          **MR. JAMES BUCCHOLZ:**  There's a suggestion that they

11   were requested, Your Honor, and I would object.  There was

12   never any request for those documentations.

13          **THE COURT:**  All right.  So to dispel any notion, if

14   they weren't requested, they weren't requested.  But he can

15   ask the question now.  The witness can answer that question,

16   if you know.

17          **THE WITNESS:**  No, I don't know the answer.

18   BY MR. ROBERT VEGELER:

19    Q. You don't have any idea what the sales were of the

20   dealership you're the general manager for 2006 for cars?

21    A. Well, we have the record.  We always do them in writing,

22   so I obviously, like I said, if you wanted to provide that, we

23   could have that provided to you.

24    Q. Well, do you have any memory what your monthly sales are

25   on the average for new and used cars?

1    A. All I can say is that in 2005 and 2006, we made tremendous

2    profit for Mr. Rohrman compared to all the others years that

3    the store been operated, if that's what your question is.

4    Q. No.  Question is:  What were the total sales?  Can you

5    tell me is it more than five million in car sales a year?

6    A. No.

7    Q. Is it more than four million?

8    A. No.

9    Q. More than three million?

10   A. No.  Like I said, sir, I would say --

11   Q. Well, how about maintenance and repairs; do you keep track

12   of that as general manager?

13   A. My manager, I have a department managers for every

14   department.  They tell me what they have made profit.

15   Q. So you never know what the total sales are?

16   A. They tell me what the profit is for that department.

17   Q. Okay.  Well, why don't you tell the jury what the profit

18   was for 2006.

19   A. I can't remember for the whole year.  Like every month we

20   go by the reports, which I -- which generated by each

21   department.  Like we brought this much in sale, and I don't

22   remember what the total number is on that one.

23   Q. Okay.  So how -- well, how has business been in 2007; has

24   it been good?

25   A. 2007 you say?

1    Q. Yeah, so far?

2    A. We had a very good March, yes.

3    Q. Okay.  Was it better than 2006?

4    A. Yes.

5    Q. And you made a lot more profit for Mr. Rohrman in 2005 and

6    2006 than previous at the Acura Subaru?

7    A. Yes.

8    Q. And was that more than a million?

9    A. No.

10    Q. Was it more than 500,000?

11    A. Yes, it was.

12    Q. Now, as general manager, do you get to see the asset and

13    liability statement of your dealership?  Are you familiar with

14    an asset and liability statement?

15    A. Are you talking about profit and loss?

16    Q. No asset and liability, bricks, mortar, inventory, tools,

17    equipment?

18    A. Yes, they show me that, yes.

19    Q. Okay.  And what was the asset value of the Acura Subaru

20    dealership in 2006?

21    A. Again, I don't recall the number.  You can -- you can

22    request our office and they can provide you that.

23    Q. Was it more than a million?

24    A. I don't know the number, sir.

25    Q. Does your dealership pay rental payments to Mr. Rohrman

```
1    for leasing the building and the land?

2    A. Yes, they do.

3    Q. And what's your monthly rental payment?

4    A. That, I know for sure, it's 15,000.

5    Q. Fifteen thousand?

6    A. Yeah.

7    Q. A month?

8    A. Yeah.

9    Q. And after you pay that, and cost of cars and labor and

10   employees, you still made like a half million dollars, right?

11   A. For --

12   Q. Profit?

13   A. For last year, yes.

14   Q. Yeah.

15   A. Yeah.

16   Q. And it's going better this year?

17   A. Yes.

18   Q. When did you replace Mr. Chapin with Irfan Hussein?

19   A. Change was made in May 2004.

20   Q. In fact, it was May 1st of 2004, wasn't it?

21   A. If that's what the paper said, yes.

22   Q. Well, don't you have an independent memory?

23   A. No.

24   Q. You don't have any idea when you replaced Mr. Chapin?

25   A. May 2 -- May 2005 when I brought Irfan as a general sales
```

1    manager.

2     Q. Well, who did you -- I thought you testified you replaced

3    Mr. Chapin as used car sales manager with Irfan Hussein?

4     A. He got additional responsibility -- Trent Chapin was a

5    used car manager and Irfan was a used car and new car manager

6    to look over all the other departments, too.

7     Q. So where did Anwar Al Ha1 came come in if he had taken

8    over the duties of Kurt Richards?

9     A. Irfan -- I'm sorry, Anwar was new Acura.  We have two

10   franchise.  We have Subaru and Acura.  That's the reason we

11   have to have two managers for two different departments.

12    Q. So Irfan -- Irfan Hussein replaced Trent Chapin?

13    A. One of his responsibilities, yes.

14    Q. Yeah.  And that was in May of 2004?

15    A. That is correct.  That is correct.

16    Q. So as I understand, your reason for replacing Mr. Chapin

17   with Irfan Hussein was his lack of production in that less

18   than 18 days of while you were general manager, correct?

19    A. Lack of performance, lack of leadership, lack of where we

20   were heading.

21    Q. And did you terminate him?

22    A. Yes, I did.

23    Q. Did you terminate Mr. Chapin?

24    A. Yes, I did.

25    Q. You didn't put him in transfer mode, did you?

1    A. No, I never heard that term before.

2    Q. You've never heard the term "transfer mode" before?

3    A. No.

4    Q. So if somebody else testified that Mr. Chapin was put in

5    transfer mode, that's inconsistent with your statement, right,

6    he was terminated?

7    A. That is correct, because in the car business, there's not

8    such thing as called transfer mode.

9         **MR. ROBERT VEGELER:**  Okay.  I have no further

10   questions, Your Honor.

