IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

TRENT L. CHAPIN,                          )
                                          )
            Plaintiff,                    )
                                          )  CIVIL
vs.                                       )  CAUSE NO:
                                          )  1:06-CV-34
MID-STATES MOTORS, INC.,                  )
            Defendant.                    )
------------------------------------      VOLUME I of I


**TRANSCRIPT OF TRIAL PROCEEDINGS HELD**
**APRIL 19, 2007, BEFORE THE**
**HONORABLE THERESA L. SPRINGMANN, UNITED STATES**
**DISTRICT JUDGE**


<u>**APPEARANCES:**</u>


**FOR THE PLAINTIFF:**          ROBERT VEGELER,ESQ.
                                110 West Berry Street
                                Fort Wayne, In  46802

**FOR THE DEFENDANT**           JAMES BUCHHOLZ, ESQ.
                                1400 One Summit Square
                                Fort Wayne, IN  46802


**OFFICIAL COURT REPORTER:**    **TINA M. GALLUCCI,**
                                **RMR, CRR, FCRR**
                                **U.S. DISTRICT REPORTER**
                                **1300 S. HARRISON STREET**
                                **SUITE 2105**
                                **FORT WAYNE, IN  46802**
                                **(260) 423-3060**


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1

### INDEX

2

3        **PLAINTIFF RESTS**........................... Page   20

4        **AMBER OKPARA -**
                 Direct Examination............... Page   21
5                Cross Examination................ Page   38
                 Redirect Examination............. Page   44
6

7        **MALCOMB DAN TWOMEY -**
                 Direct Examination............... Page   48
8                Cross Examination................ Page   51

9

10       **TIMOTHY JOSEPH MADDOX -**
                 Direct Examination............... Page   52
11

12       **LINDA BAELL -**
                 Direct Examination............... Page   58
13               Cross Examination................ Page   70
                 Redirect Examination............. Page   71
14               Recross Examination.............. Page   71

15

16       **LARRY KRUSE -**
                 Direct Examination............... Page   73

17       **BOB ROHRMAN -**
                 Direct Examination............... Page   91
18               Cross Examination................ Page  108
                 Redirect Examination............. Page  113

19

20                          *   *   *

21                     ___CASE CITATIONS___

22

23       Smith vs. Wade............................ Page   10
              461 U.S. 30
24

25       Mills vs. Healthcare Service Corp.......... Page   12
              171 F.3d 450

 1          (Whereupon, the following proceedings were held on April

 2     17, 2007; the parties appearing in person and with their

 3     respective counsel:)

 4          **THE CLERK:**  All rise.

 5          **THE COURT:**  Go ahead and be seated, please.

 6     Counsel, I've been advised that all the jurors have

 7     reported in now for the day.

 8     Are there any matters that have developed overnight that

 9     we need to address, Mr. Vegeler, for your client?

10          **MR. ROBERT VEGELER:**  No, Your Honor.

11          **THE COURT:**  Mr. Buchholz, for your clients?

12          **MR. JAMES BUCHHOLZ:**  Not presently, Your Honor,

13     although depending on how things go today, we may have some

14     things to talk about.

15          **THE COURT:**  All right.  If the plaintiff rests this

16     morning, are you going to be presenting any motions to the

17     Court?

18          **MR. JAMES BUCHHOLZ:**  I will be, Your Honor.

19          **THE COURT:**  Are they going to be written?

20          **MR. JAMES BUCHHOLZ:**  No.

21          **THE COURT:**  All right.  So you should be aware,

22     generally on any motions for directed verdict, the Court will

23     hear brief argument on in the event the jury is waiting to go

24     forward into the defendant's case.  You'll have an opportunity

25     to renew it at the end of the case.

1      Generally, the Court takes those under advisement until

2  after the verdict has been returned.  Sometimes, you know, I

3  do otherwise, but generally in cases like that just so you

4  know.

5           **MR. JAMES BUCHHOLZ:**  That's fine, Your Honor.

6           **THE COURT:**  All right.  At this time, would you

7  please bring the jury.

8           **MR. ROBERT VEGELER:**  Your Honor, could we just --

9           **THE COURT:**  Oh, sorry, go ahead.

10          **MR. ROBERT VEGELER:**  I anticipate, there's no

11  surprise, I'm not going to call anymore witnesses.

12          **THE COURT:**  All right.

13          **MR. ROBERT VEGELER:**  That might move things along a

14  little bit --

15          **THE COURT:**  To field the motion --

16          **MR. ROBERT VEGELER:**  -- anticipate we will be getting

17  back into -- based on some of the witnesses Mr. Buchholz has

18  told me about, I think we'll be re-visiting 608(b) again, and

19  I've done some more research on that, so when the Court wants

20  to talk about that, we can talk about that.

21          **THE COURT:**  All right.  So we're going to be going

22  back into the -- well, all right.  I suppose, just hear from

23  counsel.  Go ahead.  You're going to rest?

24          **MR. ROBERT VEGELER:**  Yes.

25          **THE COURT:**  You're not going to call anybody else?

1    Do you want to present your motion at this time?  And what we

2    can do, we can show the motion being properly made.  What it

3    does is save having the jury come down right away, I can hear

4    argument on it, take it under advisement, then bring the jury

5    down.  We'll let Mr. Vegeler rest his case in front of the

6    jury and we can go right into yours and you can preserve your

7    interest on it.

8         **MR. JAMES BUCHHOLZ:**  That's fine, Your Honor, so long

9    as I say -- anything I say doesn't allow him to bring anybody

10   else.

11        **THE COURT:**  The only thing that can come in that the

12   this -- you're not going to re-opening, whatever he says,

13   you're not going to reopening, correct?

14        **MR. ROBERT VEGELER:**  Correct.

15        **THE COURT:**  Only thing that would come up is

16   potential rebuttal.  Would you just tell the jury we're going

17   to be delayed for about ten more minutes; they should be in by

18   9:15.  All right.  Go ahead, Mr. Buchholz.

19        **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.  We've heard

20   from four witnesses in this case.  We've heard from

21   Mr. Chapin, Mr. Richards, Mr. Kruse and Mr. Baig.  And I'll

22   address my comments, first, as it relates to the claims

23   against Acura.

24        I'm sorry, as Your Honor knows, a motion for judgment as a

25   matter of law can occur when there's not substantial evidence

1    in the record associated with elements of the plaintiff's

2    claim.  And that's the basis of our motion.

3         We're entitled -- Acura is entitled -- to a judgment as a

4    matter of law because he has not established a prima facie

5    case of race, national origin discrimination or racial

6    discrimination.  He's got to show these within a protected

7    group:  Show he's performing his job and meeting his

8    employer's legitimate expectations, he suffered an adverse

9    employment action and that other similarly-situated employees

10   outside that class received more favorable treatment.

11        In this case, the only person that has testified about the

12   performance of Trent Chapin is Trent Chapin.  Mr. Richards

13   testified on cross examination -- he testified on direct

14   examination about all types of different things that he

15   thought Mr. Chapin was doing.  On cross examination, conceded

16   that he didn't have a basis to say any of those things, and

17   indicated he wasn't aware, because he hadn't been there long

18   enough to make a determination about Mr. Chapin's activities.

19        Mr. Baig testified that Mr. Chapin wasn't available for

20   him, that people were coming to Mr. Baig, going around

21   Mr. Chapin associated with trying to deal with customers, and

22   that his performance was lacking in terms of leadership; there

23   was no advertising that was being done, which was a legitimate

24   expectation.  There was no salespeople meetings that Mr. Baig

25   observed going on, and all those are legitimate expectations

1    of an employer of a used car manager as testified to even by

2    Mr. Chapin.

3         So there's been no showing that he was, other than his own

4    testimony, that he was legitimately meeting the expectations

5    of the employer.

6         In the reverse discrimination case, he has to show there's

7    a background circumstance to support the inference where an

8    unusual employer, Acura, is an unusual employer who

9    discriminates against majority employees, in this case white.

10        Your Honor has indicated this is a pattern case.  Well,

11   the only separation before Mr. Chapin was Mr. Richards.  One

12   prior separation does not a pattern make.  And Mr. Baig

13   testified as to non-discriminatory reasons as to why it is he

14   replaced Mr. Richards, Kurt Richards.  I guess I need to say

15   Kurt Richards, since we've got another Richards.

16        But the testimony also was from Gary Richards, a manager

17   at the dealership, as testified to by all the witnesses that

18   had knowledge -- Mr. Kruse didn't testify about it -- that

19   there was a separation or change of position in the service

20   department.  And the service department person was a Hispanic

21   male and he was replaced by a white male.

22        And before the time frame that there was any change of

23   position by Mr. Richards, who -- and we still don't believe

24   his -- his demotion is a basis of a pattern -- he was

25   replaced.  The person that replaced Mr. Richards was replaced

1    by a white male.  That testimony is in the record.  So this is

2    not a case where you can establish a pattern that of conduct

3    that would support a determination under the burden of proof

4    that the plaintiff has.  So even if he's established a prima

5    facie case -- we don't believe he has -- but even if Your

6    Honor believes he has, he hasn't established by a

7    preponderance of the evidence that his race or national origin

8    were the motivating factors in the decision to terminate.

9        The evidence is that he had poor job performance, but

10    nobody's testified that the reason for his termination as a

11    used car manager was because of his race or national origin.

12    I asked him on cross examination, "Did anybody tell you that

13    was the reason for your separation?"  He said, "No."  So he's

14    not produced sufficient evidence to establish that, had he not

15    been a white, non-Muslim he would not have been terminated,

16    which is what he has to show.  So he's not shown evidence, but

17    for his race or national origin, he wouldn't have been

18    terminated.

19        In addition to that, he hasn't proven or shown that Acura

20    acted with reckless disregard with respect to its actions.  So

21    a punitive damage claim as it relates to Acura should not be

22    allowed.  He hasn't met his burden of proof in that regard.

23        Now, as it relates to the Fort Wayne Toyota, Your Honor,

24    we believe we're entitled to a judgment as a matter of law on

25    that.  There's three things he has to prove in this case.

1    First, he's got to prove the engagement of activity.  We

2    concede that element.  We concede it.  He filed a reverse

3    discrimination claim.  That is a protected act.

4       He's got to present evidence that an adverse employment

5    action occurred.  And he also must present evidence there's a

6    causal connection between his protected activity and the

7    adverse employment action that was allegedly taken.

8       Mr. Chapin's case falls on the second and third prongs.

9    He's not presented evidence that he was fired, resigned or had

10   any significant change in benefits.  There is the tape, Your

11   Honor.  But the evidence in this case is that it was

12   repeatedly indicated to Mr. Chapin that he had a job.  And he

13   had no communication back to the dealership about why it is he

14   wouldn't take that job.  So he's not shown that there was a --

15   a change in benefits, because it's been shown, through his

16   testimony and the other witness' testimony that has come

17   before this Court, that there were three letters sent saying

18   you have a job, there was a meeting where in the tape it said

19   three or four times, "You have a job."  And there were

20   telephone calls made by Mr. Kruse associated with trying to

21   communicate with Mr. Chapin.

22      So all the evidence shows that he had a job waiting for

23   him.  He indicates that they had a job waiting for him, but he

24   made the decision not to go back.  So we think we're entitled

25   to judgment on that claim as well.

```
 1        Punitive damages as it relates to the Toyota claim also

 2   haven't been shown, Judge.  There's not been an intentional

 3   discrimination with malice or reckless indifference to his

 4   protected rights on either case as required by *Smith versus*

 5   *Wade*, 461 U.S. 30 at 56.  In this case, the evidence presented

 6   in Chapin's case, nobody can say that we acted with reckless

 7   indifference.  We acted continuously to say hey, you've got a

 8   job.  You've got a job here.

 9        So it's on those bases that we file our motion and we

10   argue our motion for judgment on the evidence, and why we

11   believe at this time, we're entitled to a directed verdict in

12   our favor based upon the plaintiff's failure of proof.

13             **THE COURT:**  Mr. Vegeler, response.

14             **MR. ROBERT VEGELER:**  Thank you, Your Honor.  With

15   respect to Acura Subaru, the test does not fly (phonetic)

16   forward (phonetic), and I believe it is the motivating factor.

17   And the evidence on that basis that with respect to Acura

18   Subaru, there were, based upon the -- a non-Caucasian Muslim,

19   non-white came in and merely because he knew -- not because of

20   productivity -- because he was acquainted with three other

21   Pakistani Muslims, that they in proximate time and replaced

22   three Caucasians and Christians.

23        So I think the tests, the legal tests stated by the

24   defendant with respect to Acura Subaru is wrong, number one.

25   And number two, I think there's more than sufficient evidence
```

1    to show that I don't believe intentional discrimination

2    requires that there be a pattern.  It's quite simply the act

3    of the person who did it.  You don't need anybody else

4    supporting -- showing that -- that that somehow is

5    inconsistent with two other acts that the -- Mr. Baig did.

6        So from that point of view, it's not a disparate impact

7    case from the beginning, but it certainly doesn't need to have

8    anything other than a reasonable -- for the jury to find, as a

9    as material fact, conclude that Mr. Baig's decision to

10   eliminate Mr. Chapin was not based upon productivity or

11   legitimate business purpose based upon religion, replacing him

12   with one of his Pakistani Muslim acquaintances.

13       With respect to reckless disregard, I'll bunch that up

14   along with the Toyota Lexis argument.  Reckless disregard is

15   claimed to be missing with respect to punitive damages on

16   Acura Subaru.  And the term used on behalf of Toyota Lexus was

17   malice and reckless indifference.  Well, I would suggest all

18   those terms are un-- unimportant and immaterial when somebody

19   does something intentionally.  You bypass all those niceties

20   of language and you go straight to the intentional act.  And

21   the intentional act doesn't need malice or reckless disregard

22   or reckless indifference or anything else.  So I think the

23   punitive damages should go to the jury.

24       Now, with respect to the three-prong test with Toyota

25   Lexus as to retaliation, having conceded the first point, they

1   move onto the second point.  I didn't really hear much

2   argument on the third point.  So the second point was that he

3   did not suffer adverse employment action.

4        Well, the issue is a lot -- I think a lot more

5   straightforward than that.  Mr. Chapin testified there was no

6   way he could go back after being brow beat.  And the situation

7   that occurred on February 28th, 2005 and go back to that

8   employment at Toyota Lexis.  And I think the jury is entitled

9   to look at the self-serving March 4th, March 8th letter, March

10  14th letter, March 18th letter sent out by Toyota Lexus as a

11  way to try and to cover up on what happened starting on

12  February 28th of 2005.

13       The tape is clear that the general manager of Toyota Lexus

14  said what he said.  The actions are clear.  The general

15  manager of Acura Subaru did what he did, and I think it's up

16  to the jury to decide, then, that those actions did or did not

17  occur.  Thank you.

18            **THE COURT:**  Reply.

19            **MR. JAMES BUCHHOLZ:**  We believe under *Mills versus*

20  *Health Care Service Corp*., 171 F.3d 450, 455, that he's got to

21  show that where an unusual employer that discriminates against

22  the majority.  Mr. Baig testified that he had previous

23  experience in terms of working with Mr. Hussein.  He testified

24  he had previous experience in terms of working with

25  Mr. Al-Haq.  He knew what their qualifications were.  He had

1    worked with them, and they were in the same positions in other

2    dealerships and that he felt that they would be able to follow

3    his lead at the dealership because of his experience with them

4    in the past.

5         You know, this is a -- this is a case where Mr. Chapin may

6    not like the fact that other people can do the same type of

7    job or a better job than he can in the car business.  And in

8    this case, it's clear that the only testimony that he was

9    meeting the expectations are his.  Nobody else has testified

10   to it.  And that's part of their burden of proof.

11        As it relates to the Acura claim, we're entitled to

12   judgment.  There's not sufficient evidence in this record to

13   support going forward on the reverse discrimination claim as

14   it relates to his employment.

15             **THE COURT:**  All right, gentlemen.  I appreciate the

16   argument that has been presented.  The Court will take the

17   matter under advisement at this time, and the motion, of

18   course, can be renewed at the conclusion of all the evidence

19   in the case, including at the end of the defendant's

20   presentation.  And the Court -- you do not have to repeat the

21   argument at that time.  If you wish to add to it at that time,

22   you can do that, Mr. Buchholz.  And I anticipate that at this

23   time that I will be taking it under advisement, except,

24   perhaps with the issue -- I need to consider the issue

25   regarding punitive damages.  But I understand the intentional

1   aspect of the plaintiff's claims as against both defendants.

2   I just need to determine whether or not the evidence that's

3   presented is sufficient to allow punitive damages to go

4   forward.  And I'll look at the case law on that.

5       All right.  We'll go ahead and call the jury down.  I do

6   want to make a point, and that is to clarify in the record

7   that when the Court used the term "pattern" in this case, I

8   was not using it as any specific conclusion of law by the

9   Court that this case, you know, involved a pattern of

10  discrimination.  I have not made such determination.  That

11  term I was using as a shorthand way of referencing the

12  evidence that the plaintiff had sought to put into the case

13  before the jury, and that is the comparative.  And perhaps

14  that would have been a preferred term.  But the comparative

15  was, as he was presenting it comparing himself and two other

16  white, Christian males at the dealerships who, within the time

17  period proximate to the events involving Mr. Chapin, suffered

18  adverse employment actions by the dealerships against them,

19  and that they were each replaced by Pakistani Muslim males.

