```
         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF INDIANA
                 FORT WAYNE DIVISION

TRENT L. CHAPIN,                    )
                                    )
              Plaintiff,            )
                                    )  CIVIL
vs.                                 )  CAUSE NO:
                                    )  1:06-CV-34
MID-STATES MOTORS, INC.,            )
          Defendant.                )  VOLUME I of I
------------------------------------
```

### TRANSCRIPT OF TRIAL PROCEEDINGS HELD
### APRIL 20, 2007, BEFORE THE
### HONORABLE THERESA L. SPRINGMANN, UNITED STATES
### DISTRICT JUDGE


**APPEARANCES:**


**FOR THE PLAINTIFF:**          **ROBERT VEGELER, ESQ.**
                                110 West Berry Street
                                Fort Wayne, In  46802

**FOR THE DEFENDANT**           **JAMES BUCHHOLZ, ESQ.**
                                1400 One Summit Square
                                Fort Wayne, IN  46802


**OFFICIAL COURT REPORTER:**    **TINA M. GALLUCCI,**
                                **RMR, CRR, FCRR**
                                **U.S. DISTRICT REPORTER**
                                **1300 S. HARRISON STREET**
                                **SUITE 2105**
                                **FORT WAYNE, IN  46802**
                                **(260) 423-3060**


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

## INDEX

CLOSING ARGUMENT by the Plaintiffs......... Page   13

CLOSING ARGUMENT by the Defendant.......... Page   32

REBUTTAL ARGUMENT by the Plaintiff......... Page   61

JURY INSTRUCTIONS......................... Page   68

VERDICT................................... Page   98

\*   \*   \*

1    (Whereupon, the following proceedings were held on April

2    20, 2007; the parties appearing in person and with their

3    counsel:)

4         **THE CLERK:**  All rise.

5    (Whereupon, counsel are reviewing the instructions.)

6         **THE COURT:**  Let's go ahead on the record.

7    All right.  Counsel, last night following the day's

8    proceedings, we had an informal conference off the record in

9    the Court's library, to review the Court's proposed

10   instructions 1 through 32 inclusive, and the special verdict

11   forms, 1 through 4, I'm sorry, 1 through 2.

12   And at that time, we discussed very candidly, some

13   suggestions to modifying the Court's instructions.  And the

14   Court has considered the arguments that were presented, and

15   has modified the instructions that we discussed, and we'll go

16   through those.

17   That's resulted now, in the Court's proposed jury

18   instructions 1 through 33 which we e-mailed you last night and

19   have also provided with you a printed -- yeah, printed copy of

20   them this morning.  I gave you an opportunity to review those

21   to make sure that those are consistent with the changes and

22   amendments we had discussed last night, and also to the extent

23   the Court had indicated that whether or not it would or would

24   not make some of the amendments that were requested.  I think

25   it reflects the Court's -- follows up on what the Court

1    indicated it would do in those circumstances.

2        Now, I wanted to give you an opportunity to make any

3    formal record of any remaining objections and let's take care

4    of that right now, starting with plaintiff's counsel, let me

5    ask you, Mr. Vegeler, are there any objections now for the

6    plaintiff as to the Court's instructions 1 through 33?

7            **MR. ROBERT VEGELER:**  None, Your Honor.

8            **THE COURT:**  Are there any objections to the Court's

9    special verdict forms 1 through 2?

10           **MR. ROBERT VEGELER:**  None, Your Honor.

11           **THE COURT:**  And Mr. Buchholz, for your client, are

12   there any objections to the Court's instructions 1 through 33?

13           **MR. JAMES BUCHHOLZ:**  Yes, Your Honor.

14           **THE COURT:**  And which ones?

15           **MR. JAMES BUCHHOLZ:**  Instruction 21, to the extent it

16   deals with a constructive discharge claim; Instruction 24, to

17   the extent it deals with a constructive discharge claim.  I

18   don't see it in 22.  And Instruction number 25, associated

19   with constructive discharge claim.  Your Honor, the pleadings

20   in this case, never pled a constructive discharge claim.  The

21   Pretrial Order doesn't contain a constructive discharge claim.

22   And it's the position of my client, or Fort Wayne Toyota, that

23   there is no evidence of a constructive discharge, that the

24   testimony is that Mr. Chapin took the conversation with

25   Mr. Kruse to be a direct termination.  And the standard

1    associated with constructive discharge claim would be that the

2    work environment that he was forced to work in was so hostile,

3    that he had no choice but to quit.  And we don't believe that,

4    A, that's been -- it's our position the first time that came

5    up was the plaintiff's proposed instructions came into Your

6    Honor after the time of the final pretrial conference.  And

7    that there's not evidence to support a constructive discharge

8    instruction or position of that -- the proposition that that

9    claim is within this matter.  And so for those reasons, we

10   would object to the instructions that I've enumerated in my

11   review that relate to -- relate or communicate constructive

12   discharge to the jury.

13          **THE COURT:**  Any other objections?

14          **MR. JAMES BUCHHOLZ:**  No, Your Honor.  We did look at

15   the mitigation of damage instruction that you prepared after

16   our conference, and that appears to be fine.

17          **THE COURT:**  Let me just mention something with regard

18   to the mitigation instruction.  That's number 29.  I want to

19   alert you -- the Court relied on I believe it's the Seventh

20   Circuit Federal Jury Instructions civil cases 3.12 pattern

21   instruction with regard to the mitigation instruction.

22       Now what I did not include, because I wasn't -- I did not

23   think this case was the sort that was subject to this sentence

24   of the instruction, the pattern included a sentence:

25   Defendant must prove both that the reduction should be made

1    and its amount.  And considering the nature of the damages in

2    this case, there were no specific damages pled.  And,

3    therefore, it was not, in my opinion, possible for the

4    defendant to -- to prove a specific amount for reduction for

5    mitigation.  So in fairness, I wanted to alert you to that

6    that I did not have a mitigation instruction that included

7    that sentence, because it wasn't simply the nature of the

8    damages being claimed by the plaintiff or the issue for

9    mitigation.  So there's that.  Unless you take issue with

10   that, Mr. Vegeler, but I wanted to alert you to that.

11            **MR. ROBERT VEGELER:**  No, Your Honor.

12            **THE COURT:**  All right.  With regard to the argument

13   on constructive discharge claim, let me give you, Mr. Vegeler,

14   an opportunity to respond to Mr. Buchholz' comments as to why

15   that claim in the alternative should be taken out of

16   instructions 21, 24 and 25.

17            **MR. ROBERT VEGELER:**  Thank you, Your Honor.  I think

18   the emphasis is misplaced by opposing counsel.  First of all,

19   it doesn't have to be in the pleading.  Second of all, the

20   Pretrial Order was not limiting as to the methodology of

21   discharge.  And third, I think the evidence, both Mr. Chapin's

22   direct testimony and Amber Okpara's testimony, and to some

23   extent the logical references from general manager of Fort

24   Wayne Toyota, clearly gives an evidentiary basis for the

25   giving of the instruction.  And as the Court correctly pointed

1    out, it was in the alternative.

2         **THE COURT:**  The Court has considered the objection

3    raised by the defendants regarding 21, 24 and 25, as to

4    allowing the Court -- I'm sorry -- the jury to consider

5    constructive discharge being pled, being presented in the

6    alternative by the plaintiff.  The Court agrees with the

7    argument presented by the plaintiff that the evidence does

8    support the giving of such an instruction to allow the jury to

9    consider either a direct discharge or a constructive

10   discharge.  The facts that support that that came into

11   evidence have been the same facts that have been consistent

12   throughout the case as discovery developed.

13        The Court does not note, nor was it argued by the

14   defendants, that there was any surprise presented during the

15   trial as to the facts that would support this alternative

16   claim, and there's been no argument that the defendants have

17   been in any way prejudiced by allowing the case to go forward

18   with that alternative claim being presented.

19        So the Court's ruling is such that, I believe, 21, 24 and

20   25 are correct statements of the law.  They're supported by

21   the facts in the record in this case, and they are not covered

22   by other of the Court's instructions.

23        The defendant's objections will be noted of record,

24   however, but will be shown overruled.

25        Were there any objections to the special verdict forms by

 1    the defendants, one or two?

 2         **MR. JAMES BUCHHOLZ:**  No, Your Honor.

 3         **THE COURT:**  All right.  We'll show that.  Now,

 4    counsel, as I told you last night, copies of the instructions

 5    will be shown on Elmo at the time that I'm reading them to the

 6    jury.  They'll show up on your screens as well.  You're

 7    welcome to use any of the instructions through your closing

 8    arguments through the Elmo system.  We had talked last night

 9    that closing arguments would be between 45 minutes and an hour

10    and so you wanted to think about that last night.

11         I just wanted to generally know and have disclosure as to

12    how much time you think you'll need, so we can balance it out

13    between both sides, both sides having, you know, an

14    opportunity for an equal amount if you choose to use it.

15    Mr. Vegeler, are you still between 45 and an hour?

16         **MR. ROBERT VEGELER:**  Yes, and my perception is 25 to

17    40 minutes on the first part, and then reserving 20 minutes or

18    less.

19         **THE COURT:**  Now, all right.  You want to reserve 20.

20    Now, let me ask you do you want me to give you a five or a

21    ten-minute --

22         **MR. ROBERT VEGELER:**  No, that's fine.

23         **THE COURT:**  -- warning?  You'll watch the clock

24    yourself.

25         **MR. ROBERT VEGELER:**  Yeah.

 1          **THE COURT:**  That's fine.  And Mr. Buchholz?

 2          **MR. JAMES BUCHHOLZ:**  I won't be watching the clock,

 3     Your Honor.  If you could give me a ten-minute and a

 4     five-minute warning, I'd appreciate it.

 5          **THE COURT:**  Both?

 6          **MR. JAMES BUCHHOLZ:**  Oh, yeah, because if I get

 7     rambling, I don't want to be in a position where -- I can rap

 8     it up in a certain fashion, but I would like to have both if

 9     it's all right with Your Honor.

10          **THE COURT:**  All right.  That's fine.

11          **MR. JAMES BUCHHOLZ:**  I can be windy.

12          **THE COURT:**  No.

13          **MR. JAMES BUCHHOLZ:**  Yeah, you've seen that in this

14     case.  I want to make sure that I'm trying to cut it down

15     appropriately.

16          **THE COURT:**  All right.

17       Now, too, before I bring the jury down, do you want to

18     double check any of the technology that you may want to use,

19     because we'll go off the record and give you the opportunity

20     to do that.  Mr. Vegeler.

21          **MR. ROBERT VEGELER:**  May not come as surprise, I will

22     be using this technology low tech as it kind of is, but we

23     checked it this morning, speaker is on.  All I've got to do is

24     plug it in, stick the tape, cue it up and we should be okay on

25     that and I'm going to use Elmo also.

1      **THE COURT:**  All right.  And Mr. Buchholz.

2      **MR. JAMES BUCHHOLZ:**  Well, I didn't want -- we talked

3   last night about moving the table over to Mr. Vegeler's table

4   because I didn't want to invade his space.  And it seems to me

5   given the size of his table that setting it up beforehand

6   might invade his space.  So I was going to ask Your Honor

7   whether we could take a ten-minute break or some period of

8   time after Mr. Vegeler's opening so that I can get it set up

9   so I'm not invading his space and preventing his ability to

10  walk around.  If you don't want to do that, I can set it up

11  right now, but they have a concern.

12     **THE COURT:**  Right.  Right.

13     **MR. JAMES BUCHHOLZ:**  Because I'll be utilizing the

14  PowerPoint as associated with part of my closing.

15     **THE COURT:**  We have a few minutes before we told the

16  jury would be brought down.  So I would suggest you set it up

17  right now, get it out, set it up, you can always roll that

18  table into position once Mr. Vegeler is done.

19     **MR. JAMES BUCHHOLZ:**  That's the problem, I can't.  As

20  I understand from it your IT guy, I've got to be hooked up to

21  this cable here.  So if I bring this table over here and then

22  set up the computer --

23     **THE COURT:**  Right, got you.

24     **MR. JAMES BUCHHOLZ:**  -- then I don't want to impede

25  his space.

1    **MR. ROBERT VEGELER:**  How about if I waive any

2  impedence of my space claim?

3    **THE COURT:**  You're willing to --

4    **MR. ROBERT VEGELER:**  Yeah, because I plan to be right

5  here, so I'll be going from here to here to there.  So if he

6  wants to set it up a there because I'm going to move that

7  right over to there.

8    **THE COURT:**  If you don't mind, that would be great.

9  But I would rather keep it going smoothly so they have two

10  hours of argument and then go to deliberate, rather than break

11  during the middle of it.  That's just bumpy.

12    So let's go ahead.  We'll go off the record.  You take the

13  time to set it up.  The system's administrator is here and can

14  assist you in doing that, and we'll make sure we're a go.  So

15  we'll make sure we do that.

16    Now, before we go off the record, is there anything else

17  we need to set into the record?  Otherwise, I want to mention

18  the defendant's motion for directed verdict remain pending.

19    **MR. JAMES BUCHHOLZ:**  That was going to be my

20  intention, Your Honor.

21    **THE COURT:**  Anything else for your client,

22  Mr. Vegeler?

23    **MR. ROBERT VEGELER:**  No, Your Honor.

24    **THE COURT:**  Okay.  Mr. Buchholz, anything for your

25  clients?  Anything else?

1        **MR. JAMES BUCHHOLZ:**  If there is, Your Honor, I'm not

2   aware of it, so no.

3        **THE COURT:**  I'll trust you will tell me when we're

4   back on the record.  All right.  So let's take whatever time

5   you need to set up and just let my Deputy know when you're

6   ready to go.

7        **MR. JAMES BUCHHOLZ:**  It should be pretty brief.

8        **THE CLERK:**  All rise.

9      (Whereupon, a break was taken; thereafter, the

10  following proceedings were held:)

11       **THE CLERK:**  All rise.

12       **THE COURT:**  Go ahead and be seated.  Counsel,

13  anything else before we call the jury down, Mr. Vegeler?

14       **MR. ROBERT VEGELER:**  No, Your Honor.

15       **THE COURT:**  Mr. Buchholz?

16       **MR. JAMES BUCHHOLZ:**  Nothing other than we all have a

17  good morning.

18       **THE COURT:**  I'm sorry.

19       **MR. JAMES BUCHHOLZ:**  Nothing other than we all have a

20  good morning.

21       **THE COURT:**  All right.  Please bring the jury down.

22    (Jury present.)

23       **THE COURT:**  Go ahead and be seated, ladies and

24  gentlemen.  Counsel, you may be seated.

25    And good morning to you.

1    We're going to be starting day four of the trial of this

2  matter, and we are going to be hearing closing arguments of

3  counsel now at this stage of the trial.

4    Let me remind you that both sides have rested with regard

5  to the presentation of the evidence.  The attorneys now in

6  their closing arguments are going to attempt to tell you what

7  they think the evidence shows.  I need to remind you that what

8  the attorneys say is not evidence, and you're to disregard

9  what is said, unless it's supported by the evidence.

10    Now the way this will work is that first plaintiff's

11  counsel will be given an opportunity to present argument

12  followed by defendant's counsel, then followed by rebuttal by

13  plaintiff's counsel.

14    With that, Mr. Vegeler, if you're ready to proceed, you

15  may do so.

16         **MR. ROBERT VEGELER:**  Yes, Your Honor.  Thank you.

17              **CLOSING ARGUMENT BY THE PLAINTIFF**

18         **MR. ROBERT VEGELER:**  Thank you for being attentive.

19  This is the fourth day of this trial.  And I think, in my

20  opinion, you've been attentive to the evidence and to both

21  sides.

22    As the Court instructed you or to you the -- all the

23  evidence is now in your mental possession, and that is what I

24  will be trying to analyze in this closing statement.

25    You will recall, as defense counsel asked you in his

1    opening statement, he said you will hear testimony.  And he

2    wanted you to listen to both sides of the story.  Now, what

3    I'm going to tell you is what I believe our side of the story

4    is.  And if you'll recall in my opening statement, I asked you

5    to categorize your thinking into a three-step process.

6         I asked you to focus on step one as being that part of the

7    case that has to do with the discrimination claim against Fort

8    Wayne Acura Subaru.  And as you can see, the dates are April

9    -- basically April 2004.

10        Then step two, I asked you to then transfer your thinking,

11   jump out of that, and go forward into the retaliation claim

12   against Fort Wayne Toyota Lexis.  So we -- we move out of step

13   one, move into step two, and that was the period of

14   February 28th, 2005 to March 4th, 2005, basically encompassed

15   by tape one and tape two, and the following letters.