11                    **CROSS EXAMINATION**

12   BY MR. JAMES BUCCHOLZ:

13   Q. Hello, Mr. Baig, how are you?

14   A. Good.

15   Q. Good.  Glad to hear that.

16        **MR. JAMES BUCCHOLZ:**  Judge, I would ask the same

17   leave with this witness as we had with Mr. Kruse.

18        **THE COURT:**  Go ahead.

19   BY MR. JAMES BUCCHOLZ:

20   Q. Mr. Baig, you testified that you are a Pakistani national,

21   correct?

22   A. Yes.

23   Q. When did you come to the United States?

24   A. I came in June of 1998 -- of '88.

25   Q. 1988.

1    A. Yeah.

2    Q. Okay.  And how old were you in June of 1988?

3    A. At that time that makes me 19 years old.

4    Q. Did you come with any family members?

5    A. No.

6    Q. Came alone?

7    A. Yes.

8    Q. What language they speak in Pakistan?

9    A. It's called Urdu.

10   Q. Okay.  And that was your native tongue?

11   A. Yes, it is my national native tongue.

12   Q. And did you receive any education while you were in

13   Pakistan?

14   A. Yes.  I did my high school and two years in college in

15   Pakistan.

16   Q. Okay.  What was your reason for coming to the United

17   States?

18   A. I wanted to -- I came here for higher education.

19   Q. Okay.  Where did you go to school?

20   A. I went to Indiana Tech.

21   Q. Okay.  That's here in Fort Wayne?

22   A. Yes, Fort Wayne, Indiana.

23   Q. Where did you enter the country?

24   A. JFK was my first stop, then I flew into Fort Wayne,

25   Indiana.

1    Q. And while you were -- I take it you took classes at

2    Indiana Tech?

3    A. Yes, I did.

4    Q. And what were the classes you took there?

5    A. I was majoring in computer information and business.

6    Q. Okay.  During the time that you were at Indiana Tech, did

7    you hold any employment?

8    A. I'm sorry, can you rephrase that?

9    Q. Sure.  Sure.  Thanks for asking.  Sometimes I can ask bad

10   questions.  During the time that you were at Indiana Tech as a

11   student --

12   A. Yes.

13   Q. -- did you have any employment, were you working anywhere?

14   A. Yes, I was.

15   Q. Okay.  And where were you working at that time?

16   A. I started working for Dominos as a pizza delivery guy.

17   Q. Okay.  And how long did you work at Dominos?

18   A. I started at '89 to '92.

19   Q. Okay.  Were you a delivery driver the entire time you were

20   at Dominos?

21   A. No, I started as a driver and I become Assistant Manager

22   and I ran the store as a general manager; I also ran the whole

23   store.

24   Q. All right.  So you were at Dominos pizza for four years?

25   A. Around then, yes.

1    Q. All right.  And then where did you go; what did you do for

2    employment after that?

3    A. After that, Dominos got bought out by different

4    individuals, so my employment was no longer needed.  So Papa

5    Johns came in town and they offer me a job since I had four

6    years' experience in restaurant business.

7    Q. And so what position -- did you take a position with Papa

8    Johns?

9    A. Yes, I did.

10   Q. What was the position you took there?

11   A. I was a general manager of the store at Papa Johns.

12   Q. Okay.  And how -- how was the profitability of that store?

13   A. Very proudly I can say from Dominos, Papa John, my record

14   speak for itself.  We made -- our store was doing from three

15   thousand a week and with hard work and good team we brought it

16   to 25,000 a week.

17   Q. Pretty good growth?

18   A. I would say so.

19   Q. Ultimately, you left Papa Johns and the pizza business?

20   A. Yes, I did.

21   Q. And why was that?

22   A. Well, like I said, sale increase from three thousand to

23   25, my income didn't go up on account of that.  I'm sure

24   profit went up, so I want to work at a place where I can make

25   more money.

1    Q. Okay.  And so where did you go?

2    A. I saw the ad and I applied at Collins Oldsmobile.

3    Q. Did you obtain a job at Collins Oldsmobile?

4    A. Yes, I did.

5    Q. What was the job that you obtained at Collins Oldsmobile?

6    A. As a sales associate.

7    Q. And that would have been somewhere around 1995?

8    A. Yes, June of 1995, I was hired in.

9    Q. Okay.  And did you hold any other positions besides sales

10   at the Collins Olds location?

11   A. No, I was just sales at Collins.

12   Q. During that time, did you become married?

13   A. Yes, I become -- I married -- I got married in 1991.

14   Q. Okay.  And when you -- November of '91?

15   A. Yes, November.

16   Q. And has there come a time since you're here that you've

17   become a U.S. citizen?

18   A. Yes, I become -- I proudly become a United States citizen

19   1996.

20   Q. Okay.  Do you have any children?

21   A. I have two children.

22   Q. Okay.  Is your wife Pakistani?

23   A. No, she is not.

24   Q. Is your wife an African American?

25   A. No, she is not.

1    Q. Is your wife Hispanic?

2    A. No, she is not.

3    Q. Is your wife Caucasian?

4    A. No, she is not.

5    Q. Okay.  Is your wife -- what is the race of your wife?

6    A. She's white American, Catholic.

7    Q. Okay.  Do you have any children?

8    A. I have two children.

9    Q. And what types of children?

10   A. I have a ten year old daughter and eight years old son.

11   Q. Okay.  Do they practice any religions?

12   A. My wife, uh, since she's Catholic, we decided to baptize

13   them -- we member of St. Charles Church.

14   Q. Okay.  So your children are Catholics?

15   A. Yes.

16   Q. Your wife is a Catholic?

17   A. Yes, she is.

18   Q. Okay.  Now, at the time frame -- what was the time frame

19   that you left Collins Oldsmobile?