20  So just to make sure that was understood, that's what I was

21  referencing.  And I think Mr. Buchholz, you know, you

22  represented it twice and I just want to make sure you

23  understand, I think you do, and that the record's clear that

24  I'm not making any finding or conclusion in that way.  We're

25  simply referencing the evidence that was being presented.

 1          **MR. JAMES BUCHHOLZ:**  Okay.

 2          **THE COURT:**  So with that being clarified in the

 3     record.

 4          **MR. JAMES BUCHHOLZ:**  Judge, may I have one more.  I

 5     apologize.

 6          **THE COURT:**  Is this going to take long, because it's

 7     going to take the jury --

 8          **MR. JAMES BUCHHOLZ:**  No, it's going to take thirty or

 9     forty seconds.

10          **THE COURT:**  Okay.  Start to bring them down.  Go

11     ahead.

12          **MR. JAMES BUCHHOLZ:**  In the Pretrial Order, there was

13     a stipulation associated with the number of employees.

14          **THE COURT:**  Do you want that read?

15          **MR. JAMES BUCHHOLZ:**  Yeah.  I mean, I don't have a

16     problem with it being read.  I don't want it to be spread of

17     the record.  I'm not sure that it really matters as it relates

18     to the jury's determination at this point, but if there were

19     damages, it would certainly be to that.  And I want it, if --

20          **THE COURT:**  You can read it in your case-in-chief if

21     you want to.  Or you can ask the Court read it in and I can

22     give them an instruction as to how to take stipulations again.

23          **MR. JAMES BUCHHOLZ:**  That's fine.

24          **THE COURT:**  Which is your preference?

25          **MR. JAMES BUCHHOLZ:**  I would prefer Your Honor did.

1    **THE COURT:**  In fact, you had four stipulations and

2    again, I read them in if the parties request them.

3    **MR. JAMES BUCHHOLZ:**  What were the other two?

4    **THE COURT:**  They're on page 5 of the Pretrial Order.

5    I don't want to read them all if you've got the Pretrial

6    Order.  Just look at page 5 under section F.

7    For instance, Chapin was employed by the defendants within

8    the certain time period; that both the defendants are

9    employers for purposes of Title 7; Mid-States had 37

10   employees, Fort Rohr had 114.  So tell me what you want read.

11   **MR. JAMES BUCHHOLZ:**  Those are the two, number 4 and

12   5 I want read by the Court.

13   **THE COURT:**  You haven't rested yet, but do you find

14   any necessity for reading in one, two or three?

15   **MR. ROBERT VEGELER:**  No, Your Honor, and I don't see

16   the necessity of reading 4 and 5 because of any --

17   **THE COURT:**  You may think you need -- you may -- you

18   know, I let counsel make the record you think is necessary, so

19   in deference to the defense wanting to do that, I'll go ahead

20   and read them.  They are stipulations.

21   Last thing I want you to be aware of, I received another

22   note from one of the jurors with a question.  I think she --

23   the juror forgot to ask it during proceedings.  She thought of

24   it this morning, or last night, gave it to my Deputy this

25   morning.  You know, I'm not sure we need to recall anybody in

1   the plaintiff's case.  I anticipate it might come up in any

2   event in the defense case.

3       Question is:  What is the nationality and religion of

4   Mr. Rohrman?

5           **MR. JAMES BUCHHOLZ:**  He'll be testifying to that.

6           **THE COURT:**  Okay.  So you know, it's there and to the

7   extent you call him to testify, I want you to be aware of the

8   question and that I might end up asking that, if you don't

9   cover it in your examination.

10          **MR. JAMES BUCHHOLZ:**  Okay.

11          **THE COURT:**  Okay.  All right.  Anything else?

12      (No audible response.)

13          **THE COURT:**  So when they come in, you'll rest and

14  then we'll be proceeding right into the defense case?

15          **MR. JAMES BUCHHOLZ:**  Right.

16          **THE COURT:**  Are your witnesses ready to come in so we

17  didn't waste any time calling?

18          **MR. JAMES BUCHHOLZ:**  I'll have Courtney go get her.

19          **THE COURT:**  Who is first up?

20          **MR. JAMES BUCHHOLZ:**  Amber Okpara.

21          **MR. ROBERT VEGELER:**  Now, Your Honor, that raises the

22  issue of the 608(b) issue.

23          **THE COURT:**  It just might.

24          **MR. ROBERT VEGELER:**  You bet.  And I didn't want to

25  waste the Court's time, because that's something I need to

1   raise prior to my cross examination.

2          **THE COURT:**  All right.  Well, let's -- you know, if I

3   recall, she was the girlfriend.

4          **MR. ROBERT VEGELER:**  Yeah.

5          **THE COURT:**  The live-in girlfriend.  And I think it

6   was during a time period relevant to the case.

7          **MR. ROBERT VEGELER:**  Oh --

8          **THE COURT:**  So I anticipate there's going to be some

9   --

10         **MR. ROBERT VEGELER:**  I anticipate there may be some

11  relevant evidence and admissible evidence.  Also, there's a

12  number of overlays that occurred in this case --

13         **THE COURT:**  Oh.

14         **MR. ROBERT VEGELER:**  -- with the civil case that

15  required Magistrate Judge Cosbey to get involved, Judge Avery

16  to get involved.

17         **THE COURT:**  I'm aware of the overlays.

18         **MR. ROBERT VEGELER:**  Okay.

19         **THE COURT:**  So but when we get to your cross, then,

20  or wherever it's appropriate, then raise the issue, ask for a

21  side bar.

22         **MR. ROBERT VEGELER:**  Okay.  I wanted to do it prior

23  to cross exam.

24         **THE COURT:**  All right.  Let's see where it goes.

25      (Jury present.)

1          **THE COURT:**  Go ahead and be seated, ladies and

2     gentlemen.  And good morning to you.

3          **JURORS:**  Good morning.

4          **THE COURT:**  Counsel, you may be seated.

5       Ladies and gentlemen, we're going to begin day three of

6     the trial of this case now.

7       As we left off last night, we were in the plaintiff's

8     case-in-chief.

9       I just want to mention a couple of things as we go forward

10    now.  I did receive a question from one of the jurors that my

11    Deputy informed me of this morning.  I have shared that

12    question with parties' counsel, and I anticipate that it will

13    be addressed as the testimony is presented today.  If not,

14    we'll be asking the appropriate witness that question.  But

15    just to let you know that I've got it, and that we will be

16    following up on it.

17      With that, let me go ahead and ask you at this time,

18    Mr. Vegeler, on behalf of your client are there any additional

19    witnesses to be called or evidence to present?

20         **MR. ROBERT VEGELER:**  Not on behalf of the plaintiff,

21    Your Honor.

22         **THE COURT:**  All right.  Does the plaintiff rest at

23    this time?

24         **MR. ROBERT VEGELER:**  Yes, Your Honor.

25                      **PLAINTIFF RESTS**

1      **THE COURT:**  All right.  Is the defense ready to go

2  forward now, Mr. Buchholz?

3      **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

4      **THE COURT:**  All right.  Mr. Buchholz, before you call

5  the next witness, is there any other evidence that you would

6  ask the Court to --

7      **MR. JAMES BUCHHOLZ:**  Yes, Your Honor, I would ask you

8  read the stipulations related to the number of employees for

9  each defendant at the time of Mr. Chapin's employment.

10     **THE COURT:**  Ladies and gentlemen of the jury, at this

11  time, I need to advise you of two stipulations or agreements

12  that the parties have reached with regard to certain facts

13  bearing on the case.

14     These two stipulations are as follows:  First, Mid-States

15  Motors Incorporated had 37 employees during Trent Chapin's

16  employment.  Second, Fort Rohr Motors Incorporated had 114

17  employees during Trent Chapin's employment.

18     You must now treat these facts as having been proved for

19  the purpose of this case.

20     With the that, if your witness is ready to come in.

21     **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.  Call Amber

22  Okpara.

23     **THE COURT:**  Miss Okpara.  I didn't see you there.

24  Please step up.  And before you sit down if you would face my

25  Deputy to be sworn to testify.

1    (Whereupon, the witness was sworn.)

2        **THE COURT:**  Go ahead and be seated, Miss Okpara.  And

3    right in front of you, there's a -- see that cord, there's a

4    microphone on the bar there.

5        (Whereupon, witness is reaching for the microphone.)

6        **THE COURT:**  There you go.  If you could clip that up

7    by your left -- on the left side so it's closest to the -- see

8    if that works.

9        **THE WITNESS:**  Okay.

10       (Whereupon, the Witness is doing as indicated.)

11       **THE COURT:**  All right.  That should help.  All right.

12   Would you please state your name into the record again.

13       **THE WITNESS:**  Yes, Amber Okpara.

14       **THE COURT:**  All right.  That works.  Go ahead,

15   Mr. Buchholz.

16                      **AMBER OKPARA,**

17             **having been first duly sworn,**

18          **was examined and testified as follows:**

19                 <u>**DIRECT EXAMINATION**</u>

20   **BY MR. JAMES BUCHHOLZ:**

21    Q. Good morning, Miss Okpara.

22    A. Good morning.

23       **THE COURT:**  Could you spell that last name for us?

24       **THE WITNESS:**  Yes, it's O-K-P-A-R-A.

25   **BY MR. JAMES BUCHHOLZ:**

1    Q. Where do you currently reside?

2    A. Monticello, Indiana.

3    Q. How long have you been there?

4    A. For about two weeks.

5    Q. Okay.  And where did you move there from?

6    A. Indianapolis, Indiana.

7    Q. Okay.  Before Indianapolis, Indiana had you resided in

8    Fort Wayne, Indiana?

9    A. At New Haven.

10   Q. Okay.  And do you know the plaintiff Trent Chapin?

11   A. Yes, I do.

12   Q. And how do you know him?

13   A. Um, we dated for about a year and two or three months.

14   Q. Okay.  And at what time frame did you date him?

15   A. Uh, from the end of January 2005 until April 2006.

16   Q. Okay.  There come a point in time within that time frame

17   that you moved in with him?

18   A. Yes.

19   Q. So you lived at the same residence?

20   A. Yes, we did.

21   Q. What residence did you live at?

22   A. We lived at 9329 Woodstream Drive in Fort Wayne.

23   Q. Anybody else reside with you there and Mr. Chapin?

24   A. My son.

25   Q. Did you have an understanding as to how that -- Mr. Chapin

1   owned that house, was running that house or anything else

2   associated with that house?

3    A. He had had a land contract with Mr. Grepkey (phonetic).

4    Q. And so you understood that there was a land contract being

5   performed associated with that premises?

6    A. Yes.

7    Q. Mr. Chapin's sons live there?

8    A. No, they did not.

9    Q. Did they visit on occasions?

10    A. Yes.

11    Q. Would you tell the Court the time frames they came to

12   visit.

13    A. Probably every other weekend.

14    Q. Was it a temporary weekend-type stay?

15    A. Yes.

16    Q. Now, there's testimony in this case that there was an

17   African cat there?

18    A. Yes.

19    Q. Would you describe that cat?

20    A. Uh, it was a leopard.

21    Q. Okay.  How was that cat housed within the house, home?

22    A. She was kept up in the upstairs master bedroom.

23    Q. Were there any cages that that cat had?

24    A. No, there wasn't.

25    Q. Now, during the time that you were dating Mr. Chapin, were

1  you aware of any automobiles that he operated or owned?

2   A. It was a white BMW.

3   Q. Did he ever own or operate, to your knowledge, a Ford

4  Thunderbird?

5   A. No.

6   Q. Did he ever have anything to do with a Suzuki 800?

7   A. No.

8   Q. You never observed any of that around the house?

9   A. No, I haven't.

10   Q. Now, could you describe for the ladies and gentlemen of

11  the jury the furniture that existed in the bedroom of

12  Mr. Chapin, the master bedroom at that location?

13   A. Yes, just the master bedroom?

14   Q. Yes.

15   A. There was a box spring, a frame, and a mattress.  Um,

16  there was a computer desk in the room also with a T.V. stand

17  and a 19-inch television.

18   Q. Did you have an understanding of the ownership of those

19  possession?

20   A. Yes.

21   Q. And how did you come around with an understanding of the

22  ownership of those possession?

23   A. From Mr. Chapin.

24   Q. What did Mr. Chapin tell you about the 19-inch television?

25   A. That was his.

1    Q. What did Mr. Chapin tell you about the box spring and

2    mattress?

3    A. Those were his also.

4    Q. What did he tell you about the computer?

5    A. The computer desk was his father's.

6    Q. Was there a computer on the computer desk?

7    A. Yes, there was.

8    Q. What did he tell you about the ownership of the computer?

9    A. That was his.

10    Q. Now, was there any Pioneer televisions at that location?

11    A. Um, I'm not sure exactly what the brand was, but there was

12    a television in the living room that was being rented from

13    Aaron's Sales.

14    Q. And when you say a television, you talking about a

15    sixty-inch type thing?

16    A. Yes, a big television.

17    Q. That was being rented from Aaron's Rent-a-Center?

18    A. Yes.

19    Q. So that wasn't something that Mr. Chapin owned?

20    A. No.

21    Q. Would you tell me the items that were in the living room?

22    A. There was a plaid couch and love seat, um, two T.V. --

23    T.V. dinner stands, that were besides the couches.  There was

24    a recliner and ottoman chair in there.

25    Q. Okay.  Did you have an understanding as to the ownership

1   of those items, ma'am?

2    A. Yes.

3    Q. What was your understanding with respect to those items?

4    A. The recliner and ottoman was his father's and the couch

5   and love seat was Mr. Chapin's.

6    Q. Was there any stereo and theater system in that house?

7    A. Yes, there was.

8    Q. And did you have an understanding of the ownership of

9   those?

10   A. Yes, that was also from Aaron's Sales and Lease.

11   Q. So those weren't something that Mr. Chapin owned?

12   A. No.

13   Q. Was there a barbecue grill at that house?

14   A. Yes, there was.

15   Q. What kind of barbecue grill was there?

16   A. Um, it was a big grill.  I'm not sure of the brand of the

17  grill.

18   Q. Other than the large 60-inch television and the 19-inch

19  television, are you aware of any other televisions at that

20  location?

21   A. No.  I had a television, a 19-inch television, that was my

22  son's.

23   Q. The so one television was yours, the large television, the

24  60-inch, was Aaron's Rental?

25   A. Yes.

1    Q. And the 19-inch for Mr. Chapin?

2    A. Yes.

3    Q. And there were no other televisions in the house?

4    A. No, there was not.

5    Q. Could you tell me, was there a dining room set in that

6    house?

7    A. Yes, there was a round dining room set with four chairs.

8    Q. Did you have an understanding of the ownership of that?

9    A. Those were his father's also.

10   Q. Did you ever see any go-carts?

11   A. Yes, there was one in the garage.

12   Q. Okay.  Could you tell me, could you describe that go-cart

13   for me, please?

14   A. It looked to me like an older go-cart.  The seats had been

15   ripped out and it was said to me one of the dogs had tore off

16   the seats of it and a start switch wouldn't work on it, so it

17   wouldn't start.

18   Q. So it wasn't operational as far as your understanding?

19   A. Correct.

20   Q. Did you ever see it operated?

21   A. No.

22   Q. Who did the laundry?

23   A. Me and Mr. Chapin both.

24   Q. Did you do his laundry on occasion?

25   A. Yes.

1    Q. As I understand it, there came a time -- well, strike

2    that.  In January of 2005, when you moved in with Mr. Chapin,

3    was he employed?

4    A. Yes, he was.

5    Q. Where was he employed?

6    A. He was employed at a Budget Car car lot.

7    Q. Okay.

8    A. Here in Fort Wayne.

9    Q. Where was that located?

10   A. It was down the street from the Auto Mall.

11   Q. Did you have an understanding as to the affiliation of

12   that lot with any car dealerships?

13   A. Yes.

14   Q. What was your understanding of that?

15   A. Mr. Rohrman.

16   Q. Okay.  Did you have an understanding in terms of what

17   position Mr. Chapin had at that location?

18   A. Yes, he was running that location.

19   Q. So he was considered a manager?

20   A. Yes, I would consider it as a manager.

21   Q. Okay.  There's been testimony in this case that there came

22   a time in the end of February or early March that there was a

23   change with Mr. Chapin, or received a change with Mr. Chapin

24   at his job.  Are you aware of that?

25   A. Yes, I am.

1    Q. And what are you aware about that?

2    A. Mr. Chapin had called me.  I had the vehicle, the BMW at

3    the time and he had called and told me I needed to come and

4    pick him up from his work location, because he had lost his

5    job.

6    Q. And so what vehicle did you take to pick him up?

7    A. The BMW.

8    Q. Now, after that day, did you notice any change in the

9    sleeping habits of Mr. Chapin?

10   A. Yeah, he slept a lot.

11   Q. So was he sleeping as much or less than he had been before

12   the end of February 2005?

13   A. I would say more.

14   Q. So he was sleeping more than he had been?

15   A. Yes.

16   Q. Did you notice any physical problems or was there any

17   complaints of him of problems after February of 2005?