16        Then assuming you get through step one and step two, then

17   I asked you at that point in time your thinking being clear on

18   one, your thinking being clear on two, then you go to step

19   three, compensatory damages, and punitive damages.  And the

20   damage claim extended to both step one and step two as you --

21   your analysis.

22        So with respect to the step one, again, we're just

23   focusing on that discrimination claim, the Court will instruct

24   you as follows, and I've highlighted this so that you can

25   actually hone in on what we're talking about here.

1    Title 7 makes it an unlawful employment practice to

2   discharge an employee or otherwise discriminate against him,

3   being Trent Chapin, with respect to his compensation, terms,

4   conditions or privilege of employment because of race,

5   religion or national origin.

6    Now, you've heard the evidence with respect to, we're

7   talking about white, Christian, American, Pakistani, Muslim.

8    The instruction goes on, indicates that the plaintiff has

9   filed two claims.  That's why we have step one and step two.

10   The claim against Fort Wayne Acura Subaru is for

11   discrimination on the basis of race, religion and national

12   origin.  The plaintiff's discrimination claim alleges he was

13   discharged from a used car sales manager position at Fort

14   Wayne Acura Subaru because of race, religion or national

15   origin.

16    Now, that is the instruction that the Court will give you,

17   and I highlighted the appropriate portions for step one.  And

18   that is based upon the federal statute.  And we won't go

19   through this in detail, but this basically is the statute upon

20   which that claim is based.  And it's unlawful employment

21   practice to discharge any individual because of race,

22   religion, national origin.

23    Now, the second part of here is unlawful employment

24   practice is established when the complaining party,

25   Mr. Chapin, demonstrates that race, religion and national

1   origin was a motivating factor.  Now, that's going to become

2   important in your analysis, motivating factor for the

3   employment practice, even though other factors also motivated

4   the practice.  So let's keep that in mind motivating factor.

5   There may be a number of factors involved with Mr. Nadim

6   Baig's decisions.  You might have understood the testimony to

7   involve a number of factors.  But the issue is whether or not

8   Trent Chapin is a white, Christian American being replaced by

9   a Muslim Pakistani was the motivating factor.

10      The Court will give you some more instruction as you sit

11   there and go, hmmm, now let me put some understanding on this

12   motivating factor concept.  Well, that's going to be contained

13   in an instruction also.

14      The plaintiff must prove by a preponderance of the

15   evidence that race, religion or national origin were

16   motivating factors in defendant Fort Wayne Acura Subaru's

17   decision to discharge him from Fort Wayne Acura Subaru.  A

18   motivating factor is something that contributed in defendant

19   Fort Wayne Acura Subaru's decision.

20      So that being the guidance for you, then the question is

21   what was the evidence?  Well, in short, the evidence was you

22   have Trent Chapin who has had years of experience in the Bob

23   Rohrman organization, Larry Kruse wanted him as used car sales

24   manager.  He made him used car sales manager in the beginning

25   of 2004, and he was working on a department that he said was

1    in disarray:  Cars with there over 220 days, they're supposed

2    to be there 45 days, got to move those things, got to sell

3    them, got to clean them, got to make the lot look right.

4        If you remember, Glenn Richards said he even moved the

5    cars around so they looked better himself.  These are the

6    kinds of things Mr. Chapin was involved in.  And then, Nadim

7    Baig comes in.

8        Evidence uncontradicted, he's a Pakistani Muslim, and that

9    he knew Irfan Hussein, Anwar Al-haq, and at some point in time

10   Khurram Solheil, all Pakistani Muslims.

11       So despite having Kurt Richards as a sales manager and

12   Mr. Baig basically coming in in early April, some date, you

13   probably remember it better than I do, whatever the evidence

14   was, and in 4 days, he replaces Kurt Richards, who was at

15   least a white and American, with Anwar Al Hague, Pakistani

16   Muslim.  No explanation in the evidence to you.  No objective

17   standards, oh, by the way, Kurt Richards missed 25 of his

18   days, he -- sales were fifty percent below objective standards

19   for the dealership, this, this, this objective standards.  It

20   was four days, you're out of here.  No evidence before you as

21   to why.  The only evidence you had before you is that Mr. Baig

22   knew him, and that he was Pakistani Muslim and so was Anwar

23   Al-Hague.

24       So then, if you remember the evidence, it goes on now

25   Mr. Baig is evaluating other managers and he focuses on Trent

1    Chapin sometime around the middle of the month, April 15th.

2    So he looks at Trent Chapin and despite a total absence of any

3    evidence, how many cars did Trent Chapin sell, what was the

4    inventory down to, how much profits, how many hours was he on

5    the lot, how many hours did he spend, according to records.

6    Glenn Richards supported the fact that Mr. Chapin came in

7    early, he stayed late, he was around, he did everything he

8    could to build up that department.  Mr. Baig goes, "Okay, I'm

9    replacing you."  Now, it wasn't transfer mode.  Remember all

10   that evidence?  Oh, transfer this, transfer that, transfer

11   down the road to 5500 Illinois Road.  No, Mr. Baig was very

12   clear.  Termination.  Termination.  Didn't make any bones

13   about it.  There wasn't any waffling from his point of view.

14       That thing, that event occurred, as brought to you in the

15   exhibit, termination report, lack of leadership and

16   performance.  But let's look at this, overall evaluation

17   unsatisfactory.  I don't know why.  There's no objective

18   standards in there.  In the record, attendance record, good.

19   Well, that flies in the face of the evidence you heard from

20   the defendants.  Is employer rehirable?  Yes.

21       So at this point in time, despite the documentation of the

22   defendant, Fort Wayne Acura, Mr. Chapin gets terminated and

23   replaced immediately by Irfan Hussein, who Mr. Chapin

24   testified, they had a meeting outside the dealer.  Well, first

25   of all let's go back.  They had a meeting inside the

1    dealership.  There's controversy.  Their side says there

2    wasn't a meeting.  Mr. Chapin says there was a meeting.  Said,

3    "Hey, I don't like any of these rumors about Chapin.  He's

4    here to stay.  He's doing a good job."  Then two days later he

5    gets terminated.

6        But Mr. Chapin also testified about the fact that he met

7    Irfan Hussein outside the dealership in the presence of

8    Mr. Baig.  Mr. Baig introduced Mr. Irfan as, "This is my

9    Pakistani friend.  He just got off the plane."  Mr. Chapin

10   goes well, get over jet lag, whatever, et cetera.  Then, and I

11   asked Mr. Baig, well, I said, "You had about 18 days to

12   evaluate Mr. Chapin."  Mr. Baig goes, "Oh, no.  No, I don't

13   understand" or something.  I said well, thirty minus twelve

14   was eighteen.  And he goes, "Well, I didn't even have Sundays

15   to evaluate Mr. Chapin.  Because we're closed."  Okay, fine,

16   let's compress it to 15 days or 16 days.  There was still no

17   evidence that Mr. Chapin was replaced by anybody but a

18   Pakistani Muslim by Mr. Baig, and there's no evidence,

19   objective evidence of Mr. Chapin failing any kind of

20   standards, any kind of performance standards, any kind of

21   evidence production standards, attendance standards at Fort

22   Wayne Acura Subaru.

23       And then as you well know, the evidence went on and there

24   was Glenn Richards who had twenty years of experience.  And as

25   you heard in tape number two, Mr. Chapin say, well, he was

1    replaced by K. Solheil, another Pakistani Muslim in November

2    of '04?  And Mr. Chapin said that was just a tragedy, you take

3    a guy with twenty years experience and it's a tragedy that

4    he's replaced by K. Solheil, Pakistani Muslim who doesn't even

5    know what MSRP is, which is the bed rock of how to charge for

6    cars and leasing both in the new and used market.

7        So that's where you leave that primary part of the

8    discrimination case.  And I believe you find -- will find that

9    Trent Chapin proved those facts by a preponderance of the

10   evidence.

11       However, there is also a situation that you will be

12   instructed on, as contained in the jury instruction that I

13   suspect may be discussed by the defendant.  And that is an

14   instruction here.  If you find that the plaintiff has proved

15   race, religion and national origin contributed as a motivating

16   factor analysis to Mr. Chapin's discharge, then you must

17   decide whether Fort Wayne Acura Subaru proved by a

18   preponderance of the evidence they would have discharged

19   Mr. Chapin, even if it was not based on race, religion or

20   national origin.

21       Now, that's interesting.  Because that's a little

22   different than what you face so far.  This analysis has -- and

23   persuasiveness (phonetic) -- the burden of proof is on Fort

24   Wayne Acura to say, ah, never mind, okay, maybe it was race,

25   maybe it was religion, et cetera, but Mr. Chapin was such a

 1    poor employee, he was going to be terminated anyway.   Record

 2    is absolutely devoid of any evidence to that effect.   Devoid.

 3    Think back in your memory, think of one instance that

 4    indicated objectively that Mr. Chapin was not doing the job

 5    after Mr. Baig's 15-day analysis.

 6        Now, then we go along onto step two.   Step two is, as we

 7    indicated, the retaliation charge.   Let's stop our thinking on

 8    step one, Nadim Baig, Fort Wayne Acura.   Let's go to step two.

 9    Fort Wayne Toyota Lexis, Larry Kruse, longtime general manager

10    in the Rohrman Association, experienced, relied upon by

11    Mr. Rohrman.   There are instructions on that issue, on step

12    two.   Those instructions in pertinent part, now we're talking

13    about Title 7 makes it unlawful for employment practice for an

14    employer, Fort Wayne Toyota Lexus, to discharge Mr. Chapin

15    with respect to compensation conditions and employment because

16    the employee, Mr. Chapin, charged the employer for violation.

17        The claim against Fort Wayne Toyota Lexis is for

18    retaliation.   The retaliation claim alleges that Mr. Chapin

19    was either directly or constructively discharged from Fort

20    Wayne Toyota for filing that charge of discrimination.

21        The statute that supports that, you've already seen a

22    glimpse of when I did step one.   But I just throw it up here

23    again because it's highlighted.   And that's the statutory

24    basis for it and it's prohibiting retaliation for opposing

25    unlawful employment practices.

1    Now, the evidence of this, after the Court has given you

2    that framework, that legal framework, I think that the

3    evidence is absolutely uncontradicted from this.  As I told

4    you in my opening argument, this is not a he said she said

5    case.  You heard the tape.  You heard tape number one,

6    February 28th, 2005.  That language was clear on there.  You

7    had a transcript.

8    Basically, Mr. Kruse, as Fort Wayne manager for Toyota,

9    basically told Mr. Chapin in no uncertain terms, "Do you want

10   to work here?"

11   Mr. Chapin:  "Yes, I do."

12   Eventually -- and that will be re-played I will later, but

13   Mr. Kruse:  "Then you need to fucking reverse the claim right

14   away, and it needs to be done today."

15   Mr. Chapin:  "Okay.  I have to go down there."

16   Mr. Kruse:  "Go do it right now.  You aren't going to work

17   here until you get it reversed period."

18   Chapin:  "Okay."

19   Kruse:  "You decide whether you are working here or not."

20   Now, I don't know how you interpret that, but I interpret

21   that as being fairly clear as to the fact that there's a

22   charge filed.  Mr. Chapin says that's unlawful discrimination

23   going on.  And Mr. Kruse as general manager says, "You reverse

24   it or you're not working here."

25   Now, that is, in my opinion, prima facie retaliation.

1    That is what the statute is meant to do.  You can't protect

2    people from unlawful employment practices and ask them to go

3    down to the EEOC and then put a bullet through their head when

4    they do.  And you heard the evidence that Mr. Kruse was trying

5    to convince you that eh, flew off the handle.  I made a

6    mistake.  I didn't really mean it.  My fingers were crossed or

7    something underneath the table.

8        Well, I asked him, "When did you get that charge?  When

9    did you first know about that charge of discrimination?"

10       Mr. Kruse goes, "Hmmm, Friday or Saturday, somewhere in

11   there."  Okay.  Friday, experienced general manager, bringing

12   in the HR boys, let's figure this out.

13       Saturday, let's figure it out some more.

14       Sunday, let's have a meeting, dealership is closed.  Let's

15   get our plan of action.  Let's call up Bob Rohrman, let's

16   bring in everybody, let's bring in attorneys, everybody.

17          **MR. JAMES BUCHHOLZ:**  Judge, I would object.

18          **THE COURT:**  I'm sorry.

19          **MR. JAMES BUCHHOLZ:**  I would object.  There's been no

20   indication of any communication between Mr. Rohrman and

21   Mr. Kruse in this case.

22          **THE COURT:**  This is closing argument.  The jury will

23   remember what the evidence has -- the evidence presented has

24   been.  Overruled.  You may proceed.

25          **MR. ROBERT VEGELER:**  Thank you, Your Honor.  He could

1    have done all of that.  He could have done that Monday

2    morning.  But he made his bed, he made the dealership's bed.

3    He made Fort Wayne Toyota's bed.  And he told Trent Chapin

4    exactly what to do.  Down there, get it reversed or you don't

5    work here.  Now, that is direct termination.  There was

6    nothing Mr. Chapin could do.  If he decided oh, by the way the

7    anti-discrimination laws of the United States mean absolutely

8    nothing, then I guess I better go down and do that and may be

9    I'll work here again.  May it will be okay.  But, that's not

10   what happened.  Mr. Chapin finally said, "This is not right.

11   It's not right what they did to me.  It's not right what

12   they're doing to Glenn Richards, and I'm going to stand up for

13   it."

14      And you heard Amber Okpara say, well, she was dating

15   Trent, she goes, we discussed it.  Trent said, "I'm not going

16   to go back down there just so they find some other reason to

17   fire me.  It's over."

18      Now, there's an instruction here that gives a little

19   different perspective of that.  Remember when they read, when

20   you saw that instruction, it said terminated directly, which

21   is our position.  But in the alternative, things can be so bad

22   at work that you can be constructively discharged.  In other

23   words, you -- it's just bad.  No matter what the conditions

24   are:  Work conditions, physical conditions, whatever.  If

25   that's imposed on employees and employee leaves, it can be

1    constructive discharge.  So in the alternative, I want you to

2    think if it's a possibility that needs to support to claim,

3    you can determine, as this instruction says, that Mr. Chapin

4    was directly or constructively discharged, then you have a

5    situation here where you -- you would want to know -- well,

6    give me a little meat on the bone for constructive discharge.

7        Well, the Court will instruct you on the constructive

8    discharge definition and you'll have time to filter that

9    through.  Although Mr. Chapin thinks it's unnecessary, but it

10   does say to establish constructive discharge, prove two

11   things:  Plaintiff quit because they made his working

12   conditions so intolerable that a reasonable person would have

13   to quit.  Well, I would suggest, oh, by the way it's a little

14   intolerable if I try to exert my anti-discrimination rights

15   and they tie the rack to me.  That's a little intolerable.

16   And second that they would not have forced him to quit if he

17   had not filed a charge of discrimination.

18       Well, you can restate that.  If Trent Chapin had never

19   filed a charge of discrimination, Larry Kruse would have never

20   been yelling at him, telling him reverse it get out of here if

21   you want a job, if you want to work here.  And the extension

22   of that is well, who was to the one that wrote all the

23   letters, March 8th, March 16th or whatever those three

24   letters?  Mr. Kruse.  He sent him -- oh, I never said you were

25   fired, you're a great employee.  Come on back.  You

1    misunderstood.  Remember that?  Remember that great letter

2    from Mr. Kruse?  That was -- that was nice.  That was a

3    kiss-and-make up letter right there.

4        It was after our conversation, conversation -- I don't

5    know that was conversation, it's our understanding upon our

6    conversation of your misunderstanding.  That's Mr. Chapin's

7    misunderstanding.  Well, I'll leave it up to you as to whether

8    or not you think Mr. Chapin misunderstood what Mr. Kruse said.

9    I personally don't think so.

10       Anyway so Mr. -- now, I think we're going to step three.

11   We're talking about damages.  I believe the evidence is clear

12   that there's been a discrimination charge proved by the

13   preponderance of the evidence.  There's been a retaliation

14   charge proved by the preponderance of evidence.

15       Now, you've got to go to step three, which is damages.

16   Okay.  Well, we're in focus.  This is kind of a long

17   instruction.  But I just wanted to familiarize you with --

18   just wanted you to start thinking about it.  And that is you

19   may award compensatory damages only for injuries that

20   plaintiff has proved by a preponderance of the evidence were

21   caused by defendant's wrongful conduct.