20   A. Collins, I would say end of '98 or '99, beginning of '99.

21   Q. Okay.  And where did you go from there?

22   A. I went to Evans Toyota for about six months.

23   Q. Okay.  And what was your position at Evans Toyota?

24   A. I was in sales.

25   Q. Sales?

1    A. Yes.

2    Q. Okay.  And after Evans, where did you go?

3    A. I went to O'Daniels Porsche, Audi, and Mazda dealership.

4    Q. After O'Daniels, where did you go?

5    A. I got a call from Larry Kruse, and for come and sit down

6    and interview with him for a job opening with his automobile

7    organization.

8    Q. Okay.  So that was Fort Wayne Toyota then?

9    A. Yes, it was Fort Wayne Toyota.

10   Q. And did you get that position?

11   A. Yes, he offered me business manager job, and I became

12   business manager for Larry Kruse.

13   Q. Okay.  That's a finance position?

14   A. That's correct, sir.

15   Q. So that's a position where people come in and you put

16   documents together for purposes of financing and completing

17   the deal?

18   A. That is correct, doing the bank contract and everything.

19   Q. Okay.  During the time frame you're at Fort Wayne Toyota,

20   did you work with Irfan Hussein?

21   A. Actually he is the one who recommended me to go talk to

22   Larry.

23   Q. Okay.  So --

24   A. He was there before I did.

25   Q. Okay.  So he was an employee at Fort Wayne Toyota?

1    A. Yes, he was.

2    Q. And he suggested your application?

3    A. Yes.

4    Q. After you left Fort Wayne Toyota, where did you go?

5    A. In 2002, Mr. Rohrman offer me a used car manager job at

6    Fort Wayne Nissan.

7    Q. Okay.  Did you go to Fort Wayne Nissan?

8    A. Yes, I did.

9    Q. Who was your manager there?

10   A. Mr. Rohrman made a change.  Kurt Richards was my general

11   manager over there.

12   Q. Did you leave Fort Wayne Nissan?

13   A. No, sir, I was let go.

14   Q. Okay.  And who let you go?

15   A. Kurt Richards.

16   Q. Okay.  Where did you go after Fort Wayne Nissan?

17   A. I was -- I got a job offer at Vorderman Motor Works, which

18   is Volkswagon dealership in Fort Wayne, Indiana.

19   Q. Did you take that position?

20   A. Yes, I did.

21   Q. And how long were you in that position?

22   A. I was there from 2002 to 2004.

23   Q. And while you were at Vorderman, what is it you did?

24   A. I was their business manager/used car manager and new car

25   manager.  I worked all those departments.

 1    Q. Okay.  So Mr. Rohrman reaches out to you at Vorderman, is

 2   that what I'm understanding?

 3    A. He called me numerous times.

 4    Q. And so what was the -- what was the purpose for the

 5   telephone calls, as you understood it?

 6    A. He wanted me to come back to the organization.

 7    Q. The Rohrman Auto Group?

 8    A. Yes, sir.

 9    Q. Were you offered a position within the -- excuse me,

10   Rohrman Group?

11    A. Yes, I was offered.

12    Q. What position were you offered?

13    A. As a general manager at Fort Wayne Acura.

14    Q. Okay.  You told us earlier that you were installed April

15   12th of 2004?

16    A. That was my hire-in date as general manager of Fort Wayne

17   Acura.

18    Q. Now, on that day, did you go to the dealership?

19    A. Mr. Rohrman drove me to the dealership at that date.

20    Q. Okay.  Did he pick you up?

21    A. Yes, he did.

22    Q. Where did he pick you up?

23    A. He call me.  He came in a plane at Smith Field Airport.

24   He call me to meet him over there, which I did, and he drove

25   me to the dealership.

 1    Q. Okay.  On the way to the dealership, did you have --

 2    strike that.

 3        When you got to the dealership, was Mr. Rohrman with you?

 4    A. Yes, sir.

 5    Q. Okay.  Was Mr. Rohrman -- how long was Mr. Rohrman at the

 6    dealership with you that day?

 7    A. We walk in the dealership.  I can't recall how long we

 8    were there, but he introduced me to everybody as the new

 9    general manager.

10    Q. Okay.  Were you introduced to Kurt Richards?

11    A. I would say yes.  Kurt Richards, yes.

12    Q. Were you introduced to Trent Chapin?

13    A. Yes, I was.

14    Q. Were you introduced to Glenn Richards?

15    A. Yes, I was.

16    Q. Were you introduced to Tim Maddox?

17    A. Yes, I was.

18    Q. Were you introduced to Clayton Doherty?

19    A. Yes, I was.

20    Q. Were you introduced to Ivan Almodovar (phonetic)?

21    A. Yes, I was.

22    Q. Were you introduced to Lucinda Baell?

23    A. Yes, I was.

24    Q. So that I understand the management structure, when you

25    come in with Mr. Rohrman, and you've been placed as the

1    general manager, who do you report to?

2     A. Robert Rohrman.

3     Q. Okay.  So you report to him?

4     A. Yes, sir.

5     Q. When you are the general manager as installed that day,

6    who reports to you?

7     A. All the employees who works at Fort Wayne Acura.

8     Q. Okay.  Now, I want to make sure that I understand who the

9    management people were in those positions --

10    A. Okay.

11    Q. -- when you started, okay?

12    A. Okay.

13    Q. Could you tell me who when you're the general manager is

14   the new car manager?

15    A. There was two people, Kurt Richard -- Kurt Richard and Tim

16   Maddox.

17    Q. Okay.  Now, Kurt Richard is that the same man you worked

18   with at Fort Wayne Nissan?