18   A. No, not to me.

19   Q. Did he make any indication that he was having additional

20   headaches?

21   A. No.

22   Q. Did he make any indication to you that he was having some

23   bleeding?

24   A. No, he did not.

25   Q. Did you observe in any of the clothes any bleeding?

1    A. No.

2    Q. During the time of the end of February '05, into March of

3    '05, were you aware of any letters coming to the residence?

4    A. Yes.

5    Q. What letters were you aware?

6    A. They were from the Fort Wayne Toyota store.

7    Q. Okay.  I'm going to place on the screen which should be in

8    front of you, Miss Okpara, a copy of Plaintiff's Exhibit

9    Number 5.  Can you see that okay?

10   A. Yes.

11   Q. Can you tell me whether this is one of the letters you

12   were referring to?

13   A. Yes.

14   Q. Did you have any discussion associated with Mr. Chapin

15   about the contents of this letter?

16   A. Yes.

17   Q. What discussions did you have with him about the contents

18   of this letter?

19   A. Well, I had asked Mr. Chapin, I said, you know, according

20   to the letter, you know, you're not fired from your job, and

21   they need to know whether, you know, you're resigning or to

22   let them know so they can get their keys back and their dealer

23   plate -- plates back to them.

24   Q. Are you aware of any communication by Mr. Chapin to

25   anybody at Fort Wayne Toyota after this letter?

1   A. No.

2   Q. Was there -- did you receive any telephone calls while you

3   were at the house there?

4   A. Yes, I did.

5   Q. Was there ever a time when you received a telephone call

6   pertaining to Mr. Chapin's employment?

7   A. Yes.

8   Q. Did the person on the other end of the phone identify

9   themselves to you?

10  A. Yes, they did.

11  Q. Do you have a recollection of who the identity was?

12  A. Yes, Mr. Larry Kruse.

13  Q. Did you tell Mr. Chapin about that call?

14  A. Yes, I did.

15  Q. Are you aware of any telephone calls he made back to

16  Mr. Kruse relating to the call that you received?

17  A. Not that I'm aware of.

18  Q. I'm going to show you what has been previously been marked

19  as Exhibit Number 6, Miss Okpara.  Have you seen that before?

20  A. Yes, I have seen this one before.

21  Q. Is that a letter that was sent to the house that you and

22  Mr. Chapin were residing in?

23  A. Yes, it was.

24  Q. Did you have any communication with Mr. Chapin about this

25  letter?

1    A. Uh, well, I had found all -- I believe there was two or

2    three letters.  And we had discussed, and I had asked him,

3    well, if you're not fired from your job, obviously they want

4    you back, you need to call and let them know something about

5    what you're going to do.  And Mr. Chapin explained to me that

6    even if he had went back, they would find some way to get him

7    fired.

8    Q. So it was his determination that he didn't want to go

9    back?

10    A. Correct.

11    Q. Are you aware of any communication of that nature to the

12    dealership by Mr. Chapin?

13    A. No, not that I'm aware of.

14    Q. Okay.  So when you talked with Mr. Chapin, it was with all

15    the three letters at one time?

16    A. Yes.

17    Q. The last letter is March 18th of 2005, previously

18    Defendant's Exhibit 6.  Is that the letter you're referring

19    to?

20    A. I believe so.

21    Q. Now, when was it that -- when was it, if ever, that you

22    left the Woodstream Drive address?

23    A. We were being evicted from that residence.

24    Q. And did you have an understanding as to why that was

25    occurring?

1    A. Yes.  Because the rent, I guess what you would call it,

2    was behind.  Mr. Chapin owed money.

3    Q. So did you have discussions with Mr. Chapin about paying

4    the rent or the amount to Mr. Grepkey (phonetic) and being

5    behind in that?

6    A. No, we never had any conversations about being behind.

7    Q. Now, did you have any discussions with him about getting a

8    job to make payments to Mr. Grepkey (phonetic) so the house

9    wouldn't be lost?

10   A. Yes.  Mr. Chapin, I believe, was receiving unemployment

11   after he was fired from the Fort Wayne Budget lot.

12   Q. When you left Woodstream Drive, was there ever a time

13   frame that -- well, where did you go?

14   A. He went to the Studio Plus hotel.

15   Q. And where was that located?

16   A. In Fort Wayne.

17   Q. Who lived there with you?

18   A. Myself, Mr. Chapin and my son.

19   Q. Was Mr. Chapin's sons living there?

20   A. No, they were not.

21   Q. Were Mr. Chapin's sons living at the Woodstream Drive

22   address?

23   A. No, they were not.

24   Q. Did you make payments associated with the Studio Plus

25   address?

1    A. No, I did not.

2    Q. Did you make payment -- did Mr. Chapin make payments

3    associated with that?

4    A. No, not that I'm aware of.

5    Q. How long were you at that location?

6    A. For about two or three months.

7    Q. And after -- do you know who made payments for that?

8    A. Yes.

9    Q. Okay.  Who made payments for that?

10   A. Mr. Bill Thayer.

11   Q. And who was he?

12   A. He was married to Mr. Chapin's -- well, wasn't married

13   yet, they were fiances to Mr. Chapin's ex-wife and his sons.

14   Q. And who was that, which ex-wife are you referring to?

15   A. Kelly Helgoe.

16   Q. Now, two to three months so that puts us June of '05 to

17   August/September of '05?

18   A. Yeah, by that time, yeah.

19   Q. Where did you go from there?

20   A. After the Studio Plus, we had went and lived with my

21   mother in Monticello.

22   Q. Monticello, Indiana?

23   A. Yes.

24   Q. Now, was there ever a time frame you're aware of between

25   June of '05 and September of '05 where there was no place to

1    live and Mr. Chapin had to live in a car?

2     A. Not that I'm aware of.

3     Q. Do you have an understanding as to where Mr. Chapin's

4    father lives?

5     A. Yes, in Fort Wayne.

6     Q. And as I understand it, you're going to Monticello, how

7    long did -- well, strike that.  What was the reason to go to

8    Monticello?

9     A. Because we no longer were going to be staying in the

10   Studio Plus hotel.

11    Q. So you, Mr. Chapin and your son went to stay with your

12   mother?

13    A. Yes, we did.

14    Q. Did you have any discussions with Mr. Chapin associated

15   with looking for employment during that time?

16    A. Yes.

17    Q. What discussions did you have?

18    A. Well, we were staying with my mother and father at that

19   time, and I didn't want to -- how you say -- bum off with my

20   parents.  We needed to help them with bills and stuff since we

21   were staying there, with food, water and electricity.

22    Q. Now, did you assist Mr. Chapin in finding employment?

23    A. Yes.

24    Q. What did you do?

25    A. I drove him to Lafayette to Mike Raisor Pontiac car

1    dealership in Lafayette, Indiana.

2     Q. And did you have an understanding as to whether he got a

3    job there?

4     A. Yes, he did.  He did get employment with them.

5     Q. Do you have an understanding as to how long he resided

6    there?

7     A. Could you rephrase that question.

8     Q. Sure.  Do you have an understanding as to how he long he

9    worked at Raisor?

10    A. I would say approximately about three weeks.

11    Q. Did there come a circumstance or a time frame where you

12   and he were not residing together?

13    A. Yes.

14    Q. And what time frame was that?

15    A. Uh, we had moved in with my mother and father in

16   Monticello, and after about a week or week and a half of us

17   staying there, I had kicked Mr. Chapin out of my mother's

18   house.

19    Q. Was there ever a time frame that you moved back in with

20   him?

21    A. Yes, there was.

22    Q. And when was that?

23    A. In October 2005.

24    Q. Okay.  At that time, was he employed?

25    A. Yes, he was.

1    Q. Okay.  And where was he employed at that time?

2    A. Auto Liquidation Center, New Haven.

3    Q. Do you have an understanding as to how long he worked

4    there?

5    A. I believe he worked there from October until maybe

6    February of 2006, along that time frame.

7    Q. And when did you and Mr. Chapin no longer live at the same

8    location?

9    A. The first part of April of 2006.

10   Q. In March of 2005, end of February 2005, was Mr. Chapin

11   buying groceries for your son?

12   A. What were the dates?

13   Q. The end of February 2005 into March of 2005?

14   A. Uh, I believe Mr. Chapin was receiving unemployment at

15   that time.

16   Q. Please listen to my questions.  In March -- in February of

17   2005, March 2005, was Mr. Chapin buying groceries for your

18   children?

19   A. No, he was not.

20   Q. Were his children residing at the location at that time?

21   A. No, they were not.

22   Q. Other than an interview with the Raisor in Monticello,

23   were you aware of any interviews by Mr. Chapin with any other

24   car dealers?

25   A. Not that I'm aware of.

1    Q. Are you aware of any submission of resumes with any other

2    car dealers, other than Raisor?

3    A. Not that I'm aware of.

4         **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

5                   <u>**CROSS EXAMINATION**</u>

6    **BY MR. ROBERT VEGELER:**

7    Q. Miss Okpara, is it your testimony at no time from -- is it

8    your testimony -- when did you start -- well, let me rephrase.

9    When did you start actually residing with Mr. Chapin?

10   A. The last part of January 2005.

11   Q. And your testimony was you dated through January of 2005

12   until April of 2006, is that correct?

13   A. Yes, we were dating and living together.

14   Q. So you moved in within the same month as to when you

15   started dating?

16   A. Yes.

17   Q. And where did you move from?

18   A. Monticello, Indiana.

19   Q. And how old is your son?

20   A. He's ten now.

21   Q. Was he nine back then or eight or nine?

22   A. Yeah, around that eight or nine around that time.

23   Q. Okay.  And what school was he attending when you moved

24   from Monticello; what school was he attending in Monticello?

25   A. He was attending Woodlawn Elementary.

1    Q. And what school was he attending when you were on

2    Woodstream?

3    A. I believe it was called Haverhill.

4    Q. Okay.  You don't know the name?

5    A. No, it was a block away from the house.

6    Q. Okay.  But you believe it was the name; you don't know the

7    name of it apparently?

8    A. I believe it was Haverhill.

9    Q. Okay.  You're not sure, though?

10   A. No.  He's had a couple different schools.

11   Q. How long was he at Haverhill?

12   A. Uh, for -- for about five, five months, somewhere around

13   there.

14   Q. Okay.  During that period of five months, did you ever

15   find out the name of the school?

16   A. Yes.

17   Q. Okay.  Now, did there come a time after you had to leave

18   Woodstream, you indicated that you stayed at a Studio Plus

19   hotel for a couple of months?

20   A. Yes.

21   Q. And where did you stay after that and how long in

22   Monticello?

23   A. For about a week and a half.

24   Q. Okay.  And then you got back together after you kicked him

25   out, right?

1    A. Yes.

2    Q. And where did he come back to?

3    A. After leaving my parents' house, he had came and stayed

4    with his father in some apartments here in Fort Wayne.

5    Q. Did he ever stay in New Haven?

6    A. Yes.

7    Q. Okay.  And did you stay in New Haven with him?

8    A. Yes, with Mr. Chapin.

9           **THE COURT:**  I'm sorry, say that last part again.

10          **THE WITNESS:**  Mr. Chapin, Mr. Trent Chapin.  Chapin

11   and I stayed in New Haven, yes.

12   **BY MR. ROBERT VEGELER:**

13   Q. Okay.  Obviously there came a time when you and he no

14   longer dated shall we say in April '06?

15   A. Right.

16   Q. Is that about the time you moved out?

17   A. Yes.

18   Q. And what -- did you then go back to Monticello?

19   A. No, I moved back to Indianapolis, Indiana.

20   Q. Now in January of '05, what employment did you have?

21   A. I was not employed at that time.

22   Q. Okay.  Tell me your employment from January of '05 through

23   April of '06?

24   A. Um, I had worked at Auto Liquidation center, same as

25   Mr. Chapin.

1    Q. For how long?

2    A. About three months.

3    Q. And where else did you work?

4    A. It was a company called AWS, Anthony Wayne Services

5    working with disabled adults.

6    Q. And how many months did you work there?

7    A. I worked there for about two or three weeks.

8    Q. Okay.  So other than Anthony Wayne Services and Auto

9    Liquidators, did you work anywhere else during that period?

10   A. No, I don't believe so.

11   Q. And during the approximate three months and three weeks of

12   employment during the 15-month period, did you from your

13   earnings help pay for the food and rent and so forth?

14   A. Yes, there was a period that I was receiving food stamps

15   at that time, as well as Medicaid.

16   Q. Now, was there some reason why you weren't employed those

17   other 12 months, 11 months?

18   A. After what period?

19   Q. No, during the 15 month period you were with Mr. Chapin.

20   A. Well, after I stopped working for AWS, the BMW, I guess

21   the water pump broke and you need transportation to carry your

22   clients back and forth.  That's why I stopped working at AWS.

23   Q. You know -- you weren't around after April of '06, though,

24   you moved to Indianapolis, right?

25   A. Correct.

1    Q. Now, you indicated that you didn't see Mr. Chapin, you're

2    not aware, I believe your testimony was you were not aware of

3    any other interviews or submissions for employment other than

4    what you testified to at --

5    A. Correct.

6    Q. -- Raisor Ford?

7    A. Correct.

8    Q. And Auto Liquidators, those two?

9    A. Correct.

10   Q. You didn't hang around Mr. Chapin 24 hours a day watching

11   him do any on-line applications, did you?

12   A. I didn't observe him filling out any applications.

13   Q. Yeah.  I mean, you were doing other things than sitting at

14   his computer desk all day watching him, correct?

15   A. Correct, I was cleaning and taking care of my son.

16   Q. Now, your son's in school --

17   A. Yes.

18   Q. -- a number of months there.  You're obviously not taking

19   care of him while he's in school and watching him at school,

20   are you?

21   A. Correct, but we -- I had painted, uh, I would say two or

22   three different, two rooms in the house which took up quite a

23   bit of time.

24   Q. Is it fair to say you and Mr. Chapin departed -- well,

25   first of all, you kicked him out somewhere along the way,

1   right?

2    A. Right.  When we stayed at my mother's house.

3    Q. And in April of '06, is it fair to say you parted on terms

4   that -- that weren't exactly friendly?

5    A. I would say they were friendly.

6    Q. Okay.  Then why did you leave?

7    A. Well, Mr. Chapin and I, we had differences, didn't agree

8   on stuff and I didn't feel that he was treating my son fairly

9   compared to the way he treated his children so we figured it

10   was best to part ways.

11    Q. Was that the two children that never lived with him while

12   you were there?

13    A. Correct, Cash and Sterling.

14    Q. They never once stayed with him during that --

15    A. Yeah, they --

16    Q. -- 15-month period?

17    A. Stayed with him, they stayed on weekends and there was a

18   period they stayed for one or two months when their mother,

19   dumped them off.

20    Q. Okay.  So the children did stay with Mr. Chapin, his

21   children did stay with him during that 15-month period?

22    A. For one or two months when he were in New Haven.

23    Q. For regular parenting time and kids come over, right?

24    A. Every other weekend.

25        **MR. ROBERT VEGELER:**  May I have a moment to check

```
 1  with my client?

 2          THE COURT:  Certainly.

 3      (Whereupon, there was a brief pause in the proceedings.)

 4          MR. ROBERT VEGELER:  No further questions, Your

 5  Honor.

 6          THE COURT:  Redirect?

 7          MR. JAMES BUCHHOLZ:  Yes, Your Honor.

 8                      REDIRECT EXAMINATION

 9  BY MR. JAMES BUCHHOLZ:

10   Q. The month or two associated with the children staying

11  occurred in New Haven?

12   A. Yes.

13   Q. That was in what time frame?

14   A. Uh, well, it was after we moved in, probably a couple of

15  months after we moved in.  Their mother was having problems

16  with them until and told Mr. Chapin that she could not --

17          MR. ROBERT VEGELER:  Your Honor, I'm going to object.

18  That's hearsay.

19          THE COURT:  Sustained.  You can't -- you can't

20  testify to what others said.

21          THE WITNESS:  Oh, okay.

22          THE COURT:  So that portion of her testimony will be

23  stricken.  I'd ask you, ladies and gentlemen, not to consider

24  it.

25          THE WITNESS:  Okay.
```

1          **THE COURT:**  Rephrase the question; what you're

2     looking for is a time period.

3          **MR. JAMES BUCHHOLZ:**  Sure.

4     **BY MR. JAMES BUCHHOLZ:**

5     Q. You told me you were at Woodstream Drive from January of

6     '05 through June of '05, correct?

7     A. Yes, along that time frame.

8     Q. That was in New Haven, wasn't it?

9     A. No, it was not.  It was in Fort Wayne.

10    Q. So it was from the October time frame of '05 into the

11    spring of '06 that you're referring to about the children

12    staying?

13    A. Yes.

14    Q. Now, Mr. Vegeler said two children, correct?

15    A. Yes.

16    Q. Were you ever told that Mr. Chapin had more than two

17    children?

18    A. Yes.

19          **MR. ROBERT VEGELER:**  Your Honor, I'm going to object

20    based upon no foundation as to who said what was said to her.

21    The question was "were you ever told".  That's obviously

22    hearsay.

23          **MR. JAMES BUCHHOLZ:**  I'll rephrase, Your Honor.