22       Now, granted, your award must not be based on evidence,

23   must be based on evidence and not speculation or guesswork.

24   So right now if I was just stopping and silence go, hmmm, I'm

25   a little fuzzy on the concept here from the evidence.  So

1    let's go down a little bit.  This does not mean, however, that

2    compensatory damages are restricted to actual loss of money.

3    Remember all that testimony about lost the house, lost the

4    car, lost the cat, lost the furniture, lost my family

5    pictures.  My house was foreclosed upon.  And there was some

6    pluses and minuses.  Mr. Chapin had values, and then testified

7    he got so much, and then there was a lot of redirect or, you

8    know, re-cross and who sold who the cat, and who got who, what

9    money and so forth.  That's not the point.  The point here is

10    are not restricted to the actual loss of money.

11        They are to include the mental aspects of injury, even if

12    they are not easy to measure.  So this is what we're talking

13    about.  We're talking about the fact you can consider the

14    following types of compensatory damages, mental and emotional

15    pain.

16        Now, the testimony from Mr. Chapin I think was fairly

17    clear, and I'll summarize it in about three sentences.  And

18    that is he lost his home due to foreclosure, because he

19    couldn't make the payments.  He lost a couple of vehicles that

20    he prized because he couldn't afford them.  He lost a special

21    cat.  He lost almost all of his furniture he was selling for

22    pennies on the dollar to buy groceries and pay for what he

23    could.  He couldn't even pay for the hotel after he got thrown

24    out because Amber Okpara's friend paid for it, somebody else

25    paid for it.  He lost those family pictures.  He said he had

1    trouble sleeping, he had nervousness, he was anxious, he had

2    anxiety, he was taking medications.  I mean, when you think

3    about evaluating a person's personal experience, the emotional

4    impact -- and he lost his two sons  He couldn't afford them

5    anymore, they had to go back with their mother, after they

6    were living with him.  I do not know what the value is to

7    compensate him for that kind of stress, strain, emotional

8    issues.

9         Maybe you almost have to experience them to know what it's

10   like to see how bad it is.  But that's for you to decide.  In

11   addition, other losses incurred but not including wages and

12   benefits.  That's not an issue.  It's the other losses and

13   that's really what the focus of Exhibit 8 was when he itemized

14   the various items of property he had lost.

15        I think that he lost with respect to claim one, step one,

16   he lost his job, he lost money, he said he was stressed, he

17   was uncertain, had no job, no food, and that was with the

18   Nadim Baig situation.  And, of course, when he lost his job

19   with Mr. Kruse at Fort Wayne Toyota Lexis, it just -- it went

20   down the hill even further.

21        Now, there is some evidence produced in this trial that in

22   your mind you're going to have to weigh it as you would.

23   Amber Okpara, things weren't as bad as they appeared to be.

24   I'll leave that for you to decide.

25        Amber Okpara, you can judge her demeanor, credibility, the

1  way she carried herself, her words.  But the bottom line is

2  Trent Chapin recently married another woman, and Miss Okpara

3  did not get to marry Trent Chapin, did not get to live with

4  her, and they split up sometime in 2006, I believe her

5  testimony was.  And during the 15 months they were supposedly

6  together, she worked a whole three months and three weeks.

7  Other than that she was on Medicaid and food stamps.  And I

8  would suggest that maybe she is biased, little bitter about

9  what -- how the events turned out.

10  Now the second part of that equation on damages is

11  punitive damages.  And punitive damages, you will be

12  instructed on has a number of factors.  And again, you'll have

13  these with you to look at, analyze, to see if it fits the

14  situation.  But there's certain situations where people are

15  responsible for their actions, and companies are responsible

16  who act through their general managers.  And when you make an

17  intentional decision to ruin somebody's income stream, and

18  their life and subsequently their life, then the Court and the

19  law, anti-discrimination laws, allow jurors to assess punitive

20  damages.

21  And that is what this instruction is about.  The purpose

22  of punitive damages is to punish a defendant for his conduct

23  and to serve as an example a warning to the liable defendant.

24  There are a number of factors that are appropriate.  And some

25  of those factors that I highlighted here for you, which I

1  think are more appropriate, is the reprehensibility of the

2  defendant's conduct, the impact of the defendant's conduct on

3  the defendant (sic) the defendant's financial condition.

4      Now, I think the defendant's financial condition was

5  brought in through several sources.  As you heard Mr. Kruse,

6  Fort Wayne Toyota had sales of vehicles in appropriate period

7  in excess of ten million dollars.  They have maintenance and

8  repair money in excess of two million.  They have assets in

9  excess of two million.  They had profits in excess of five

10  million a year.

11      Fort Wayne Acura Subaru, less employees, less money.  But

12  nevertheless, Mr. Rohrman himself said Fort Wayne Acura had

13  assets in the relevant period of time of at least a million

14  dollars.

15      Now, they are capable of being punished for intentionally

16  doing what they did.  You cannot be responsible for what you

17  do.  And that is a message that should be driven home.

18      We've gone through a number of the factors.  And there's

19  -- and there's another instruction, and I want to drive this

20  point home, because I don't want any mistake about this case.

21  Four days of preparation are not going to -- we don't want any

22  open holes here.

23      A corporation can only act through its officers, employees

24  and agents.  Any act or omission of an officer, employer or

25  agent, acting within the scope of authority or is an act or

1    omission of the corporation.  I want to make that point very

2    clear.  Mr. Rohrman appeared to be fine gentleman.  Everybody

3    has good qualities.  Mr. Rohrman is very successful, very

4    engaging.  Could have talked for hours, I'm sure.  But you're

5    not punishing Mr. Rohrman.  You're not awarding damages

6    against Mr. Rohrman or Mr. Kruse or Mr. Baig.  They, pursuant

7    to that instruction, are acting upon these million dollar,

8    multi-million dollar corporations.  And that's who you're

9    sending the message to.

10        Again, in this world of I'm not responsible, nobody's

11   responsible for their conduct.  This courtroom makes people

12   responsible for their conduct.  There's no skating out of

13   here.

14        Now, in case you had forgotten, I wanted to again remind

15   you briefly that there was a second tape also.  You know, the

16   February 28 first tape, '05, abundantly clear.  The second

17   tape, there was some really interesting comments in that.  And

18   if you'll recall, this is where you get the side step, the

19   company side step, the corporate side step.  "I didn't say

20   that."  Mr. Kruse and Mr. Chapin engaged in a conversation

21   Mr. Chapin:  "You told me don't come back unless I reverse it.

22   That is your exact words."

23        Mr. Kruse:  "You misunderstood."

24        Chapin:  "I didn't misunderstand.  You were very clear."

25        Kruse:  "I didn't tell you that."

1      I'm not responsible, I didn't say that.  That's not my

2  company.  You misunderstood.  The buck stops here.  The

3  responsibility stops here.  They knew what they did, and they

4  did it, and they ran right over Mr. Chapin in the process.

5  And, you know, it didn't really make any difference to them.

6      Thank you.

7              **THE COURT:**  Mr. Buchholz, for the defendant.

8          **MR. JAMES BUCHHOLZ:**  Thank you, Your Honor.

9                **CLOSING ARGUMENT FOR THE DEFENSE**

10         **MR. JAMES BUCHHOLZ:**  Ladies and gentlemen, this is

11  third time I've had the chance to talk to you directly in this

12  case.  First it was voir dire, when we were asking questions

13  of qualification.  Then it was opening statement, and that was

14  last day.

15             **COURT REPORTER:**  Excuse me.  Can you turn your

16  microphone on.  Is it on?

17         **MR. JAMES BUCHHOLZ:**  Yeah.

18             **COURT REPORTER:**  Okay.

19             **THE COURT:**  It's amplifying now.  Go ahead.

20         **MR. JAMES BUCHHOLZ:**  I'm sorry.  This is the last

21  time I'm going to get the chance to talk to you about this

22  case.  And I'm tired.  It's been a long week.  But I've been

23  asking myself, what do you show this jury?  Have you shown

24  them enough information?  Have you asked enough questions?

25  (Unintelligible) out.

1          **THE COURT:**  Can you hear, Mr. Vegeler?

2          **MR. ROBERT VEGELER:**  I cannot understand him.

3          **THE COURT:**  Let's just.  Can amplify.

4          **MR. ROBERT VEGELER:**  It's not that I can't hear him.

5     It's -- it seemed like -- there seems like there's a rever --

6          **THE COURT:**  There's some kind of feedback.  Go ahead.

7     Let's start one more time.  I think we've got the adjustment

8     made now.  Sorry about that.

9          **MR. JAMES BUCHHOLZ:**  That's okay.  I'm tired.  As

10    I've been thinking about this case a lot, I've been thinking

11    about the testimony of Mr. Chapin, thinking about the evidence

12    that we presented, the evidence to provide enough information

13    to you as a jury to make an accurate decision in this case.

14         Because ultimately it's your determination associated with

15    the facts and the laws indicated by the Judge that will

16    resolve the dispute between the parties.

17         In our system of government, we have jury trials, which is

18    wonderful, because we bring people off the street that have no

19    ax to grind.  That's why we ask you questions initially to

20    resolve disputes between parties.  We're one of the only

21    countries in the world that does that.  We've been doing it

22    for about 230, 240 years.  And the reason we do that when you

23    put a group of people together, such as yourselves, there's 16

24    eyes, 16 years, listening to evidence coming from that witness

25    stand.  Something may get by one.  Another thing may get by

1    another.  But you aren't pulling any fast ones on the jury.

2        I'd like to believe you have all of the information, and

3    it will be your job as Your Honor will instruct you to

4    evaluate that evidence, and to deliberate about that evidence.

5        You know, Harry Truman said the most important thing after

6    he was no longer president, the most important thing that a

7    citizen can do in this United States is go to work for your

8    country -- some of our people are doing in the middle east

9    now -- vote, and be a juror.

10       A lot of people are -- a lot of people say the jury system

11   is outdated, it's too expensive.  Probably not because of the

12   jurors' payments that you receive at the end of the case.  But

13   the time that is spent by people and money spent associated

14   with being involved with the jury, and the time frame that it

15   takes from the time the dispute is first filed until the time

16   it gets to a jury has been criticized.  But again, you have

17   438 years of combined experience among you in order to

18   determine and judge things like credibility of witnesses, and

19   to evaluate what the testimony has been.

20       And Her Honor is going to indicate to you what the

21   credibility is.  There's going to be a instruction read to you

22   about credibility, but it's nothing that you don't do every

23   day.  We all judge credibility every day.  Credibility is an

24   important part of this case.

25       We judge credibility when we say to a child, did you eat

1    the cookie?  And you see the crumbs and you see the chocolate

2    on the face.  You judge credibility when you look at athletes

3    when you look at their performance and their conduct and are

4    they taking drugs in order to get these records.

5         In the paper today on the front page of the

6    Journal-Gazette, there's articles about the credibility of the

7    Attorney General of the United States, a political figure,

8    about whether his actions and whether he's been truthful

9    associated with the things he's said.  So deciding credibility

10   is something that we do every day.

11        The decision is ultimately yours about the credibility you

12   assign that witness.  But when you're making those

13   determinations, I'd like to submit there's evidence that's

14   important in that regard.

15        When I was asking Mr. Chapin some questions about the

16   second tape, remember the March 4th tape where he comes into

17   Mr. Kruse's office and they're talking about well, you've got

18   a job, well, you didn't tell me I had a job.  Remember what

19   his testimony on cross examination was?  I said, "Well,

20   Mr. Chapin, did you tell Mr. Kruse that you wanted to work at

21   Fort Wayne Toyota?  And his answer was yes.  But I would say

22   anything I had to say to get out of that office.  He had a

23   goal.  His goal was to say anything to satisfy Mr. Kruse to

24   get out of that office.

25        I submit that the evidence in this case supports the

1   proposition that Mr. Chapin will say anything necessary to

2   accomplish his goal that he wants to attain.  He testified at

3   the beginning got me, he testified at the beginning of my

4   cross examination that he would tell the truth whether he was

5   under oath or not under oath, no different one way or the

6   other.  He's always a truthful guy.  But then we heard -- then

7   we heard that he told me under oath that he had been married

8   on three occasions.  And then he admitted well, yeah, I've

9   said under oath I've been married to somebody other than

10  Kelly, Kelly and Tracy.

11      We heard him say, "I have two children.  They're Trent the

12  second and Sterling."  We heard later that he's got a

13  daughter.  He never told us about a daughter.  Didn't tell us

14  about the daughter in the deposition, he didn't tell us about

15  the daughter in the testimony in this court.

16      He tells me in the deposition that he's had two legal

17  matters.  Yet, he sits in this courtroom from that stand, and

18  admits that he's been involved in well more than 10, 14 I

19  think is the number that he agreed he had been involved in.

20      I submit to you, you should consider these issues as it

21  relates to his credibility, because Mr. Chapin will say

22  whatever it is he needs to say to accomplish a goal.  He said

23  that.  He agreed to that when we talked about the second tape.

24      So when we talk about the evidence in this case as it

25  relates to Fort Wayne Toyota and as we talk about it when it

1    relates to Fort Wayne Acura, bear in mind where his testimony

2    is coming from and weigh the credibility of what is being said

3    and by who it is that testimony's coming from.  That's what

4    Your Honor is going to indicate to you the instructions will

5    indicate to you is your job to do.

6        I think the testimony in this case has been pretty clear

7    that Mr. Chapin came back to Fort Wayne, Indiana in March of

8    2004.  And at that time, since he had a previous relationship

9    with Mr. Kruse, he gave him and call and said, "Hey, can I

10   come and work on the Fort Wayne Toyota lot?"  And the

11   testimony was he was, in fact, employed there on March 11th

12   and Mr. Chapin said in cross examination, "I signed some

13   papers to start there.  One of the things I signed was a

14   discrimination policy.

15       Starting March 11th and March 18th, what happened?

16   Remember what he testified to?  Remember what the evidence is?

17   On March 18 -- mind if I borrow this, Mr. Vegeler?

18           **MR. ROBERT VEGELER:**  Yeah, that's fine.

19           **MR. JAMES BUCHHOLZ:**  Okay.  Thank you.  Is that on

20   everybody's screen?

21       On March 18th, 2000 -- 2004, highlighted in the upper

22   right hand corner, this exhibit, Mr. Chapin has a warning.

23   And the warning is he didn't show up, even though he was

24   scheduled.  See, it says right here (Indicating), "Did not

25   report to work as scheduled.  Called to say he had a flat

1    tire.  Never reported to work."  He said, "I thought I was

2    off."  What was his goal?  To explain why it took all day to

3    get a flat tire changed.  Mr. Chapin has a goal.  He'll say

4    anything to try and accomplish it.

5        This exhibit shows consistency with what it is he

6    testified to from the witness stand about the March 4th

7    meeting.  Also shows consistency about how it is that he

8    performs his daily activities.

9        The next thing we heard about Fort Wayne -- and by the way

10   you see at the bottom here this is a warning and immediate

11   termination will occur if something like that happens again.

12       And what happened again?  Testimony from Mr. Chapin was --

13   thank you, Mr. Vegeler.

14           **MR. ROBERT VEGELER:**  Sure.

15           **MR. JAMES BUCHHOLZ:**  Testimony from Chapin was well,

16   yeah, I got the termination report and that's in evidence,

17   that was an April 2nd document.  I took an employee home, it

18   was about 10 or 15 minutes before the end of the day, so I

19   just didn't come back.  What was the testimony from Kruse?

20   No, he left in the middle of the day.  Again, Mr. Chapin

21   (Unintelligible) to get to a goal by saying whatever it is he

22   thinks gets you to that goal.

23       And it happens again in this case.  I mean Mr. Vegeler

24   even did.  He says well, Mr. Chapin started on April the

25   second, then, the next day at Fort Wayne Acura.

1        Well, ladies and gentlemen, you're going to have -- and

2   before I get there, remember what Mr. Chapin said about the

3   March 18th document?  Yeah, that's my signature, after it's in

4   evidence?  No, I'm not sure that's my signature.  I make my

5   R's different.

6        I submit, ladies and gentlemen, there's a bunch of letters

7   from Mr. Chapin that are going to be going to the jury room.

8   I invite you to compare them to see if there's any kind of

9   differences within those signatures.