19    A. Yes, he was the same guy.

20    Q. And Tim Maddox, he was, what was his position?

21    A. He was doing both the new car manager and he was one of

22   the men our businessman also when the manager were off on

23   their day offs.

24    Q. Okay.  If Mr. Richards or Mr. Chapin indicated that Mr.

25   Maddox was in an Internet manager position, would you have a

1    reason to disagree with that?

2     A. He may have been doing it, but he had a job title at that

3    time.

4     Q. Okay.  Who was the officer manager?

5     A. Lucinda Baell.

6     Q. Okay.  And what is her race?

7     A. I'm sorry?

8     Q. Does she have a nationality that you're aware of or a

9    race?

10    A. She's white.

11    Q. Okay.  And what about Kurt Richards?

12    A. He's white.

13    Q. What about Trent Chapin?

14    A. White.

15    Q. What about Tim Maddox?

16    A. White.

17    Q. What about Clayton Doherty (phonetic)?

18    A. White.

19    Q. What was his position?

20    A. He's a parts manager, sir.

21    Q. Now you're still general manager, right?

22    A. Yes.

23    Q. Who is the parts manager there now?

24    A. Clayton Doherty (phonetic).

25    Q. And who is the office manager there right now?

1    A. Lucinda Baell.

2    Q. When Mr. Rohrman came into the store with you, did you

3    have any, other than individual meetings, did you have any

4    other meetings with the employees?

5    A. When I came in with Mr. Rohrman, we had a group meeting,

6    which Mr. Rohrman conducted first as I was introduced as the

7    new general manager.

8        Then I had the meeting upstairs with -- I was asked to

9    speak and let them -- let everybody know what my position is

10   and what my goals and everything is.

11   Q. Okay.  Now, you talked about how four or five days passed

12   and Kurt Richards is replaced, correct?

13   A. Yes.

14   Q. Okay.  And the reason for his replacement from your

15   perspective was what?

16   A. Not helping the sales staff training and to me, mentor

17   responsibility to train and work with your salesperson and

18   have to come up with a sale strategy or how you want to get to

19   the goals.  He wasn't doing that.

20   Q. Did you harbor any ill will toward Mr. Kurt Richards

21   because of the -- strike that.

22       Your evaluation of Mr. Richards occurred when he was in

23   what office?  How was his office related to yours in the

24   dealership?

25   A. His office was right next to my office.

1   Q. Okay.  Were you able to observe his daily activity?

2   A. Absolutely, because his office is right next to mine.

3   Q. What did you observe him doing for the four or five days

4   that he was in that position?

5   A. Not going out to meet customer, and talk with the

6   salespeople and see what they're going to be doing.  If

7   salesperson come that day to work, what their goals and what

8   their agenda is to do their job that day.

9   Q. Okay.  And so did you observe that activity on more than

10   one occasion?

11   A. Since I work -- we open from 8:30 to 9:00, I -- I would

12   say I did every hour.

13   Q. Okay.  Was that something you were going to be able to

14   accept as the new general manager?

15   A. Not at all.

16   Q. You took action?

17   A. Yes, I did.

18   Q. Now, there also has been some testimony associated with

19   Mr. Chapin, correct?

20   A. That is correct.

21   Q. Okay.  And what did you observe associated with his

22   actions?

23   A. Pretty similar to Kurt Richard because I did not -- I

24   didn't see any leadership, any training with a sales

25   associate, because we hire a lot of new salespersons.  There

1  was no training whatsoever, they didn't have any direction.

2  There wasn't any advertising whatsoever provided by from his

3  department to grow in that business in that department.

4   Q. Okay.  Now, were there time frames that you attempted to

5  contact Mr. Chapin while he was the used car manager and you

6  were the general manager?

7   A. I'm sorry, sir, scan you repeat that?

8   Q. Sure, I'm sorry.  Were there time frames when you tried to

9  get in touch with Mr. Chapin while he was the used car manager

10  and you were the general manager?

11   A. It was very hard to find -- his salespersons keep coming

12  to me he was very hard to find.

13   Q. Okay.  When you say salespeople kept coming to you, what

14  do you mean by that?

15       **MR. ROBERT VEGELER:**  Your Honor, may we approach the

16  bench?

17       **THE COURT:**  Certainly.

18    (Whereupon, the following bench conference was held

19  outside the hearing of the jury:)

20       **MR. ROBERT VEGELER:**  Under the present questioning,

21  the only way I can see him having a foundation for his

22  testimony is based upon statements that salespeople that are

23  hearsay statements, because they're not here.

24       **THE COURT:**  Why isn't it hearsay?

25       **MR. JAMES BUCCHOLZ:**  Well, my question was how did --

1  what was your problem.  He said sales people came to me.  I'm

2  not asking -- what I'm going to follow up with as a result of

3  those salespeople coming there, what actions did you have to

4  take.  I'm not going to ask him about any comments or

5  communications.

6  **THE COURT:**  You can do that.

7  **MR. JAMES BUCCHOLZ:**  That's why I'm going --

8  **MR. ROBERT VEGELER:**  He made those --

9  **THE COURT:**  He's not asking what they said.  If he

10  did that, that would be hearsay and it would be sustained.  He

11  can walk around it.

12  **MR. JAMES BUCCHOLZ:**  That's where I'm intending to

13  go.

14  **THE COURT:**  The salespeople -- well, you did it by

15  calling for hearsay.  The way the Court let it in, subject to

16  Baig, 802(1)(d) --

17  **MR. ROBERT VEGELER:**  I'm talking about actions that

18  Trent Chapin did when he talked to Larry Janes (phonetic) at

19  Metro and you sustained his objection, kept me asking what was

20  asked, and I asked what subsequently what did he decide, and

21  he objected and now he's trying to do the same thing to me.