24    That's no problem.

25          **THE COURT:**  Try --

1  **BY MR. JAMES BUCHHOLZ:**

2   Q. Do you have an understanding as to whether Mr. Chapin has

3  more than two children?

4   A. Yes.

5   Q. And where did you come by that understanding?

6   A. Mr. Chapin himself had told me that he had a daughter, but

7  he was unaware of her location.

8   Q. Did she ever come to stay?

9   A. No.

10       **MR. JAMES BUCHHOLZ:**  Thank you, Miss Okpara.

11       **THE COURT:**  Anything else?

12       **MR. ROBERT VEGELER:**  Nothing else.

13       **THE COURT:**  Was this witness under subpoena?

14       **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

15       **THE COURT:**  All right.  You're now released from the

16  subpoena and you may step down.  Let's take the mic off.

17       **MR. JAMES BUCHHOLZ:**  May we approach briefly, Your

18  Honor?

19       **THE COURT:**  Certainly.

20      Miss Okpara, just one moment.  I made a note to myself,

21  and I didn't get to ask the jurors if they have any questions

22  for the witness.  Before I excuse her, anyone?  Any questions

23  from anyone?

24       **JURORS:**  (No audible response.)

25       **THE COURT:**  All right.  You may go ahead and leave.

1    Sorry.  Now approach.

2         (Whereupon, the following bench conference was held

3    outside the hearing of the jury:)

4         **THE COURT:**  Go ahead.

5         **MR. JAMES BUCHHOLZ:**  Based upon her testimony, Miss

6    Okpara, Your Honor, we would withdraw the request for bench

7    warrant.  When I requested that on Tuesday, Miss Okpara had

8    moved.  Under the record that was made, I didn't have her at

9    that time, and that was the reason, the need for some of the

10   testimony associated with Kelly Helgoe.

11      Now that that testimony has come in through another

12   witness, I can't, as an officer of the Court, indicate a

13   substantial need any further.  And as soon as that testimony

14   has now come in, Your Honor, you keep it for purposes of

15   telling Miss Helgoe, she's got to keep (Inaudible).  But for

16   purposes of this trial, I don't need her further.

17        **THE COURT:**  All right.  I'll think about whether or

18   not I want to recall the warrant, because technically she's in

19   contempt of court right now, but...

20        **MR. JAMES BUCHHOLZ:**  I wanted to make the record.

21        **THE COURT:**  I appreciate that, and no, that's fine.

22   We'll show you withdrawing that request and I'll think about

23   what I want to do.

24      Are you ready with your next witness?

25        **MR. JAMES BUCHHOLZ:**  I believe so.  I want to check

 1    the hallway.

 2              **THE COURT:**  Who is that going to be?

 3              **MR. JAMES BUCHHOLZ:**  I believe Dan Twomey.

 4              **THE COURT:**  All right.  All right.  Let's go.

 5         (Witness entering the courtroom.)

 6              **THE COURT:**  Sir, if you would please step up to the

 7    witness stand.  And now if you would please face my Deputy to

 8    be sworn in to testify.

 9         (Whereupon, the Witness was sworn.)

10              **THE COURT:**  And sir, if you could take that

11    microphone now, and put it on your collar to the left so we'll

12    be able to hear.  And would you now state your name for the

13    record?

14              **THE WITNESS:**  Malcomb Dan Twomey.

15              **THE COURT:**  Go ahead, Mr. Buchholz.

16                   **MALCOMB DAN TWOMEY,**

17               **having been first duly sworn,**

18             **was examined and testified as follows:**

19                  <u>**DIRECT EXAMINATION**</u>

20    BY MR. JAMES BUCHHOLZ:

21     Q. Morning, Mr. Twomey.  How are you today?

22     A. Good.

23     Q. You live here in Fort Wayne?

24     A. Roanoke.

25     Q. And how are you employed?

1    A. Biomet, Warsaw.

2    Q. And what do you do for them?

3    A. Orthopedic specialist.

4    Q. And prior to the time that you were an orthopedic

5    specialist, did you have an understanding or come to meet

6    Trent Chapin?

7    A. Through the car dealership, car business.

8    Q. Were you employed with him at one time?

9    A. Yes.

10   Q. And that's how you got to know him?

11   A. Yes.

12   Q. Did you have an understanding, by virtue of his

13   relationship with him, whether he had any exotic African cats?

14   A. After I got to know him better, yes.

15   Q. And what were you told by Mr. Chapin about exotic African

16   cats?

17   A. Um, I just asked questions about them and stuff like that,

18   and how he -- you know, how you get them and obtain them, and

19   things like that.

20   Q. Okay.  So you were interested in one?

21   A. Yes.

22   Q. Okay.  Did Mr. Chapin ever tell you that he needed permits

23   for a cat?

24   A. Um, we talked about it before, and I -- I don't know if I

25   had thought you needed one.  I don't know if he was aware you

1    did.  I questioned it a little bit, and then I contacted the

2    DNR, and they informed me that you did.

3     Q. Now, was there ever a time frame that you came in

4    possession of the cat of Mr. Chapin?

5     A. Yes.

6     Q. Okay.  And how did that occur?

7     A. Um, he had called me and cat was difficult for him to take

8    care of at the time, because he was living in a hotel.  So he

9    inquired if I would be interested about it, because he always

10   knew I liked her and I had more of a facility where I would be

11   able to do that.  Then he offered to sell the cat to me.

12    Q. Did you, in fact, buy that cat?

13    A. Yes.

14    Q. And how was that payment made?

15    A. Pay Pal.

16    Q. Now, so he didn't give you the cat?

17    A. No.

18    Q. Has there ever been a time frame that you purchased any

19   furniture from Mr. Chapin?

20    A. No.

21    Q. Did he ever offer to sell you any furniture?

22    A. No.

23        **MR. JAMES BUCHHOLZ:**  Nothing else of this witness,

24   Your Honor.

25

1        **CROSS EXAMINATION**

2   BY MR. ROBERT VEGELER:

3    Q. Mr. Twomey, did you -- when you got the cat, from

4   Mr. Chapin, the big cat, did you get some accessories with

5   that cat also?

6    A. No.

7    Q. You didn't get any cages?

8    A. No.

9        **MR. ROBERT VEGELER:**  No further questions.  Thank

10  you.

11       **THE COURT:**  Anything based on that?

12       **MR. JAMES BUCHHOLZ:**  No, Your Honor.

13       **THE COURT:**  Is this witness under subpoena?

14       **MR. JAMES BUCHHOLZ:**  He was, your Honor.

15       **THE COURT:**  Mr. Twomey, you're now released from that

16  subpoena, and you're welcome to step down.  Take the mic off.

17     (Whereupon, the Witness is entering the courtroom.)

18       **THE COURT:**  Sir, if you would please come up to the

19  witness stand.

20       **THE WITNESS:**  (Doing as Indicated.)

21       **THE COURT:**  And before you sit down, please face my

22  Deputy to be sworn.

23     (Whereupon, the Witness was sworn.)

24       **THE COURT:**  Before we begin, I forgot to ask you

25  again, I'm going to put this in front of you.  Did you have

 1    any questions for that last witness, because I can call him

 2    before he steps down, off the side.

 3              **JURORS:**  (No audible response.)

 4              **THE COURT:**  All right.  Would you please state your

 5    name into the record, sir.

 6              **THE WITNESS:**  Yes, Timothy Joseph Maddox.

 7              **THE COURT:**  And Mr. Maddox, would you take that

 8    microphone and if you could clip it on the left side up by the

 9    --

10              **THE WITNESS:**  Okay.

11              **THE COURT:**  Go ahead, Mr. Buchholz.

12        **MR. JAMES BUCHHOLZ:**  Thank you.

13                        **TIMOTHY JOSEPH MADDOX,**

14                   **having been first duly sworn,**

15              **was examined and testified as follows:**

16                        <u>**DIRECT EXAMINATION**</u>

17    BY MR. JAMES BUCHHOLZ:

18     Q. State your name for the record, please.

19     A. Timothy J. Maddox.

20     Q. Okay.  Can you tell us, Mr. Maddox, how you're employed?

21     A. I work for Fort Wayne Toyota.

22     Q. And has there ever been a time you've been employed by

23    Fort Wayne Acura?

24     A. Yes, sir.

25     Q. Would you give us a little bit of background in terms of

1    your education.

2     A. I was a graduate of Bishop Luers High School.

3     Q. And at that time, did you become employed in some

4    capacity?

5     A. Yes, sir.

6     Q. And what was that?

7     A. Um, I worked for a home repair kind of painting business.

8     Q. Okay.  And when did you become involved in the auto

9    business?

10    A. Um, on or around 1996.

11    Q. And within that -- so you've been in it about eleven

12   years?

13    A. Yes.

14    Q. How many different dealerships have you worked in?

15    A. Four.

16    Q. And what would those be?

17    A. Fort Wayne Acura Subaru, O'Daniel Oldsmobile, and Fort

18   Wayne Toyota Lexus.  And for a short time, I was in Fort

19   Lauderdale, Florida at the Daewoo in Fort Lauderdale.

20    Q. Okay.  Where were you employed?

21          **THE COURT:**  Did you say Daewoo?

22          **THE WITNESS:**  Yes.

23   **BY MR. JAMES BUCHHOLZ:**

24    Q. Where were you employed in the spring of 2004?

25    A. Fort Wayne Acura Subaru.

1    Q. Okay.  Is there a time frame that you're aware of that

2    there was a installation of a new manager?

3    A. Yes, sir.

4    Q. Okay.  A new general manager?

5    A. Yes.

6    Q. And April of 2004 sound about right to you?

7    A. Yes.

8    Q. Okay.  In April of 2004, was your position Internet

9    Manager?

10   A. That was a transition time.  Yes, I think as a matter of

11   fact, I was.

12   Q. Okay.  Would you tell us what the Internet Manager does?

13   A. They take all of the generated leads from the Internet,

14   and make contact through the Internet with the customers.

15   Q. Okay.  Now, at that time was Kurt Richards there?

16   A. Yes, he was.

17   Q. Okay.  And after Mr. Baig took over, what was

18   Mr. Richards' position?

19   A. As Nadim took over, Mr. Baig took over, I was the new car

20   manager at that point, and Kurt Richards was actually brought

21   down to the dealership as an acting general manager.  And I

22   stepped down from my position, so he was actually the new car

23   manager.

24   Q. Okay.  So when Mr. Baig started, Mr. Kurt Richards was the

25   new car manager?

1    A. Right.

2    Q. And you were the Internet Manager?

3    A. Yes, sir.

4    Q. Who was the used car manager?

5    A. Rob Bixby.

6    Q. When Mr. Baig took over in April of 2004, was Mr. Chapin

7    the used car manager?

8    A. Uh, no, he was not.

9    Q. Okay.  When is your understanding in terms of when he

10   became the used car manager?

11   A. A few weeks later.

12   Q. Okay.  Lucinda Baell an office person?

13   A. Yes.

14   Q. And is she a manager?

15   A. Yes, the office manager.

16   Q. Was Clayton Doherty (phonetic) a manager of parts at that

17   time?

18   A. Yes, he was.

19   Q. And was Ivan Alabamar (phonetic) the manager of service at

20   that time?

21   A. Yes.

22   Q. All of those managers, other than Mr. Salvadar (phonetic)

23   were white?

24   A. Yes.

25   Q. When Mr. Baig was brought in as the general manager, was

1    he accompanied by anybody?

2     A. No.  Mr. Rohrman.

3     Q. Okay.  So Mr. Rohrman came in with Mr. Baig?

4     A. Yes.

5     Q. And did you observe any introductions with Mr. Rohrman and

6    Mr. Baig in the dealership?

7     A. Absolutely.

8     Q. And you are you aware of any meetings that occurred that

9    day?

10    A. Yes, there was a meeting for the whole dealership.

11    Q. Okay.  So what happened at that meeting?

12    A. They held the morning quarters and everybody came into the

13   conference room.  Mr. Rohrman came up with Mr. Baig and

14   introduced him as the general manager.

15    Q. During the time frame that Mr. Chapin was at -- in the

16   used car position, did you ever observe him sleeping at his

17   desk?

18    A. Yes, sir.

19    Q. During the time Mr. Chapin was a used car manager, did you

20   ever observe the used car sales people going to the general

21   manager for assistance?

22    A. Yes.

23    Q. Were you part of a meeting with -- oh, strike that.

24        Are you aware of any meeting or did you attend any meeting

25   relating to the salespeople or managers about Mr. Chapin's

1    performance at the dealership?

2     A. Not that I'm aware of.

3     Q. Okay.  You were involved in a meeting with Glenn Richards

4    and Mr. Chapin, correct?

5     A. Yes, sir.

6     Q. And in that meeting, as I understand it, Mr. Chapin was

7    told he was no longer the used car manager?

8     A. Yes.

9     Q. Did you agree with that decision?

10    A. Yes.

11          **MR. JAMES BUCHHOLZ:**  I have no other questions of

12    this witness, Your Honor.

13          **MR. ROBERT VEGELER:**  No questions of this witness,

14    Your Honor.

15          **THE COURT:**  Does the jury have any questions for this

16    witness?

17          **JURORS:**  (No audible response.)

18          **THE COURT:**  All right.  You may step down, sir.

19          **MR. JAMES BUCHHOLZ:**  We'd next call Lucinda Baell,

20    Your Honor.

21          **THE COURT:**  Ma'am, if you would please come up to the

22    witness stand.

23          **THE COURT:**  Go ahead and put your purse down.  Before

24    you sit down, would you face my Deputy and she'll swear you in

25    to testify.

```
 1            (Whereupon, the Witness was sworn.)

 2            THE COURT:  Ma'am, could you take this microphone

 3    here.

 4            THE WITNESS:  Sure.

 5            THE COURT:  And put it on the lapel, high on the

 6    notch.

 7            THE WITNESS:  Sure.

 8            THE COURT:  And could you please state your name into

 9    the record.

10            THE WITNESS:  Mmm-mm, Lucinda Baell.

11            THE COURT:  Go ahead, Mr. Buchholz.

12            MR. JAMES BUCHHOLZ:  Thank you, Your Honor.

13                        LUCINDA BAELL,

14                having been first duly sworn,

15            was examined and testified as follows:

16                      DIRECT EXAMINATION

17    BY MR. JAMES BUCHHOLZ:

18    Q. How are you doing, ma'am?

19    A. Great.

20    Q. Are you currently employed?

21    A. Yes.

22    Q. Where are you employed?

23    A. Mid-State Motors, Inc. doing business as Fort Wayne Acura

24    Subaru.

25    Q. And how long have you been there?
```

1    A. Almost 18 years.

2    Q. What position do you occupy currently?

3    A. Office manager.

4    Q. How long have you held that position?

5    A. Um, about 16 years.

6    Q. Can you tell us generally what an office manager does?

7    A. Uh, oversee all the duties in the office.  I prepare

8    financial statements, take care of the taxes, payroll records.

9    I do the -- I process the deals when they're turned into the

10   office.  I guess that's -- doesn't sound like much.

11   Q. Do you have anything to do with employment records?

12   A. Yes.

13   Q. I'm going to hand you what has been marked as Defendant's

14   Exhibit U.

15       Tell me if you recognize that document.

16   A. Yes, I do.

17   Q. What is that document?

18   A. It's our harassment policy.

19   Q. Is that the copy of the policy you sent me from

20   Mr. Chapin's file?

21   A. Yes, it is.

22   Q. Is that a file that's kept in the ordinary course of

23   business at your dealership?

24   A. Yes.

25   Q. Does it have your signature at the bottom?

1    A. Yes, it does.

2         **MR. JAMES BUCHHOLZ:**  I move the admission of

3  Defendant's Exhibit U, Your Honor.

4         **MR. ROBERT VEGELER:**  No objection, Your Honor.

5         **THE COURT:**  U is admitted.

6  **BY MR. JAMES BUCHHOLZ:**

7   Q. Is this document something that we have -- that you have

8  employees sign when they come into the dealership as an

9  employee?

10   A. Yes, we do.

11   Q. And the date on that is?

12   A. April 8th of '04.

13   Q. Okay.  That would be the day that Mr. Chapin began at

14  Subaru?

15   A. Yes.

16   Q. Is there an employee handbook that you give out at that

17  time?

18   A. Yes.

19   Q. I'm going to hand you what has been marked as Defendant's

20  Exhibit D, Miss Baell.

21   A. Okay.

22   Q. And tell me what that is.

23   A. It's the employee handbook for our dealership.

24   Q. Is that something that's handed out to employees if

25  they're -- at the start time?

1    A. Yes.

2    Q. Is this something that Mr. Chapin would have received?

3    A. Yes.

4    Q. Okay.  In fact, does this form acknowledge receipt of that

5    within his file?

6    A. Yes.

7         **MR. JAMES BUCHHOLZ:**  Judge, I move the admission of

8    Defendant's Exhibit D.

9         **MR. ROBERT VEGELER:**  No objection.

10        **THE COURT:**  D is admitted.

11   **BY MR. JAMES BUCHHOLZ:**

12   Q. I'd also like to hand you, Mrs. Baell, what's been marked

13   as Defendant's Exhibit V.  Have you seen that before?

14   A. Yes.

15   Q. What is that?

16   A. It's an acknowledgment for receipt of the employee

17   handbook?