10       But let's get back to Fort Wayne Acura.  I'm sorry I

11  missed that.  At Fort Wayne Acura he says well, we started

12  April the 2nd there and it was 3 or 4 days before I signed

13  anything.  Well, all the documents and Miss Baell testified

14  that when an employee starts -- and she's been at Fort Wayne

15  Acura for 18 years -- she's the employment lady for the last

16  16 years.  Mr. Chapin says ah, I just signed it after I was

17  there five or six days.  That's when I signed all the

18  paperwork.  That credible to you?  The documents, all the

19  documents for Mr. Chapin's employment at Fort Wayne Acura are

20  April the 8th.  Doesn't that make sense?  Because he said --

21  he said four or five days after I was there, Mr. Baig came on.

22  Four or five days after April the 8th is April the 12th.  And

23  what's all the testimony in this case been?

24       Mr. Baig started April the 12th.  So what's the reason for

25  him saying I want to be there April 2nd?  I don't know.  He's

1    got a goal.  It's up for you to determine what that goal is.

2        Now, we know that he signed on April the 4th at Fort Wayne

3    Acura a harassment discrimination policy.  And remember, he

4    testified yeah, I signed one at Fort Wayne Toyota in March.  I

5    signed one at Fort Wayne Acura in April.  I'm not positive if

6    I signed one -- I don't think I signed one.  You've got to

7    show me I signed one in November, or excuse me, in June of '04

8    at Fort Wayne Toyota.  The harassment policy from Fort Wayne

9    Acura Subaru says in pertinent part -- and you'll have this

10   back in the jury room -- if you feel you're being harassed by

11   any other associate, supervisor, non-supervisor because of

12   your race, color, sex, religion, national origin, age or

13   handicap, you should at once make your feelings known to your

14   immediate supervisor or another company official.  We'll then

15   see that the matter is investigated.

16       Then there's a note at the bottom, and this small, and

17   I'll try and focus in a little bit for you.  I'm not zooming

18   the way I like.  "If you feel someone has violated the policy,

19   please contact your supervisor.  If you would feel more

20   comfortable speaking with another manager, please do so.  That

21   manager will document the incident and make sure it's

22   handled."

23       What's the testimony in this case from Mr. Chapin?  Did he

24   ever make a complaint to anybody at Fort Wayne Acura

25   associated with his separation there?  Anybody?  His testimony

1    was not in May, not in June, not in July, not in August,

2    September, October, November, December, January, until 2005

3    February and then he didn't make any report to Fort Wayne

4    Acura or Fort Wayne Toyota.  He went to Fort Wayne Metro.  He

5    didn't follow that policy.  And that policy is reiterated in

6    Mr. Rohrman's company manual.  And the company manual he

7    acknowledged and you'll have, I'm not going to show it on the

8    screen, he acknowledged on the 4th of April that he received

9    this.  Look on page 54.  It's the exact same policy -- I

10   believe it was page 54 -- the exact same policy that

11   Mr. Chapin signed on April the 4th.

12       Okay?  So he's got it two ways.  He's got it because he

13   gets the Employee Handbook, which you've got an acknowledgment

14   form on dated April the 4th, and then he signs it again.  So

15   he gets it twice that day.  And he gets it twice in March.  He

16   gets it twice in April, and he gets it twice in June.

17       And despite that, he never made a complaint to anybody

18   associated with the dealership relating to his belief that he

19   had been discriminated against by Fort Wayne Acura.  Let's

20   talk about Fort Wayne Acura for a minute.

21       April 12th, 2004 testimony from Mr. Rohrman was that he

22   brought Mr. Baig into the dealership.  Mr. Chapin doesn't

23   believe Mr. Rohrman was there.  Mr. Chapin doesn't believe

24   that there was a meeting.  But the testimony from Mr. Rohrman

25   and Mr. Baig were that Miss Baell was -- there was a big

1   meeting when he was introduced to all the employees, that is

2   the new general manager.   Remember what Mr. Rohrman said, "He

3   had worked for us before.   He had worked for us over at Fort

4   Wayne Toyota.   He worked for us at Fort Wayne Nissan."

5        I knew it, and I thought he could run the store because we

6   were having problems there.   Well, the testimony has been from

7   the witnesses that when there's a management change, the

8   general manager at an individual Rohrman store is responsible

9   for everybody and everything.   The only person he reports to

10  is Mr. Rohrman.

11       So you've got a management change, you better have people

12  loyal to you and able to do the job and move the company in

13  the direction you want it to go in order to remain in the

14  position of general manager.   When Mr. Baig started --

15            **MR. JAMES BUCHHOLZ:**  Are we on the screen?

16            **THE COURT:**  It's up.

17            **MR. ROBERT VEGELER:**  It's on now.

18            **MR. JAMES BUCHHOLZ:**  Mr. Baig was a general manager.

19  Ms. Baell was office manager.   Mr. Richards was new car

20  manager.   Mr. Chapin was the used car manager.   The Internet

21  sales manager was Tim Maddox.   The finance manager was Glenn

22  Richards.   Parts manager was Clayton Doherty.   And service

23  manager was Ivan Almodovar.   I've said his name all different

24  ways.   Same guy.   Testimony is that Baell, Kurt Richards,

25  Trent Chapin, Tim Maddox, Glenn Richards, Clayton Doherty are

 1   all white.  Testimony is that Mr. Almodovar was Hispanic.

 2   There's no question.  There's no question in this case that

 3   Kurt Richards was let go first.

 4       The testimony from Mr. Baig, remember that testimony, "I

 5   had worked with Mr. Richards before at Fort Wayne Nissan.  He

 6   let me go there.  I evaluated what it was he was doing within

 7   the first 3 or 4 days.  My office is right next to his.  He

 8   wasn't going out on the floor meeting customers.  He wasn't

 9   doing anything to train sales staff.  It did not appear to me

10   that he was doing anything to try to be productive."

11       As a new general manager, if you don't have a new car

12   manager supporting you and letting you go in the direction you

13   have laid out, in the meeting with Mr. Rohrman what do you do?

14   You leave him there and let you cut your own throat with

15   Mr. Rohrman?  No.  You change it, and that's what he did.  He

16   brought in a guy he worked with before, he testified he worked

17   with before, whose experience he knew who could work and would

18   follow his lead in this new venture for him at the dealership.

19   What else happened?  Mr. Vegeler says there's testimony in

20   this case about what was done associated with Mr. Chapin.  I'm

21   not sure I agree with that, and it's up for you to determine.

22   You heard all the evidence.  You be the judge of that.  That's

23   your role.  And Her Honor is going to indicate that to you.

24       But I submit, hey, used car manager requires an individual

25   to display inventory, train sales people, close customer

 1   sales, advertise and those are the exact same things that

 2   Mr. Chapin said their duties were, except he said Mr. Chapin

 3   said, pay bonuses.

 4        So Mr. Chapin, and Mr. Baig agreed -- in fact Mr. Kruse

 5   said that to a certain extent as well, as it relates to the

 6   budget lot.  So all three of them agree those are the duties

 7   of a new car manager, excuse me, used car manager.

 8        Did they submit any evidence in this case that he was

 9   training the sales staff or any meetings with the sales staff

10   or training?  Did they bring in any of those people?  Did they

11   bring in any of the salespeople that reported to him to say

12   yeah, we had these meetings, and he was helpful.  That didn't

13   happen.  Did he bring in anybody that said hey, Mr. Chapin

14   really helped me close car deals and he really helped in

15   closing car deals?  Did any of those salespeople come in?  No.

16   Did any of those salespeople come in and say, hey, I got my

17   bonus paid?  No.  Did anybody come in and say hey, he was

18   doing great advertising?  No.  In fact, Mr. Baig came in and

19   said hey, I had salespeople coming to me.  I had to close

20   deals for the used car department.  Mr. Maddox said, I saw use

21   car people going in to Mr. Baig to close deals.  Why?  Because

22   Mr. Chapin couldn't be found.  Nobody ever said he wasn't

23   present on the lot.  They couldn't find him.  He wasn't

24   available.  Mr. Baig testified, hey, I was looking for him, I

25   couldn't find him.  I'm not saying he wasn't on the lot, but I

1    couldn't -- is there any testimony that they rendered about

2    advertising?  Mr. Baig said he never advertised.  He wasn't

3    training people.  Mr. Baig, again, this is a management

4    change.  He's got to have somebody out there working for him.

5         Mr. Baig's position was and testimony was it wasn't

6    happening, so he got rid of him.  And Mr. Chapin said well,

7    before he made me do that, I got rid of two or three

8    salespeople.  Remember that testimony?  I came into

9    Mr. Richards and Mr. Baig came into my office and made me fire

10   two or three salespeople.  Any of those salespeople come in to

11   testify that they were replaced by Pakistani Muslims?  Did

12   Mr. Chapin indicate they had been replaced by Pakistani

13   Muslims?  No.

14        In fact, Mr. Maddox came in and testified and said saw I

15   Mr. Chapin sleeping at his desk.  I saw sales people going to

16   Mr. Baig.  Mr. Richards came in and testified I think he was

17   doing okay, he was doing this and doing that.  And then I

18   asked him on cross examination, well in your deposition you

19   said you didn't have time to evaluate him.  And why would that

20   be?  Because Glenn Richards has no stake in it.  The guy who

21   was on the hook with Mr. Rohrman is Mr. Baig.  So it doesn't

22   surprise me that he would say I don't know how he was doing, I

23   didn't have enough time.  I submit it shouldn't surprise you

24   either, because he's supposed to be in the office doing

25   financing deals.  And he testified they're in different

1    offices, and different buildings.

2        And then there's a difference between Mr. Richards and

3    Mr. Chapin about where it is the termination occurred.  Was

4    Chapin in Richards' office?  Was it only Chapin or was it in

5    Chapin's office with Maddox and Baig?  That's for you to

6    determine.

7        What you have in this case in terms of his job performance

8    on behalf of the plaintiff is his perception of his own job.

9    There's nobody else that's come in and said anything else.

10   It's Mr. Chapin's position.  He says he doesn't know any of

11   the qualifications of the people that came into the new car

12   position or the used car position.

13       I submit, ladies and gentlemen, he hasn't proven under the

14   instructions that Mr. Vegeler showed you the Instruction 23

15   that race, national origin or religion was any factor, any

16   factor in his separation.  In fact, Mr. Baig told you he's

17   married to a white woman and that his children have been

18   Baptized Catholic.  He'd have you believe that that man is

19   discriminating against him based upon his race, national

20   origin and skin color.  That's what he's saying.  The

21   separation was motivated by -- motivated by his skin color,

22   white, his national origin, U.S.A., and his religion, Baptist.

23       We believe the testimony has been, and the evidence you

24   can determine under the law given by Her Honor that he failed

25   to lead the used car force, he failed to train the used car

```
1    force, he failed to be available and he failed in production.

2    And remember what Mr. Baig said about production.  Production

3    to him was more than just sale of cars.  Sale of cars, it was

4    more than that.  It included advertising.  It included other

5    factors that weren't there, weren't shown.

6        So I submit that the evidence has not -- there's not

7    sufficient evidence in this case to suggest that they've

8    proven by a preponderance of the evidence that there was

9    discrimination in his separation from Fort Wayne Acura.

10        So he goes down to Fort Wayne Toyota and, at that time,

11   does he say anything under the discrimination policies to

12   Mr. Kruse?  Hey, I think I was mistreated down there.  No.  We

13   talked about that earlier.  He didn't do anything until

14   February of 2005.

15        Between that -- so he starts in June of 2005 and remember,

16   he was trying to say, he testified, I started June 1.  No.

17   No.  No.  Wait, I'm wrong, it was July 2004.  And then on the

18   tape, on the March 4th tape he's saying well, heck I've been

19   down there since June the first and you haven't done this for

20   me and you haven't done that for me.  Remember that testimony?

21   Remember what Mr. Vegeler was saying?  He just wasn't giving

22   me enough opportunity at the budget lot at Fort Wayne Toyota

23   to make it work.  Remember that?  Well, the testimony is from

24   Mr. Kruse he was given full rein to bring in anybody he

25   wanted, his salespeople, sound familiar.  He said he could do
```

1    advertising.  He had a full ability to do -- get any of the

2    inventory from any of the Rohrman stores anywhere in the city.

3    And probably -- it wasn't been testified to -- but given the

4    way Mr. Rohrman testified yesterday, probably anywhere within

5    the Rohrman system.  So there's not a lack of inventory

6    that he had.  No shackles had been placed upon him.

7        What does he say in the tape of March 4th?  You don't have

8    a sign down there.  Well, ladies and gentlemen, hard as this

9    may be to believe, some people may not want to go to Mr.

10   Rohrman.  And to put a sign up, maybe they'll get into that

11   later, there's a connection.  Maybe that's the case.  That's a

12   fair inference from the evidence, when Mr. Chapin agreed.

13   There was a very good production down there at the budget lot.

14   He attributed to lack of traffic.  He attributed because I

15   can't get good people in.  He attributed it all on this

16   March 4th tape.  He attributed it to other things.

17       Isn't it interesting that the things he's complaining

18   about associated with the budget lot sound like the same

19   things Mr. Baig was talking about at Fort Wayne Acura in terms

20   of his performance, and what it is he was doing associated

21   with having sales people and getting deals closed?

22       Mr. Vegeler says this is a place people don't skate

23   (phonetic).  I suggest Mr. Chapin is trying to skate, not

24   owning up to what his responsibilities were.

25       Now, the evidence in this case is from both audio tapes

1    created by Mr. Chapin.  He told you in one of them that he was

2    saying whatever it is he had to say to get out.  And if you

3    look at the March 4th tape, it's kind of interesting.  He said

4    in the beginning, I haven't had a chance to get down there

5    yet.  I haven't talked to them.  Well, what's it about?  Well,

6    it's reverse discrimination.  Well, why haven't you been back

7    here to work?  Well, you told me not to come back.  You

8    misunderstood.

9        Now, ladies and gentlemen, you're going to hear -- you

10   have the opportunity to listen to tape number one.  And

11   there's testimony in this case that Mr. Kruse was upset, okay?

12   I'm talking about the Fort Wayne Toyota retaliation claim

13   haven't we all been upset and said things came out differently

14   than we expected, differently than we meant?  Haven't we all

15   done that?

16       For crying out loud, it happened to me last night.  I'm

17   watching my two little kids.  I'm worried about this trial.

18   They've got homework.  I've got a bunch of things going on in

19   the office because surprisingly I've been here doing something

20   else.  And now I have things crashing on me.  And I snapped

21   and said something to my son that I regret.  I apologized to

22   him.  That's what Mr. Kruse tried to do.

23       The testimony -- he stood, he stood on that witness stand

24   and he said to you and he said to Her Honor, yeah, I said

25   those things and I was fired up, and I didn't mean it.  And

 1   called Mr. Chapin down and I tried to talk to him about it

 2   because I could see how it is he could misunderstand what I

 3   said to be a termination.

 4       Mr. Kruse said that, "I see how it is he could

 5   misunderstand how he could believe he had been terminated."

 6       So what happens?  We have this meeting on March the 4th.

 7   And Chapin is saying, "Yeah, I want to work here.  Yeah, I've

 8   got to have a job."  And Mr. Kruse is saying, "Come on down

 9   tomorrow.  Come on down today."  Well, I need this money.

10   Well if you need the money, why aren't you working.  You've

11   got a job here.

12       Remember what the testimony is in this case?  Mr. Chapin

13   never contacted the dealership again.  They wrote him letters.

14   They're in evidence.  You've seen them.  Hey, we told you you

15   misunderstood what we meant and what was said.  You've got a

16   job here.  No response.  Telephone calls made.  Not answered.

17   Telephone calls made gets to Amber Okpara, hey, you've still

18   got a job there; why aren't you going in?

19       Isn't it interesting in this case the charge of

20   retaliation wasn't filed with the local agency until March the

21   10th?  That's six days after Mr. Kruse said, "You've got a job

22   here."  And Mr. Chapin says in the March 4th tape, "I haven't

23   had a chance to talk to him.  You know, I went down there and

24   they weren't available."  But at the end of the tape, he

25   testified on direct examination to Mr. Vegeler that he went

1    down February 28th, he was in that office, and he confirmed

2    again on cross examination.  Four days later he's telling

3    Mr. Kruse he's never been down there.  And then at the end of

4    the tape, at the end of the tape, Mr. Chapin says, "Well, I

5    talked to them.  They told me not to do anything about it.

6    They told me not to reverse it."  Now, how can you have it

7    both ways?  How can you -- I haven't talked to him yet, I'm

8    going to call him, I'm gonna, I will.  How can you have it, I

9    was down there February 28th, but I didn't do anything for

10   another eleven, ten days and have it, well, I talked to him

11   already and they told me not to do anything.