22  **THE COURT:**  Well, I'm trying to recall if you -- if

23  your question was asking what did Metro tell you or your

24  client or your client voluntarily saying that's what they told

25  me at Metro.  That's certainly stricken because it is hearsay.

1    But if the question was did you take, did you do, what did you

2    based on --

3         **MR. ROBERT VEGELER:**  No, I just asked him --

4         **THE COURT:**  Well, you can, you know, let's make a

5    separate record on that and whether you want to call your man.

6         **MR. ROBERT VEGELER:**  I'm just trying to get it

7    straight.

8         **THE COURT:**  You have all the time in the world.  Both

9    sides do on this objection.  Tell me if he phrases his

10   question in that way; it's not calling for hearsay.

11        **MR. ROBERT VEGELER:**  Well, I think it's based upon

12   hearsay, so the record is what it is.

13        **THE COURT:**  All right.  Hearsay objection is

14   overruled.  You can ask those questions.

15        **MR. JAMES BUCCHOLZ:**  Okay.

16    (Whereupon, the bench conference was concluded;

17   thereafter, the following proceedings were held:)

18        **MR. JAMES BUCCHOLZ:**  Judge, is it okay if I have her

19   roll it back, so I can see exactly what I did ask?

20        **THE COURT:**  (Inaudible) she can read it.

21        **MR. JAMES BUCCHOLZ:**  I thought what I asked was good,

22   and I want to make sure I said it the same way.  That's why I

23   asked that.

24        **THE COURT:**  Did salespeople go -- without it being

25   leading.  You're going into the reasons, him taking actions to

1    Chapin.

2    BY MR. JAMES BUCCHOLZ:

3     Q. Or were there time frames when you were the general

4    manager and Mr. Chapin was the used car manager that

5    salespeople came to you?

6     A. Yes, they did.

7     Q. Okay.  Now, on the occasions when salespeople came to you,

8    did you need to take action associated with their life

9    (phonetic) on your office?

10    A. Can you rephrase that question?

11    Q. Sure.  If a salesperson comes to you --

12    A. Hmmm.

13    Q. It seems to me you take action, is that true?

14    A. Yes, I do.

15    Q. Okay.  What type of actions would you take?

16    A. Well, if salesperson need help, to help to do the sale, I

17   -- we supposed to drop everything to help customer at that

18   time.

19    Q. Okay.  So salespeople would come to you for purposes of

20   assistance with sales?

21    A. That is correct, sir.

22    Q. And then you dealt with the sales?

23    A. Yes.  Yes, I did.

24    Q. And those people came from which office?

25    A. Used car department.

1    Q. Okay.  Now, were there occasions that you attempted to

2   locate Mr. Chapin on the premises and were unsuccessful?

3    A. Yes.

4    Q. Okay.  Did you ever attempt to locate him when those

5   salespeople were dealing with customers?

6    A. Yes, I did.

7    Q. Okay.  So his availability wasn't what you liked?

8    A. No.

9    Q. He was present at the dealership somewhere you understood?

10   A. He was clocked in, yes.

11   Q. Did you observe Mr. Chapin having any meetings with any of

12  his salespeople associated with training?

13   A. None whatsoever.

14   Q. You didn't observe that ever happening?

15   A. No, sir.

16   Q. When you say there's a problem with production, what do

17  you mean by that?

18   A. That, again, salesmen, their job is to train and work with

19  their employees, that mean the people who work under you.

20  That could be like training, that could be like advertisement

21  on the departments, and fixing the lot to making sure that

22  your lot look nice and cars are washed.

23   Q. So to you, "production" means more than volume of sales?

24   A. I would say volume of sales also, sir.

25   Q. That's a component, but it means more than that?

1    A. That is correct, sir.

2    Q. All right.  There's been testimony in this case that

3    several days before Mr. Chapin was replaced there was a sales

4    meeting.  Do you agree with that?

5    A. I don't recall any of that, no.

6    Q. Was there -- did you ever make a statement to the effect

7    that there are rumors about Mr. Chapin, "If I hear anything

8    else, people are going to be terminated"?

9    A. No, I did not.

10   Q. You don't recall making those statements or you didn't

11   make those statements?

12   A. No, I did not make that statement.

13   Q. All right.  At any time, did you tell Mr. Chapin he was

14   doing a good job in your view?

15   A. No, I did not.  Otherwise, I would still have him as a

16   sales manager.

17   Q. If he were doing a good job, what would you do with him?

18   A. Keep him.

19   Q. Okay.  Now, in April of 2004, as I understand it, you made

20   two management changes, correct?

21   A. That is correct.

22   Q. Kurt Richards and Trent Chapin?

23   A. That is correct.

24   Q. What's the next management change that you recall at the

25   dealership?

1    A. That would be a finance or business office.

2    Q. Okay.  Would you tell the ladies and gentlemen of the jury

3    what you understood the qualifications of Irfan Hussein were

4    in April of 2004.

5    A. Well, he had experience of billings and finance

6    management, plus he worked at Fort Wayne Toyota as a new car

7    manager under Larry Kruse's supervision.

8    Q. Okay.  Would you tell the ladies and gentlemen of the jury

9    of the qualifications or background of Anwar Al Haq as you

10   understood them in April of 2004.

11   A. He was at Evans Toyota for, I would say, seven, eight

12   years as a salesperson.  Plus he was Internet manager and he

13   was assistant sales manager at Evans Toyota.

14   Q. Okay.  Had you worked with Mr. Hussein at any location

15   other than Fort Wayne Toyota?