18   Q. When is that dated?

19   A. April 8th of '04.

20   Q. Is that something else that you took from Mr. Chapin's

21   employment file?

22   A. Yes.

23   Q. And that provides acknowledgment of receiving this book?

24   A. Correct.

25        **MR. JAMES BUCHHOLZ:**  Move to admission of Defendant's

1    Exhibit V, Your Honor.

2          **MR. ROBERT VEGELER:**  No objection.

3          **THE COURT:**  B (sic) is admitted.

4          **MR. ROBERT VEGELER:**  I think it's V.

5          **THE COURT:**  V as in Victor -- V as in Victor is

6    admitted.

7    **BY MR. JAMES BUCHHOLZ:**

8    Q. In the spring of 2004, Miss Baell, did Nadim Baig become

9    the general manager?

10   A. Yes.

11   Q. Is that the first time a general manager has come into the

12   Acura store during your tenure there?

13   A. No.

14   Q. So that's something that has happened before April of

15   2004?

16   A. Yes.

17   Q. When Mr. Baig was brought in as the general manager, did

18   anybody accompany him?

19   A. Yes.

20   Q. Who accompanied him?

21   A. Mr. Rohrman.

22   Q. Was that something that was different than any other time

23   when a general manager had come into Acura?

24   A. No.

25   Q. Are you aware of ever a time a general manager was brought

1    into the store that you worked at that Mr. Rohrman hasn't

2    accompanied him?

3    A. No.

4    Q. So every time it's occurred, he's been there?

5    A. Yes.

6    Q. Okay.  When Mr. Baig was introduced, how was that done?

7    A. Uh, we had a meeting with most of the employees, all that

8    could go upstairs.  We had to leave a few downstairs to cover

9    the dealership.

10   Q. Okay.  When a new general manager comes in, is there an

11   evaluation time frame of other managers?

12   A. Yes.

13   Q. Okay.  Now in April of 2004, after Mr. Baig had come into

14   the dealership, is it fair -- is it fair to say that Kurt

15   Richards was the used car manager, or excuse me, the new car

16   manager?

17   A. New car manager, yes.

18   Q. Who was the used car manager?

19   A. Um, Trent Chapin.

20   Q. Okay.  And who was the finance business manager?

21   A. Glenn Richards.

22   Q. You were the office manager?

23   A. Correct.

24   Q. Who was the parts manager?

25   A. Clayton Doherty (phonetic).

1    Q. And service?

2    A. Ivan Alabamar (phonetic).

3    Q. Everybody but Ivan in the same race?

4    A. Yes.

5    Q. Okay.  And what was that?

6    A. White.

7    Q. And you are?

8    A. White.

9    Q. Okay.  Mr. Alabamar (phonetic)?

10   A. I believe he's Spanish.

11   Q. Okay.  Now, as I understand it, Kurt Richards was a

12   manager that was asked to find other employment by Mr. Baig?

13   A. Correct.

14   Q. Was the time frame associated with that different than you

15   had ever seen before as it relates to a general manager

16   changing management positions?

17   A. No.

18   Q. Okay.  Did it surprise you in terms of that time frame?

19   A. No.

20   Q. Did you have experience in terms of why it is some things

21   like that would occur?

22   A. Yes.

23   Q. Okay.  Do you have an understanding in terms of the

24   management structure of the dealership?

25   A. Yes.

1    Q. Okay.  Who does the general manager report to?

2    A. Mr. Rohrman.

3    Q. And the other managers in the store report to who?

4    A. The general manager.

5    Q. Okay.  So he's responsible for -- general manager is

6    responsible for all the managers?

7    A. Yes.

8    Q. Is Fort Wayne Acura under the same corporate umbrella as

9    Fort Wayne Toyota?

10   A. No.

11   Q. Different corporations?

12   A. Yes.

13   Q. Does Fort Wayne Acura and Fort Wayne Toyota have the same

14   bank account?

15   A. No.

16   Q. Separate bank accounts?

17   A. Yes.

18   Q. Is the accounting the same between Acura and Toyota?

19   A. We have the same policies and structure of doing things.

20   Q. Okay.  But in terms of the work performance for

21   accounting, they do theirs, you do yours?

22   A. Correct, we're totally separate.

23   Q. Okay.  You don't do anything with them, do you?

24   A. No.

25   Q. Accounting?

```
 1    A. No.  No.

 2    Q. Is the payroll the same --

 3    A. No.

 4    Q. -- between the dealerships?

 5    A. No.

 6    Q. Is the employees the same between the two dealerships?

 7    A. No.

 8    Q. They're separate standing entities, aren't they?

 9    A. Yes.

10    Q. Are you aware of any meeting called by Nadim Baig to say

11    that Mr. Chapin was doing a good job at the dealership?

12    A. No.

13    Q. Now, in your position as the office manager, you said you

14    looked at the transactions, the finance papers after they've

15    been completed by a business manager?

16    A. Yes.

17    Q. And it's -- is it important or not important for those

18    documents to be accurate?

19    A. Extremely important.

20    Q. Why is that?

21    A. Well, if the documents are not accurate or if we're

22    missing any documents, the Banks will not fund the contracts,

23    therefore, we do not receive our money.  There's also other

24    documents in there that protect the dealership in the future.

25    Q. Okay.  So if there's -- if there's a problem with the
```

1   documentation, there's problems all the way around?

2   A. Yes.

3   Q. Problems for customers?

4   A. Yes.

5   Q. Problems with banks?

6   A. Yes.

7   Q. Problems for the dealership?

8   A. Yes.

9   Q. During the time frame you were the office manager, I

10  understand Glenn Richards was a business manager, correct?

11  A. Yes.

12  Q. That would be the same as a finance position?

13  A. Yes.

14  Q. Did you ever experience any problems with the work

15  performance that he had relating to creating these documents?

16  A. Yes.

17  Q. What problems did you have?

18  A. Documents that -- incorrect documents that were missed

19  that the customer hadn't signed, manager's signatures were

20  missing on forms.

21  Q. Okay.  Did you have discussions with Mr. Richards about

22  those problems?

23  A. Yes.

24  Q. Did he remedy the deficiencies?

25  A. Yes.

1    Q. Okay.  Did you ever have any discussions -- was there --

2    after you had discussions with him, were there other dealer

3    transactions that came through that had the same issues?

4    A. Yes.

5    Q. Okay.  So if you talked to him on an individual basis

6    about a deal, he would clean it up, correct?

7    A. Yes.  Yes.

8    Q. But there may be a problem with the next one?

9    A. Correct.

10   Q. And the next one after that?

11   A. Yes.

12   Q. Was that frustrating for you?

13   A. Extremely.

14   Q. Did you take any action associated with that?

15   A. Yes.

16   Q. What did you do?

17   A. Spoke with the general manager.

18   Q. Okay.  The general manager take any action?

19   A. Yes.

20   Q. What was that?

21   A. He trans -- he gave him the opportunity to transfer to a

22   different position within the dealership.

23   Q. Did that occur?

24   A. Yes.

25   Q. Okay.  Now, as I understand it, after Trent Chapin, there

1    was a change in the service department, correct?

2     A. Yes.

3     Q. Was there any changes in the management structure from the

4    time frame that Mr. Chapin left until the time frame that

5    there was a change in the service department?

6     A. No.

7     Q. Mr. Alabamar (phonetic) was let go?

8     A. Yes.

9     Q. Who was he replaced by?

10    A. He was replaced by Kevin Brown.

11    Q. Okay.  And are you aware of Mr. Brown's nationality?

12    A. Yes.

13    Q. What is that?

14    A. White.

15    Q. Okay.  Are you aware if he's a U.S. citizen?

16    A. Yes.

17    Q. Are you aware of any of the managers not being a U.S.

18    citizen?

19    A. No.

20    Q. Are you aware of his religion?

21    A. No.

22    Q. But that action occurred before the time frame that you

23    and Mr. Baig had discussions about Mr. Glenn Richards

24    performance?

25    A. Yes.

1      **MR. JAMES BUCHHOLZ:**  One second, Your Honor.

2        (Whereupon, there was a brief pause in the proceedings.)

3      **MR. JAMES BUCHHOLZ:**  I don't have any other questions

4   of this witness, Your Honor.

5      **THE COURT:**  Cross?

6                      **CROSS EXAMINATION**

7   BY MR. ROBERT VEGELER:

8    Q. Ms. Baell, in the 18 years as finance manager, there as

9   number of financial papers that had to go back to salespeople

10  or managers, used car, new car dealers to remedy, I think to

11  use your term, isn't that true?

12   A. Yes.

13   Q. Now, you're aware of who replaced Mr. Glenn Richards?

14   A. Yes.

15   Q. And who was that?

16   A. Um, that would have been Khurram Solheil (phonetic).

17   Q. And was he in charge of getting these -- this paperwork

18  done?

19   A. Yes.

20   Q. And did you ever have to go to him and have it

21  straightened out?

22   A. Yes.

23   Q. And was he then relieved of being a business manager?

24   A. Yes.

25      **MR. ROBERT VEGELER:**  No further questions.

1          <u>**REDIRECT EXAMINATION**</u>

2    **BY MR. JAMES BUCHHOLZ:**

3    Q. Who replaced Mr. Solheil?

4    A. Tim Maddox.

5    Q. The man that was just here in the courtroom?

6    A. Yes.

7    Q. You know his nationality?

8    A. Yes.

9    Q. What is that?

10   A. White.

11   Q. Is he a United States citizen?

12   A. Yes.

13   Q. You know what his religion is?

14   A. No.

15   Q. Knowing the religion of any of your employees matter to

16   you?

17   A. No.

18          **MR. JAMES BUCHHOLZ:**  Nothing else with this witness,

19   Your Honor.  Nothing.

20          **THE COURT:**  Mr. Vegeler.

21          <u>**RECROSS EXAMINATION**</u>

22   **BY MR. ROBERT VEGELER:**

23   Q. Tim Maddox, he took over after Mr. Solheil?

24   A. Yes.

25   Q. Was he then terminated?

```
 1      A. Yes.

 2              MR. ROBERT VEGELER:  No further questions.  Thank

 3      you.

 4              THE COURT:  Jury have any questions for this witness,

 5      anyone?

 6              JURORS:  (No audible response.)

 7              THE COURT:  All right.  Ma'am, you can take off the

 8      microphone and you can step down.

 9              THE COURT:  Do you have another witness to call?

10              MR. JAMES BUCHHOLZ:  I do, Your Honor.

11              THE COURT:  If you want to call --

12              MR. JAMES BUCHHOLZ:  I'd recall Mr. Kruse.  I want to

13      introduce a couple of exhibits through him.

14              THE COURT:  All right.

15              MR. JAMES BUCHHOLZ:  And then I'll have one other

16      witness, Your Honor.

17              THE COURT:  All right.

18              MR. JAMES BUCHHOLZ:  If Your Honor likes, after

19      Mr. Kruse, if you want to take --

20              THE COURT:  Certainly.  That would be an appropriate

21      time.  Okay.  Mr. Kruse, let me just remind you you do remain

22      under oath with regard to your testimony.

23              THE WITNESS:  Yes, ma'am.

24              THE COURT:  And if you would go ahead and sit down

25      and put the mic on.
```

1    **THE WITNESS:**  (Doing as indicated.)

2                        **LARRY KRUSE,**

3              **having been first duly sworn,**

4        **was examined and testified as follows:**

5                    <u>**DIRECT EXAMINATION**</u>

6    BY MR. JAMES BUCHHOLZ:

7    Q. I'm going to hand you, Mr. Kruse, the Exhibit X.  Would

8    you tell me what that is?

9    A. That's the harassment policy for the dealership.

10   Q. And that's for Fort Wayne Toyota?

11   A. For Fort Wayne Toyota Lexus, yes.

12   Q. And where did you obtain this document?

13   A. This was from Trent Chapin's file, employee file.

14   Q. Okay.  Is that his signature at the bottom?

15   A. Yes, it is.

16   Q. What's the date on that?

17   A. 6-1 of '04.

18          **MR. JAMES BUCHHOLZ:**  I'd move the admission of

19   Defendant's Exhibit X, Your Honor.

20          **THE COURT:**  Any objection?

21          **MR. ROBERT VEGELER:**  No objection, Your Honor.

22          **THE COURT:**  Show X admitted.

23   BY MR. JAMES BUCHHOLZ:

24   Q. Okay.  Now, you heard Ms. Baell testify about Defendant's

25   Exhibit D, correct?

1    A. Yes, I did.

2    Q. Okay.  Is that something that was provided to Mr. Chapin

3    in June of 2004?

4    A. Yes, he was, every employee receives that when they start

5    employment.

6    Q. I'm going to do hand you what has been marked as

7    Defendant's Exhibit W.  Can you tell us what that is?

8    A. Acknowledgment for receipt of the Employee Handbook.

9    Q. Whose signature appears on that?

10   A. Trent Chapin.

11   Q. And what's the date on that?

12   A. 6-1 of '04.

13        **MR. JAMES BUCHHOLZ:**  Move the admission of

14   Defendant's Exhibit W, Your Honor.

15        **MR. ROBERT VEGELER:**  No objection, Your Honor.

16        **THE COURT:**  W is admitted.

17        **MR. JAMES BUCHHOLZ:**  I have no other questions of

18   Mr. Kruse at this time, Your Honor.

19        **THE COURT:**  Any cross?

20        **MR. ROBERT VEGELER:**  No, Your Honor.

21        **THE COURT:**  Any questions?

22        **MR. ROBERT VEGELER:**  (No audible response.)

23        **THE COURT:**  All right.  You may step down.

24        **THE WITNESS:**  Thank you.

25        **MR. JAMES BUCHHOLZ:**  If we could take a break, Your

1    Honor, then I've got one more witness to call, and --

2         **THE COURT:**  Okay.  All right.  Ladies and gentlemen,

3    let's take our mid-morning break.  It's 10:30.  Let's take a

4    break for about 15 minutes.  We should be back on the record

5    at about 10:45.

6         Keep in mind the Court's continuing admonition with regard

7    to recesses and remember to take your notes upstairs with you.

8         (Jurors absent.)

9         **THE COURT:**  Fifteen minutes, counsel.

10        **MR. JAMES BUCHHOLZ:**  Thank you.

11        **THE CLERK:**  All rise.

12        **THE COURT:**  Go ahead and be seated, please.  All

13   right.  Is your witness --

14        **MR. JAMES BUCHHOLZ:**  He's here, Your Honor.

15        **THE COURT:**  -- ready to go?  Mr. Vegeler.

16        **MR. ROBERT VEGELER:**  Your Honor, if this is the

17   appropriate point we kind of hit upon it before, that is, it

18   is our understanding, although we do not know hundred percent

19   sure that -- but you heard some testimony about Mr. Rohrman

20   kept calling Mr. Baig to come back, kept calling him to come

21   back numerous times, et cetera.

22        And Mr. Baig's testimony, after he had been let go, and I

23   alerted the Court to the fact that it was our understanding

24   that Mr. Baig was appointed general manager of Acura Subaru

25   because he had claimed discrimination and this was part of the

 1    settlement.

 2         **THE COURT:**  Right.

 3         **MR. ROBERT VEGELER:**  Now, if -- if, I don't know what

 4    Mr. Rohrman is going to testify to, but he certainly can

 5    answer the question as to whether or not he kept calling

 6    Mr. Baig -- Mr. Baig had been terminated from the Bob Rohrman

 7    Auto Group, that he was at -- that he was -- Mr. Rohrman

 8    supposedly called him a number of times asking him to come

 9    back, whatever the testimony develops on that.

10         And at that point in time, the issue becomes whether or

11    not I can ask Mr. Rohrman, whether or not Mr. Baig sued the

12    Bob Rohrman Auto Group or its dealerships for discrimination

13    and whether or not that case was settled, and as part of the

14    settlement he was brought back as the general manager.

15         **THE COURT:**  Okay.  I've been anticipating the issue,

16    you know, being raised in the case.  I keep coming back to the

17    same question.  Why would that be relevant?

18         **MR. ROBERT VEGELER:**  Well, given the fact that --

19         **THE COURT:**  I mean, I can understand why you would

20    want it in, but why would it be relevant?

21         **MR. ROBERT VEGELER:**  Because it may very well show --

22    it may more likely establish a fact or not that the Bob

23    Rohrman Group has, in fact, engaged in discriminatory practice

24    in the past.

25         **MR. JAMES BUCHHOLZ:**  Judge, anybody can file a --

1          **THE COURT:**  Wait, wait.  He's still talking.

2          **MR. JAMES BUCHHOLZ:**  I'm sorry.

3          **MR. ROBERT VEGELER:**  They can file it, but they sure

4     as heck may not settle it and give him a job.

5          **THE COURT:**  I know, but it's not part of the

6     plaintiff's case, and it's not the evidence you would intend

7     to present to show, if there was prior litigation over

8     discrimination by the dealership against somebody else and

9     that resulted in the settlement of sorts, that that somehow

10    could constitute evidence going into your client's case.

11         **MR. ROBERT VEGELER:**  Well, but the person who was

12    involved was a direct actor in this case.  That's number one.