12        Well, that's for you to decide all those issues.  But I

13   submit, ladies and gentlemen, that there's no constructive --

14   there's no direct discharge in this case.  Mr. Kruse talked

15   about that in the March 4th tape and he's testified on the

16   stand I understand how it is he felt that way.  I continued to

17   tell him he had a job.

18        It's our position in this case and we submit there was no

19   termination of Mr. Chapin on February 28th.  It's also our

20   contention and position that there was no constructive

21   discharge.  You know, it's interesting to me you would take

22   the position there was a constructive discharge and a direct

23   discharge.  Well, what is it?

24        The constructive discharge, you will be instructed under

25   Instruction Number 25 was, is the basis of making working

1   conditions so intolerable, so intolerable that a reasonable

2   person would have to quit.

3        Ladies and gentlemen, it's not that Mr. Chapin didn't know

4   what retaliation was.  In fact, he said -- he's reported to be

5   telling Amber Okpara, "Well, if I go down there, they're going

6   to retaliate against me."

7        Isn't that protection?  Isn't that protection against bad

8   performance?  Hey, you know, Trent, things aren't going so

9   well at the budget lot.  What's going on?  Oh, you're only

10   saying that because I filed the discrimination claim.  Isn't

11   that protection?  Doesn't that give you job security?  He

12   never gave us the opportunity to retaliate.  He didn't work

13   anymore.  And we kept telling him, "Hey, come on in."

14        And what's the testimony from Mr. Chapin?  After March the

15   4th, how long was it before he started looking for a job?

16   Eight weeks he says.  According to Amber Okpara, it was until

17   September.  She said she never observed him looking for a job

18   until September when they moved in with her mother.  Wouldn't

19   you expect somebody who claims, claims that they aren't able

20   to feed their kids, who, by the way, we heard weren't living

21   there, and lost his house when he wasn't looking for a job,

22   wouldn't he be looking for a job?  Wouldn't he take that job

23   at Fort Wayne Toyota with job security knowing hey, if they do

24   something, I've got this in my back pocket?  He didn't want to

25   work.  He failed to mitigate his damages.  If he had any -- if

1   he had any.

2       We submit, ladies and gentlemen, that there's no evidence

3   in this case that was submitted that would support a position

4   that Mr. Chapin was constructively discharged.

5       We would suggest, ladies and gentlemen, and it's up to you

6   to determine that you could interpret, you could, in fact,

7   interpret the February 28th tape as a termination.  You could.

8   Mr. Kruse was upset.  He said some things it came out in a

9   fashion that didn't intend.  We conceded that.  We suggest,

10  ladies and gentlemen, that he was not terminated, that he had

11  a job, and we communicated to him that issue frequently.  We

12  sent him letters, we sent him telephone calls, we hadn't been

13  able to get him to come in.  He refused to work he abandoned

14  his job.  And he provided no basis to us as to why.  He said

15  to Amber, well, I may have been retaliated against if I went

16  back.  Remember his testimony?  "I never called them ever.  I

17  never told them anything."  And in fact, he didn't utilize the

18  discrimination policy at Fort Wayne Toyota.  He had seen that

19  policy at least three times in the three months prior.  At

20  least three times since 2-04.  He said he saw it in March of

21  2004, April 2004, and June 2004.

22      We submit on both claims of Mr. Chapin, he's not sustained

23  his burden of proof, and that the ladies and gentlemen of the

24  jury, you look no further when looking at verdicts form -- too

25  many papers.  It's over here.  Too many papers.  When you look

1    at the verdict forms, ladies and gentlemen, Special Verdict

2    Form Number 1 talks about Mid-States Motors that's doing

3    business as Fort Wayne Acura.  We submit under the evidence as

4    presented, and the law as given by Her Honor associated with

5    termination on race, national origin and religion, that the

6    plaintiff has not met -- Mr. Chapin has not met his burden of

7    proof by a preponderance of the evidence and that the answer

8    to question number one is no.  The plaintiff did not prove the

9    preponderance of the evidence the elements of his claim.

10       We submit as to question number two, that Mid-States

11   Motors, in fact, did prove through the testimony of Mr. Baig,

12   the testimony of Mr. Maddox, that even if the plaintiff were

13   not of the race, religion, national origin, he would have been

14   terminated.  That's one of the instructions Mr. Vegeler talked

15   to you about earlier.

16       And after you get to the two questions that relates to

17   Fort Wayne Subaru, Fort Wayne Acura Subaru, there's no need to

18   go further on this verdict form.

19       As it relates to the retaliation claim, you'll see Special

20   Verdict Form Number 2.  And the question is as to Fort Wayne

21   Toyota did the plaintiff prove by a preponderance of the

22   evidence all of the evidence of retaliation claim as

23   instructed by the Court.  The answer to that question, we

24   submit, would be no.  And as a result of that, you would not

25   need to go further with respect to this verdict form.

1      Now, there are two other lines on each verdict form and

2   they are whether there are compensatory or punitive damages --

3   you see that okay -- compensatory or punitive damages

4   associated with either one of these claims.  I would not do my

5   clients a service if I didn't talk about damages in front of

6   this jury.

7      I don't mean to suggest to you in any way, shape or form

8   that I believe you should ever get to the question of damages

9   in this case.  Shouldn't happen.  Burden of proof hasn't been

10   met.  It's for you to decide.  We submit it has not been.

11      **THE COURT:**  You have ten minutes, Mr. Buchholz.

12      **MR. JAMES BUCHHOLZ:**  Thank you.  To the extent you

13   get to damages in these cases, let's talk about them.  What

14   are the damages?  Well, as it relates to Fort Wayne Acura,

15   there was no testimony about sleeping problems.  There was no

16   testimony about depression or stress or any other thing

17   between April of 2004 and June -- April 30th, 2004 and June

18   the 1st, 2004.

19      We submit the reason for that is because, like he said on

20   the tape, I know they're going to -- you've got a new general

21   manager, he's going to bring his own people in.  He knew the

22   reason he was separated at Fort Wayne Acura had nothing to do

23   with his race, national origin, religion.  He knew that.

24      All of the damages he testified about were in relation to

25   the Fort Wayne Toyota claims.  Remember what he said?  He left

1   you with the impression after the first day of trial.  His

2   testimony was that he had lost everything as a result of this

3   claim, everything.  And he had that exhibit number eight where

4   he's talking about he was losing a cat, and losing a T-bird

5   and losing a Suzuki and losing his house and all these other

6   items.

7        Remember what Amber Okpara said?  And it was interesting

8   because I said to Mr. Chapin, "You gave that cat away.  That

9   cat was special to you.  That fifty five-pound cat, that Amber

10  Okpara said if you touched it, it would hiss at you a get all

11  crazy.  You gave that away."  He goes, "Yeah."  In cross exam

12  he said that the first day, and I come back on cross

13  examination, "You gave that away, didn't you?"

14       "Yeah."

15       "It was a really special cat to you, wasn't it?"

16       "Right."

17       He didn't give it away.  He sold it.  You heard the man

18  that bought it.  Again, day one of this trial, Mr. Chapin had

19  a goal, to convince you that he had been damaged by virtue of

20  what happened.  He was willing to say anything that he felt

21  was appropriate or needed to be said to convince you that he

22  had been damaged.

23       Ladies and gentlemen, we talked with Amber Okpara,

24  remember about all these items?

25       "Was there a T-Bird you ever saw when you lived with him

1    in January of 2005 -- four, excuse me -- January 2005 until

2    September of 2005?"

3         "No."

4         "Was there any T-Bird you saw from October of 2005 until

5    April 2006?"

6         "No."

7         "Was there a Suzuki?"

8         "No."

9         "Was there a master bedroom suite?

10        "Yeah, but he didn't own all of it."

11        "Was there a tinier television?"

12        "Yeah, but it was not his.  It was rented."

13        "Was there a stereo system?"

14        "Yeah, it was rented."

15        "Was the living room suite his?"

16        "Well, part of it was.  Part of it wasn't.  His father had

17   some of the stuff."

18        "Did he have any televisions, did these T.V.'s, did he

19   have this go-cart?"

20        "No, no, no."

21        Ladies and gentlemen, Mr. Chapin was acting in consistent

22   fashion with what it is he met with in March of 2004, saying

23   whatever it is that he felt would convince you to get to his

24   ultimate goal, money damages.

25        I would submit, ladies and gentlemen he's got none.

1    Remember, he said, "Oh, I was so stressed out, I couldn't

2    sleep."  What did Amber say?  He was sleeping more.

3        Was there a counselor that came in and said, "Oh, he came

4    to me, and he was having problems and I helped counsel him?"

5    Did that happen?  No.  The only person that testified about

6    the effects on Mr. Chapin were Mr. Chapin.  And Amber said

7    that they weren't true.  He said he was living in a car.

8    Remember that?  "I lost everything and I had to sleep in my

9    car."  And that was in June and July of 2005.  He never lived

10   in his car.

11       Amber Okpara told you what happened.  And she told you the

12   first time he went to look for a job was in September of 2005,

13   he got it.  He hasn't mitigated his damages, if he had any

14   damages.  He hasn't mitigated them.  He hasn't brought any

15   doctor in to say hey, this -- this guy came in, and I had to

16   perform this treatment on him, because of all these problems

17   that he was having because he lost his job.  Does that come

18   in?  Has there been any evidence of that?  The only evidence

19   you have about what his physical problems are is from him.

20   And then one of problems he said I've got problems with

21   bleeding.  Remember what Amber said?  "I did laundry I never

22   saw anything."

23       He didn't have any damages.  He's got no compensatory

24   damages.  He hasn't proven any.  We submit he's got none on

25   either claim.

1        Now, as it relates to punitive damages, Your Honor is
2    going to instruct you on punitive damages and what you need to
3    find.   In order to get to that point -- now, I don't think --
4    again, I don't mean to suggest that you should be considering
5    damages at all.   But if you're going to be considering them,
6    look at what the standard is up here around the brackets.
7    You've got to find that the management employees were reckless
8    in disregard of Mr. Chapin's rights, and the action was
9    reckless to take the knowledge (Unintelligible).   Any
10   testimony of that in this case?   Any testimony of that in this
11   case?   I submit there isn't.

12       When in the jury room after Her Honor has instructed you,
13   consider the Defendant's Exhibit or the jury instructions, the
14   Court's Jury Instruction 26.   You should not concern
15   yourselves with whether the defendant's actions were wise,
16   reasonable or fair, even if an employer is mistaken in his
17   business judgment, and is wrong or entitled to make its own
18   policy and business judgment.

19       Remember what the testimony was in this case as relates to
20   Fort Wayne Acura?   The next separation or next change of
21   management after Mr. Chapin was the service manager.   He was
22   replaced by a white male.   They want to make a big deal about
23   Glenn Richards moving positions from a finance person to a
24   customer relations.   And because he was replaced with a
25   Pakistani Muslim, there must be some kind of discrimination

1    involved with that.

2        Remember what Ms. Baell said?  She was pulling her hair

3    out.  "Documents weren't coming in with the I's dotted.

4    Documents were coming in with the T's crossed, and I was

5    having problems with customers, the bank and getting these

6    deals done.  I went to Mr. Baig."  I, Miss Baell went to

7    Mr. Baig and said, "I'm having a problem," and the action that

8    was taken was replacing Mr. Richards.

9        Maybe the person he put in there wasn't such a great

10   choice because he was ultimately terminated or separated from

11   that position.  And who went in his place?  Testimony is

12   clear, Mr. Maddox, who was the Internet sales guy, who had

13   been there all along.  You met him, he came and testified, the

14   white guy.

15       Ladies and gentlemen, I submit to you that you the

16   plaintiff has not submitted evidence that supports the claims

17   that Fort Wayne Acura Subaru discriminated against him on the

18   basis of the skin color, his national origin or his religion

19   and you should fill out the verdict forms as I showed you

20   earlier, Special Verdict Number 1, question one, answer no,

21   question two, answer yes.  And I would submit as to Special

22   Verdict Form Number 2 that the evidence does not support the

23   proposition that Mr. Chapin was terminated directly or

24   constructively by Fort Wayne Toyota for filing a

25   discrimination claim against Fort Wayne Acura.

1    And we would request, ladies and gentlemen of the jury,

2    verdicts in favor of both Fort Wayne Acura and Fort Wayne

3    Toyota, legal names Fort-Rohr Corporation and Mid-States

4    Motors as relates to plaintiff's claims.

5    Thank you for your attention today and through the course

6    of the trial, and we look forward to your result.

7    Thank you.  Thank you, Your Honor.

8         **THE COURT:**  Mr. Vegeler, rebuttal.

9         **MR. ROBERT VEGELER:**  Thank you.

10         **THE COURT:**  You have about 25 minutes left.

11         **MR. ROBERT VEGELER:**  Thank you.

12              **REBUTTAL ARGUMENT BY THE PLAINTIFF**

13         **MR. ROBERT VEGELER:**  Now is my time to, I believe,

14    highlight, low light, shed some light on comments made by

15    opposing counsel in this matter.  And opposing counsel made

16    some good points.  That's why we're here.  If it was so easy,

17    we would have never been here.  It would have somehow been

18    resolved or never happen.  But it did happen.  And so there is

19    some conflict and that is why you're the jurors and we're not.

20    But I think opposing counsel started out about credibility

21    and whether or not somebody had cookie crumbs on their face or

22    had not -- shouldn't have eaten cookies, et cetera.

23    And my only point to you is that the evidence is

24    uncontradicted with respect to the actions of both Mr. Baig

25    and Mr. Kruse.  You've heard the tapes.  You've heard the

1    evidence.  It is uncontradicted.

2        Now, there was a lot of this, you know, perception, that

3    perception, what somebody said, what somebody didn't say.  But

4    all of that skirted the main point.  All of that discussion

5    skirted the main point.  And that is you know that Mr. Chapin

6    was terminated at Fort Wayne Acura.  And you know that he was

7    terminated at Fort Wayne Toyota.  And you know Mr. Baig meant

8    to do what he did, and Mr. Kruse meant to do what he did.  And

9    no amount of phone calls, letters saying something else was

10   the motivating factor is going to change those facts.

11       It was interesting as counsel put up Exhibit U, remember

12   that harassment policy exhibit where Mr. Chapin -- well, first

13   of all, it's not a harassment case, but a general

14   anti-discrimination case.  Remember the little note down at

15   the bottom where it said, if you've got a problem, you better

16   go running to your supervisor or general manager, and if that

17   doesn't work maybe you better go run to somebody else in your

18   organization and tell them your problem.  Well, that can't

19   happen.  That can't happen, because you get the rock tied to

20   you when you do.  You can't even use the federal

21   anti-discrimination laws to help you because then you get

22   fired.

23       You know, maybe none of you have been in these

24   circumstances, but if you want a job, if you don't have any

25   money coming in and you've got your house payment and you've

 1    got the expenses and so forth and you don't have any money

 2    coming in because you've been terminated at Fort Wayne Acura

 3    Subaru, you're not going to immediately run down, start

 4    complaining about discrimination with somebody in the Bob

 5    Rohrman organization so you can get no chance of moving down

 6    to the Toyota store.  Because you heard what Larry Kruse's

 7    position was.  If you do somebody against any one of the

 8    Rohrman dealerships, that's against Bob Rohrman, that's

 9    against all of us.  So you're not going to be able to go down

10    and say oh, Metro, 24 minutes ago I got fired over here and

11    here's my complaint.  Well, first of the all, it's the EEOC

12    it's anti-discrimination.  You're not going to get anything

13    done in 24 minutes or 24 hours anyway.  So there is a time

14    delay.  And you heard Mr. Chapin's testimony.  He said, "I was

15    agonizing over it.  I was agonizing over it.  It was not

16    right.  It was not right."

17        Then when they demoted Glenn Richards and replaced him

18    with K, that was -- that was just wrong.  So now we had --

19    opposing counsel was talking about well, he didn't do anything

20    for four months, five months, six months, seven months, well,

21    if you're paying the bills you've got to tread pretty

22    carefully about what you do.

23        And then finally when Mr. Chapin decided that he couldn't

24    take it anymore, that the federal laws were there to protect

25    him, he does what he's supposed to do on the law and then he's

1    told, "You don't have a job now."  That is one good reason why

2    I wouldn't be running down there filing a charge of

3    discrimination or I wouldn't be going to Bob Rohrman saying,

4    "Hey, I've been discriminated against."