16   A. Yes, six months, like I said before at Evans Toyota.

17   Q. Okay.  And had you worked with Mr. Al-haq at any location

18   before?

19   A. Yes, that's right, at Evans Toyota.

20   Q. And where was it that you worked with him?

21   A. At Evans Toyota with Anwar Al-haq, right.

22   Q. Anwar, yes?

23   A. Right.  And plus, he was -- I worked with him at Fort

24   Wayne Toyota also as a business manager, too.

25   Q. Okay.  Now, in November of 2004, Glenn Richards had moved

1    from business manager to business relations, is that correct?

2    A. That is correct.

3    Q. And he's replaced by who, who replaces him?

4    A. If I recall it, K. Solheil.

5    Q. Okay.  What is your understanding in November of 2004 of

6    his qualifications?

7    A. K. worked at Evans Toyota and Fort Wayne Toyota and sales

8    associate for Larry Kruse.

9    Q. Did the race of Mr. Al Haq have anything to do with the

10   placement of him as a new car manager?

11   A. No, not at all.

12   Q. Did the nationality of Mr. Al Haq have anything to do with

13   the placement of him as a new car manager?

14   A. Not at all.  I make decision based on performance.

15   Q. Did the skin color of Mr. -- or excuse me, the religion of

16   Mr. Al Haq have anything to do with his placement as the new

17   car management at Fort Wayne Acura Subaru?

18   A. Not at all.

19   Q. Was the nationality of Irfan Hussein part of any of the

20   decision-making process in terms of his placement as a used

21   car manager at Fort Wayne Toyota (sic)?

22   A. Not at all.

23   Q. Acura, I'm sorry.

24       Was his religion any part of the discussion or thought

25   process in terms of placing him into that position?

1    A. Not at all.

2    Q. Was his nationality anything to do with that decision?

3    A. No, not at all.

4    Q. Okay.  Now, was the skin color, nationality or religion of

5    Mr. Soheil involved in any fashion relating to his placement

6    in a management position at Fort Wayne Acura?

7    A. Not at all.

8    Q. Mr. Baig, some people practice their religion more

9    ardently than others.  Do you know what I mean by that?

10   A. Please explain that.  I'm sorry.

11   Q. Some people are more devout in their religion than others.

12   Do you understand what I many by that?

13   A. Yes, I do.

14   Q. As it relates to you, you ever prayed with the Koran at

15   Fort Wayne Acura Subaru?

16   A. No.  No, I have not.  No.

17   Q. Are you aware of whether anybody else has?

18   A. Not at all.

19   Q. Is it possible others have without your knowledge?

20   A. I -- I'm in charge and I know where everything is, no.

21   Q. Okay.  You ever pray in your office?

22   A. I -- well, never in my office, out where I get in any

23   church, I do that.

24        **MR. JAMES BUCCHOLZ:**  Thank you, Mr. Baig.

25        **THE WITNESS:**  Thank you.

1        **MR. ROBERT VEGELER:**  Your Honor, I need to check with

2   your courtroom deputy on an exhibit.

3        (Whereupon, there was a brief pause in the proceedings.)

4                    **REDIRECT EXAMINATION**

5   BY MR. ROBERT VEGELER:

6    Q. Mr. Baig, did you fill out and sign a termination report

7   for Mr. Chapin on or about April 30th, 2004?

8    A. Yes, I do.  I did.

9    Q. Hand you what's marked as Plaintiff's Exhibit number 9.

10  Is that the signature at the bottom of Mr. Chapin's

11  termination report?

12   A. That is my signature, yes.

13   Q. Did you fill this out?

14   A. Yes, I did.

15   Q. Does it accurately state the reasons for termination for

16  Mr. Chapin?

17   A. Yes, lack of performance.

18   Q. And this is -- this is an accurate copy of that

19  termination report?

20   A. That's correct.

21        **MR. ROBERT VEGELER:**  I move for admission of

22  Plaintiff's Exhibit Number 9.

23        **MR. JAMES BUCCHOLZ:**  No objection.

24        **THE COURT:**  Nine is admitted.

25        **MR. JAMES BUCCHOLZ:**  You have a copy for me?

1      **MR. ROBERT VEGELER:** It's your N. She's got them

2  all. Can I display this to --

3      **THE COURT:** Certainly.

4  BY MR. ROBERT VEGELER:

5   Q. Mr. Baig, can you see Plaintiff's Exhibit Number 9?

6   A. Yes.

7   Q. Zip code and under performance report, overall evaluation

8  and satisfactory, you agree that is checked, is that correct?

9   A. Unsatisfactory, yes.

10   Q. Okay.  Attendance record good?

11   A. That is correct.

12   Q. And that's your checkmark, correct?

13   A. That is correct.

14   Q. Is employee rehirable?  Check mark yes, correct?

15   A. That is correct.

16   Q. Did you write any notations down here about other

17  problems, other than lack of leadership and performance?

18   A. I did not write it down except for lack of leadership and

19  performance.

20   Q. So I understand your answer, that's the -- those are your

21  words as to why he was terminated correct?

22   A. That is correct.

23      **MR. ROBERT VEGELER:** I have no further questions,

24  Your Honor.

25      **THE COURT:** Anything else?

1          **MR. JAMES BUCCHOLZ:**  Not from the defendants, Your

2     Honor, at all.

3          **THE COURT:**  If the jury has any questions for this

4     witness, you may write them down now.  My deputy will collect

5     them.

6        Let me ask you, Mr. Baig, just so I'm following, what's --

7     which -- which employee was it went down to Indianapolis and

8     then just recently came back?

9          **THE WITNESS:**  That was Irfan Hussein.