13    Because there's clearly plenty of discovery allowed in the

14    cases that says going back two years and find all the charges,

15    all the claims and suits, and so forth.  You're entitled to

16    see those.  Now, if they weren't relevant, then why would be

17    able to discover them?  There must have been some nexus here

18    that allowed that discovery over the years in these various

19    cases and I'm saying this is as close a nexus as you're going

20    to get as far as the fact that there may be some pattern here.

21    Although the Court cautioned on the use of that term, but

22    there may be similarities that show that there is conduct

23    done.  And Mr. Baig is very well aware of what's right and

24    what's wrong.  Mr. Rohrman is very well aware of what's right

25    and what's wrong, and that may have a bearing on how this

 1   plays out.

 2        **THE COURT:**  Well, not every instance of where there's

 3   smoke there's fire makes for legitimate or for relevant

 4   evidence coming into the case.  And it's my understanding, and

 5   I'll, you know, be corrected, if my understanding is

 6   incorrect, is that the lawsuit was filed by Baig.  I don't

 7   know if he was the only one in the case was settled or

 8   settlement was reached.  I don't know if it's confidential.  I

 9   don't know if there was an admission of liability.  Cases, as

10   you know, settle for all sorts of reasons, usually for

11   economic reasons.

12        **MR. ROBERT VEGELER:**  Clearly, I've got to anticipate

13   the document said there's no admission of liability and that

14   there is -- and it's confidential.  I can --

15        **THE COURT:**  You know, if there was -- well, even then

16   -- but obviously, I don't think you're dealing in a situation

17   where there was a court order and an EEOC directive that was

18   issued with regard to Baig's claim.  But in any event, I still

19   don't see where prior litigation -- because corporations and

20   the bigger they are, the more litigation they're going to get

21   on issues like what's being presented in this case -- and, you

22   know, it's simply not the fact that every time a corporation

23   is sued with a charge of employment discrimination that

24   evidence of those filings, those charges can come into a

25   subsequent case as proof that there must be something fishy or

1    suspicious about the employer or the practice.

2             **MR. ROBERT VEGELER:**  And the only --

3             **THE COURT:**  See, that's where I need to get over that

4    hump to show me that it ties in more relevant to your client's

5    case.

6             **MR. ROBERT VEGELER:**  Yeah, well, if Bob Rohrman Auto

7    Group settled the case with Joe Smith two years ago, and Joe

8    Smith wasn't a player in this case, then I think that puts us

9    pretty remotely away from, perhaps, relevance in this case.

10        However, the key player -- one of the two key players in

11   this case is the person who was affected by that and was the

12   beneficiary of it allegedly, and could very well have --

13   should have -- should have heightened his knowledge of what

14   the anti-harassment, anti-discrimination policy was because he

15   was the very beneficiary of that, and he turns around and does

16   it himself seems to me.

17            **THE COURT:**  And honestly, I thought it might come up

18   with regard to Baig.  We're talking about Baig.

19            **MR. ROBERT VEGELER:**  Yeah.

20            **THE COURT:**  Since he was the one that benefited from

21   the litigation and was put in the position and now had -- the

22   only one he ever had to report to was Mr. Rohrman himself.  I

23   thought it would come in your inquiry or the issue would come

24   in on his testimony with regard to any interest, bias or

25   whether or not he thought he had carte blanch to do whatever

1    he wanted then with regard to him having hiring or firing

2    powers.  You're right it could come in.  I can see where you

3    would have waited for Rohrman to answer to it, too, since he

4    was the target of the suit.

5           **MR. ROBERT VEGELER:**  Yeah.

6           **THE COURT:**  But I'm still not convinced yet it's

7    relevant.  Might be interesting.  I can't see the relevance

8    yet.  So let me hear from Mr. Buchholz and I'll come back to

9    you.

10          **MR. JAMES BUCHHOLZ:**  Your Honor, I have direct

11   knowledge of what happened with the Baig --

12          **THE COURT:**  I thought you would.

13          **MR. JAMES BUCHHOLZ:**  That doesn't surprise you, I'm

14   sure.  Mr. Baig withdrew that charge.  There was no

15   agreements, there was no settlement.  He withdrew the charge

16   in front of the EEOC.

17          **MR. ROBERT VEGELER:**  Well, good, there's no

18   confidentiality agreement.

19          **MR. JAMES BUCHHOLZ:**  But whether there's a

20   confidentiality agreement or not, it's not relevant to this

21   case.  Mr. Rohrman is going to testify as to why he wanted

22   Mr. Baig in that position.

23          **THE COURT:**  Don't mean to interrupt you, but you

24   represented Mr. Baig in that other case?  I'm sorry.

25          **MR. ROBERT VEGELER:**  No.

 1          **MR. JAMES BUCHHOLZ:**  Nobody did.

 2          **THE COURT:**  Baig represented himself?

 3          **MR. JAMES BUCHHOLZ:**  Baig represented himself, and

 4  two weeks or three weeks after he filed it he withdrew it.

 5          **THE COURT:**  He was pro se?

 6          **MR. JAMES BUCHHOLZ:**  Yes.

 7          **THE COURT:**  Was it here in this court?

 8          **MR. JAMES BUCHHOLZ:**  No, it was Fort Wayne Metro.  He

 9  didn't get a right to sue letter, there was no investigation.

10  There was nothing.

11          **THE COURT:**  He just filed an EO --

12          **MR. JAMES BUCHHOLZ:**  He filed an EEOC claim and three

13  weeks later he dropped it.

14          **THE COURT:**  And Rohrman never was even called in by

15  EEOC to respond?

16          **MR. JAMES BUCHHOLZ:**  No.  I filed an appearance.

17  Before I could get my position paper in, it's gone, he

18  withdrew it.

19          **THE COURT:**  Okay.  Anything else you want to argue

20  then with --

21          **MR. JAMES BUCHHOLZ:**  Well, it's not relevant as to

22  what he wants to talk about, Your Honor.  I think you're on

23  the right track, shouldn't come in.

24          **THE COURT:**  All right.  Well that makes it even

25  lighter -- a lighter situation.

1     **MR. ROBERT VEGELER:**  I don't know which way.

2     **THE COURT:**  It's lighter.  How compelling is it to be

3  able to ask Rohrman?  I'm not even sure you have anything to

4  say was he aware of it, did he know anything about this EEOC

5  complaint?  I mean, I'm taking it you haven't deposed Rohrman.

6     **MR. ROBERT VEGELER:**  Well no, because --

7     **THE COURT:**  All right.

8     **MR. ROBERT VEGELER:**  -- he didn't have any knowledge.

9     **THE COURT:**  Interrogatories, you know, is there

10  anything there that I should know that if you were allowed to

11  ask that question, and he'd answer it --

12     **MR. ROBERT VEGELER:**  Not based upon.

13     **THE COURT:**  -- you could use to impeach him or

14  anything else?

15     **MR. ROBERT VEGELER:**  Not based on the interrogatories

16  that were signed by representatives of the individual

17  dealerships.

18     **MR. JAMES BUCHHOLZ:**  Nadim Baig signed the

19  interrogatories on behalf of Fort Wayne Acura.  Larry Kruse

20  signed them on behalf of Fort Wayne Toyota, Your Honor.

21     **THE COURT:**  I'm sorry.  Say that again.

22     **MR. JAMES BUCHHOLZ:**  Interrogatories were responded

23  to, executed by Nadim Baig for Fort Wayne Acura and Larry

24  Kruse for Fort Wayne Toyota.  And we're talking about in terms

25  of Mr. Baig's claim, claim against Fort Wayne Nissan, not even

1    a party to this case.  They're not even a party.  They're a

2    separate third company.  And I'm going to have to deal with

3    another set.

4            **MR. JAMES BUCHHOLZ:**  (Laughing.)

5            **MR. ROBERT VEGELER:**  I don't think it's that

6    humorous, Your Honor.

7            **THE COURT:**  Well, I'm not laughing.

8            **MR. ROBERT VEGELER:**  In any event, I asked for in

9    discovery from Acura Subaru certain identifying information as

10   to adverse employment actions based upon, for the defendant

11   during 2003 through 2005.  So from that point of view, it was

12   -- it was with respect to Mid-States.  But there were some by

13   Mr. Baig, so...

14           **THE COURT:**  Who did Mr. Baig --

15           **MR. JAMES BUCHHOLZ:**  The claim with Mr. Baig was

16   against Fort Wayne Nissan.  That's yet a third corporation in

17   this city.

18           **THE COURT:**  Part of the Rohrman band or group?

19           **MR. JAMES BUCHHOLZ:**  It's part of a group of

20   companies.

21           **THE COURT:**  And now Rohrman is taking to stand to --

22           **MR. JAMES BUCHHOLZ:**  Yes, he is.

23           **THE COURT:**  -- answer to all of that.  All right.  If

24   the Court were to determine -- let's take this farther.  If

25   the Court assumes that it's relevant with regard to motive on

1    the part of Baig, since he filed an EEOC complaint, and as a

2    result of the EEOC complaint being withdrawn, he becomes GM.

3    Now, there may be a whole lot of explanation between the

4    filing and withdrawing and boom, he's a GM.  You know, it's

5    still conceivably relevant to show -- to suggest he had motive

6    now or free reign to discriminate however he wished.  So

7    that's arguable.  But again, I'm not sure because there's no

8    evidence that's been developed.  There's nothing right now to

9    show the Court that Rohrman had knowledge of all that.  I

10   mean, I'm -- you're assuming, Mr. Vegeler, that he did, and

11   that this was somehow done as a reaction to that EEOC

12   complaint.

13           **MR. ROBERT VEGELER:**  Yeah.

14           **THE COURT:**  There's no evidence of that, correct?

15           **MR. ROBERT VEGELER:**  No.  What kind of ticked it up

16   on the radar screen then was Mr. Baig's constant telephone

17   calls from Mr. Rohrman.

18           **MR. JAMES BUCHHOLZ:**  Well, if I may, Your Honor.

19           **THE COURT:**  You know, if anything Baig does he has to

20   check with Rohrman or he doesn't have to check with Rohrman.

21   Go ahead, Mr. Buchholz.  Anything else to add into that?  What

22   if this is relevant with regard to motive, either --

23           **MR. JAMES BUCHHOLZ:**  Your Honor, the testimony in

24   this case is that Mr. Baig left Fort Wayne Nissan, and for a

25   period of two years thereafter, he was employed by Vorderman

1    Motor Werks.  Two years.  Now, it seems to me, it seems to me

2    the space of two years certainly undercuts any assertion from

3    the filing of his claim and the separation from Fort Wayne

4    Nissan to the time frame that he's installed at Fort Wayne

5    Acura.  Two years pass, under his testimony.  He said he left

6    Fort Wayne Nissan in 2002.  He comes into Fort Wayne Acura in

7    April of 2004.  It's a stretch for me to believe, Your Honor,

8    and to believe that it's relevant in the firsthand.  In the

9    secondhand, that there's any connection between the two, when

10   there's two years that have passed.

11            **THE COURT:**  Well, and I understand what you're saying

12   about the two years.

13            **MR. JAMES BUCHHOLZ:**  I mean --

14            **THE COURT:**  But here, let me ask you this.  There's

15   been a suggestion made into the record, and the jury has heard

16   testimony to the effect that Mr. Baig was called by

17   Mr. Rohrman, and there's no context really that he was sought

18   out to come over and be the manager, the new GM over Acura.

19   He was at Nissan, and then there's this gap, and then somehow

20   Mr. Rohrman seeks him out to bring him in now to Acura.  This

21   would explain it.  That evidence would explain it, would it

22   not?  And is there an argument to be made that the door was

23   opened when the testimony came into the effect that and Baig

24   was able to testify that, you know, he was at Nissan, he was

25   fired from there, suddenly two years later, he's magically

1   called by Bob Rohrman to say come on over and head up things

2   at Acura.

3        **MR. JAMES BUCHHOLZ:**  I didn't open the door on that.

4   And it's his claim.  I'm responding to the assertions within

5   his claim within the evidence.

6        **THE COURT:**  But wasn't it on your examination -- let

7   me go back.  You will called Baig in your case.

8        **MR. JAMES BUCHHOLZ:**  No, I didn't.

9        **THE COURT:**  No, I'm pointing to Mr. Vegeler.

10       **MR. JAMES BUCHHOLZ:**  I'm sorry.

11       **THE COURT:**  Mr. Vegeler called Mr. Baig in his case,

12  and the examination, cross examination, direct examination,

13  I'm not sure where it was, but in any event, who called him is

14  really beyond the point.  The evidence came in and I don't

15  recall that it was objected to to the effect that he was

16  working at Nissan, he was fired from Nissan, two years go by

17  and he gets the call out of the blue from Mr. Rohrman, "Come

18  work for me," leaving the impression that somehow Mr. Baig has

19  this wonderful, you know, reputation that somehow, you know,

20  he's out there in the community, and Rohrman wants him back to

21  head up Acura.

22       **MR. ROBERT VEGELER:**  That was this cross examination,

23  Your Honor.

24       **THE COURT:**  Wherever it was.  Nobody owns a witness.

25       **MR. ROBERT VEGELER:**  But that opens the door.

 1        **THE COURT:**  I understand.  But in any event, there is

 2   this void in the evidence that this goes directly to.  And

 3   without letting it in, you know, the jury is left to

 4   speculate, potentially it's left to be argued that Baig just

 5   was such a great worker had just such a great reputation,

 6   Mr. Rohrman hires him in and brings him back.  So that's what

 7   I'm concerned about.  And why isn't it relevant there and why

 8   doesn't it then go to Mr. Rohrman's motive potentially?

 9        **MR. JAMES BUCHHOLZ:**  So you're telling me, Your

10   Honor, that I need to bring Nadim Baig back to talk to him

11   about his motivation for  --

12        **THE COURT:**  Please don't take the Court's invitation

13   to argue the point as a directive to you, Mr. Buchholz.

14        **MR. JAMES BUCHHOLZ:**  No, I'm --

15        **THE COURT:**  I'm not telling to you do anything and I

16   haven't throughout this case.

17        **MR. JAMES BUCHHOLZ:**  I understand.

18        **THE COURT:**  But you take what the Court says, you

19   turn it and you say, you're instructing me.  You're telling

20   me.  I haven't done that, counsel.

21        **MR. JAMES BUCHHOLZ:**  I'm sorry if I --

22        **THE COURT:**  I just invited argument to you.

23        **MR. JAMES BUCHHOLZ:**  Okay.

24        **THE COURT:**  I have to be fully informed of each

25   party's position in this case, since there was no -- well, in

1   this case, since everything has been left to trial, I'm

2   catching these facts as they're coming out.  Now I'm inviting

3   argument on whether or not there is -- this could be relevant

4   evidence with regard to motive either by Baig or by Rohrman or

5   by both, and would you potentially have to recall Baig?

6   Possibly.  I'm just asking you where is my thinking wrong or

7   being misdirected to -- to not see it as potentially relevant

8   on that issue or motive?

9        **MR. JAMES BUCHHOLZ:**  It seems to me, Your Honor, that

10  the question is, "Mr. Rohrman, what was your motive in

11  bringing Mr. Baig back to Fort Wayne Acura?"  That would be a

12  fair inquiry.  But if the inquiry is, isn't the reason you

13  brought him back because he filed a discrimination claim, A,

14  it's not relevant; and B, it's overly prejudicial to this

15  jury, because then I've got -- because then it puts the

16  defendant in a situation where I'm defending -- I've already

17  thought I'm defending kind of three cases with Glenn Richards,

18  because I had to call Lucinda Baell in to talk about his

19  situation today.  Then I've got to deal with a case that's two

20  years older than that, associated with this case and so --

21       **THE COURT:**  Let's focus on this.  If that question

22  were asked, it would be objected to because it's assuming a

23  fact not in evidence.  We don't have any evidence.  If

24  Mr. Vegeler asked Mr. Rohrman, isn't it a fact that you only

25  brought Baig in because you were the -- your company was the

1    subject of an EEOC complaint, that was what you presented.

2    That would not be allowable.  But if he said, what was your

3    motive for bringing or what inspired you to bring in Baig

4    after him having been let go from Nissan, I don't know what

5    Mr. Rohrman's going to say.  But we're dealing with the

6    potential that, or the possibility that he will say well, you

7    know, I had this EEOC complaint come in and I had to deal with

8    it, and Baig was part of what I had to deal with.  I don't

9    know.  You tell me.

10            **MR. JAMES BUCHHOLZ:**  It seems to me that the time

11   frame to deal with whether we opened the door, that should

12   have occurred after the time frame of his testimony because

13   you would have his testimony in front of you in terms of what

14   it is he has said, and whether he's even opened the door to

15   talk about that on cross examination.  And to say beforehand,

16   well, I'm going to let that cross examination in, then that

17   affects my direct, so --

18            **THE COURT:**  I agree.  I'll wait until this cross, and

19   you may develop something in the direct that covers the issue

20   indirectly that explains why he brought Baig back, because I

21   assume there's going to be something as to why he hired Baig

22   in and made the big introduction and all of that.  So, but it

23   was not improper for it to be brought up and that we

24   anticipate it and get this done now during this jury break

25   before.

 1          **MR. JAMES BUCHHOLZ:**  I understand.

 2          **THE COURT:**  We take another break in 10 minutes.

 3          **MR. JAMES BUCHHOLZ:**  I understand, Your Honor.