5         If you notice, I was listening very carefully, Mr --

6    opposing counsel indicated that Mr. Chapin engaged or had

7    contact with that the anti-harassment, the harassment policy

8    that he signed and so forth.  If you listened to Mr. Rohrman's

9    testimony very closely, he never indicated -- and there's no

10   evidence in the record -- that any general manager ever had to

11   sign a handbook or ever had to sign that harassment policy.

12   They talked about employee handbooks and employees signing

13   them.  But they ever never said a general manager had to sign

14   them.  And no evidence of such that they had to sign them.

15        I think a point was made or trying to be made by counsel

16   that, you know, we had a nice graphic of all the people who

17   were managers and so forth, and who didn't have any negative,

18   didn't get fired, demoted, or whatever, and they were white or

19   Christian or American or whatever.  That misses the point.

20   The point here is what was Nadim Baig doing when he dealt with

21   Kurt Richards, Trent Chapin and Glenn Richards?  That's the

22   point.  Doesn't matter that he hired a thousand employees and

23   they were all white Christian Americans.  It was what was the

24   motivating factor with Mr. Chapin?  That's what you're

25   deciding.  And you can't just sit there and say I am

1    absolutely blameless because I did this, this, this and this

2    because that doesn't tell you what they did here.  So it's of

3    no import in your decision.

4        You know, talks about this totally bad performance by

5    Mr. Chapin at Acura Subaru.  Let me see, he gets terminated on

6    the 30th, according to Mr. Chapin.  Well, first of all, he

7    leaves Fort Wayne Toyota in, uh, late March of '04.  Is

8    immediately hired the next week or so by Mr. Kruse in Acura

9    Subaru, who was acting general manager.  And as soon as he

10   supposedly does such a bad job at Acura Subaru, according to

11   Nadim Baig, Mr. Kruse said he was put in transfer mode, and

12   then starts at Toyota either one month or two months later.

13   That does not support the rationale that Mr. Baig did an

14   extensive study and analyzed with objective criteria that

15   Mr. Chapin was not doing the job.

16       What that does support, though, is I want my Pakistani

17   Muslim pal in here who I know just got off the plane and he's

18   coming in and you're out.  That's what that supports.

19       A couple more points and that is, he indicated that

20   opposing counsel indicated that he didn't understand why there

21   was actual termination or constructive discharge, actual

22   discharge, constructive discharge.  Can't have it both ways.

23   Yeah, you can't have it both ways.  That's why you're the

24   jury.  Decides whether it's A or B or none of the above.  It's

25   in the alternative.  So don't get confused about the fact that

1    there's different theories, because they're multiple answers.

2         And the point was made that, quote, he -- Mr. Chapin never

3    gave Fort Wayne Toyota a chance to retaliation.  I do not

4    understand that comment.  If somebody told you take care of

5    that charge, dismiss that charge, reverse that charge, you

6    don't have a job, don't come back, I must be missing the

7    logic.  That sounds to me like it's over.  That sounds like

8    retaliation to me.  The facts are made.  The curtain has been

9    pulled down on you.

10        With respect to damages, yeah, damages as the instructions

11   said is in the perfect world in this dispute.  It's up to you

12   to decide how that is analyzed.

13        Now, much focus was on the property aspect of damages, but

14   Mr. Chapin testified to his -- what happened to him, and you

15   know it wasn't disputed that the house was foreclosed upon,

16   and they got -- they had to leave.  It wasn't disputed that

17   they lived in a hotel they couldn't pay for.  It wasn't

18   disputed that a bunch of furniture was sold.  And it wasn't

19   disputed that there was total disruption.

20        And I've got to tell you, again, the credibility of Amber

21   Okpara is left for you to decide.  But at the end of the day,

22   my gosh, she wasn't the one that ended up marrying Mr. Chapin,

23   and she wasn't the one that got to stay, and she was the one

24   who was not working to support her child and she couldn't

25   possibly be around 24/7 to see what he's doing on line or out

1    at interviews.  She never said he didn't go out and interview,

2    et cetera.  She said she wasn't aware.  Well, I don't know

3    what she was doing.

4        I think that when you talk about the credibility of

5    Mr. Chapin, fine, fine.  Maybe he isn't perfect.  Maybe

6    Mr. Kruse's not perfect.  Maybe Mr. Baig's not perfect.  Maybe

7    they don't have perfect recall.  Maybe they don't remember

8    everything that happened in '04 and '05 when we're in '07.

9    But the substance of it, the big picture of it is undisputed.

10   The objective evidence before you is undisputed.  And I think

11   as -- as opposing counsel said in opposing counsel's

12   examination of Mr. Chapin, "I just want to be fair."  Said it

13   twice.  "I just want to be fair," in soliciting the answers

14   from Mr. Chapin.

15       Well, I can only think of -- and I'm going to play that

16   tape number one for you again, because it lasts about a

17   minute -- I think that what is fair is what you hear in the

18   comments and the responsibility that has to be taken for those

19   actions that are set forth in that conversation on tape number

20   one.  Your Honor, with your --

21           **MR. JAMES BUCHHOLZ:**  Your Honor, the jury can listen

22   to that as much as they want if they determine in their

23   determination that they want to do that within their

24   deliberation.  But we're beyond rebuttal as it relates to any

25   closing.  He didn't play the tape initially and while it was

1  discussed initially, I don't think playing the tape in

2  rebuttal is a fair fashion by which to (Unintelligible) to

3  rebuttal.

4      **THE COURT:**  I appreciate your objection.  It's

5  overruled.  Proceed.

6      **MR. ROBERT VEGELER:**  Thank you.

7    (Whereupon, the tape was played.)

8      **MR. ROBERT VEGELER:**  Thank you, ladies and gentlemen.

9                    **JURY INSTRUCTIONS**

10     **THE COURT:**  Members of the Jury, you have seen and

11 heard all the evidence and the arguments of the attorneys. Now

12 I will instruct you on the law.

13     You have two duties as a jury. Your first duty is to

14 decide the facts from the evidence in the case. This is your

15 job, and yours alone.

16     Your second duty is to apply the law that I give you to

17 the facts. You must follow these Instructions, even if you

18 disagree with them. Each Instruction is important, and you

19 must follow all of them.

20     Perform these duties fairly and impartially. Do not

21 allow sympathy, prejudice, fear, or public opinion to

22 influence you.

23     Nothing I say now, and nothing I said or did during the

24 trial, is meant to indicate any opinion on my part about

25 what the facts are or about what your verdict should be.

1      These Instructions are in writing and I will send them

2   to the jury room for your use as you deliberate upon your

3   verdict. In these Instructions, you may not single out any

4   certain sentence or any individual point or directive and

5   ignore the others. Instead, you must consider all

6   Instructions as a whole, and you must construe the

7   Instructions in harmony with each other.

8      You will also be permitted to take the exhibits with

9   you to use in your deliberations upon your verdict.

10      Also, it is unlikely that a written transcript will be

11   available to you to read, as it can be difficult and

12   time-consuming for the reporter to read back testimony.

13      During this trial, I have asked a witness a question

14   myself. Do not assume that because I asked questions I hold

15   any opinion on the matters I asked about, or on what the

16   outcome of the case should be.

17      During the trial, written questions by some members of

18   the jury have been submitted to be asked of certain

19   witnesses. Testimony answering a question submitted by a

20   juror should be considered in the same manner as any other

21   evidence in the case. If you submitted a question that was

22   not asked, that is because I determined that under the rules

23   of evidence the answer would not be admissible, just as when

24   I sustained any objection to questions posed by counsel.

25      You should draw no conclusion or inference from my

1    ruling on any question, and you should not speculate about

2    the possible answer to any question that was not asked or to

3    which I sustained an objection.

4        In this case, the Defendants are corporations. All

5    parties are equal before the law. A corporation is entitled

6    to the same fair consideration that you would give any

7    individual person.

8        The evidence consists of the testimony of the

9    witnesses, the exhibits admitted in evidence, and

10   stipulations.

11       A stipulation is an agreement between both sides that

12   certain facts are true.

13       Certain things are not to be considered as evidence. I

14   will list them for you:

15       First, testimony and exhibits that I struck from the

16   record, or that I told you to disregard, are not evidence

17   and must not be considered.

18       Second, anything that you may have seen or heard

19   outside the courtroom is not evidence and must be entirely

20   disregarded. This includes any press, radio, or television

21   reports you may have seen or heard. Such reports are not

22   evidence and your verdict must not be influenced in any way

23   by such publicity.

24       Third, questions, objections, or comments by the

25   lawyers are not evidence. Lawyers have a duty to object when

1    they believe a question is improper. You should not be

2    influenced by any objection and you should not infer from my

3    ruling that I have any view as to how you should decide the

4    case.

5         Fourth, the lawyers' opening statements and closing

6    arguments to you are not evidence. The purpose of these is

7    to discuss the issues and the evidence. If the evidence, as

8    you remember it, differs from what the lawyers said, your

9    memory is what counts.

10        Any notes you have taken during this trial are only

11   aids to your memory. If your memory differs from your notes,

12   you should rely on your memory and not your notes. The notes

13   are not evidence. If you have not taken notes, you should

14   rely on your independent recollection of the evidence and

15   not be unduly influenced by the notes of other jurors. Notes

16   are not entitled to any greater weight than the

17   recollections or impressions of each juror about the

18   testimony.

19        In determining whether any fact has been proved, you

20   should consider all of the evidence bearing on the question

21   regardless of who introduced it.

22        You will recall that during the course of this trial I

23   instructed you that I admitted certain evidence for a

24   limited purpose. You must consider this evidence only for

25   the limited purpose for which it was admitted.

1    You should use common sense in weighing the evidence

2    and consider the evidence in light of your own observations

3    in life. In our lives, we often look at one fact and

4    conclude from it that another fact exists. In law we call

5    this "inference." A jury is allowed to make reasonable

6    inferences. Any inferences you make must be reasonable and

7    must be based on the evidence in the case.

8    You may have heard the phrases "direct evidence" and

9    "circumstantial evidence." Direct evidence is proof that

10    does not require an inference, such as the testimony of

11    someone who claims to have personal knowledge of a fact.

12    Circumstantial evidence is proof of a fact, or a series of

13    facts, that tends to show that some other fact is true.

14    For example, direct evidence that it is raining is

15    testimony from a witness who says, "I was outside a minute

16    ago and I saw it raining." Circumstantial evidence that it

17    is raining is the observation of someone entering a room

18    carrying a wet umbrella.

19    The law makes no distinction between the weight to be

20    given to either direct or circumstantial evidence. You

21    should decide how much weight to give to any evidence. In

22    reaching your verdict, you should consider all the evidence

23    in the case, including the circumstantial evidence.

24    You are to decide whether each witness's testimony is

25    truthful and accurate, in part, in whole, or not at all. You

1    must also decide what weight, if any, you give to the

2    testimony of each witness.

3         In evaluating the testimony of any witness, including

4    any party to the case, you may consider, among other things:

5         - the witness's intelligence;

6         - the ability and opportunity the witness had to see,

7    hear, or know the things that the witness testified about;

8         - the witness's memory;

9         - any interest, bias, or prejudice the witness may

10   have;

11        - the manner of the witness while testifying; and

12        - the reasonableness of the witness's testimony in

13   light of all the evidence in the case.

14        You may consider statements given by witnesses under

15   oath before trial as evidence of the truth of what these

16   witnesses said in earlier statements, as well as deciding

17   what weight to give their testimony.

18        If you decide that before trial, a witness made a

19   statement not under oath that is inconsistent with his or

20   her testimony here in court, you may consider the earlier

21   statement only in deciding whether his or her testimony here

22   in court was true and what weight to give to his or her

23   testimony here in court.

24        In considering a prior inconsistent statement, you

25   should consider whether it was simply an innocent error or

1  an intentional falsehood and whether it concerns an

2  important fact or an unimportant detail.

3       It is proper for a lawyer to meet with any witness in

4  preparation for trial.

5       You may find the testimony of one witness or a few

6  witnesses more persuasive than the testimony of a larger

7  number. You need not accept the testimony of the larger

8  number of witnesses.

9       The law does not require a party to call as a witness

10 every person who might have knowledge of the facts related

11 to this trial. Similarly, the law does not require a party

12 to present as exhibits all papers and things mentioned

13 during this trial.

14      You must give separate consideration to each claim and

15 each party in this case. Although there are two defendants,

16 it does not follow that if one is liable, the other is also

17 liable. Likewise, it does not follow that if one is not

18 liable, the other is also not liable.

19      In considering a claim against a defendant, you must

20 not consider evidence admitted only against other the other

21 defendant or only as to other claims.

22      When a party has the burden to prove an issue by a

23 preponderance of the evidence, that means by a greater

24 weight of the evidence. A greater number of witnesses

25 testifying to a fact on one side or a greater quantity of

1    evidence introduced on one side is not necessarily of the

2    greater weight. For a fact to be proved by a preponderance

3    of the evidence, you must find that the fact is more

4    probably true than not true.

5        A corporation can act only through its officers,

6    employees, or agents. Any act or omission of an officer, an

7    employee, or an agent acting within the scope of his

8    authority is the act or omission of the corporation.

9        Title VII makes it an unlawful employment practice to

10   discharge an employee or otherwise discriminate against him

11   with respect to his compensation, terms, conditions, or

12   privileges of employment because of his race, religion, or

13   national origin. Title VII also makes it an unlawful

14   employment practice for an employer to discharge or

15   otherwise discriminate against an employee with respect to

16   his compensation, terms, conditions, or privileges of

17   employment because the employee charged the employer for

18   violations of Title VII.

19       The Plaintiff has filed two claims under Title VII of

20   the Civil Rights Act of 1964. The claim against Defendant

21   Fort Wayne Acura/Subaru is for discrimination on the basis

22   of his race, religion, and national origin. The claim

23   against Defendant Fort Wayne Toyota/Lexus is for

24   retaliation. The Plaintiff's discrimination claim alleges

25   that he was discharged from a Used Car Sales Manager

1    position at Fort Wayne Acura/Subaru because of his race,

2    religion, or national origin. The Plaintiff's retaliation

3    claim alleges that he was either directly or constructively

4    discharged from Fort Wayne Toyota/Lexus for filing a charge

5    of discrimination with the Equal Employment Opportunity

6    Commission against Fort Wayne Acura/Subaru.

7          Defendant Fort Wayne Acura/Subaru denies the

8    Plaintiff's allegations and claims that the Plaintiff was

9    terminated from the Used Car Sales Manager position because

10   he lacked leadership and performance. Defendant Fort Wayne

11   Toyota/Lexus denies that it retaliated against the Plaintiff

12   for filing a charge of discrimination with the Equal

13   Employment Opportunity Commission and claims that the

14   Plaintiff voluntarily left his employment.

15         The relevant portions of Title VII prohibiting

16   discrimination on the basis of race, religion, and national

17   origin state:

18         It shall be an unlawful employment practice for an

19   employer (1) . . . to discharge any individual, or otherwise

20   to discriminate against any individual with respect to his

21   compensation, terms, conditions, or privileges of

22   employment, because of such individual's race, . . .

23   religion, . . . or national origin;

24         [A]n unlawful employment practice is established when

25   the complaining party demonstrates that race, . . .

1  religion, . . . or national origin was a motivating factor

2  for any employment practice, even though other factors also

3  motivated the practice.

4      The relevant portions of Title VII prohibiting

5  retaliation for opposing unlawful employment practices

6  state:

7      It shall be an unlawful employment practice for an

8  employer to discriminate against any of his employees . . . ,

9  because he has opposed any practice made an unlawful

10  employment practice by this subchapter, or because he has

11  made a charge, testified, assisted, or participated in any

12  manner in an investigation, proceeding, or hearing under

13  this subchapter.

14      The Plaintiff must prove by a preponderance of the

15  evidence that his race, religion, or national origin were

16  motivating factors in Defendant Fort Wayne Acura/Subaru's

17  decision to discharge him from Fort Wayne Acura/Subaru. A

18  motivating factor is something that contributed to Defendant

19  Fort Wayne Acura/Subaru's decision.

20      If you find that the Plaintiff has proved that his

21  race, religion, or national origin contributed to Defendant

22  Fort Wayne Acura/Subaru's decision to discharge him from

23  Fort Wayne Acura/Subaru, you must then decide whether

24  Defendant Fort Wayne Acura/Subaru proved by a preponderance

25  of the evidence that it would have discharged him from Fort

1    Wayne Acura/Subaru even if the Plaintiff was not of the

2    race, religion, or national origin that he was. If so, you

3    must enter a verdict for the Plaintiff but you may not award

4    him damages.