10         **THE COURT:**  All right.  So Mr. Hussein is still

11    working there?

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  Is Mr. Anwar Al Haq still working with

14    any of the Rohrman companies?

15         **THE WITNESS:**  No.

16         **THE COURT:**  And is Mr. K. Solheil?

17         **THE WITNESS:**  No.

18         **THE COURT:**  Thank you.  Ladies and gentlemen of the

19    jury, did you have any questions for my deputy to collect?

20    Anyone, anyone?

21         **JURORS:**  (No audible response.)

22         **THE COURT:**  All right.  There's no questions for this

23    witness.  Was he under subpoena?

24         **MR. ROBERT VEGELER:**  He was by us, Your Honor.

25         **THE COURT:**  All right.  He's now released from that

1    subpoena.  You may step down.  Just take the microphone off.

2        And given the hour of the day, I think we should move into

3    or -- any other witnesses to be called in the plaintiff's

4    case.  Let's wait until tomorrow.  Let me just, so we can

5    gauge how far we're going to go into tomorrow so I can let the

6    jury make arrangements, do we anticipate finishing up the

7    plaintiff's case-in-chief tomorrow morning?

8            **MR. ROBERT VEGELER:**  Correct, Your Honor.

9            **THE COURT:**  And the defense will be prepared to go

10   forward?

11           **MR. JAMES BUCHHOLZ:**  (Nodding.)  Yes, Your Honor.

12           **THE COURT:**  All right.  Do we anticipate we'll be

13   able the finish the evidence tomorrow?

14           **MR. JAMES BUCHHOLZ:**  That's my hope, Your Honor.  I

15   told Mr. Vegeler that I would tell him who it is, tell him who

16   our line up is, 5 or 6 people, 4 or 5, in that general range,

17   Judge.  So it's my hope we'll be done tomorrow.  I don't

18   expect anybody is going to be as long as Mr. Chapin was.

19           **THE COURT:**  Ladies and gentlemen, of the jury I want

20   to inquire on that so you can make the appropriate

21   arrangements.  During the voir dire I said this may be a 3 to

22   4 day trial.  And we're never sure until we get started in the

23   evidence.  Right now, I can tell you we will be going into

24   Friday.  Even if we finish up the evidence tomorrow, Thursday,

25   you know, I still need to work with counsel to -- on the

1  Court's instructions and you still need to hear closing

2  arguments and receive those instructions.

3      So I anticipate the day tomorrow will hopefully complete

4  the evidence within the 9:00 to 5:00, I'm hoping and you'll be

5  coming back here Friday morning for closing arguments and

6  instructions so you can make the appropriate arrangements.

7      Now, let me just remind you again of the Court's

8  continuing admonition.  Make sure you take any notes that you

9  -- that you have with you up to the jury room, leave them up

10  there over night, leave any exhibits that are in the box,

11  leave them on the rail so my deputy can collect those before

12  they go up.  You're not to do any independent investigation

13  with regard to this case tonight.  Don't expose yourself to

14  any media coverage.  You're not to discuss the case with

15  anyone.  You cannot yet discuss it amongst yourselves and you

16  must keep an open mind with regard to the issues in the case

17  until you've heard all the evidence, received the Court's

18  instructions and heard the closing arguments of counsel.

19  We'll keep the same schedule tomorrow as we did today, and

20  we'll make the same arrangements to have some breakfast ready

21  for you this morning.

22      Did it get delivered on time about 8:30?  Yeah, was it

23  here.

24          **THE CLERK:**  It was here at 8:00 o'clock.

25          **THE COURT:**  See, you can come in even earlier if you

1   want to have more breakfast.  But let's get ready to have

2   everybody here by at least a quarter to 9:00 and then by 9:00

3   o'clock, we'll be assembled and ready to start up proceedings.

4   So we'll see you tomorrow morning.

5      (Jury absent.)

6      **THE COURT:**  All right.  Go ahead and be seated,

7   counsel.  Let me ask you, give me an idea who you intend on

8   calling, without disclosing any trial strategy.  About how

9   many more witnesses do you expect to call?

10      **MR. ROBERT VEGELER:**  Either zero or one.

11      **THE COURT:**  Okay.  And I told you, too, if there's

12   any issue with regard to your client being recalled on that

13   Metro issue, you know, just bring that up to me tomorrow.

14    At the side bar when I was trying to field the objection

15   on what was going in at that time, I really need to check back

16   on my notes and the transcripts to see, but I understand where

17   you're going with that.  I just didn't remember that that was

18   how the events unfolded on that questioning.

19    Then you have maybe 5 or 6 people and then there might be

20   some rebuttal.  I think realistically we'll get the evidence

21   in tomorrow.

22      **MR. JAMES BUCHHOLZ:**  Depending on what happens with

23   Miss Helgoe, that's about the right number, Judge.

24      **THE COURT:**  What I would suggest you do, even if we

25   go late tomorrow, just make sure you have all your people here

1    to go.

2          **MR. JAMES BUCHHOLZ:**  I expect most of them will be

3    relatively short.  There may be one that's longer, but most of

4    them are short.

5          **THE COURT:**  And then with regard to Kelly Helgoe,

6    we'll check on the status of the bench warrant as to her

7    availability.

8          **MR. JAMES BUCHHOLZ:**  I guess I might consider whether

9    we'd request an instruction about her failure to attend and

10   based upon her status and inference against Mr. Chapin.

11         **THE COURT:**  And usually that's an instruction that's

12   granted if there's some evidence that the plaintiff had

13   control of the witness or the evidence, and failed to produce

14   the witness or the -- or the documents or other evidence.  And

15   so I think the record has yet to be made with regard to that,

16   but you certainly have the right to try to make that record

17   tomorrow.