 4          **THE COURT:**  All right.  Let's do that then.  We'll

 5    bring -- Mr. Rohrman is going to come in.  We'll bring the

 6    jury.  We'll start with the direct.  If you anticipate that

 7    you're going to deal with that on cross, then ask for a side

 8    bar, we may need another hearing outside the hearing of the

 9    jury.  We'll see.  All right.  Anything else?

10          **MR. ROBERT VEGELER:**  Nothing, Your Honor.

11          **MR. JAMES BUCHHOLZ:**  Not from me, Your Honor.

12          **THE COURT:**  Okay.  Please bring the jury down.  I

13    think we're still on track, counsel, that we'll get the

14    evidence done today.  But I think the work we have to do with

15    instructions and making sure there's rebuttal and so on, I'm

16    still going to bring the jury back tomorrow morning for

17    closing arguments and instructions and deliberations, okay?

18       We're sticking with plan A.  I thought for a moment we

19    might get it done today, but I just think that would hurry

20    everybody and that's not the best thing.

21       (Jury present.)

22          **THE COURT:**  Go ahead and be seated, ladies and

23    gentlemen.  Counsel, you may be seated.

24          **THE COURT:**  Again, ladies and gentlemen, that was

25    longer than I expected, but we've been working on matters

1    diligently in the courtroom.  You may proceed.

2         Counsel, if you are you ready to call your next witness,

3    you may proceed.

4         **MR. JAMES BUCHHOLZ:**  We would call Robert Rohrman.

5         **THE COURT:**  Mr. Rohrman, if you would please come up

6    here to the witness stand.

7         (Witness doing as indicated.)

8         **THE COURT:**  Mr. Rohrman, before you sit down, could

9    you please face my Deputy to be sworn in to testify.

10        **THE WITNESS:**  I will.

11        (Whereupon, the Witness was sworn.)

12        **THE COURT:**  And finally, Mr. Rohrman, if I could ask

13   you to take that -- no, if you could put this on your left

14   lapel by your -- by the button hole, then we can hear you.

15        **THE WITNESS:**  Okay.

16        **THE COURT:**  Mr. Buchholz.

17        **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

18                         **BOB ROHRMAN,**

19              **having been first duly sworn,**

20           **was examined and testified as follows:**

21                    **DIRECT EXAMINATION**

22   BY MR. JAMES BUCHHOLZ:

23    Q. Good morning, Mr. Rohrman.

24    A. Good morning.

25    Q. As I understand it, you're the president of Fort Wayne

1    Toyota Lexis, Inc.?

2     A. Yes.

3     Q. And the corporate name that that's doing business as what?

4     A. It's a d/b/a of Fort Wayne Toyota Lexis.

5     Q. Okay.

6     A. Well, actually it's a d/b/a of Fort Wayne Toyota and Lexis

7    I believe.

8     Q. Okay.  So Fort Rohr runs Fort Wayne Toyota Lexus?

9     A. Correct.

10    Q. And Mid-States runs Fort Wayne Acura?

11    A. Correct.

12    Q. Are they separate companies?

13    A. Separate companies, separate corporations, mm-mmm.

14    Q. Do you have a relationship with either of those companies?

15    A. I'm the president of both.

16    Q. Can you tell us, Mr. Rohrman, as the president of both

17   companies whether the payroll for Fort Wayne Acura is the same

18   payroll for Fort Wayne Toyota?

19    A. No, it's separate.  It's completely different.  All the --

20   all the corporations have different bookkeeping, different

21   payrolls, different people that work for them and they're

22   completely separate.

23    Q. Different management?

24    A. Different management.

25    Q. Okay.  Now, I understand you began in the car business in

1    what year?

2     A. Do I really have to tell that year?  That's a long time.

3    Ha, ha, ha, ha.  Well, I got out of the Army in 19 -- in April

4    of 1955, and I started selling cars about five days later for

5    the local Ford dealer in Lafayette.  And, so I sold cars for

6    Glenn R. Pitman for seven years -- eight years.  Actually, I

7    was the general -- I ended up as the general sales manager,

8    and Ford tried to get -- he was getting up in the years, and

9    Ford tried to get him to sell out to me.  And he said he was

10   going to, but he said that for a couple of years, and I

11   decided I don't think he's going to do that.

12        And it happened that he died in his office at the age of

13   91, so I know he didn't want to get out of the car business.

14   But it's just like anything else, if you enjoy it, you know,

15   you just stay with it.

16        Well, attorneys -- one thing, sometimes they practice

17   until they're a hundred, you know.

18    Q. Well, when you got done with Mr. Pitman's operation, did

19   you open your own lot?

20    A. I did.  I opened a used car lot in Sagamore Parkway in

21   Lafayette, which was 52 bypass at that time.  And I was a used

22   car dealer then from 1963 until the fall of 1969, when I

23   acquired the Toyota franchise.

24    Q. Okay.  And that Toyota franchise was located where?

25    A. The Toyota -- in Lafayette, Indiana.

1    Q. Okay.

2    A. It's located the exact same spot as my used car dealer or

3    my used car lot was at that time.

4    Q. Okay.  And you live in Lafayette?

5    A. I live in Lafayette.  I spend a lot of time in

6    Indianapolis, Lafayette, Fort Wayne and in the Chicago

7    suburbs.

8    Q. From the time that you had that individual Toyota

9    dealership, the first dealership after you were a used car

10   sale guy --

11   A. Yeah.

12   Q. -- your operation has grown, hasn't it?

13   A. It's grown, yeah.  It is growing.

14   Q. You have dealerships in many locations now, don't you?

15   A. I have 14 -- 14 dealerships in the suburbs of Chicago from

16   Westmont to Shaumburg to Arlington Heights, Buffalo Grove,

17   Palatine, Libertyville, Gurney, 14 separate dealerships there,

18   and 13 in Indiana.

19   Q. Are the dealerships in Illinois each separate

20   corporations?

21   A. Yes.

22   Q. Okay.  You said you have thirteen dealerships or locations

23   in the State of Indiana?

24   A. Correct.

25   Q. Are they all separate corporations?

1    A. Yes, mmm-mm.  Actually, I have -- I think it's 40

2    franchises.  So there is 27 dealerships, but in some cases,

3    like in Lafayette -- well, in Fort Wayne for instance, I have

4    Toyota, Lexis and Kia, same corporation.

5    Q. That would be Fort Rohr doing business as Fort Wayne

6    Toyota Lexus?

7    A. Right.

8    Q. And then perhaps also the Acura Subaru store?

9    A. Right, that's a separate corporation, but it does have

10   Acura and Subaru.

11   Q. Okay.  Based upon the size, the number of dealerships, are

12   there some employee policies that you utilize in more than one

13   location?

14   A. Yes.  Well, I have a policy manual, and all of -- all of

15   my general managers, when I hire the general managers, they

16   get a copy of the policy manual and so the policies are

17   essentially the same in all stores.

18   Q. All right.  And then you also have employee manuals,

19   correct?

20   A. I do.  And that's the same in all stores.

21   Q. And this is Defendant's Exhibit D.  Does this appear to be

22   the employee manual handed out to employees?

23   A. Yes.

24   Q. That's what you expected?

25   A. Yes.

1    Q. One of the policies that goes across all corporations are

2    discrimination policies?

3    A. Oh, yes, mmm-mm.  Yeah, that's very important policy for

4    us, at least for the last 20 years or so.

5    Q. Okay.  Now, as I understand it, I'd like to focus your

6    attention to the Fort Wayne Acura store in the spring of 2004

7    okay?

8       It's my understanding at that time Nadim Baig was

9    installed as a general manager?

10   A. Correct.

11   Q. Who made the decision to do that?

12   A. I did.

13   Q. Now --

14   A. I --

15   Q. Did you have any experience with Mr. Baig in terms of his

16   qualifications before that day?

17   A. Yes.  Yes, Nadim -- Nadim worked for me at the Toyota

18   store.  Well, he worked for Larry Kruse who -- Larry was the

19   general manager and he hired him, and he worked there in

20   finance and insurance department.  Worked there for quite

21   awhile and done a very good job for us and I'm not sure why he

22   left there, but he left there and went to work for -- I

23   believe -- he went to work for the Volkswagon dealer.

24   Q. Okay.

25   A. The Volkswagon dealer at that time built a new store out

1   on '96 (sic) and he went to work for him.  I think it was as a

2   sales manager or general sales manager.

3    Q. You don't keep track of individual employees that leave

4   and where they all jump to between the time that you're last

5   aware of them, do you?

6    A. No.  Well, sometimes I do if they're real good, and I

7   want -- I wonder why they left, you know, and so I do.  But

8   normally I don't even know when they left or why they left,

9   because I hire the general manager.  I don't hire the sales

10  manager.  If I hired the sales manager, finance manager,

11  salesman or technicians, they'd be working for me, and the

12  general manager would have no control.  So I hire only the

13  general managers.

14   Q. All right.  And so as it relates to general managers,

15  then, they report to you?

16   A. They report directly to me.

17   Q. Okay.  And then the general managers deal with the

18  management team in place?

19   A. Correct.

20   Q. Now, I assume that there's been -- that you have a

21  procedure that you go through when you bring a new general

22  manager into a dealership, is that true?

23   A. Oh, yeah.

24   Q. Can you tell us what that is?

25   A. Well, normally -- well, let me tell you a little bit about

1    Nadim, because I -- I called Nadim a couple of times because

2    we were having a little difficulty at the Acura store, and I

3    called Nadim two or three times and I said, "Nadim, would you

4    think about being a general manager for me at the" -- oh, you

5    know, I'll take that back a little bit, because Nadim went to

6    work for my Nissan store --

7    Q. Okay.

8    A. -- before he went to work for the Volkswagon store.

9    Q. Okay.

10   A. And but getting back to how I hired Nadim as a GM, and I

11   said, "Nadim, how about sitting down and talking to me about

12   this." He said, "Okay." I said, "Let's go, how about --

13   we'll have a little lunch maybe at a restaurant." Okay. So

14   we did. We met at -- I believe -- I believe it was the

15   breakfast restaurant out there by 96 (sic).

16   Q. Ninety-six or 69?

17   A. Sixty-nine, yeah.

18   Q. Okay.

19   A. And so we talked about it. He said, "Yeah, you know, I

20   think -- I think I might be interested in that. I'm not

21   sure." He said, "Well, let me talk to my wife or whatever."

22   I said, "Okay." So he got back to me again. Oh, I think it

23   was a pay plan because, you know, pay plan is important to

24   everybody.

25   Q. When you talk about a "pay plan", you're talking about the

1   compensation made for work done as a general manager within a

2   dealership?

3    A. Correct, yeah, mmm-mm.

4    Q. So he was concerned about what his compensation would be

5   as a general manager?

6    A. Correct, yeah.

7    Q. For the work performed within the dealership?

8    A. Correct.

9    Q. Okay.  And so ultimately after some discussion back and

10   forth --

11    A. Yeah.

12    Q. -- you and he --

13    A. Yeah.  In fact, we had another meeting at another

14   restaurant or maybe it was the same one, that's when he said

15   okay, he would go to work for me, we've got the pay plan

16   worked out.  And if I recall at that time is the time I took

17   him over to Acura and had a meeting, which I normally do, I'll

18   call in all the management people at this store, we've got a

19   small conference room at each store normally, and I'll

20   introduce him as the new general manager.

21    Q. Okay.  So if the testimony has been on April 12th, 2004,

22   you and Nadim went into the dealership to be introduced as the

23   new general manager, would you have any reason to disagree

24   with that?

25    A. No, I keep a Daytimer.  I'm not so good on these

1    computers, so I keep a Daytimer that I've used for about 20

2    years.  But I keep a copy of every one, so I went back and

3    looked at that, and on the 12th, meeting at 1:00 o'clock with

4    Nadim at Fort Wayne at -- and I wrote this down as

5    (Unintelligible) Restaurant or something like that.  Starts

6    with a "B".

7     Q. Biaggi's may be?

8     A. May be.  Yeah, I can't read that writing.  It's probably

9    not even spelled right because my English is not the best, but

10   -- but I think that was the date.

11    Q. Okay.  And can you tell me, Mr. Rohrman, whether you were

12   in town at Fort Wayne Toyota at Fort Rohr on February 28th,

13   2005?

14    A. No, I looked that up as well, and -- February 28th --

15   let's see, February 28th, 2005, is that what you're saying?

16    Q. Yes, sir.  Or excuse me February 26, 2005.  I'm sorry,

17   February 26, 2005.

18    A. Okay.  On February 25th, which was Friday, I -- we just

19   got back from a Lexis meeting in Miami, Florida that

20   afternoon -- that evening.  Since we do a lot of advertising

21   with -- with Comcast Sport -- the sports channel in Chicago,

22   we have -- we get -- sometimes we get a suite for the Bulls.

23   That evening we had the whole suite at the Bull's game on

24   Friday.

25    Q. Okay.

1    A. And that Saturday, my -- my wife's girl, that's 16, she

2    was 15 at that time, she dances at the high school

3    competition, and all that Saturday, she had competition with

4    dance.  And I made sure I was there, because she wanted me to

5    be there.

6    Q. Were you in Fort Wayne that day at all?

7    A. No.  No.  No.  I'd never be in Fort Wayne on Saturday

8    anyhow, because Saturday, we probably sell half our cars on

9    Saturday, so it wouldn't be too good for me to be at any one

10   of the stores on Saturday.  I might go in and get right back

11   out, but I never talk to anybody there at the store.

12   Q. Reason for that being disruption based on who you are?

13   A. On the sales, yeah.  Yeah.

14   Q. Now, in your experience, when a new general manager is

15   placed at a dealership, he becomes responsible for the entire

16   operation to you, correct?

17   A. Correct, mmm-mm.  Correct.

18   Q. And is it common for changes to occur or can changes occur

19   within the management structure of an individual dealership

20   after your installation of a general manager?

21   A. Correct.  And normally -- normally there is, mmm-mm.

22   Q. Do you have an understanding as to the reason for that,

23   sir?

24   A. Well, the -- the main reason why I would change a general

25   manager, unless the old general manager just quit and went

1   someplace else with a bigger store, but the main reason I

2   would change a general manager -- and I'm the only one that

3   can hire and fire general managers -- the main reason for that

4   that they're not getting the job done.  So I would try and get

5   me a new general manager.  And normally the general manager

6   would look at his management team and say, "Why aren't we

7   getting the job done?"  And -- and he may have to -- he may

8   have to change a lot of his management team or some of his

9   salespeople or even some of his technicians he might have to

10  change them the way he sees fit, because he's responsible for

11  that store to do a good job, sell cars, make some money and

12  that's his job.

13   Q. If the store doesn't make money, what happens to the

14  general manager?

15   A. Well, normally -- normally the general manager is let go.

16  But that's not always the case, because in some stores, let me

17  take, for instance, I've got a couple of Kia stores in Chicago

18  and each one of them lost over a million dollars last year

19  apiece.  It's not because of the general manager, just because

20  Kia in Chicago is not selling.  We're selling ten, twelve new

21  Kia's a month in Chicago at the two -- each one, and Larry

22  last month in Fort Wayne sold 76 new Kia's.  So it's not the

23  general manager in that case.

24      And -- but in some cases if you got a -- if you've got a

25  Toyota or a Lexis store or a Honda store in today's market,

1    they better be making money because I think maybe one of my

2    grandsons is seven, eight years old could probably make money

3    in that store because of the product.

4     Q. As it relates to -- before you said you're married and

5    you've got a 16 year old that you're watching dance every once

6    in a awhile, correct?

7     A. Yeah, that's my stepdaughter.

8     Q. What is your race, Mr. Rohrman?

9     A. My what?

10    Q. Your race?

11    A. Oh, my race.

12    Q. Are you white, Asian, something else?

13    A. I'm not real sure, but my great great grandfather came

14    over from Germany in 1850 or sixty and so Rohrman, the name of

15    Rohrman is a German name.  But then my mother says I'm half

16    French too, so I'm not sure.  I must -- if I -- if I believe

17    what my mother and father told me, I would behalf French and

18    half German.

19    Q. Okay.  And you're white, right?

20    A. Am I white?

21    Q. You're white?

22    A. Well, I'm a little dark complected.

23    Q. You get a little better sun than I do?

24    A. Ha, ha, ha, ha.

25    Q. Now, were you born in the United States?

1    A. (No audible response.)

2    Q. Were you born in the United States?

3    A. Yeah, mmm-mm.

4    Q. Any brothers and sisters?

5    A. Yeah, I was born -- I was born in Lafayette, Indiana on

6    South River Road.  And I have -- my mother and father have

7    eleven children and I was the ninth from the oldest.  So I

8    have two younger ones.  And my mother and father are both from

9    Madison, Indiana and they moved to Lafayette before I was --

10   right before I was born.  And they rented a house out there, a

11   farm, and when they got there, of course, this was a few years

12   ago when they got there, the people were still living in the

13   house, and so he had a -- a log cabin about two or three

14   blocks from the house, and so my mother and father had with

15   all the kids, moved into this one-room log cabin and that's

16   where I was born in that log cabin.  Not that I wanted to be,

17   but at that time, of course, most of the kids were born at

18   home.  And, of course, I had nine older brothers and sisters.

19   I have two younger ones.  And so that's where I was born, and

20   raised, and then we moved to Lafayette when I was in the

21   second grade.