5         The Plaintiff claims that Defendant Fort Wayne

6    Toyota/Lexus either directly or constructively discharged

7    him from Fort Wayne Toyota/Lexus for filing a charge of

8    discrimination with the Equal Employment Opportunity

9    Commission against Fort Wayne Acura/Subaru. To succeed on

10   this claim, Plaintiff must prove by a preponderance of the

11   evidence that Defendant Fort Wayne Toyota/Lexus either

12   directly or constructively discharged him for filing a

13   charge of discrimination with the Equal Employment

14   Opportunity Commission against Fort Wayne Acura/Subaru. To

15   determine that Defendant Fort Wayne Toyota/Lexus either

16   directly or constructively discharged him for filing a

17   charge of discrimination with the Equal Employment

18   Opportunity Commission against Fort Wayne Acura/Subaru, you

19   must decide that Defendant Fort Wayne Toyota/Lexus would not

20   have either directly or constructively discharged the

21   Plaintiff if he had not filed a charge of discrimination

22   with the Equal Employment Opportunity Commission against

23   Fort Wayne Acura/Subaru but everything else was the same.

24        If you find that the Plaintiff has proved by a

25   preponderance of the evidence each of the things required of

1    him, then you must find for the Plaintiff. However, if you

2    find that the Plaintiff did not prove by a preponderance of

3    the evidence each of the things required of him, then you

4    must find for Defendant Fort Wayne Toyota/Lexus.

5        To establish constructive discharge, the Plaintiff must

6    prove two things by a preponderance of the evidence:

7        First, that the Plaintiff quit because Defendant Fort

8    Wayne Toyota/Lexus purposely made his working conditions so

9    intolerable that a reasonable person in his position would

10   have had to quit; and

11       Second, Defendant Fort Wayne Toyota/Lexus would not

12   have forced him to quit if he had not filed a charge of

13   discrimination with the Equal Employment Opportunity

14   Commission against Fort Wayne Acura/Subaru but everything

15   else was the same.

16       In deciding the Plaintiff's claims, you should not

17   concern yourselves with whether the Defendants' actions were

18   wise, reasonable, or fair. Even if an employer is mistaken

19   and its business judgment is wrong, an employer is entitled

20   to make its own policy and business judgment. An employer

21   may make those employment decisions as it sees fit, as long

22   as it is not unlawful.

23       Rather, your concern is only whether the Plaintiff has

24   proved that Defendant Fort Wayne Acura/Subaru discharged him

25   from a Used Car Sales Manager position because of his race,

1  religion, or national origin and whether Defendant Fort

2  Wayne Toyota/Lexus discharged him for filing a charge of

3  discrimination with the Equal Employment Opportunity

4  Commission against Fort Wayne Acura/Subaru.

5       If you find that the Plaintiff has proved any of his

6  claims against either Defendant, then you must determine

7  what amount of damages, if any, the Plaintiff is entitled to

8  recover. The Plaintiff must prove his damages by a

9  preponderance of the evidence.

10      If you find that the Plaintiff has failed to prove all

11  of his claims, then you will not consider the question of

12  damages.

13      You may award compensatory damages only for injuries

14  that the Plaintiff has proved by a preponderance of the

15  evidence were caused by the Defendants' wrongful conduct.

16      Your award must be based on evidence and not

17  speculation or guesswork. This does not mean, however, that

18  compensatory damages are restricted to the actual loss of

19  money; they include the mental aspects of injury, even if

20  they are not easy to measure.

21      In calculating damages, you should not consider the

22  issue of lost wages and benefits. The court will calculate

23  and determine any damages for past or future lost wages and

24  benefits. You should consider the following types of

25  compensatory damages, and no others:

1       1.   The mental and emotional pain and suffering that

2   the Plaintiff has experienced. No evidence of the dollar

3   value of mental or emotional pain and suffering has been or

4   needs to be introduced. There is no exact standard for

5   setting the damages to be awarded on account of pain and

6   suffering. You are to determine an amount that will fairly

7   compensate the Plaintiff for the injury he has sustained.

8       2.   Other losses, not including lost wages and

9   benefits, which the Plaintiff incurred directly because of

10  the Defendants' wrongful conduct.

11      The Plaintiff has a duty to mitigate his damages, which

12  means that he must take reasonable actions to reduce his

13  damages. Defendant bears the burden of proving by

14  preponderance of the evidence that the Plaintiff's claim for

15  compensatory damages should be reduced.

16      If you find that the Plaintiff did not take reasonable

17  actions to reduce his damages, you should reduce any amount

18  you might award the Plaintiff for compensatory damages by

19  the amount that the Plaintiff would have reduced his

20  compensatory damages had he taken reasonable actions in this

21  regard.

22      If you find for the Plaintiff, you may, but are not

23  required to, assess punitive damages against the liable

24  Defendant or Defendants. The purposes of punitive damages

25  are to punish a defendant for its conduct and to serve as an

1    example or warning to the liable Defendant or Defendants and

2    others not to engage in similar conduct in the future.

3         The Plaintiff must prove by a preponderance of the

4    evidence that punitive damages should be assessed against

5    the liable Defendant or Defendants. You may assess punitive

6    damages only if you find that the conduct a Defendant's

7    managerial employees was in reckless disregard of the

8    Plaintiff's rights. An action is in reckless disregard of

9    the Plaintiff's rights if taken with knowledge that it may

10   violate the law.

11        If you find that punitive damages are appropriate, then

12   you must use sound reason in setting the amount of those

13   damages. Punitive damages, if any, should be in an amount

14   sufficient to fulfill the purposes that I have described to

15   you, but should not reflect bias, prejudice, or sympathy

16   toward either/any party. In determining the amount of any

17   punitive damages, you should consider the following factors:

18

19        - the reprehensibility of a Defendant's conduct;

20        - the impact of a Defendant's conduct on Plaintiff;

21        - the relationship between the Plaintiff and a

22   Defendant;

23        - the likelihood that a Defendant would repeat the

24   conduct if an award of punitive damages is not made;

25        - Defendant's financial condition;

1    – the relationship of any award of punitive damages to

2    the amount of actual harm the Plaintiff suffered.

3         Upon retiring to the jury room, you will select one of

4    your members to act as your foreperson. The foreperson will

5    preside over your deliberations, and will speak for you

6    here, in Court.

7         Forms of verdict have been prepared for you. You will

8    take these form to the jury room and, when you have reached

9    unanimous agreement as to your verdict, your foreperson will

10   fill in, date, and sign the appropriate form or forms. Then,

11   the foreperson should notify the Court Security Officer that

12   you are ready to return to the courtroom with your verdict.

13        It is necessary from this time until you are discharged

14   to remain together in a body and in the charge of the

15   officer who will be sworn to attend you. During your

16   deliberations and until you are discharged, you may not

17   communicate with anyone except each other and the officer.

18        I do not anticipate that you will need to communicate

19   with me. If you do, however, the only proper way is in

20   writing. The writing must be signed by the presiding juror,

21   or, if he or she is unwilling to do so, by some other juror.

22   The writing should be given to the Court Security Officer,

23   who will give it to me. I will respond either in writing or

24   by having you return to the courtroom so that I can respond

25   orally.

1        You will note from the oath about to be taken by the

2    court security officers that they, as well as all other

3    persons, are forbidden to communicate in any way or manner

4    with any member of the jury on any subject touching the

5    merits of the case.

6        Bear in mind also that you are never to reveal to any

7    person—not even to the Court—how the jury stands,

8    numerically or otherwise, on the questions before you, until

9    after you have reached a unanimous verdict.

10        The verdict must represent the considered judgment of

11    each juror. Your verdict must be unanimous.

12        You should make every reasonable effort to reach a

13    verdict. In doing so, you should consult with one another,

14    express your own views, and listen to the opinions of your

15    fellow jurors. Discuss your differences with an open mind.

16    Don't hesitate to reexamine your own views and change your

17    opinion if you come to believe it is wrong. But you should

18    not surrender your honest beliefs about the weight or effect

19    of evidence solely because of the opinion of your fellow

20    jurors or for the purpose of returning a unanimous verdict.

21        You should consider all the evidence fairly and equally

22    and deliberate with the goal of reaching an agreement which

23    is consistent with the individual judgment of each juror.

24    You are impartial judges of the facts.

25        Let me review with you the special verdict forms.  Form

1   number one, discrimination claim against defendant

2   Mid-States Motors Incorporated, doing business as Fort Wayne

3   Acura Subaru.  We, the Jury, in the above-entitled action

4   find the following Special Verdict on the question submitted

5   to us:

6        Question one:  As to defendant, Mid-States Motors,

7   Incorporated doing business as Fort Wayne Acura Subaru, did

8   the plaintiff prove by a preponderance of the evidence all

9   of the elements of a claim of discrimination on the basis of

10  race, religion or national origin?  And there's a line where

11  you can check yes or no.

12      If you answered yes to question one, answer question two.

13  If you answered no to question one, do not answer question

14  two.  The foreperson should sign and date this verdict form on

15  the next page, and you will not proceed further on this claim.

16       Question two:  Did defendant Mid-States Motors,

17  Incorporated doing business as Fort Wayne Acura Subaru prove

18  by a preponderance of the evidence that it would have

19  terminated the plaintiff, even if the plaintiff were not of

20  the race, religion or national origin that he was?  There's

21  lines to check on this, yes or no.  If you answered no to

22  question two, proceed to questions three and four.

23      If you answered yes to question two, do not answer

24  questions three and four.  The foreperson should sign and date

25  this verdict form directly below, and you will not proceed

1    further on this claim.

2        Question three:  As to defendant, Mid-States Motors,

3    Incorporated doing business as Fort Wayne Acura Subaru, enter

4    the amount of compensatory damages that the plaintiff has

5    proved by a preponderance of the evidence.  There's a dollar

6    sign and a line that can be filled in.

7        Question four:  As to defendant Mid-States Motors,

8    Incorporated doing business as Fort Wayne Acura Subaru, enter

9    the amount of punitive damages that the plaintiff has proved

10   by the preponderance of the evidence.  There's a dollar sign

11   and a line that can be filled in.

12       After you have answered the questions as instructed by

13   this Special Verdict Form, the foreperson should sign and date

14   the form below.  And there's a signature line for the

15   foreperson and a date on there.

16       Special Verdict Form Number 2, retaliation claim against

17   defendant Fort Rohr Motors, Incorporated, doing business as

18   Fort Wayne Toyota Lexus.

19       We, the Jury in the before-entitled action, find the

20   following special verdict on the questions submitted to us:

21       Question one:  As to defendant, Fort Rohr Motors,

22   Incorporated doing business as Fort Wayne Toyota Lexus, did

23   the plaintiff prove by a preponderance of the evidence all of

24   the elements of a retaliation claim?  And there's lines where

25   you can mark yes or no.

1    If you answered yes to question one, proceed to questions

2  two and three.  If you answered no to question one, do not

3  answer questions two and three.

4    The foreperson should sign and date this verdict form on

5  the next page and you will not proceed further on this claim.

6    Question two:  As to defendant, Fort Rohr Motors,

7  Incorporated doing business as Fort Wayne Toyota Lexus, enter

8  the amount of compensatory damages that the plaintiff has

9  proved by the preponderance of the evidence.  And there's a

10  dollar sign and a line that can be filled in.

11    As to defendant Fort Roar Motors, Incorporated doing

12  business as Fort Wayne Toyota Lexus, enter the amount of

13  punitive damages that the plaintiff has proved by the

14  preponderance of the evidence.  There's a dollar sign and a

15  line that can be filled in.

16    After you have answered the questions as instructed by

17  this special verdict form, the foreperson should sign and date

18  the form below.  There's a signature line for the foreperson

19  and a line for the date.

20    Ladies and gentlemen, the Court will send a copy of these

21  instructions upstairs with you.  The Court will also be

22  sending upstairs all of the exhibits that have been admitted

23  into evidence.

24    If you want to hear the tapes that were introduced into

25  evidence, please send a note to the Court, and we'll bring you

1    back into the courtroom, since the stereo set-up is set up in

2    here and working.  If you want the hear either of the tapes

3    again, we'll have a play back here in the courtroom, all

4    right?  The transcripts, remember are not -- have not been

5    admitted as exhibits in the case for your review.

6        At this time, I should also tell that you the Court has

7    ordered lunch be delivered in.  That will be coming in by

8    about 12:00 o'clock.  If I could ask the Court Security

9    Officers who will be in attendance for this jury to please

10   approach.

11       (Whereupon, the Court Security Officers were sworn.)

12       **THE COURT:**  All right.  At this time, then, if

13   there's nothing further to put into the record, we will -- I'd

14   ask the Court Security Officers to escort the jury upstairs to

15   the jury room now to begin their deliberations on the verdict.

16       Ladies and gentlemen, please let us know when you are

17   ready to report the verdicts.  Remember to take your notebooks

18   with you.

19       (Whereupon, the Jury is absent while in deliberations.)

20       **THE COURT:**  Go ahead and be seated, counsel.  When I

21   read through the jury instructions, it never fails there's

22   always a few typos that get in there or extraneous words that

23   we miss after all of us have reviewed it a few times over.  I

24   think there was one.

25       **MR. ROBERT VEGELER:**  There was another, early on.

 1          **THE COURT:**  Yeah, that was this Instruction 18.  So

 2   with your leave, we'll make the correction on that.  It should

 3   be only against the other defendant or only as to other

 4   claims.

 5          **MR. JAMES BUCHHOLZ:**  I think you read it

 6   appropriately.

 7          **THE COURT:**  Correct, but I just want to make sure a

 8   copy of the instructions that goes up to them is correct,

 9   because otherwise --

10          **MR. JAMES BUCHHOLZ:**  Okay.

11          **THE COURT:**  It will confuse them.  Were there any

12   other typos that you noticed.

13          **MR. ROBERT VEGELER:**  You ran into one.  It said these

14   "form" and I think you meant to say these forms.  Did you note

15   where that was?

16          **MR. JAMES BUCHHOLZ:**  Might be on the verdict form, I

17   would think.

18          **MR. ROBERT VEGELER:**  No, it's in one of the Court --

19   let's see -- 31 first line.  First line, second paragraph.

20          **THE COURT:**  Correct, I've got it.  It should be

21   forms.  So 31 will be corrected.  Second paragraph, you will

22   take these forms, plural, to the jury room.

23      So that will be corrected.  Let's see.  Anything else?

24   Mr. Buchholz?

25          **MR. JAMES BUCHHOLZ:**  Not from the defendants, Your

1 Honor.

2      **MR. ROBERT VEGELER:** No, Your Honor.

3      **THE COURT:** All right.

4      **LAW CLERK:** There's a typo on 22.

5      **THE COURT:** Which number is it?

6      **LAW CLERK:** 22.

7      **THE COURT:** All right. We'll make that corrections.

8 And we'll get you a clean copy of the instructions then with

9 those corrections. And those will go upstairs.

10    Anything else we need to set into the record now? It's

11 about 11:30. For your client, Mr. Vegeler?

12      **MR. ROBERT VEGELER:** Pardon?

13      **THE COURT:** Anything else to put into the record

14 before we recess?

15      **MR. ROBERT VEGELER:** No.

16      **THE COURT:** Mr. Buchholz, for your client?

17      **MR. JAMES BUCHHOLZ:** No, other than motions that are

18 pending, Judge.

19      **THE COURT:** And that will remain pending at this

20 point until after the Court has received or the jury has

21 returned their verdicts.

22    The way the playback goes, let me ask you about this, if I

23 get a letter or a note from the jury that says we want to

24 listen to the tapes again, I've done it a couple of different

25 ways in the past cases. If a note comes to me, and with your

1    leave, if there's agreement, I can have them escorted down and

2    just be on the bench they will be played back.  No commentary,

3    nothing.  They're simply played back.

4        And then they go back upstairs.  Now, sometimes counsel

5    wants to be here in the courtroom during the playbacks and so

6    that requires that we let the jury know that as soon as we can

7    get everybody back together, all bring them down for that

8    playback and then we're all gathered back in here and we do

9    the same thing, we just silently, we play the tape back

10   without comment or anything else and they go back up.

11       Do you have any preference one way or the other if they

12   should ask for that, Mr. Vegeler?

13            **MR. ROBERT VEGELER:**  No, Your Honor.

14            **THE COURT:**  Mr. Buchholz, do you have a preference?

15            **MR. JAMES BUCHHOLZ:**  I don't have a preference, Your

16   Honor.

17            **THE COURT:**  All right.  So there would be no

18   objection if the Court just did the playback without

19   necessitating -- requiring that you come back here for that?