18         **MR. ROBERT VEGELER:**  That would only be relevant over

19   the last, since he tried to serve her, right, the last ten

20   days?

21         **THE COURT:**  You know, I need to hear what it is but I

22   don't want to hear it right now.

23         **MR. ROBERT VEGELER:**  No, I need to know whether I've

24   got to prepare for 4 years or 4 weeks on his supposed control

25   over her.  Okay.  Never mind.  We'll work it out tomorrow.

1    **THE COURT:**  How about during -- well, let's -- I'm

2    not going to hazard a guess on the time frame.  I'm assuming

3    it's within the life of the lawsuit and I'm assuming it's

4    within the -- I don't know what to expect.  Ha, ha, I don't

5    know what the facts are going to be with regard to Kelly

6    Helgoe and control issues and that yet, so...

7    **MR. ROBERT VEGELER:**  When do you --

8    **THE COURT:**  -- guidance --

9    **MR. ROBERT VEGELER:**  -- when do you anticipate, from

10   what your experience has been, we will start working on

11   instructions sometime?

12   **THE COURT:**  As soon as we're done with the evidence.

13   **MR. ROBERT VEGELER:**  Then we should be prepared

14   tomorrow?

15   **THE COURT:**  Be prepared.  What I want to do is finish

16   the evidence, and then it may be a late night tomorrow going

17   over instructions.  And just so you know, and I think I've

18   gone over this in other pretrial matters, but I have an

19   informal conference sit down with counsel and we go through a

20   proposed package of the Court's instructions and then we'll

21   discuss them and then all will be given an opportunity before,

22   once we're back on the record Friday morning, I'm hoping

23   before arguments, to make a formal record with regard to any

24   objections.  That gives me, gives us the opportunity to work

25   through any issues involving the instructions.  All parties

```
 1   and counsel have an interest in properly instructing the jury,

 2   and so let's, you know, striving to that, I have the

 3   conference, I take any issues that you may have, additional

 4   law and cases, and consider them and we'll probably modify the

 5   Court's instructions, add to them, take away from them until

 6   we have a finalized package and then you can make a formal

 7   record of objections on those, okay?  You understand that

 8   process?

 9           MR. ROBERT VEGELER:  Oh, yeah.

10           THE COURT:  Any questions on that, Mr. Buchholz?

11           MR. JAMES BUCHHOLZ:  I don't.  I might have somebody

12   a little smarter in the law attend with me.

13           THE COURT:  All right.  As long as we do it in

14   tandem, you need to be there as well.

15           MR. JAMES BUCHHOLZ:  No, I understand.

16           THE COURT:  The evidence as you see it, that's gone

17   into the case.

18           MR. JAMES BUCHHOLZ:  I understand.

19           THE COURT:  You and Ms. Bauer, so I have the proper

20   number of chairs?

21           MR. JAMES BUCHHOLZ:  She knows a lot more than I do,

22   that's for sure.

23           THE COURT:  Now, anything else that we need to take

24   care of tonight?

25           MR. ROBERT VEGELER:  None, Your Honor.
```

1        **THE COURT:**  Anything else for your clients?

2        **MR. JAMES BUCHHOLZ:**  Not tonight, Your Honor, no.

3        **THE COURT:**  Okay.  Last thing, do you expect to use

4    the PowerPoint for closing, so we can --

5        **MR. JAMES BUCHHOLZ:**  I'm nervous.

6        **THE COURT:**  You know, I am so hoping that we can be

7    tested again on our technology, so that's why -- because

8    usually if you use the PowerPoint for opening, you use it for

9    closing.  And so I just wanted to indicate to you that if you

10   were looking to do that, the system is a go.

11       **MR. JAMES BUCHHOLZ:**  I will -- it will depend on how

12   much time I have to work on it this evening, frankly, and I

13   may do a limited one.  I generally do, Your Honor.  I don't

14   mean to -- I don't mean to dissuade Your Honor thinking I'm

15   not going to.

16       **THE COURT:**  Just so you know, the IT fellow will be

17   here and it will work and it will not be a problem, should you

18   decide to use it or the plaintiff decide to use any of the

19   technology for closing or anything else in the case.

20       **MR. JAMES BUCHHOLZ:**  What I might do, Your Honor, and

21   I asked Mr. Vegeler -- if I do that, I'd ask his indulgence

22   because it seems to me when it was over here, that limited

23   kind of what it is I can do, if I can utilize it so the screen

24   is here, so closer.

25       **THE COURT:**  We can even set up the table in the

1    middle.

2         **MR. JAMES BUCHHOLZ:**  I don't want to invade his

3    space.

4         **THE COURT:**  We'll --

5         **MR. JAMES BUCHHOLZ:**  It couldn't go much beyond here

6    and that's something --

7         **THE COURT:**  We can bring in another table.  You can

8    set it up there.

9         **MR. JAMES BUCHHOLZ:**  I'll let you know tomorrow.

10        **THE COURT:**  All right.  Thank you, counsel.  We'll

11   see you tomorrow morning by a quarter to 9:00.  If there's any

12   issues that develop overnight, we'll hear them then.

13

14                         *   *   *

15

16                  **CERTIFICATE OF THE REPORTER**

17

18        I hereby certify that the foregoing proceedings is true

19   and correct, as taken down by me, and transcribed to the

20   best of my ability, with the aid of realtime computer-aided

21   transcription and/or transcriptionist.

22

23

24                    s/ Tina M. Gallucci_____
                      **Tina M. Gallucci, RMR, CRR, FCRR**
25                    **United States District Court Reporter**