22   Q. Do you have a religion?

23   A. Oh, yeah, mmm-mm.

24   Q. What is your religion?

25   A. Well, my mother and father had eleven children, ha, ha,

1    ha, ha.

2     Q. I'll take a guess that you were Catholic?

3     A. Yes, that's true.  That's true, my mother was very strong

4    Catholic.  And I still am Catholic.

5     Q. Now, there was some testimony from Mr. Baig yesterday

6    associated with the profit at Fort Wayne Acura.  Can you tell

7    -- have you done any work associated with making determination

8    of what that was for, 2006?

9     A. I do.

10    Q. Can you tell the ladies and gentlemen of the jury what

11   that is?

12    A. Okay.  In -- in 2006 -- let me look here -- yeah.  In

13   2006, the net profit before any of my salary, the net profit

14   was $246,098.

15    Q. Okay.

16    A. In 2005 --

17    Q. I'm only asking 2006.

18    A. Okay.  Okay.  Okay.

19    Q. So you get a salary from Fort Wayne Acura?

20    A. No.  Well, I do.  I do if they had the money, but -- well,

21   let me tell you a little bit about Fort Wayne Acura.  In 1988,

22   John Barrett (phonetic) was my general manager at Shaumburg

23   Honda in Shaumburg, Illinois.  And John's from Lafayette

24   originally.  I hired him as salesman way back 30 years ago and

25   so they offered John the Acura dealership in either South Bend

1    or Fort Wayne, and so John decided Fort Wayne.  And so John

2    didn't have any money, and so I loaned John $500,000 to go --

3    to open up the store, and I put 500,000 in and we opened the

4    store 50/50.

5         Well, in 1988, Acura -- Acura was not a hot product, and

6    he did a good job selling them, but -- and he did a good job

7    in the market, but Acura was not a hot product.  In fact, my

8    Acura store in Chicago even lost money in '88/'89.  So two

9    years later, he had lost all that million dollars, and he

10   called me up, he said, "Hey, I got to go -- I'm getting -- I'm

11   leaving."  I said, "Okay, Johnny."  He went to Florida, went

12   to work for another friend of mine down in Florida, and he

13   came back to work for me a couple of years later at the Indy

14   Honda.  But -- so I put some more money in the store, and at

15   one time I think it was like '93 or '94, '95, we had a loss of

16   the store of close to a million five.  And then Acura kind of

17   got a little bit -- we moved Acura from the north side where

18   we've got Nissan -- well, across the street where we've got

19   Nissan there now.  That's where we opened it up and we moved

20   it out to where it is at the present time.

21    Q. Over on Illinois Road?

22    A. On Illinois Road.  And then it got a little better, and

23   got a little better, and we started making a little money.  So

24   in -- in nineteen -- in 1905 (sic).

25    Q. 2005?

1    A. Yeah, 2005, yeah, excuse me.  In 2005, we had a negative

2    equity for -- a negative net worth of the store of $531,000

3    yet.  Now, remember, we went from a million five to this.

4        Now, that was after -- that was after I took salary that

5    year to pay the federal tax.  And part of it came out of that

6    store.  And so that was the only money I've ever taken out of

7    the store in almost 20 years was $512,945.  And I take it out

8    of several of the stores to pay my federal tax and the state

9    tax as well.  And that came out of the store.  So we still had

10   a negative, even after my salary, of 18,000.

11       So when -- in -- in -- that was in '05.  In '06, then, we

12   made $246,098.

13    Q. Is that profit?

14    A. That's profit, mmm-mm.  So actually we still have a

15   negative retained earnings, but because I took that salary out

16   -- we have a negative retained earnings of $284,934 after I

17   took that salary out.  So we came back from a loss of over a

18   million three or four and I'm not real sure what that figure

19   is.  I didn't look it up.  So where we're at today -- but

20   that's -- that's a -- a lot of that's due in the car business

21   is two things, is product and people.  Those two things.  And

22   that's -- and Nadim has done a good job since he's been there

23   those two years.

24    Q. Thank you, Mr. Rohrman.?

25          **MR. JAMES BUCHHOLZ:**  I don't have any other questions

1    of this witness, Your Honor.

2                          **CROSS EXAMINATION**

3    **BY MR. ROBERT VEGELER:**

4     Q. Mr. Rohrman, you focused upon the negative retained

5    earnings at the Acura Subaru store in 2005.  What were the

6    total assets of the Acura Subaru on the balance sheet in 2004,

7    if you know?

8     A. You know, I'm not real sure, but I -- I would imagine it

9    was probably around a million dollars, because I never -- I

10   never put anymore money in for -- for the -- for the company.

11   If they needed more money, then I would just loan them the

12   money personally, and they paid me the interest the same as

13   the floor plan interest.  So that was probably the same.

14    Q. Okay.  Now with respect to, as I understand your

15   testimony, Mr. -- you indicated that you're responsibility --

16   responsible for hiring the general manager and they report

17   directly to you, is that correct?

18    A. Right.

19    Q. And then you expect them to develop their team members,

20   and the car managers, used car managers, finance managers,

21   correct?

22    A. Everybody.

23    Q. And those people -- the person responsible for that

24   decision would be the general manager as to who they hire and

25   who they didn't hire?

1    A. Right.

2    Q. Did Nadim Baig, after you brought him in in April of '04,

3    did he check with you to see who he ought to hire as sales

4    managers and used car managers?

5    A. Uh, not normally, not normally.  If he did -- if he did,

6    and some of the guys do this -- they would -- they might call

7    me and say, "Hey, Bob, do you know a certain party?"  And I

8    was thinking about may be putting him in as a new car manager,

9    "What do you think of that?  Well, I don't really know him,

10   Nadim, so use your own judgment, because you're the general

11   manager and if you make a good one, it's up to you; bad one,

12   it's still your problem."

13   Q. So if I understand your answer correctly, you don't really

14   have any independent recollection or knowledge that Nadim Baig

15   gets on the phone and talked to you personally, "Hey, I want

16   to terminate Trent Chapin and hire Mr. X at Acura Subaru."

17   You don't have any recollection of that?

18   A. Don't have any recollection of that.

19   Q. Okay.

20   A. It could have happened, but I don't have any

21   recollection -- remember that because sometimes that does

22   happen, but not very often.  And the reason why it may not

23   happen is because I don't -- I don't know the guy.

24   Q. Do you know Mr. Trent Chapin?

25   A. No.

1    Q. Do you know Irfan Hussein?

2    A. I do -- I do now because he works for me.

3    Q. What about Anwar Al-haig (phonetic), do you know him?

4    A. I did, but I don't remember, if he walked in here I would

5    remember him probably.

6    Q. You indicated Mr. Nadim Baig went to your Nissan store

7    after you thought about it for awhile, correct?

8    A. Mmm-mm.

9    Q. Do you recall why he -- the circumstances under which he

10   left your Nissan store in Fort Wayne?

11   A. I think -- I think, if I recall, and my memory has been

12   jogged with a couple of things, but I believe that he had a

13   problem with the general manager there, and I think maybe the

14   general manager might have let him go.

15   Q. And did you -- when did you find out about that, if you

16   recall?

17   A. That he let him go?

18   Q. Yeah.

19   A. You know, I don't recall, but it wasn't -- it wasn't right

20   away.  Yeah.  Because I think the guy that was the general

21   manager there worked for us at Toyota as the service manager

22   at one time.

23   Q. Then you indicated that you had a breakfast meeting,

24   perhaps two breakfast meetings with Mr. Baig to talk about

25   maybe a future with the Rohrman Auto Group?

1    A. Mmm-mm.

2    Q. And you indicated that after one of those meetings, you

3    scheduled a -- the date I have written down in my notes is

4    April 12th, 2004 at 1:00 o'clock you took or come meet him at

5    the Acura Subaru dealership in Fort Wayne?

6    A. Mmm-mm.

7    Q. How did you get into Fort Wayne that day, do you recall?

8    Did you drive up and meet with him for breakfast?

9    A. You know, I'm not real sure.  I could have flew up,

10   because I've got a small plane, and a lot of times I'll fly

11   from Lafayette to Fort Wayne, because the roads are not that

12   good from Lafayette to Fort Wayne.  And it's very easy to fly

13   up because we fly into Smith Field.  So it's possible I did

14   fly up, but I'm not real positive of that.

15   Q. Now, you testified that you called Nadim Baig a couple of

16   times maybe as many as three times?

17   A. Mmm-mm.

18   Q. What prompted you to -- well, let me ask you this, when

19   did you start calling Mr. Baig, how soon was it before the

20   April '04 start?

21   A. Hmmm, not that -- not that soon.  It was probably maybe a

22   couple of months.

23   Q. Okay.

24   A. If it was that long.

25   Q. And if he had testified that he was let go at the Nissan

1    store in 2002 and your testimony is you might have started

2    talking to him in February of 2004, or so?

3     A. Mmm-mm.

4     Q. What prompted you to pick up the phone and call him?

5     A. You know, I'm not real sure.  But I knew -- see, I knew he

6    had done such a good job for me over at Fort Wayne Toyota and

7    I'll tell you, it might be possible -- I'm not sure of this --

8    but it might be possible that I asked Larry, because Larry has

9    been with me for a long time and done a good job at Fort Wayne

10   Toyota Lexus and I've asked Larry a lot of times about

11   different people, to put in different general managers, jobs

12   here and I think I might have asked Larry, "You know, Larry,

13   I'm having a little problem over there with the general

14   manager.  Who would you suggest maybe we could put in there at

15   GM?"  And he might have suggested Nadim.

16       But I knew Nadim pretty well, too, so I knew he could do

17   -- I knew he could do the job.

18    Q. Did you talk to him at any time or did you have any

19   contact with Mr. Baig between when he had left -- when he was

20   let go at your Nissan store in Fort Wayne and when you started

21   calling him, say, in February of '04?

22    A. No, not that I -- not that I know of.  I might have called

23   him before that, tried to get him back at Fort Wayne Toyota,

24   because Larry, I know -- I'm pretty sure Larry had talked to

25   him about becoming a part of Wayne Toyota because he had done

1    a real good job in the finance and insurance department.  He

2    and -- forget the other guy's name -- but they done a great

3    job there, and that's the reason why we elevated him to the

4    general sales manager at Fort Wayne Nissan.

5             **MR. ROBERT VEGELER:**  Just a moment, Your Honor.

6         (Whereupon, there was a brief pause in the proceedings.)

7             **MR. ROBERT VEGELER:**  No further questions.  No

8    further questions of this witness, Your Honor.

9             **THE COURT:**  Any redirect?

10            **MR. JAMES BUCHHOLZ:**  One question.

11                   <u>**REDIRECT EXAMINATION**</u>

12   **BY MR. JAMES BUCHHOLZ:**

13    Q. When you say you "talked to Larry", are you referring to

14   Larry Kruse?

15    A. Yeah, right.

16            **MR. JAMES BUCHHOLZ:**  No other questions, Your Honor.

17            **THE COURT:**  Anything based on that?

18            **MR. ROBERT VEGELER:**  No, Your Honor.

19            **THE COURT:**  Does the jury have any questions for the

20   witness, anyone?

21            **JURORS:**  (No audible response.)

22            **THE COURT:**  This witness, you can now step down.

23   Just take your mike off.

24            **THE WITNESS:**  Oh, yeah.  I forgot to do that a couple

25   of times.

1          **THE COURT:**  I've had a few witnesses forget.  Does

2     the defense have any additional witnesses to call?

3          **MR. JAMES BUCHHOLZ:**  I have no other witnesses, Your

4     Honor.  We'd rest at this time.

5                           **DEFENSE RESTS**

6          **THE COURT:**  Any rebuttal for the plaintiff?

7          **MR. ROBERT VEGELER:**  No rebuttal, Your Honor.

8          **THE COURT:**  Ladies and gentlemen, of the jury, it's

9     almost noon and we've concluded the presentation of the

10    evidence in this case.

11         Now, even though you've heard all the evidence, I need to

12    advise you that given the schedule that we set out or I

13    mentioned yesterday, this afternoon, I need to work with

14    parties' counsel to finalize the Court's instructions of law

15    and this can very often be a very long process taking several,

16    several hours.  So rather than have you stay and wait for that

17    process, I'm going to allow that you leave today and come back

18    tomorrow morning, and then we will, as I indicated proceed

19    with closing arguments, the Court's instructions and you'll go

20    into deliberations.  So we'll keep the schedule tomorrow that

21    you be here by a quarter to nine, and then -- then we'll

22    conclude the case tomorrow.

23         Now, even though you've heard all the evidence, the Court

24    still needs to instruct you that you must keep an open mind

25    with regard to the case, because you have not yet received the

1   Court's instructions of law, which you will have to apply to

2   the facts as you find them to be from the evidence that you've

3   heard.  Nor have we heard the attorneys' closing arguments.

4   So over this evening recess or this afternoon evening recess,

5   you need to keep an open mind.  You, again, are reminded not

6   to expose yourselves to any media coverage, if any, with

7   regard to the case.  You're not to undertake any investigation

8   regarding the case, including through the Internet.  And

9   you're -- if there's any contact with anybody else, you are to

10   immediately -- or contact by somebody else with you, to

11   discuss the case, you need to notify me of that as well.

12       Now, if you -- let's keep to the same schedule, have you

13   come in tomorrow.  We'll have breakfast ready for you and

14   we'll start to try to get started at 9:00 o'clock.

15       I remind you to take your notes upstairs, leave them

16   upstairs overnight.  If there are any exhibits in the box,

17   just put them on the rail and my Deputy will collect them.

18       With that said, we'll see you tomorrow morning at a

19   quarter to 9:00.

20       (Jury absent.)

21           **THE COURT:**  Go ahead and be seated, counsel.  All

22   right.  Counsel, this moved this morning very, very quickly,

23   and I can have a package of the Court's proposed jury

24   instructions for you in about, say, 15 minutes.  We're just

25   making some final changes to them.

1     What I want to give you the opportunity is, over -- give

2   you have an opportunity for lunch and then be able to come

3   back and have our instruction conference to get those

4   finalized this afternoon.  So if you want to wait, they'll be

5   ready in 15 minutes and you can utilize part of your lunch

6   hour.  If you rather not wait, come back in, say, an hour,

7   hour and a half, and we'll have the package of instructions at

8   that time.  I'll give you some time to review them then and

9   then we'll have our conference.

10     Any preference?  You want to wait, then we'll get them to

11   you.  If you want to come back in an hour, hour and a half,

12   we'll do it that way.  Mr. Vegeler?

13         **MR. ROBERT VEGELER:**  My question is would it -- if we

14   left now, could we have them e-mailed to our office like we

15   e-mail things to your Chambers?

16         **THE COURT:**  Yeah, we can e-mail.  Again,

17   understanding they're just draft.

18         **MR. ROBERT VEGELER:**  Right, at least we can get it

19   on -- just pull them up off the Internet.

20         **THE COURT:**  Right, we can do that, if you want.

21         **MR. ROBERT VEGELER:**  I'd like that.

22         **THE COURT:**  We can e-mail them to you as soon as we

23   have them ready.  When you come back here after lunch you'll

24   have a written set.

25         **MR. JAMES BUCHHOLZ:**  What time would you like us

1    back?

2          **THE COURT:**  How much time do you need?  I mean, we

3    have the whole afternoon open.  You need about an hour and a

4    half for lunch, say, come back by 1:30?

5          **MR. ROBERT VEGELER:**  Yeah.

6          **THE COURT:**  You want to do that?  All right.  Do you

7    want them e-mailed to you or no?

8          **MR. JAMES BUCHHOLZ:**  That would be fine, Judge.  That

9    way we've got --

10          **THE COURT:**  That's a good idea.  As soon as they're

11   ready, we'll e-mail them and we'll be back at 1:30-ish and do

12   our conference.

13          **MR. ROBERT VEGELER:**  Now, Your Honor, make sure, do

14   the representatives and the parties have to be here?

15          **THE COURT:**  No.  No.

16          **MR. ROBERT VEGELER:**  I just want to make sure.

17          **THE COURT:**  You know, you're welcome to sit in the

18   courtroom, but I meet with counsel in the library in this

19   process, and it's off the record.

20          **MR. JAMES BUCHHOLZ:**  So the record is clear, I'd

21   renew my motions and rely on the arguments made therein that

22   we made at the close of the plaintiff's case, Your Honor.

23          **THE COURT:**  Right.  And I'll give you an opportunity

24   again if there's anything additional to expand on that, but

25   it's noted and preserved.  All right.  Anything else?

1    (No audible response.)

2         **THE COURT:**  All right.  I'll see counsel back here at

3    1:30.

4         **THE CLERK:**  All rise.

5    (Whereupon, this concludes the proceedings in this matter

6    this date; the Court met with counsel informally to discuss

7    instructions.)

8

9                                *   *   *

10

11                    <u>**CERTIFICATE OF THE REPORTER**</u>

12

13    I hereby certify that the foregoing proceedings is true

14    and correct, as taken down by me, and transcribed to the

15    best of my ability, with the aid of realtime computer-aided

16    transcription and/or transcriptionist.

17

18

19                        s/ Tina M. Gallucci_____
                          **Tina M. Gallucci, RMR, CRR, FCRR**
20                        **United States District Court Reporter**

21

22

23

24

25