20            **MR. JAMES BUCHHOLZ:**  I wouldn't have an objection to

21   that, Your Honor, so long as there's some indication to the

22   jury that we were not ordered to come back in for some reason.

23            **THE COURT:**  Correct.  So they're not going to think

24   you're just disrespecting the process.  I would make that

25   clear to them.

1        All right.  Counsel, too, let me ask that you, during this

2   recess, and until we hear back from the jury, that you try not

3   to be anymore than ten minutes away from the courthouse.  And

4   let me just ask that before you leave the courthouse, that you

5   let my Deputy know where you're going and give her the

6   telephone numbers of where you can be reached, all right?  Let

7   me just tell you I'm really becoming a bug on this because

8   I've had some bad situations come up in other cases where, for

9   instance, counsel's given my Deputy their cell phone number,

10  their cell phone battery went dead and we spent an hour

11  calling all the restaurants in town trying to find where

12  counsel is at.  In the mean time, the jury is cooling their

13  heals upstairs waiting to deliver a verdict.  I don't want

14  that to happen again.  So figure out where you're going to be

15  and the numbers where we can get in contact with you, as well

16  as your clients.  So that should they want to be here when

17  they return, they are likewise immediately accessible to come

18  back to court and again we don't keep that jury waiting.

19       Something I had mentioned early on, either at the start of

20  the trial or in one of the final pretrial conferences, was

21  that I give the jurors an opportunity, once the verdict has

22  been returned and off the record, and just as an educational

23  opportunity, for the Court, counsel and the parties, really to

24  comment about the case.  And usually, I told you I do this

25  just by breaking the ice with them, just, you know, just

1   general questions about how they went about reaching their

2   verdicts.  And then I give counsel the opportunity to ask them

3   questions, if you want to, counsel that opportunity.  But it's

4   all contingent whether the jury wants to do that.  Whether

5   they all want to stay, some of them want to stay.  I've had it

6   where they all want to leave.  I've had some where some want

7   to stay.  I've had it where they all want to stay.  It's

8   usually on the process, along twenty minutes on that.  I make

9   that available to you when we hear back from the jury.  And

10  just so you're prepared for that, any question about how that

11  works or going through that, Mr. Vegeler?

12          **MR. ROBERT VEGELER:**  No, Your Honor.

13          **THE COURT:**  Mr. Buchholz?

14          **MR. JAMES BUCHHOLZ:**  Not from me Your Honor.

15          **THE COURT:**  And it's in addition nothing that comes

16  out during that informal process can be made the grounds of an

17  appeal.  And I just want to confirm that you understand that,

18  Mr. Buchholz?

19          **MR. JAMES BUCHHOLZ:**  I do understand that, Your

20  Honor.

21          **THE COURT:**  And Mr. Vegeler?

22          **MR. ROBERT VEGELER:**  Yes, Your Honor.

23          **THE COURT:**  Lastly, before we're off the record, I

24  just want to tell you that it's been a privilege for the Court

25  to preside over this case over the last four days.  This case

1   has been very well prepared and very well presented case.

2   Every case has bumps as you go through it.  Just because

3   that's the nature of trials.  There is no such thing as a

4   perfect trial.  It's just -- just what happens.  But I

5   understand from my own experience what attorneys go through to

6   present a case to present it to the jury and I want your

7   clients to know, whatever the verdicts are in this case, that

8   they have been very well served by their attorneys in this

9   matter.  And thank you for those efforts.

10      Mr. Buchholz, my only comment is you seem to be a

11  lightning rod for technology glitches.

12          **MR. JAMES BUCHHOLZ:**  Yes, I do, Your Honor.

13          **THE COURT:**  Magnetic armor next time.

14          **MR. JAMES BUCHHOLZ:**  I'll see what I can do.

15          **THE COURT:**  I apologize for that.  That just was bad

16  luck on the system.  But you overcame that, and went on, and

17  we appreciate that.  Even during your closing arguments when

18  the sound went out on the microphone.  And I just want your

19  clients to understand that was nothing you did or did not do.

20  That was simply us trying to have 21st Century technology work

21  in an antique courtroom.  And with all the wires that cross,

22  in this courtroom, sometimes that glitch occurs.

23      Okay.  With that said, anything else, Mr. Vegeler?

24          **MR. ROBERT VEGELER:**  Yes, Your Honor.

25          **THE COURT:**  Go ahead.

1          **MR. ROBERT VEGELER:**  In case, I've had this happen

2     before, and I know counsel has.  I don't care, if they want to

3     have it played back.  They pass a note having a question.

4     Does Mr. Chapin have to be here, because he's authorized me to

5     handle it without him being here.

6          **THE COURT:**  I'm glad you mentioned that.  There's a

7     couple of other ways we can handle notes, other than a play

8     back.  And that is if it's a note that, you know, if I get a

9     note, we will contact you, counsel, indicate what the note

10    says and then you will have a choice.  If it's a note that

11    says, can we have a calculator, usually we can accommodate

12    that.  I just say that facetiously.  Sometimes I get a note

13    that says can you give us a dictionary.  Those are the common

14    kind of mundane questions we get.  They don't always

15    necessitate coming back to the courtroom and huddling up to

16    the record and answering it.

17         If I get a note that's not more ordinary or mundane, then

18    I'll invite you to come back into the courtroom, we'll make a

19    record, decide how to respond to it.  I call the jury back

20    down and I will verbally instruct them or respond to their

21    note.  That's a better way to put it okay?  So that's -- so

22    we'll let you know and we'll just decide at that time, based

23    on the nature of the note, whether or not you want to come

24    back.

25         In any event, your clients do not have to come back for

1   that process.  They really only should come back for the

2   verdict's return.

3       Anything else on that point, Mr. Vegeler?

4           **MR. ROBERT VEGELER:**  No, Your Honor.

5           **THE COURT:**  Anything else on that point, Mr.

6   Buchholz?

7           **MR. JAMES BUCHHOLZ:**  I did want -- you do want my

8   representatives back for the verdict, Your Honor?

9           **THE COURT:**  They should be; they don't have to be.

10          **MR. JAMES BUCHHOLZ:**  Okay.  That's -- thank you.

11          **THE COURT:**  All right.  With that, then, it's about

12  twenty 'til and we'll let you know when we hear from the jury.

13  Thank you, counsel.

14          **THE CLERK:**  All rise.

15      (Whereupon, the Court is in recess while the Jury is in

16  deliberations.)

17          **THE CLERK:**  All rise.

18          **THE COURT:**  Please be seated.  Counsel, I've been

19  advised the jurors have reached a verdict -- have reached

20  verdicts in this case.

21      Is there anything to set into the record before I call

22  them down and receive the verdict, Mr. Vegeler?

23          **MR. ROBERT VEGELER:**  Nothing, Your Honor.

24          **THE COURT:**  Mr. Buchholz?

25          **MR. JAMES BUCHHOLZ:**  Nothing on behalf of me, Your

1  Honor.  I have called Mr. Kruse and Mr. Gardener, but if the

2  jury -- if you want to have them down before they get here,

3  that's fine, Your Honor.  We have no objection there.

4       **THE COURT:**  Well, I rather -- unless you can tell me

5  they're just a couple minutes away or something like that.

6       **MR. JAMES BUCHHOLZ:**  My understanding they were at

7  the dealerships, the Acura dealership and the Toyota

8  dealership on Highway 14, because they were going back to

9  their offices, which I would (Unintelligible) the courthouse.

10  As soon as I got the call from Jennifer, I made the call.  So

11  I don't know how long ago that was.  I came a block or two

12  blocks and they've got longer than that.

13       **THE COURT:**  I can explain to the jury we wanted to

14  take your verdicts.

15       **MR. JAMES BUCHHOLZ:**  That's fine.  I'm representing

16  that I have called them.

17       **THE COURT:**  All right.  They walk in, that's fine,

18  too.  But I'll explain to the jurors, so they won't hold it

19  against them.  Please bring the jury down.

20     If there's any issue with regard to the special verdict

21  forms, I'll call you to the side bar, before I read them.

22  Once in awhile we have questions like this.  It may not be

23  real clear through reading it up here on the bench.  So three

24  sets of eyes are better than one.

25       (Whereupon, the Jury is present.)

1              **VERDICT**

2          **THE COURT:**  Go ahead and be seated, ladies and

3      gentlemen.  Counsel, you may be seated.

4          It should be noted in the record that all the jurors are

5      present.  At this time, let me ask the foreman to please rise

6      and state his name into the record.

7          **JUROR:**  Brian Keith Headings.

8          **THE COURT:**  Mr. Headings, has this jury, in fact,

9      agreed upon verdicts in this case?

10         **JUROR:**  Yes, Your Honor.

11         **THE COURT:**  At this time, would you please hand the

12     verdict forms to the Court Security Officer and he will

13     deliver them to the Court, then you may go ahead and sit down.

14         (Doing as indicated.)

15         **JUROR:**  Thank you.

16         **THE COURT:**  At this time, the jury has returned the

17     following verdicts:  As to Special Verdict Form Number 1, We,

18     the Jury, in the above-entitled action find the following

19     special verdict on the question submitted to us:

20         Question one:  As to defendant Mid-States Motors,

21     Incorporated doing business as Fort Wayne Acura Subaru, did

22     the plaintiff prove by a preponderance of the evidence all of

23     the elements of the claim of discrimination on the basis of

24     race, religion or national origin?

25         The jury has checked off no, and has signed as signed by

1    the foreperson dated this April 20th, 2007.

2         As to verdict form number two, We, the Jury, in the

3    above-entitled action find the following special verdict on

4    the question submitted to us:

5         Question one:  As to defendant Fort Rohr Motors,

6    Incorporated doing business as Fort Wayne Toyota Lexis, did

7    the plaintiff prove by a preponderance of the evidence all of

8    the elements of a retaliation claim?  The answer checked is

9    yes.

10        Question two:  As to defendant Fort Rohr Motors,

11   Incorporated doing business as Fort Wayne Toyota Lexis, enter

12   the amount of compensatory damages that the plaintiff has

13   proved by the preponderance of the evidence.  The jury has

14   written in $100,000.

15        As to question three:  As to defendant Fort Rohr Motors,

16   Incorporated doing business as Fort Wayne Toyota Lexis, enter

17   the amount of punitive damages that the plaintiff has proved

18   by the preponderance of the evidence.  The jury has written in

19   one million dollars.  Signed by the foreperson of this jury,

20   and dated this April 20th, 2007.

21        Ladies and gentlemen of the jury, is this, in fact, your

22   verdict?

23             **JURORS:**  Yes.

24        **THE COURT:**  Let me ask you each individually now,

25   Miss Brueck, is that your verdict?

1    **JUROR:**  Yes.

2    **THE COURT:**  And Ms. Hudson, is that your verdict?

3    **JUROR:**  Yes.

4    **THE COURT:**  Miss Grogg, is that your verdict?

5    **JUROR:**  Yes.

6    **THE COURT:**  My Seymour, is that your verdict?

7    **JUROR:**  Yes.

8    **THE COURT:**  Miss Flener, is that your verdict?

9    **JUROR:**  Yes.

10   **THE COURT:**  Mr. Hearn, is that your verdict?

11   **JUROR:**  Yes.

12   **THE COURT:**  Mr. Stell, is that your verdict?

13   **JUROR:**  Yes, Your Honor.

14   **THE COURT:**  And Mr. Headings, is that your verdict?

15   **JUROR:**  Yes, Your Honor.

16   **THE COURT:**  At this time, then, the Clerk of the

17   Court is going to be directed to report -- I'm sorry, to

18   record the verdict.  The Court will withhold the entry of

19   judgment on the verdict until it has resolved certain other

20   motions pending before the Court.

21        Ladies and gentlemen of the jury, I wish to express to you

22   at this time the appreciation of the Court for your service in

23   this case.  I well understand that it is often a hardship to

24   be called to duty to serve as a juror, but understand that in

25   doing so, you are, in fact, performing a very patriotic duty

1    in helping the judicial branch of the Federal Government

2    continue to operate properly.

3        You've been very attentive and conscientious throughout

4    this four-day trial, and I am grateful for your cooperation.

5    Before you leave, let me now tell you that you are free to

6    discuss this case with anyone.  The admonition that you cannot

7    discuss it with anyone is being removed.

8        But you are not required to discuss it with anyone.  In

9    fact, you should know that there is a local district rule that

10   prohibits the parties, their attorneys, or their agents from

11   communicating with you to discuss this case unless they have

12   specific permission of the Court to do so.

13       Let me mention, too, when you indicated to my Deputy that

14   or to the Court Security Officer when you had reached a

15   verdict, and that was reported to my Court or my Deputy, we

16   called to have parties and counsel and their representatives

17   here in the courtroom.  The defendant's representatives are

18   not here.  They're in the process of coming here, but we

19   didn't want to keep you waiting to receive the verdicts.  So

20   please understand that that's why they're not at defense table

21   right now with Mr. Buchholz.  But they are in transit to being

22   here.

23       Now, counsel the Court will provide you with copies of the

24   special verdict form -- forms that have been returned by the

25   jury.

1        At this time, your work on this case is completed.  But

2   let me tell you something that the Court offers jurors,

3   parties and the attorneys in civil cases.  And that is an

4   opportunity to speak off the record if you want to do so.  And

5   the process that we do, that we offer in is as follows:

6        Once we're concluded on the record, those of you who would

7   have the time and would be willing to stay in the courtroom

8   for a few minutes just to discuss informally with the Court --

9   and I would allow some questions by counsel -- as to why you

10  reached the verdict that you did, that's helpful to the Court

11  as well as to the attorneys and the parties as well to

12  understand, you know, what actions can result in what kind of

13  verdicts and what kind of evidence is compelling to a jury.

14  So that when you go forward into other cases, they can be

15  evaluated with the jurors' opinions in mind.

16       So that I would offer to you, but I certainly understand,

17  you know, 2:00 o'clock on a, you know, Friday afternoon in

18  April, you may have other appointments.  I know some of you

19  come from a long distance.  But if you're willing the stay,

20  that's fine.  You don't have to all stay.  That's fine.  If

21  you all get up and go, that's fine, too.

22       Before you do leave, the Court Security Officers will help

23  you retrieve anything you've left upstairs in the jury

24  deliberation room, and they, the Clerk's office is ready to

25  provide you with any work slips or anything else that you may

1    need, all right?

2        Just one moment, counsel.  Is there anything else we need

3    to set into the record in this case at this time?

4            **MR. ROBERT VEGELER:**  Nothing, Your Honor.

5            **THE COURT:**  Mr. Buchholz?

6            **MR. JAMES BUCHHOLZ:**  Not on behalf of the defendants

7    at this time, Your Honor.

8            **THE COURT:**  All right.  At this time, then, let's

9    show that we're concluded on the record with regard to this

10   trial.

11       (Whereupon, the Jury is absent.)

12           **THE COURT:**  Go ahead and be seated, counsel.

13   Counsel, what I would suggest given the motions that remain

14   pending in the case, the Court has not entered judgment on the

15   verdict.  I would suggest that we schedule this matter for a

16   telephone status conference sometime in the next week and see

17   whether or not at that time this case might be amenable to

18   being resolved or having further briefing put in or further

19   motions and continuing onto -- continuing on with it.  But to

20   give you time to be able to consider the options, talk to your

21   respective clients and see how you want to go forward in the

22   case, all right?

23       Let me give you a time and date right now if you generally

24   know your calendars.  Is there any one day --

25           **MR. JAMES BUCHHOLZ:**  I'm lucky that I have the people

1    who know my calendars --

2              **MR. ROBERT VEGELER:**  Your Honor, I'm kind of like

3    Mr. Rohrman.  Mine's on paper in a computer and I left them

4    both.

5              **THE COURT:**  You know what, what we'll do, my Deputy

6    will be in contact with you later this afternoon or probably

7    Monday and my Deputy will give your offices a call and

8    probably late today or Monday.

9         All right.  Anything else?  Otherwise, we're concluded.

10        (No audible response.)

11             **THE COURT:**  All right.  Thank you counsel.

12             **MR. ROBERT VEGELER:**  Thank you.

13

14                          *   *   *

15

16                  **CERTIFICATE OF THE REPORTER**

17

18        I hereby certify that the foregoing proceedings is true

19   and correct, as taken down by me, and transcribed to the

20   best of my ability, with the aid of realtime computer-aided

21   transcription and/or transcriptionist.

22

23

24                     s/ Tina M. Gallucci_____
                       **Tina M. Gallucci, RMR, CRR, FCRR**
25                     **United States District Court Reporter**